**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Brian F. Moore
Kyle J. Ortiz

*Proposed Attorneys for Debtor*
*Toshiba Nuclear Energy Holdings (UK) Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

In re                                          :
                                               :        **Chapter 11**
**WESTINGHOUSE ELECTRIC**                      :
**COMPANY LLC**, *et al.*,                     :        **Case No. 17-_____ (___)**
                                               :
        Debtors.[1]                            :        **(Joint Administration Pending)**

-------------------------------------------------------x

## DECLARATION OF LISA J. DONAHUE PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

I, Lisa J. Donahue, pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge, information, and belief:

1.    I am a Managing Director and the Leader of the Global Turnaround

and Restructuring Group at AlixPartners LLC ("**AlixPartners**"), where I have been since 2001.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (2348), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

I have been working with the Company to address its liquidity concerns and implement cost savings since December 2016.  On March 8, 2017, I was retained by the Debtors to be their Chief Transition and Development Officer.  I have performed similar roles for other debtors in large, complex chapter 11 cases, including, among others, acting as Chief Restructuring Officer of Puerto Rico Electric Power Authority; acting as executive vice president and Chief Financial Officer of Calpine Corporation; Chief Restructuring Officer of SemGroup, LP; and Chief Financial Officer and Chief Restructuring Officer at Exide Technologies Inc.

2.        I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "**Declaration**") to assist the Court and parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Motions**").

3.        Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with the members of the Debtors' senior management, information provided to me by the team working under my supervision or the Debtors' professional advisors, Weil, Gotshal & Manges LLP ("**Weil**") as legal restructuring counsel and PJT Partners, Inc. ("**PJT**") as investment banker, or my opinion based upon my experience and knowledge.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

# I.

# Overview[2]

4.　　　　Formed as the nuclear power subdivision of one of the great names in American manufacturing—Westinghouse Electric Corporation—the Debtors and their non-Debtor affiliates (collectively, "**Westinghouse**" or the "**Company**") operate a global business that provides its products and services to customers worldwide.  Westinghouse provides design and engineering services, decommissioning services, and a variety of other critical operations to both new plant construction as well as the existing operating fleet of nuclear power plants.  Due to the world-class quality and breadth of the nuclear products and services Westinghouse provides, the Company serves more than half of the nuclear power plants in the world.

5.　　　　Despite the Debtors' recent financial troubles, the majority of the Debtors' businesses—particularly those relating to nuclear fuel and the servicing of nuclear plants—are very profitable.  Westinghouse's uninterrupted supply of these goods and services is necessary for the continuous and safe operation of more than half of the nuclear plants in the world, and particularly those in the United States and Europe.  The Debtors will use these chapter 11 cases to reorganize around their profitable Core Businesses and isolate them from the one specific area of their businesses that is losing money:  their construction of nuclear power plants in Georgia and South Carolina.  The Debtors will use the protections and tools afforded by the Bankruptcy Code to resolve their issues with the U.S. construction projects and reorganize around their Core Businesses to emerge from bankruptcy as a healthy, well-capitalized company capable of continuing Westinghouse's proud history as an icon of American ingenuity.

---

[2] Capitalized terms used but not defined in this section shall have the meaning subsequently ascribed to them in this Declaration.

6.        As described in more detail below, the Debtors' need to avail themselves of the protections of the Bankruptcy Code arises primarily from a series of unforeseen challenges that significantly delayed and increased the cost of construction of the nuclear plants in Georgia and South Carolina (referred to as Vogtle and VC Summer, respectively).  These challenges potentially expose the Debtors to billions of dollars either in (i) cost overruns to complete the projects or (ii) penalties and liabilities if they abandon the projects. The Debtors cannot afford either option.  Notwithstanding that the Debtors' other businesses are profitable and world-class, the Construction Business cost increases have led to a liquidity crisis that the Debtors can only solve in chapter 11.

7.        During the chapter 11 cases, the breathing spell afforded by the automatic stay, the significant liquidity from the Debtors' committed postpetition financing, and the credit support from the Debtors' majority owner, Toshiba, will permit the Debtors to protect their Core Businesses and operate them with both minimal disruption and the same record of safety and quality that made the Debtors global leaders in the nuclear power sector.  The Debtors will also be able to use the liquidity from their postpetition financing to provide funding needed by their many foreign Non-Debtor Affiliates, whose operations are integral to the Debtors' Core Businesses, to continue to operate in the ordinary course outside of any insolvency proceedings.

8.        Concurrently, the Debtors will use their chapter 11 cases as the forum to resolve their difficulties that stem from the construction cost increases at Vogtle and VC Summer.  Pursuant to short-term agreements with the Owners of Vogtle and VC Summer, the Debtors and the Owners will explore the continued feasibility of those projects in a manner that is cost-neutral and cash-neutral to the Debtors.   The ultimate resolution of the Debtors' involvement in these projects remains uncertain, but the Debtors' chapter 11 cases will remove

4

the threat that the construction cost increases pose to the Debtors' ability to operate their Core Businesses.

9.          The Debtors have formulated their strategy to minimize any negative impact of these chapter 11 cases to their Core Businesses in the United States and the rest of the world.    The Debtors and their Non-Debtor Affiliates will continue without interruption or disruption to provide their customers around the world with unparalleled nuclear components and services.    The Debtors will move purposefully in these chapter 11 cases to resolve their construction issues with Vogtle and VC Summer, reorganize around their Core Businesses and maximize their value, and emerge from chapter 11 as a healthy and profitable company that remains at the forefront of the global nuclear power industry.

## II.

## Background

10.          The Company's history dates back to the very dawn of the atomic power era, when Westinghouse designed and supplied the world's first full-scale, commercial pressurized water reactor (a "**PWR**") in 1957 in Shippingport, Pennsylvania.    Sixty years later, there are more than 430 nuclear power reactors in operation worldwide, with an aggregate net installed capacity of 370,543 MWe,[3] accounting for approximately 10% of electricity generation worldwide.    Remarkably, technology designed by Westinghouse is at the heart of approximately 50% of the world's commercial nuclear reactors, giving the Company the world's largest installed base of operating nuclear power plants.

11.          Westinghouse's presence is even more pronounced in the United States, where it has offices in 14 states.    As of December 1, 2016, there were 99 operating

---

[3] MWe stands for megawatt electrical, a measurement for the electric power produced by a generator.    A 1,000 MWe reactor running at 90% capacity provides enough electricity to supply approximately 720,000 U.S. households on average.

nuclear reactors at 61 nuclear power plants in the United States.[4] Westinghouse technology is used in 60% of these power plants.[5] Since 1990, the share of total annual U.S. electricity generation provided by nuclear power has averaged about 20%. Further, Westinghouse is the original equipment manufacturer ("**OEM**") for nuclear reactor technology for 61 out of the 99 licensed commercial nuclear reactors in the U.S. and 111 out of the 450 operable licensed commercial nuclear reactors worldwide.

A.    **Corporate Organization**[6]

12.    Westinghouse is divided into two sibling chains of corporate entities: (i) a chain of U.S.-domiciled entities that are directly and indirectly owned by Debtor Westinghouse Electric Company LLC ("**WEC**", and together with its direct and indirect subsidiaries, "**WEC U.S.**"), a Delaware limited liability company; and (ii) a chain of entities in the rest of the world ("**WEC EMEA**") that are directly and indirectly owned by Debtor Toshiba Nuclear Energy Holdings (UK) Limited ("**TNEH UK**"), a holding company registered in England and Wales whose only assets in the United States are funds held in New York, New York. The Company has a total of 61 offices all over the globe, including 37 offices outside of the United States. As of the Petition Date, Toshiba Corporation ("**Toshiba**") indirectly owns 87% of WEC, Japanese conglomerate IHI Corporation ("**IHI**") indirectly owns 3%, and the remaining 10% of WEC is indirectly owned by Kazakhstan's National Atomic Company Kazatomprom JSC ("**Kazatomprom**"). Toshiba, IHI, and Kazatomprom also directly own the same percentages of TNEH UK.

---

[4] A power plant may contain nuclear as well as non-nuclear electricity generating units. Each nuclear reactor located at a commercial nuclear power plant is unique and has its own personnel and equipment. The reactor provides heat to make steam, which drives a turbine and, in turn, drives the generator that produces electricity.

[5] U.S. Energy Information Administration, *available at* https://www.eia.gov/tools/faqs/faq.php?id=104&t=3.

[6] *See* **Exhibit A**, Organization Chart, for additional information regarding the Company's corporate structure.

13.        WEC, TSB Nuclear Energy Services Inc. ("**TNESI**"), TNEH UK, and all of the wholly-owned WEC U.S. entities other than Westinghouse Government Services LLC and Wesdyne International LLC (together, the "**WEC U.S. Non-Filers**")[7] are Debtors in these chapter 11 cases. None of the WEC EMEA entities, other than TNEH UK, is a Debtor in these chapter 11 cases, and none is subject to any other insolvency proceedings (together with the WEC U.S. Non-Filers, the "**Non-Debtor Affiliates**").

14.        The WEC U.S. and WEC EMEA entities depend heavily on one another for business support relating to operations, intellectual property, credit support and guarantees. The Company operates its complex businesses by business line on a geographically consolidated basis. As such, WEC U.S. and WEC EMEA are a synergistic and operationally integrated nuclear power company.

15.        In certain business lines, like the operating plant business ("**OPB**" or the "**Operating Plant Business**"), various Westinghouse entities in the U.S. and globally share equipment and professionals, depending on the services and licensing required. These entities also rely on one another to service customers—WEC EMEA typically relies on WEC U.S. for spare parts and engineers while WEC U.S. regularly utilizes WEC EMEA engineers for design and construction of new tooling. Additionally, WEC EMEA relies on the WEC U.S. entities for a number of corporate functions, including the provision of information technologies (including computer servers and third party products and licenses) and insurance coverage. Maintenance of the value of each of WEC U.S. and WEC EMEA is dependent on the continued health, operation, and cooperation of the other.

---

[7] The WEC U.S. Non-Filers currently remain non-debtors as they are counterparties to valuable governmental contracts. The Debtors reserve all rights to file voluntary chapter 11 petitions for one or both of the WEC U.S. Non-Filers.

**B.      Business Lines**

16.      Westinghouse global operations are divided into five major business lines—the Nuclear Fuel & Component Manufacturing business ("**NFCM**" or the "**Nuclear Fuel and Component Manufacturing Business**"); the Operating Plant Business; the Decontamination, Decommissioning, Remediation & Waste Management business ("**DDR**" or the "**Decommissioning Business**"); the combined WECTEC Services business (the "**Services Business**"); and New Plants & Major Projects business (the "**Construction Business**", and collectively with the Services Business, the "**New Projects Business**" or "**NPB**").[8]  The health and success of the business lines vary significantly, and it is these variations that support the Debtors' underlying strategy of separating the profitable portion of their businesses from the unprofitable portion of their businesses through this chapter 11 process.  As described above, a primary goal of these chapter 11 cases is to separate the profitable Nuclear Fuel and Component Manufacturing Business, Operating Plant Business, Decommissioning Business, and certain portions of the New Projects Business (the "**Core Businesses**"), from the unprofitable portions of the New Projects Business (the "**Non-Core Businesses**").

         **(i)      *Nuclear Fuel and Component Manufacturing Business***

17.      The Westinghouse Nuclear Fuel and Component Manufacturing Business is a leading global supplier of nuclear fuel products, components, and services for nuclear fuels of all types.  The NFCM division has a significant presence in the U.S. and Europe, where it provides the majority of fuel products to all PWR reactors.  It has a fast-growing presence in Asia through strategic joint ventures, and as well as strategic licensing agreements in Brazil, Spain, and Korea.  The NFCM division generated revenues of approximately $1.48

---

[8] On March 15, 2017, the Services Business and the Construction Business were combined for organizational purposes only into the New Projects Business line.

billion and EBITDA of approximately $165 million in FY 2015.[9]  This business line has been a stable source of profits for years.

18.       Westinghouse manufactures more fuel types than any other supplier in the world.  The product line enjoys a strong reputation for delivering high performance fuel for PWRs, boiling water reactors ("**BWRs**"), Vodo-Vodyanoi Energetichesky reactors ("**VVERs**"), and advanced gas-cooled reactors ("**AGRs**").  The annual global demand for fuel fabrication services for PWR, BWR, and VVER (collectively known as "**Light Water Reactors**") is about 7,000 tons of enriched uranium to be made into fuel assemblies, a number that is expected to increase 35% by 2020.[10]  Westinghouse is the world's largest supplier of fuel for Light Water Reactors, supporting 145 nuclear plants worldwide through a robust supply chain and multiple manufacturing sites.  Westinghouse services 84% of the currently-installed PWR plants in the Americas.  In addition, the Company delivers fuel to 22% of the active nuclear power plants in Europe, the Middle East, and Africa, and 14% of the nuclear power plants in Asia.

19.       The NFCM business depends heavily on the operational integration of WEC U.S. and WEC EMEA.  For example, the NFCM business in the United States supplies the WEC EMEA entities with necessary components, but WEC EMEA entity Uranium Asset Management Ltd. (residing in the U.K.) manages uranium working stock for both WEC U.S. and WEC EMEA.

**(ii)      *Operating Plant Business***

20.       The Operating Plant Business division is one of the largest providers of critical nuclear services to nuclear power plant operators globally, providing some degree of

---

[9] Westinghouse's fiscal year ends annually on March 31.

[10]    World Nuclear Association—Nuclear Fuel Fabrication,    http://www.world-nuclear.org/information-library/nuclear-fuel-cycle/conversion-enrichment-and-fabrication/fuel-fabrication.aspx (Feb. 14, 2017).

services to over 80% of the operating nuclear power plants in the world. The division has a significant presence in the United States and Western Europe, and emerging, high-growth businesses in Asia, Central and Eastern Europe, and other parts of the world.

21.    OPB delivers automation and engineering products and services to the global operating nuclear power fleet, including field services, testing, instrumentation and control, welding and machining, and installation-related functions that help keep nuclear power plants operating safely and competitively. Like the Nuclear Fuels Business, the Operating Plant Business is a very profitable global business, generating worldwide revenues of approximately $1.65 billion and EBITDA of approximately $238 million in FY2015.

22.    The Operating Plant Business line focuses on utilities' needs for external services for their plants' nuclear steam supply systems, providing a broad range of engineering, field management and maintenance, and repair and replacement services. Specifically, this segment offers products and services that keep nuclear power plants operating in a safe, efficient, and competitive manner worldwide. It provides outage, management, maintenance and inspection services, repair and refurbishment parts and services, and design engineering services to customers worldwide.

23.    Additionally, during regularly scheduled refueling outages (generally every 18-24 months), the Operating Plant Business provides maintenance and safety inspections. Scheduled outage services involve the complete shutdown of a plant for a specified period of time to allow for refueling, maintenance, and testing services that help to ensure the continued efficient and safe operations of the plant. The Operating Plant Business division also provides similar services to operating plants on an *ad hoc* basis as needed between scheduled outages.

24.       The OPB division also offers automated control and protection products used to operate nuclear power plants.   Products include new and replacement instrumentation and process automation systems for operating plants, and integrated new instrumentation and control systems for new plants.  The OPB division is one of the largest providers of nuclear automation products and services globally, providing products and services to most major commercial plants, irrespective of OEM.   The product line has a significant presence in the U.S. and Europe, with a rapidly developing presence in Asia.   The nuclear automation product line is strongly focused on continuing growth through a combination of superior platform technology and applications solutions.

   (iii)   *Decommissioning Business*

25.       The Decommissioning Business deploys global technologies and forms local partnerships to carry out long-term projects related to decontaminating, decommissioning, and remediating nuclear power facilities.  These services, provided to nuclear power producers worldwide, include spent fuel management and plant decommissioning.  The DDR business line is the smallest business line operated by the Company, but it is expected to experience growth as reactors worldwide reach the end of their useful lives.   Revenues in FY2015 were $45.0 million.

26.       The decommissioning of a nuclear power plant is a large, complex, and expensive project that involves multiple companies working closely with regulators to meet the regulatory standards of that particular jurisdiction.   As part of DDR's decontamination services, the division removes nuclear material from plant machinery and equipment to lower personnel exposure and reduces handling costs and decommissioning time.  DDR's services also reduce waste classification levels, allow for less-expensive disposal of used nuclear materials, lower airborne risks, reduce spread of contamination and clean-up, and increase options for

11

cutting plant materials.  DDR also dismantles nuclear power plants to the point that they no longer require measures for radiation protection.

(iv)    *Services Business*

27.    The Services Business is run by Debtor WECTEC, LLC ("**WECTEC**") and its subsidiaries, and consists of two segments: (1) construction services for the Advance Passive 1000 ("**AP1000**") projects—a new generation nuclear power plant design that radically departs from existing nuclear plants—in the U.S.; and (2) global project services, staffing services, and government services to advance the use of nuclear energy worldwide as well as non-nuclear engineering and construction services.  WECTEC's AP1000-related business segment is co-engaged with the Company's Construction Business in building the U.S. AP1000 Projects.  The non-AP1000 business segment provides assistance to customers to enhance the availability and reliability of their operating plants while sustaining regulatory compliance, extending plant life, and reducing operation and maintenance costs.

28.    The Services Business also helps customers enhance the availability and reliability of their operating plants while sustaining regulatory compliance, extending plant life, and reducing operation and maintenance costs.  Critical plant investigations are offered using state-of-the-art codes and analytical methods for the design of systems and components, structural and thermo-hydraulic calculations, probabilistic risk analysis, fire protection, radiation protection, and environmental risk review.  The Services Business offers numerous programs related to margin management, up-rating, plant simplification, plant equipment upgrades, trip reduction, technical specification optimization, regulatory compliance management, and replacement of steam generators.

(v)    *Construction Business*

29.    The Construction Business division delivers both new-plant projects and major projects for new and already operating nuclear power plants globally. It consists of two business segments: (1) engineering, procurement, and construction ("**EPC**") services for customers around the globe, primarily offering the AP1000 technology; and (2) engineering and procurement ("**E&P**") services, such as design, equipment, and site installation and startup support, to both AP1000 and non-AP1000 projects. While some portions of the Construction Business are profitable, the main portion of the EPC business, which constructs the Vogtle and VC Summer projects, has damaged the profitability of the entire Construction Business. As a result, the Construction Business generated EBITDA from FY2013 to FY2015 of *negative* $343 million.[11] As described in detail below, these losses have accelerated in the past 15 months following the Company's purchase of CB&I Stone & Webster, Inc. ("**S&W**").

## C.    Employees

30.    Westinghouse currently employs approximately 11,500 individuals in 19 countries, with approximately 9,200 of these employees working in the United States. Approximately 2,000 employees work primarily on the Nuclear Fuel and Component Manufacturing Business, approximately 1,850 employees work primarily on the Operating Plant Business, approximately 400 employees work primarily on the Services Business, and approximately 2,300 employees work primarily on the Construction Business. In addition, approximately 1,200 employees provide central corporate services to all of the Debtors' business lines and approximately 1,500 employees work primarily in the Company's engineering center of excellence.

---

[11] The Construction Business EBITDA excludes a goodwill impairment of $394.5 million taken in FY2013.

31.     The Debtors' employees perform a variety of critical functions for the Debtors, including tasks pertaining to engineering, construction, product manufacturing, facility and machine maintenance, testing, decommissioning and decontaminating, quality assurance, management, purchasing and sales administration, finance and accounting, human resources, customer service, safety, security, and other areas crucial to the Debtors' businesses.  The skill and expertise of the employees are fundamental to the success of the Debtors' businesses and operations and, as a result, critical to these chapter 11 cases.

**D.     L/C Facility**

32.     Pursuant to that certain *Second Amended and Restated Credit Agreement*, dated as of October 7, 2009, as amended and restated as of November 10, 2011, and as further amended and restated as of December 15, 2015 (as amended, the "**L/C Facility**"), with BNP Paribas as administrative agent (the "**Administrative Agent**") for the banks and other financial institutions (the "**Banks**"), WEC and Non-Debtor Affiliate Westinghouse Electric UK Holdings Limited ("**WEC UK**"), a company registered in England and Wales, could borrow up to $800 million to post letters of credit related to their various projects throughout the world.  As of the Petition Date, the L/C Facility is cash collateralized in an amount equal to 105% of the face value of the outstanding letters of credit. Further, the L/C Facility is guaranteed by Toshiba pursuant to a separate *Second Amended and Restated Parent Guarantee*, also dated as of October 7, 2009, as amended and restated as of November 10, 2011, and as further amended and restated as of December 15, 2015 (as amended, the "**Parent L/C Guaranty**").  As of March 22, 2017, WEC and WEC UK jointly and severally owed approximately $493.7 million under the L/C Facility.

