**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**TOGUT, SEGAL & SEGAL LLP**
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Brian F. Moore
Kyle J. Ortiz

*Proposed Attorneys for Debtor*
*Toshiba Nuclear Energy Holdings (UK)*
*Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : |  |
|  | : | **Chapter 11** |
| **WESTINGHOUSE ELECTRIC** | : |  |
| **COMPANY LLC**, *et al.*, | : | **Case No. 17-10751 (MEW)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |

--------------------------------------------------------x

### NOTICE OF FILING OF REVISED EXHIBIT
### TO THE MOTION OF DEBTORS PURSUANT TO 11 U.S.C.
### §§ 362, 363, 364, 507, AND 105 AND FED. R. BANKR. P. 2002,
### 4001, 6003, 6004, AND 9014 FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED,
### SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS
### AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961). The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

In connection with the hearing to be held on March 30, 2017 at 11:00 a.m. with respect to the *Motion of Debtors Pursuant to 11 U.S.C. §§ 362, 363, 364, 507, and 105 and Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, and (III) Scheduling A Final Hearing* (the "**Motion**"), Westinghouse Electric Company LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases, hereby file the revised Exhibit 1 to Exhibit A of the Motion (the "**Exhibit**").

Attached hereto as **Exhibit A** is a revised clean copy of the Exhibit, and attached

hereto as **Exhibit B** is a blacklined copy of the Exhibit, which is marked against the version of

the Exhibit to the Motion previously filed with the Court (Docket No. 19).

Dated: March 30, 2017
      New York, New York

                            */s/ Garrett A. Fail*
                            Gary T. Holtzer
                            Robert J. Lemons
                            Garrett A. Fail
                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            Telephone: (212) 310-8000
                            Facsimile: (212) 310-8007
                            Email: gary.holtzer@weil.com
                            Email: robert.lemons@weil.com
                            Email: garrett.fail@weil.com

                            *Proposed Attorneys for Debtors*
                            *and Debtors in Possession*

                            -and-

                            Albert Togut
                            Brian F. Moore
                            Kyle J. Ortiz
                            TOGUT, SEGAL & SEGAL LLP
                            One Penn Plaza, Suite 3335
                            New York, New York 10119
                            Telephone: (212) 594-5000
                            Facsimile: (212) 967-4258
                            Email: altogut@teamtogut.com
                            Email: bmoore@teamtogut.com
                            Email: kortiz@teamtogut.com

                            *Proposed Attorneys for Debtor*
                            *Toshiba Nuclear Energy Holdings (UK)*
                            *Limited*

WEIL:\96080976\1\80768.0015

## Exhibit A

**Revised Exhibit**

CONFIDENTIAL

---

**$800 MILLION SENIOR SECURED DEBTOR-IN-POSSESSION TERM LOAN FACILITY**
**AMENDED SUMMARY OF TERMS AND CONDITIONS**

dated as of March 30, 2017

among

**WESTINGHOUSE ELECTRIC COMPANY LLC**,
as Borrower and debtor and debtor-in-possession,

_____

**GUARANTORS PARTY HERETO**

_____

**FUNDS AND ACCOUNTS MANAGED BY**
**APOLLO CAPITAL MANAGEMENT, L.P. AND/OR ITS AFFILIATES**,
as Lenders,

_____

**CITIBANK, N.A.**,
as Administrative Agent and Collateral Agent,

_____

**CITIGROUP GLOBAL MARKETS INC.**,
as sole Lead Arranger and Bookrunner

---

**$800 Million Senior Secured Debtor-In-Possession Term Loan Facility**

**Summary of Terms And Conditions**

Set forth below is a summary of certain key terms for a proposed $800 million DIP Facility (as defined below) to be made available to Westinghouse Electric Company LLC (the "**Term Sheet**"). In connection with the DIP Facility, (a) Apollo Investment Corporation ("**AIC**") is pleased to advise you of its several, but not joint, commitment to provide 5.000% of the principal amount of the DIP Facility, (b) AP WEC Debt Holdings LLC ("**AP WEC**") is pleased to advise you of its several, but not joint, commitment to provide 85.156% of the principal amount of the DIP Facility, (c) Midcap Financial Trust ("**MidCap**") is pleased to advise you of its several, but not joint, commitment to provide 8.750% of the principal amount of the DIP Facility, (d) Amundi Absolute Return Apollo Fund PLC ("**Amundi**") is pleased to advise you of its several, but not joint, commitment to provide 0.656% of the principal amount of the DIP Facility, (e) Ivy Apollo Strategic Income Fund ("**Ivy Strategic**") is pleased to advise you of its several, but not joint, commitment to provide 0.188% of the principal amount of the DIP Facility and (f) Ivy Apollo Multi Asset Income Fund ("**Ivy Multi**" and, together with AIC and AP WEC, MidCap, Amundi and Ivy Strategic, "**Apollo**") is pleased to advise you of its several, but not joint, commitment to provide 0.250% of the principal amount of the DIP Facility, in each case, upon the terms and subject to the conditions set forth in the Term Sheet. The commitments hereunder will expire in the event the DIP Closing Date does not occur by April 7, 2017. The parties hereto agree that Apollo is the exclusive DIP Facility provider to the Company and its affiliates, and in the event that the Company, for whatever reason, fail to incur the DIP Loans on the DIP Closing Date, then all fees and expenses that would otherwise be payable hereunder, including, without limitation, the OID, the Exit Payment (assuming prepayment within six months of the DIP Closing Date) and the Expense Deposit, shall become immediately due and payable to Apollo.

| | |
|---|---|
| **Borrower:** | Westinghouse Electric Company LLC, a Delaware limited liability company (the "**Company**" or the "**Borrower**"). |
| | The Company, in its capacity as a Borrower under the DIP Facility, shall be a debtor and debtor-in-possession in a proceeding (the "**Company's Case**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). |

| | |
|---|---|
| **Guarantors:** | The obligations of the Company under the DIP Facility (as defined below) will be guaranteed (a) by all of the Company's direct and indirect domestic subsidiaries (collectively, the "**US Guarantors**"), and (b) Toshiba Nuclear Energy Holdings (UK) Limited (the "**UK Parent**" and, together with the US Guarantors, the "**Guarantors**"), each of which will be a debtor and a debtor-in-possession in proceedings (together with the Company's Case, the "**Cases**") under chapter 11 of the Bankruptcy Code filed contemporaneously and jointly administered with the Company's Case; *provided* that WesDyne International LLC and Westinghouse Government Services LLC shall neither be US Guarantors nor debtors and debtors-in-possession in the Cases.[1] |
| | The Company and the Guarantors are referred to herein as "**Loan Parties**" and each, a "**Loan Party**" or "**Debtors**" and each, a "**Debtor**". |
| | The date of commencement of the Cases is referred to herein as the "**Petition Date**". |
| **Lenders:** | Apollo (or the "**Initial Lender**", as applicable) and other banks, financial institutions or institutional lenders identified by Apollo in consultation with the Company (collectively, the "**Lenders**") on a several and not joint basis. |
| **Lead Arranger and Bookrunner** | Citigroup Global Markets Inc. shall act as sole lead arranger and bookrunner for the DIP Facility. |
| **Administrative Agent and Collateral Agent:** | Citibank, N.A. shall act as administrative agent in respect of the DIP Facility (as defined below) (in such capacity, the "**Administrative Agent**") and as collateral agent (in such capacity, the "**Collateral Agent**," and together with the Administrative Agent, the "**Agents**") in respect of the DIP Facility. |
| **DIP Facility:** | Senior secured superpriority term loans (the "**DIP Loans**") in an aggregate principal amount of $800 million (together with the Letter of Credit Facility described in Annex B, the "**DIP Facility**") to be made available to the Company, $350 million of which will be new money available at the DIP Closing (as defined below) and $450 million of which will be new money available on the Final Term Funding Date (as defined below); *provided,* that up to $225 million of such new money funding (such amount, the "**Letter of Credit Sublimit**") shall be used to provide cash in respect of a cash collateralized letter of credit facility (the "**Letter of Credit Facility**") with an affiliate of Citigroup Global Markets Inc. on the terms described in Annex B attached hereto. |
| | A portion of the Letter of Credit Sublimit may be drawn on the DIP Closing Date in the amount of $100 million, with the remaining balance to be drawn on the Final Term Funding Date. |

---

[1] It being understood that any guarantee and credit support from the UK Parent shall be subject to local law restrictions, corporate benefit, financial assistance, regulatory consents and requirements, contractual restrictions/prohibitions and existing third party arrangements.

| | |
|---|---|
| **Termination Date:** | The "**Termination Date**" with respect to the DIP Facility shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) 45 days after the entry of the Interim Order (as defined below) if the Final Order (as defined below) has not been entered prior to the expiration of such period, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the consummation of a sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code or otherwise and (e) the acceleration of the DIP Loans and the termination of the commitment with respect to such DIP Facility in accordance with the DIP Loan Documents (as defined below). |

"**Scheduled Termination Date**" means the date that is 12 months after the DIP Closing Date (as defined below); *provided* that, subject to the satisfaction of customary conditions precedent (including payment of a 3% extension fee in respect of the DIP Facility), the Company, at its option, may extend the Scheduled Termination Date by an additional 12 months.

"**Final Order**" means a final non-appealable order of the Bankruptcy Court authorizing the DIP Facility in form and substance satisfactory to the Administrative Agent, the L/C Issuer and the Required Lenders.

| | |
|---|---|
| **Purpose:** | For working capital and general corporate purposes of the Loan Parties and their subsidiaries, to make loans under the Intercompany Facility (as defined below) and to pay fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Cases. |

| | |
|---|---|
| **Intercompany Facility:** | Any amounts (whether from proceeds of the DIP Facility or otherwise and inclusive of any letters of credit issued for the account of Intercompany Borrowers), directly or indirectly, distributed by the Company or any US Guarantor to an Intercompany Borrower and any of its subsidiaries (the "**UK Silo**") shall be advanced by way of intercompany revolving loans (the "**Intercompany Facility**") from the Company to the parties listed on Schedule 2 hereto  and any other party that becomes an "Additional Borrower" under the Liquidity Facility Agreement (collectively, the "**Intercompany Borrowers**"); provided that (a) upon completion of the Initial Funding G&C Requirements[2], up to $300 million of such Intercompany Facility may be advanced, including in the form of letters of credit issued for the account of Intercompany Borrowers in the aggregate amount up to $50 million under the Letter of Credit Facility and (b) subject to the completion of the remaining G&C Requirements, an additional $75 million of such Intercompany Facility may be advanced, including in the form of letters of credit issued for the account of Intercompany Borrowers in the aggregate amount up to $25 million under the Letter of Credit Facility (for the avoidance of doubt, the maximum amount of the Intercompany Facility shall be $375 million).  The intercompany advances shall be evidenced by a Liquidity Facility Agreement substantially in the draft form delivered by advisors to the Initial Lender prior to 1am on March 29, 2017 (with such changes that are reasonably acceptable to the Initial Lender) (the "**Liquidity Facility Agreement**").

No advances under the Intercompany Facility may be made, directly or indirectly, to any UK Silo entity that shall have commenced or shall have been required to commence or be subject to any proceeding under any applicable law relating to insolvency, debt restructuring, or bankruptcy.

The Required Lenders shall have the ability to cause the Company to enforce its remedies under the Intercompany Facility. |
| **Loan Documents:** | A loan agreement and a guarantee in the form customary with respect to credit facilities similar to the DIP Facility (including the Letter of Credit Facility) (including the Term Sheet, the "**DIP Loan Documents**"); *provided* that on the DIP Closing Date, the Term Sheet shall govern the terms of the DIP Facility. For the avoidance of doubt, the Liquidity Facility Agreement shall not be a DIP Loan Document. |
| **Interest Rates and Fees:** | As set forth on Annex A attached hereto. |
| **Optional Payments:** | As set forth on Annex A attached hereto. |

---

[2] To be defined.

| | |
|---|---|
| **Mandatory Prepayments:** | The net cash proceeds after any applicable taxes from any non-ordinary course asset sale by (a) the Company or any of its subsidiaries, or (b) any UK Silo or any of its subsidiaries (to the extent such assets secure the Intercompany Facility) shall be used to repay the DIP Loans. |
| **Tax Gross Up and Indemnity:** | Any and all payments by or on account of any obligation of any Loan Party under the DIP Loan Documents shall be made without deduction or withholding for any taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such tax is an "Indemnified Tax" (as such term is defined in the LSTA Model Credit Provisions Exposure Draft dated June 25, 2014), then, the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable pursuant to the terms of this provision) the applicable recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made. |
| | Without duplication of any amounts paid pursuant to the immediately preceding provision, the Loan Parties shall indemnify each recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this provision) payable or paid by such recipient or required to be withheld or deducted from a payment to such recipient (in each case, excluding penalties and interest attributable solely to the gross negligence or willful misconduct of such recipient) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. |
| **Security and Priority:** | The obligations of the Company under the DIP Facility, including all DIP Loans, shall, subject to the Carve-Out (as defined below), at all times: |
| | (a) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by (A) a perfected first priority priming security interest and lien on the Collateral of each Loan Party (collectively, the "**Priming Liens**"); |

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by (i) a perfected first priority security interest and lien on the Collateral of each Loan Party (x) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (y) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively "**Avoidance Actions**") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions);

(c) subject to clause (a) above, pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a junior perfected security interest and lien on the Collateral of each Loan Party to the extent such Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, subject as to priority to such liens in favor of such third parties; and

(d) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Case of such Loan Party (the "**DIP Superpriority Claims**").

The obligations of the Intercompany Borrowers under the Intercompany Facility shall, subject to local law limitations, regulatory consents and requirements, corporate benefit, financial assistance, existing contractual restrictions/prohibitions and other limitations to be agreed, be (a) guaranteed by each Intercompany Borrower and its subsidiaries that receives, directly or indirectly, proceeds from the Intercompany Facility (the "**Intercompany Beneficiaries**"), and (b) secured by the assets of such Intercompany Beneficiaries and Intercompany Borrowers, in each case, to the extent permitted by the applicable local jurisdiction requirements and as set forth on Schedule 1 hereto (the "**G&C Requirements**").[3]

---

[3]. Completion of the G&C Requirements (other than the Initial Funding G&C Requirements) to be required on or before the Final Term Funding Date.

All of the liens granted by the Debtors and described above shall be effective and perfected upon entry of the Interim Order, except as otherwise provided herein.

Notwithstanding the foregoing, the Letter of Credit Facility shall be secured solely by the amounts on deposit (including all investment property, financial assets, interest, dividends and instruments arising out of, or received from, any investments made in respect of such amounts) in the L/C Cash Collateral Account (and the proceeds thereof) as set forth in Annex B. Upon (x) the termination in full of the commitment in respect of the Letter of Credit Facility, (y) the expiration of all Letters of Credit issued under the Letter of Credit Facility and (z) the payment in full of all amounts due and owing in respect of the Letter of Credit Facility, any remaining proceeds in the L/C Cash Collateral Account shall revert to the Borrower.

Customary flood documentation to be delivered within a time period to be reasonably agreed with the Collateral Agent.

"**Collateral**" means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof. For the avoidance of doubt, "Collateral" shall not include any assets and property of the Loan Parties that are located at (i) the "V.C. Summer Project" site, being the site of the AP1000 nuclear plant owned by South Carolina Electric & Gas Company and certain others, and the related off-site storage facilities located at Two Blythewood and 375 Metropolitan Drive, West Columbia, South Carolina, and (ii) the "Vogtle Project" site, being the AP1000 nuclear plant owned by Georgia Power Company and certain others and the related off-site storage facility located at 321 Mills Road, Waynesboro, Georgia.

**Carve-Out**:    Subject to customary carve-out for facilities of this type and size with respect to Collateral other than amounts on deposit in the L/C Cash Collateral Account; *provided* that carve-out requirements shall not contain any cap on any "pipeline" expenses of Debtor's professionals.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Loan Documents, and the superpriority claims, and any and all other liens or claims securing the DIP Facility.

| | |
|---|---|
| **Conditions Precedent to Each Loan and Each Issuance, Amendment, Extension or Renewal of a Letter of Credit:** | On the funding date of each DIP Loan and on the date of each issuance, amendment, extension or renewal of a Letter of Credit, (i) there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, issuance, amendment, extension or renewal, (iii) the making of such DIP Loan or issuance, amendment, extension or renewal of such Letter of Credit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) the making of any DIP Loan shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, and (vi) with respect to the DIP Facility and the Letter of Credit Facility, the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the DIP Loan Documents, modified or amended in any manner. |
| **Conditions Precedent to the Initial Extension of Credit under the DIP Facility:** | The initial extension of credit (the "**DIP Closing**"; the date on which the DIP Closing occurs, the "**DIP Closing Date**") under the DIP Facility and the Letter of Credit Facility shall be subject to the satisfaction (or waiver) of the following conditions precedent (and the conditions set forth under "*Conditions Precedent to Each Loan*" above): |

    A.  The Term Sheet and the Liquidity Facility Agreement shall have been executed and delivered by each party thereto.

    B.  The Petition Date shall have occurred, and each Loan Party shall be a debtor and a debtor-in-possession. All "first day orders" entered at the time of commencement of the Cases, including without limitation a cash management order, shall be satisfactory in form and substance to the Administrative Agent.

    C.  The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Administrative Agent, the L/C Issuer and the Initial Lender, which order shall have been entered not later than three (3) business days following the Petition Date (or such later date as the Administrative Agent may agree) (the "**Interim Order**", and together with the Final Order, the "**DIP Financing Orders**"), authorizing and approving the making of the DIP Loans in the amounts consistent with those set forth in the "*DIP Facility*" section above and the issuance of Letters of Credit as contemplated by this Term Sheet, and the granting of the superpriority claims and liens and other liens referred to above under the heading "*Security and Priority*" and the liens referred to in Annex B to secure Letters of Credit issued under the Letter of Credit Facility, which Interim Order shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the DIP Loan Documents, modified or amended in any manner.

D.  No trustee, responsible officer or examiner having expanded powers shall have been appointed with respect to the Loan Parties, any of their subsidiaries or their respective properties.

E.  All reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP Loan Documents or otherwise required to be paid to the Agents, the L/C Issuer and the Lenders on or before the DIP Closing shall have been paid.  All other fees that have been agreed to be paid to the Arranger and the L/C Issuer on or before such date shall have been paid.

F.  The Administrative Agent shall have received and be reasonably satisfied with a cash flow forecast for the 13-week period ending after the DIP Closing Date dated as of a date not more than 3 business days prior to the DIP Closing Date.

G.  The Administrative Agent shall have received copies of organizational documents and resolutions for the Loan Parties; it being understood and agreed that no US opinions of counsel shall be required.

H.  Each Lender who has requested the same at least two (2) business days prior to the DIP Closing Date shall have received "know your customer" and similar information at least one (1) day prior to the DIP Closing Date.

I.  The Collateral Agent, for the benefit of the Lenders, shall have (i) the valid and perfected liens on the security interests in the Collateral of the Debtors contemplated by the "*Security and Priority*" section above granted and perfected pursuant to the Interim Order in the case of the Debtors and (ii) the valid liens on the security interests in the Collateral of any Intercompany Beneficiary or Intercompany Borrower organized in the United Kingdom, in accordance with the Initial Funding G&C Requirements (or waived).  The obligations of the Loan Parties under the Letter of Credit Facility shall be secured as described in Annex B and shall be perfected pursuant to the Interim Order.

J.  The representations and warranties set forth in Annex C attached hereto shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects).

**Conditions Precedent to the Final Term Funding Date**

The funding of the portion of the DIP Facility not available at DIP Closing (the date on which such funding occurs, the "**Final Term Funding Date**") shall be subject to the satisfaction (or waiver) of the following conditions precedent (and the conditions set forth under "*Conditions Precedent to Each Loan and Each Issuance, Amendment, Extension or Renewal of a Letter of Credit*" above):

A.  The DIP Loan Documents shall have been executed and delivered by each party thereto in form and substance satisfactory to the Administrative Agent, the L/C Issuer and Required Lenders.

-10-

B.   The Administrative Agent shall have received a signed copy of the Final
     Order, which shall not have been vacated, reversed, terminated or stayed in
     any respect or, except as expressly permitted by the DIP Loan Documents,
     modified or amended in any manner.

C.   All reasonable and documented out-of-pocket costs, fees, expenses
     (including, without limitation, reasonable and documented legal fees and
     expenses) set forth in the DIP Loan Documents or otherwise required to be
     paid to the Agents, the L/C Issuer and the Lenders on or before such date
     shall have been paid.  All other fees that have been agreed to be paid to the
     Arranger and the L/C Issuer on or before such date shall have been paid.

D.   The Administrative Agent shall have received copies of the of all proposed
     pleadings and orders in the Cases, including with respect to "second day"
     pleadings and orders, with reasonably sufficient time for review and
     comment by the Lenders.  The relief requested by the Debtors in the first and
     second day orders and pleadings shall be reasonably acceptable in form and
     substance to the Lenders.  The Debtors shall provide the Lenders will
     advance copies of (and a reasonable opportunity to comment on) any press
     release in which a Lender or any affiliate or agent of a Lender is mentioned.

E.   Each Intercompany Beneficiary or Intercompany Borrower organized in the
     United Kingdom shall have used its reasonable best efforts to incur valid and
     perfected security liens in favor of the Collateral Agent, for the benefit of the
     Lenders, on substantially all of their assets subject to local law restrictions,
     corporate benefit, financial assistance, contractual restrictions and
     prohibitions, regulatory consents and requirements; provided that, with
     respect to any regulatory consents, the Company, each applicable
     Intercompany Beneficiary and Intercompany Borrower shall use its
     reasonable best efforts to seek such regulatory approval.