33.     On February 13, 2017, at the request of WEC, WEC UK, and Toshiba (the "**L/C Credit Parties**"), the Banks and Administrative Agent waived certain specified

14

defaults and made certain amendments to the L/C Facility, which were documented pursuant to the *Waiver and Amendment No. 1* to the L/C Facility (the "**First L/C Facility Waiver and Amendment**").  However, after Toshiba failed to provide its financial statements to the Banks as required on February 14, 2017, the First L/C Facility Waiver and Amendment terminated, causing the L/C Credit Parties to once again be in default under the L/C Facility.

34.    Pursuant to that certain *Waiver and Amendment No. 2 to the Second Amended and Restated Credit Agreement and Amendment No. 1 to the Second Amended and Restated Parent Guarantee* (the "**Second L/C Facility Waiver**"), the L/C Facility was 105% cash collateralized on March 28, 2017 with funds provided by Toshiba.  The cash collateral is being held in an account at the New York branch of the Administrative Agent in the name of LC Collateral SPV LLC, an affiliate of Toshiba.   In exchange for the cash collateral, the Administrative Agent and Banks agreed, among other things, to waive their right to call an event of default against WEC UK upon the commencement of these chapter 11 cases.

**E.    Additional Funding from Toshiba**

35.    In addition to funding the cash collateral provided by Toshiba for the L/C Facility just prior to the Petition Date, Toshiba provided emergency funding to WEC of approximately $250.0 million under certain unsecured *Promissory Notes* dated February 6, 2017 and February 13, 2017 (collectively, the "**WEC U.S. Notes**").  This emergency funding is described in more detail below.

36.    As of the Petition Date, the Debtors do not have any other secured or unsecured funded debt.

# III.

## Events Leading to Chapter 11

A.    **AP1000 Nuclear Power Plant**

37.    In the early 2000s, building on earlier designs, engineers at Westinghouse conceptualized the initial design for a new type of nuclear power plant called the AP1000.  The AP1000 plant is a Generation III+, two-loop PWR with a gross power rating of 3,415 megawatt thermal (MWt) and a nominal electrical output of 1,110 megawatt electric (MWe).  The U.S. Nuclear Regulatory Commission (the "**NRC**") initiated its formal review of the AP1000 design on March 28, 2002, approving the original design certification on December 30, 2005.  A series of additional revisions to the design were made over the next several years, with the NRC certifying an amended standard plant design and publishing a final rule in December 2011.

38.    The AP1000 design is a radical departure from existing nuclear power plants.  The primary advantage of the AP1000 is its simplified design and passive safety features.  Westinghouse believed the simplified design would make the AP1000 easier and less expensive to build, operate, and maintain, while requiring fewer materials and a smaller footprint to construct.  The passive safety features—using natural forces like gravity and convective cooling rather than pumps and valves—mean no operator action is required to assure safety, limiting the risk of severe accidents.



**Figure 1 -- Illustration of the AP1000 reactor.**

39.      Four of Westinghouse's new-generation AP1000 reactors are being
built at the only two new nuclear construction sites currently in the United States—the Allen W.
Vogtle Electric Generating Plant near Augusta, Georgia (the "**Vogtle Reactors**") and the Virgil
C. Summer Nuclear Station near Columbia, South Carolina (the "**VC Summer Reactors**" and
together with the Vogtle Reactors, the "**U.S. AP1000 Projects**").  Ground was broken for both
sites in 2011, with the expectation that the first reactors were expected to come online in
mid-2016.

40.      In addition to the U.S. AP1000 Projects, four AP1000 reactors are
currently being constructed in Sanmen and Haiyang, China based on 2007 agreements between
Westinghouse and China's State Nuclear Power Technology Corp.  The two AP1000 reactors at

Sanmen (south of Shanghai, China), as well as the two AP1000 reactors at Haiyang, were expected to go online in 2013 and 2014. As of the Petition Date, construction at the Sanmen nuclear power plant continues, and the Company expects the first AP1000 unit to come online in late 2017 or early 2018. Similarly, the construction of the AP1000 reactors at the Haiyang power plant are ongoing, and Westinghouse expects the first unit at that location to come online in late 2017 or early 2018.

**B.    EPC Agreements**

41.    Pursuant to that certain *Engineering, Procurement, and Construction Agreement* dated April 8, 2008 (the "**Vogtle EPC Agreement**") between Georgia Power Company, a subsidiary of Southern Company ("**Southern**"), for itself and as agent for Oglethorpe Power Corporation, Municipal Electric Authority of Georgia and The City of Dalton, Georgia, acting by and through its Board of Water, Light and Sinking Fund Commissioners (collectively, the "**Vogtle Owners**") and a consortium of S&W, the nuclear engineering company that was responsible for the physical construction of the plant, and WEC (the "**Consortium**"), the Consortium agreed to construct the Vogtle Reactors. The Vogtle EPC Agreement had a "Guaranteed Substantial Completion Date" (as defined therein) whereby the Consortium had to substantially complete the first Vogtle Reactor by April 1, 2016, and the second Vogtle Reactor by April 1, 2017. Failure to meet the Guaranteed Substantial Completion Dates subjected the Consortium to a number of liquidated damages provisions.

42.    Similarly, pursuant to that *Engineering, Procurement, and Construction Agreement* dated May 23, 2008 (the "**VC Summer EPC Agreement**" and together with the Vogtle EPC Agreement, the "**EPC Agreements**") between South Carolina Electric & Gas Company, a subsidiary of SCANA Corporation ("**SCANA**"), for itself and as agent for the South Carolina Public Service Authority (collectively, the "**VC Summer Owners**" and together

18

with the Vogtle Owners, the "**Owners**") and the Consortium, the Consortium agreed to construct the VC Summer Reactors. The VC Summer EPC Agreement had a "Guaranteed Substantial Completion Date" (as defined therein) whereby the Consortium had to substantially complete the first VC Summer Reactor by April 1, 2016 and the second VC Summer Reactor by January 1, 2019. Failure to meet the Guaranteed Substantial Completion Dates subjected the Consortium to a number of liquidated damages provisions.

43.     In both cases, Westinghouse generally was responsible for the design, manufacture, and procurement of the nuclear reactor, steam turbines, and generators; while S&W was responsible for on-site construction and procurement of auxiliary equipment. When signed in April and May of 2008, the EPC Agreements were in effect the first contracts for new nuclear power plant construction in the U.S. in 30 years.

44.     Each EPC Agreement includes a payment guarantee from Toshiba (the "**EPC Parent Guarantees**") in connection with any and all obligations of WEC U.S. to the respective Owner under the applicable EPC Agreement when due.

## C.    Delays at the U.S. AP1000 Projects

45.     In 2008, Westinghouse began work on the U.S. AP1000 Projects in collaboration with the Owners, S&W, and the NRC. However, regulatory changes, including ones stemming from the September 11, 2001 terrorist attacks in the United States, led to additional NRC requirements for reactor design and licensing. Between 2009 and 2011, after the EPC Agreements had already been executed, the NRC requested additional design changes to the AP1000. These new requirements and safety measures created additional, unanticipated engineering challenges that resulted in increased costs and delays on the U.S. AP1000 Projects and other AP1000 projects worldwide. These design changes delayed issuance of a combined

license to start the U.S. AP1000 Projects until early 2012.  As a result, the Consortium could not pour the first concrete at the Vogtle and VC Summer construction sites until 2013.

46.      As construction progressed, additional unforeseen challenges regarding the projects emerged.  As time passed and delays compounded, disputes arose between the Owners and the Consortium regarding the pace of the projects and which parties bore the ultimate responsibility for cost increases.  The Owners and the Consortium alleged claims against each other, and the Vogtle Owners commenced litigation against Westinghouse, S&W, and Chicago Bridge & Iron Company ("**CB&I**")—the owner of S&W.  Southern, on behalf of the Vogtle Owners, commenced a declaratory judgment suit regarding additional costs deriving from regulatory change, and the Company believed there was a risk that litigation could commence with SCANA as well.  The deteriorating situation also created risk of claims between Westinghouse and S&W regarding the allocation of increased costs.

47.      Under these circumstances, Toshiba, WEC, CB&I, and the Owners entered into discussions to resolve the disputes.  To resolve existing and potential litigation, WEC considered the feasibility of acquiring S&W.  WEC believed such an acquisition would allow the parties to re-baseline the projects and increase the likelihood of their success.  Upon completing the acquisition, WEC planned to focus on project management with a newly-appointed subcontractor, Fluor Corporation ("**Fluor**")—a U.S.-based global engineering and construction company with knowledge and experience in nuclear plant construction—taking on primary responsibility for construction.

**D.    Acquisition of S&W**

   **(i)    *Westinghouse and CB&I Enter Into the S&W Purchase Agreement***

48.      On October 27, 2015, a wholly-owned WEC subsidiary created to acquire S&W, WSW Acquisition Co., LLC ("**WSW Acquisition**"), entered into a purchase

agreement (the "**S&W Purchase Agreement**") to acquire S&W from CB&I. The S&W Purchase Agreement provided for a purchase price at closing of $0, subject to a Purchase Price determination process specified in the Purchase Agreement (the "**Closing Date Adjustment**"), and with the prospect of deferred payments in the future. The Deferred Purchase Price, the Net Proceeds Earnout Amounts, and the Milestone Payments (all as defined in the S&W Purchase Agreement) constituted deferred consideration that might be received over time—resulting in a headline price of $229 million for the acquisition.

49.   As part of the consideration for acquiring S&W, Westinghouse generally agreed to assume S&W's current and future liabilities relating to the U.S. AP1000 Projects, including any liabilities that might arise from the cost overruns on the U.S. AP1000 Projects. The transaction closed on December 31, 2015.

50.   Westinghouse entered into settlement agreements with the Owners of both U.S. AP1000 Projects, resulting in increases to the EPC Agreement prices and significant schedule relief. Following Westinghouse's acquisition of S&W, construction workers employed by S&W were transferred to Fluor, which was directly responsible for construction work and site management at the project sites. With Fluor on board, WEC believed the construction of the U.S. AP1000 Projects would improve.

(ii)   *Purchase Price Determination Process*

51.   The Purchase Price determination process under the S&W Purchase Agreement could result in either Westinghouse or CB&I being responsible for a post-closing amount to the other, depending upon, *inter alia*, whether CB&I delivered S&W to Westinghouse with net working capital greater or less than the Target Net Working Capital Amount of $1.174 billion.

52.       As the December 31, 2015 closing approached, CB&I prepared the Closing Payment Statement, which included a "good faith estimate" of an "Estimated Closing Date Purchase Price." On December 28, 2015, CB&I provided Westinghouse with the Closing Payment Statement that included an Estimated Net Working Capital Amount of $1,601,805,000. CB&I's estimate exceeded the Target Net Working Capital Amount by approximately $428 million. The delivery of the Closing Payment Statement obligated Westinghouse to provide CB&I with the Closing Statement setting forth Westinghouse's good faith calculations resulting in the Closing Date Purchase Price.

53.       On April 28, 2016, Westinghouse presented CB&I with the Closing Statement, wherein Westinghouse calculated the Net Working Capital Amount at closing as *negative* $976,500,000. This figure was dramatically less than the Target Net Working Capital Amount and would require a payment from CB&I to Westinghouse of approximately $2.15 billion.

### (iii)    *Litigation over the Closing Date Adjustment*

54.       Pursuant to the S&W Purchase Agreement, CB&I had 60 days after Westinghouse's delivery of its closing payment statement to object to Westinghouse's calculations. A timely objection would trigger a dispute resolution mechanism under the S&W Purchase Agreement.

55.       On July 21, 2016, shortly before the expiration of the objection period, CB&I ignored the dispute resolution mechanism and filed an action in the Court of Chancery in the State of Delaware against WEC and WSW Acquisition (case no. 12585-VCL). CB&I's complaint asserted two counts for declaratory relief. Count I contended that Westinghouse's calculation of the Closing Date Adjustment breached the express terms of the S&W Purchase Agreement. Count II contended that Westinghouse's calculation of the Closing Date Adjustment

breached the implied covenant of good faith and fair dealing inherent in the S&W Purchase Agreement. Westinghouse asserted that the dispute should be heard by the independent auditor pursuant to the terms of the S&W Purchase Agreement and that it had not violated any provisions of the S&W Purchase Agreement as a matter of law.

56.    Ultimately, on December 2, 2016, the Delaware Chancery Court ruled in favor of Westinghouse, holding that the plain language of the S&W Purchase Agreement established that the disputes at issue were to be resolved by the independent auditor, and that Westinghouse had not breached any express provisions on the S&W Purchase Agreement. On January 5, 2017, the parties retained the independent auditor to hear the dispute. As of the Petition Date, this dispute remains unresolved.

**(iv)    Cost to Complete Estimates**

57.    After the S&W acquisition, assessment of the status of the projects led Westinghouse and Fluor to conclude that the number of hours required to complete the projects, labor costs, project management, and procurement costs were significantly higher than anticipated. As the Company—including its newly-purchased subsidiary—continued to work, it became increasingly clear to the Company that the estimated cost of S&W's scope of work on the U.S. AP1000 Projects needed to be increased significantly.

58.    By late Fall 2016, Westinghouse began working around-the-clock with Fluor and others to try to quantify the increased U.S. AP1000 Project construction costs and simultaneously find ways to limit the increases. Over the course of the next several weeks, the two companies preliminarily identified three areas driving costs. First, Westinghouse and Fluor estimated that completion of the U.S. AP1000 Projects on schedule could require $3.7 billion in additional labor costs. Second, equipment prices and vendor costs associated with the building of specific components could drive up costs by an additional $1.8 billion. Finally, additional risk

and contingency planning—including warranty and fee claims—could increase costs by approximately $600 million. These preliminary estimates of approximately $6.1 billion could not be sustained by Westinghouse.

59.     In early December 2016, Westinghouse reported to Toshiba about the possibility of U.S. AP1000 Project losses and the resulting goodwill impairment that might be recognized on Toshiba's fiscal reports. Westinghouse also reported that it was working to quantify the total amount of the estimate cost increases with additional specificity, but that it believed the costs totaled in the billions of dollars. Subsequently, Toshiba and Westinghouse began working together to obtain an accurate understanding of the situation and discuss appropriate countermeasures.

60.     On December 27, 2016, while Westinghouse continued its review of the purchase price accounting process and its determination of the estimated cost increases, Toshiba made an announcement, "Possibility of Recognition of Goodwill and Loss Related to Westinghouse's Acquisition of CB&I Stone & Webster," that considered the possible impact on Toshiba's financial status. Toshiba continued the analysis with Westinghouse and submitted the results to Toshiba's financial auditor in mid-January 2017. Faced with potentially massive liabilities under the EPC Agreements and mounting day-to-day costs at the project sites, Toshiba and Westinghouse each explored their limited options.

61.     Under the EPC Agreements, cessation of work by WEC on the U.S. AP1000 Projects could lead to significant damage claims. The VC Summer EPC Agreement caps liability at 25% of payments made to the Consortium as of the date of the event giving rise to the claim. The maximum total liability under the Vogtle EPC Agreement is capped at 20% of the Contract Price (as defined therein) of the Vogtle Reactors and 40% of the Contract Price for

abandonment of the work.  Accordingly, Westinghouse would likely face claims by the Owners of billions of dollars predicated upon material breach of the EPC Agreements.

**E.        Westinghouse Liquidity Crisis**

62.        As Westinghouse continued to quantify the ultimate estimated cost increases in late 2016 and early 2017, Westinghouse and Toshiba each began to consider various strategic options.

63.        While Westinghouse, Toshiba, and their advisors considered solutions to the increasingly complex problems, Westinghouse requested that Toshiba provide it with an emergency liquidity infusion to buy the parties additional time to explore options.  Toshiba responded by providing emergency funding to Non-Debtor Affiliate WEC UK on January 17, 2017, in the amount of $650 million, and then providing funding to WEC of approximately $250.0 million in early February—$100.0 million of funding on February 6, 2017 and a further $150.0 million of funding on February 13, 2017—pursuant to the WEC U.S. Notes.    This additional liquidity allowed the Debtors to continue to consider options as well as begin contingency planning for a potential chapter 11 filing.

64.        In the coming weeks, as cash shortfalls related to the U.S. AP1000 Projects escalated, Westinghouse's overall liquidity crisis was deepening, and began to spill over from WEC U.S. to WEC EMEA. In an effort to alleviate some of the pressures that Westinghouse faced in the U.S. and abroad, the Company and Toshiba discussed the possibility of additional emergency funding from Toshiba.  As talks progressed into March 2017, however, Toshiba stated it could not provide additional funding without collateral, including potentially through debtor-in-possession funding to WEC U.S. in chapter 11. Westinghouse adopted various liquidity-saving measures while it considered next steps.

65.     Ultimately, the Debtors' dwindling liquidity forced them to focus their efforts on a reorganization in chapter 11 in order to obtain necessary financing, resolve their issues with the U.S. AP1000 Projects, and preserve the value of the Core Businesses.

## IV.

## Preparation for Chapter 11

A.     **DIP Financing**

(i)     *WEC Sources DIP Financing*

66.     On March 9, 2017, the WEC board of directors authorized PJT to begin the process of sourcing potential debtor-in-possession financing from third parties. The Debtors' primary strategic considerations when marketing the financing opportunity were the identification of an economical and reliable source of financing that could (i) support the Debtors' need for a large DIP loan on the best economic terms that would provide for a letter of credit facility and on-lending to WEC EMEA and (ii) partner with the Debtors for the length of their chapter 11 cases and afford them the time, flexibility, and breathing space to pursue a restructuring strategy that is in the best interests of their estates.

67.     Over the next few weeks, PJT and the Debtors' other advisors began communicating with numerous potential financing sources to ascertain their interest in providing DIP financing to Westinghouse. The interest received from the capital markets in financing the Debtors' chapter 11 cases was tremendous, as the Debtors were soon inundated with proposals from a number of prominent banks, private equity firms, and hedge funds in a highly competitive process.

68.     Ultimately, the Debtors determined that the $800 million commitment submitted by Apollo Investment Corporation, AP WEC Debt Holdings LLC, and Midcap Financial Trust (collectively, "**Apollo**" or the "**Initial Lender**"), including a $225 million letter

of credit facility with Citigroup Global Markets Inc., as issuing bank (in such capacity, the "**L/C Issuer**" and with Apollo, the "**Lenders**"), was the best financing proposal available to the Debtors, the Debtors then began to negotiate the terms and conditions of the DIP Credit Agreement.  The terms and conditions of the DIP Credit Agreement were negotiated extensively and at arms'-length by well-represented, independent parties in good faith, and are consistent with, if not better than, the terms generally provided to Debtors in other similar chapter 11 cases.

69.     Through the highly competitive process, the Debtors were able to obtain the necessary financing on the best terms available in the market.  The DIP Facility provides a vehicle for the Debtors and Apollo, a preeminent global financial institution, to partner together to achieve a successful reorganization of the Debtors' businesses.  The terms of the DIP Facility demonstrate the success of the marketing and negotiation process, and are a testament to the confidence that the capital markets have in the Debtors' Core Businesses.   The DIP Facility gives the Debtors the funding and flexibility needed to reorganize around their Core Businesses and successfully emerge from these chapter 11 cases.[12]

**(ii)     *Westinghouse Has Immediate Need for DIP Financing***

70.     The Debtors require the financing available under the DIP Facility to have sufficient liquidity to operate their business and administer their estates during these chapter 11 cases.  As a result of the dramatic liquidity drain caused by Westinghouse's obligations related to the U.S. AP1000 Projects, as of the Petition Date, the Debtors do not have sufficient liquidity to support their ongoing operations.   In addition to funding their own operations, the Debtors need to access the DIP Facility to on-lend funds to WEC EMEA to

---

[12] More detail regarding the DIP Facility and the Debtors' process to obtain the best possible facility are in the *Declaration of Mark Buschmann in Support of Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, and (III) Scheduling a Final Hearing* (the "**Buschmann Declaration**"), filed contemporaneously herewith.

maintain the solvency and operations of such entities to avoid value destructive actions taken by such entities' stakeholders.  Absent authority to access DIP Financing, even for a limited period of time, Westinghouse (including WEC EMEA) would not be able to operate its businesses, which would destroy value and cause immediate and irreparable harm to the Debtors' estates and creditors.

71.    The Debtors are currently unable to pay their debts as they become due.  Accordingly, the orderly continuation of the Debtors' businesses is dependent on their ability to access the DIP Facility.  The DIP Facility will allow the Debtors to, among other things, make payroll and satisfy other working capital and general corporate purposes of the Debtors, including making essential payments to suppliers and regulatory agencies.