F.   The Collateral Agent, for the benefit of the Lenders, shall have the valid and
     perfected liens on the security interests in the Collateral of the Loan Parties
     contemplated by the "*Security and Priority*" section above granted and
     perfected pursuant to the Interim Order in the case of the Debtors and all
     actions contemplated by the G&C Requirements with respect to any
     Intercompany Beneficiary or Intercompany Borrower who is not organized
     in the United Kingdom.

| | |
|---|---|
| **Representations and Warranties:** | The DIP Loan Documents (other than the Term Sheet) will contain the following representations and warranties (subject to certain exceptions, qualifications and carveouts to be set forth in the applicable DIP Loan Documents):  organization; powers; authorization; enforceability; governmental approvals; financial statements; no material adverse effect; title to properties; possession under leases; subsidiaries; litigation; compliance with laws; Federal Reserve regulations; Investment Company Act; use of proceeds; taxes; no material misstatements; employee benefit plans; environmental matters; security documents; locations of real property and leased premises; labor matters; insurance; no default; intellectual property; licenses; etc.; status as senior debt; USA PATRIOT Act; OFAC; Foreign Corrupt Practices Act; certain bankruptcy matters; AP 1000 Projects. |
| **Affirmative Covenants:** | The DIP Loan Documents will contain the following affirmative covenants (subject to the exceptions, qualifications and carveouts to be set forth in the applicable DIP Loan Documents):[4] |

A.  Preservation and maintenance of existence, business and properties.

B.  Procurement and maintenance of certain insurance, insurance certificates and endorsements.

C.  Payment of income taxes and other material taxes and other claims.

D.  Financial statements, reports, etc.

E.  Litigation and other notices.

F.  Compliance with laws and regulations.

G.  Maintenance of records, access to properties and inspections.

H.  Use of proceeds.

I.  Compliance with environmental laws.

J.  Provision of additional collateral, guarantees and mortgages; further assurances.

K.  Maintenance of cash management systems; application of the proceeds of accounts.

L.  Certain bankruptcy matters.

---

[4] Prior to entry of the DIP Loan Documents (other than the Term Sheet), the affirmative covenants set forth on Annex D attached hereto shall apply.

M. Continued retention of a restructuring advisor and a financial advisor reasonably satisfactory to the Administrative Agent (it being agreed that Alix Partners and PJT Partners are reasonably satisfactory to the Administrative Agent).

N. Quarterly lender calls.

O. Bi-weekly update calls for the Initial Lender and its advisors.

P. Company shall have used its reasonable best efforts to enter into the DIP Loan Documents.

Q. Such other information (financial or otherwise) with respect to the Company and its subsidiaries as the Lenders and the L/C Issuer (through the Administrative Agent) may reasonably request.

**Negative Covenants:**

The DIP Loan Documents will contain the following negative covenants (subject to the exceptions, qualifications and carveouts to be set forth in the DIP Loan Documents) [5]:

A. Limitations on indebtedness.

B. Limitations on liens.

C. Limitations on sale and leaseback transactions.

D. Limitations on investments, loans and advances.

E. Limitations on mergers, consolidations, sales of assets and acquisitions; provided that post-closing Corporate Reorganization (as defined in Annex E) shall be permitted with the consent of Required Lenders (not to be unreasonably withheld or delayed).

F. Limitations on dividends and distributions.

G. Limitations on transactions with affiliates.

H. Limitations on changes in business.

I. Limitations on the (i) payment and modification of subordinated or other prepetition indebtedness, except in the case of prepetition debt, pursuant to "first day" or other orders entered by the Bankruptcy Court that are in form and substance satisfactory to the Administrative Agent, and (ii) modification of certificate of incorporation, by-laws and certain other agreements, etc.

---

[5]. Prior to entry of the DIP Loan Documents (other than the Term Sheet), the negative covenants set forth on Annex E attached hereto shall apply.

J.  Limitations on (i) AP 1000 Projects shut-down costs limited to $125 million, and (ii) outstanding amounts under the Intercompany Facility, in each case, in accordance with the Budget.

K.  Limitations on hedging agreements.

L.  Limitations on other "designated senior debt".

M.  Limitations on changes to fiscal year and accounting.

**Financial Covenants:**   The DIP Facility will contain the following financial covenants:

A.  Minimum unrestricted cash and cash equivalents of the Company and the US Guarantors, on a consolidated basis, of $100 million ("**Minimum Liquidity**"), tested on a weekly basis.

B.  Receipt of a business plan ("**Business Plan**"), in form and substance reasonably acceptable to the Required Lenders, within 120 days of the DIP Closing Date; *provided* that such Business Plan may be supplemented or amended subject to a reasonable consent of the Required Lenders.

C.  Minimum EBITDA.

Initially tested as of the last day of each fiscal month (commencing on the month ended September 30, 2017) with applicable testing periods commencing on August 1, 2017 and ending on the applicable month then ended.  Commencing on the test period ended March 31, 2018 and for each month ended thereafter, LTM testing period (the "**LTM Test**").

No less than the greater of (a) solely with respect to any LTM Test, $350 million and (b) the corresponding amount set forth in the Business Plan plus a cushion of 15%.

"**EBITDA**" means, for any period, net earnings (or net loss) plus, without duplication and to the extent reflected as a charge in the consolidated statement of earnings, the sum of: (a) interest expense, (b) income tax expense (benefit), (c) depreciation expense, (d) amortization expense (including with respect to intangibles), (e) deferred financing fees (and any writeoffs thereof), (f) any extraordinary or nonrecurring expenses or losses, (g) any loss from discontinued operations and any loss on disposal of discontinued operations and/or joint ventures, (h) any earnings impact (if negative) related to the U.S. AP1000 projects including Vogtle and VC Summer, (i) any other non-cash charges or expenses, including, in respect of (A) any pre-petition obligations, liabilities or claims (provided, that to the extent any such non-cash charges represent an accrual or reserve for potential cash items in any future period, any cash payment made in respect thereof in a future period shall be subtracted from EBITDA for such future period to such extent), or (B) goodwill or asset writeoffs or writedowns, (j) pension, equity awards, other post-employment benefits expense and any non-cash compensation expense realized from grants of stock appreciation rights or similar rights, stock options or other rights to directors,

officers or employees, (k) loss on foreign exchange, (l) fees, costs and expenses (including (i) fees, costs and expenses related to legal, financial and other advisors, auditors and accountants, (ii) printer costs and expenses, (iii) filing fees and (iv) underwriting, arrangement, syndication, backstop and placement premiums, discounts, fees, charges and expenses) incurred (whether capitalized or expensed) in connection with the Cases, emergence from the Proceedings, any Reorganization Plan (whether or not consummated) or any transaction (including any financing or disposition) or litigation, related, incidental or complementary to any of the foregoing (including any rollover financing and exit financing), in each case, regardless of whether initially incurred by the Company or paid by the Company to reimburse others for such fees costs and expenses, (m) any non-cash (loss) relating to hedging activities, (n) costs, expenses and charges relating to losses associated with cancelled or discontinued products or services,  (o) charges, premiums and expenses associated with the discharge of indebtedness and (p) corporate restructuring charges (including retention, severance, contract termination costs, plant closure or consolidation costs, employee relocation and business optimization expenses) and minus, to the extent included in net earnings on the consolidated statement of earnings, (i) interest income, (ii) pension and other postemployment benefits income and credit, (iii) gains on foreign exchange, (iv) any extraordinary or non-recurring income or gains, (v) any non-cash gain relating to hedging activities, (vi) any gain from discontinued operations and any gain on disposal of discontinued operations, (vii) any non-cash gain associated with the discharge of indebtedness, and (viii) any other non-cash income (other than the accrual of revenue in the ordinary course of business), in each case determined in accordance with GAAP for such period[; provided that any adjustments of the type set forth in clauses (f), (g), (h), (l) or (p) above shall be subject to the reasonable consent of the Required Lenders].[6]

**Financial Reporting Requirements:**

The Company shall provide the Administrative Agent:

(i) monthly unaudited consolidated financial statements of the Company and its subsidiaries within 30 days after the end of each fiscal month, certified by the Company's chief financial officer or the Company's vice president of finance;

(ii) quarterly unaudited consolidated financial statements of the Company and its subsidiaries within 45 days of quarter-end for the first 3 fiscal quarters of the fiscal year, certified by the Company's chief financial officer or the Company's vice president of finance, accompanied by a customary management's discussion and analysis;

(iii) annual consolidated financial statements of the Company and its subsidiaries within 120 days of year-end, accompanied by a customary management's discussion and analysis;

(iv) 13-week cash flow forecasts, on a rolling 13-week basis, updated every four weeks in form and substance reasonably acceptable to the Required Lenders (the "**Budget**"); and

---

[6] Replacement of the bracketed language with caps on the corresponding clauses to be discussed.

(vi) a variance analysis with respect to the Budget for the preceding four week period comparing actual total net cash receipts and disbursements for the applicable period to projected total cash net receipts and disbursements set forth in the Budget, noting therein all variances on a rolling four week and cumulative basis from values set forth for such period in the Budget, commencing with the fifth week after the DIP Closing Date.

**Events of Default:**    The DIP Loan Documents will contain the following events of default (each an "**Event of Default**"):

A.    Failure to pay principal, interest (for two (2) business days) or any other amount (for three (3) business days) when due.

B.    Representations and warranties incorrect in any material respect when made or deemed made.

C.    Failure to comply with covenants, subject to 30 day grace period in the case of the affirmative covenants.

D.    Cross-default to payment defaults on other post-petition or unstayed indebtedness in excess of $20 million of the Loan Parties and their subsidiaries, or any other default or event of default with respect to any such indebtedness if the effect is to accelerate or permit acceleration, and cross-acceleration to any such indebtedness.

E.    Post-petition judgments subject to carve-outs in excess of $10 million.

F.    The occurrence of certain ERISA events that result in liabilities that could reasonably be expected to have a Material Adverse Effect (as defined in Annex C hereto).

G.    Asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any DIP Loan Document (including the failure of any lien of the Collateral Agent to remain perfected and with respect to such impairment, superior to and prior to the rights of all third persons or any guarantee agreement ceasing to be in full force and effect (for the avoidance of doubt including without limitation the lien on the L/C Cash Collateral Account)) or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed under the DIP Loan Documents.

H.    (i) The entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by the Debtors of a motion or other pleading seeking entry of such an order;

(ii) A trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Company's Case, the Company applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion;

(iii) The entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Administrative Agent, the L/C Issuer or the Lenders, or the filing by the Company of an application, motion or other pleading seeking entry of such an order;

(v) The entry of an order in any of the Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties in excess of $5 million;

(vi) The entry of a final non-appealable order in the Cases (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the L/C Issuer, or the commencement of other actions by the Loan Parties that challenges the rights and remedies of the Administrative Agent, the L/C Issuer or the Lenders under the DIP Facility in any of the Cases or inconsistent with the applicable DIP Loan Documents (other than the use of cash collateral on a non-consensual basis), (ii) avoiding or requiring disgorgement by the Lenders or the L/C Issuer of any amounts received in respect of the obligations under the DIP Facility or (iii) resulting in the marshaling of any Collateral.

(vii) Without the consent of the Administrative Agent, the entry of an order in any of the Cases seeking authority to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; or

(viii) The filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (vii) above, unless such filing or any pleading is in connection with the enforcement of the DIP Loan Documents against the Administrative Agent or the Lenders.

I.  The making of any material payments in respect of prepetition obligations other than (i) as permitted by the Interim Order or the Final Order, (ii) as permitted by any "first day" or "second day" orders satisfactory to the Administrative Agent, (iii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Administrative Agent, (iv) distributions to direct or indirect equity owners of the Debtors to pay taxes attributable to taxable income of the Debtors for such period ("**Tax Distributions**") or (v) as otherwise agreed to by the Administrative Agent.

J.  The entry of the Final Order shall not have occurred within 45 days after entry of the Interim Order.

K.  An order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable DIP Loan Documents, (i) a priority of any Lien against the Company or any other Loan Party that is equal to or senior to the priority of the liens of the Administrative Agent, L/C Issuer and the Lenders under the DIP Facility or (ii) any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent, the L/C Issuer and the Lenders under the DIP Facility, or the filing by the Company of a motion or application seeking entry of such an order.

L.  Noncompliance by any Loan Party or any of its subsidiaries with the terms of the Interim Order or the Final Order.

M.  The Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party) shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders or the L/C Issuer regarding the DIP Facility, unless such suit or other proceeding is in connection with the enforcement of the DIP Loan Documents against the Administrative Agent, the Lenders or the L/C Issuer.

N.  A plan of reorganization shall be confirmed in any of the Cases that is not an Acceptable Plan of Reorganization (to be defined in the DIP Loan Documents), or an order approving a sale under section 363 of the Bankruptcy Code shall be entered that does not provide for payment in full of the Facilities, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the DIP Facility or is not otherwise reasonably satisfactory to the Administrative Agent, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

O.  Failure to execute and deliver the DIP Loan Documents on or prior to the date that is 10 business days from the Petition Date (subject to entry of the Final Order).

Upon the occurrence of an Event of Default, the Administrative Agent, on behalf of the Lenders and the L/C Issuer, may (and at the direction of the Required Lenders, shall) exercise all rights and remedies provided for in the DIP Loan Documents and may declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the DIP Loan Documents as to any future liability or obligation of the Agents, the L/C Issuer and the Lenders, but without affecting any of the DIP liens or the liabilities or obligations of any Loan Party; *provided* that, with respect to the enforcement of the DIP liens or exercise of any other rights or remedies with respect to the Collateral (including rights to set off or apply any amounts in any bank accounts that are a part of the Collateral), the Administrative Agent shall provide the Company with at least five (5) days' written notice prior to taking the action contemplated thereby; *provided, further*, that no notice shall be required for any exercise of rights or remedies (x) to block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement), and (y) in the event the obligations under the DIP Facility have not been repaid in full in cash on the Scheduled Termination Date.[7]

**Expenses and Indemnification:**

The Company and each Guarantor shall jointly and severally pay or reimburse the Agents, the L/C Issuer and the Initial Lender for all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent and the Initial Lender (including reasonable and documented attorneys' (including foreign local counsel), financial advisors' and other professionals' as determined by the Lenders fees and expenses and limited, with respect to legal fees, to one counsel for the Lenders, one counsel for the Agents and the L/C Issuer and one counsel for each relevant material jurisdiction and counsel for actual and perceived conflicts) in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents; (ii) the syndication and funding of the DIP Loans; (iii) the creation, perfection or protection of the liens under the DIP Loan Documents (including all search, filing and recording fees); and (iv) the on-going administration of the DIP Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto).

---

[7] NTD: Remedies include, for the avoidance of doubt, ability to credit bid all or some of the DIP Loans pursuant to section 363(k) of the Bankruptcy Code.

The Company and each Guarantor further agrees to jointly and severally pay or reimburse the Administrative Agent, the Collateral Agent and each of the Lenders for all reasonable and documented out-of-pocket costs and expenses, including reasonable and documented attorneys' fees and expenses, incurred by the Administrative Agent, the L/C Issuer or such Lenders in connection with (i) the enforcement of the DIP Loan Documents; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Loan Documents.

The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), the Arranger, each Lender and the L/C Issuer, and each Related Party (as defined below) of any of the foregoing persons (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable and documented out-of-pocket fees and expenses (including the reasonable documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any subsidiary thereof arising out of, in connection with, or as a result of (i) the execution or delivery of this Term Sheet, the DIP Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties and the Collateral Agent (and any sub-agent thereof) and its Related Parties, the administration and enforcement of this Term Sheet and the DIP Loan Documents, (ii) any DIP Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit) and (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are found in a final, non-appealable judgment by a court of competent jurisdiction to (x) have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for material breach of such Indemnitee's obligations under this Term Sheet or under any other DIP Loan Document or (z) result from a dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Term Sheet or any DIP Loan Document or any claims arising out of any act or omission of the Borrower or any of its affiliates).  As used herein, a "**Related Party**" means, with respect to any person, such person's affiliates and the partners, directors, officers, employees, agents, attorneys and advisors of such person and of such person's affiliates.

**Administrative Agent / Collateral Agent:**

Each of the Lenders hereby irrevocably appoints Citibank, N.A. to act on its behalf as Administrative Agent and as Collateral Agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of this Term Sheet and the DIP Loan Documents, together with such actions and powers as are reasonably incidental thereto. The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Term Sheet and the DIP Loan Documents.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary) or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any default unless and until notice describing such default is given to the Administrative Agent by the Borrower, a Lender or the L/C Issuer.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.

The Collateral Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Collateral Agent. The Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required to be paid by it to the Administrative Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), the Arranger, the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Collateral Agent (or any such sub-agent), the Arranger, such L/C Issuer or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Collateral Agent (or any such sub-agent), the Arranger or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent (or any such sub-agent), the Arranger or L/C Issuer in connection with such capacity.

| | |
|---|---|
| **Assignments and Participations:** | Assignments must be in a minimum amount of $1.0 million (or, if less, the remaining commitments and/or DIP Loans of any assigning Lender) and are subject to the consent of the Administrative Agent. If no Default or Event of Default then exists, then assignments shall also be subject to the consent of the Company (not to be unreasonably withheld) if the result of any such assignments is that the Initial Lender no longer constitutes the Required Lenders.  No participation shall include voting rights, other than for matters requiring consent of all affected Lenders. |
| **Register:** | The Administrative Agent, acting solely for this purpose as an agent of the Company, shall maintain at one of its offices in New York, NY a copy of each assignment delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments of, and principal amounts (and stated interest) of the DIP Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Term Sheet and the DIP Loan Documents. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. |
| | Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the DIP Loans or other obligations under this Term Sheet or DIP Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under this Term Sheet or DIP Loan Document) to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this DIP Term Sheet and the DIP Loan Documents notwithstanding any notice to the contrary. |
| **Required Lenders:** | Lenders holding greater than 50.0% of the outstanding aggregate commitments and/or exposure under the DIP Facility (the "**Required Lenders**"). |

| | |
|---|---|
| **Amendments:** | Required Lenders, except for amendments customarily requiring approval by affected Lenders. The consent of the Administrative Agent shall be required with respect to amendments and waivers of this Term Sheet and the DIP Loan Documents directly adversely affecting its rights or duties. The consent of the L/C Issuer shall be required with respect to amendments and waivers of this Term Sheet and the DIP Loan Documents: (i) directly adversely affecting its rights or duties, (ii) that extend of the final scheduled maturity, (iii) any amendments, waivers or modifications of the Interim Order or the Final Order and (iv) to the definition of "Acceptable Plan of Reorganization" solely in respect of the L/C Facility and the application and use of the proceeds of the pledged cash collateral in respect of the L/C Facility. |
| **U.S. Federal Income Tax Treatment:** | The Loan Parties shall treat the DIP Loans as indebtedness for U.S. federal income tax purposes and shall not take any inconsistent position on any tax return. The Borrower and Administrative Agent, as applicable, shall use reasonable best efforts to consult with the Lenders and advisors to the Lenders with respect to all original issue discount computations involving the DIP Facility, and upon the reasonable request of the Lenders, the Borrower or the Administrative Agent shall provide any information reasonably requested by the Lenders with respect to such original issue discount computations. |
| **Miscellaneous:** | To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against the Borrower and its affiliates or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Term Sheet, the DIP Loan Documents or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any DIP Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee or the Borrower and its affiliates shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Term Sheet, the DIP Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.

Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Term Sheet, the DIP Loan Documents or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory). Each party (a) certifies that no representative, agent or attorney of any other person has represented, expressly or otherwise, that such other person would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties have been induced to enter into this Term Sheet, the DIP Loan Documents by, among other things, the mutual waivers and certifications herein.

The agreements herein shall survive the resignation of the Administrative Agent, the Collateral Agent, the Arranger and the L/C Issuer, the replacement of any Lender, the termination of the commitments in respect of the DIP Facility or the |

Letter of Credit Facility and the repayment, satisfaction or discharge of all obligations in respect of the DIP Facility and the Letter of Credit Facility.

The DIP Loan Documents will also include (i) yield protection provisions and (ii) agency, set-off and sharing language, in each case substantially customary for facilities of this type.

| | |
|---|---|
| **Governing Law and Submission to Exclusive Jurisdiction:** | State of New York (and, to the extent applicable, the Bankruptcy Code).  Each Loan Party irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Term Sheet and the DIP Loan Documents, or for recognition or enforcement of any judgment, and each of the parties irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State Court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Term Sheet or other DIP Loan Documents shall affect any right to bring any action or proceeding relating to this Term Sheet or the DIP Loan Documents against the Borrower or any other Loan Party or its properties in the court of any jurisdiction. |
| **Counsel to Initial Lender:** | Paul, Weiss, Rifkind, Wharton & Garrison, LLP. |

[Remainder of this page intentionally left blank]

**APOLLO INVESTMENT
CORPORATION**

By: _____
      Name: Joseph D. Glatt
      Title: Vice President

**AP WEC DEBT HOLDINGS LLC**

By: _____
      Name: Joseph D. Glatt
      Title: Vice President

**MIDCAP FINANCIAL TRUST**

By:  Apollo Capital Management, L.P.,
  its investment manager

By: Apollo Capital Management GP, LLC,
its general partner

By_____
Name: Joseph D. Glatt
Title: Vice President

[Signature Page Term Sheet]

**AMUNDI ABSOLUTE RETURN APOLLO FUND PLC**

By: Apollo Belenos Management LLC,
its trading manager

By: Apollo Capital Management, L.P.,
its sole member

By:  Apollo Capital Management GP, LLC,
its general partner

By: _____
     Name: Joseph D. Glatt
     Title: Vice President

**IVY APOLLO STRATEGIC INCOME FUND**

By: Apollo Credit Management, LLC,
its investment sub-adviser

By: _____
     Name: Joseph D. Glatt
     Title: Vice President

**IVY APOLLO MULTI ASSET INCOME FUND**

By: Apollo Credit Management, LLC,
its investment sub-adviser

By: _____
     Name: Joseph D. Glatt
     Title: Vice President

CITIGROUP GLOBAL MARKETS INC.