72.    In short, access to the DIP Facility is essential for the Debtors to assure their employees, customers, and vendors, as well as the applicable regulatory and governmental bodies, that the Debtors have sufficient capital to continue their operations in the ordinary course of business during the pendency of these chapter 11 cases.

**(iii)    *Immediate Need to Preserve Value of WEC EMEA***

73.    Equally crucial to the value of the Debtors' estates and their reorganization efforts is preserving the value of WEC EMEA.   The Debtors and WEC EMEA entities depend heavily on one another for business support relating to operations, intellectual property, credit support and guarantees, and manage certain business lines on a consolidated basis, and as such have significant synergies that in effect create a globally integrated and interdependent nuclear power company.  Certain business lines see the various Westinghouse entities in the U.S. and globally share equipment and professionals, depending on the services and licensing that are required.  These entities also rely on one another to service each other's customers.

28

74.        Furthermore, the Debtors have historically relied on WEC EMEA as (i) a significant source of revenue through the intercompany purchase of goods and services pursuant to a transfer pricing program and (ii) a cash-flow positive contributor of liquidity to Westinghouse.  As a result, the value of the Debtors' estates is dependent upon WEC EMEA entities maintaining their operations and going concern value.

75.        Until recently, WEC U.S. and WEK UK and certain of its subsidiaries were party to a cash pooling arrangement (the "**Global Cash Pool**") that allowed the parties to efficiently transfer cash to where it was needed in the Westinghouse organization.  Withdrawals from the Global Cash Pool generated receivables to the Global Cash Pool owed by withdrawing entities and deposits into the Global Cash Pool generated payables owed to the depositing entities.  Certain of the WEC EMEA entities were dependent on the Global Cash Pool as a source of liquidity.  In recent months, as a result of Westinghouse's deteriorating liquidity, the balance of the Global Cash Pool diminished, causing liquidity issues for a number of the WEC EMEA participants, and raising concerns about their solvency going forward.

76.        The combination of dwindling liquidity in the Global Cash Pool and the constraints on issuing LCs as a result of the defaults under the LC Agreement, caused certain WEC EMEA entities to express significant concern regarding their ability to continue to operate as a going concern and/or satisfy certain financial assurance requirements with respect to pension obligations and maintaining nuclear regulatory licenses.  In fact, certain WEC EMEA entities have stated that they will need to commence local insolvency proceedings in the absence of immediate capital and liquidity infusions.  Although the Debtors have been working closely with WEC EMEA to manage their liquidity concerns and provide assurance to the relevant regulatory bodies, a financing solution is required.

77.     Given the Debtors' currently liquidity situation, access to the DIP Facility to provide funds to on-lend to WEC EMEA entities is necessary to ensure the orderly continuation of WEC EMEA's operations and the preservation of WEC EMEA's going concern value.  The DIP Facility will ensure the financial stability of WEC EMEA throughout the Debtors' chapter 11 cases, and allow the Debtors to develop and implement a global restructuring solution aimed at maximizing the value of the Westinghouse enterprise for the benefit of the Debtors' estates.

**B.     Negotiations with the U.S. AP1000 Project Owners**

78.     As Westinghouse worked to buy itself time and stretch its limited liquidity, it also negotiated with the Owners in an effort to achieve a limited breathing spell on the projects.  These negotiations resulted in the two short-term settlements reached with the VS Summer Owners and the Vogtle Owners that are the subject of the *Motion of the Debtors Pursuant to 11 U.S.C. § 105(a) for Entry of an Order Approving the Interim Assessment Agreements* (the "**Interim Assessment Agreement Approval Motion**").  These agreements ultimately permit the Debtors and the Owners to continue negotiations for up to the first 30 days of the chapter 11 cases in order to explore and assess scenarios for the potential resolution of the U.S. AP1000 Projects.

**(i)     *VC Summer Construction Continuation Agreement***

79.     After back-and-forth negotiations in the weeks before the Petition Date, the Debtors were able to reach a settlement with the VC Summer Owners on the Summer Reactors on March 28, 2017 pursuant to the *Interim Assessment Agreement* (the "**VC Summer Interim Assessment Agreement**").  Concurrently, the Debtors negotiated with the Vogtle Owners for a similar arrangement on the Vogtle Reactors, eventually executing the *Interim Assessment Agreement* (the "**Vogtle Interim Assessment Agreement**" and with the VC Summer

Interim Assessment Agreement, the "**Interim Assessment Agreements**") on March 29, 2017.[13]

Both Interim Assessment Agreements are effective as of the commencement of these chapter 11

cases.

80.      The Interim Assessment Agreements give their respective Owners,

WEC, and WECTEC through the earlier of (a) April 28, 2017, or (b) termination of the other

Owners' Interim Assessment Agreement (such period, the "**Interim Assessment Period**") to

work out a long-term solution to the issues related to the construction of the U.S. AP1000

Projects.  Further, upon five (5) business days' notice, any of Owners has the right to elect to

terminate their respective Interim Assessment Agreement.

81.      Pursuant the Agreements, the Owners have agreed to the following

key terms during the Interim Assessment Periods:[14]

a.  the Owners shall be obligated to pay all amounts incurred by the Debtors for work
    performed by subcontractors and vendors on a go-forward basis in connection with
    completion of the Owners' respective projects;

b.  the Owners will each have the right, but not the obligation, to pay subcontractors and
    vendors with prepetition amounts owed by the Debtors in respect of their projects; and

c.  the Owners will pay the Debtors amounts calculated by the Debtors to cover their costs
    for scope of services, including design engineering, field engineering, equipment and
    commodities  procurement,  construction  management,  commissioning,  project
    management,  project controls,  project site services,  licensing,  quality assurance,
    environment safety and health, information technology, and records management,
    provided by the Debtors.

82.      In sum, during the Interim Assessment Periods, construction will

continue on the U.S. AP1000 Projects, but in a manner that is cash-neutral and cost-neutral to the

Debtors.  Entry into these agreements was a vital piece of the Debtors' prepetition strategy and

---

[13] The Vogtle Interim Assessment Agreement was executed in advance of the filing of the Debtors' chapter 11
petitions.

[14] This summary is qualified in its entirety by the provisions of the Interim Assessment Agreements.  In the event
that there is any inconsistency between the description provided in this Motion and the actual terms of the
Agreements, the Agreements shall control.

provides the Debtors with additional time to determine how they can maximize the value of the

U.S. AP1000 Projects to the estates.

**V.**

**<u>Relief Sought in First Day Papers</u>**[15]

83.    Contemporaneously with the filing of their chapter 11 petitions, the

Debtors have filed several First Day Motions seeking relief that is necessary to enable the

Debtors to smoothly transition into these chapter 11 cases and minimize disruptions to their

business operations.  I respectfully submit that the relief requested in each First Day Motion

should be granted, because such relief is a critical element in stabilizing and facilitating

Westinghouse's operations during the pendency of these chapter 11 cases.

84.    A summary of the relief requested in each First Day Motion is set forth

below.  I have reviewed each of the First Day Motions and confirm that all of the facts set forth

therein are true and correct to the best of my knowledge and belief, based upon my personal

knowledge of the Debtors' businesses, employees, operations, and finances; information learned

from my review of relevant documents; my discussions with members of the Debtors' senior

management and advisors; information provided to me by employees working under my

supervision; or my opinion based on experience, knowledge, and information concerning the

Debtors' businesses.

**A.    Administrative Motions**

**(i)    *Joint Administration Motion***

85.    By this motion, the *Motion of Debtors Pursuant to Fed. R. Bankr.*

*P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint**

**Administration Motion**") the Debtors request entry of an order directing joint administration of

---

[15] Terms used but not defined in this section shall have the meanings ascribed to them in the respective motion.

their chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Westinghouse Electric Company LLC. Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than Westinghouse Electric Company LLC to indicate the joint administration of the chapter 11 cases.

86. Given the integrated nature of the Debtors' businesses, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. There are 30 Debtors with approximately 35,000 creditors on a consolidated basis. Many of the motions, hearings, and orders that will be filed in the chapter 11 cases will almost certainly affect each of the Debtors. I believe that an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.

(ii) *Automatic Stay Motion*

87. Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. § 105 for Entry of an Order Enforcing the Protections of 11 U.S.C. §§ 362, 365, 525, and 541(c)*, (the "**Automatic Stay Motion**") the Debtors request entry of an order enforcing the protections of sections 362, 365, 525, and 541(c) of the Bankruptcy Code to aid in the administration of these chapter 11 cases and to help ensure that the Debtors' global business operations are not disrupted.

88. The relief requested is particularly appropriate because the Debtors, through their various Debtor and Non-Debtor Affiliates and subsidiaries, operate in numerous

countries with different legal systems, including Belgium, Brazil, China, the Czech Republic, France, Germany, Italy, Japan, the Republic of Korea, South Africa, Spain, Sweden, Switzerland, Ukraine, and the United Kingdom, among others.  The Debtors engage with numerous foreign customers, suppliers, and other vendors, as well as foreign regulators and other governmental units.  Certain of the Debtors are also incorporated under the laws of other countries, including Belgium, Brazil, China, the Czech Republic, France, Germany, India, South Africa, Sweden, the Republic of Korea, and the United Kingdom, among others.  Moreover, many of the Debtors' key contracts are governed by the laws of still more foreign jurisdictions. Absent an order from this Court, parties might attempt to take improper actions against the Debtors and/or property of their estates.

(iii)    *Schedules and Statements Extension Motion*

89.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 521, Fed. R. Bankr. P. 1007(c) and 9006(b), and Local Rule 1007-1 for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* (the "**Schedules and Statements Extension Motion**"), the Debtors request entry of an order granting additional time to file their schedules and statements of financial affairs (collectively, the "**Schedules and Statements**") for an additional 30 days.  The Debtors estimate that they have approximately 35,000 creditors and other parties in interest on a consolidated basis.  The breadth of the Debtors' business operations requires the Debtors to maintain voluminous books and records and complex accounting systems.  Given the size, complexity, and geographic diversity of their business operations, and the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements and the hundreds of employee and advisor hours required

34

to complete the Schedules and Statements would be unnecessarily burdensome to the Debtors during the period of time following the Petition Date.

   **(iv)**  ***Waiver of Creditor Matrix and Noticing Procedures Motion***

   90.  By this *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 342(a), and Fed. R. Bankr. P. 1007(a)(3) and 2002(a), (d), (f), and (l), for Entry of Order (I) Waiving Requirement to File a List of Creditors and (II) Granting Debtors Authority to Establish Procedures for Notifying Creditors of Commencement of Chapter 11 Cases* (the "**Waiver of Creditor Matrix and Noticing Procedures Motion**"), the Debtors seek entry of an order waiving the requirements to file a list of creditors on the Petition Date.  In lieu of filing the list of creditors, the Debtors propose to provide to their notice and claims agent a consolidated list of creditors.  The Debtors propose that the notice and claims agent undertake all mailings directed by the Court or the U.S. Trustee, or as required by the Bankruptcy Code, including, without limitation, the notice of commencement of these chapter 11 cases.  In addition, the Debtors propose to publish the notice of commencement in the national editions of each of the *Wall Street Journal* and *The New York Times*, as well as in the *Pittsburgh Post-Gazette* and on the website to be established by the Debtors' notice and claims agent.  Given the large number of creditors, I submit that the notice and claims agent's assistance with mailing and preparation of creditor lists and notices will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee, while at the same time ensuring that actual notice is provided to all of the Debtors' creditors in an efficient and cost-effective manner.

**B.**  **Operational Motions Requesting Immediate Relief**

   **(i)**  ***Cash Management Motion***

   91.  As set forth in the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), 364(a), 503(b)(1) and 507 and Fed. R. Bankr. P. 6003 and 6004 for (I)*

*Interim and Final Authority to (A) Continue Existing Cash Management System, (B) Continue Existing Intercompany Transactions, (C) Honor Certain Prepetition Obligations Related Thereto, and (D) Maintain Business Forms and Existing Bank Accounts; (II) An Extension of Time to Comply With, or Seek Waiver Of, 11 U.S.C. § 345(b); and (III) Related Relief* (the "**Cash Management Motion**"), prior to the commencement of these chapter 11 cases, the Debtors maintained a complex cash management system to collect, concentrate, and disburse funds generated by the Debtors' operating entities (the "**Legacy Cash Management System**"). In broad terms, the Legacy Cash Management System is similar to the cash management systems used by other global corporate entities.

92.    Legacy Cash Management System.    Although the accounts and processes connected to the Legacy Cash Management System remain functional, the Debtors have substantially transitioned from use of the Legacy Cash Management System to the current simpler, more efficient, and less costly Cash Management System (defined below). The Debtors are working with their customers to ensure that payments are directed to the BMO Harris Bank Account (defined below) under the Cash Management System and are steadily discontinuing use of the Bank Accounts in the Legacy Cash Management System.

93.    The Legacy Cash Management System is comprised of approximately 16 Bank Accounts: seven maintained by JPMorgan Chase Bank ("**JPMorgan**") and nine maintained by PNC Bank ("**PNC**"). JPMorgan and PNC are designated as authorized depositories by the Region 2 U.S. Trustee pursuant to the U.S. Trustee's Operating Guidelines for Chapter 11 Cases (the "**UST Guidelines**"). All of these Bank Accounts are owned by the Debtors with the exception of three Bank Accounts owned by non-Debtor affiliates: (i) the PNC Bank Account ending in -5253 owned by Westinghouse Government Services LLC, (ii) the

36

JPMorgan Bank Account ending in -0864 owned by Westinghouse Electric (Asia) SA, and (iii) the PNC Bank Account ending in -6797 owned by NuCrane Manufacturing LLC.

94.      Central to the functioning of the Legacy Cash Management System was a JPMorgan Bank Account ending in -3172 (the "**Concentration Account**").  At the end of each day, funds from other JPMorgan Bank Accounts ending in -0211, -1890, and -4977 were automatically swept into the Concentration Account and any funds in the other JP Morgan Bank Accounts and PNC Bank Accounts were swept by wire transfer.  Under the Legacy Cash Management System, substantially all disbursements were made out of PNC Bank Accounts ending in -3056 and -3048 (the "**Disbursement Accounts**").

95.      In addition to cash receipts from operations, the Legacy Cash Management System benefitted from a cash pool (the "**Global Cash Pool**") maintained with Bank Mendes Gans ("**BMG Bank**").  The Global Cash Pool aggregated balances in accounts at BMG Bank held by WEC, WEC UK, and subsidiaries of WEC UK.  The Global Cash Pool allowed WEC U.S. and WEC EMEA entities efficiently to transfer cash to where it was most needed.  Withdrawals from the Global Cash Pool generated receivables to the Global Cash Pool owed by withdrawing entities, and deposits into the Global Cash Pool generated payables owed to the depositing entities.  If the Debtors needed to access funds in the Global Cash Pool, WEC's Treasury ("**Treasury**") manually transferred funds into the Concentration Account from the Global Cash Pool.

96.      Activity in the Legacy Cash Management System has steadily declined.  The Debtors no longer withdraw or deposit funds into the Global Cash Pool.  On February 16, 2017, BMG Bank sent a letter terminating the *Cash Pool Agreement*, dated June 17, 2010, among WEC, WEC UK, other WEC EMEA entities, and BMG, effective as of May 17,

2017.  On March 24, 2017, BMG Bank sent a notice of temporary suspension of the Global Cash Pool to WEC and other participants.  The Debtors' use of Bank Accounts within the Legacy Cash Management System is substantially limited to customer receipts into the JPMorgan Bank Account ending in 10211 and PNC Bank Account ending in 3013. The Disbursement Accounts are substantially dormant.  Funds deposited in Bank Accounts in the Legacy Cash Management System continue to flow to the Concentration Account, but as part of its transition to the Cash Management System, Treasury regularly transfers funds from the Concentration Account to the BMO Harris Bank Account, from which it then makes disbursements.

97.      The Debtors are making every effort to ensure a smooth transition—without any disruption to cash flow—to exclusive use of the BMO Harris Bank Account for deposits and disbursements.  Although there is still functionality and limited use of the Legacy Cash Management system, the Debtors have made significant progress in transitioning to the Cash Management System.  Any disruption to this process would likely have a severe and adverse impact on the day-to-day business operations of the Debtors.

98.      Cash Management System.  As stated above, the Debtors recently formalized a new centralized cash management process as a result of strategic planning and in preparation for these chapter 11 cases.  The Cash Management System is a centralized system, designed to collect and transfer the funds generated by the Debtors and disburse those funds to satisfy the obligations incurred in the course of operating the Debtors' businesses from a single bank account.  Until the transition from the Legacy Cash Management System is complete, the Cash Management System utilizes the Legacy Cash Management System to the limited degree described above.

99.     The Cash Management System allows the Debtors to efficiently collect the cash generated by their business and pay their financial obligations. Specifically, it facilitates four principal cash functions: (1) cash collection; (2) cash concentration; (3) disbursements to fund the Debtors' operations; and (4) cash transfers among the Debtors and certain Non-Debtor Affiliates. It also enables the Debtors to facilitate their cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the Bank Accounts.

100.     The Cash Management System utilizes a central operating Bank Account that is held and controlled by Westinghouse and is maintained by BMO Harris Bank N.A. ("**BMO Harris**" and the "**BMO Harris Bank Account**"). As discussed above, the Debtors also use on a limited and diminishing basis several active Bank Accounts from the Legacy Cash Management System. WEC also maintains certain miscellaneous accounts, set up and utilized by the Debtors' Legacy Cash Management System and the Cash Management System prior to the Petition Date.[16] Because these accounts are substantially dormant, they are not described for the purposes of this Motion.

101.     WEC serves as the "central banker" entity in the Cash Management System. All monies deposited in the Bank Accounts associated with the Legacy Cash Management System are swept into the Concentration Account and then manually transferred to the BMO Harris Bank Account. With limited exceptions, Debtors other than WEC do not have

---

[16] These accounts include an account at Mizuho Bank, LTD ("**Mizuho**") ending in -5926 and an account at Sumitomo Mitsui Banking Corp ("**SMBC**") ending in -3837. The Debtors use the accounts at Mizuho and SMBC to receive cash from Toshiba. Deposits from Toshiba are to be swept into the BMO Harris Bank Account at the end of each day that the funding is received, or as soon as practicable thereafter. WEC LLC also holds two accounts at BMG Bank ending in -6483 and -4925 in connection to the Global Cash Pool, WEC no longer uses these accounts because it does not deposit or withdraw funds from the Global Cash Pool, which is suspended. Debtor Westinghouse Energy Systems LLC has three accounts at Citibank Europe Plc. These accounts support Debtor Westinghouse Energy Systems LLC's operations in Bulgeria. Cash in these accounts is not swept into BMO Harris Bank Account or the Concentration Account.

their own accounts.  Rather, each Debtor relies on the Cash Management System in the course of its day-to-day business operations.  This system allows seamless accounting in a single location across and among all Debtor entities, reducing banking expenses, permitting prompt and accurate liquidity tracking, and allowing simple and accurate intercompany allocations and transfers.  To lessen the disruption caused by these chapter 11 cases, minimize expense, and maximize the value of their estates, it is vital that the Debtors continue their transition to and use of the Cash Management System.

102.    Cash Collection.  Revenue is generated by WEC U.S., which collects revenue primarily from (i) service agreements; (ii) sales of nuclear fuel products and related servicing agreements; and (iii) funds generated from construction projects.  The Debtors also receive cash payments from counterparties to the Debtors' derivatives contracts.

103.    Concentration. With the exception of the above-mentioned customer payments made to Bank Accounts connected to the Legacy Cash Management System, substantially all payments made to WEC U.S. are deposited or directed into the BMO Harris Bank Account.    Any payment made to a Bank Account connected to the Legacy Cash Management System is swept into the Concentration Account and then periodically transferred to the BMO Harris Bank Account.    Nearly all cash received by the Debtors is ultimately collected and held at BMO Harris.  When a deposit is made to the BMO Harris Bank Account, WEC books a journal entry for the applicable Debtor or non-Debtor affiliate on account of that transaction.

104.    Disbursements.    WEC U.S. makes substantially all of their disbursements out of the BMO Harris Bank Account.  The disbursements relate primarily to

(i) operating expenses, including payroll and other employee expenses;[17] (ii) research and development costs; (iii) corporate overhead expenses; (iv) trade payables to vendors; and (v) taxes. Disbursements, including wires, certain automated clearing house ("**ACH**") and electronic funds transfer ("**EFT**") payments, certain accounts payable checks, and certain checks to governmental entities are issued by WEC. WEC books journal entries to allocate the disbursements to the applicable Debtor and non-Debtor affiliates.