By:

Name:  Christopher Marino
Title:  Vice President and Director

**CITIBANK, N.A.**

By:

Name:     Christopher Marino

Title:     Vice President and Director

WESTINGHOUSE ELECTRIC COMPANY LLC

By

Name: Lisa J. Donahue
Title: Chief Transition and Development Officer

CE NUCLEAR POWER INTERNATIONAL, INC
FAUSKE AND ASSOCIATES LLC
PAR NUCLEAR, INC.
PAR NUCLEAR HOLDING CO., INC.
PCI ENERGY SERVICES LLC
WEC CAROLINA ENERGY SOLUTIONS, LLC
WEC CAROLINA ENERGY SOLUTIONS, INC.
WEC ENGINEERING SERVICES, INC.
WEC EQUIPMENT & MACHINING SOLUTIONS LLC
WEC SPECIALTY LLC
WEC WELDING & MACHINING, LLC
WECTEC STAFFING SERVICES LLC
WESTINGHOUSE ENERGY SYSTEMS LLC
WESTINGHOUSE INDUSTRY PRODUCTS INTERNATIONAL COMPANY LLC
WESTINGHOUSE INTERNATIONAL TECHNOLOGY LLC
WESTINGHOUSE TECHNOLOGY LICENSING COMPANY LLC
FIELD SERVICES LLC
NUCLEAR TECHNOLOGY SOLUTIONS LLC
SHAW GLOBAL SERVICES LLC
SHAW NUCLEAR SERVICES INC.
STONE & WEBSTER INTERNATIONAL INC.
STONE & WEBSTER SERVICES LLC
WECTEC CONTRACTORS INC.
STONE & WEBSTER ASIA INC.
STONE & WEBSTER CONSTRUCTION INC.
WECTEC GLOBAL PROJECT SERVICES INC.
WECTEC LLC

By _____

   Name: Lisa J. Donahue
   Title: Chief Transition and Development Officer

ANNEX A

**$800 Million Senior Secured Debtor-In-Possession Term Loan Facility**

**Interest Rates And Fees**

| | |
|---|---|
| **Interest Rates:** | DIP Loans will bear interest, at the option of the Company, at one of the following rates: |
| | (i) the Applicable Margin (as defined below) <u>plus</u> the Base Rate, payable monthly in arrears; or |
| | (ii) the Applicable Margin <u>plus</u> the current LIBOR Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two, three or six months (the "**LIBOR Rate**"), payable at the end of the relevant interest period, but in any event at least quarterly; *provided* that (x) the LIBOR Rate in respect of DIP Loans shall be not less than 1.00% *per annum* and (y) in no event shall the LIBOR Rate be less than 0% (the "**LIBOR Floor**"). |
| | "**Applicable Margin**" means: (x) 5.25% *per annum*, in the case of Base Rate Loans and (y) 6.25% *per annum*, in the case of LIBOR Rate Loans. |
| | "**Base Rate**" means the highest of (i) the Administrative Agent's prime rate, (ii) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1% and (iii) the LIBOR Rate for an interest period of one month (giving effect to the LIBOR Floor) <u>plus</u> 1.00%. |
| | Interest and fees shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of interest with respect to Base Rate Loans based on the Administrative Agent's prime rate). |
| **Default Interest:** | During the continuance of an Event of Default (as defined below), any overdue amounts under the DIP Loan Documents (including unreimbursed amounts on account of drawn Letters of Credit) will bear interest at an additional 2% *per annum*. |
| **Unused Commitment Fees:** | From and after the DIP Closing Date, a non-refundable unused commitment fee at the rate of 0.50% *per annum* will accrue as a percentage of the daily average undrawn portion of the DIP Facility (whether or not then available), payable monthly in arrears and on the Final Term Funding Date. |
| **OID:** | 2.50% |
| **Exit Payments:** | 103% (first 6 months), 102% (next 6 months), par (at initial Scheduled Termination Date or thereafter). |
| **Administrative and Collateral Agency Fees:** | As separately agreed to between the Company and each Agent. |

**Expense Retainer:**    For the account of the Initial Lender, a non-refundable expense retainer of $750,000, without deduction or withholding for any taxes.

ANNEX B

**Summary of Term and Conditions for Letter of Credit Facility**

**L/C Issuer:** An affiliate of Citigroup Global Markets Inc. shall act as issuing bank in respect of the Letter of Credit Facility (the "**L/C Issuer**").

**Letter of Credit Facility:** A letter of credit facility (the "**Letter of Credit Facility**") in the amount of $225 million for new letters of credit (the "**Letters of Credit**") that shall be cash collateralized as set forth below opposite the heading "L/C Cash Collateral Account". Letters of Credit shall be available in (i) Dollars and (ii) Pounds Sterling, Euros and each other currency that is readily available and freely transferable and convertible into Dollars and approved by the Administrative Agent and the L/C Issuer in their sole discretion (each such currency described in this clause (ii), an "**Alternative Currency**"; and a Letter of Credit denominated in an Alternative Currency, an "**Alternative Currency Letter of Credit**").

The commitment of the L/C Issuer under the Letter of Credit Facility shall initially be $100 million on the DIP Closing Date and shall automatically increase to $225 million on the date of entry of the Final Order.

Each Letter of Credit shall have an initial expiration date that is no later than five days prior to the Scheduled Termination Date (such date being the "**Letter of Credit Expiration Date**") then in effect for the DIP Facility or, subject to the provisions set forth below opposite the heading "L/C Cash Collateral Account", the date that is 12 months from such Letter of Credit Expiration Date. The L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions; *provided* that any such auto-extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit).

The issuance of all Letters of Credit shall be subject to the customary procedures of the L/C Issuer.

Notwithstanding that a Letter of Credit is in support of any obligations of, or is for the account of, a subsidiary of the Borrower or Westinghouse Electric UK Holdings Limited ("**Westinghouse UK**") or any of its subsidiaries, the Borrower shall be obligated to reimburse the L/C Issuer for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of any of its subsidiaries or Westinghouse UK or any of its subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of its subsidiaries and Westinghouse UK and its subsidiaries.

**L/C Cash Collateral Account:** Cash collateral in an amount equal to the applicable L/C Collateralization Amount (as defined below) shall be solely provided by the Borrower and shall be deposited in a segregated deposit account at Citibank, N.A. established for the benefit of the Borrower under the sole and exclusive control of the L/C Issuer (the "**L/C Cash Collateral Account**"). Amounts on deposit in the L/C Cash

Collateral Account shall be posted to Citibank, N.A.'s dollars on deposit in custody account in accordance with the Pledge Agreement referred to below. Prior to the issuance of any Letter of Credit, the Borrower shall execute and deliver a customary pledge, assignment and control agreement with respect to the L/C Cash Collateral Account (the "**Pledge Agreement**").

"**L/C Collateralization Amount**" means an amount in Dollars provided by the Borrower equal to (i) until the Maturity Date, the sum of (x) 103% multiplied by the amount of all obligations in respect of Letters of Credit denominated in Dollars existing at such time plus (y) 103% multiplied by the Dollar Amount (as defined below) of all obligations in respect of Alternative Currency Letters of Credit existing at such time, and (ii) upon and following the Maturity Date, the sum of (x) 105% multiplied by the amount of all obligations in respect of Letters of Credit denominated in Dollars existing at such time plus (y) 105% multiplied by the Dollar Amount of all obligations in respect of Alternative Currency Letters of Credit existing at such time.

If, as a result of any revaluation of currency (on any Revaluation Date (as defined below) or otherwise) with respect to any Alternative Currency Letters of Credit, the amount on deposit in the L/C Cash Collateral Account shall be less than the L/C Collateralization Amount then applicable after giving effect to such revaluation, the Borrower shall, within two business days after notice from the Administrative Agent of such revaluation, deposit in the L/C Cash Collateral Account cash in an amount necessary to cause the amount on deposit in the L/C Cash Collateral Account to be equal to the L/C Collateralization Amount.

So long as no Event of Default has occurred and is continuing, the Borrower may from time to time, by written notice to the L/C Issuer, request a withdrawal from the L/C Cash Collateral Account if the total amount on deposit in the L/C Cash Collateral Account is greater than the minimum L/C Collateralization Amount then applicable. The L/C Issuer shall promptly instruct Citibank, N.A. to pay the amount so requested (the "**Proposed Withdrawal Amount**") if the L/C Issuer is satisfied (in its sole discretion) that the following the withdrawal of the Proposed Withdrawal Amount, the total amount on deposit in the L/C Cash Collateral Account will not be less than the minimum L/C Collateralization Amount then applicable.

|                           |                                                                                      |
|---------------------------|--------------------------------------------------------------------------------------|
| **Reimbursement of Disbursements:** | The Borrower shall pay to the L/C Issuer the full amount of any drawing under a Letter of Credit in the currency in which such Letter of Credit was issued, unless the L/C Issuer (at its option) shall have specified that it will require reimbursement in Dollars for any Alternative Currency Letter of Credit, plus all interest accrued thereon, not later than the first business day after the Borrower receives notice of payment from the L/C Issuer (or the second business day if such notice is received after 11:00 a.m. NY time); provided that the Borrower's obligation to reimburse the L/C Issuer with respect to such drawing shall, unless the Borrower and the L/C Issuer shall otherwise each agree, first be satisfied by funds (in Dollars) withdrawn by the Administrative Agent from the L/C Cash Collateral Account and transferred to the L/C Issuer. |
| **Currency**              | The Administrative Agent shall determine the Spot Rates (as defined below) as of each Revaluation Date (as defined below) to be used for calculating Dollar |

**Equivalents:**    Amounts (as defined below) of Letter of Credit extensions denominated in Alternative Currencies.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.  The applicable amount of any currency (other than Dollars) shall be such Dollar Amount as so determined by the Administrative Agent.

"**Spot Rate**" for a currency means the rate determined by the L/C Issuer to be the rate quoted by the L/C Issuer as the spot rate for the purchase by the L/C Issuer of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. NY time on the date two business days prior to the date as of which the foreign exchange computation is made; provided that the L/C Issuer may obtain such spot rate from another financial institution designated by the L/C Issuer if the person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and provided that the L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Alternative Currency Letter of Credit.

"**Revaluation Date**" means with respect to any Alternative Currency Letter of Credit, each of the following: (i) each date of issuance of an Alternative Currency Letter of Credit, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by the L/C Issuer under any Letter of Credit denominated in an Alternative Currency, (iv) each date of withdrawal of any amount from the Letter of Credit Account and (v) such additional dates as the Administrative Agent or the L/C Issuer shall reasonably determine.

"**Dollar Amount**" means, at any time:

a)  with respect to an amount denominated in Dollars, such amount; and

b)  with respect to an amount denominated in an Alternative Currency, an equivalent amount thereof in Dollars as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

**Procedures for Issuance/Amendment:**    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) of an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer (the "**Letter of Credit Application**"), appropriately completed and signed by a Responsible Officer of the Borrower.   As used herein, "**Responsible Officer**" means (i) the chief executive officer, president or any vice president of the Borrower or any applicable subsidiary and, in addition, any person holding a similar position or acting as a director or managing director with respect to any other foreign subsidiary of the Borrower or (ii) with respect to financial matters, the chief financial officer, senior vice president – finance, vice president –

finance, principal accounting officer, treasurer, assistant treasurer or controller of such person.

Such Letter of Credit Application must be received by such L/C Issuer and the Administrative Agent not later than 11:00 a.m. NY time at least three business days (or such later date and time as the Administrative Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a business day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a business day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may reasonably require.

Additionally, the Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment as the L/C Issuer or the Administrative Agent may reasonably require.

**Conditions Precedent to Issuance:**
The issuance of any Letter of Credit shall be conditioned on: (i) receipt by the L/C Issuer of a duly completed and executed Letter of Credit Application, (ii) the amount on deposit in the L/C Cash Collateral Account shall not be less than the L/C Collateralization Amount applicable at such time (after giving effect to the issuance of such Letter of Credit), (iii) there shall exist no default under the DIP Loan Documents, (iv) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, issuance or granting, (v) the issuance of such Letter of Credit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (vi) the issuance of such Letter of Credit shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, and (vii) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect.

**Letter of Credit Facility Fees:**
A fronting fee in the amount of 0.125% on the outstanding face amount of each Letter of Credit shall be payable to the L/C Issuer. Such fronting fees shall be due and payable in Dollars on the first business day after the end of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. In addition, the Borrower will pay to the L/C

Issuer its standard opening, amendment, presentation, wire and other administration charges applicable to each such Letter of Credit.

**Counsel to the L/C Issuer:**    Shearman & Sterling LLP.

ANNEX C

## Representations and Warranties[8]

### 3.1    Financial Statements; No Change.

(a)    The audited consolidated balance sheet of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) dated March 31, 2016, and the related audited consolidated statements of income and of cash flows for the fiscal year of the Financial Statement Entities ended on that date (i) were prepared in accordance with GAAP applied consistently throughout the period reflected therein and with prior periods, except as disclosed therein, and (ii) fairly present in all material respects the consolidated financial condition of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) as of the date thereof and their consolidated results of operations and consolidated cash flows for the period covered thereby, subject, in the case of clauses (i) and (ii), to any events relating to the Vogtle project and the Summer project.

(b)    The unaudited consolidated balance sheets of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) dated June 30, 2016 and September 30, 2016 and the related unaudited consolidated statements of income and of cash flows for the relevant quarterly period of the 2016 fiscal year of such Financial Statement Entities ended on that date (i) were prepared in accordance with GAAP (except that such financial statements may include abbreviated notes) applied consistently throughout the period reflected therein and with prior periods, except as disclosed therein, and (ii) fairly present in all material respects the consolidated financial condition of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) as of the date thereof and their consolidated results of operations and consolidated cash flows for the period covered thereby, subject, in the case of clauses (i) and (ii), to normal year-end audit adjustments and any events relating to the Vogtle project and the Summer project.

(c)    Since March 31, 2016, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.  For the purposes herein, "Material Adverse Effect" shall mean a material adverse effect on (a) the business, property, operations, condition (financial or otherwise) or prospects of the Company, Westinghouse Electric UK Holdings Limited ("Westinghouse UK") and their respective Subsidiaries taken as a whole, other than, in each case, (i) any change, event or occurrence, arising individually or in the aggregate, from events relating to the [Vogtle project] and the [Summer project] and (ii) events that would reasonably be expected to result from the filing or commencement of the Cases or the announcement of the filing or commencement of the Cases, (b) the validity or enforceability of this Term Sheet or any of the other DIP Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

### 3.2    Existence; Compliance with Law.

Each of the Company, Westinghouse UK and their respective Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, except for absences of such good standing in respect of such Subsidiaries as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (b) has the organizational power and authority,

---

[8] Capitalized terms used but not otherwise defined in the Term Sheet shall have the meanings assigned to such terms in that certain Second Amended and Restated Credit Agreement dated December 11, 2015 among the Company, Westinghouse UK, the financial institutions party thereto, and BNP Paribas, as administrative agent (as amended, amended and restated or otherwise modified from time to time, the "Existing BNP Facility").

and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, except for absences of such power, authority or right as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (c) is duly qualified as a foreign organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except for absences of such qualification or good standing as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

### 3.3    Power; Authorization; Enforceable Obligations

(a)    Each Loan Party has the organizational power and authority, and the legal right, to make, deliver and perform the DIP Loan Documents to which it is a party and to obtain extensions of credit thereunder. Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the DIP Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of the DIP Loan Documents. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit under the DIP Loan Documents or with the execution, delivery, performance, validity or enforceability of the DIP Loan Documents. Each DIP Loan Document to which any Loan Party is a party on the DIP Closing Date has been duly executed and delivered on behalf of such Loan Party. Each DIP Loan Document to which any Loan Party is a party upon execution will constitute, a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

(b)    The Company has the organizational power and authority, and the legal right to make, deliver and perform the Liquidity Facility Agreement.  The Company has taken all necessary organizational action to authorize the execution, delivery and performance of the Liquidity Facility Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the Liquidity Facility Agreement or with the execution, delivery, performance, validity or enforceability of the Liquidity Facility Agreement.  The Liquidity Facility Agreement has been duly executed and delivered on behalf of the Company.  The Liquidity Facility Agreement upon execution will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

### 3.4    No Legal Bar.

The execution, delivery and performance of the Liquidity Facility Agreement, the DIP Loan Documents, the extension of credit thereunder and the use of proceeds thereof will not violate any Requirement of Law or any Contractual Obligation, including any post-petition agreement, of the Company, Westinghouse UK or any of their respective Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation, other than Liens created under the DIP Loan Documents and the DIP Financing Orders. No Requirement of Law or Contractual Obligation applicable

to the Company, Westinghouse UK or any of their respective Subsidiaries could reasonably be expected to have a Material Adverse Effect.

### 3.5    Litigation.

Other than the Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Company or Westinghouse UK, threatened by or against the Company, Westinghouse UK or any of their respective Subsidiaries or against any of their respective properties or revenues (a) with respect to any of the DIP Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

### 3.6    No Default.

Except for the defaults and events of defaults set forth under the waivers to the Existing BNP Facility, none of the Company, Westinghouse UK or any of their respective Subsidiaries is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect. No default or event of default under the DIP Facility has occurred and is continuing.

### 3.7    Ownership of Property; Liens.

Each of the Company, Westinghouse UK and their respective Subsidiaries has title in fee simple to, or a valid leasehold interest in, all its Material real property, and good title to, or a valid leasehold interest in, all its other Material property, and none of such property is subject to any Lien except as permitted by the DIP Loan Documents.

### 3.8    Intellectual Property.

The Company, Westinghouse UK and each of their respective Subsidiaries owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business in all Material respects as currently conducted. No Material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does the Company nor Westinghouse UK know of any valid basis for any such claim. The use of Intellectual Property by the Company, Westinghouse UK and their respective Subsidiaries does not infringe on the rights of any Person in any Material respect.

### 3.9    Taxes.

Each of the Company, Westinghouse UK and each of their respective Subsidiaries has timely filed or caused to be timely filed all foreign, national, state and local income and other Material tax returns that are required to be filed (taking into account all proper extensions) and has timely paid all income Taxes and other Material Taxes required to be paid and paid any assessments made against it or any of its property and all other income taxes and other Material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any taxes, fees or other charges the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Company, Westinghouse UK or their respective Subsidiaries, as the case may be); no Tax Lien has been filed, and, to the knowledge of the Company or Westinghouse UK, no claim is being asserted, with respect to any Tax, fee or other charge. There are no tax sharing agreements between either the Company or Westinghouse UK and Toshiba Corporation. Under the laws of its Relevant Jurisdiction it is not

necessary that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the DIP Loan Documents or the transactions contemplated by the DIP Loan Documents.

### 3.10    Federal Regulations.

No extension of credit under the DIP Loan Documents, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board. If requested by any Lender or the Administrative Agent, the Company and Westinghouse UK will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

### 3.11    Labor Matters.

Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Company, Westinghouse UK or any of their respective Subsidiaries pending or, to the knowledge of the Company or Westinghouse UK, threatened; (b) hours worked by and payment made to employees of the Company, Westinghouse UK and their respective Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Company, Westinghouse UK or any of their respective Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Company, Westinghouse UK or the relevant Subsidiary.

### 3.12    ERISA.

[Neither a Reportable Event nor a failure to satisfy the minimum funding standards (within the meaning of Section 412 or 430 of the Code or Section 302 of ERISA) has occurred during the five-year period (or, if shorter, for the period during which the Plan in question has been in existence) prior to the date on which this representation is made or deemed made with respect to any Pension Plan, and each Plan has complied in all Material respects with the applicable provisions of ERISA and the Code. No Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA). No termination of a Pension Plan has occurred, and no Lien in favor of the PBGC or a Pension Plan has arisen, during such period. The present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Pension Plan allocable to such accrued benefits by a Material amount. None of the Company, Westinghouse UK or any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a Material liability under ERISA, and none of the Company, Westinghouse UK or any Commonly Controlled Entity would become subject to any Material liability under ERISA if the Company, Westinghouse UK or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No Multiemployer Plan is in Reorganization or Insolvent.][9]

### 3.13    Investment Company Act; Other Regulations.

---

[9] Subject to on-going review.

None of the Company, Westinghouse UK or any of their respective Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. None of the Company, Westinghouse UK or any of their respective Subsidiaries is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

**3.14     Use of Proceeds.**

The loans and letters of credit extended or issued under the DIP Facility shall be used for the purposes set forth in the "*Purpose*" section in the Term Sheet.

**3.15     Environmental Matters.**

Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)     the facilities and properties owned, leased or operated by the Company, Westinghouse UK or any of their respective Subsidiaries (the "Properties") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)     none of the Company, Westinghouse UK or any of their respective Subsidiaries has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by the Company, Westinghouse UK or any of their respective Subsidiaries (the "Business"), nor do the Company and Westinghouse have knowledge or reason to believe that any such notice will be received or is being threatened;

(c)     Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d)     no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Company and Westinghouse UK, threatened, under any Environmental Law to which the Company, Westinghouse UK or any of their respective Subsidiaries is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)     there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of the Company, Westinghouse UK or any of their respective Subsidiaries in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

(f)     the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no

contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g)    none of the Company, Westinghouse UK or any of their respective Subsidiaries has assumed any liability of any other Person under Environmental Laws.

### 3.16    Accuracy of Information, etc.

No statement or information contained in any DIP Loan Document, or any other document, certificate or statement furnished by or on behalf of the Company or Westinghouse UK to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by the DIP Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.

### 3.17    Solvency.

The non-Debtor Subsidiaries of the Company and WEC UK (taken as a whole), after giving effect to the transactions contemplated by the DIP Loan Documents and the borrowings thereunder, are Solvent.

### 3.18    AML Laws; Anticorruption Laws and Sanctions.

Each of the Company and Westinghouse UK has implemented and maintains in effect policies and procedures designed to ensure compliance by the Company, Westinghouse UK, their respective Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions. Each of (a) the Company, Westinghouse UK, any of their respective Subsidiaries or, to the knowledge of either the Company or Westinghouse UK, any of their respective directors or officers, or any of their respective employees or Affiliates, or (b) to the knowledge of either the Company or Westinghouse UK, any agent of the Company, Westinghouse UK or any of their respective Subsidiaries or other of its Affiliates that will act in any capacity in connection with or benefit from the DIP Facility, (i) is not a Sanctioned Person, (ii) is in compliance in all material respects with Anti-Corruption Laws and Sanctions, (iii) to the extent applicable, is in compliance in all material respects with AML Laws. No extension of credit under the DIP Facility, use of proceeds thereof by the Company, Westinghouse UK or any of their respective Subsidiaries or other transaction contemplated by the DIP Loan Documents will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions. Each of the Company and Westinghouse UK represents that neither it nor any of its Subsidiaries, or, to its knowledge, its parent company or any other of its Affiliates has engaged in or intends to engage in any unlawful dealings or transactions with, or for the benefit of, any Sanctioned Person or with or in any Sanctioned Country.