105.    <u>Intercompany Transactions and Claims Among WEC U.S. Entities</u>.[18] As described in the Donahue Declaration, the business and financial affairs of the Debtors and non-Debtor affiliates are complex. Because not all U.S. entities generate revenue, the Debtors collect and move funds through numerous bank accounts to ensure the continued operation of each entity. In order to manage the movement of funds, in the ordinary course of business, the WEC U.S. entities engage in a variety of intercompany transactions (the "**Intercompany Transactions**"), including those described above with respect to cash concentration and disbursements, that give rise to intercompany receivables and payables (collectively, the "**Intercompany Claims**"). The Debtors track all Intercompany Transactions processed through the Cash Management System by use of their enterprise resource planning software system (the "**ERP System**") and are able to ascertain, trace, and account for all Intercompany Transactions and Intercompany Claims.

106.    The main Intercompany Transactions giving rise to Intercompany Claims are:

a.    <u>Cash Receipts Activities</u>. As described above, using the Cash Management System, WEC U.S. entities concentrate their receipts into the

---

[17] Such expenditures are described in more detail in the section regarding the Employee Wage Motion, *infra*.

[18] The Debtors are also seeking in the DIP Motion authorization to make certain transfers to WEC EMEA entities. That motion contains more detail on such transfers.

BMO Harris Bank Account. As a result, to the extent the cash receipts held at BMO Harris are transferred from a WEC subsidiary, an Intercompany Transaction is recorded in the ERP System for the account of that subsidiary.

b.  <u>Disbursement Activities</u>. Likewise, under the Cash Management System, any disbursement made from the BMO Harris Bank Account on behalf of a WEC subsidiary is recorded as an Intercompany Transaction, creating a payable from such subsidiary.

c.  <u>Expense Allocations</u>. In the ordinary course of business, WEC U.S. entities incur centrally-billed expenses, including insurance premiums, workers' compensation obligations, payroll and benefit costs, general corporate services, and information technology costs. WEC pays these expenses, thereby creating Intercompany Claims that are reflected on the relevant entities' balance sheets.

107.    All Intercompany Transactions are tracked electronically in the ERP System. Transactions are concurrently recorded on each applicable entity balance sheet. The accounting system requires that all general-ledger entries be balanced at the legal-entity level, and, therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.

108.    Because the Debtors allocate shared expenses to the appropriate entities and record all cash transfers at the legal-entity level, no Debtor will be subsidizing the expenses of any other affiliate. To help ensure that each individual Debtor will not disadvantage its creditors by funding the operations of its affiliates, the Debtors have requested that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, the Court grant administrative expense status to all Intercompany Claims against a Debtor that arise postpetition from Intercompany Transactions.

109.    <u>Bank Fees</u>. In the ordinary course of their business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts service charges and

other fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**"). The Bank Fees collectively average approximately $20,000 per month. Additionally, if the balance in a particular the Bank Account decreases below a threshold amount established by the applicable Bank, the Debtors may incur additional fees for sending and receiving wire transfers, clearing checks, automated clearinghouse transfers, and other transactions.

110. <u>Existing Business Forms</u>. In the ordinary course of business, the Debtors use a variety of correspondence and business forms, including, among other things, checks, purchase orders, invoices, and letterheads (collectively, the "**Business Forms**"). To minimize expenses, the Debtors seek authority to continue using all Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without reference to the Debtors' status as debtors in possession.

111. Maintenance of the Cash Management System is critical to the Debtors' ongoing operations and the successful execution of any business plan in chapter 11. Modifications of and disruptions to the cash management system likely would cause significant payment delays, impeded the Debtors' ability to efficiently track the flow of funds and obtain important financial information, frustrate employees and vendors, and cause severe and irreparable harm to the Debtors' businesses. Ultimately, these outcomes would cause a diminution in the value of the Debtors' estates to the detriment of all parties-in-interest.

**(ii)** *Employee Wage Motion*

112. Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 507 and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Authority to (I) Pay Prepetition Wages, Salaries, and Other Compensation and Benefits, (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (III) to Authorize Banks to Honor and Process Related Checks and Transfers* (the "**Employee Wage**

Motion"), filed concurrently herewith, the Debtors seek entry of interim and final orders: (i) authorizing, but not directing, the Debtors to pay or otherwise honor all prepetition Compensation Obligations, Payroll Processing Obligations, Employee Bonus Obligations, Reimbursable Expenses, Withholding Obligations, Employee Benefit Obligations, Pension and Retirement Obligations, Employee Insurance Obligations, Employee Service Obligations, Temporary Worker Benefits Obligations, and Staffing Agency Fees (each as defined herein and, together with any related costs or expenses of administration, the "**Prepetition Employee Obligations**"); authorizing, but not directing, programs, and policies for their Employees, Temporary Workers, and Independent Contractors (each as defined herein), in effect as of the date hereof and as those practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' businesses (the "**Employee Programs**"), and honor any related administrative costs and obligations arising thereunder (such obligations, collectively with the Prepetition Employee Obligations, the "**Employee Obligations**"); (iii) modifying the automatic stay to the extent necessary to permit the Debtors' Employees and Temporary Workers to proceed with any claims they may have under the Workers' Compensation Programs (as defined herein), and (iv) authorizing Banks to process and honor related transfers.

113.    The various components and approximate amounts of the unpaid Prepetition Employee Obligations, each of which is discussed in further detail below, are summarized in the following chart:

| Category of Prepetition Employee Obligation | Amount Seeking Authority to Pay on Interim Basis | Amount Seeking Authority to Pay on Final Basis |
|---|---|---|
| Compensation Obligations | $4,500,000 | $4,500,000 |
| Payroll Processing Obligations | $205,000 | $205,000 |

| Category of Prepetition Employee Obligation | Amount Seeking Authority to Pay on Interim Basis | Amount Seeking Authority to Pay on Final Basis |
|---|---|---|
| Employee Bonus Obligations | $300,000 | $300,000 |
| Reimbursable Expenses | $3,600,000 | $7,200,000 |
| Withholding Obligations | $750,000 | $750,000 |
| Employee Benefit Obligations | $4,520,000 | $9,020,000 |
| Temporary Worker Benefit Obligations | $750,000 | $750,000 |
| Staffing Agency Fees | $15,000,000 | $27,000,000 |
| **Total Prepetition Employee Obligations:** | **$29,625,000** | **$49,725,000** |

114.    The Company employs approximately 9,190 Employees (as defined below), primarily in the United States (with many employed at the Debtors' global headquarters in Cranberry Township, Pennsylvania), but with a small number in Canada, Brazil, Europe, and Asia.  The Debtors' Employees include approximately (i) 2,265 full-time hourly Employees, regularly scheduled to work a minimum of 40 hours per week (collectively, the "**Full-Time Hourly Employees**"), (ii) 15 part-time hourly Employees, regularly scheduled to work fewer than 40 hours per week (the "**Part-Time Hourly Employees**" and, together with the Full-Time Hourly Employees, the "**Hourly Employees**"), (iii) 6,555 full-time salaried Employees, who are employed to work a minimum of 40 hours per week (the "**Full-Time Salaried Employees**" and, together with the Full-Time Hourly Employees, the "**Full-Time Employees**"), (iv) 355 part-time salaried Employees, who are employed to work fewer than 40 hours per week (the "**Part-Time Salaried Employees**" and, together with the Part-Time Hourly Employees, the "**Part-Time Employees**," and the Part-Time Salaried Employees together with the Full-Time Salaried

45

Employees, the "**Salaried Employees**").  The Hourly Employees and Salaried Employees are collectively referred to herein as the "**Employees**."

115.     In addition to the Employees, PCI Energy Services LLC ("**PCI**") employs approximately 904 temporary workers (the "**Temporary Workers**") who work exclusively for the Operating Plant Business.  The Debtors also engage independent contractors (the "**Independent Contractors**") through the Staffing Agencies to work at the Debtors' various plants and facilities, primarily for the Operating Plant Business.  Although the number of Independent Contractors at any given time varies significantly, the Debtors estimate that on average they spend approximately $15 million each month to engage Independent Contractors.

116.     Information regarding each Debtor's Employees is summarized in the following chart:

| Debtor | Total Number of Employees | Full-Time Employees | Part-Time Employees | Salaried Employees | Hourly Employees |
|---|---|---|---|---|---|
| Fauske and Associates LLC | 69 | 68 | 1 | 69 | 0 |
| Field Services, LLC | 5 | 5 | 0 | 5 | 0 |
| PaR Nuclear, Inc. | 149 | 149 | 0 | 119 | 30 |
| PCI Energy Services LLC | 9 | 9 | 0 | 9 | 0 |
| Stone & Webster Asia Inc. | 57 | 57 | 0 | 18 | 39 |
| Stone & Webster Services LLC | 1,362 | 1,321 | 41 | 1,054 | 308 |

| Debtor | Total Number of Employees | Full-Time Employees | Part-Time Employees | Salaried Employees | Hourly Employees |
|---|---|---|---|---|---|
| WEC Carolina Energy Solutions, LLC | 303 | 303 | 0 | 8 | 295 |
| WEC Equipment & Machining Solutions, LLC | 121 | 121 | 0 | 67 | 54 |
| WEC Welding & Machining, LLC | 26 | 26 | 0 | 17 | 9 |
| WECTEC Staffing Services LLC | 883 | 623 | 260 | 470 | 413 |
| Westinghouse Electric Company LLC | 6,143 | 6,075 | 68 | 5,011 | 1,132 |
| Westinghouse Industry Products International Company LLC | 53 | 53 | 0 | 53 | 0 |
| CE Nuclear Power International, Inc. | 10 | 10 | 0 | 10 | 0 |
| **Total** | **9,190** | **8,820** | **370** | **6,910** | **2,280** |

117.     Approximately 1,946 Employees work primarily for the Nuclear Fuel
Business, approximately 1,745 Employees work primarily for the Operating Plant Business,
approximately 21 Employees work primarily for the Decommissioning Business, approximately

469 Employees work primarily for the Services Business, and approximately 2,311 Employees work primarily for the Construction Business.  In addition, 1,206 Employees provide central corporate services to all of the Debtors' business lines, and 1,492 Employees work primarily in the Debtors' engineering center of excellence.

118.    As of the Petition Date, approximately 713 of the Debtors' Employees are represented by a union (the "**Union Employees**").  Approximately 904 of Debtor PCI Energy Services LLC's ("**PCI**") Temporary Workers are also members of various national unions.

119.    The Debtors are party to three collective bargaining agreements (each, a "**CBA**"):  (i) the Association of Westinghouse Salaried Employees ("**AWSE**") CBA, (ii) the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers ("**NWB**") CBA, and (iii) the International Brotherhood of Electrical Workers ("**IBEW**") CBA (collectively, the "**CBAs**," and AWSE, NWB, and IBEW, collectively, the "**Unions**").  Approximately 386 of the Debtors' Salaried employees at the Cranberry Township headquarters are party to the AWSE CBA, which expires in July 2017.  Approximately 172 of the Debtors' Employees at the Newington, Connecticut component manufacturing facility are party to the NWB CBA, which expires in April 2017.  Approximately 155 of the Debtors' Employees are party to the IBEW CBA, which expires in July 2017.

120.    Information regarding the business lines and union membership of each Debtor's Employees is summarized in the following chart:

| Debtor | Business Line | Employee Count | Number of Union Employees | Name of Union |
|---|---|---|---|---|
| Westinghouse Electric Company LLC | Corporate Center | 1,166 | 96 | AWSE |

| Debtor | Business Line | Employee Count | Number of Union Employees | Name of Union |
|---|---|---|---|---|
| PaR Nuclear, Inc. | Corporate Center | 4 | 0 | N/A |
| WEC Welding and Machining, LLC | Corporate Center | 23 | 0 | N/A |
| Fauske and Associates, LLC | Corporate Center | 1 | 0 | N/A |
| CE Nuclear Power International, Inc. | Corporate Center | 4 | 0 | N/A |
| Westinghouse International Products International Company | Corporate Center | 8 | 0 | 0 |
| Westinghouse Electric Company LLC | Decommissioning Business | 21 | 0 | N/A |
| Fauske and Associates, LLC | Engineering Center of Excellence | 68 | 0 | N/A |
| Westinghouse Electric Company LLC | Engineering Center of Excellence | 1,394 | 111 | AWSE |
| PaR Nuclear, Inc. | Engineering Center of Excellence | 30 | 0 | N/A |
| Westinghouse Electric Company LLC | Construction Business | 418 | 16 | AWSE |
| CE Nuclear Power International, Inc. | Construction Business | 6 | 0 | N/A |

| Debtor | Business Line | Employee Count | Number of Union Employees | Name of Union |
|---|---|---|---|---|
| Westinghouse International Products International Company | Construction Business | 45 | 0 | N/A |
| PaR Nuclear, Inc. | Nuclear Fuel and Components Manufacturing | 76 | 0 | N/A |
| Westinghouse Electric Company LLC | Nuclear Fuel and Components Manufacturing | 1,870 | 405 | IBEW, AWSE, NWB |
| WEC Welding and Machining, LLC | Operating Plant Business | 3 | 0 | N/A |
| PaR Nuclear, Inc. | Operating Plant Business | 39 | 0 | N/A |
| PCI Energy Services LLC | Operating Plant Business | 9 | 0 | N/A |
| WEC Equipment & Machining Solutions, LLC | Operating Plant Business | 121 | 0 | N/A |
| Westinghouse Electric Company LLC | Operating Plant Business | 1,270 | 84 | AWSE |
| WEC Carolina Energy Solutions, LLC | Operating Plant Business | 303 | 0 | N/A |
| Westinghouse Electric Company LLC | Services Business | 4 | 0 | N/A |

| Debtor | Business Line | Employee Count | Number of Union Employees | Name of Union |
|---|---|---|---|---|
| Stone & Webster Services LLC | Services Business | 1,362 | 0 | N/A |
| Stone & Webster Asia Inc. | Services Business | 57 | 0 | N/A |
| WECTEC Staffing Services LLC | Services Business | 883 | 1 | AWSE |
| Field Services, LLC | Services Business | 5 | 0 | N/A |

121.    The Employees, Temporary Workers, and Independent Contractors perform a variety of critical functions for the Debtors, including tasks pertaining to engineering, construction, product manufacturing, facility and machine maintenance, testing, decommissioning and decontaminating, quality assurance, management, purchasing and sales administration, finance and accounting, human resources, customer service, safety, security, and other areas crucial to the Debtors' businesses.  Due to the highly technical and specialized nature of the nuclear power industry, the skill and expertise of the Employees, Temporary Workers, and Independent Contractors are fundamental to the success of the Debtors' businesses and operations and, as a result, critical to these chapter 11 cases.  Further, there is a limited supply of workers with the specialization, training, certificates, and licenses that the Debtors require of their Employees.  For these reasons, it would be difficult and expensive—if not impossible—to replace Employees who might quit or seek other employment if prepetition amounts are not paid. A shortage of employees at this critical time would severely damage the Debtors' ability to meet

the needs of customers to their Core Businesses, maintain the requisite safety standards, and continue to innovate in a highly competitive industry, thus jeopardizing the entire reorganization.

122.    The Debtors estimate that, as of the Petition Date, the aggregate amount of their unpaid Prepetition Employee Obligations is approximately $49,725,000, an estimated $29,625,000 of which will come due in the period before the Final Hearing (the "**Interim Period**").  The various components of the Employee Obligations are described in further detail below.

A.    *Compensation Obligations*

123.    The Debtors pay their Employees and Temporary Workers salaries, wages, and other compensation (including overtime pay) in exchange for the services they provide (the "**Compensation Obligations**").  The Debtors' Salaried Employees typically receive salary payments in arrears on a monthly basis on the last day of each month, with an option to receive a mid-month advance on the business day nearest the 15th of the month.  Most of the Debtors' Hourly Employees receive bi-weekly payments for wages two weeks in arrears every other Friday; however, certain of the Debtors' Hourly Employees receive wages on a weekly basis one week in arrears every Thursday.  All Employees are paid in U.S. dollars.  Most Employees are paid via direct deposit, although some Employees are paid via checks, which are printed by third-party payroll management company ADP, LLC ("**ADP**") and draw on ADP accounts.  On average, the Debtors pay approximately $90 million each month on account of Compensation Obligations.  As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid Compensation Obligations accrued prepetition totals approximately $4.5 million, all of which the Debtors seek authority to pay during the Interim Period.

124.    Payroll Processing Obligations. The Debtors use ADP to administer payroll for their Employees and Temporary Workers and provide related payroll processing,

payroll tax reporting, time entry systems, payment preparation, payroll transfer administration, and other reporting and administrative services.  In addition, the Debtors employ Bitta Group Inc. ("**Bitta**"), which provides time entry systems and related services for Employees of WECTEC Staffing Services, LLC ("**StaffCo**").  WEC, on behalf of the Debtors, generally pre-funds payroll to ADP two days prior to each payroll date, and ADP remits payments to Employees in accordance with the payroll schedule described above.  In addition, WEC transfers funds to ADP as true-ups throughout the month to the extent the amounts funded by WEC for Compensation Obligations do not equal the amounts remitted by ADP to the Employees.  The Debtors typically pay ADP approximately $125,000 each month and Bitta approximately $80,000 per month (such administration costs, collectively, the "**Payroll Processing Obligations**").  As of the Petition Date, the Debtors estimate that they owe approximately $205,000 in Payroll Processing Obligations relating to the prepetition period to ADP and Bitta, all of which will come due during the Interim Period.

125.    <u>Employee Bonus Obligations</u>.  The Debtors have historically maintained certain bonus programs as an additional component of the Employees' compensation structure.  The Employee Bonus Obligations are designed to compensate certain employees for achieving certain performance goals and hiring and retaining the most effective employees for the Company.

126.    <u>The PowerUp Plan</u>.  In the ordinary course of business, the Debtors maintain an employee recognition award bonus program in which all non-insider Employees may participate (the "**PowerUp Plan**," and the payments thereunder, the "**PowerUp Bonuses**").  The PowerUp Program is for rank-and-file Employees and excludes officers and directors.  Under the Power-Up Program, senior Employees nominate rank-and-file Employees to earn

reward points based on an Employee's outstanding contribution or attitude at work. The awards under the PowerUp Plan are granted daily and are paid in the form of points redeemable for merchandise or gift cards. In addition, the Debtors pay a monthly administration fee to the PowerUp Plan administrator, Globoforce Limited. The Debtors pay approximately $167,000 per month under the PowerUp Plan and estimate that they owe approximately $100,000 in prepetition amounts thereunder.

127.    The Retention Agreement Program.    In the ordinary course of business, the Debtors maintain an incentive compensation program based on performance in which approximately 140 non-insider Employees participate (the "**Retention Agreement Program**," and the payments thereunder, the "**RAP Bonuses**" and, together with the PowerUp Bonuses, the "**Employee Bonus Obligations**"). RAP Bonuses are paid annually to Employees who generally have performed well. Receipt of a RAP Bonus is not guaranteed and is subject to a participating Employee's performance and continued employment at the Company. For fiscal year 2017, the Debtors committed up to $3 million dollars for the Retention Agreement Program and pay approximately $200,000 per month under the Retention Agreement Program. The Debtors estimate that approximately $200,000 will come due under the Retention Agreement Plan during the Interim Period.

128.    Reimbursable Expenses.    In the ordinary course of their businesses, the Debtors reimburse certain of their Employees, Independent Contractors, Temporary Workers, and independent directors for reasonable and customary expenses incurred in the scope of their services to the Debtors, including those expenses related to, among other things, business travel, communications (*e.g.*, cell phone expenses), and office supplies (collectively, and including amounts due in respect of the Employee Credit Card Programs (as defined below), the

"**Reimbursable Expenses**").  Employees must submit all expenditures in accordance with the Debtors' travel and expense policy in order to qualify for reimbursement, and each request for reimbursement is reviewed by a manager to ensure compliance.  Reimbursable Expenses typically take between one and two weeks to process once the expense request is submitted.

129.    <u>Withholding Obligations</u>.  As employers, the Debtors are required by law to withhold from certain Employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit them to the appropriate taxing authorities (collectively, the "**Taxing Authorities**").  The Debtors are also required to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**").  In the aggregate, the Debtors' monthly Withholding Taxes and Employer Payroll Taxes total approximately $25 million and $7 million, respectively.

130.    In the ordinary course of processing payroll for the Employees, the Debtors may also be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "**Garnishments**").  Each pay cycle, the Debtors withhold such amounts from applicable Employees' paychecks and remit them to the appropriate authorities or entities.  On average, the Debtors withhold approximately $200,000 in Garnishments per month from Employees' wages and salaries.  In addition, the Debtors withhold from Union Employees' paychecks and remit dues each month to ASWE, NWB, and IBEW in

the aggregate amounts of approximately $11,200, $8,400, and $5,100, respectively (such dues, collectively with the Payroll Tax Obligations and the Garnishments, the "**Withholding Obligations**").