### 3.19    Security Interest.

(a)    Upon entry of each of the Interim Order and the Final Order, as applicable, each such DIP Financing Order shall be effective to create in favor of the Collateral Agent, for the benefit of the Lenders, a legal, valid, enforceable and perfected security interest in the Collateral of the Debtors and proceeds thereof, as contemplated thereby, as described in the DIP Loan Documents.

(b)    The provisions of the DIP Loan Documents shall be effective to create in favor of the Collateral Agent, for the benefit of the Lenders, a legal, valid, enforceable and perfected security

interest and hypothec in the Collateral of the Loan Parties who are not Debtors and proceeds thereof, as contemplated thereby, as described in the DIP Loan Documents.

### Section 3.20    DIP Financing Orders.

(a)    The Interim Order or, at all times after its entry by the Bankruptcy Courts, the Final Order, is in full force and effect, and has not been vacated, reversed, terminated, stayed modified or amended in any manner without the reasonable written consent of the Required Lenders.

(b)    Upon the occurrence of the maturity date (whether by acceleration or otherwise) of any of the obligations under the DIP Facility, the Lenders shall, subject to the provisions of the "*Events of Default*" section in the Term Sheet and the applicable provisions of the applicable DIP Financing Order, be entitled to immediate payment of such obligations, and to enforce the remedies provided for under the DIP Loan Documents in accordance with the terms thereof and such DIP Financing Order, as applicable, without further application to or order by the Bankruptcy Court.

(c)    If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such DIP Financing Order, the extension of credit or the performance by any Loan Party of any of its obligations under any of the DIP Loan Documents shall be the subject of a presently effective stay pending appeal. The Company, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the DIP Financing Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Company, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with the DIP Loan Documents notwithstanding any such objection or appeal unless the relevant DIP Financing Order has been stayed by a court of competent jurisdiction.

### Section 3.21    Appointment of Trustee or Examiner; Liquidation.

No order has been entered in any of the Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of a responsible officer or examiner (other than a fee examiner) having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (iii) to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Cases.

### Section 3.22    Superpriority Claims; Liens.

Upon the entry of each of the Interim Order and the Final Order, each such DIP Financing Order and the DIP Loan Documents are sufficient to provide the DIP Superpriority Claims and security interests and Liens on the Collateral of the Debtors described in, and with the priority provided in, the DIP Loan Documents.

### Section 3.23   AP 1000 Projects.

(a)    [Each of the Vogtle construction contract and the Summer construction contract (collectively, the "Subject Contracts") are executory contracts, which are, subject to one or more agreements approved by the Bankruptcy Court, capable of being rejected pursuant to Section 365 of the Bankruptcy Code.

(b)    The rejection of any of the Vogtle construction contract and the Summer construction contract would not give rise to any secured claims, claims that would rank senior to the DIP

Loans, or enforceable rights of set-off, other than with respect to any assets of the Loan Parties located on the [Vogtle project site] and the [Summer project site].

(c)     The rejection of any of the Subject Contracts does not default, impair, terminate, forfeit, or trigger any cross-default to, any regulatory license or permit necessary for the operations of the non-AP1000 businesses, or prevent any of the non-AP1000 business from continued compliance with any of their regulatory license or permitting necessary for their continued operations.

(d)     The rejection of any of the Subject Contracts does not give rise to or trigger any personal liability of any of the officers or directors of the Loan Parties, or result in any of the Loan Parties' executives being precluded from continued employment under applicable regulations in the industry.

(e)     The rejection of the Subject Contracts does not result in the forfeiture of any material assets of the Loan Parties, other than assets located on the [Vogtle project site] and the [Summer project site].][10]

---

[10] Subject to on-going review.

ANNEX D

### Affirmative Covenants[11]

A.  Preservation and maintenance of existence, business and properties.

B.  (i) Procurement and maintenance with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business; (ii) prompt notification to the Administrative Agent and each Lender of any change, or proposed change, of which the Company or any Intercompany Borrower becomes aware to the provisions of the Nuclear Installations Act 1965 (including, without limitation, section 16 thereof) which gives legislative force to the principles of the Paris Convention on Third Party Liability in the Field of Nuclear Energy and the Brussels Convention supplementary to the Paris Convention; and (iii) limitation to only carry out advisory or other work in relation to nuclear generation to the extent that it is covered by insurance or other arrangements constituting alternative safeguards to a level considered prudent by its directors in relation to any liability which could arise from such work.

C.  Payment of income and other material taxes and other claims.

D.  Financial statements, reports, etc.

E.  Litigation and other notices, including, but not limited to, with respect to (i) the occurrence of a default or Event of Default under the DIP Loan Documents, (ii) after the Petition Date, any default under any Contractual Obligation of the Company, Westinghouse UK and their respective Subsidiaries or litigation, investigation or proceeding that may exist at any time between the Company, Westinghouse UK and any of their respective Subsidiaries and any Governmental Authority, that in either case, if not cured or if adversely determined , as the case may be, could reasonably be expected to have a Material Adverse Effect, (iii) after the Petition Date, the commencement of any litigation or proceeding affect the Company, Westinghouse UK or any of their respective Subsidiaries (1) in which the amount involved is $10,000,000 or more and not covered by insurance, (2) in which Material injunctive or similar relief is sought or (3) which relates to any DIP Loan Document, (iv) after the Petition Date, the following events, as soon as possible and in any event within 30 days after the Company or Westinghouse UK knows or has reason to know thereof: (1) the occurrence of any Reportable Event with respect to any Pension Plan; a failure to make any required contribution to a Plan; a Pension Plan entering "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); the creation of any Lien in favor of the PBGC or any Plan; any withdrawal from, or the termination of, any Pension Plan or Multiemployer Plan; or the Reorganization or Insolvency of any Multiemployer Plan, or determination that any Multiemployer Plan is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or (2) the institution of proceedings or the taking of any other action by the PBGC or the Company, Westinghouse UK or any Commonly Controlled Entity or any Plan or Multiemployer Plan with respect to the withdrawal from, or the termination of, any Pension Plan or Multiemployer Plan, the Reorganization or Insolvency of any Multiemployer Plan, or the determination that any Multiemployer Plan is in endangered or critical status, (v) any development or event that has had or could reasonably be expected to have a Material Adverse

---

[11] Capitalized terms used but not otherwise defined in the Term Sheet shall have the meanings assigned to such terms in the Existing BNP Facility.

Effect and (vi) such other information (financial or otherwise) with respect to the Company, Westinghouse UK or any of their Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

F.   Compliance with laws and regulations.

G.   Maintenance of records, access to properties and inspections.

H.   Use of proceeds solely in accordance with the Term Sheet.

I.   Compliance with environmental laws.

J.   Provision of additional collateral, guarantees and mortgages; further assurances.

K.   Compliance in all respects, after entry thereof, with all requirements and obligations set forth in the DIP Financing Orders, "first day" orders and "second day" orders, as each such order is amended and in effect from time to time in accordance with the DIP Loan Documents.

L.   Copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any of the Loan Parties with the Bankruptcy Court, or distributed by or on behalf of any of the Loan Parties to any appointed in the Cases, providing copies of the same to the Lenders and counsel for the Administrative Agent and Initial Lender.

M.   Continued retention of a restructuring advisor and a financial advisor reasonably satisfactory to the Administrative Agent (it being agreed that Alix Partners and PJT Partners are reasonably satisfactory to the Administrative Agent).

N.   Quarterly lender calls.

O.   Bi-weekly update calls for the Initial Lender and its advisors.

P.   Company shall have used its reasonable best efforts to enter into the DIP Loan Documents.

Q.   Such other information (financial or otherwise) with respect to the Company and its subsidiaries as the Lenders and the L/C Issuer (through the Administrative Agent) may reasonably request.

**ANNEX E**

## Negative Covenants

A.  Limitations on indebtedness, except that the following indebtedness shall be permitted:

1.  indebtedness under the DIP Facility (including the Letter of Credit Facility);

2.  indebtedness of the Loan Parties and its subsidiaries existing on the DIP Closing Date, and listed on a Schedule 3 to the Term Sheet;[12]

3.  indebtedness in connection with the Intercompany Loans;

4.  indebtedness (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit (other than letters of credit under the Letter of Credit Facility), bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

5.  (i) guaranties of the obligations of suppliers, customers and licensees in the ordinary course of business, (ii) indebtedness incurred in the ordinary course of business to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) indebtedness in respect of letters of credit (other than letters of credit under the Letter of Credit Facility), bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business, workers compensation claims or other employee benefits;

6.  guarantees of indebtedness otherwise permitted to be incurred pursuant to this Section A or other obligations not prohibited by this Term Sheet; *provided* that in the case of any guarantee by any Loan Party of the obligations of any subsidiary that is not a Loan Party, the related investment is permitted under Section D;

7.  indebtedness consisting of (i) the financing of insurance premiums and/or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

8.  indebtedness with respect to capital leases and purchase money indebtedness incurred in the ordinary course of its business in an aggregate outstanding principal amount not to exceed $5,000,000;

9.  [indebtedness under any hedging transaction not entered into for speculative purposes];[13]

10.  other indebtedness in an aggregate outstanding principal amount not to exceed $5,000,000.

B.  Limitations on liens, except that the following liens shall be permitted:

1.  liens for taxes not yet due or that are being contested in good faith by appropriate proceedings;

---

[12] Schedule subject to review.
[13] Inclusion subject to diligence

2.  carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like liens arising in the ordinary course of business that are not overdue for a period of more than 30 days;

3.  pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

4.  deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

5.  easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business;

6.  liens in existence on the DIP Closing Date listed on Schedule 4 to Term Sheet;[14]

7.  liens securing indebtedness in connection with capital leases and purchase money debt permitted under Section (A) above;

8.  liens not otherwise permitted by this Section B so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $5,000,000;

9.  liens securing the obligations under the DIP Facility (including the Letter of Credit Facility);

10. precautionary or purported liens evidenced by the filing of UCC financing statements or similar financing statements under applicable laws;

11. liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

12. leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any indebtedness;

13. liens securing the Intercompany Loans; and

14. liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto.

C.    Limitations on sale and leaseback transactions.

D.    Limitations on investments, loans and advances (collectively, the "**Investments**"), except that the following Investments shall be permitted:

1.  Investments (i) existing on, or contractually committed to or contemplated as of, the DIP Closing Date and described on Schedule 5 to this Term Sheet[15];

2.  the Intercompany Loans;

---

[14] Schedule subject to review.
[15] Schedule subject to review.

3.  (i) Investments existing on the DIP Closing Date in the Loan Parties or any of their subsidiaries, (ii) Investments among the Borrower and/or one or more of Loan Parties, (iii) Investments made by any Loan Party's subsidiary that is not a Loan Party in any Loan Party and/or any other Loan Party's subsidiary that is not a Loan Party;

4.  Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of clause (iii), to the extent necessary to maintain the ordinary course of supplies;

5.  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

6.  other Investments in an aggregate amount at any time outstanding not to exceed $5,000,000; and

7.  Investments in connection with the Corporate Reorganization subject to the consent of Required Lenders (not to be unreasonably withheld or delayed)[16].

E.    Limitations on mergers, consolidations, sales of assets ("**Dispositions**") and acquisitions, except that the following shall be permitted:

1.  the Corporate Reorganization subject to the consent of Required Lenders (not to be unreasonably withheld or delayed) and, to the extent permitted by the Bankruptcy Court, any other corporate reorganization;

2.  Dispositions of surplus, obsolete or worn out property in the ordinary course of business;

3.  the sale of inventory in the ordinary course of business;

4.  Dispositions of other property having a fair market value not to exceed $5,000,000.

5.  to the extent that (i) the relevant property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of the relevant Disposition are promptly applied to the purchase price of such replacement property;

6.  Dispositions of property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

7.  Dispositions made to comply with any order of any governmental authority or any applicable laws; and

8.  Any other Dispositions permitted by the applicable order of the Bankruptcy Court.

F.    Limitations on dividends and distributions, except that the Borrower and its Subsidiaries shall be permitted:

---

[16] "**Corporate Reorganization**" means a reorganization that may involve a transfer after the DIP Closing Date of ownership of Westinghouse Electric UK Holdings Limited ("**WEC UK**") to a new holding company that will be the direct parent of WEC UK and the indirect parent of Toshiba Nuclear Energy Holdings (US) Inc.

1. dividends and distributions from subsidiaries of any Loan Parties to such Loan Party;

2. to pay general administrative costs and expenses (including corporate overhead, legal or similar expenses and customary salary, bonus and other benefits payable to any director, officer or employees of any parent company) and franchise taxes, and similar fees and expenses, required to maintain the organizational existence of such parent company;

3. to pay audit and other accounting and reporting expenses of any parent company to the extent such expenses are attributable to any parent company and/or its subsidiaries; and

4. to pay any insurance premium that is payable by, or attributable to, any parent company and/or its subsidiaries.

G.    Limitations on transactions with affiliates, except for:

1. any transaction among Loan Parties;

2. any transactions in connection with the Corporate Reorganization, subject to the consent of Required Lenders (not to be unreasonably withheld or delayed);

3. transactions in existence on the DIP Closing Date and any similar transaction among Loan Parties and their subsidiaries consistent with past practice;

4. any Intercompany Loans; and

5. any transaction on terms that are no less favorable to the Loan Parties or their subsidiaries than might be obtained at the time in a comparable arm's length transaction from a person who is not an affiliate.

H.    Limitations on changes in business, except for changes relating to the AP1000 Projects.

I.    Limitations on the (i) payment and modification of subordinated or other prepetition indebtedness, except in the case of prepetition debt, pursuant to "first day" or other orders entered by the Bankruptcy Court that are in form and substance satisfactory to the Administrative Agent, (ii) modification of certificate of incorporation and by-laws and (ii) modification of the Liquidity Facility Agreement without the prior consent of the Requisite Lenders to the extend such modifications are adverse to the Lenders.

M.    Limitations on changes to fiscal year and accounting.

**SCHEDULE 1**

**[*** SUBJECT TO LOCAL LAW RESTRICTIONS, CORPORATE BENEFIT, FINANCIAL ASSISTANCE, REGULATORY CONSENT AND REQUIREMENTS, CONTRACTUAL RESTRICTIONS/PROHIBITIONS AND EXISTING THIRD PARTY ARRANGEMENTS ***]**

**Guaranty and Security Requirements by Jurisdiction**

**[England and Wales**

1. Subject to regulatory consent to the extent required (if at all), TSB (Investment Europe) Limited, Uranium Asset Management Limited and Westinghouse Electric Company UK Limited (the "**UK Entities**") will be able to provide guarantees in respect of the obligations of the Intercompany Borrower.

2. Each of the UK Entities will be able to provide pledges over their shares and assets (cash, account receivables, inventory, plant, property & equipment and intangible fixed assets).

3. Toshiba Nuclear Energy Holdings (UK) Limited will be able to provide a pledge of its shares in the new UK holding company ("**UK Newco**") and UK Newco will be able to provide a pledge over its shares in Westinghouse Electric UK Holdings Limited.

**France**

4. Subject to corporate benefit requirements, each of the following French entities Westinghouse Electrique France SAS, Astare, Westinghouse Operations Nucleaire SAS and Westinghouse Service Nucleaire (the "**French Entities**") will be able to provide guarantees in respect of the obligations of the Intercompany Borrower.

5. Subject to corporate benefit requirements, each of the French Entities will be able to provide pledges over their shares and assets (cash, account receivables, inventory, plant, property & equipment and intangible fixed assets).

**Germany**

6. Subject to corporate benefit requirements, Westinghouse Electric Germany GmbH (WEG) will be able to provide a guarantee in respect of the obligations of the Intercompany Borrower.

7. Subject to corporate benefit requirements, WEG will be able to provide pledges over its shares and assets pledges over its subsidiaries including to the extent possible those shares it holds in joint-ventures; pledges over its bank accounts; security over its receivables (including trade receivables, insurance receivables, intra-group receivables); security over its moveable assets; security over IP-rights; land charges). .

**Japan**

8. Subject to regulatory consent to the extent required (if at all), Westinghouse Electric Japan Limited (WEJL) will be able to provide a guarantee in respect of the obligations of the Intercompany Borrower.

9. Subject to regulatory consent to the extent required (if at all), WEJL will be able to provide pledges over its shares and assets (account receivables, inventory, plant, property & equipment).

## Spain

10. Subject to corporate benefit requirements, Westinghouse Electric Spain, S.A.U. ("**WES**") will be able to provide a joint and several guarantee in respect of the obligations of the Intercompany Borrower.

11.  WES will be able to grant security, pledges or mortgages over its assets (including but not limited to account receivables, bank accounts, inventory, plants, real estate assets, bank accounts and equipment), and Westinghouse Electric UK Holdings Limited will grant Spanish law share pledges over the shares in WES and in Westinghouse Technology Services.

## Sweden

12. TNEE Electric Sweden Holding AB ("**TNEE Sweden**") will be able to provide (i) a guarantee in respect of Westinghouse Electric Sweden AB ("**WES AB**") obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers (ii) a pledge over the shares in WES AB.

13. WES AB's will be able to provide a guarantee in respect of its own obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers.

14. Subject to applicable regulatory consent to the extent required (if at all) TNEE Electric Sweden Holding AB ("TNEE Sweden") will be able to provide (i) a guarantee in respect of Westinghouse Electric Sweden AB ("WES AB") obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers (ii) a pledge over the shares in WES AB.

15. WES AB's will be able to provide a guarantee in respect of its own obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers.

16. Subject to applicable regulatory consent to the extent required (if at all), WES AB will be able to provide pledges over (i) the shares in WESDYNE Sweden AB ("Wesdyne Sweden") and Westinghouse Electric Ukraine AB; business mortgages in an amount to be agreed; mortgages in an amount to be agreed ; Swedish and European trademarks; intercompany receivables and customer receivables.

17. Subject to limitation language, Wesdyne Sweden will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) pledges over its business mortgage; Swedish and European trademarks and intercompany receivables.

18. Subject to limitation language, Westinghouse Electric Ukraine AB will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) a pledge over intercompany receivables.

19. , WES AB will be able to provide pledges over (i) the shares in WESDYNE Sweden AB ("**Wesdyne Sweden**") and Westinghouse Electric Ukraine AB; business mortgages (amount TBC); mortgages (amount TBC); Swedish and European trademarks; intercompany receivables and customer receivables.

20. Subject to limitation language, Wesdyne Sweden will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) pledges over its business mortgage; Swedish and European trademarks and intercompany receivables.

21. Subject to limitation language, Westinghouse Electric Ukraine AB will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) a pledge over intercompany receivables.

## Belgium

22. Subject to corporate benefit requirements, Westinghouse Electric Belgium SA (WEB) will be able to provide a guarantee in respect of the obligations of the Intercompany Borrower.

23. Subject to corporate benefit requirements, security can be taken over its shares and assets (receivables (incl. bank accounts), IP (if material), plant, property & equipment).

## Regulated Entities

Any guarantees or security taken over shares in or assets of the regulated entities in England & Wales, Belgium, Sweden or Japan will require regulatory review and approval – a timeline regarding this process to be confirmed.][17]

---

[17] Subject to on-going review.