131.     As of the Petition Date, the Debtors estimate that they owe approximately $1.6 million in Withholding Obligations relating to the prepetition period, all of which will come due during the Interim Period.

   B.     *Employee Benefits*

132.     In addition to the aforementioned payment-related obligations, the Debtors maintain various employment benefit plans and policies for their Employees, including: (i) medical and dental plans; (ii) flexible spending and health savings accounts; (iii) retirement plans and benefits; (iv) employee insurance; and (v) employee service programs (collectively, the "Employee Benefit Programs").

133.     <u>Health Care Obligations</u>.  Employees are eligible to receive medical, prescription drug, vision, dental, and other health care benefits (collectively, the "**Health Care Benefits**," and the obligations relating thereto, the "**Health Care Obligations**").  Except as otherwise provided herein, Foreign Employees and Part-Time Employees who work fewer than 24 hours per week are not entitled to the Health Care Benefits.

134.     <u>Medical Insurance</u>.  The Debtors maintain two medical insurance programs, the "WEC Medical Program" and the "StaffCo Medical Program" (together, the "**Medical Programs**") for which Aetna Inc. ("**Aetna**") provides administrative services.  The WEC Medical Program, which covers approximately 6,925 Employees, is self-insured by the Debtors, with a stop-loss policy that covers approximately 15% of participating Employees.  As part of the WEC Medical Program, the Debtors offer Employees prescription drug coverage through CVS Caremark.  In addition to payments made by the Debtors, Employees contribute to

the WEC Medical Program via payroll deductions. The Debtors make weekly payments of approximately $1.2 million under the WEC Medical Program, which payments operate on a lag of four to six weeks, and the Debtors also receive quarterly rebates for prescription drugs, two quarters in arrears, totaling approximately $3.2 million annually. The Debtors estimate that they owe approximately $7.2 million in prepetition amounts on account of the WEC Medical Program, $3.6 million of which will come due during the Interim Period.

135.    The StaffCo Medical Program, which covers approximately 300 StaffCo Employees who work at least 30 hours per week (the "**StaffCo Benefits Employees**"), is fully insured by Aetna. The Debtors subsidize $250 per month per Employee on account of StaffCo Medical Program premiums, and the remainder of the insurance premium amount is purchased by the Employee. The Debtors estimate that they owe approximately $71,000 in prepetition amounts on account of the StaffCo Medical Program, all of which will come due during the Interim Period.

136.    The Debtors estimate that they remit additional monthly payments to Aetna totaling approximately $900,000 on account of medical and stop-loss insurance and administrative fees for the Medical Programs (the "**Aetna Medical Obligations**"), all of which is paid net of Employee contributions. As of the Petition Date, the Debtors estimate that they owe approximately $9 million in Aetna Medical Obligations relating to the prepetition period, $4.5 million of which will come due during the Interim Period.

137.    Vision Service Plan. The Debtors offer certain Employees access to vision coverage administered by Vision Service Plan (the "**Vision Program**"). The Vision Program is fully insured and costs the Debtors approximately $1.2 million per year. The Debtors generally split the cost of the Vision Service Plan with participating Employees. However, the

Debtors do not pay any amounts under the Vision Program for StaffCo Benefits Employees. As of the Petition Date, the Debtors estimate that they owe approximately $5,000 under the Vision Program relating to the prepetition period, all of which will come due during the Interim Period.

138.    Dental Plan.    The Debtors provide certain Employees with dental insurance (the "**Dental Program**") through Metropolitan Life Insurance Co. ("**MetLife**"). Approximately half of the cost of the Dental Program is withheld from participating Employees' paychecks, and the other half is funded by the Debtors. The Debtors make monthly payments totaling approximately $420,000 on account of the Dental Program. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 under the Dental Program relating to the prepetition period, all of which will come due during the Interim Period.

139.    Employee Assistance Program.    The Debtors provide their Employees with counseling services (the "**EAP**") through Beacon Health Options ("**Beacon**"). Employees are eligible for up to five counseling sessions per issue per year. The Debtors pay Beacon approximately $13,000 per month, one month in arrears, in connection with the EAP. As of the Petition Date, the Debtors estimate that they owe Beacon approximately $13,000 on account of the EAP, all of which will come due during the Interim Period.

140.    Flexible Spending Accounts & Health Savings Account.    In addition to offering the medical benefits described above, the Debtors offer certain Employees the option to enroll in the following flexible spending accounts (each, an "**FSA**," and the obligations related thereto, the "**FSA Obligations**") and/or a health savings account (each, an "**HSA**," and the obligations related thereto, the "**HSA Obligations**"): (i) the "**Healthcare FSA**," for which third party Hewitt Associates LLC (together with certain of its affiliates, "**Aon Hewitt**") provides administrative services, which provides certain Employees with pre-tax reimbursement for

58

qualified health care expenses not covered by insurance; (ii) the "Limited Purpose FSA," for which Aon Hewitt provides administrative services, which provides enrollees with pre-tax reimbursement for dental and vision expenses not covered by insurance; (iii) the "Dependent Care FSA," for which Aon Hewitt provides administrative services, which provides pre-tax reimbursement for a participating Employees' eligible dependents' day care needs; and (iv) the "Employee HSA," for which PayFlex Systems USA, Inc. ("**PayFlex**") provides administrative services, which provides enrollees in a consumer-driven health plan with a tax-advantaged medical savings account from which to pay eligible health care expenses not covered by insurance.

141.    Under the terms of the FSAs and HSA, during the annual enrollment period, eligible Employees may choose to designate an amount of their pre-tax wages or salary towards the FSAs and/or HSA, which can then be used for eligible health care expenses.  A participating Employee will either submit receipts for such eligible expenses to the administrator of the FSA or HSA, which then reimburses such Employee from his or her FSA or HSA, or use special-purpose FSA or HSA debit cards.  Currently, approximately 2,300 Employees are enrolled in an FSA and approximately 2,300 Employees are enrolled in an HSA.  The Debtors estimate that they remit payments totaling approximately $10,000 per month to Aon Hewitt for FSA administration fees and approximately $10,000 per month to PayFlex for HSA administration fees.  As of the Petition Date, the Debtors estimate that they owe Aon Hewitt approximately $10,000 for unpaid FSA Obligations, all of which will come due during the Interim Period, and PayFlex approximately $10,000 for unpaid HSA Obligations relating to the prepetition period, all of which will come due during the Interim Period.

C.    *Retirement Benefits*

142.    The 401(k) Plans. The Debtors maintain three qualified defined contribution savings plans meeting the requirements of section 401(a) and 401(k) of the Internal Revenue Code: (i) the Westinghouse Electric Company Savings Plan (the "Westinghouse 401(k) Plan"), for which Aon Hewitt provides administrative services; (ii) the WECTEC 401(k) Savings Plan (the "WECTEC 401(k) Plan"), for which Merrill Lynch provides administrative services; and (iii) the WECTEC Staffing Services 401(k) Savings Plan (the "StaffCo 401(k) Plan" and, collectively with the Westinghouse 401(k) Plan and the WECTEC 401(k) Plan, the "401(k) Plans," and the obligations thereunder, the "401(k) Plan Obligations"), for which Empower Retirement provides administrative services. There are approximately 8,804 active Employees enrolled in the Westinghouse 401(k) Plan, 2,162 active Employees enrolled in the WECTEC 401(k) Plan, and 500 active Employees enrolled in the StaffCo 401(k) Plan. There are 1,683 and 789 terminated vested former employees in the WEC 401(k) Plan and WECTEC 401(k) Plan, respectively.

143.    The estimated weekly amount withheld from such Employees' paychecks for contributions under the 401(k) Plans is approximately $1.8 million in the aggregate. With respect to the Westinghouse 401(k) Plan, the Debtors match Employee contributions 50 cents on the dollar up to a maximum of 6% of pay and Debtors contribute 3% of certain participating Employees' pay to a retirement contribution account (the "RCA"). With respect to the WECTEC 401(k) Plan, the Debtors match dollar-for-dollar up to 3% of pay and 50 cents per dollar on the next 2% of pay, for a maximum total match of 4% of pay. StaffCo does not match contributions under the StaffCo 401(k) Plan. The Debtors estimate that they match approximately $469,000 under the 401(k) Plans each week. As of the Petition Date, the Debtors

owe approximately $125,000 in unpaid matching contributions to Employees under the 401(k) Plans, all of which will come due during the Interim Period.

144.     <u>NWB Pension Plan</u>.  The Westinghouse Pension Plan for Newington Boilermakers (the "NWB Pension Plan" and, together with the 401(k) Plans, the "Retirement Plans," and the obligations thereunder, collectively, the "Pension and Retirement Obligations"), for which Aon Hewitt provides administrative services, is a flat dollar plan with 181 active Union Employees, 51 terminated vested former employees, and 77 retirees.  The Debtors are required to meet minimum funding requirements totaling $1.2 million during fiscal year 2017, with approximately $140,000 due each quarter and an additional $600,000 due on September 15, 2017.  The Debtors' next contribution to the NWB Pension Plan is due on April 14, 2017.  The Debtors also pay an annual fee of approximately $732,000 to the Pension Benefit Guaranty Corporation.  As of the Petition Date, the Debtors owe approximately $140,000 on account of the NWB Pension Plan, $140,000 of which will come due during the Interim Period.

D.     *Employee Insurance Programs*

145.     The Debtors also provide certain insurance coverage to Employees and offer other additional insurance options (collectively, the "**Employee Insurance Programs**," and the obligations related thereto, the "**Employee Insurance Obligations**").

146.     <u>Salary Continuance and FMLA</u>.  The Debtors offer short-term disability coverage to eligible Salaried Employees (the "**Salary Continuance Program**").  The Debtor-insured, Aetna-administered Salary Continuance Program is intended to provide a benefit to eligible Employees who cannot work as a result of a short-term injury or illness.  The benefit pays eligible Employees a six-month salary continuation of either 60% or 100% of base salary, depending on the Employee's seniority.  Pursuant to U.S. federal law in accordance with the Family & Medical Leave Act ("**FMLA**"), eligible Employees are also entitled to unpaid leave

under certain circumstances.  The Debtors pay approximately $20,000 in administration fees per month to Aetna on account of the Salary Continuance Program and the FMLA Program.  As of the Petition Date, the Debtors owe approximately $300,000 in prepetition amounts pursuant to the Salary Continuance Program, $220,000 of which will come due during the Interim Period.

147.    <u>Workers' Compensation</u>.  In the ordinary course of business, the Debtors maintain workers' compensation insurance coverage (the "Workers' Compensation Programs") for claims arising from or related to employment by the Debtors (the "Workers' Compensation Claims").  In many instances, applicable law in the states in which the Debtors operate requires that the Debtors maintain the Workers' Compensation Programs.  The Workers' Compensation Programs cover, among other things, workers' compensation and employer liability for accidents, death, or disease sustained by employees in the course of their employment with the Debtors.

148.    The Debtors self-insure the Workers' Compensation Programs up to $500,000, and liabilities exceeding $500,000 are covered under a stop-loss policy provided by Mitsui Sumitomo Insurance Group ("**Mitsui**").  In addition to out-of-pocket expenses and premiums for the Workers' Compensation Programs, the Debtors pay a yearly brokerage fee of approximately $850,000 per year to Marsh USA, Inc. for insurance procurement services and monthly fees of approximately $7,000 in the aggregate to Broadspire Services Inc. and Crawford & Co. for administration of claims under the Workers' Compensation Programs.  For the coverage period ending on March 31, 2017, the Debtors' annual premium for the Workers' Compensation Program was approximately $868,000, which has been paid in full.  As of March 28, 2017, the Debtors have approximately 75 open workers' compensation claims.  Historically, the Debtors have spent approximately $119,000 per month on account of claims under the

Workers' Compensation Programs.  As of the Petition Date, the Debtors estimate that they owe approximately $100,000 in prepetition amounts with respect to the Workers' Compensation Programs, all of which will come due during the Interim Period.

E.     *Employee Service Programs*

149.     <u>Benefits Advisory Services</u>.  Aon Hewitt maintains a call center to assist Employees with any questions regarding the Employee Benefit Programs, maintains the Debtors' benefits website and enrollment, and provides other related services as needed by the Debtors (such services, collectively, the "Benefits Advisory Services").  The Debtors pay Aon Hewitt approximately $100,000 per month, two months in arrears, for the Benefits Advisory Services.  As of the Petition Date, the Debtors estimate that they owe Aon Hewitt approximately $200,000 on account of Benefits Advisory Services, $100,000 of which will come due during the Interim Period.

150.     <u>Employee Relocation Program</u>.  The Debtors routinely pay both domestic and international relocation expenses for their Full-Time Employees (the "Employee Relocation Program").  The Debtors primarily use Cartus Corp. and Parks Moving Companies for relocation services, with some supplemental work by smaller local vendors.  The Debtors spend approximately $2.5 million annually in domestic relocation expenses and approximately $7.0 million annually in international relocation expenses.  These amounts are generally paid two weeks in arrears.  As of the Petition Date, the Debtors estimate that they owe approximately $1.2 million in prepetition amounts in connection with the Employee Relocation Program, $800,000 of which will come due during the Interim Period.

F.     *Temporary Worker Union Benefits*

151.     The Debtors' Temporary Workers are members of various unions (the "**Temporary Worker Unions**") in the United States.  In accordance with the benefit plans of

these Temporary Worker Unions, the Debtors make contributions of approximately $667,500 to the Temporary Worker Unions for their Temporary Workers (such contributions, the "**Temporary Worker Benefit Obligations**"). These amounts are paid to the Temporary Worker Unions along with union dues withheld from Temporary Workers' paychecks. As of the Petition Date, the Debtors owe approximately $750,000 in prepetition Temporary Worker Benefit Obligations, all of which will become due during the Interim Period.

152.    The Debtors utilize approximately 50 staffing agencies (the "**Staffing Agencies**") to fulfill temporary worker needs at their facilities through the Independent Contractors. Although the number of Independent Contractors varies by season, the Debtors typically utilize approximately 500 Independent Workers and pay an aggregate amount of approximately $15 million to the Staffing Agencies each month (the "**Staffing Agency Fees**") for the services of the Independent Contractors. The services of the Staffing Agencies and Independent Contractors are vital to the Debtors because there is a limited pool of Independent Contractors with the requisite clearance for nuclear plant access and special training for work in the nuclear industry. Training and clearance for Independent Contractors provided by the Staffing Agencies typically takes at least six months and may take up to five years in some instances. The Independent Contractors are necessary for the Debtors to provide services during scheduled outages of nuclear plants as well as round-the-clock emergency support to operating nuclear plants that have unplanned shutdowns and require immediate support to safely shut down for necessary repairs. Any interruption—even a temporary one—in the provision of services by the Staffing Agencies and Independent Contractors would jeopardize the Debtors' value, public safety, and the continuous provision of power to the public. As of the Petition Date, the Debtors

estimate that they owe approximately $27 million in Staffing Agency Fees, $15 million of which will come due during the Interim Period.

153.    Payment of the Prepetition Employee Obligations and continuation of the Employee Programs are warranted and justified by the facts and circumstances of these chapter 11 cases.  The Employees are vital to the continued operation of the Debtors' businesses and necessary for the success of these chapter 11 cases.  Any delay in paying Prepetition Employee Obligations or cessation of Employee Programs will adversely impact the Debtors' relationship with their Employees as it could irreparably harm the Employees' morale, dedication, confidence, and cooperation.  Because many of the Employees interact with the Debtors' customers and suppliers—on whose continued support and loyalty the Debtors rely— and perform safety functions, the Employees' support for the Debtors' reorganization efforts is key to the Debtors' ongoing operations.

154.    Additionally, as set forth above, the importance of maintaining stability among the Debtors' Employees is heightened here because there is a limited supply of workers with the skills and knowledge, training, certificates, and licenses that the Debtors require.  Therefore, it would be difficult and expensive, if not impossible, to replace Employees who might quit if prepetition amounts are not paid or Employee Programs were not continued.  Furthermore, a shortage of Employees could hamper the Debtors' ability to perform under customer contracts and maintain the requisite safety standards.  Instability among the Debtors' Employees and the resultant harm to production would reduce the value of the Debtors' businesses and lower creditor recoveries.  Moreover, absent an order granting the relief requested, many Employees will suffer undue hardship and, in many instances, serious financial difficulties.  Thus, without the relief requested, the success of these chapter 11 cases may be

undermined by the possibility that otherwise loyal Employees will seek other employment alternatives.

155.    It is necessary to pay the administrative costs owed to third-party vendors who provide compensation and other benefit-related services and products.  Absent the relief requested, the Debtors will be unable to maintain their compensation and benefit programs in an efficient and cost-effective manner.

156.    In addition, it is essential that the Debtors be permitted to pay amounts owed under the Workers' Compensation Programs.  The Debtors' failure to pay their obligations under the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to significant liability in fines by state workers' compensation boards.  Furthermore, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact the financial well-being and morale of not just those claimants but also the Debtors' active Employees.  This could result in Employee departures, causing a significant disruption in the Debtors' business with a materially adverse impact on the Debtors' operations, the value of their estates, and the interests of all parties in these chapter 11 cases.

157.    It is critical that the Debtors pay the fees to the Staffing Agencies for work by the Independent Contractors.  As described above, the Debtors rely on the Independent Contractors to provide both scheduled and emergency services to nuclear plants.   Any interruption in the services of these Independent Contractors could be catastrophic to the Debtors and harmful to the public.

(iii)    *Critical Vendors Motion*

158.    By the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) for Interim and Final Authorization (I) To Pay Prepetition Obligations to Critical*

*Vendors, Shippers, Warehousemen, Other Lien Claimants, and Foreign Creditors, (II) Confirming Administrative Status for Certain Goods Delivered and Services Provided Postpetition, and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* (the "**Critical Vendors Motion**"), pursuant to  sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) pay certain prepetition claims of certain vendors, suppliers, service providers, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise (the "**Critical Vendors**" and their prepetition claims, the "**Critical Vendor Claims**"); (ii) pay those prepetition charges to Shippers, Warehousemen, Equipment Manufacturers, Tool Makers, and Other Lien Claimants (each as defined below and, collectively, the "**Lien Claimants**") that the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of inventory, supplies, goods, tools, equipment, components, materials, or other items held by any Lien Claimants; and (iii) pay certain suppliers, service providers, and other entities outside of the United States (collectively, the "**Foreign Creditors**" and their prepetition claims, the "**Foreign Claims**") in the ordinary course of business, in each case, subject to the procedures and conditions described therein.  The Debtors also request that the Court (i) confirm administrative priority status of all undisputed obligations of the Debtors owing to third party vendors and suppliers arising from the postpetition delivery of goods and provision of services ordered prior to the Petition Date and (ii) authorize the Debtors to pay such obligations in the ordinary course of business.  Finally, the Debtors request that the Court authorize all Banks to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent directed by the Debtors in accordance with the Motion, whether such checks were presented or electronic

requests were submitted before or after the Petition Date, and that all such Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion, without any duty of further inquiry, and without liability for following the Debtors' instructions.

A.    *Critical Vendors*

159.    As discussed above, the Debtors operate a nuclear power business that delivers a range of products and services to customers worldwide that span the full lifespan of a nuclear power generator—from construction to decommissioning and all maintenance in between.  The Debtors rely heavily on certain Critical Vendors to provide them with services related to health and safety, specialized and unique parts, equipment, materials, and other services necessary to conduct the business operations detailed above.  Due to, among other things, the specialized goods and services required to operate the Debtors' business lines and maintain compliance with strict environmental, health, and safety regulations, the Debtors have limited alternatives when going to market for necessary goods and services.  Replacing such vendors, even in the infrequent instances where possible, could result in substantially higher costs for the Debtors and their estates and risk delays that could create safety and/or environmental risks and harm the Debtors' value.  Among others, the Debtors rely on the following vendors to operate their five primary business lines:

- The Nuclear Fuel and Component Manufacturing Business relies on specialized suppliers to provide components to build fuel assemblies in nuclear reactor vessels.  Many of these suppliers are unique to the nuclear industry and, in many cases, are unique to the Debtors' business operations.  The vast majority of these suppliers are the sole source of components that are necessary for the Debtors to continue to operate the Nuclear Fuel and Component Manufacturing Business.