SCHEDULE 2

**Intercompany Borrowers**

| NAME OF ORIGINAL BORROWER | REGISTRATION NUMBER (OR EQUIVALENT, IF ANY) ORIGINAL JURISDICTION |
|---|---|
| ASTARE | [ *** ] (France) |
| Springfields Fuel Limited | 03857770 (England & Wales) |
| TSB (Investment Europe) Limited | 03976730 (England & Wales) |
| Uranium Asset Management Limited | 03162046 (England & Wales) |
| Westinghouse Electric Belgium SA | [ *** ] (Belgium) |
| Westinghouse Electric Company UK Limited | 04006213 (England & Wales) |
| Westinghouse Electric Germany GmbH | [ *** ] (Germany) |
| Westinghouse Electric Japan Limited | [ *** ] (Japan) |
| Westinghouse Electric Spain S.A.U. | [ *** ] (Spain) |
| Westinghouse Electric Sweden AB | [ *** ] (Sweden) |
| Westinghouse Electric UK Holdings Limited | 02458109 (England & Wales) |
| Westinghouse Electrique France SAS | [ *** ] (France) |
| Westinghouse Operations Nucleaire SAS | [ *** ] (France) |
| Westinghouse Service Nucleaire | [ *** ] (France) |

## Exhibit B

**Blackline of Exhibit**

~~CONFIDENTIAL~~

**$800 MILLION SENIOR SECURED DEBTOR-IN-POSSESSION TERM LOAN FACILITY**
**AMENDED SUMMARY OF TERMS AND CONDITIONS**

**dated as of March 30, 2017**

**among**

**WESTINGHOUSE ELECTRIC COMPANY LLC,**
**as Borrower and debtor and debtor-in-possession,**

_____

**GUARANTORS PARTY HERETO**

_____

**FUNDS AND ACCOUNTS MANAGED BY**
**APOLLO CAPITAL MANAGEMENT, L.P. AND/OR ITS AFFILIATES,**
**as Lenders,**

_____

**CITIBANK, N.A.,**
**as Administrative Agent and Collateral Agent,**

_____

**CITIGROUP GLOBAL MARKETS INC.,**
**as sole Lead Arranger and Bookrunner**

WEIL:\96075641\3\80768.0015

**$800 Million Senior Secured Debtor-In-Possession Term Loan Facility**

**Summary of Terms And Conditions**

Set forth below is a summary of certain key terms for a proposed $800 million DIP Facility (as defined below) to be made available to Westinghouse Electric Company LLC (the "**Term Sheet**"). In connection with the DIP Facility, (a) Apollo Investment Corporation ("**AIC**") is pleased to advise you of its several, but not joint, commitment to provide 5.00**5.000**% of the principal amount of the DIP Facility, (b) AP WEC Debt Holdings LLC ("**AP WEC**") is pleased to advise you of its several, but not joint, commitment to provide 81.41**85.156**% of the principal amount of the DIP Facility, (c) Midcap Financial Trust ("**MidCap**") is pleased to advise you of its several, but not joint, commitment to provide 12.50**8.750**% of the principal amount of the DIP Facility, (d) Amundi Absolute Return Apollo Fund PLC ("**Amundi**") is pleased to advise you of its several, but not joint, commitment to provide 0.66**0.656**% of the principal amount of the DIP Facility, (e) Ivy Apollo Strategic Income Fund ("**Ivy Strategic**") is pleased to advise you of its several, but not joint, commitment to provide 0.19**0.188**% of the principal amount of the DIP Facility and (f) Ivy Apollo Multi Asset Income Fund ("**Ivy Multi**" and, together with AIC and AP WEC, MidCap, Amundi and Ivy Strategic, "**Apollo**") is pleased to advise you of its several, but not joint, commitment to provide 0.25**0.250**% of the principal amount of the DIP Facility, in each case, upon the terms and subject to the conditions set forth in the Term Sheet. The commitments hereunder will expire in the event the DIP Closing Date does not occur by April 7, 2017. The parties hereto agree that Apollo is the exclusive DIP Facility provider to the Company and its affiliates, and in the event that the Company, for whatever reason, fail to incur the DIP Loans on the DIP Closing Date, then all fees and expenses that would otherwise be payable hereunder, including, without limitation, the OID, the Exit Payment (assuming prepayment within six months of the DIP Closing Date) and the Expense Deposit, shall become immediately due and payable to Apollo.

| | |
|---|---|
| **Borrower:** | Westinghouse Electric Company LLC, a Delaware limited liability company (the "**Company**" or the "**Borrower**"). |
| | The Company, in its capacity as a Borrower under the DIP Facility, shall be a debtor and debtor-in-possession in a proceeding (the "**Company's Case**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). |

WEIL:\96075641\3\80768.0015

**Guarantors:**    The obligations of the Company under the DIP Facility (as defined below) will be guaranteed (a) by all of the Company's direct and indirect domestic subsidiaries (collectively, the "**US Guarantors"), and (b) Toshiba Nuclear Energy Holdings (UK) Limited (the "UK Parent" and, together with the US Guarantors, the "Guarantors**"), each of which will be a debtor and a debtor-in-possession in proceedings (together with the Company's Case, the "**Cases**") under chapter 11 of the Bankruptcy Code filed contemporaneously and jointly administered with the Company's Case; *provided* that WesDyne International LLC and Westinghouse Government Services LLC shall not**neither** be US Guarantors and**nor** debtors and debtors-in-possession under**in** the Cases; and (b) Toshiba Nuclear Energy Holdings (UK) Limited (the "**UK Parent**" and, together with the US Guarantors, the "**Guarantors**").[1]

The Company and the Guarantors are referred to herein as "**Loan Parties**" and each, a "**Loan Party**" or "**Debtors**" and each, a "**Debtor**".

The date of commencement of the Cases is referred to herein as the "**Petition Date**".

**Lenders:**    Apollo (or the "**Initial Lender**", as applicable) and other banks, financial institutions or institutional lenders identified by Apollo in consultation with the Company (collectively, the "**Lenders**") on a several and not joint basis.

**Lead Arranger and Bookrunner**    Citigroup Global Markets Inc. shall act as sole lead arranger and bookrunner for the DIP Facility.

**Administrative Agent and Collateral Agent:**    Citibank, N.A. shall act as administrative agent in respect of the DIP Facility (as defined below) (in such capacity, the "**Administrative Agent**") and as collateral agent (in such capacity, the "**Collateral Agent**," and together with the Administrative Agent, the "**Agents**") in respect of the DIP Facility.

**DIP Facility:**    Senior secured superpriority term loans (the "**DIP Loans**") in an aggregate principal amount of $800 million (together with the Letter of Credit Facility described in Annex B, the "**DIP Facility**") to be made available to the Company, $350 million of which will be new money available at the DIP Closing (as defined below) and $450 million of which will be new money available on the Final Term Funding Date (as defined below); *provided,* that up to $225 million of such new money funding (such amount, the "**Letter of Credit Sublimit**") shall be used to provide cash in respect of a cash collateralized letter of credit facility (the "**Letter of Credit Facility**") with an affiliate of Citigroup Global Markets Inc. on the terms described in Annex B attached hereto.

---

[1] It being understood that any guarantee and credit support from the UK Parent shall be subject to local law restrictions, corporate benefit, financial assistance, regulatory consents and requirements, contractual restrictions/prohibitions and existing third party arrangements.

Doc#: US1:11205871v8

A portion of the Letter of Credit Sublimit may be drawn on the DIP Closing Date in the amount of $100 million, with the remaining balance to be drawn on the Final Term Funding Date.

**Termination Date:** The "**Termination Date**" with respect to the DIP Facility shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) 45 days after the entry of the Interim Order (as defined below) if the Final Order (as defined below) has not been entered prior to the expiration of such period, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the consummation of a sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code or otherwise and (e) the acceleration of the DIP Loans and the termination of the commitment with respect to such DIP Facility in accordance with the DIP Loan Documents (as defined below).

"**Scheduled Termination Date**" means the date that is 12 months after the DIP Closing Date (as defined below); *provided* that, subject to the satisfaction of customary conditions precedent (including payment of a 3% extension fee in respect of the DIP Facility), the Company, at its option, may extend the Scheduled Termination Date by an additional 12 months.

"**Final Order**" means a final non-appealable order of the Bankruptcy Court authorizing the DIP Facility in form and substance satisfactory to the Administrative Agent, the L/C Issuer and the Required Lenders.

**Purpose:** For working capital and general corporate purposes of the Loan Parties and their subsidiaries, to make loans under the Intercompany Facility (as defined below) and to pay fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Cases.

Doc#: US1:11205871v8

| | |
|---|---|
| **Intercompany Facility:** | Any amounts (whether from proceeds of the DIP Facility or otherwise and inclusive of any letters of credit issued for the account of Intercompany Borrowers), directly or indirectly, distributed by the Company or any US Guarantor to an Intercompany Borrower and any of its subsidiaries (the "**UK Silo**") shall be advanced by way of intercompany revolving loans (the "**Intercompany Facility**") from the Company to the parties listed on Schedule 2 hereto **and any other party that becomes an "Additional Borrower" under the Liquidity Facility Agreement** (collectively, the "**Intercompany Borrowers**"); provided that (a) upon completion of the **Initial Funding** G&C Requirements (as defined below) with respect to any Intercompany Borrower or Intercompany Beneficiary (as defined below) organized in the United Kingdom[2], up to $300 million of such Intercompany Facility may be advanced, including in the form of letters of credit issued for the account of Intercompany Borrowers in the aggregate amount up to $50 million under the Letter of Credit Facility and (b) subject to the completion of the remaining G&C Requirements, an additional $75 million of such Intercompany Facility may be advanced, including in the form of letters of credit issued for the account of Intercompany Borrowers in the aggregate amount up to $25 million under the Letter of Credit Facility (for the avoidance of doubt, the maximum amount of the Intercompany Facility shall be $375 million).  The intercompany advances shall be evidenced by a Liquidity Facility Agreement substantially in the draft form delivered by advisors to the Initial Lender prior to 1am on March 29, 2017 (with such changes that are reasonably acceptable to the Initial Lender) (the "**Liquidity Facility Agreement**").

No advances under the Intercompany Facility may be made, directly or indirectly, to any UK Silo entity that shall have commenced or be**shall have been** required to commence or be subject to any proceeding under any applicable law relating to insolvency, debt restructuring, or bankruptcy or be subject to any government enforcement action against such entity in any non-US jurisdiction.

The Required Lenders shall have the ability to cause the Company to enforce its remedies under the Intercompany Facility. |
| **Loan Documents:** | A loan agreement and a guarantee in the form customary with respect to credit facilities similar to the DIP Facility (including the Letter of Credit Facility) (including the Term Sheet, the "**DIP Loan Documents**"); *provided* that on the DIP Closing Date, the Term Sheet shall govern the terms of the DIP Facility**. For the avoidance of doubt, the Liquidity Facility Agreement shall not be a DIP Loan Document**. |
| **Interest Rates and Fees:** | As set forth on Annex A attached hereto. |
| **Optional Payments:** | As set forth on Annex A attached hereto. |

---

[2] **To be defined.**

**Doc#: US1:11205871v8**

**Mandatory Prepayments:**   The net cash proceeds **after any applicable taxes** from any non-ordinary course asset sale by (a) the Company or any of its subsidiaries, or (b) any UK Silo or any of its subsidiaries (to the extent such assets secure the Intercompany Facility) shall be used to repay the DIP Loans.

**Tax Gross Up and Indemnity:**   Any and all payments by or on account of any obligation of any Loan Party under the DIP Loan Documents shall be made without deduction or withholding for any taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such tax is an "Indemnified Tax" (as such term is defined in the LSTA Model Credit Provisions Exposure Draft dated June 25, 2014), then, the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable pursuant to the terms of this provision) the applicable recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

Without duplication of any amounts paid pursuant to the immediately preceding provision, the Loan Parties shall indemnify each recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this provision) payable or paid by such recipient or required to be withheld or deducted from a payment to such recipient (in each case, excluding penalties and interest attributable solely to the gross negligence or willful misconduct of such recipient) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

**Security and Priority:**   The obligations of the Company under the DIP Facility, including all DIP Loans, shall, subject to the Carve-Out (as defined below), at all times:

(a) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by (A) a perfected first priority priming security interest and lien on the Collateral of each Loan Party (collectively, the "**Priming Liens**");

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by (i) a perfected first priority security interest and lien on the Collateral of each Loan Party (x) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (y) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively "**Avoidance Actions**") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions);

(c) subject to clause (a) above, pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a junior perfected security interest and lien on the Collateral of each Loan Party to the extent such Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, subject as to priority to such liens in favor of such third parties; and

(d) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Case of such Loan Party (the "**DIP Superpriority Claims**").

The obligations of the Intercompany Borrowers under the Intercompany Facility shall, subject to local law limitations, regulatory consents and requirements, corporate benefit, financial assistance, existing contractual restrictions/prohibitions and other limitations to be agreed, be (a) guaranteed by each ~~non Debtor~~**Intercompany Borrower and its subsidiaries** that receives, directly or indirectly, proceeds from the Intercompany Facility (the "**Intercompany Beneficiaries**") ~~and by each Intercompany Borrower~~, and (b) secured by the assets of such Intercompany Beneficiaries and Intercompany Borrowers, in each case, to the extent ~~required~~**permitted** by the applicable local jurisdiction requirements **and as** set forth on Schedule 1 hereto (the "**G&C Requirements**").[23]

---

[23]. Completion of the G&C Requirements (other than ~~with respect to UK entities~~**the Initial Funding G&C Requirements**) to be required on or before the Final Term Funding Date.

Doc#: US1:11205871v8

All of the liens **granted by the Debtors and** described above shall be effective and perfected upon entry of the Interim Order, except as otherwise provided herein.

Notwithstanding the foregoing, the Letter of Credit Facility shall be secured solely by the amounts on deposit (including all investment property, financial assets, interest, dividends and instruments arising out of, or received from, any investments made in respect of such amounts) in the L/C Cash Collateral Account (and the proceeds thereof) as set forth in Annex B. Upon (x) the termination in full of the commitment in respect of the Letter of Credit Facility, (y) the expiration of all Letters of Credit issued under the Letter of Credit Facility and (z) the payment in full of all amounts due and owing in respect of the Letter of Credit Facility, any remaining proceeds in the L/C Cash Collateral Account shall revert to the Borrower.

Customary flood documentation to be delivered within a time period to be reasonably agreed with the Collateral Agent.

"**Collateral**" means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof. For the avoidance of doubt, "Collateral" shall not include any assets and property of the Loan Parties that are located at (i) the "V.C. Summer Project" site, being the site of the AP1000 nuclear plant owned by South Carolina Electric & Gas Company and certain others, and the related off-site storage facilities located at Two Blythewood and 375 Metropolitan Drive, West Columbia, South Carolina, and (ii) the "Vogtle Project" site, being the AP1000 nuclear plant owned by Georgia Power Company and certain others and the related off-site storage facility located at 321 Mills Road, Waynesboro, Georgia.

**Carve-Out**:    Subject to customary carve-out for facilities of this type **and size** with respect to Collateral other than amounts on deposit in the L/C Cash Collateral Account; *provided* that carve-out requirements shall not contain any cap on any "pipeline" expenses of Debtor's professionals.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Loan Documents, and the superpriority claims, and any and all other liens or claims securing the DIP Facility.

| | |
|---|---|
| **Conditions Precedent to Each Loan and Each Issuance, Amendment, Extension or Renewal of a Letter of Credit:** | On the funding date of each DIP Loan and on the date of each issuance, amendment, extension or renewal of a Letter of Credit, (i) there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, issuance, amendment, extension or renewal, (iii) the making of such DIP Loan or issuance, amendment, extension or renewal of such Letter of Credit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) the making of any DIP Loan shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, and (vi) with respect to the DIP Facility and the Letter of Credit Facility, the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the DIP Loan Documents, modified or amended in any manner. |
| **Conditions Precedent to the Initial Extension of Credit under the DIP Facility:** | The initial extension of credit (the "**DIP Closing**"; the date on which the DIP Closing occurs, the "**DIP Closing Date**") under the DIP Facility and the Letter of Credit Facility shall be subject to the satisfaction (or waiver) of the following conditions precedent (and the conditions set forth under "*Conditions Precedent to Each Loan*" above): |

A.  The Term Sheet **and the Liquidity Facility Agreement** shall have been executed and delivered by each party thereto.

B.  The Petition Date shall have occurred, and each Loan Party shall be a debtor and a debtor-in-possession. All "first day orders" entered at the time of commencement of the Cases, including without limitation a cash management order, shall be satisfactory in form and substance to the Administrative Agent.

C.  The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Administrative Agent, the L/C Issuer and the Initial Lender, which order shall have been entered not later than three (3) business days following the Petition Date (or such later date as the Administrative Agent may agree) (the "**Interim Order**", and together with the Final Order, the "**DIP Financing Orders**"), authorizing and approving the making of the DIP Loans in the amounts consistent with those set forth in the "*DIP Facility*" section above and the issuance of Letters of Credit as contemplated by this Term Sheet, and the granting of the superpriority claims and liens and other liens referred to above under the heading "*Security and Priority*" and the liens referred to in Annex B to secure Letters of Credit issued under the Letter of Credit Facility, which Interim Order shall not have been vacated, reversed, modified, amended or stayed **in any respect or, except as expressly permitted by the DIP Loan Documents, modified or amended in any manner**.

Doc#: US1:11205871v8

D. No trustee, responsible officer or examiner having expanded powers shall have been appointed with respect to the Loan Parties, any of their subsidiaries or their respective properties.

E. All reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP Loan Documents or otherwise required to be paid to the Agents, the L/C Issuer and the Lenders on or before the DIP Closing shall have been paid.  All other fees that have been agreed to be paid to the Arranger and the L/C Issuer on or before such date shall have been paid.

F. The Administrative Agent shall have received and be reasonably satisfied with a cash flow forecast for the 13-week period ending after the DIP Closing Date dated as of a date not more than 3 business days prior to the DIP Closing Date.

G. The Administrative Agent shall have received copies of organizational documents and resolutions for the Loan Parties; it being understood and agreed that no US opinions of counsel shall be required.

H. Each Lender who has requested the same at least two (2) business days prior to the DIP Closing Date shall have received "know your customer" and similar information at least one (1) day prior to the DIP Closing Date.

I. The ~~Administrative~~**Collateral** Agent, for the benefit of the Lenders, shall have **(i)** the valid and perfected liens on the security interests in the Collateral of the ~~Loan Parties~~**Debtors** contemplated by the "*Security and Priority*" section above granted and perfected pursuant to the Interim Order in the case of the Debtors and ~~all actions contemplated by the G&C Requirements with respect to~~ **(ii) the valid liens on the security interests in the Collateral of** any Intercompany Beneficiary or Intercompany Borrower organized in the United Kingdom~~ shall be completed~~**, in accordance with the Initial Funding G&C Requirements** (or waived).  The obligations of the Loan Parties under the Letter of Credit Facility shall be secured as described in Annex B and shall be perfected pursuant to the Interim Order.

J. The representations and warranties set forth in Annex C attached hereto shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects).

**Conditions Precedent to the Final Term Funding Date**

The funding of the portion of the DIP Facility not available at DIP Closing (the date on which such funding occurs, the "**Final Term Funding Date**") shall be subject to the satisfaction (or waiver) of the following conditions precedent (and the conditions set forth under "*Conditions Precedent to Each Loan and Each Issuance, Amendment, Extension or Renewal of a Letter of Credit*" above):

**Doc#: US1:11205871v8**

A.  The DIP Loan Documents shall have been executed and delivered by each party thereto in form and substance satisfactory to the Administrative Agent, the L/C Issuer and Required Lenders.

B.  The Administrative Agent shall have received a signed copy of the Final Order, which shall not have been vacated, reversed, ~~modified,~~ terminated~~, amended~~ or stayed **in any respect or, except as expressly permitted by the DIP Loan Documents, modified or amended in any manner**.

C.  All reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP Loan Documents or otherwise required to be paid to the Agents, the L/C Issuer and the Lenders on or before such date shall have been paid.  All other fees that have been agreed to be paid to the Arranger and the L/C Issuer on or before such date shall have been paid.

D.  The Administrative Agent shall have received copies of the of all proposed pleadings and orders in the Cases, including with respect to "second day" pleadings and orders, with reasonably sufficient time for review and comment by the Lenders.  The relief requested by the Debtors in the first and second day orders and pleadings shall be reasonably acceptable in form and substance to the Lenders.  The Debtors shall provide the Lenders will advance copies of (and a reasonable opportunity to comment on) any press release in which a Lender or any affiliate or agent of a Lender is mentioned.

E.  ~~The Administrative Agent, for the benefit of the Lenders, shall have the valid and perfected liens on the security interests in substantially all the assets of any~~**Each** Intercompany Beneficiary or Intercompany Borrower organized in the United Kingdom **shall have used its reasonable best efforts to incur valid and perfected security liens in favor of the Collateral Agent, for the benefit of the Lenders, on substantially all of their assets subject to local law restrictions, corporate benefit, financial assistance, contractual restrictions and prohibitions, regulatory consents and requirements; provided that,** with respect to any regulatory consents, the Company, each applicable Intercompany Beneficiary and Intercompany Borrower shall use its reasonable best efforts to seek such regulatory approval.

**F.**  The ~~Administrative~~**Collateral** Agent, for the benefit of the Lenders, shall have the valid and perfected liens on the security interests in the Collateral of the Loan Parties contemplated by the "*Security and Priority*" section above granted and perfected pursuant to the Interim Order in the case of the Debtors and all actions contemplated by the G&C Requirements with respect to any Intercompany Beneficiary or Intercompany Borrower **who is not** organized in the United Kingdom ~~shall be completed (or waived).³~~**.**

---

~~³ Subject to further discussion.~~

Doc#: US1:11205871v8

**Representations and Warranties:**   The DIP Loan Documents **(other than the Term Sheet)** will contain the following representations and warranties (subject to certain exceptions, qualifications and carveouts to be set forth in the **applicable** DIP Loan Documents):  organization; powers; authorization; enforceability; governmental approvals; financial statements; no material adverse effect; title to properties; possession under leases; subsidiaries; litigation; compliance with laws; Federal Reserve regulations; Investment Company Act; use of proceeds; taxes; no material misstatements; employee benefit plans; environmental matters; security documents; locations of real property and leased premises; labor matters; insurance; no default; intellectual property; licenses; etc.; status as senior debt; USA PATRIOT Act; OFAC; Foreign Corrupt Practices Act; certain bankruptcy matters; AP 1000 Projects.

**Affirmative Covenants:**   The DIP Loan Documents will contain the following affirmative covenants (subject to the exceptions, qualifications and carveouts **to be** set forth ~~herein~~**in the applicable DIP Loan Documents**):[4]

A.  Preservation and maintenance of existence, business and properties.

B.  Procurement and maintenance of certain insurance, insurance certificates and endorsements.

C.  Payment of **income taxes and other material** taxes and other claims.

D.  Financial statements, reports, etc.

E.  Litigation and other notices.

F.  Compliance with laws and regulations.

G.  Maintenance of records, access to properties and inspections.

H.  Use of proceeds.

I.  Compliance with environmental laws.

J.  Provision of additional collateral, guarantees and mortgages; further assurances.

K.  Maintenance of cash management systems; application of the proceeds of accounts.

L.  Certain bankruptcy matters.

---

[4] Prior to entry of the DIP Loan Documents (other than the Term Sheet), the affirmative covenants set forth on Annex D attached hereto shall apply.

**-12-**

Doc#: US1:11205871v8

M. Continued retention of a restructuring advisor and a financial advisor reasonably satisfactory to the Administrative Agent (it being agreed that Alix Partners and PJT Partners are reasonably satisfactory to the Administrative Agent).

N. Quarterly lender calls.

O. Bi-weekly update calls for the Initial Lender and its advisors.

P. Company shall have used its reasonable best efforts to enter into the DIP Loan Documents.

Q. Such other information (financial or otherwise) with respect to the Company and its subsidiaries as the Lenders and the L/C Issuer (through the Administrative Agent) may reasonably request.