- The Operating Plant Business relies on several different types of suppliers and service providers to provide custom-built equipment and essential

services for nuclear operating plant upgrades, maintenance, inspection and testing, and outage support. The equipment provided by these vendors includes equipment specially-designed for use in the nuclear industry, equipment designed for general commercial use but tested for suitability for use in the nuclear industry, and equipment custom-designed and tested for use specifically by the Debtors. Generally, it takes anywhere from six months to four years to complete the qualification of equipment for use in the nuclear industry. The Debtors' customers require that the Debtors use the specific suppliers of proprietary tools and services to perform under the Debtors' customer contracts. Accordingly, such vendors also provide proprietary tools and services necessary to support such contracts. If the Debtors were unable to obtain the required tools and services from these specific vendors, the Debtors would be unable to comply with, and perform under, many of their customer contracts. Goods and services from these vendors are also necessary to enable the Debtors to provide round-the-clock emergency support to operating nuclear plants that have unplanned shut downs and require immediate support to safely shut down for necessary repairs.

- The Decommissioning Business relies on several different types of vendors to survey radioactive sites and characterize radioactive materials, as well as qualified vendors to safely handle, transport, and dispose of such materials. The Decommissioning Business also requires the services of vendors that have experience in engineering, planning, and carrying out complex radioactive site remediation and decommissioning. These include niche vendors who possess experience in nuclear decontamination and decommissioning, and who provide protection to public safety by reducing the risk of additional contamination through their remediation services.

- The WECTEC Services Business relies on a variety of vendors to provide custom built equipment and essential services for nuclear operating plant upgrades, maintenance, inspection and testing, and outage support as well as support for U.S. government nuclear projects. Similar to the Operating Plant Business, the equipment provided by these vendors is either specially designed or qualified for use in the nuclear industry, which may take up to four years to complete. Certain suppliers also provide proprietary tools and services necessary to support the Debtors' customer contracts.

- The New Nuclear Plants / Major Projects and Construction Business relies on special heavy manufacturing vendors for reactor vessels, steam generators, reactor coolant systems, and plant support systems. All of such equipment is specially designed for the New Nuclear Plants / Major Projects and Construction Business in accordance with specialized requirements, qualifications, and certifications. Additionally, certain

69

vendors provide specialized electrical instrumentation and control systems and computers which they design and qualify.

160.     As previously discussed, the Debtors' future involvement in construction of the U.S. AP1000 Projects is uncertain.  Accordingly, the Debtors do not expect to pay prepetition claims of vendors that provide goods or services exclusively in connection with the AP1000 business segment pursuant to the Critical Vendors Motion.  However, the WECTEC Services Business and the New Nuclear Plants / Major Projects and Construction Business rely on vendors that provide goods and services to both the AP1000 and non-AP1000 business segments ("**Overlap Vendors**") that may refuse to continue providing goods and services to the non-AP1000 projects if they are not paid in connection with the goods and services they provide to the AP1000 projects.  Additionally, this category encompasses certain vendors and professionals that provide services necessary for the Debtors to maintain numerous patents used in connection with all five of their business lines, such as vendors who manage the Debtors' international patent database and the Debtors' payment of its patent maintenance fees.  The Debtors propose to pay the Overlap Vendors if, in the Debtors' business judgment, the failure to pay such claims would diminish the value of non-AP1000 projects or the Debtors' other business lines, including by failing to maintain appropriate safety and/or environmental standards.

161.     Anticipating a situation where vendors become increasingly unwilling to extend trade credit to the Company, the Debtors took painstaking efforts to ensure the stability of the goods and services essential to their ongoing business prior to commencing these chapter 11 cases – including developing a narrowly-tailored critical vendor program.  The process of developing the critical vendor program involved a core, centralized team comprised of members of the Debtors' purchasing and supply team with the assistance of AlixPartners and Weil and was subject to the personal supervision of the Debtors' Vice President of Finance, Daniel

Sumner. The Debtors will authorize payment only to those suppliers critical to the Debtors' operations and subject to the vendors' own obligations to provide Customary Trade Terms (as defined below).

162.     With the assistance of AlixPartners and Weil, the Debtors spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify certain critical business relationships and Critical Vendors—the loss of which could materially harm the Debtors' businesses or impair going-concern viability. As a result of that analysis and review, the Debtors have identified the following two general categories of Critical Vendors: (i) health and safety suppliers and servicers—the interruption of goods or services from these vendors would either (a) cause environmental hazards or pose significant risk to the environment, (b) pose a threat to health and public safety, or (c) compromise the Company's customers' ability to provide power to the electrical grid—and (ii) specialized servicers and suppliers to businesses other than the U.S. AP1000 projects—sole source suppliers, vendors unique to the nuclear industry or the Debtors' specific business operations, suppliers of proprietary tools and services necessary to support the Debtors' customer contracts, vendors with specialized qualifications, or vendors that otherwise provide specialized goods or services related to the nuclear power industry.

163.     The Debtors estimate that the aggregate amount owed to Critical Vendors for goods delivered or services provided during the period before the Petition Date should not exceed $87.3 million (the "**Critical Vendor Cap**"). Of this amount, the Debtors are requesting authority to pay up to $58.9 million of Critical Vendor claims on an interim basis

prior to a final hearing.  Of these amounts, $11.5 million and $16.3 million are attributable to claims under section 503(b)(9) of the Bankruptcy Code on an interim and final basis, respectively.

> B.    *Lien Claimants*

164.    In operating their businesses, the Debtors use and make payments to specialized shippers qualified to deliver hazardous materials, common carriers, freight forwarders and consolidators, delivery services, small parcel services, shipping auditing services, and distributors (collectively, the "**Shippers**") to ship, transport, and otherwise facilitate the movement of inventory, supplies, merchandise, tools, equipment, components, materials, and other items (collectively, the "**Goods**"), some of which are stored at third party warehouses (the "**Warehousemen**" and such payments, the "**Shipping and Warehousing Charges**").

165.    The services provided by the Shippers and Warehousemen are critical to the Debtors' day-to-day operations.  If many of the Goods in transport are not timely delivered, the Debtors' business operations would be brought to a halt, which could result in nuclear plant shutdowns.  Furthermore, many of the Goods in transport are critical to health and safety.  Accordingly, to maintain uninterrupted operations, the Debtors have implemented an efficient system for the receipt of materials which relies heavily on third parties, including Shippers and Warehousemen.

166.    At any given time the Debtors may owe the Shippers and Warehousemen fees related to a number of different shipments and the Shippers may, in turn, have multiple vehicles in transit carrying Goods on behalf of the Debtors.  Accordingly, the refusal of any Shipper or Warehouseman to perform could negatively impact the Debtors' different business lines and create attendant risks to public health and safety.

167.    Because of the commencement of these chapter 11 cases, certain Shippers and Warehousemen who hold Goods for delivery to or from the Debtors may refuse to release the Goods pending receipt of payment for their prepetition services.  Some state laws, a Shipper or Warehouseman may have a lien on the Goods in its possession to secure the charges or expenses incurred for the transportation or storage of Goods.  Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection as holders of possessory liens.  As discussed, because of the Debtors' supply needs, any delay in shipments would disrupt the Debtors' operations and could harm the Debtors' reorganization efforts as well as pose a potential risk to health and safety.

168.    It is thus imperative that the Debtors be authorized to pay any Shipping and Warehousing Charges, whether they arose prior to or after the Petition Date, that the Debtors determine in their business judgment they must pay to ensure the uninterrupted shipment and delivery of the Goods.

169.    Moreover, the Debtors routinely transact business with a number of other third parties, including contractors, repairmen, and manufacturers who may assert tooling, mechanics', and other possessory liens (the "**Other Lien Claimants**") against the Debtors and their property if the Debtors fail to pay for the goods or services rendered.  As discussed in more detail below, the Other Lien Claimants perform a number of services for the Debtors, including Equipment Manufacturers, Tool Makers, and Miscellaneous Other Lien Claimants (each, as defined below).

C.    *Equipment Manufacturers*

170.    In the ordinary course of their businesses, the Debtors are required to contract with third party equipment manufacturers (the "**Equipment Manufacturers**") to make specialized equipment and parts needed by the Debtors' various business lines.  The Debtors

require the Equipment Manufacturers' services for highly specialized components needed to keep nuclear plants operational.

171.     Typically, the Equipment Manufacturers are paid at intervals based upon progress or milestones relative to the completion of the item(s) they are manufacturing. To the extent that the Debtors are unable to fulfill their payment obligations to the Equipment Manufacturers, the Equipment Manufacturers may assert liens against the partially and/or fully built equipment in their possession. Such actions could severely hinder the Debtors' ability to fulfill production obligations to their customers on both existing and new programs.

D.     *Tool Makers*

172.     In the ordinary course of their businesses, the Debtors regularly contract with independent tool and die shops (the "**Tool Makers**"), on behalf of both the Debtors and the customers, for the production of specialized tools, moldings, fixtures, and special machines necessary for producing and maintaining customer equipment. The selection and qualification of a Tool Maker and the design and manufacture and qualification of tools can take considerable time; in fact, it is not uncommon for this process to take over a year. Therefore, a number of Tool Makers may be in the process of producing tools that the Debtors need to continue existing lines of business.

173.     The Debtors typically pay for tools either by providing a deposit at the beginning of the production process and the balance owed once production is complete or by making progress payments to the Tool Makers throughout the production process. The Debtors take possession of tools prior to paying the Tool Makers in full for such tools so that all necessary quality and performance-related tests can be performed. Accordingly, the Debtors have not yet fully paid for the majority of the tools being produced by the Tool Makers.

174.     Many states have legislatively granted Tool Makers security interests in finished or unfinished tools.  Moreover, the Debtors frequently contract with the same Tool Makers to produce various tools for various product lines.  The Debtors believe that, upon the commencement of these chapter 11 cases, certain of the Tool Makers may, in enforcing their state law rights, refuse to deliver new tooling in the future or return tooling that they are servicing unless the Tool Makers are paid in full for such tools or provided assurance of future payment.  As such, the Debtors' are requesting that they be granted the authority, in their sole discretion, to pay the Tool Makers for outstanding prepetition amounts owed.

E.     *Miscellaneous Other Lien Claimants*

175.     Numerous third parties render services related to the Debtors' property at the Debtors' various facilities throughout the U.S.  For example, the Debtors rely on third parties to provide maintenance, calibration, stamping, refurbishment, and mechanic services.  Certain of these third parties may have the right to perfect state law statutory liens or mechanics' liens on the Debtors' property and, thus, may be able to hinder the Debtors' use of property needed to operate their businesses.

176.     To the extent any Other Lien Claimant has perfected a lien on any of the Debtors' property or its customers' property or, in the Debtors' estimation, could assert and perfect a lien on any such property, it is imperative that the Debtors be authorized to immediately pay such Other Lien Claimants regardless of whether their claims arose prior to or after the Petition Date to secure the release of any such lien and the Debtors' continued uninterrupted access to the goods and services provided by the Other Lien Claimants.

177.     As of the Petition Date, the Debtors estimate that approximately $23.5 million is owed to Lien Claimants (including Shippers, Warehouseman, and Other Lien Claimants), approximately $16.8 million of which the Debtors expect to be due during the

interim period prior to a final hearing.  Of these amounts, $2.3 million and $3.2 million are attributable to claims under section 503(b)(9) of the Bankruptcy Code on an interim and final basis, respectively.

F.    *Foreign Creditors*

178.    In the ordinary course of conducting their businesses, the Debtors incur various obligations to and rely on many of the Foreign Creditors, which are located in, among other places, Belgium, Bulgaria, Canada China, Croatia, France, Germany, Israel, Italy, Japan, Korea, Spain, Sweden, Switzerland, and the United Kingdom, to supply various goods or services that are crucial to the Debtors' ongoing operations.

179.    Raw Material Suppliers.  The Debtors utilize a significant amount of raw materials in providing products and services to their customers, including, without limitation, zirconium crystals, uranium, magnesium, and various castings and forgings.  While most of these raw materials are sourced from domestic companies, certain of the Debtors' raw material suppliers are located outside the United States.   While the Debtors could seek alternative raw material suppliers, any new supplier would likely charge the Debtors significant premiums and price increases that would negatively impact the Debtors' liquidity and prospects for a successful reorganization.   Additionally, the qualification process for some Foreign Creditors can take up to 18 months.  Therefore, the Debtors seek permission to pay these Foreign Creditors that supply raw materials in order to keep operating costs low at a critical time in the Debtors' reorganization and to meet customer delivery schedules.

180.    Equipment Suppliers.  The Debtors also contract with several overseas suppliers that provide fixtures and equipment that are utilized in the Debtors' business operations.  As the Debtors operate in a highly specialized and technologically demanding industry, there are only a few qualified suppliers the Debtors can rely on to provide equipment

and components that meet the rigorous engineering specifications required by the Debtors' customers. Moreover, several of these vendors also supply equipment that allows the Debtors to safely run their business. For instance, some overseas suppliers provide tubing for components that are necessary to ensure the safe operation of nuclear reactors. Failure to pay these Foreign Creditors could result in hazards to the environment or health and safety. Although the Debtors generally prepay some portion of their equipment supplier obligations prior to shipment, the Debtors are seeking authority to pay any prepetition amounts owed to these Foreign Creditors that supply equipment to continue operating safely and smoothly.

G.    *Other Foreign Creditors*

181.    As previously discussed, the Debtors' businesses utilize numerous patents and trademarks. In addition to the Foreign Creditors above, the Debtors rely heavily on services provided by law firms across the globe (without U.S. offices) that work to defend the Debtors' intellectual property. Failure to pay these Foreign Creditors may jeopardize the Debtors' ability to maintain patents and trademarks that are vital to all five of the Debtors' business lines.

182.    As of the Petition Date, the Debtors estimate that the amount of prepetition claims owed to Foreign Creditors is approximately $20.1 million, approximately $14.7 million of which the Debtors expect to be due during the interim period prior to a final hearing. Of these amounts, $4.4 million and $6.3 million are attributable to claims under section 503(b)(9) of the Bankruptcy Code on an interim and final basis respectively.

183.    The Debtors are making every effort to avoid interruptions in the supply chain and the adverse effects that even a temporary break in the supply chain could have on their businesses. Any short term disruption could generate instability and thus jeopardize the Debtors' ability to preserve their value. Because of the nature of the Debtors' businesses, many

of the Foreign Creditors will make, or have made, credible actionable threats that, unless paid on account of the prepetition debt, they will cease to supply the Debtors with the specialized goods and services necessary to maintain the operation of the Debtors' businesses.

184.    Additionally, most of the Foreign Creditors have little or no connection to the United States.  Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtors may not be able to enforce the stay in foreign jurisdictions if the creditor against whom enforcement is sought has minimal or no presence in the United States.  As a result, despite the commencement of these cases and the imposition of the automatic stay, the Foreign Creditors may be able to immediately pursue remedies and seek to collect prepetition amounts owed to them.  Indeed, there is the real risk that Foreign Creditors may attach or seize the Company's assets in their jurisdictions—which would significantly disrupt operations.

185.    In light of the potential for serious and irreparable consequences if the Foreign Creditors do not continue to make uninterrupted and timely deliveries and/or take actions outside the United States to collect on prepetition obligations the Debtors have determined, in the exercise of their business judgment, that payment of certain Foreign Creditors' claims is essential to avoid costly disruptions to the Debtors' operations and, accordingly, the Debtors believe the relief requested in this motion should be granted.

186.    *Payment Protocol for All Vendor Claimants*.  To minimize the amount of payments required, the Debtors request authority to identify and pay particular Critical Vendors, Lien Claimants, and Foreign Creditors (collectively, the "**Vendor Claimants**" and their prepetition claims, the "**Vendor Claims**"), including Vendor Claimants with claims under section 503(b)(9) of the Bankruptcy Code, utilizing the following payment protocol (the

"**Payment Protocol**") which includes (i) routing requests for Vendor Claimant treatment through a centralized control center staffed by specifically identified members of the Supplier Management Committee, and assisted by professionals from AlixPartners and Weil; (ii) reviewing any proposed payment on account of a prepetition claim for, among other things, (a) the business need for the goods or services at issue; (b) the terms offered by the particular vendor; (c) the amount of payment at issue; and (d) the existence of any contract requiring the vendor to perform and the likelihood that the Debtors could compel performance in time to prevent loss of value to the Debtors' businesses; (iii) requiring written approval of material business terms (including proposed payments) by specifically-designated members of the Debtors' management team, with any necessary assistance from the Debtors' professionals; (iv) requiring all proposed payments of $450,000 to be approved by the Debtors' Vice President of Finance; (v) requiring that all proposed payments be documented pursuant to an executed vendor agreement in which the Vendor Claimant agrees to continue to supply goods or services to the Debtors as well as any and all entities affiliated with the Debtors on "Customary Trade Terms" for 24 months from the date of the agreement, with any specific exception from this requirement to be made only with the express authorization of the Debtors' Vice President of Finance and notice to counsel to the DIP Lenders; and (vi) permitting payment to only be physically executed by specifically-designated members of the Debtors' finance department when the Payment Protocol has been completed and upon presentation of completed documentation.  As used herein, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the parties, including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the 24 months

before the Petition Date, or such other trade terms as agreed by the Debtors and the Vendor Claimant.

187.     The Debtors believe that their deliberative process, combined with their comprehensive Payment Protocol, justifies the relief requested in the Motion.

188.     <u>Prepetition Purchase Orders</u>.  As of the Petition Date, the Debtors have certain prepetition purchase orders (the "**Prepetition Purchase Orders**") outstanding with various third party vendors and suppliers (the "**Vendors**") for goods and/or services ordered by the Debtors that have not yet been delivered to the Debtors' facilities or provided to the Debtors. These Vendors may be concerned that, because the Debtors' obligations under the Prepetition Purchase Orders arose prior to the Petition Date, such obligations will be treated as general unsecured claims in these chapter 11 cases.  Accordingly, certain Vendors may refuse to provide goods and/or services to the Debtors purchased pursuant to the Prepetition Purchase Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (i) confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods and/or services subject to Prepetition Purchase Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code and (ii) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

189.     As discussed above, any delay in the shipment or delivery of goods and/or services could bring the Debtors' operations to a halt, harming the Debtors' businesses. Further, as also discussed above, interruption could pose a significant risk to health and safety. Although it is difficult to estimate the total amount due and owing under the Prepetition Purchase Orders for goods and/or services that are not scheduled to be delivered or provided until after the Petition Date, the Debtors submit that the total amount to be paid to the Vendors in connection

therewith, if the relief requested herein is granted, is *de minimis* compared to the importance and necessity of the goods and/or services provided.

    **(iv)**    ***Taxes Motion***

    190.    Pursuant to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541 and Fed. R. Bankr. P. 6003 and 6004 Authorizing (I) Payment of Certain Prepetition Taxes and (II) Banks to Honor and Process Related Checks and Transfers* (the "**Taxes Motion**"), the Debtors are requesting (i) interim and final authority to pay various local, state, federal, and foreign taxing authorities (collectively, the "**Taxing Authorities**") all Taxes (as defined below) that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) that the Court authorize, but not direct, the Banks to receive, honor, process, and pay all checks issued or to be issued and electronic fund transfers requested or to be requested relating to the above.

    191.    The taxes and assessments to which the Debtors are typically subject generally fall into the following categories, each of which is described in further detail in the Taxes Motion: Franchise Taxes, Sales and Use Taxes, Property Taxes, Customs Duties, Regulatory Fees, and Other Taxes (each herein defined and collectively, the "**Taxes**"). The Debtors pay the Taxes monthly, quarterly, or annually, in each case as required by applicable laws and regulations. In the last 12 months, the Debtors paid approximately $53.0 million in Taxes. The Debtors estimate that approximately $6.4 million in Taxes relating to the prepetition period will become due and owing to the Taxing Authorities after the Petition Date, including approximately $2.1 million during the interim period.

    192.    The Taxes are summarized as follows and each Tax is discussed in turn:

| Category | Estimated Total Amount Accrued as of Petition Date | Estimated Amount Due in Interim Period |
| --- | --- | --- |
| Franchise Taxes | $500,000 | $0 |
| Sales and Use Taxes | $1,600,000 | $1,600,000 |
| Property Taxes | $1,700,000 | $0 |
| Regulatory Fees | $1,500,000 | $0 |
| Import/Export Taxes | $200,000 | $200,000 |
| Other Taxes | $900,000 | $300,000 |
| **Total** | **$6,400,000** | **$2,100,000** |

193.    <u>Franchise Taxes</u>.    The Debtors are required to pay certain taxes assessed for the privilege of doing business within a particular jurisdiction (collectively, the "**Franchise Taxes**").    The Franchise Taxes are typically paid annually, either in advance or in arrears, to the applicable Taxing Authorities.    The Debtors estimate that approximately $500,000 in Franchise Taxes relating to the prepetition period have accrued as of the Petition Date, none of which will become due and owing in the interim period.