**Negative Covenants:**   The DIP Loan Documents will contain the following negative covenants (subject to the exceptions, qualifications and carveouts **to be** set forth ~~herein~~**in the DIP Loan Documents**) [5]:

A. Limitations on indebtedness.

B. Limitations on liens.

C. Limitations on sale and leaseback transactions.

D. Limitations on investments, loans and advances.

E. Limitations on mergers, consolidations, sales of assets and acquisitions; provided that post-closing ~~corporate reorganization that may involve post-petition transfer of ownership of Westinghouse Electric Company UK Limited ("WEC UK") to a new holding company that will be the direct parent of the Company and WEC UK~~**Corporate Reorganization (as defined in Annex E)** shall be permitted with the consent of Required Lenders (~~such consent~~not to be unreasonably withheld **or delayed**).

F. Limitations on dividends and distributions.

G. Limitations on transactions with affiliates.

H. Limitations on changes in business.

---

[5]. Prior to entry of the DIP Loan Documents (other than the Term Sheet), the negative covenants set forth on Annex E attached hereto shall apply.

Doc#: US1:11205871v8

I.   Limitations on the (i) payment and modification of subordinated or other prepetition indebtedness, except in the case of prepetition debt, pursuant to "first day" or other orders entered by the Bankruptcy Court that are in form and substance satisfactory to the Administrative Agent, and (ii) modification of certificate of incorporation, by-laws and certain other agreements, etc.

J.   Limitations on (i) AP 1000 Projects shut-down costs limited to $125 million, and (ii) outstanding amounts under the Intercompany Facility, in each case, in accordance with the ~~Business Plan~~**Budget**.

K.   Limitations on hedging agreements.

L.   Limitations on other "designated senior debt".

M.   Limitations on changes to fiscal year and accounting.

**Financial Covenants:**   The DIP Facility will contain the following financial covenants:

A.   Minimum unrestricted cash and cash equivalents of the Company and the US Guarantors, on a consolidated basis, of $100 million ("**Minimum Liquidity**"), tested on a weekly basis.

B.   Receipt of a business plan ("**Business Plan**"), in form and substance reasonably acceptable to the Required Lenders, within 120 days of the DIP Closing Date; *provided* that such Business Plan may be supplemented or amended subject to a reasonable consent of the Required Lenders.

C.   Minimum EBITDA.

Initially tested as of the last day of each fiscal month (commencing on the month ended September 30, 2017) with applicable testing periods commencing on August 1, 2017 and ending on the applicable month then ended.  Commencing on the test period ended March 31, 2018 and for each month ended thereafter, LTM testing period (the "**LTM Test**").

No less than the greater of (a) solely with respect to any LTM Test, $350 million and (b) the corresponding amount set forth in the Business Plan plus a cushion of 15%.

"**EBITDA**" means, for any period, net earnings (or net loss) plus, without duplication and to the extent reflected as a charge in the consolidated statement of earnings, the sum of: (a) interest expense, (b) income tax expense (benefit), (c) depreciation expense, (d) amortization expense (including with respect to intangibles), (e) deferred financing fees (and any writeoffs thereof), (f) any extraordinary or nonrecurring expenses or losses, (g) any loss from discontinued operations and any loss on disposal of discontinued operations~~, (h~~ **and/or joint ventures, (h) any earnings impact (if negative) related to the U.S. AP1000 projects including Vogtle and VC Summer, (i**) any other non-cash charges or expenses**, including,** in respect of (A) any pre-petition obligations, liabilities or

claims (provided, that to the extent any such non-cash charges represent an accrual or reserve for potential cash items in any future period, any cash payment made in respect thereof in a future period shall be subtracted from EBITDA for such future period to such extent), or (B) goodwill or asset writeoffs or writedowns, (i**j**) pension, equity awards, other post-employment benefits expense and any non-cash compensation expense realized from grants of stock appreciation rights or similar rights, stock options or other rights to directors, officers or employees, (j**k**) loss on foreign exchange, (k**l**) fees, costs and expenses (including (i) fees, costs and expenses related to legal, financial and other advisors, auditors and accountants, (ii) printer costs and expenses, (iii) filing fees and (iv) underwriting, arrangement, syndication, backstop and placement premiums, discounts, fees, charges and expenses) incurred (whether capitalized or expensed) in connection with the Cases, emergence from the Proceedings, any Reorganization Plan (whether or not consummated) or any transaction (including any financing or disposition) or litigation, related, incidental or complementary to any of the foregoing (including any rollover financing and exit financing), in each case, regardless of whether initially incurred by the Company or paid by the Company to reimburse others for such fees costs and expenses, (l**m**) any non-cash (loss) relating to hedging activities, (m**n**) costs, expenses and charges relating to losses associated with cancelled or discontinued products or services,  (n**o**) charges, premiums and expenses associated with the discharge of indebtedness, **and** (o**p**) corporate restructuring charges (including retention, severance, contract termination costs, plant closure or consolidation costs, employee relocation and business optimization expenses) and minus, to the extent included in net earnings on the consolidated statement of earnings, (i) interest income, (ii) pension and other postemployment benefits income and credit, (iii) gains on foreign exchange, (iv) any extraordinary or non-recurring income or gains, (v) any non-cash gain relating to hedging activities, (vi) any gain from discontinued operations and any gain on disposal of discontinued operations, (vii) any non-cash gain associated with the discharge of indebtedness, and (viii) any other non-cash income (other than the accrual of revenue in the ordinary course of business), in each case determined in accordance with GAAP for such period[; provided that any adjustments of the type set forth in clauses (f), (k**g**)**, (h), (l)** or (o**p**) above shall be subject to the reasonable consent of the Required Lenders].[6]

**Financial Reporting Requirements:**   The Company shall provide the Administrative Agent:

(i) monthly unaudited consolidated financial statements of the Company and its subsidiaries within 30 days after the end of each fiscal month, certified by the Company's chief financial officer **or the Company's vice president of finance**;

---

[6] Replacement of the bracketed language with caps on the corresponding clauses to be discussed.

Doc#: US1:11205871v8

(ii) quarterly unaudited consolidated financial statements of the Company and its subsidiaries within 45 days of quarter-end for the first 3 fiscal quarters of the fiscal year, certified by the Company's chief financial officer **or the Company's vice president of finance**, accompanied by a customary management's discussion and analysis;

(iii) annual consolidated financial statements of the Company and its subsidiaries within 120 days of year-end, accompanied by a customary management's discussion and analysis;

(iv) 13-week cash flow forecasts, on a rolling 13-week basis, updated every four weeks in form and substance reasonably acceptable to the Required Lenders (the "**Budget**"); and

(vi) a variance analysis with respect to the Budget ~~every four weeks~~**for the preceding four week period comparing actual total net cash receipts and disbursements for the applicable period to projected total cash net receipts and disbursements set forth in the Budget, noting therein all variances on a rolling four week and cumulative basis from values set forth for such period in the Budget**, commencing with the fifth week after the DIP Closing Date.

**Events of Default:**     The DIP Loan Documents will contain the following events of default (each an "**Event of Default**"):

A.  Failure to pay principal, interest (for two (2) business days) or any other amount (for three (3) business days) when due.

B.  Representations and warranties incorrect in any material respect when made or deemed made.

C.  Failure to comply with covenants, subject to 30 day grace period in the case of the affirmative covenants.

D.  Cross-default to payment defaults on other post-petition or unstayed indebtedness in excess of $20 million of the Loan Parties and their subsidiaries, or any other default or event of default with respect to any such indebtedness if the effect is to accelerate or permit acceleration, and cross-acceleration to any such indebtedness.

E.  Post-petition judgments subject to carve-outs in excess of $10 million.

F.  The occurrence of certain ERISA events that result in liabilities that could reasonably be expected to have a Material Adverse Effect **(as defined in Annex C hereto)**.

G.  ~~Actual or asserted~~**Asserted** (by any Loan Party or any affiliate thereof) invalidity or impairment of any DIP Loan Document (including the failure of any lien of the Collateral Agent to remain perfected and **with respect to such impairment,** superior to and prior to the rights of all third persons or any guarantee agreement ceasing to be in full force and effect (for the avoidance of doubt including without limitation the lien on the L/C Cash Collateral Account)) or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed under the DIP Loan Documents.

H.  (i) The entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by the Debtors of a motion or other pleading seeking entry of such an order;

(ii) A trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Company's Case, the Company applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion;

(iii) The entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Administrative Agent, the L/C Issuer or the Lenders, or the filing by the Company of an application, motion or other pleading seeking entry of such an order;

~~(iv) The entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties and the Debtors have not obtained use of cash collateral (consensually or non-consensually);~~

(v) The entry of an order in any of the Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties in excess of $5 million;

(vi) The entry of a final non-appealable order in the Cases (i) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the L/C Issuer, or the commencement of other actions by the Loan Parties that challenges the rights and remedies of the Administrative Agent, the L/C Issuer or the Lenders under the DIP Facility in any of the Cases or inconsistent with the applicable DIP Loan Documents (other than the use of cash collateral on a non-consensual basis), (ii) avoiding or requiring disgorgement by the Lenders or the L/C Issuer of any amounts received in respect of the obligations under the DIP Facility or (iii) resulting in the marshaling of any Collateral.

Doc#: US1:11205871v8

(vii) Without the consent of the Administrative Agent, the entry of an order in any of the Cases seeking authority to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; or

(viii) The filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (vii) above, unless such filing or any pleading is in connection with the enforcement of the DIP Loan Documents against the Administrative Agent or the Lenders.

I.  The making of any material payments in respect of prepetition obligations other than (i) as permitted by the Interim Order or the Final Order, (ii) as permitted by any "first day" or "second day" orders satisfactory to the Administrative Agent, (iii) as permitted by any other order of the Bankruptcy Court in amounts **reasonably** satisfactory to the Administrative Agent, or **(iv) distributions to direct or indirect equity owners of the Debtors to pay taxes attributable to taxable income of the Debtors for such period ("Tax Distributions") or (v)** as otherwise agreed to by the Administrative Agent.

J.  The entry of the Final Order shall not have occurred within 45 days after entry of the Interim Order.

K.  An order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable DIP Loan Documents, (i) a priority of any Lien against the Company or any other Loan Party that is equal to or senior to the priority of the liens of the Administrative Agent, L/C Issuer and the Lenders under the DIP Facility or (ii) any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent, the L/C Issuer and the Lenders under the DIP Facility, or the filing by the Company of a motion or application seeking entry of such an order.

L.  Noncompliance by any Loan Party or any of its subsidiaries with the terms of the Interim Order or the Final Order.

M.  The Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party) shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders or the L/C Issuer regarding the DIP Facility, unless such suit or other proceeding is in connection with the enforcement of the DIP Loan Documents against the Administrative Agent, the Lenders or the L/C Issuer.

Doc#: US1:11205871v8

N.    No non US subsidiary of the Borrower (other than the Debtors) nor any UK Silo entity shall have commenced or be required to commence or be subject to any proceeding under any applicable law relating to insolvency, debt restructuring, or bankruptcy or be subject to any government enforcement action against such entity in any non US jurisdiction.

ON.    A plan of reorganization shall be confirmed in any of the Cases that is not an Acceptable Plan of Reorganization (to be defined in the DIP Loan Documents), or an order approving a sale under section 363 of the Bankruptcy Code shall be entered that does not provide for payment in full of the Facilities, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the DIP Facility or is not otherwise reasonably satisfactory to the Administrative Agent, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order.

P.    Failure to file an Acceptable Plan of Reorganization for the Debtors prior to the expiration of the earlier of (a) 18 months after the Petition Date or (b) the period in which the Debtors have the exclusive right to file a chapter 11 plan under section 1121 of the Bankruptcy Code (such period, the "Exclusive Period"), as the Exclusive Period may be terminated or extended, in each case, by court order.

QO.    Failure to execute and deliver the DIP Loan Documents on or prior to the date that is 10 business days from the Petition Date (subject to entry of the Final Order).

Doc#: US1:11205871v8

Upon the occurrence of an Event of Default, the Administrative Agent, on behalf of the Lenders and the L/C Issuer, may (and at the direction of the Required Lenders, shall) exercise all rights and remedies provided for in the DIP Loan Documents and may declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the DIP Loan Documents as to any future liability or obligation of the Agents, the L/C Issuer and the Lenders, but without affecting any of the DIP liens or the liabilities or obligations of any Loan Party; *provided* that, with respect to the enforcement of the DIP liens or exercise of any other rights or remedies with respect to the Collateral (including rights to set off or apply any amounts in any bank accounts that are a part of the Collateral), the Administrative Agent shall provide the Company with at least five (5) days' written notice prior to taking the action contemplated thereby; *provided*, *further*, that no notice shall be required for any exercise of rights or remedies (x) to block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement), and (y) in the event the obligations under the DIP Facility have not been repaid in full in cash on the Scheduled Termination Date.[7]

|  |  |
|---|---|
| **Expenses and Indemnification:** | The Company and each Guarantor shall jointly and severally pay or reimburse the Agents, the L/C Issuer and the Initial Lender for all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent and the Initial Lender (including reasonable and documented attorneys' (including foreign local counsel), financial advisors' and other professionals' as determined by the Lenders fees and expenses and limited, with respect to legal fees, to one counsel for the Lenders, one counsel for the Agents and the L/C Issuer and one counsel for each relevant material jurisdiction and counsel for actual and perceived conflicts) in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents; (ii) the syndication and funding of the DIP Loans; (iii) the creation, perfection or protection of the liens under the DIP Loan Documents (including all search, filing and recording fees); and (iv) the on-going administration of the DIP Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto). |

---

[7] NTD: Remedies include, for the avoidance of doubt, ability to credit bid all or some of the DIP Loans pursuant to section 363(k) of the Bankruptcy Code.

Doc#: US1:11205871v8

The Company and each Guarantor further agrees to jointly and severally pay or reimburse the Administrative Agent, the Collateral Agent and each of the Lenders for all reasonable and documented out-of-pocket costs and expenses, including reasonable and documented attorneys' fees and expenses, incurred by the Administrative Agent, the L/C Issuer or such Lenders in connection with (i) the enforcement of the DIP Loan Documents; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Loan Documents.

Doc#: US1:11205871v8

The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), the Arranger, each Lender and the L/C Issuer, and each Related Party (as defined below) of any of the foregoing persons (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable and documented out-of-pocket fees and expenses (including the reasonable documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any subsidiary thereof arising out of, in connection with, or as a result of (i) the execution or delivery of this Term Sheet, the DIP Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties and the Collateral Agent (and any sub-agent thereof) and its Related Parties, the administration and enforcement of this Term Sheet and the DIP Loan Documents, (ii) any DIP Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit) and (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are found in a final, non-appealable judgment by a court of competent jurisdiction to (x) have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for material breach of such Indemnitee's obligations under this Term Sheet or under any other DIP Loan Document or (z) result from a dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Term Sheet or any DIP Loan Document or any claims arising out of any act or omission of the Borrower or any of its affiliates).  As used herein, a "**Related Party**" means, with respect to any person, such person's affiliates and the partners, directors, officers, employees, agents, attorneys and advisors of such person and of such person's affiliates.

Doc#: US1:11205871v8

| | |
|---|---|
| **Administrative Agent / Collateral Agent:** | Each of the Lenders hereby irrevocably appoints Citibank, N.A. to act on its behalf as Administrative Agent and as Collateral Agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of this Term Sheet and the DIP Loan Documents, together with such actions and powers as are reasonably incidental thereto. The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Term Sheet and the DIP Loan Documents. |

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary) or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any default unless and until notice describing such default is given to the Administrative Agent by the Borrower, a Lender or the L/C Issuer.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.

The Collateral Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Collateral Agent. The Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.

To the extent that the Borrower for any reason fails to indefeasibly pay any amount required to be paid by it to the Administrative Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), the Arranger, the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Collateral Agent (or any such sub-agent), the Arranger, such L/C Issuer or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Collateral Agent (or any such sub-agent), the Arranger or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent (or any such sub-agent), the Arranger or L/C Issuer in connection with such capacity.

| | |
|---|---|
| **Assignments and Participations:** | Assignments must be in a minimum amount of $1.0 million (or, if less, the remaining commitments and/or DIP Loans of any assigning Lender) and are subject to the consent of the Administrative Agent. If no Default or Event of Default then exists, then assignments shall also be subject to the consent of the Company (not to be unreasonably withheld) if the result of any such assignments is that the Initial Lender no longer constitutes the Required Lenders.  No participation shall include voting rights, other than for matters requiring consent of all affected Lenders. |
| **Register:** | The Administrative Agent, acting solely for this purpose as an agent of the Company, shall maintain at one of its offices in New York, NY a copy of each assignment delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments of, and principal amounts (and stated interest) of the DIP Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Term Sheet and the DIP Loan Documents. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the DIP Loans or other obligations under this Term Sheet or DIP Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under this Term Sheet or DIP Loan Document) to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this DIP Term Sheet and the DIP Loan Documents notwithstanding any notice to the contrary. |
| **Required Lenders:** | Lenders holding greater than 50.0% of the outstanding aggregate commitments and/or exposure under the DIP Facility (the "**Required Lenders**"). |

Doc#: US1:11205871v8

**Amendments:**    Required Lenders, except for amendments customarily requiring approval by affected Lenders. The consent of the Administrative Agent shall be required with respect to amendments and waivers of this Term Sheet and the DIP Loan Documents directly adversely affecting its rights or duties. The consent of the L/C Issuer shall be required with respect to amendments and waivers of this Term Sheet and the DIP Loan Documents: (i) directly adversely affecting its rights or duties, (ii) that extend of the final scheduled maturity, (iii) any amendments, waivers or modifications of the Interim Order or the Final Order and (iv) to the definition of "Acceptable Plan of Reorganization" solely in respect of the L/C Facility and the application and use of the proceeds of the pledged cash collateral in respect of the L/C Facility.

**U.S. Federal Income Tax Treatment:**    The Loan Parties shall treat the DIP Loans as indebtedness for U.S. federal income tax purposes and shall not take any inconsistent position on any tax return. The Borrower and Administrative Agent, as applicable, shall use reasonable best efforts to consult with the Lenders and advisors to the Lenders with respect to all original issue discount computations involving the DIP Facility, and upon the reasonable request of the Lenders, the Borrower or the Administrative Agent shall provide any information reasonably requested by the Lenders with respect to such original issue discount computations.

**Miscellaneous:**    To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against the Borrower and its affiliates or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Term Sheet, the DIP Loan Documents or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any DIP Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee or the Borrower and its affiliates shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Term Sheet, the DIP Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.

Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Term Sheet, the DIP Loan Documents or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory). Each party (a) certifies that no representative, agent or attorney of any other person has represented, expressly or otherwise, that such other person would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties have been induced to enter into this Term Sheet, the DIP Loan Documents by, among other things, the mutual waivers and certifications herein.

The agreements herein shall survive the resignation of the Administrative Agent, the Collateral Agent, the Arranger and the L/C Issuer, the replacement of any Lender, the termination of the commitments in respect of the DIP Facility or the

Letter of Credit Facility and the repayment, satisfaction or discharge of all obligations in respect of the DIP Facility and the Letter of Credit Facility.

The DIP Loan Documents will also include (i) yield protection provisions and (ii) agency, set-off and sharing language, in each case substantially customary for facilities of this type.

**Governing Law and Submission to Exclusive Jurisdiction:**    State of New York (and, to the extent applicable, the Bankruptcy Code). Each Loan Party irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Term Sheet and the DIP Loan Documents, or for recognition or enforcement of any judgment, and each of the parties irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State Court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Term Sheet~~, the~~ **or other** DIP Loan Documents shall ~~aff~~**affect** any right to bring any action or proceeding relating to this Term Sheet or the DIP Loan Documents against the Borrower or any other Loan Party or its properties in the court of any jurisdiction.

**Counsel to Initial Lender:**    Paul, Weiss, Rifkind, Wharton & Garrison, LLP.

[Remainder of this page intentionally left blank]

Doc#: US1:11205871v8

**APOLLO INVESTMENT CORPORATION**

By:
      Name: Joseph D. Glatt
      Title:  Vice President

**AP WEC DEBT HOLDINGS LLC**

By:
      Name: Joseph D. Glatt
      Title:  Vice President

[Signature Page Term Sheet]

**MIDCAP FINANCIAL TRUST**

By: Apollo Capital Management, L.P.,
its investment manager

By: Apollo Capital Management GP, LLC,
its general partner

By:
    Name: Joseph D. Glatt
    Title: Vice President

[Signature Page Term Sheet]

**AMUNDI ABSOLUTE RETURN APOLLO FUND PLC**

By: Apollo Belenos Management LLC,
its trading manager

By: Apollo Capital Management, L.P.,
its sole member

By:  Apollo Capital Management GP, LLC,
its general partner

By:
    Name: Joseph D. Glatt
    Title: Vice President

**IVY APOLLO STRATEGIC INCOME FUND**

By: Apollo Credit Management, LLC,
its investment sub-adviser

By:
    Name: Joseph D. Glatt
    Title: Vice President

**IVY APOLLO MULTI ASSET INCOME FUND**

By: Apollo Credit Management, LLC,
its investment sub-adviser

By:
    Name: Joseph D. Glatt
    Title: Vice President

[Signature Page Term Sheet]

**CITIGROUP GLOBAL MARKETS INC.**

By: _____
Name:
Title:

**CITIBANK, N.A.**

By: _____
Name:
Title:

[Signature Page Term Sheet]

Accepted and agreed to as of the date first above written:

**WESTINGHOUSE ELECTRIC COMPANY LLC**

By: _____
    Name:
    Title:


**TOSHIBA NUCLEAR ENERGY HOLDINGS (UK) LIMITED**

By: _____
    Name:
    Title:


**[GUARANTORS]**

**ANNEX A**

**$800 Million Senior Secured Debtor-In-Possession Term Loan Facility**

**Interest Rates And Fees**

| | |
|---|---|
| **Interest Rates:** | DIP Loans will bear interest, at the option of the Company, at one of the following rates: |

(i) the Applicable Margin (as defined below) <u>plus</u> the Base Rate, payable monthly in arrears; or

(ii) the Applicable Margin <u>plus</u> the current LIBOR Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two, three or six months (the "**LIBOR Rate**"), payable at the end of the relevant interest period, but in any event at least quarterly; *provided* that (x) the LIBOR Rate in respect of DIP Loans shall be not less than 1.00% *per annum* and (y) in no event shall the LIBOR Rate be less than 0% (the "**LIBOR Floor**").