194.    <u>Sales and Use Taxes</u>.    The Debtors are required in certain states to collect and pay sales and use taxes (collectively, the "**Sales and Use Taxes**").    The Debtors collect sales taxes from purchasers of their products and/or services on a per sale basis and periodically remit the sales taxes to the applicable Taxing Authorities.    The Debtors also incur and collect use taxes, primarily when property or services are purchased from vendors that have no nexus to the resident state of the Debtors.    The Debtors are obligated to self-assess and pay the use taxes, when applicable, to the states in which such purchasers operate.    Sales and Use Taxes are paid in arrears on a monthly, annual, semi-annual, or quarterly basis, depending on the

state.  If the Debtors do not pay the Sales and Use Taxes in accordance with their obligations, then the Debtors will become liable for further amounts in the form of penalties.  The Debtors estimate that approximately $1.6 million in Sales and Use Taxes relating to the prepetition period have accrued and/or been collected as of the Petition Date, all of which will become due and owing in the interim period.

195.    Property Taxes.  The Debtors own real and personal property located throughout the country that is subject to state, county, and local property taxes (the "**Real Property Taxes**" and "**Personal Property Taxes**," respectively, and collectively, the "**Property Taxes**").  The Real Property Taxes typically accrue on an annualized basis.  Depending on the jurisdiction in which the property is located, the Real Property Taxes are either paid in arrears or for the current year, (annually, semi-annually, or quarterly).  The Personal Property Taxes typically accrue on an annualized basis and are paid annually in arrears.  The Debtors estimate that approximately $1.7 million in Property Taxes relating to the prepetition period have accrued as of the Petition Date, none of which will become due and owing in the interim period.

196.    Regulatory Fees.  The Debtors are required to pay certain regulatory assessments, permitting fees, licensing fees, levies, and federal, state, and other miscellaneous fees or charges (collectively, the "**Regulatory Fees**").  The continued payment of these Regulatory Fees is crucial to the continued operation of the Debtors' businesses.  The Debtors estimate that approximately $1.5 million in Regulatory Fees relating to the prepetition period have accrued as of the Petition Date, none of which will become due and owing in the interim period.

197.    Import/Export Taxes.  The Debtors are required to pay certain customs duties, tariffs, and other taxes, fees, and charges relating to the import and export of goods

(collectively, the "**Import/Export Taxes**").    The continued payment of these Import/Export Taxes, including any such Taxes due and owing on account of prepetition Other Taxes, is crucial to the continued operation of the Debtors' businesses.    The Debtors estimate that they owe approximately $200,000 on account of Import/Export Taxes relating to the prepetition period, all of which will become due and owing in the interim period.

198.    <u>Other Taxes</u>.    In the ordinary course of business, the Debtors may collect, withhold, or incur other miscellaneous taxes, fees, or charges (collectively, the "**Other Taxes**").    The Debtors estimate that approximately $900,000 in Other Taxes relating to the prepetition period have accrued as of the Petition Date, of which $300,000 will become due and owing in the interim period.

199.    <u>Audits</u>.    The amounts of the Taxes listed above are good-faith estimates based on the Debtors' books and records and remain subject to potential and ongoing audits and other adjustments.

200.    The Debtors seek to pay the prepetition Taxes to, among other things, discourage the Taxing Authorities from taking actions that may interfere with the Debtors' continued business operations.    Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, asserting liens, seeking to lift the automatic stay, or revoking or suspending necessary licenses, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

201.    Failure to satisfy the prepetition Taxes may also jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.

Failure to make timely payment of certain Taxes may result in the interruption of the Debtors' business operations.

202.    The Debtors file approximately 176 tax returns monthly within the 44 states in which they have a tax nexus.  The failure to remit prepetition Taxes, such as Sales and Use Taxes, significantly increases the Debtors' officers' and directors' exposure to possible personal liability during the pendency of these chapter 11 cases.  The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their officers and directors from important tasks during a critical time.  This would be detrimental to parties in interest because the dedicated and active participation of the Debtors' officers and directors is integral to the Debtors' continued operations and essential to the orderly administration of these chapter 11 cases.

      (v)    *KCC Retention Application*

203.    By the *Application of Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 5075-1 for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors* (the "**KCC Retention Application**"), pursuant to section 156(c) of title 28 of the United States Code, section 105(a) of the Bankruptcy Code, and Local Rule 5075-1, the Debtors request authority to appoint Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent in the Debtors' chapter 11 cases, in accordance with the terms and conditions of that certain engagement agreement dated as of March 27, 2017, effective *nunc pro tunc* to the Petition Date.

204.    The Debtors request entry of an order appointing KCC as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  Although the Debtors have not yet filed

their schedules of assets and liabilities, they anticipate that there will be approximately 35,000 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of KCC as claims and noticing agent is in the best interests of both the Debtors' estates and their creditors.

  **(vi)**  *Interim Assessment Agreement Approval Motion*

  205.  Pursuant to the *Interim Assessment Agreement Approval Motion*, the Debtors seek authorization under section 105(a) of the Bankruptcy Code to enter into (i) the VC Summer Interim Assessment Agreement between WEC, WECTEC, and the VC Summer Owners and (ii) the Vogtle Interim Assessment Agreement between WEC, WECTEC, and the Vogtle Owners.  The Interim Assessment Agreements are cost-neutral and cash-neutral to the Debtors, and are in the best interests of the Debtors and their estates.

## VI.

## Information Required Pursuant to Local Rule 1007-2

  206.  In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

  207.  Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

  208.  Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' thirty (30) largest unsecured claims on a consolidated basis, excluding claims of insiders.

  209.  Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the four (4) largest secured claims against the Debtors on a consolidated basis.

210.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

211.    Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

212.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

213.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

214.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

215.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

216.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

217.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

218.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated: March 29, 2017
       New York, New York


                                    /s/ Lisa J. Donahue
                              Name: Lisa J. Donahue
                              Title:  Chief Transition and Development Officer
                                      Westinghouse Electric Company LLC

## <u>Exhibit A</u>

**Corporate Organizational Chart**



## Schedule 1

**Committees**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no committee has been organized prior to the Commencement Date.

## Schedule 2

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, the thirty (30) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| FLUOR ENTERPRISES INC (FEI) 100 Fluor Daniel Drive Greenville SC 29607 US | Pat Selvaggio Pat.Selvaggio@Fluor.com | Trade Debts | | $0 | $0 | $193,891,735 |
| CB&I One CB&I Plaza, 2103 Research Forest Drive The Woodlands TX 77380 US | Lee Pressley (815) 342-3905 lpresley@CBI.com | Deferred Purchase Price | Contingent | $0 | $0 | $145,000,000 |
| CB&I LAURENS INC 366 Old Airport Rd Laurens SC 29360 US | Rick Crow/Project Manager 864-683-3962 Rick.crow@cbi.com | Trade Debts | | $0 | $0 | $32,806,489 |
| NEWPORT NEWS INDUSTRIAL CORP 182 Enterprise Dr Newport News VA 23603-1368 US | Steve Napiecek/VP & GM 757-870-2463 Steve.Napiecek@hii-nns.com | Trade Debts | | $0 | $0 | $18,463,053 |
| NUCLEAR FUEL SERVICES INC 1205 Banner Hill Rd Erwin TN 37650-9318 US | Frank Masseth 423-735-5661 fxmasseth@nuclearfuelservices.com | Trade Debts | | $0 | $0 | $10,086,210 |
| VIGOR 9460 Se Lawnfield Rd. Clackamas OR 97015 US | Corey Yraguen/President 503-314-0859 Corey.Yraguen@vigor.net | Trade Debts | | $0 | $0 | $8,345,458 |
| THOMPSON CONSTRUCTION GROUP IN 100 North Main Street Sumter SC 29150 US | William Gryant, VP 864-643-9592 bbryant@thompsonind.com | Trade Debts | | $0 | $0 | $8,027,241 |
| RSCC WIRE & CABLE LLC 20 Bradley Park Rd East Granby CT 06026-9789 US | Mark St. Onge / Director of Strategic Accounts 203-645-2275 Mark.stonge@r-scc.com | Trade Debts | | $0 | $0 | $7,931,485 |
| CURTISS WRIGHT 13925 Ballantyne Corporate Place, Suite 400 Charlotte NC 28277 US | David C. Adams, CEO 704-869-4667 dadams@CURTISSWRIGHT.com | Trade Debts | | $0 | $0 | $7,782,122 |
| NEWPORT NEWS INDUSTRIAL CORP 182 Enterprise Dr Newport News VA 23603-1368 US | Matt Gorman/GM 412-777-2101, ext 320 mgorman@ssmi.biz | Trade Debts | | $0 | $0 | $5,479,722 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| AECON INDUSTRIAL<br>150 Sheldon Drive<br>Cambridge<br><br>N1R 7K9<br>CND | Ian Turnbull/Sr. VP<br>519-240-5487<br>iturnbull@aecon.com | Trade Debts | | $0 | $0 | $5,465,543 |
| WILLIAMS SPECIALTY SERVICES LL<br>100 Crescent Centre Parkway<br>Tucker<br>GA<br>30084<br>US | Douglas Page, President<br>770-595-7691<br>dpage@wisgrp.com | Trade Debts | | $0 | $0 | $5,153,942 |
| GEXPRO<br>1000 Bridgeport Ave<br>Shelton<br>CT<br>06484<br>US | Dan Collins<br>412-877-0267<br>Dan.Collins@gexpro.com | Trade Debts | | $0 | $0 | $5,087,626 |
| SMCI<br>4015 Drane Field Rd<br>Lakeland<br>FL<br>33811-1290<br>US | Bob Marshall/EVP & CFO<br>423-413-1582<br>Bob.marshall@metaltek.com | Trade Debts | | $0 | $0 | $5,012,335 |
| RESEARCH COTTRELL COOLING INC<br>58 East Main Street<br>Somerville<br>NJ<br>08876<br>US | John Urbaniak<br><br>John.urbaniak@rc-cooling.com | Trade Debts | | $0 | $0 | $4,386,505 |
| GARNEY COMPANIES INC<br>5895 Shiloh Road, Suite 114<br>Alpharetta<br>GA<br>30004<br>US | Greg Harris<br>(770) 754-4141<br>gharris@garney.com | Trade Debts | | $0 | $0 | $3,762,101 |
| ACCENTURE LLP<br>K&L Gates Center 210 6th Ave. 25th Floor<br>Pittsburgh<br>PA<br>15222-2614<br>US | Mark Sobota<br><br>mark.sobota@accenture.com 724-787-9807 | Trade Debts | Contingent | $0 | $0 | $3,494,139 |
| OWEN INDUSTRIES INC<br>501 Avenue H<br>carter Lake<br>IA<br>51510<br>US | Tyler Owen/President<br>402-290-1481<br>towen@owenind.com | Trade Debts | | $0 | $0 | $3,410,946 |
| DUBOSE NATIONAL ENERGY SERVICE<br>900 Industrial Dr<br>Clinton<br>NC<br>28328-8068<br>US | Richard Rogers/VP and GM<br>910-590-2151<br>Richard.rogers@dubosenes.com | Trade Debts | | $0 | $0 | $3,358,718 |
| STEELFAB INC<br>8623 Old Dowd Rd.<br>Charlotte<br>NC<br>28214<br>US | Glen Sherrill/President<br>704-604-6603<br>GSherrill@steelfab-inc.com | Trade Debts | | $0 | $0 | $3,151,617 |
| CSC COMPUTER SCIENCES CORP<br>1775 Tysons Blvd<br>Mc Lean<br>VA<br>22102-4284<br>US | Rick Beroth<br>336-399-9825<br>rberoth@csc.com | Trade Debts | | $0 | $0 | $3,090,237 |
| ENVIROVAC HOLDINGS LLC<br>486 Old Louisville Road<br>Garden City<br>GA<br>31408<br>US | Ann Brown<br>912-964-0660<br>ann@envirovac.us | Trade Debts | | $0 | $0 | $3,040,135 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| AMERICAN EQUIPMENT CO<br>2106 Anderson Road<br>Greenville<br>SC<br>29611<br>US | Dean Smith, VP Operations<br>864.354.9520<br>dean.smith@ameco.com | Trade Debts | | $0 | $0 | $3,018,565 |
| VALLEN<br>900 Sunset Blvd<br>West Columbia<br>SC<br>29169-6860<br>US | Cantey Haile<br>Cantey.Haile@vallen.com | Trade Debts | | $0 | $0 | $2,948,212 |
| HERC RENTALS<br>6230 S Loop E<br>Houston<br>TX<br>77087<br>US | James Fiscus, VP Sales<br>832-414-0236<br>james.fiscus@hercrentals.com | Trade Debts | | $0 | $0 | $2,846,014 |
| SIEMENS INDUSTRY INC<br>4620 Forest Ave<br>Cincinnati<br>OH<br>45212-3306<br>US | Scott Conner - VP & General Manager<br>540-314-7009<br>scott.conner@siemens.com | Trade Debts | | $0 | $0 | $2,824,817 |
| CALVERT COMPANY INCORPORATED<br>3100 West 7th Street, Suite 500<br>Fort Worth<br>TX<br>76107<br>US | Douglas Calvert / Presiden<br>(912) 293-2278<br>sambarr@azz.com | Trade Debts | | $0 | $0 | $2,614,441 |
| JONES LANG LASALLE AMERCIAS INC<br>200 E Randolph St Ste 4300<br>Chicago<br>IL<br>60601-6519<br>US | Matt Gonterman / CIO<br>312 228 2142<br>matt.gonterman@am.jll.com | Trade Debts | | $0 | $0 | $2,582,841 |
| EATON CORP<br>8609 Six Forks Rd<br>Raleigh<br>NC<br>27615-2966<br>US | General Counsel | Trade Debts | | $0 | $0 | $2,475,281 |
| MARTIN MARIETTA MATERIALS<br>Dba Martin Marietta Aggregates<br>Columbia<br>SC<br>29033<br>US | Roselyn R. Bar - Executive Vice President & General Counsel<br>(919) 783-4603<br>roselyn.bar@martinmarietta.com | Trade Debts | | $0 | $0 | $2,434,753 |

## <u>Schedule 3</u>

**Holders of the four (4) largest secured claims against the Debtors on a consolidated basis**

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, there are no liquidated secured claims against the Debtors.

### Schedule 4
Condensed Consolidated Balance Sheet (Unaudited)

**Condensed & Consolidated Balance Sheet**
**Rounded to millions (USD)**

| | 2/28/2017 | 1/28/2017 | 3/31/2016 | 2/29/2016 |
|---|---|---|---|---|
| Assets | | | | |
| Current Assets | | | | |
| Cash and Cash Equivalents | $ 106 | $ 80 | $ 120 | $ 42 |
| Accounts Receivable | 657 | 470 | 428 | 596 |
| Allowance for Doubtful Accounts | (2) | (2) | (1) | (1) |
| Inventories, Net | 295 | 312 | 287 | 314 |
| Costs and Estimated Earnings in Excess of Billings | 563 | 601 | 1,477 | 1,116 |
| Other Current Assets | 464 | 476 | 262 | 211 |
| **Total Current Assets** | **$ 2,083** | **$ 1,937** | **$ 2,573** | **$ 2,278** |
| | | | | |
| Noncurrent Assets | | | | |
| Plant, Property & Equipment - Gross, Net | $ 617 | $ 621 | $ 686 | $ 688 |
| Goodwill | 512 | 512 | 742 | 742 |
| Other Intangible Assets, Net | 984 | 988 | 1,035 | 1,039 |
| Other Noncurrent Assets | 133 | 117 | 497 | 400 |
| **Total Assets** | **$ 4,329** | **$ 4,175** | **$ 5,533** | **$ 5,146** |
| | | | | |
| Liabilities | | | | |
| Current Liabilities | | | | |
| Accounts Payable | $ 624 | $ 694 | $ 489 | $ 417 |
| Billings in Excess of Costs and Estimated Earnings | 1,720 | 1,678 | 1,770 | 1,599 |
| Reserve for Contract Loss | 4,007 | 4,091 | 28 | 32 |
| Other Current Liabilities | 1,363 | 1,125 | 699 | 592 |
| **Total Current Liabilities** | **$ 7,714** | **$ 7,588** | **$ 2,986** | **$ 2,640** |
| | | | | |
| Noncurrent Liabilities | | | | |
| Reserves for Decommissioning Matters | $ 128 | $ 128 | $ 124 | $ 128 |
| Benefit Obligations | 521 | 516 | 489 | 538 |
| Deferred Income Tax Liabilities | 291 | 291 | 298 | 247 |
| Other Noncurrent Liabilities | 737 | 726 | 664 | 717 |
| **Total Liabilities** | **$ 9,391** | **$ 9,249** | **$ 4,561** | **$ 4,270** |
| | | | | |
| Equity | | | | |
| Capital Stock | $ 3,677 | $ 3,676 | $ 3,680 | $ 3,569 |
| Retained (Deficit) Earnings | (8,543) | (8,554) | (2,498) | (2,488) |
| Accumulated Other Comprehensive Loss | (196) | (196) | (210) | (204) |
| Noncontrolling Interests | - | - | - | - |
| **Total Equity** | **$ (5,062)** | **$ (5,074)** | **$ 972** | **$ 877** |
| | | | | |
| **Total Liabilities + Shareholder's Equity** | **$ 4,329** | **$ 4,175** | **$ 5,533** | **$ 5,146** |

## Schedule 5

**The Debtors' Securities**

Pursuant to Local Rule 1007-2(a)(7), the Debtors do not have any publicly traded stock, debentures, or securities.

## Schedule 6

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or  custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, materialmen, distributors, warehousemen, service providers or custodians, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property and their addresses and telephone numbers would be impractical.

**Schedule 7**

List of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Property Name | Address | City | State Province | Postal Code | Country | Property Type | Ownership Type |
|---|---|---|---|---|---|---|---|
| Augusta | 2215 Tobacco Rd | Augusta | Georgia | 30906-8111 | United States | Office | Leased |
| Birmingham | 44 Inverness Center Parkway | Birmingham | Alabama | 35242 | United States | Office | Leased |
| Blairsville | 559 Westinghouse Road | Blairsville | Pennsylvania | 15717 | United States | Manufacturing | Owned |
| Blythewood | 110 Belk Ct | Blythewood | South Carolina | 29016-7301 | United States | Warehouse | Leased |
| Burr Ridge - 16W070 West 83rd | 16W070 West 83rd Street | Burr Ridge | Illinois | 60527 | United States | Shop | Leased |
| Burr Ridge - 341 Shore Drive | 341 Shore Drive | Burr Ridge | Illinois | 60527 | United States | Shop | Leased |
| Canton | 150 Royall St | Canton | Massachusetts | 02021-1031 | United States | Office | Leased |
| Charlotte - Glen Lake | 3730 Glen Lake Dr | Charlotte | North Carolina | 28201 | United States | Office | Leased |
| Charlotte - Glen Lake 2 | 3735 Glen Lake Dr | Charlotte | North Carolina | 28208 | United States | Office | Leased |
| Chattanooga | 401 River Terminal Road | Chattanooga | Tennessee | 37406 | United States | Shop | Owned |
| Clearfield | Freeport Center | Clearfield | Utah | 84016 | United States | Warehouse | Leased |
| Clearfield 2 | Freeport Center | Clearfield | Utah | 84016 | United States | Warehouse | Leased |
| Cranberry | 400 Bertha Lamme Drive | Cranberry | Pennsylvania | 16066 | United States | Office | Subleased |
| Cranberry | 400 Bertha Lamme Drive | Cranberry | Pennsylvania | 16066 | United States | Office | Leased |
| Cranberry | 1000 Westinghouse Drive | Cranberry | Pennsylvania | 16066 | United States | Office | Leased |
| Cranberry | 1000 Westinghouse Drive | Cranberry | Pennsylvania | 16066 | United States | Office | Subleased |
| Festus - 3181 State Road P | 3181 State Road P | Festus | Missouri | 63028 | United States | Residential | Owned |
| Festus - 3300 State Road P | 3300 State Road P | Festus | Missouri | 63028 | United States | Office | Owned |
| Festus - 3400 Kathleen Drive | 3400 Kathleen Drive | Festus | Missouri | 63028 | United States | Residential | Owned |
| Goodyear | 1626 North Litchfield Road | Goodyear | Arizona | 85395 | United States | Office | Leased |
| Greenwood Village | 6400 South Fiddlers Green Circle | Greenwood Village | Colorado | 80111 | United States | Office | Leased |
| Hopkins | 5801 Bluff Street | Hopkins | South Carolina | 29061 | United States | Manufacturing | Owned |
| Hutchinson | 900 Highway 7 West | Hutchinson | Minnesota | 55350 | United States | Shop | Leased |
| Hutchinson (Vale) | 19405 Vale Ave. | Hutchinson | Minnesota | 55350 | United States | Warehouse | Leased |
| Lake Bluff Owned | One Energy Drive | Lake Bluff | Illinois | 60044 | United States | Shop | Owned |
| Madison | 680 Waltz Mill | Madison | Pennsylvania | 15663 | United States | Multiple | Owned |
| Madison | 680 Waltz Mill | Madison | Pennsylvania | 15663 | United States | Office | Subleased |
| Monroeville | 4350 Northern Pike | Monroeville | Pennsylvania | 15146 | United States | Office | Leased |
| New Stanton | 1000 Westinghouse Drive | New Stanton | Pennsylvania | 15672 | United States | Multiple | Leased |
| Newington | 205 Shattuck Way | Newington | New Hampshire | 03801 | United States | Multiple | Leased |
| Newington | 20 Durham Street | Portsmouth | New Hampshire | 03801 | United States | Multiple | Leased |
| Newington | 178 Shattuck Way | Newington | New Hampshire | 03801 | United States | Manufacturing | Owned |
| Ogden | 10000 West 900 South | Ogden | Utah | 84404 | United States | Manufacturing | Owned |
| Pittsburgh | 1332 Beulah Road | Pittsburgh | Pennsylvania | 15235 | United States | Shop | Leased |

| Property Name | Address | City | State Province | Postal Code | Country | Property Type | Ownership Type |
|---|---|---|---|---|---|---|---|
| Portsmouth | 195 New Hampshire Avenue | Portsmouth | New Hampshire | 03801 | United States | Warehouse | Leased |
| Richland | 2939 Richardson Road | Richland | Washington | 99352 | United States | Shop | Leased |
| Rock Hill | 244 East Mount Gallant Road | Rock Hill | South Carolina | 29730 | United States | Multiple | Owned |
| Rockville | 11333 Woodglen Drive | Rockville | Maryland | 20852 | United States | Office | Leased |
| San Jose | 226 Airport Parkway | San Jose | California | 95110 | United States | Office | Leased |
| Shoreview | 899 Highway 96 West | Shoreview | Minnesota | 55126 | United States | Manufacturing | Owned |
| Warrendale | 4000 and 5000 Marconi Drive | Warrendale | Pennsylvania | 15086 | United States | Multiple | Leased |
| Washington, D.C | 1775 Pennsylvania Ave NW Fl 2 | Washington | District of Columbia | 20006-4605 | United States | Office | Leased |
| Waynesboro | 321 Mills Road | Waynesboro | Georgia | 30830 | United States | Warehouse | Leased |
| West Columbia | 375 Metropolitan Dr | West Columbia | South Carolina | 29170-2265 | United States | Warehouse | Leased |
| Windsor | 20 International Drive | Windsor | Connecticut | 06095 | United States | Office | Leased |
| Windsor | 102 Addison Road | Windsor | Connecticut | 06095 | United States | Office | Owned |