"**Applicable Margin**" means: (x) 5.25% *per annum*, in the case of Base Rate Loans and (y) 6.25% *per annum*, in the case of LIBOR Rate Loans.

"**Base Rate**" means the highest of (i) the Administrative Agent's prime rate, (ii) the Federal Funds Effective Rate <u>plus</u> 1/2 of 1% and (iii) the LIBOR Rate for an interest period of one month (giving effect to the LIBOR Floor) <u>plus</u> 1.00%.

Interest and fees shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of interest with respect to Base Rate Loans based on the Administrative Agent's prime rate).

| | |
|---|---|
| **Default Interest:** | During the continuance of an ~~event~~**Event** of ~~default~~**Default** (as defined ~~in the DIP Loan Documents~~**below**), any overdue amounts under the DIP Loan Documents (including unreimbursed amounts on account of drawn Letters of Credit) will bear interest at an additional 2% *per annum*. |
| **Unused Commitment Fees:** | From and after the DIP Closing Date, a non-refundable unused commitment fee at the rate of 0.50% *per annum* will accrue as a percentage of the daily average undrawn portion of the DIP Facility (whether or not then available), payable monthly in arrears and on the Final Term Funding Date ~~without deduction or withholding for any taxes~~. |
| **OID:** | 2.50% |
| **Exit Payments:** | 103% (first 6 months), 102% (next 6 months), par (at initial Scheduled Termination Date or thereafter). |
| **Administrative and** | As separately agreed to between the Company and each Agent. |

**Collateral Agency Fees:**

**Expense Deposit Retainer:**   For the account of the Initial Lender, a non-refundable expense ~~deposit~~**retainer** of $750,000, ~~which shall be earned, due and payable on March 28, 2017,~~ without deduction or withholding for any taxes.

A-2

**ANNEX B**

**Summary of Term and Conditions for Letter of Credit Facility**

**L/C Issuer:**      An affiliate of Citigroup Global Markets Inc. shall act as issuing bank in respect of the Letter of Credit Facility (the "**L/C Issuer**").

**Letter of Credit Facility:**      A letter of credit facility (the "**Letter of Credit Facility**") in the amount of $225 million for new letters of credit (the "**Letters of Credit**") that shall be cash collateralized as set forth below opposite the heading "L/C Cash Collateral Account". Letters of Credit shall be available in (i) Dollars and (ii) Pounds Sterling, Euros and each other currency that is readily available and freely transferable and convertible into Dollars and approved by the Administrative Agent and the L/C Issuer in their sole discretion (each such currency described in this clause (ii), an "**Alternative Currency**"; and a Letter of Credit denominated in an Alternative Currency, an "**Alternative Currency Letter of Credit**").

The commitment of the L/C Issuer under the Letter of Credit Facility shall initially be $100 million on the DIP Closing Date and shall automatically increase to $225 million on the date of entry of the Final Order.

Each Letter of Credit shall have an initial expiration date that is no later than five days prior to the **Scheduled** Termination Date (such date being the "**Letter of Credit Expiration Date**") then in effect for the DIP Facility or, subject to the provisions set forth below opposite the heading "L/C Cash Collateral Account", the date that is 12 months from such Letter of Credit Expiration Date. The L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions; *provided* that any such auto-extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit).

The issuance of all Letters of Credit shall be subject to the customary procedures of the L/C Issuer.

Notwithstanding that a Letter of Credit is in support of any obligations of, or is for the account of, a subsidiary of the Borrower or Westinghouse Electric UK Holdings Limited ("**Westinghouse UK**") or any of its subsidiaries, the Borrower shall be obligated to reimburse the L/C Issuer for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of any of its subsidiaries or Westinghouse UK or any of its subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of its subsidiaries and Westinghouse UK and its subsidiaries.

**L/C Cash Collateral Account:**      Cash collateral in an amount equal to the applicable L/C Collateralization Amount (as defined below) shall be solely provided by the Borrower and shall be deposited in a segregated deposit account at Citibank, N.A. established for the benefit of the Borrower under the sole and exclusive control of the ~~Collateral Agent~~**L/C Issuer** (the "**L/C Cash Collateral Account**"). Amounts on deposit

in the L/C Cash Collateral Account shall be ~~invested, or caused to be invested by the Administrative Agent, in an account or investment reasonably acceptable to the Borrower and the Administrative Agent, which the Administrative Agent may require to be an account managed by the Administrative Agent or its affiliates~~**posted to Citibank, N.A.'s dollars on deposit in custody account in accordance with the Pledge Agreement referred to below**.  Prior to the issuance of any Letter of Credit, the Borrower shall execute and deliver a customary pledge, assignment and control agreement with respect to the L/C Cash Collateral Account~~.~~ **(the "Pledge Agreement").**

"**L/C Collateralization Amount**" means an amount in Dollars provided by the Borrower equal to (i) until the Maturity Date, the sum of (x) 103% multiplied by the amount of all obligations in respect of Letters of Credit denominated in Dollars existing at such time plus (y) 103% multiplied by the Dollar Amount (as defined below) of all obligations in respect of Alternative Currency Letters of Credit existing at such time, and (ii) upon and following the Maturity Date, the sum of (x) 105% multiplied by the amount of all obligations in respect of Letters of Credit denominated in Dollars existing at such time plus (y) 105% multiplied by the Dollar Amount of all obligations in respect of Alternative Currency Letters of Credit existing at such time.

If, as a result of any revaluation of currency (on any Revaluation Date (as defined below) or otherwise) with respect to any Alternative Currency Letters of Credit, the amount on deposit in the L/C Cash Collateral Account shall be less than the L/C Collateralization Amount then applicable after giving effect to such revaluation, the Borrower shall, within two business days after notice from the Administrative Agent of such revaluation, deposit in the L/C Cash Collateral Account cash in an amount necessary to cause the amount on deposit in the L/C Cash Collateral Account to be equal to the L/C Collateralization Amount.

So long as no ~~event~~**Event** of ~~default~~**Default** has occurred and is continuing, the Borrower may from time to time, by written notice to the L/C Issuer, request a withdrawal from the L/C Cash Collateral Account if the total amount on deposit in the L/C Cash Collateral Account is greater than the minimum L/C Collateralization Amount then applicable.   The L/C Issuer shall promptly **instruct Citibank, N.A. to** pay the amount so requested (the "**Proposed Withdrawal Amount**") if the L/C Issuer is satisfied (in its sole discretion) that the following the withdrawal of the Proposed Withdrawal Amount, the total amount on deposit in the L/C Cash Collateral Account will not be less than the minimum L/C Collateralization Amount then applicable.

**Reimbursement of Disbursements:**   The Borrower shall pay to the L/C Issuer the full amount of any drawing under a Letter of Credit in the currency in which such Letter of Credit was issued, unless the L/C Issuer (at its option) shall have specified that it will require reimbursement in Dollars for any Alternative Currency Letter of Credit, plus all interest accrued thereon, not later than the first business day after the Borrower receives notice of payment from the L/C Issuer (or the second business day if such notice is received after 11:00 a.m. NY time); provided that the Borrower's obligation to reimburse the L/C Issuer with respect to such drawing shall, unless the Borrower and the L/C Issuer shall otherwise each agree, first be satisfied by funds (in Dollars) withdrawn by the Administrative Agent from the L/C Cash

Collateral Account and transferred to the L/C Issuer.

**Currency Equivalents:** The Administrative Agent shall determine the Spot Rates (as defined below) as of each Revaluation Date (as defined below) to be used for calculating Dollar Amounts (as defined below) of Letter of Credit extensions denominated in Alternative Currencies. Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. The applicable amount of any currency (other than Dollars) shall be such Dollar Amount as so determined by the Administrative Agent.

"**Spot Rate**" for a currency means the rate determined by the L/C Issuer to be the rate quoted by the L/C Issuer as the spot rate for the purchase by the L/C Issuer of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. NY time on the date two business days prior to the date as of which the foreign exchange computation is made; provided that the L/C Issuer may obtain such spot rate from another financial institution designated by the L/C Issuer if the person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and provided that the L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Alternative Currency Letter of Credit.

"**Revaluation Date**" means with respect to any Alternative Currency Letter of Credit, each of the following: (i) each date of issuance of an Alternative Currency Letter of Credit, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by the L/C Issuer under any Letter of Credit denominated in an Alternative Currency, (iv) each date of withdrawal of any amount from the Letter of Credit Account and (v) such additional dates as the Administrative Agent or the L/C Issuer shall reasonably determine.

"**Dollar Amount**" means, at any time:

a) with respect to an amount denominated in Dollars, such amount; and

b) with respect to an amount denominated in an Alternative Currency, an equivalent amount thereof in Dollars as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

**Procedures for Issuance/Amendment:** Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) of an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer (the "**Letter of Credit Application**"), appropriately completed and signed by a Responsible Officer of the Borrower. As used herein, "**Responsible Officer**" means (i) the chief executive officer, president or any vice president of

the Borrower or any applicable subsidiary and, in addition, any person holding a similar position or acting as a director or managing director with respect to any other foreign subsidiary of the Borrower or (ii) with respect to financial matters, the chief financial officer, senior vice president – finance, **vice president – finance,** principal accounting officer, treasurer, assistant treasurer or controller of such person.

Such Letter of Credit Application must be received by such L/C Issuer and the Administrative Agent not later than 11:00 a.m. NY time at least three business days (or such later date and time as the Administrative Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a business day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the L/C Issuer may reasonably require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a business day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may reasonably require.

Additionally, the Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment as the L/C Issuer or the Administrative Agent may reasonably require.

**Conditions Precedent to Issuance:**   The issuance of any Letter of Credit shall be conditioned on: (i) receipt by the L/C Issuer of a duly completed and executed Letter of Credit Application, (ii) the amount on deposit in the L/C Cash Collateral Account shall not be less than the L/C Collateralization Amount applicable at such time (after giving effect to the issuance of such Letter of Credit), (iii) there shall exist no default under the DIP Loan Documents, (iv) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, issuance or granting, (v) the issuance of such Letter of Credit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (vi) the issuance of such Letter of Credit shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, and (vii) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect.

**Letter of Credit**   A fronting fee in the amount of 0.125% on the outstanding face amount of each

**Facility Fees:**    Letter of Credit shall be payable to the L/C Issuer. Such fronting fees shall be due and payable in Dollars on the first business day after the end of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. In addition, the Borrower will pay to the L/C Issuer its standard opening, amendment, presentation, wire and other administration charges applicable to each such Letter of Credit.

**Counsel to the L/C Issuer:**    Shearman & Sterling LLP.

ANNEX C

## Representations and Warranties[8]

### 3.1    Financial Statements; No Change.

(a)    The audited consolidated balance sheet of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) dated March 31, 2016, and the related audited consolidated statements of income and of cash flows for the fiscal year of the Financial Statement Entities ended on that date (i) were prepared in accordance with GAAP applied consistently throughout the period reflected therein and with prior periods, except as disclosed therein, and (ii) fairly present in all material respects the consolidated financial condition of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) as of the date thereof and their consolidated results of operations and consolidated cash flows for the period covered thereby, subject, in the case of clauses (i) and (ii), to any events relating to the Vogtle project and the ~~Sumner~~**Summer** project.

(b)    The unaudited consolidated balance sheets of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) dated June 30, 2016~~,~~ **and** September 30, 2016 ~~and December 31, 2016~~ and the related unaudited consolidated statements of income and of cash flows for the relevant quarterly period of the 2016 fiscal year of such Financial Statement Entities ended on that date (i) were prepared in accordance with GAAP (except that such financial statements may include abbreviated notes) applied consistently throughout the period reflected therein and with prior periods, except as disclosed therein, and (ii) fairly present in all material respects the consolidated financial condition of the Financial Statement Entities and their consolidated Subsidiaries (on a combined basis) as of the date thereof and their consolidated results of operations and consolidated cash flows for the period covered thereby, subject, in the case of clauses (i) and (ii), to normal year-end audit adjustments and any events relating to the Vogtle project and the ~~Sumner~~**Summer** project.

(c)    Since March 31, 2016, ~~other than the commencement of the Cases,~~ there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect. **For the purposes herein, "Material Adverse Effect" shall mean a material adverse effect on (a) the business, property, operations, condition (financial or otherwise) or prospects of the Company, Westinghouse Electric UK Holdings Limited ("Westinghouse UK") and their respective Subsidiaries taken as a whole, other than, in each case, (i) any change, event or occurrence, arising individually or in the aggregate, from events relating to the [Vogtle project] and the [Summer project] and (ii) events that would reasonably be expected to result from the filing or commencement of the Cases or the announcement of the filing or** commencement of the Cases, **(b) the validity or enforceability of this Term Sheet or any of the other DIP Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.**

### 3.2    Existence; Compliance with Law.

Each of the Company, Westinghouse ~~Electric~~ UK ~~Holdings Limited ("~~**Westinghouse UK")** and their respective Subsidiaries (a) is duly organized, validly existing and in good standing under

---

[8] **Capitalized terms used but not otherwise defined in the Term Sheet shall have the meanings assigned to such terms in that certain Second Amended and Restated Credit Agreement dated December 11, 2015 among the Company, Westinghouse UK, the financial institutions party thereto, and BNP Paribas, as administrative agent (as amended, amended and restated or otherwise modified from time to time, the "Existing BNP Facility").**

the laws of the jurisdiction of its organization, except for absences of such good standing in respect of such Subsidiaries as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (b) has the organizational power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, except for absences of such power, authority or right as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (c) is duly qualified as a foreign organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except for absences of such qualification or good standing as could not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

### 3.3    Power; Authorization; Enforceable Obligations

(a)    Each Loan Party has the organizational power and authority, and the legal right, to make, deliver and perform the DIP Loan Documents to which it is a party and to obtain extensions of credit thereunder. Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the DIP Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of the DIP Loan Documents. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit under the DIP Loan Documents or with the execution, delivery, performance, validity or enforceability of the DIP Loan Documents. Each DIP Loan Document to which any Loan Party is a party **on the DIP Closing Date** has been duly executed and delivered on behalf of such Loan Party. Each DIP Loan Document to which any Loan Party is a party upon execution will constitute, a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**(b)    The Company has the organizational power and authority, and the legal right to make, deliver and perform the Liquidity Facility Agreement. The Company has taken all necessary organizational action to authorize the execution, delivery and performance of the Liquidity Facility Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the Liquidity Facility Agreement or with the execution, delivery, performance, validity or enforceability of the Liquidity Facility Agreement. The Liquidity Facility Agreement has been duly executed and delivered on behalf of the Company. The Liquidity Facility Agreement upon execution will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).**

### 3.4    No Legal Bar.

The execution, delivery and performance of the **Liquidity Facility Agreement, the** DIP Loan Documents, the extension of credit thereunder and the use of proceeds thereof will not violate any Requirement of Law or any Contractual Obligation, including any post-petition agreement, of the Company, Westinghouse UK or any of their respective Subsidiaries and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any

Requirement of Law or any such Contractual Obligation, other than Liens created under the DIP Loan Documents and the DIP Financing Orders. No Requirement of Law or Contractual Obligation applicable to the Company, Westinghouse UK or any of their respective Subsidiaries could reasonably be expected to have a Material Adverse Effect.

### 3.5    Litigation.

Other than the Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Company or Westinghouse UK, threatened by or against the Company, Westinghouse UK or any of their respective Subsidiaries or against any of their respective properties or revenues (a) with respect to any of the DIP Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

### 3.6    No Default.

Except for the defaults and events of defaults set forth under the waivers to the Existing BNP Facility, none of the Company, Westinghouse UK or any of their respective Subsidiaries is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect. No default or event of default under the DIP Facility has occurred and is continuing.

### 3.7    Ownership of Property; Liens.

Each of the Company, Westinghouse UK and their respective Subsidiaries has title in fee simple to, or a valid leasehold interest in, all its Material real property, and good title to, or a valid leasehold interest in, all its other Material property, and none of such property is subject to any Lien except as permitted by the DIP Loan Documents.

### 3.8    Intellectual Property.

The Company, Westinghouse UK and each of their respective Subsidiaries owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business in all Material respects as currently conducted. No Material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does the Company nor Westinghouse UK know of any valid basis for any such claim. The use of Intellectual Property by the Company, Westinghouse UK and their respective Subsidiaries does not infringe on the rights of any Person in any Material respect.

### 3.9    Taxes.

Each of the Company, Westinghouse UK and each of their respective Subsidiaries has timely filed or caused to be timely filed all foreign, national, state and local income and other Material tax returns that are required to be filed (taking into account all proper extensions) and has timely paid all **income Taxes and other Material** Taxes required to be paid and paid any assessments made against it or any of its property and all other **income taxes and other Material** taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any taxes, fees or other charges the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Company, Westinghouse UK or their respective Subsidiaries, as the case may be); no Tax Lien has been filed, and, to the knowledge of the Company or Westinghouse UK, no claim is being

asserted, with respect to any Tax, fee or other charge. There are no tax sharing agreements between either the Company or Westinghouse UK and Toshiba Corporation. Under the laws of its Relevant Jurisdiction it is not necessary that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the DIP Loan Documents or the transactions contemplated by the DIP Loan Documents.

### 3.10    Federal Regulations.

No extension of credit under the DIP Loan Documents, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board. If requested by any Lender or the Administrative Agent, the Company and Westinghouse UK will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

### 3.11    Labor Matters.

Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Company, Westinghouse UK or any of their respective Subsidiaries pending or, to the knowledge of the Company or Westinghouse UK, threatened; (b) hours worked by and payment made to employees of the Company, Westinghouse UK and their respective Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Company, Westinghouse UK or any of their respective Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Company, Westinghouse UK or the relevant Subsidiary.

### 3.12    ERISA.

[Neither a Reportable Event nor a failure to satisfy the minimum funding standards (within the meaning of Section 412 or 430 of the Code or Section 302 of ERISA) has occurred during the five-year period (or, if shorter, for the period during which the Plan in question has been in existence) prior to the date on which this representation is made or deemed made with respect to any Pension Plan, and each Plan has complied in all Material respects with the applicable provisions of ERISA and the Code. No Pension Plan is in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA). No termination of a Pension Plan has occurred, and no Lien in favor of the PBGC or a Pension Plan has arisen, during such period. The present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Pension Plan allocable to such accrued benefits by a Material amount. None of the Company, Westinghouse UK or any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a Material liability under ERISA, and none of the Company, Westinghouse UK or any Commonly Controlled Entity would become subject to any Material liability under ERISA if the Company, Westinghouse UK or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No Multiemployer Plan is in Reorganization or Insolvent.][9]

---

[9] **Subject to on-going review.**

**3.13    Investment Company Act; Other Regulations.**

None of the Company, Westinghouse UK or any of their respective Subsidiaries is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. None of the Company, Westinghouse UK or any of their respective Subsidiaries is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

**3.14    Use of Proceeds.**

The loans and letters of credit extended or issued under the DIP Facility shall be used for the purposes set forth in the "*Purpose*" section in the Term Sheet.

**3.15    Environmental Matters.**

Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    the facilities and properties owned, leased or operated by the Company, Westinghouse UK or any of their respective Subsidiaries (the "Properties") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)    none of the Company, Westinghouse UK or any of their respective Subsidiaries has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by the Company, Westinghouse UK or any of their respective Subsidiaries (the "Business"), nor do the Company and Westinghouse have knowledge or reason to believe that any such notice will be received or is being threatened;

(c)    Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d)    no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Company and Westinghouse UK, threatened, under any Environmental Law to which the Company, Westinghouse UK or any of their respective Subsidiaries is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)    there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of the Company, Westinghouse UK or any of their respective Subsidiaries in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

(f)       the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g)       none of the Company, Westinghouse UK or any of their respective Subsidiaries has assumed any liability of any other Person under Environmental Laws.

### 3.16    Accuracy of Information, etc.

No statement or information contained in any DIP Loan Document, or any other document, certificate or statement furnished by or on behalf of the Company or Westinghouse UK to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by the DIP Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.

### 3.17    Solvency.

The non-Debtor Subsidiaries **of the Company and WEC UK** (taken as a whole), after giving effect to the transactions contemplated by the DIP Loan Documents and the borrowings thereunder, are Solvent.

### 3.18    AML Laws; Anticorruption Laws and Sanctions.

Each of the Company and Westinghouse UK has implemented and maintains in effect policies and procedures designed to ensure compliance by the Company, Westinghouse UK, their respective Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions. Each of (a) the Company, Westinghouse UK, any of their respective Subsidiaries or, to the knowledge of either the Company or Westinghouse UK, any of their respective directors or officers, or any of their respective employees or Affiliates, or (b) to the knowledge of either the Company or Westinghouse UK, any agent of the Company, Westinghouse UK or any of their respective Subsidiaries or other of its Affiliates that will act in any capacity in connection with or benefit from the DIP Facility, (i) is not a Sanctioned Person, (ii) is in compliance in all material respects with Anti-Corruption Laws and Sanctions, (iii) to the extent applicable, is in compliance in all material respects with AML Laws. No extension of credit under the DIP Facility, use of proceeds thereof by the Company, Westinghouse UK or any of their respective Subsidiaries or other transaction contemplated by the DIP Loan Documents will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions. Each of the Company and Westinghouse UK represents that neither it nor any of its Subsidiaries, or, to its knowledge, its parent company or any other of its Affiliates has engaged in or intends to engage in any unlawful dealings or transactions with, or for the benefit of, any Sanctioned Person or with or in any Sanctioned Country.

### 3.19    Security Interest.

**(a)**       Upon entry of each of the Interim Order and the Final Order, as applicable, each such DIP Financing Order shall be effective to create in favor of the Collateral Agent, for the benefit of the Lenders, a legal, valid, enforceable and perfected security interest ~~and hypothec~~ in the Collateral of the ~~Loan Parties~~**Debtors** and proceeds thereof, as contemplated thereby, as described in the DIP Loan Documents.