## Schedule 8

**Location of Debtors' Assets, Books, and Records**

Pursuant to Local Rule 1007-2(a)(1), the following lists the locations of the
Debtors' substantial assets, the location of their books and records, and the nature, location, and
value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of Debtors' Substantial Assets**

The Debtors have assets of more than $4.3 Billion, as provided in Schedule 4, with substantial
assets in Alabama, Arizona, California, Colorado, Connecticut, District of Columbia, Georgia, Kentucky, Illinois, Maryland,
Massachusetts, Minnesota, Missouri, New Hampshire, North Carolina, Texas, Pennsylvania, South Carolina,  Tennessee, Utah,
and Washington.

**Books and Records**

The Debtors' books and records are located at 1000 Westinghouse Drive, Cranberry Township, PA 16066

## <u>Schedule 9</u>

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Commencement Date, where a judgment against the Debtors or a seizure of their property may be imminent.

**Schedule 10**

Senior Management

Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilites and Experience |
| --- | --- |
| *Danny Roderick*<br><br>*Chairman of the Board of Westinghouse Electric Company* | Danny Roderick currently serves as Chairman of the Board of Westinghouse Electric Company after being named to the role on March 12, 2016.<br><br>Danny Roderick joined Westinghouse Electric Company as president and chief executive officer on Sept. 26, 2012. He joined Westinghouse with more than 30 years of proven performance within the nuclear industry.<br>Before his Westinghouse appointment, Mr. Roderick was senior vice president, Nuclear Plant Projects, with GE-Hitachi (GEH) Nuclear Energy, where he managed all facets of new and existing nuclear plant projects. Prior to that, Mr. Roderick held progressively responsible leadership positions at GEH within engineering and project management, outage and work controls, and operations.<br>Mr. Roderick also was site operations director and plant general manager at Progress Energy's Crystal River Nuclear Plant. As the company's vice president of Nuclear Projects and Construction, he also managed a multibillion-dollar new-nuclear expansion program.<br>Before joining Progress Energy, Mr. Roderick spent 13 years with Entergy's Nuclear Division working in plant operations and engineering. Also, he spent three years as a startup and field engineer with Johnson Controls and Howard S. Wright Contractors at the Perry Nuclear and Columbia Generating Stations.<br>Mr. Roderick has a bachelor's degree from Lake Erie College and a master's degree in Operations Management from the University of Arkansas. |
| *José Emeterio Gutiérrez*<br>*Interim President and Chief Executive Officer* | José Emeterio Gutiérrez was named interim president and chief executive officer in June 2016.<br><br>Prior to being named to the company's highest leadership role, Mr. Gutiérrez led the Westinghouse global Nuclear Fuel and Components Manufacturing (NF&CM) organization, a product line that provides nuclear fuel, fuel-handling equipment and cranes, large nuclear components and global nuclear supply chain services to a global customer base.<br><br>Mr. Gutiérrez, who also had been a member of the Westinghouse Board of Directors, will retain his role on the board as the acting president and CEO.<br><br>Prior to serving as senior vice president of NF&CM, which he assumed in April 2012, Mr. Gutiérrez served as managing director and vice president for Southern Europe in Westinghouse's Europe, Middle East and Africa (EMEA) region since 2010. In this position he was responsible for operations in Spain, Slovenia, Italy, Bulgaria and Romania, and also was responsible for customer and stakeholder interfaces, Westinghouse legal representation and statutory requirements.<br><br>Additionally, Mr. Gutiérrez served as regional vice president of Spain for Westinghouse, as well as Nuclear Services technical director, leading all Westinghouse Services operations in Spain between 2008 and 2010.<br><br>Prior to joining Westinghouse, he held fuel leadership positions with ENUSA Industrias Avanzadas S.A. in Spain over a period of 22 years. In his nuclear fuel director role at ENUSA, Mr. Gutiérrez was responsible for leading the Juzbado Manufacturing Plant and had full responsibility before the Spanish Nuclear Regulatory Commission. Overall, he brings more than 25 years of experience in the global nuclear market, including experience in nuclear fuel engineering and fabrication, as well as participation in various GE nuclear fuel development projects in the United States.<br><br>He served as chairman of the Spanish Nuclear Society between 2009 and 2011, and has been a member of several European organizations such as Foratom European Atomic Forum and the European Nuclear Society. He also served as dean of the Business School of Westinghouse University, which is designed to prepare the Westinghouse workforce for the future.<br><br>Mr. Gutiérrez received a civil engineering degree from the Polytechnic University of Madrid and is a certified Westinghouse Customer 1st (continuous improvement) Green Belt. |

| Name & Position | Responsibilites and Experience |
|---|---|
| **Mark Marano**<br><br>*Chief Operating Officer* | Mark Marano brings nearly 30 years of nuclear industry and vendor operations experience to his position of Chief Operating Officer. Since March 2017 Marano has held global responsibility for the company's core businesses of Nuclear Fuel and Components Manufacturing; Operating Plants Business; Decontamination, Decommissioning, Remediation and Waste Management; the company's Engineering Center of Excellence; and nuclear regulatory affairs. He is also responsible for corporate strategy, and is committed to increased alignment with customers by uniting the company's product lines and engineering teams under a single operational focus.<br><br>Previously Marano was president, Americas and Europe, Middle East and Africa Regions. He was responsible for Westinghouse customer relationships, account team development, and government and regulatory affairs within the two Regions. He oversaw global marketing, commercial operations, communications, corporate development, strategy and facilities management, all to enhance customer value while realizing targeted strategic growth.<br><br>Prior to his tenure at Westinghouse, Marano held executive leadership roles at AREVA NP, Burns and Roe Enterprises, Inc. and GE Hitachi.<br><br>Marano also held a progressive series of management positions at American Electric Power and their power generation fleet of 82 plants in 11 states, inclusive of nuclear, coal, gas and hydroelectricity.<br><br>Prior to his roles at AEP, Marano spent 10 years in successive levels of senior management positions at nuclear plants sites, including Florida Power and Light, Carolina Power and Light, Public Services Electric and Gas and Florida Power Corporation.<br><br>Before his commercial nuclear experience, Marano worked for Grumman Aerospace and the defense industry.<br><br>Marano was appointed in 2015 to the boards of directors for Westinghouse Electric Company and Toshiba America Energy Systems. Also he holds board directorships with E4 Carolinas—an energy industry-related trade association in the Charlotte, N. Carolina (USA) region; the University of North Carolina at Charlotte's Energy Production and Infrastructure Center; and the U.S.-based National Association of Manufacturers.<br><br>Marano graduated from Oswego State University in 1984 with a Bachelor's degree in business administration. |
| **David Durham**<br><br>*Senior Vice President, New Projects Business*<br><br>*President of WECTEC LLC* | David Durham is senior vice president, New Projects Business, and president of WECTEC LLC, a wholly owned Westinghouse subsidiary. He is responsible for all aspects of Westinghouse's New Plant organization, including current AP1000® plant projects and business development, as well as the services provided by the WECTEC product line, which include government services, project support services and contingency staffing services.<br><br>Mr. Durham joined Westinghouse in 2015; since January 2016, he has led the WECTEC Services product line, the majority of which supports Westinghouse's AP1000 plant projects. Before coming to Westinghouse, Mr. Durham was senior vice president and chief commercial officer at GE Hitachi Nuclear Energy. Previously, he was vice president of Fluor Corporation, leading commercial activities for the company's global nuclear power and government businesses.<br><br>Earlier in his career, Mr. Durham served in the administration of U.S. President George H.W. Bush, overseeing the creation and operations of the defense nuclear facilities cleanup program for Energy Secretary James Watkins, as well as federal facilities enforcement for U.S. Environmental Protection Agency Administrator Bill Reilly.<br><br>Mr. Durham holds a juris doctor degree from the George Washington University National Law Center and bachelor's degrees in foreign affairs and history from Assumption College. |
| **Steve Hamilton**<br><br>*Senior Vice President*<br><br>*Quality, Environment, Health and Safety* | Steve Hamilton brings more than 32 years of global nuclear quality experience to Westinghouse where he leads global efforts in continuous improvement, quality compliance, environment, health and safety activities, as well as global information systems and technology. His broad experience complements Westinghouse's already strong commitment and capabilities in these areas.<br><br>He comes to Westinghouse from GE Hitachi Nuclear Energy, where he was senior vice president, nuclear oversight. While there, Mr. Hamilton led programs such as quality assurance; Lean Six Sigma; continuous improvement; environment, health and safety; regulatory affairs; human performance; technical training; and nuclear safety culture.<br><br>Prior to that, he served as vice president, quality and performance with AREVA Inc. He also spent 13 years with Carolina Power & Light Company's Brunswick Nuclear Station.<br>Mr. Hamilton also is a previous Westinghouse employee who served as president, PN Services, a former Westinghouse subsidiary specializing in chemical cleaning and decontamination for nuclear reactors.<br>Mr. Hamilton holds a bachelor's degree in environmental science from University of North Carolina at Wilmington and a master's degree in business administration from Colorado State University. |

| Name & Position | Responsibilites and Experience |
|---|---|
| **David A. Howell**<br>*President*<br><br>*Americas Region* | David Howell brings over 34 years of strategic nuclear industry leadership to his role as president, Americas Region.<br><br>Appointed to the position in March 2017, Howell leads Westinghouse customer relationship management and all commercial responsibilities for the core business of Westinghouse in the Americas Region including account team development and deployment. He oversees the company's global commercial and marketing organization, government and international affairs, global security and facilities management.<br><br>Most recently, Howell was senior vice president, Operating Plant Business, where he held executive operational responsibility for all products and services related to growth and enhancement of the company's instrumentation and control (I&C) business, outage support and plant modification services. He also oversaw engineering products and nuclear parts for pressurized water reactors and boiling water reactors worldwide.<br><br>In a previous role as Westinghouse vice president of Global Field Services, Howell had complete executive oversight of the company's outage support, advanced products, nuclear power plant component services and customer training globally.<br><br>Howell has held engineering and field operations management positions for the company's business lines related to reactor vessel and steam generator inspection, and repair for pressurized water reactor nuclear steam supply systems. He also was a lead design engineer for remote reactor repair projects.<br><br>He holds six patents for innovative equipment serving this market. Howell is a black belt in Six Sigma and Lean processes. He also is a certified Customer 1st Leader and was the deployment director for that program within the Westinghouse Nuclear Fuel business, where he drove implementation throughout that business.<br><br>A registered professional engineer in Pennsylvania, Howell has a bachelor's degree in mechanical engineering from Geneva College in Beaver Falls, Pennsylvania (USA). He is a member of the Geneva College Advanced Board, and is an elder in the Presbyterian Church in America.<br><br>Howell also is a member of the Westinghouse Operating Committee and a past member of the Westinghouse Board of Directors. |
| **Kenichi Ikeda**<br>*Senior Vice President and Chief Financial Officer* | Kenichi Ikeda is senior vice president and chief financial officer (CFO) at Westinghouse Electric Company. He is responsible for leading financial operations, reporting and alignment with Toshiba Corporation. During his 30-year career at Toshiba, Mr. Ikeda held progressively responsible positions in the areas of cost accounting, financial planning and control, accounting systems, investor relations and corporate audits. Most notably, he served as the vice president and |
| **Gavin Liu**<br>*President*<br><br>*Asia Region* | Gavin Liu is president of Asia for Westinghouse, responsible for developing and executing business strategy, delivering customer projects and interfacing with customers, partners, suppliers and principal shareholder to enable timely, local decision making on matters strategic to the Asian market.<br><br>Mr. Liu rejoined Westinghouse after working for three years with ABB as senior vice president, China and North Asia Region. Prior to joining ABB in 2011, Mr. Liu worked for Westinghouse for 10 years, where he most recently helped to build relationships with customers in China to secure the contracts for the first four AP1000™ nuclear power plant units as vice president and managing director of the Asia Region's China sub-region.<br>Mr. Liu began his career in the China Ministry of Electric Power in 1991 and in 1992 moved to various sales and business development roles with ABB. He joined Westinghouse as part of the ABB CE acquisition in 2000.<br>Mr. Liu graduated from Tsinghua University with a degree in Thermal Engineering and received his MBA from Peking University. |
| **Robert Massy**<br>*Acting Senior Vice President*<br><br>*Human Resources* | Robert Massy is senior vice president, Human Resources at Westinghouse Electric Company, responsible for talent and organizational initiatives focused on accelerating the company's global growth strategy in existing and emerging markets.<br><br>Previously at Westinghouse, Massy was vice president of Global Talent Management throughout the company's product lines and operating regions, including governance and strategy over all areas of talent acquisition, global learning, talent and organizational effectiveness and leadership development for the nuclear technology company's 12,000 employees. |

| Name & Position | Responsibilites and Experience |
|---|---|
| | Prior to joining Westinghouse in 2015, Massy held a series of positions of increasing responsibility at Weatherford International, a multi-billion dollar oil and gas services company operating in over 100 countries around the world. While at Weatherford, Massy led their regional talent practice in Asia while based in Singapore and laterally in Malaysia. He then transitioned to Weatherford's corporate headquarters in the greater Houston area where he directed corporate training and competencies as well as leading the design, build and implementation of HR programs and processes. Massy was a key member of Weatherford's global human resources leadership.<br><br>Prior to his experience with Weatherford, Massy spent a number of years in senior business leadership/consulting roles in both Europe and Asia. Massy, a native of Ireland, attended Lancaster University of Lancaster, U.K. where he earned a Bachelor's of Arts degree in Behavior in Organisations, and is a graduate of the University of East London where he earned his Masters of Business Administration. |
| **Takayuki Shibano**<br><br>*Senior Vice President & Chief Coordination Officer* | Takayuki Shibano is the senior vice president and chief coordination officer for Westinghouse Electric Company. He is responsible for identifying and realizing global synergy opportunities between Toshiba and Westinghouse.<br><br>Mr. Shibano brings nearly 30 years of nuclear industry experience to this role in the areas of engineering and management.<br><br>Prior to joining to Westinghouse in April 2015, Mr. Shibano was the deputy general manager of the Nuclear System & Services Division in Toshiba Power Systems Company, where he provided general oversight of Westinghouse activities and worked to develop new nuclear power plant opportunities.<br><br>From 2007 to 2012, Mr. Shibano served as senior manager of the Nuclear Chemical System Engineering department of Toshiba Corporation, where he was responsible for the engineering of reprocessing systems, waste treatment systems, and decontamination, decommissioning and remediation systems. He also provided direct support for the water treatment system at the Fukushima Dai-ichi Nuclear Power Plant after March 11, 2011.<br><br>Mr. Shibano began his career in Toshiba Corporation in 1987 as an engineer working on uranium enrichment systems using laser technology (AVLIS), where he was a member of the project team involved with the construction of the demonstration plant.<br><br>Mr. Shibano also has experience as an internal management auditor in Toshiba Corporation, where he provided audit management and oversight of several Toshiba group companies during 2005 and 2006.<br><br>Mr. Shibano holds a Bachelor's and Master's degree in nuclear engineering from Osaka University. He also completed the Advanced Management Program at Harvard Business School. He is currently located at the Westinghouse corporate headquarters near Pittsburgh, Pennsylvania, U.S.A. |
| **Mike Sweeney**<br><br>*Senior Vice President & General Counsel*<br><br><br><br>*Legal & Contracts* | Mr. Sweeney is responsible for overseeing all legal operations of the global business activities of Westinghouse Electric Company LLC.<br>Mr. Sweeney joined Westinghouse in 2005 as an Assistant General Counsel for Nuclear Services. In that role, he was responsible for managing all legal aspects of Westinghouse's Nuclear Services business. Starting in 2006, Mr. Sweeney gained responsibility for Westinghouse's global insurance program, International attorneys and most recently, Westinghouse's Nuclear Automation operations.<br>Prior to joining Westinghouse, Mr. Sweeney was a partner in the law firm of Pietragallo Gordon Alfano Bosick & Raspanti, LLP (formerly Pietragallo, Bosick and Gordon). His primary focus was on corporate and business matters where he counseled companies on various legal matters including financing operations, strategic initiatives and general corporate matters. In addition, from 1989 to 2000, Mr. Sweeney held positions of increasing responsibility in the Law Department of CBS Corporation (formerly, Westinghouse Electric Corporation). His primary focus was on Board of Director Matters, Security and Exchange Commission filing requirements for public companies as well as Acquisitions and Divestitures.<br>Mr. Sweeney has a bachelor's degree in political science from the University of Pittsburgh, and a master's degree in business administration and a juris doctor degree from the University of Pittsburgh. |
| **Luc Van Hulle**<br><br>*Interim President*<br><br>*EMEA Region* | Luc Van Hulle is interim president, EMEA Region at Westinghouse Electric Company, responsible for customer relationships, account team development, and government and regulatory affairs in the EMEA Region. Van Hulle has more than 35 years of nuclear industry experience and joined Westinghouse in 1980.<br><br>Previously at Westinghouse, Van Hulle was vice president of EMEA Marketing and Commercial Integration. Prior to his responsibility for key customer accounts and large integrated projects throughout the EMEA Region, he supported engineering, plant construction and field services in Europe. |

| Name & Position | Responsibilites and Experience |
|---|---|
| | Van Hulle is a graduate of the University of Gent, Belgium, where he earned his degree in Civil Engineering. He completed additional studies in business administration at Insead, France, and is a certified Black Belt. |

## <u>Schedule 11</u>

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| Payments to Employees (Not Including Officers, Directors, and Stockholders) | $88.4M |
| Payments to Officers, Directors, and Stockholders | $0.6M |
| Payments to Financial and Business Consultants | $0 |

## <u>Schedule 12</u>

**Cash Receipts and Disbursements, Net Cash Gain or Loss,
Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day
period following the filing of the chapter 11 petition, the estimate cash receipts and
disbursements, net cash gain or loss, and obligations and receivables expected to accrue that
remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $927,030,000 |
| **Cash Disbursements** | $519,310,000 |
| **Net Cash Gain** | $407,720,000 |
| **Unpaid Obligations** | $52,070,000 |
| **Uncollected Receivables** | $24,730,000 |