**(b)    The provisions** of the DIP Loan Documents shall be effective to create in favor of the Collateral Agent, for the benefit of the Lenders, a legal, valid, enforceable and perfected security interest and hypothec in the Collateral of the Loan Parties who are not Debtors and proceeds thereof, as contemplated thereby, as described in the DIP Loan Documents.

### Section 3.20    DIP Financing Orders.

(a)    The Interim Order or, at all times after its entry by the Bankruptcy Courts, the Final Order, is in full force and effect, and has not been vacated, reversed, terminated, stayed modified or amended in any manner without the reasonable written consent of the Required Lenders.

(b)    Upon the occurrence of the maturity date (whether by acceleration or otherwise) of any of the obligations under the DIP Facility, the Lenders shall, subject to the provisions of the "*Events of Default*" section in the Term Sheet and the applicable provisions of the applicable DIP Financing Order, be entitled to immediate payment of such obligations, and to enforce the remedies provided for under the DIP Loan Documents in accordance with the terms thereof and such DIP Financing Order, as applicable, without further application to or order by the Bankruptcy Court.

(c)    If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such DIP Financing Order, the extension of credit or the performance by any Loan Party of any of its obligations under any of the DIP Loan Documents shall be the subject of a presently effective stay pending appeal. The Company, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the DIP Financing Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Company, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with the DIP Loan Documents notwithstanding any such objection or appeal unless the relevant DIP Financing Order has been stayed by a court of competent jurisdiction.

### Section 3.21    Appointment of Trustee or Examiner; Liquidation.

No order has been entered in any of the Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of a responsible officer or examiner (other than a fee examiner) having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (iii) to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Cases.

### Section 3.22    Superpriority Claims; Liens.

Upon the entry of each of the Interim Order and the Final Order, each such DIP Financing Order and the DIP Loan Documents are sufficient to provide the DIP Superpriority Claims and security interests and Liens on the Collateral of the ~~Loan Parties~~**Debtors** described in, and with the priority provided in, the DIP Loan Documents.

### Section 3.23    AP 1000 Projects.

(a)    [Each of the Vogtle construction contract and the ~~Sumner~~**Summer** construction contract (collectively, the "Subject Contracts") are executory contracts**, which are, subject to one or more agreements approved by the Bankruptcy Court,** capable of being rejected pursuant to Section 365 of the Bankruptcy Code.

(b)    The rejection of any of the Vogtle construction contract and the ~~Sumner~~**Summer** construction contract would not give rise to any secured claims, claims that would rank senior to the DIP Loans, or enforceable rights of set-off**, other than with respect to any assets of the Loan Parties located on the [Vogtle project site] and the [Summer project site]**.

(c)    The rejection of any of the Subject Contracts does not default, impair, terminate, forfeit, or trigger any cross-default to, any regulatory license or permit necessary for the operations of the non-AP1000 businesses, or prevent any of the non-AP1000 business from continued compliance with any of their regulatory license or permitting necessary for their continued operations.

(d)    The rejection of any of the Subject Contracts does not give rise to or trigger any personal liability of any of the officers or directors of the Loan Parties, or result in any of the Loan Parties' executives being ~~"permit blocked" or otherwise~~ precluded from continued employment under applicable regulations in the industry.

(E)    The rejection of the Subject Contracts does not result in the forfeiture of any material assets of the Loan Parties~~.~~**, other than assets located on the [Vogtle project site] and the [Summer project site].]**[10]

---

**[10] Subject to on-going review.**

**ANNEX D**

### Affirmative Covenants[11]

~~The~~
~~DIP Loan Documents~~
~~will contain the following affirmative covenants (subject to the exceptions, qualifications and carveouts set forth herein):~~
~~*~~

A.   Preservation and maintenance of existence, business and properties.

B.   (i) Procurement and maintenance with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business; (ii) prompt notification to the Administrative Agent and each Lender of any change, or proposed change, of which the Company or any Intercompany Borrower becomes aware to the provisions of the Nuclear Installations Act 1965 (including, without limitation, section 16 thereof) which gives legislative force to the principles of the Paris Convention on Third Party Liability in the Field of Nuclear Energy and the Brussels Convention supplementary to the Paris Convention; and (iii) limitation to only carry out advisory or other work in relation to nuclear generation to the extent that it is covered by insurance or other arrangements constituting alternative safeguards to a level considered prudent by its directors in relation to any liability which could arise from such work.

C.   Payment of **income and other material** taxes and other claims.

D.   Financial statements, reports, etc.

E.   Litigation and other notices, including, but not limited to, with respect to (i) the occurrence of a default or ~~event of default~~**Event of Default** under the DIP Loan Documents, (ii) **after the Petition Date,** any default under any Contractual Obligation of the Company, Westinghouse ~~Electric~~ UK ~~Holdings Limited ("__Westinghouse UK__")__ and their respective Subsidiaries or litigation, investigation or proceeding that may exist at any time between the Company, Westinghouse UK and any of their respective Subsidiaries and any Governmental Authority, that in either case, if not cured or if adversely determined , as the case may be, could reasonably be expected to have a Material Adverse Effect, (iii) **after the Petition Date, the commencement of** any litigation or proceeding affect the Company, Westinghouse UK or any of their respective Subsidiaries (1) in which the amount involved is $10,000,000 or more and not covered by insurance, (2) in which Material injunctive or similar relief is sought or (3) which relates to any DIP Loan Document, (iv) **after** the **Petition Date, the** following events, as soon as possible and in any event within 30 days after the Company or Westinghouse UK knows or has reason to know thereof: (1) the occurrence of any

---

[11] **Capitalized terms used but not otherwise defined in the Term Sheet shall have the meanings assigned to such terms in the Existing BNP Facility.**
~~*  Prior to entry of the DIP Loan Documents (other than the Term Sheet), the affirmative covenants set forth on Annex E attached hereto shall apply.~~

Reportable Event with respect to any Pension Plan; a failure to make any required contribution to a Plan; a Pension Plan entering "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); the creation of any Lien in favor of the PBGC or any Plan; any withdrawal from, or the termination of, any Pension Plan or Multiemployer Plan; or the Reorganization or Insolvency of any Multiemployer Plan, or determination that any Multiemployer Plan is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or (2) the institution of proceedings or the taking of any other action by the PBGC or the Company, Westinghouse UK or any Commonly Controlled Entity or any Plan or Multiemployer Plan with respect to the withdrawal from, or the termination of, any Pension Plan or Multiemployer Plan, the Reorganization or Insolvency of any Multiemployer Plan, or the determination that any Multiemployer Plan is in endangered or critical status, (v) any development or event that has had or could reasonably be expected to have a Material Adverse Effect, **and** (vi) ~~the imposition of any Applicable Debt Rating or any change therein and (vii)~~ such other information (financial or otherwise) with respect to the Company, Westinghouse UK or any of their Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

F.   Compliance with laws and regulations.

G.   Maintenance of records, access to properties and inspections.

H.   Use of proceeds solely in accordance with the Term Sheet.

I.   Compliance with environmental laws.

J.   Provision of additional collateral, guarantees and mortgages; further assurances.

K.   ~~Maintenance of cash management systems; application of the proceeds of accounts.~~

~~L~~**K**.   Compliance in all respects, after entry thereof, with all requirements and obligations set forth in the DIP Financing Orders, "first day" orders and "second day" orders, as each such order is amended and in effect from time to time in accordance with the DIP Loan Documents.

~~M~~**L**.   Copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of any of the Loan Parties with the Bankruptcy Court, or distributed by or on behalf of any of the Loan Parties to any appointed in the Cases, providing copies of the same to the Lenders and counsel for the Administrative Agent and Initial Lender.

~~N~~**M**.   Continued retention of a restructuring advisor and a financial advisor reasonably satisfactory to the Administrative Agent (it being agreed that Alix Partners and PJT Partners are reasonably satisfactory to the Administrative Agent).

~~O~~**N**.   Quarterly lender calls.

~~P~~**O**.   Bi-weekly update calls for the Initial Lender and its advisors.

~~Q~~**P**.   Company shall have used its reasonable best efforts to enter into the DIP Loan Documents.

RQ.       Such other information (financial or otherwise) with respect to the Company and its
subsidiaries as the Lenders and the L/C Issuer (through the Administrative Agent) may reasonably
request.

**ANNEX E**

**Negative Covenants**

A.  Limitations on indebtedness, except that the following indebtedness shall be permitted:

1.  indebtedness under the DIP Facility (including the Letter of Credit Facility);

2.  indebtedness of the Loan Parties and its subsidiaries existing on the DIP Closing Date, and listed on a Schedule 3 to the Term Sheet;[9][12]

3.  indebtedness in connection with the Intercompany Loans;

4.  indebtedness (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit (other than letters of credit under the Letter of Credit Facility), bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

5.  (i) guaranties of the obligations of suppliers, customers and licensees in the ordinary course of business, (ii) indebtedness incurred in the ordinary course of business to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) indebtedness in respect of letters of credit (other than letters of credit under the Letter of Credit Facility), bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business, workers compensation claims or other employee benefits;

6.  guarantees of indebtedness otherwise permitted to be incurred pursuant to this Section A or other obligations not prohibited by this Term Sheet; *provided* that in the case of any guarantee by any Loan Party of the obligations of any subsidiary that is not a Loan Party, the related investment is permitted under Section D;

7.  indebtedness consisting of (i) the financing of insurance premiums and/or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

8.  indebtedness with respect to capital leases and purchase money indebtedness incurred in the ordinary course of its business in an aggregate outstanding principal amount not to exceed $5,000,000;

9.  [indebtedness under any hedging transaction not entered into for speculative purposes];[10][13]

10. other indebtedness in an aggregate outstanding principal amount not to exceed $5,000,000.

B.  Limitations on liens, except that the following liens shall be permitted:

---

[9][12] Schedule subject to review.
[10][13] Inclusion subject to diligence

1.  liens for taxes not yet due or that are being contested in good faith by appropriate proceedings;

2.  carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like liens arising in the ordinary course of business that are not overdue for a period of more than 30 days;

3.  pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

4.  deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

5.  easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business;

6.  liens in existence on the DIP Closing Date listed on Schedule 4 to Term Sheet;[14]

7.  liens securing indebtedness in connection with capital leases and purchase money debt permitted under Section (A) above;

8.  liens not otherwise permitted by this Section B so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $5,000,000;

9.  liens securing the obligations under the DIP Facility (including the Letter of Credit Facility);

10. precautionary or purported liens evidenced by the filing of UCC financing statements or similar financing statements under applicable laws;

11. liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

12. leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any indebtedness;

13. liens securing the Intercompany Loans; and

14. liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto.

C.      Limitations on sale and leaseback transactions.

D.      Limitations on investments, loans and advances (collectively, the "**Investments**"), except that the following Investments shall be permitted:

---

[14] Schedule subject to review.

1. Investments (i) existing on, or contractually committed to or contemplated as of, the DIP Closing Date and described on Schedule 5 to this Term Sheet¹²¹⁵;

2. the Intercompany Loans;

3. (i) Investments existing on the DIP Closing Date in the Loan Parties or any of their subsidiaries, (ii) Investments among the Borrower and/or one or more of Loan Parties, (iii) Investments made by any Loan Party's subsidiary that is not a Loan Party in any Loan Party and/or any other Loan Party's subsidiary that is not a Loan Party;

4. Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of clause (iii), to the extent necessary to maintain the ordinary course of supplies;

5. Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

6. other Investments in an aggregate amount at any time outstanding not to exceed $5,000,000; and

7. Investments in connection with the Corporate Reorganization¹³ **subject to the consent of Required Lenders (not to be unreasonably withheld or delayed)¹⁶.**

E.     Limitations on mergers, consolidations, sales of assets ("**Dispositions**") and acquisitions, except that the following shall be permitted:

1. the Corporate Reorganization (subject to the consent of Required Lenders **(not to be unreasonably withheld or delayed**) and, to the extent permitted by the Bankruptcy Court, any other corporate reorganization;

2. Dispositions of surplus, obsolete or worn out property in the ordinary course of business;

3. the sale of inventory in the ordinary course of business;

4. Dispositions of other property having a fair market value not to exceed $5,000,000.

5. to the extent that (i) the relevant property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of the relevant Disposition are promptly applied to the purchase price of such replacement property;

---

¹²¹⁵ Schedule subject to review.

¹³ "**Corporate Reorganization**" means a reorganization that may involve a transfer after the DIP Closing Date of ownership of Westinghouse Electric UK Holdings Limited ("**WEC UK**") to a new holding company that will be the direct parent of WEC UK and the indirect parent of Toshiba Nuclear Energy Holdings (US) Inc.

¹⁶ **"Corporate Reorganization" means a reorganization that may involve a transfer after the DIP Closing Date of ownership of Westinghouse Electric UK Holdings Limited ("WEC UK") to a new holding company that will be the direct parent of WEC UK and the indirect parent of Toshiba Nuclear Energy Holdings (US) Inc.**

6. Dispositions of property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

7. Dispositions made to comply with any order of any governmental authority or any applicable laws; **and**

8. **Any other Dispositions permitted by the applicable order of the Bankruptcy Court.**

F. Limitations on dividends and distributions, except that the Borrower and its Subsidiaries shall be permitted:

1. dividends and distributions from subsidiaries of any Loan Parties to such Loan Party;

2. to pay general administrative costs and expenses (including corporate overhead, legal or similar expenses and customary salary, bonus and other benefits payable to any director, officer or employees of any parent company) and franchise taxes, and similar fees and expenses, required to maintain the organizational existence of such parent company;

3. to pay audit and other accounting and reporting expenses of any parent company to the extent such expenses are attributable to any parent company and/or its subsidiaries; and

4. to pay any insurance premium that is payable by, or attributable to, any parent company and/or its subsidiaries.

G. Limitations on transactions with affiliates, except for:

1. any transaction among Loan Parties;

2. any transactions in connection with the Corporate Reorganization, subject to the consent of Required Lenders **(not to be unreasonably withheld or delayed)**;

3. transactions in existence on the DIP Closing Date and any similar transaction among Loan Parties and their subsidiaries consistent with past practice;

4. any Intercompany Loans; and

5. any transaction on terms that are no less favorable to the Loan Parties or their subsidiaries than might be obtained at the time in a comparable arm's length transaction from a person who is not an affiliate.

H. Limitations on changes in business, except for changes relating to the AP1000 Projects.

I. Limitations on the (i) payment and modification of subordinated or other prepetition indebtedness, except in the case of prepetition debt, pursuant to "first day" or other orders entered by the Bankruptcy Court that are in form and substance satisfactory to the Administrative Agent, (ii) modification of certificate of incorporation and by-laws and (ii) modification of the Liquidity Facility Agreement without the prior consent of the Requisite Lenders to the extend such modifications are adverse to the Lenders.

M. Limitations on changes to fiscal year and accounting.

**SCHEDULE 1**

**[\*\*\* SUBJECT TO LOCAL LAW RESTRICTIONS, CORPORATE BENEFIT, FINANCIAL ASSISTANCE, REGULATORY CONSENT AND REQUIREMENTS, CONTRACTUAL RESTRICTIONS/PROHIBITIONS AND EXISTING THIRD PARTY ARRANGEMENTS \*\*\*]**

**Guaranty and Security Requirements by Jurisdiction**

**[England and Wales**

1. Subject to regulatory consent to the extent required (if at all), TSB (Investment Europe) Limited, Uranium Asset Management Limited and Westinghouse Electric Company UK Limited (the "**UK Entities**") will be able to provide guarantees in respect of the obligations of the Intercompany Borrower.

2. Each of the UK Entities will be able to provide pledges over their shares and assets (cash, account receivables, inventory, plant, property & equipment and intangible fixed assets).

3. Toshiba Nuclear Energy Holdings (UK) Limited will be able to provide a pledge of its shares in the new UK holding company ("**UK Newco**") and UK Newco will be able to provide a pledge over its shares in Westinghouse Electric UK Holdings Limited.

**France**

4. Subject to corporate benefit requirements, each of the following French entities Westinghouse Electrique France SAS, Astare, Westinghouse Operations Nucleaire SAS and Westinghouse Service Nucleaire (the "**French Entities**") will be able to provide guarantees in respect of the obligations of the Intercompany Borrower.

5. Subject to corporate benefit requirements, each of the French Entities will be able to provide pledges over their shares and assets (cash, account receivables, inventory, plant, property & equipment and intangible fixed assets).

**Germany**

6. Subject to corporate benefit requirements, Westinghouse Electric Germany GmbH (WEG) will be able to provide a guarantee in respect of the obligations of the Intercompany Borrower.

7. Subject to corporate benefit requirements, WEG will be able to provide pledges over its shares and assets pledges over its subsidiaries including to the extent possible those shares it holds in joint-ventures; pledges over its bank accounts; security over its receivables (including trade receivables, insurance receivables, intra-group receivables); security over its moveable assets; security over IP-rights; land charges). .

**Japan**

8. Subject to regulatory consent to the extent required (if at all), Westinghouse Electric Japan Limited (WEJL) will be able to provide a guarantee in respect of the obligations of the Intercompany Borrower.

9. Subject to regulatory consent to the extent required (if at all), WEJL will be able to provide pledges over its shares and assets (account receivables, inventory, plant, property & equipment).

**Spain**

10. Subject to corporate benefit requirements, Westinghouse Electric Spain, S.A.U. ("**WES**") will be able to provide a joint and several guarantee in respect of the obligations of the Intercompany Borrower.

11. WES will be able to grant security, pledges or mortgages over its assets (including but not limited to account receivables, bank accounts, inventory, plants, real estate assets, bank accounts and equipment), and Westinghouse Electric UK Holdings Limited will grant Spanish law share pledges over the shares in WES and in Westinghouse Technology Services.

**Sweden**

12. TNEE Electric Sweden Holding AB ("**TNEE Sweden**") will be able to provide (i) a guarantee in respect of Westinghouse Electric Sweden AB ("**WES AB**") obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers (ii) a pledge over the shares in WES AB.

13. WES AB's will be able to provide a guarantee in respect of its own obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers.

14. Subject to applicable regulatory consent to the extent required (if at all) TNEE Electric Sweden Holding AB ("TNEE Sweden") will be able to provide (i) a guarantee in respect of Westinghouse Electric Sweden AB ("WES AB") obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers (ii) a pledge over the shares in WES AB.

15. WES AB's will be able to provide a guarantee in respect of its own obligations under the Intercompany Facility and subject to guarantee limitations in respect of obligations of certain other Intercompany Borrowers.

16. Subject to applicable regulatory consent to the extent required (if at all), WES AB will be able to provide pledges over (i) the shares in WESDYNE Sweden AB ("Wesdyne Sweden") and Westinghouse Electric Ukraine AB; business mortgages in an amount to be agreed; mortgages in an amount to be agreed ; Swedish and European trademarks; intercompany receivables and customer receivables.

17. Subject to limitation language, Wesdyne Sweden will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) pledges over its business mortgage; Swedish and European trademarks and intercompany receivables.

18. Subject to limitation language, Westinghouse Electric Ukraine AB will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) a pledge over intercompany receivables.

19. , WES AB will be able to provide pledges over (i) the shares in WESDYNE Sweden AB ("**Wesdyne Sweden**") and Westinghouse Electric Ukraine AB; business mortgages (amount TBC); mortgages (amount TBC); Swedish and European trademarks; intercompany receivables and customer receivables.

20. Subject to limitation language, Wesdyne Sweden will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) pledges over its business mortgage; Swedish and European trademarks and intercompany receivables.

21. Subject to limitation language, Westinghouse Electric Ukraine AB will be able to provide (i) a guarantee in respect of WES AB's obligations under the Intercompany Facility and (ii) a pledge over intercompany receivables.

## Belgium

22. Subject to corporate benefit requirements, Westinghouse Electric Belgium SA (WEB) will be able to provide a guarantee in respect of the obligations of the Intercompany Borrower.

23. Subject to corporate benefit requirements, security can be taken over its shares and assets (receivables (incl. bank accounts), IP (if material), plant, property & equipment).

## Regulated Entities

Any guarantees or security taken over shares in or assets of the regulated entities in England & Wales, Belgium, Sweden or Japan will require regulatory review and approval – a timeline regarding this process to be confirmed.][17]

---

[17] **Subject to on-going review.**

**SCHEDULE 2**

**Intercompany Borrowers**

| Name of Original Borrower | Registration number (or equivalent, if any) Original Jurisdiction |
|---|---|
| ASTARE | [ *** ] (France) |
| Springfields Fuel Limited | 03857770 (England & Wales) |
| TSB (Investment Europe) Limited | 03976730 (England & Wales) |
| Uranium Asset Management Limited | 03162046 (England & Wales) |
| Westinghouse Electric Belgium SA | [ *** ] (Belgium) |
| Westinghouse Electric Company UK Limited | 04006213 (England & Wales) |
| Westinghouse Electric Germany GmbH | [ *** ] (Germany) |
| Westinghouse Electric Japan Limited | [ *** ] (Japan) |
| Westinghouse Electric Spain S.A.U. | [ *** ] (Spain) |
| Westinghouse Electric Sweden AB | [ *** ] (Sweden) |
| Westinghouse Electric UK Holdings Limited | 02458109 (England & Wales) |
| Westinghouse Electrique France SAS | [ *** ] (France) |
| Westinghouse Operations Nucleaire SAS | [ *** ] (France) |
| Westinghouse Service Nucleaire | [ *** ] (France) |

| Summary report: | |
|---|---|
| **Litéra® Change-Pro 7.5.0.176 Document comparison done on 3/30/2017 8:50:59 AM** | |
| **Style name:** PW Basic | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://US/US1/11205871/4 | |
| **Modified DMS:** iw://US/US1/11205871/8 | |
| **Changes:** | |
| **Add** | 183 |
| Delete | 120 |
| Move From | 11 |
| **Move To** | 11 |
| **Table Insert** | 0 |
| Table Delete | 4 |
| **Table moves to** | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 329 |