**Presentment Date and Time: November 3, 2017 at 11:00 a.m. (Eastern Time)**
**Objection Deadline: November 2, 2017 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): November 15, 2017 at 11:00 a.m. (Eastern Time)**

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY LLC**, *et al.*, | : | **Case No. 17-10751 (MEW)** |
| | : | |
| | : | |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

--------------------------------------------------------- x

## NOTICE OF PRESENTMENT OF APPLICATION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AUTHORITY TO EMPLOY AND RETAIN DELOITTE & TOUCHE LLP FOR ACCOUNTING ADVISORY SERVICES *NUNC PRO TUNC* TO JULY 17, 2017

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961). The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

**PLEASE TAKE NOTICE** that on **November 3, 2017** at **11:00 a.m. (Eastern Time)**, the undersigned will present the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte & Touche LLP for Accounting Advisory Services Nunc Pro Tunc to July 17, 2017* (the "**Application**") to the Honorable Michael E. Wiles, United States Bankruptcy Judge, in Room 617 of the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York, 10004 (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Application must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules, and shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and the *Order Pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No. 101] so as to be received no later than **November 2, 2017 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Application, the Debtors may, on or after the Objection Deadline,

submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed

to the Application, which order may be entered with no further notice or opportunity to be heard.

Dated: October 19, 2017
       New York, New York


                                        /s/  Robert J. Lemons
                                        Gary T. Holtzer
                                        Robert J. Lemons
                                        Garrett A. Fail
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        *Attorneys for Debtors
                                        and Debtors in Possession*

**Presentment Date and Time: November 3, 2017 at 11:00 a.m. (Eastern Time)**
**Objection Deadline: November 2, 2017 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): November 15, 2017 at 11:00 a.m. (Eastern Time)**

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY** | : | **Case No. 17-10751 (MEW)** |
| **LLC, *et al.*,** | : | |
| | : | |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| ------------------------------------------------------- x | | |

**APPLICATION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328,
FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1
FOR AUTHORITY TO EMPLOY AND RETAIN DELOITTE & TOUCHE LLP FOR
ACCOUNTING ADVISORY SERVICES *PRO TUNC* TO JULY 17, 2017**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

Westinghouse Electric Company LLC and certain debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this application (the "**Application**"):

## Background

1.      On March 29, 2017 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

2.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      On April 7, 2017, the United States Trustee for Region 2 appointed the Official Committee of Unsecured Creditors pursuant to section 1102 of the Bankruptcy Code.

4.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Lisa J. Donahue Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to and filed on the Petition Date [ECF No. 4].

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January

31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

6.     By this application, pursuant to sections 327(a) and 328 the Bankruptcy

Code, Rules 2014(a) and 2016 of the Bankruptcy Rules, and Rules 2014-1 and 2016-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Debtors

request authority to retain and employ Deloitte & Touche LLP ("**Deloitte & Touche**") to provide

internal audit co-sourcing services relating to the Debtors' Sarbanes Oxley ("**SOX**") readiness

activities, including performing certain procedures, in accordance with that certain work order,

dated August 11, 2017 (the "**SOX Work Order**"), a copy of which is annexed hereto as **Exhibit**

**A**,[2] *nunc pro tunc* to the July 17, 2017.

7.     In support of this Application, the Debtors submit the declaration of Travis

Wright, a managing director of Deloitte & Touche (the "**Wright Declaration**"), annexed hereto

as **Exhibit C**.

8.     A proposed form of order granting the relief requested herein on a final

basis is annexed hereto as **Exhibit D** (the "**Proposed Order**").

**Deloitte & Touche's Qualifications**

9.     The Debtors seek to employ and retain Deloitte & Touche, a public

accounting firm with offices across the United States, to provide certain services relating to the

Debtors' SOX readiness activities because of its extensive experience in providing accounting

services.  Such experience renders Deloitte & Touche well-qualified and able to provide services

---

[2] The SOX Work Order is issued under and pursuant to the terms of that certain master services agreement between
the Debtors and Deloitte LLP, an affiliate of Deloitte & Touche, dated as of April 28, 2011, as amended, for the
provision of professional services (the "**MSA**," together with the SOX Work Order, the "**Engagement**
**Agreement**"), a copy of which is annexed hereto as **Exhibit B**.

3

to the Debtors during the pendency of these chapter 11 cases (the "**Chapter 11 Cases**") in a cost-effective, efficient, and timely manner, and it is in the best interests of the Debtors' estates and creditors to employ and retain Deloitte & Touche to provide accounting advisory services to the Debtors.

### Services Provided by Deloitte & Touche

10.    Subject to the Court's approval of the Application, Deloitte & Touche has agreed to provide professional services to the Debtors pursuant to the terms and conditions of the SOX Work Order, as follows:

    a)    Entity Level Controls ("**ELCs**") and Planning:

        i)    performing an assessment of the existing entity-level risk and control framework.  The scope of this review will cover the Corporate/US Location for Westinghouse Electric Company LLC ("**WEC**"), Sweden, France and Springfield locations;

        ii)    assisting WEC with a mapping exercise of ELCs and providing a benchmarking assessment using the Committee of Sponsoring Organizations (COSO) 2013 framework;

        iii) assisting WEC with documentation procedures for ELCs, including walkthroughs, as well as providing recommendations for remediation on design gaps; and

        iv) performing testing procedures related to remediation efforts performed by WEC.

    b)    Project Management and Roadmap Strategy:

        i)    providing provide project management services for WEC, including regular status updates and progress reports; and

        ii)    assisting WEC with and providing documentation of a roadmap and strategy for execution of its SOX compliance program.

### Efforts to Avoid Duplication of Services

11.    The services performed by Deloitte & Touche are intended to complement, not unnecessarily duplicate or overlap with, other services performed by the

4

Debtors' other retained consultants and advisors in these Chapter 11 Cases.  As set forth in the Wright Declaration, Deloitte & Touche understands that the Debtors have retained and may retain additional professionals during the term of the SOX Work Order and will use its reasonable efforts to work cooperatively with the Debtors to avoid unnecessary duplication of services.

### Professional Compensation

12.     As set forth in the Wright Declaration, and subject to Court approval, the Debtors understand and have agreed that Deloitte & Touche will apply to the Court for allowances of compensation and reimbursement of expenses in accordance with General Order M-412 (Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals, dated December 21, 2010 (Gonzalez, C.J.)), Administrative Order M-447 (Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated January 29, 2013 (Morris, C.J.)), and the U.S. Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58) (collectively, the "**Fee Guidelines**"), the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the *Order Pursuant to 11 U.S.C. §§ 105(a), 330, 331, Fed R. Bankr. P. 2016, and Local Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 544] (the "**Interim Compensation Order**"), and any other applicable orders of the Court, both in connection with the Application and the interim and final fee applications to be filed by Deloitte & Touche in these Chapter 11 Cases, in accordance with the terms and conditions of the SOX Work Order.  Moreover, the Debtors are advised that Deloitte

5

& Touche intends to make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the Fee Guidelines.

13.    Subject to the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Fee Guidelines, the Debtors propose to compensate Deloitte & Touche in accordance with the its terms and conditions of employment, including the proposed compensation agreements as set forth in the SOX Work Order.

14.    Pursuant to the terms of the SOX Work Order, Deloitte & Touche agreed to charge the Debtors the applicable hourly billing rates by classification of personnel with respect to such services, set forth in the table below.

| Personnel Classification | Hourly Rates |
|---|---|
| Partner/Principal/Managing Director | $ 450 |
| Senior Manager | $ 340 |
| Manager | $ 300 |
| Senior Consultant | $ 260 |
| Consultant | $ 215 |
| Intern | $100 |

15.    Hourly rates are revised periodically in the ordinary course of Deloitte & Touche's business. Deloitte & Touche shall advise the Debtors of any new rates should it institute a rate-change during the Chapter 11 Cases. Such changes will be noted on the invoices for the first time period in which a revised rate becomes effective.

16.    In addition to the rates set forth above, the Debtors propose to reimburse Deloitte & Touche for all actual, reasonable and necessary expenses incurred by Deloitte & Touche in connection with the professional services performed, including, but not limited to, expenses incurred on account of travel and lodging, data processing and storage, and communications charges, courier services, and other similar expenses incurred on behalf of the Debtors.

6

17.     The Debtors are advised that Deloitte & Touche intends to file interim and final fee applications for the allowance of compensation for the services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any applicable orders of the Court, including the Interim Compensation Oder and the Order granting this application (to the extent compliance is not waived), and/or any guidelines issued by the Office of the U.S. Trustee.

18.     The Debtors are advised that Deloitte & Touche will maintain records in support of any fees incurred in connection with the services it performs in the Chapter 11 Cases by category and nature of the services rendered, and will provide reasonably detailed descriptions of those services rendered on behalf of the Debtors, the time expended in provided those services, and the individuals who provided professional services on behalf of the Debtors. Deloitte & Touche will present such records to the Court in its fee applications to the Court. Deloitte & Touche requests that the invoices, after appropriate review, be paid in a manner consistent with the payment of other retained professionals in this matter, subject to any administrative orders, if any, that would apply to interim payments.  The Debtors are advised that Deloitte & Touche understands that all payments rendered pursuant to Deloitte & Touche's retention by the Debtors must be approved by an order of this Court and based upon the filing by Deloitte & Touche of appropriate interim and final applications for allowance of compensation and reimbursement of expenses.

19.     The Debtors believe that the compensation terms contemplated by the SOX Work Order are reasonable and comparable to those generally charged by accounting services providers of similar stature to Deloitte & Touche for similar engagements.  The fee structure summarized above is similar to Deloitte & Touche's practices for comparable

7

engagements. Moreover, the fee structures are consistent with and typical of arrangements entered into by Deloitte & Touche and other firms rendering of comparable services to clients such as the Debtors. The Debtors submit that the compensation terms are fair and reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

20.     All compensation and expenses will be sought in accordance with section 330 of the Bankruptcy Code. The Debtors submit that the U.S. Trustee will retain the right to object to the compensation to be paid to Deloitte & Touche pursuant to the Engagement Agreements based on the reasonableness standard provided for in section 330 of the Bankruptcy Code; provided that reasonableness for this purpose shall include, among other things, an evaluation by comparing the fees payable in this case to the fees paid to other comparable firms for comparable services in other chapter 11 cases and outside of chapter 11 cases, and shall not be evaluated primarily on the basis of time committed or the length of these cases.

21.     Deloitte Financial Advisory Services LLP ("**Deloitte FAS**") and Deloitte Transaction and Business Analytics LLP ("**DTBA**"), both affiliates of Deloitte & Touche, provided prepetition services to the Debtors, and are providing post-petition services to the Debtors. *See Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328, Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Transactions and Business Analytics LLP as Valuation and Discovery Services Provider Nunc Pro Tunc to the Petition Date* [ECF No. 1128]; *see also Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328, Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Financial Advisory Services LLP as Financial Services Provider Nunc Pro Tunc to the Petition Date* [ECF No. 1129]. In the ninety (90) days prior to the Petition Date, the Debtors paid Deloitte FAS $2,291,566, including the

8

application of retainer amounts, and DTBA $628,399.  As of the Petition Date, no amounts were outstanding with respect to the invoices issued by DTBA, and $196,978 was outstanding with respect to the invoices issued and/or work performed by Deloitte FAS.  Deloitte FAS will not seek any recovery with respect to such invoiced amounts.

22.    Prior  to  the  Petition  Date,  Deloitte  Consulting  LLP  ("**Deloitte Consulting**") and Deloitte Tax LLP ("**Deloitte Tax**"), also affiliates of Deloitte & Touche, each provided certain professional services to the Debtors.  In the ninety (90) days prior to the Petition Date, the Debtors paid Deloitte Tax $9,022 for services performed.  The Debtors did not make any payments to Deloitte Consulting during this period.  As of the Petition Date, no amounts were outstanding with respect to the invoices issued by Deloitte Consulting.  As of the Petition Date, $3,119 was outstanding with respect to the invoice(s) issued by Deloitte Tax.

23.    Some  services  incidental  to  the  tasks  to  be  performed  by  Deloitte  & Touche in the Chapter 11 Cases may be performed by personnel now employed by or associated with affiliates of Deloitte & Touche, such as Deloitte FAS, DTBA, Deloitte Tax and Deloitte Consulting, and/or their respective subsidiaries, including subsidiaries located outside of the United States.

24.    The Debtors are advised that Deloitte & Touche has received no promises regarding compensation in the Chapter 11 Cases other than in accordance with the Bankruptcy Code and as set forth in this Declaration.  Deloitte & Touche has no agreement with any nonaffiliated or unrelated entity to share any compensation earned in the Chapter 11 Cases.

**Indemnification Provisions**

25.    As part of the overall compensation payable to Deloitte & Touche under the terms of the Engagement Agreement, the Debtors have agreed to certain indemnification and

contribution provisions set forth in the Engagement Agreement (the "**Indemnification Provisions**"), to the extent permitted by applicable law and as modified by the Proposed Order.

26.     The Terms of the Engagement Agreement and the Indemnification Provisions were fully negotiated at arm's length.  The Debtors respectfully submit that the Indemnification Provisions are reasonable and in the best interests of the Debtors, their estates and creditors.

27.     Moreover, consistent with the practice in this jurisdiction, the Debtors request, and Deloitte & Touche has agreed, that the Court approve the Indemnification Provision reflected in the Engagement Agreement subject to the modifications reflected in the Proposed Order.  The Debtors believe that the proposed modifications to the Indemnification Provisions of the Engagement Agreement are appropriate under the circumstances, consistent with recent orders entered in this jurisdiction, and should be approved.

**Deloitte & Touche's Disinterestedness**

28.     As set forth in the Wright Declaration, and upon review of its client database, Deloitte & Touche has learned that it has or has had a business relationship with certain creditors of the Debtors, as well as various other parties potentially adverse to the Debtors in matters unrelated to the Chapter 11 Cases.  However, Deloitte & Touche has represented to the Debtors that (a) neither Deloitte & Touche, nor any partner, principal, or managing Director of Deloitte & Touche that is anticipated to provide the services for which Deloitte & Touche is to be retained (the "**Engagement Partners/Principals/Managing Directors**") holds any interest adverse to the Debtors; and (b) Deloitte & Touche and the Engagement Partners/Principals/Managing Directors have no relationship to the Debtors, their significant creditors, certain other significant parties-in—interest, or to the attorneys that are known to be

assisting the Debtors in the Chapter 11 Cases, except as set forth in the Wright Declaration. Moreover, as of the Petition Date, no amounts were outstanding with respect to the invoices issued by Deloitte & Touche.

29.    Accordingly, to the best of the Debtors' knowledge and except to the extent disclosed herein and in the Wright Declaration:  (i) Deloitte & Touche is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code and does not hold or represent an interest adverse to the Debtors' estates; and (ii) Deloitte & Touche has no connection to the Debtors, their creditors, the U.S. Trustee, or any other party with a significant interest in the Debtors' cases or their attorneys or accountants except as may be disclosed in the Wright Declaration.  To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of the Debtors' retention are discovered or arise, Deloitte & Touche will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## **Basis for Relief Requested**

30.    The Debtors seek authority to employ and retain Deloitte & Touche for internal audit co-sourcing services relating to WEC's overall SOX readiness activities, including performing certain procedures, under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtor] in carrying out the [Debtor's] duties under this title."  11 U.S.C. § 327(a).

31.    The Debtors seek approval of the SOX Work Order (including the Indemnification Provisions) pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the

11

employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Accordingly, section 328 of the Bankruptcy Code permits the compensation of professionals, including valuation and discovery service providers, on flexible terms that reflect the nature of their services and market conditions.

32.    The compensation terms set forth in the SOX Work Order set forth reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The fee structures adequately reflect: (i) the nature of the services to be provided by Deloitte & Touche; and (ii) fee and expense structures and indemnification provisions typically utilized by Deloitte & Touche and other leading audit services providers. In addition, as noted above, Deloitte & Touche is "disinterested" and all of its fees and expenses are subject to approval of the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and any applicable law or further orders of the Court.

33.    Accordingly, the Debtors submit that the relief requested in the Application is in the best interests of their estates, creditors, and all parties-in-interest in these chapter 11 cases, and the Court should approve the employment and retention of Deloitte & Touche pursuant to the terms set forth in the SOX Work Order, *nunc pro tunc* to July 17, 2017.

## Notice

34.    Notice of this Application will be provided to the Rule 2002 Parties set forth in the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No. 101]. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

12

35.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order and such other and further relief as the Court may deem just and appropriate.

Dated: October 19, 2017
        New York, New York

WESTINGHOUSE ELECTRIC COMPANY, LLC
(for itself and on behalf of its affiliates
as Debtors and Debtors in Possession)

/s/ *Lisa J. Donahue*
NAME:  Lisa J. Donahue
TITLE:  Chief Transition and Development Officer

13

**<u>Exhibit A</u>**

**SOX Work Order**

## WORK ORDER

| Work Order Number: | WEC-01 | Authorized Start Date: August 2017 |
|---|---|---|

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC ("WEC") dated as of April 21st, 2011 (the "Agreement"), as amended.  For the purposes of this Work Order, Consultant shall be Deloitte & Touche LLP and for the purposes of Paragraph 7 of the Agreement, Consultant shall include Deloitte & Touche Products Company LLC.

**Consultant Services Description:**

The nature of the Services Consultant will provide to WEC are as follows:

- Consultant will provide Internal Audit cosourcing services relating to overall Sarbanes Oxley ("SOX") readiness activities.
- Consultant will report to the Director of Internal Audit and Risk Management, who has full responsibility in decision making and control over the Internal Audit function.


Consultant anticipates performing procedures in two (2) phases and Consultant's approach for this engagement is as follows:

- Phase I - Entity Level Controls (ELCs) and Planning

    - o Consultant will perform an assessment of the existing entity-level risk and control framework.  The scope of this review will cover the Corporate/US Location for WEC, Sweden, France and Springfield locations.

    - o Consultant will assist Internal Audit with a mapping exercise of ELCs and provide a benchmarking assessment using the Committee of Sponsoring Organizations (COSO) 2013 framework.

    - o Consultant will assist with documentation procedures for ELCs, including walkthroughs, as well as provide recommendations for remediation on design gaps.

    - o Consultant will perform testing procedures to evaluate remediation efforts performed by WEC.


- Phase II – Project Management and Roadmap Strategy

    - o Consultant will provide project management services for WEC.  During the course of the engagement, Consultant will provide WEC with regular status updates and progress reports.

    - o Consultant will assist Internal Audit and provide documentation of a roadmap and strategy for execution of SOX compliance program.


Assumptions for this engagement include:

The Services will be performed in accordance with the Statement on Standards for Consulting Services issued by the American Institute of Certified Public Accountants (AICPA). Consultant will provide Consultant's observations, advice, and recommendations.  However, Consultant's services will not

constitute an engagement to provide audit, compilation, review, or attestation services as described in the pronouncements on professional standards issued by the AICPA, and, therefore, Consultant will not express an opinion or any other form of assurance with respect to WEC's system of internal control over financial reporting or its compliance with laws, regulations, or other matters.

Consultant will not perform any management functions, make management decisions, or perform in a capacity equivalent to that of an employee of WEC.

The services provided under this engagement letter should not be used as the basis for any management assertions in connection with the Sarbanes-Oxley Act.  Consultant will make no representations or warranties nor provide any assurances that (1) WEC's disclosure controls and procedures and the internal control and procedures for financial reporting are compliant with the certification requirement and internal control reporting requirement of the Sarbanes-Oxley Act, or (2) WEC's plans are sufficient to address and correct any shortcomings that would prohibit WEC from making the required certification or from reporting under the Sarbanes-Oxley Act.  In addition, Consultant will not be providing any legal advice or conducting a legal review of any of WEC's documents, records, or policies.

WEC acknowledges and agrees that Consultant will not be responsible for the accuracy or completeness of any data made available to Consultant through any third-party tool, database, or software application.  WEC further acknowledges and agrees that Consultant will have no responsibility for evaluating the functionality of such third-party tool, database, or software application, nor for any results obtained by Consultant through the use of such third-party tool, database, or software application.

## LIMITATIONS OF AN ENTITY'S INTERNAL CONTROL

Internal control, no matter how well designed and operated, can provide only reasonable assurance of achieving an entity's control objectives.  The likelihood of achievement is affected by limitations inherent to internal control.  These include the realities that human judgment in decision-making can be faulty and that breakdowns in internal control can occur because of human failures such as simple errors or mistakes.  Additionally, controls, whether manual or automated, can be circumvented by the collusion of two or more people or inappropriate management override of internal control.

Consultant has structured the following Engagement Team for the performance of the Services:

- Travis Wright, Deloitte & Touche LLP Managing Director, will participate as Engagement Leader, maintaining overall responsibility for the engagement on behalf of the Consultant.

- Matt Polachek and Jonathan Sullivan, and Sarah Gallo, Deloitte & Touche LLP Managers, will coordinate daily management of this engagement.

Additional support may also be provided by other professionals of Consultant and Consultant's affiliates who will be identified during this engagement.

**Estimated Timing of Services and Deliverables:**

During the engagement, the following project deliverables will be provided to WEC**:**

- Phase I - ELC Control Mapping for the existing control environment in regards to the COSO 2013 principles and points of focus, highlighting the recommended action plan or control gaps for WEC Management's consideration.

- o  Timing – Documentation Review to be completed in August 2017; Walkthroughs to be completed in August and September 2017.


- Phase II – Weekly Status and Progress Reports and overall Roadmap Strategy document for SOX compliance program.
  - o  Timing - Ongoing


**Fees and Expenses:**

Consultant's professional service fees for performing the Services will be billed based on the actual hours incurred at the hourly rates in the table below:

| Resource Level | Hourly Rate |
|---|---|
| **Principal, Managing Director** | *$450* |
| **Senior Manager** | *$340* |
| **Manager** | *$300* |
| **Senior Consultant** | *$260* |
| **Consultant** | *$215* |
| **Intern** | *$100* |

Such rates recognize the experience and special skills of the applicable personnel as well as the complexity of the Services.

Fees for this engagement will be billed biweekly as the work progresses for fees accrued and expenses incurred by us since Consultant's last invoice in performing Consultant's Services.

Consultant estimates hours and fees for this project to be as follows:

| Phase | Hours Estimates | Fee Estimates |
|---|---|---|
| **Phase 1 – ELC / Planning** | *350 – 400* | *$75,000 – $90,000* |
| **Phase 2 – Project Management** | *100 – 150* | *$25,000 – $40,000* |

The proposed hourly rates are based upon Consultant's current understanding of the project requirements, Consultant's roles and responsibilities, any assumptions set forth in the Agreement, and active participation of WEC's management and other personnel, as described in this SOW. Based on Consultant's experience, issues sometimes arise that require procedures beyond what was initially anticipated. If this should occur, Consultant will discuss it with you prior to performing any additional work.

Consultant understands that you will reimburse us for all reasonable expenses incurred in performing Consultant's Services on this engagement (including, but not limited to, Consultant's reasonable travel, meals, lodging, and mileage expenses).

The hourly rates set forth herein are based upon Consultant's current understanding of the engagement requirements, Consultant's roles and responsibilities, any assumptions set forth herein, and active participation of WEC's management and other personnel, as described in this engagement letter. Based on Consultant's experience, issues sometimes arise that require procedures beyond what was initially anticipated. If this should occur, Consultant will discuss it with you prior to performing any additional work.

This engagement is expected to start during August 2017.

**Client Responsibilities:**

WEC acknowledges and agrees to the following:

- Substantial and meaningful involvement of WEC's Director of Internal Audit and Risk Management in confirming the scope and general objectives of the Services to be performed by Advisor and providing oversight for the Services (for example, reviewing and approving deliverables, including drafts, in a timely manner) is critical to the success of this engagement

- WEC is, and will continue to be, solely responsible for establishing and maintaining an effective system of internal control over financial reporting, including, without limitation, systems designed to assure achievement of its control objectives and its compliance with applicable laws and regulations.  WEC is responsible for the results of this engagement, including the final assessment of control weaknesses, and any other deliverables resulting from this engagement.

- Management is responsible for communicating in a timely manner to WEC's independent accountants and the Audit Committee of WEC's Board of Directors all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect WEC's ability to record, process, summarize, or report financial information, and any fraud, whether or not material, that involves management or other employees who have a significant role in WEC's internal control over financial reporting. In addition, Advisor's personnel performing the Services may communicate directly to WEC's independent accountants such findings and information that have been previously communicated to the management of WEC.

**Other Terms (including changes in provisions of the Agreement):**

(1)    Applies The parties hereby elect whether the indemnification provision set forth in Section 13 (a) (ii) of the Agreement applies to this Work Order:

Yes    ☒

No     ☐

**WESTINGHOUSE ELECTRIC COMPANY LLC**          **DELOITTE & TOUCHE LLP**

By: _Timothy J Baird (signature)_          By: _Travis Wright (signature)_

Name: _TIMOTHY J. BAIRD_          Name: _Travis Wright_

Title: _DIRECTOR, INTERNAL AUDIT_          Title: __Managing Director_

Date: _8/11/2017_          Date: __August 10, 2017_

          Address: 2600 One PPG Place

                    Pittsburgh, PA  15222

## **Exhibit B**

**Master Services Agreement**

AMENDMENT NO. 2
TO
MASTER SERVICES AGREEMENT
BETWEEN
DELOITTE LLP
AND
WESTINGHOUSE ELECTRIC COMPANY LLC

This Amendment No. 2 (this "Amendment") is made and entered into as of the 14th day of June, 2017, between Deloitte LLP ("DLLP"), for and on behalf of its subsidiaries, and Westinghouse Electric Company LLC ("Westinghouse").

WHEREAS, DLLP and Westinghouse have entered into a Master Services Agreement, dated April 28, 2011 (the "Agreement"), for the performance of services by function-specific subsidiaries of DLLP on a statement of work basis;

WHEREAS, on April 3, 2014, DLLP and Westinghouse amended the Agreement pursuant to the Agreement's terms to extend the Agreement's expiration date from April 28, 2014 to April 28, 2017;

WHEREAS, the parties seek to further extend the expiration date of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, DLLP and Westinghouse hereby agree to amend the Agreement, effective as of the date hereof, as follows:

1.    Section 6(a) of the Agreement, is hereby amended and restated in its entirety as follows:

"a)    This Agreement shall commence on April 28, 2011 and, unless terminated sooner in accordance with its terms, shall terminate on April 28, 2020."

Except as expressly amended herein, the Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, DLLP (for an on behalf of its subsidiaries) and Westinghouse have signed this Amendment as of the day and year written above.

DELOITTE LLP                        WESTINGHOUSE ELECTRIC COMPANY LLC


By: _____      By: _____
    Name: Glenn J. Yauch                  Name: Timothy J. Baird
    Title:  Principal                     Title: Director Internal Audit & Risk Management

AMENDMENT NO. 1
TO
MASTER SERVICES AGREEMENT
BETWEEN
DELOITTE LLP
AND
WESTINGHOUSE ELECTRIC COMPANY LLC

This Amendment No. 1 (this "Amendment") is made and entered into as of the 3rd day of April, 2014, between Deloitte LLP ("Deloitte U.S."), for an on behalf of its subsidiaries, and Westinghouse Electric Company LLC ("Westinghouse").

WHEREAS, Deloitte U.S. and Westinghouse have entered into a Master Services Agreement, dated April 28, 2011 (the "Agreement"), for the performance of services by function-specific subsidiaries of Deloitte U.S. on a statement of work basis;

WHEREAS, the Agreement shall expire pursuant to its terms on April 28, 2014; and

WHEREAS, the parties seek to amend the expiration date of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Deloitte U.S. and Westinghouse hereby agree to amend the Agreement, effective the date hereof, as follows:

1.    Section 6(a) of the Agreement, is hereby amended and restated in its entirety as follows:

"a)    This Agreement shall commence on April 28, 2011 and, unless terminated sooner in accordance with its terms, shall terminate on April 28, 2017."

Except as expressly amended herein, the Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Deloitte U.S. (for an on behalf of its subsidiaries) and Westinghouse have signed this Amendment as of the day and year written above.

DELOITTE LLP                          WESTINGHOUSE ELECTRIC COMPANY LLC

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

## MASTER SERVICES AGREEMENT

**THIS AGREEMENT** is made and entered into as of the 28th day of April, 2011, by and between Deloitte LLP, a limited liability partnership registered under the laws of the State of Delaware ("Deloitte U.S."), for and on behalf of its function-specific subsidiaries, including, without limitation, Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte Tax LLP and Deloitte Financial Advisory Services LLP, and Westinghouse Electric Company LLC, a limited liability company organized under the laws of the State of Delaware ("Client").

### WITNESSETH:

**WHEREAS,** Client desires to engage one or more function-specific subsidiaries of Deloitte U.S. to provide certain professional services; and

**WHEREAS,** one or more function-specific subsidiaries of Deloitte U.S. are willing to provide certain professional services to assist Client; and

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual promises contained herein, the parties agree as follows:

1.  **Engagement**.

    a)  Client understands and agrees that Deloitte U.S. is not a provider of professional services under this Agreement and that Work Orders (as hereinafter defined) will be executed by the Deloitte U.S. function-specific subsidiary having primary responsibility for performance of the requested services. As used herein, the term "Consultant" shall mean the Deloitte U.S. function-specific subsidiary that has executed the pertinent Work Order. For purposes of this Agreement, "Client" shall mean Westinghouse Electric Company LLC and its subsidiaries and Client Affiliates. Westinghouse Electric Company LLC represents that it has the power and authority to execute this Agreement and each Work Order (as defined herein) on behalf of, and to bind, itself and its subsidiaries and Client Affiliates. Client hereby engages Consultant, and Consultant hereby accepts the engagement, to provide professional services as further described in a Work Order issued pursuant hereto and on the terms and conditions set forth herein. No audit, review, compilation or attest services as described in the pronouncements on professional standards issued by the American Institute of Certified Public Accountants or any successor standard setting organization shall be performed under this Agreement. Consultant shall not provide advice regarding the financial accounting treatment of any transaction implemented from the services provided under a Work Order and will not assume any responsibility for any financial reporting with respect to such services.

    b)  For purposes of this Agreement, the following definitions apply:

        (i)  "Affiliates" shall mean any person or entity that controls, is controlled by, or is under common control with, such person or entity.

        (ii)  "Client Affiliates" shall mean Westinghouse Electric UK Limited, and each of its subsidiaries.

1

(iii)    "Related Entities" shall mean the member firms of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and the Affiliates of such member firms.

2.    **Services**.

a)    From time to time during the term of this Agreement as Client, in its sole discretion, determines that it requires professional services, Client shall request such services from Consultant pursuant to and in accordance with separate purchase orders, the content of which shall be substantially as set forth in Exhibit A annexed hereto and made a part hereof (herein referred to as the "Work Order"). In addition, any pre-printed terms in such purchase orders shall be superseded by the terms of this Agreement. Consultant, in its sole discretion, may agree to provide such services. Once executed by Consultant and Client, such Work Order shall be binding upon the parties thereto. Each Work Order shall specifically reference this Agreement and shall specify the details of the particular services to be performed under the Work Order (the "Services"). All rights and obligations of Consultant and Client hereunder shall be deemed to apply to such Work Order as if fully set forth therein. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of any Work Order, the terms of the Work Order shall control, provided, that, such term in such Work Order clearly sets forth the parties intent to modify a specific term of this Agreement. In the event such clarification is not set forth in such Work Order, this Agreement shall control any such conflict.

b)    Consultant and Client expressly acknowledge and agree that the Work Orders are based on understandings and expectations that apply at the time such Work Orders are executed and that, except as specifically set forth in the applicable Work Order, the specific start and stop dates contained in the Work Orders are not firm performance dates, are expected to be revised during the term of any engagement, and are only to be regarded as estimated beginning and completion dates for the tasks and activities as of the date of the Work Orders. Nonetheless, Consultant agrees to use diligent efforts to meet such dates. Except where a Work Order provides for firm performance dates (but subject in such case to Section 11 below), if Consultant utilizes diligent efforts but is unable to meet such dates, it shall not be considered to have defaulted in its obligations hereunder. Consultant agrees to notify Client promptly in writing if it expects or encounters significant delays in completing its Services.

c)    It is understood and agreed that the Services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. In connection with the performance of the Services, Consultant shall be entitled to rely on all decisions and approvals of Client.

3.    **Compensation**. For the Services provided by Consultant with respect to any Work Order, Client shall compensate Consultant in accordance with the terms of such Work Order.

4.    **Expenses**.

a)  Client shall reimburse Consultant for all reasonable expenses described in the applicable Work Order incurred by Consultant in performing the Services (including, without limitation, all reasonable travel, meal, lodging, and mileage expenses) in accordance with Consultant's standard policies as they exist from time to time. Client shall be responsible for all taxes imposed on the Services or on the transaction, other than Consultant's income taxes imposed on a net basis or by employment withholding, and other than taxes imposed on Consultant's property.

b)  Client acknowledges that temporary living reimbursements to Consultant's personnel may be deemed compensatory under federal, state, and local tax laws if such personnel's assignment in a particular location will exceed or has exceeded one year.  The parties shall cooperate in good faith to limit the duration of a person's assignment in a particular location to less than one year.  If Client's requirements are such that it becomes necessary for a person's services in a particular location to continue for a year or more and, as a result, such person's living expenses are deemed compensatory for tax purposes, then Client shall pay Consultant the amount of additional compensation provided to Consultant's personnel to compensate for taxes imposed therefor as reflected on a corresponding invoice.

5.  **Payment of Invoices**.

a)  Consultant's invoices shall be due net forty-five (45) days after the date of Client's receipt of an accurate and substantiated invoice.  Except as otherwise provided in any Work Order, Consultant shall invoice Client following the end of each monthly period for fees accrued and expenses incurred by Consultant in performing the Services under such Work Order.  Without limiting its rights or remedies, Consultant shall have the right to halt or terminate the performance of Services under a Work Order if payment for undisputed invoices for such Work Order is not received within sixty (60) days of the invoice date; provided, that, Consultant has provided Client with written notice of such failure, and Client has failed to cure such non-payment within fifteen (15) days of receiving such additional written notice. With respect to any invoices under a Work Order that Client disputes in good faith, Consultant agrees to continue performing Services under such Work Order while the parties seek to resolve such dispute in accordance with the dispute resolution procedure set forth in Section 5(b) hereof.

b)  With respect to any disputed invoice, Client shall provide Consultant with written notice of any good faith dispute within fifteen (15) days after Client received the invoice subject to such dispute.  The parties agree to immediately escalate such dispute to Consultant's lead engagement partner or principal for such Work Order and Client's business sponsor for such Work Order.  If such dispute is not resolved to the mutual satisfaction of the parties, the parties agree to further escalate such dispute to a senior partner or principal of Consultant and the Vice President of Finance of Client.  If the parties fail to resolve such dispute within seventy-five (75) days after Client received the invoice subject to such dispute, then Consultant shall have the right to halt or terminate such Services.

6.    **Term**.

   a)    This Agreement shall commence on the date hereof and, unless sooner terminated in accordance with its terms, shall terminate on the third anniversary of the date hereof.

   b)    This Agreement may be terminated by either party at any time upon giving written notice to the other party not less than thirty (30) days before the effective date of termination; provided, however, that this Agreement shall continue to apply to all Work Orders that are in existence at the effective date of such termination and under which the Services have not been completed or otherwise terminated. Any Work Order may be terminated by Client at any time with or without cause, or by Consultant with cause, in either case by giving written notice to the other not less than thirty (30) days before the effective date of termination; provided that in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. In addition, Consultant may terminate any Work Order or performance of any part of the Services, if it determines that (i) a governmental, regulatory or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board or the Securities and Exchange Commission) or entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation or decision the result of which would render Consultant's performance of any part of the Services illegal or otherwise unlawful or in conflict with independence or professional rules, or (ii) circumstances change such that an attest client of Deloitte & Touche LLP or an affiliate of such attest client owns, directly or indirectly, 20% or more of the voting stock of Client or any of its affiliates. If any Work Order is terminated pursuant to this Paragraph 6(b), this Agreement shall continue to apply to all Work Orders that have not been terminated.

   c)    The obligations of Consultant and Client that have been incurred prior to the effective date of termination (including, without limitation, the obligations of Client under Paragraphs 3 and 4 hereof) shall continue in full force and effect notwithstanding the expiration or termination of this Agreement or any Work Order and whether or not an invoice has been rendered with respect thereto.

7.    **Ownership**. Upon full and final payment to Consultant under a Work Order, and subject to all other terms and conditions herein, Consultant hereby grants Client a royalty-free, fully paid-up, non-exclusive license to use, have used for the benefit of Client, modify, copy, create derivative works and distribute the works of authorship, materials, information and other intellectual property delivered to Client pursuant to the Work Order (the "Deliverables"). To the extent a Deliverable being licensed to Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such license is provided by Consultant as agent for Deloitte Consulting Product Services LLC (in the case of Work Orders executed by Deloitte Consulting LLP) or Deloitte & Touche Products Company LLC (in the case of Work Orders executed by Deloitte & Touche LLP) or Deloitte Tax Products Company LLC (in the case of Work Orders executed by Deloitte Tax LLP) or Deloitte FAS Products Company LLC (in the case of Work Orders executed by Deloitte Financial Advisory Services LLP), on the terms and conditions herein. The license grant in this Paragraph 7 does not apply to any software, documentation or products that are subject to a separate license agreement between Client and any third party, including, without limitation,

Deloitte Consulting Products Services LLC, Deloitte & Touche Products Company LLC, Deloitte Tax Products Company LLC and Deloitte FAS Products Company LLC.

8.  **Limitation on Warranties and Actions**.

a)  Consultant represents and warrants that it shall perform the Services in good faith, in a professional manner, with knowledge and judgment, in accordance with applicable professional standards, and shall be in compliance in all material respects with all requirements of the Work Order.    EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SETION 8(a) OR FOR ANY ADDITIONAL WARRANTIES IN A WORK ORDER (PROVIDED THAT ANY SUCH WARRANTY IS SPECIFICALLY IDENTIFIED AS A WARRANTY IN SUCH WORK ORDER), CONSULTANT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR CONSULTANT, UPON RECEIPT OF WRITTEN NOTICE, TO, AT CLIENT'S OPTION, EITHER (I) USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY SUCH CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH, OR (II) RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.

b)  No action, regardless of form, arising under or relating to this Agreement, any Work Order or the Services may be brought more than one year after Client becomes aware (or should have become aware) of the cause of action giving rise to the claim, except that an action for nonpayment may be brought not later than one year following the date of the last payment due to the entity bringing the action.

9.  **Limitation on Damages**. Client and Consultant agree that neither party, nor their Affiliates, subcontractors, nor their respective personnel shall be liable to the other party for any claims, liabilities, or expenses relating to this Agreement, any Work Order, or the Services under any Work Order ("Claims") for an aggregate amount in excess of (a) in the case of Consultant's liability to Client, the fees paid by Client to Consultant under such Work Order, or (b) in the case of Client's liability to Consultant, the amounts paid and payable to Consultant under such Work Order; except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the other party (the "Indemnitee") for any such Claim under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for such Claim.  In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, or incidental loss, damage, or expense relating to this Agreement, any Work Order, or the Services, except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the Indemnitee for any such loss, damage, or expense under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for

such loss, damage, or expense.    In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any punitive or exemplary damages relating to this Agreement, any Work Order, or the Services.    In circumstances where all or any portion of the provisions of this Paragraph are judicially determined to be unavailable or unenforceable, the aggregate liability of either party, its Affiliates, subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that their conduct bears to all other conduct giving rise to such Claim.

10. **Client Responsibilities**.

    a)    In addition to Client's responsibilities as set forth in a Work Order, as a condition to Consultant's performance of the Services, Client shall cooperate with Consultant in the performance by Consultant of the Services, including, without limitation, (i) providing Consultant with adequate working space, equipment and facilities and timely access to data, information, and personnel of Client, (ii) providing qualified personnel having appropriate skills to perform their assigned tasks and duties; (iii) providing a suitable infrastructure environment which will support the Services and allow Consultant and Client to work productively; and (iv) promptly notifying Consultant of any issues, concerns or disputes with respect to the Services.

    b)    Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Consultant for purposes of the performance of the Services.

    c)    Client acknowledges and agrees that Consultant's performance is dependent on Client's timely and effective satisfaction of Client's responsibilities under this Agreement and any Work Order and timely decisions and approvals of Client in connection with the Services.

    d)    Client shall be solely responsible for: (i) making all management decisions and performing all management functions; (ii) designating a competent management member to oversee the Services; (iii) evaluating the adequacy and results of the Services; and (iv) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

11. **Force Majeure**.  Neither party shall be liable for any delays or nonperformance resulting directly or indirectly from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel, and agents); acts or omissions or the failure to cooperate by any third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

12. **Confidentiality and Internal Use.**

    a)    To the extent that, in connection with this Agreement or any Work Order, either Consultant or Client (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the

disclosing party's consent.  The disclosing party hereby consents to the receiving party disclosing applicable and appropriate information (i) to subcontractors, whether located within or outside of the United States, that are providing services specific to a Work Order and that have agreed to be bound by confidentiality obligations similar to those in this Paragraph 12(a), (ii) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining to this Agreement or any Work Order; provided, that, to the extent permitted by applicable law or regulation, the receiving party provides the disclosing party with prompt written notice of such requirement and, to the extent practical, the disclosing party has been given a prior opportunity to seek a protective order, or (iii) to the extent such information (A) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency on an unrestricted basis and available to the public) other than as the result of a disclosure in breach hereof, (B) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party which the receiving party believes is not prohibited from so disclosing such information to the receiving party by obligation to the disclosing party, (C) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (D) is developed by the receiving party independent of any disclosures of such information made by the disclosing party to the receiving party.  The receiving party shall carry out its obligations under this Paragraph 12(a) using at least the same degree of care as it employs in maintaining in confidence its own proprietary and confidential information, but in no event less than a reasonable degree of care.  Nothing in this Paragraph 12(a) shall alter Client's obligations under Paragraph 12(b).  Notwithstanding anything to the contrary herein, Client acknowledges that Consultant, in connection with performing the Services, may develop or acquire experience, skills, and ideas that are retained in the unaided memory of its personnel.  Client acknowledges and agrees that Consultant may use and disclose such experience, skills, and ideas.

b)    Client agrees that (i) all Services and Deliverables shall be solely for Client's internal use, and are not intended to be and should not be used by any person or entity other than Client, and (ii) except as otherwise provided in a Work Order, the Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to the Services or Deliverables be made to, any person or entity without Consultant's prior written consent other than (i) Client, or (ii) Toshiba Corporation and its Affiliates provided, that, such entities agree to comply with the restrictions on disclosure set forth in this paragraph.

c)    Tax Services Provisions

(i)    Notwithstanding anything to the contrary in this Agreement or any Work Order, the provisions of this Paragraph 12 regarding confidentiality and internal use will not apply to the tax treatment and tax structure (as defined in Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance) of any transaction, tax services or Deliverables (collectively referred to as "Subject Tax Planning Advice"), if any, provided to Client by Consultant under any Work Order.  Nothing in this Paragraph 12 shall be construed as limiting or restricting disclosure of the Subject Tax Planning Advice or any tax feature thereof for purposes of Rule 3501(c)(i) of PCAOB Release 2005-014

and Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance. The Client acknowledges that none of its other advisors have imposed or will impose any conditions of confidentiality with respect to any Subject Tax Planning Advice. All Services and Deliverables shall be solely for Client's informational purposes and internal use and neither this Agreement nor any Work Order shall create privity between Consultant and any person or party other than Client ("third party"). Neither the Services nor any Deliverables are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose, on the advice, opinions, reports, or other Services or Deliverables of Consultant. In the event of any unauthorized reliance, Client agrees to indemnify and hold harmless Consultant, its Affiliates, subcontractors and their respective personnel from all third-party claims, liabilities, costs and expenses.

(ii) Certain Tax Disclosures and Reporting. In accordance with IRC sections 6111 and 6112 Contractor may be required to report to the IRS or certain state tax authorities the tax Services including without limitation any related tax transaction(s) described in the applicable Work Order as well as Client's participation therein. In addition, separate and apart from any reporting by Consultant, Client, in accordance with IRC section 6011, may also be required to disclose to a taxing authority its participation in one or more transactions which are the subject of the applicable Work Order. The determination of whether, when and to what extent Consultant and Client should comply with their respective federal or state "tax shelter" reporting requirements will be made exclusively and respectively by Consultant and Client. Consultant and Client further agree that (i) any liability for fines or penalties or any other consequences resulting from non-compliance by one party with applicable tax disclosure or reporting rules will be borne or incurred exclusively by the non-compliant party, and (ii) any request by Client of Consultant for services in identifying or otherwise consulting on transactions subject to IRC section 6011 or corresponding state law and the reporting or disclosing thereof will be the subject of a separate Work Order.

(iii) Accountant / Client Privilege – IRC §7525. Client should be aware that certain information discussed with personnel of Consultant who are Federally Authorized Tax Practitioners or their agents for the purpose of obtaining Consultant's advice on tax matters may be privileged from disclosure in any non-criminal tax matters before the Internal Revenue Service and in non-criminal proceedings in Federal court that stem from matters before the Internal Revenue Service, if the United States is a party to the proceedings. Client is solely responsible for managing the recognition, establishment and maintenance of the confidentiality privilege and Client must notify Consultant if Client wishes to invoke the confidentiality privilege and Consultant will cooperate with Client's reasonable instructions relating to the confidentiality privilege. Circumstances may arise under which Client may wish to divulge or have Consultant divulge privileged information to other parties. Client should be aware that such disclosure might result in a waiver of the confidentiality privilege. Accordingly, if Client wishes Consultant to divulge such information, Consultant shall require Client to provide Consultant in advance with written authority to make such disclosures. In addition, if it is ultimately determined

that a significant purpose of the tax matter was to avoid or evade any U.S. federal income tax, Client should be aware that the confidentiality privilege under §7525 of the Internal Revenue Code will not apply to any communications between Client and Consultant.

In the event that Consultant receives a request from a third party (including a subpoena, summons or discovery demand in litigation) calling for the production of privileged information, Consultant will promptly notify Client and will follow Client's reasonable instructions regarding any third party requests or needs for such material before Consultant would disclose same as may be required under applicable law or rules. Client agrees to hold Consultant, its Affiliates, subcontractors, and their respective personnel harmless from and also assumes responsibility for any expenses (including attorney's fees, court costs, costs incurred by outside advisors and any other cost imposed whether by way of penalty or otherwise) incurred by Consultant as a result of Client's assertion of the confidentiality privilege or Client's direction to Consultant to assert the confidentiality privilege on behalf of Client.

13.  **Indemnification and Insurance.**

a)  (i)  Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims attributable to claims of third parties to the extent arising out of Client's breach of this Agreement.

(ii)  If specifically agreed upon in a Work Order, Client shall provide the following indemnity:

Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims arising from the Client's disclosure of the Services or Deliverables (other than any Subject Tax Planning Advice) to any third party.

b)  Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties solely for bodily injury, death or damage to real or tangible personal property, to the extent caused by the negligence or intentional misconduct of Consultant in connection with this Agreement or any Work Order.

c)  Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties arising out of infringement by the Deliverables of any patent or copyright or any unauthorized use of any trade secret or trademark, except to the extent that such infringement or unauthorized use arises from (i) Client's modification of the Deliverables or use thereof in a manner not contemplated by this Agreement or the applicable Work Order, (ii) the failure of Client to use any corrections or modifications made available by Consultant, (iii) information, materials, instructions or specifications provided by or on behalf of Client, (iv) Client's distribution, marketing or use for the benefit of third parties of the Deliverables, or (v) the use of the Deliverable in combination with any product or data not provided by Consultant whether or not with Consultant's consent, where such combination gives rise to the claim of

infringement. If any such Deliverable, or any portion thereof, becomes, or in Consultant's reasonable judgment, is likely to become the subject of a claim based upon infringement or unauthorized use, or if any such Deliverable or any portion thereof, is found by final, non-appealable order of a court of competent jurisdiction to be such an infringement or unauthorized use, Consultant, at its option and expense, shall have the right to (i) procure for Client the continued use of such Deliverable, (ii) replace or modify such Deliverable provided that the replacement or modified Deliverable is reasonably capable of performing substantially the same function, or (iii) require Client to cease use of such Deliverable and refund an appropriate portion of the fee paid with respect to the affected Deliverable. The foregoing provisions of this paragraph constitute the sole and exclusive remedy of Client, and the sole and exclusive obligation of Consultant, relating to a claim that Consultant's Deliverable infringes any patent or copyright or makes unauthorized use of any trade secret or trademark of a third party.

d)    Insurance

Consultant shall, during the performance of Services and the warranty period therefor, maintain insurance of the types and minimum amounts set forth below. Maintenance of insurance shall not limit Consultant's liability for loss or damage in excess of policy limits or outside of policy coverage.

| Type of Coverage | Minimum Amount of Coverage |
|---|---|
| Worker's Compensation | As required by law |
| Employer's Liability | $100,000 for each person/disease/aggregate |
| Motor Vehicle Liability (covering owned, leased and non-owned vehicle) | $1,000,000 combined single limit |
| Commercial General Liability, including:<br><br>• Premises/Operations<br>• Underground<br>• Explosion & Collapse Hazard<br>• Products/Completed Operations<br>• Broad Form Property Damage<br>• Blanket Contractual Liability Coverage | $1,000,000 per occurrence /$2,000,000 aggregate |
| Product Liability (may be included in Commercial General Liability) | $2,000,000 aggregate |
| Property (if Consultant has care, custody or control of Client property) | Replacement Value |

10

Consultant shall upon Client's request provide a certificate evidencing the required insurance.

**14.  Approval of Services and Deliverables.**

a)  All Services shall be deemed accepted by Client if not rejected (or if notice of non-acceptance is not given) in writing, within thirty (30) days of complete of performance under any Work Order.  If, during the term hereof, Client believes that there is a breach of the warranty in Paragraph 8(a) hereof, Client will notify Consultant, in writing, within thirty (30) days of becoming aware of the claimed breach, setting forth the nature of such claimed breach.  Consultant shall promptly investigate such claim of breach and advise Client of Consultant's planned corrective action, if any.  In addition, the provisions of Paragraphs 14(b) through 14(j) shall apply with respect to Work Orders for information technology-related Services.

b)  All Deliverables prepared by Consultant shall have the written approval of Client's project director or his or her written designee that such Deliverables comply in all material respects with the requirements of the relevant Work Order, which approval shall not be unreasonably withheld.

c)  Client shall complete its review of a Deliverable in not more than the number of business days that is specified in the Work Order for Client review of such Deliverable.  If not specifically identified in the Work Order, then the number of business days for any Client review of a Deliverable shall be no more than ten (10) business days.  Client shall provide Consultant (i) with approval of the Deliverable or (ii) with a written statement, as provided below, of the deficiencies preventing approval.  Such business days shall be counted from and include the first business day following the delivery of the Deliverable to Client.

d)  Client's review and approval of Deliverables shall be solely for the purpose of determining compliance in all material respects with the applicable acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, format or style of the Deliverables or the incorporation at that time of additional ideas or functionality.  Approval shall be granted if the Deliverable conforms in all material respects to the applicable acceptance criteria set forth in the Work Order. In the event of Client's rejection of a Deliverable (or Client's notice that it is not accepting a Deliverable), Client shall provide a complete and written statement which identifies in reasonable detail, with references to the applicable acceptance criteria in the Work Order, all deficiencies.  Deliverables requiring only minor or cosmetic corrections and not requiring extensive re-review by Client and for which corrections have been made by Consultant within specified times will be deemed approved.

e)  Consultant shall have thirty (30) business days to complete all such corrective actions or changes in order for such Deliverable to conform in all material respects with the requirements therefor set forth in this Agreement or in the applicable Work Order.  The count of such business days shall begin on the first business day following Consultant's receipt of the written statement of required corrective actions or changes as set forth in subparagraph (c) of this Paragraph.

f)   Client shall have ten (10) business days to complete a review of the corrective actions or changes made to the Deliverable in response to Client's written statement of deficiencies as set forth in subparagraph (c) of this Paragraph and notify Consultant in writing of acceptance or rejection (or non-acceptance). The count of such days shall begin on the first business day after Client receives the corrected or changed Deliverable from Consultant. Client's review and approval of such corrected or changed Deliverable shall be solely for the purpose of determining that corrections have been made to bring the Deliverables into compliance in all material respects with the acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, for format, style or the incorporation of additional ideas or functionality.

g)   Client and Consultant may mutually agree to extend the period of time allotted for any review, correction or change under this Paragraph. Any such extension of time shall extend the schedule for subsequent Deliverables by a corresponding amount.

h)   Notwithstanding the provisions of Paragraphs 14(b) through 14(g), approval of a Deliverable shall be deemed given by Client if Client has not delivered to Consultant a notice of deficiencies in writing for such Deliverable prior to the expiration of any period for Client review thereof as set forth in this Paragraph, or if Client uses the Deliverable in production. Notwithstanding the foregoing provisions of this Paragraph, approval of corrective actions or changes with respect to a Deliverable shall be deemed given by Client if Client has not rejected in writing (or has not provided written notice that it is not accepting), in accordance with this Paragraph, such corrective actions or changes with respect to such Deliverables prior to the expiration of any period for Client review thereof as set forth in this Paragraph.

i)   To the extent that any Deliverables have been approved by Client at any stage of Consultant's performance hereunder, Consultant shall be entitled to rely on such approval for purposes of all subsequent stages of Consultant's performance hereunder. Upon Client's approval of each Deliverable, Client agrees that, in the event of a contradiction between the relevant Work Order and the approved Deliverable, the contradiction shall be resolved by the approved Deliverable controlling.

j)   If Consultant is unable to correct any deficiency in a Deliverable within the period of time set forth above, Client shall be entitled, at its option, to a refund or credit of professional fees paid to Consultant hereunder with respect to the Services giving rise to the claimed deficiency and this shall be Client's sole and exclusive remedy, and Consultant's sole and exclusive obligation, with respect to any claim that the Deliverables do not conform to the terms of this Agreement and the Work Order.

15.  **Waiver of Jury Trial. CONSULTANT AND CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT, ANY WORK ORDER, OR THE SERVICES.**

16.  **Independent Contractor.** It is understood and agreed that each of Consultant and Client is an independent contractor and that neither of them is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner or representative. Neither Consultant nor Client shall act or represent itself, directly or by implication, in any

such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

17.   **Survival**.   All Paragraphs herein relating to compensation, expenses, payment of invoices, ownership, limitation on warranties and actions, limitation on damages, confidentiality and internal use, indemnification, waiver of jury trial, survival, binding nature, assignment and subcontracting, non-solicitation, non-exclusivity, interpretation, governing law, and jurisdiction and venue shall survive the expiration or termination of this engagement.   **The provisions of Paragraphs 8, 9, 12, 13, 15, 26 and 27 shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*) or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

18.   **Binding Nature; Assignment and Subcontracting**.   This Agreement and each Work Order shall be binding on the respective parties thereto and their respective permitted successors and assigns; provided, however, that, except as provided below, neither Consultant nor Client may assign, transfer, or delegate any of its rights or obligations under this Agreement or any Work Order (including, without limitation, interests or claims relating to this Agreement or any Work Order) without the prior written consent of the other.   Client hereby consent to Consultant assigning or subcontracting any of Consultant's rights or obligations under this Agreement or any Work Order to (a) any Affiliate of Consultant or Related Entity, whether located within or outside the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Consultant.   Client may assign this Agreement or any Work Order to any entity that acquires all or a substantial part of the assets or business of Client, provided, that Consultant provides its prior written consent to such assignment (such consent not to be unreasonably withheld).   Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

19.   **Notices**.   Whenever under this Agreement or any Work Order notice is required or permitted to be given, such notice shall be in writing and effective upon receipt.   All notices shall be hand delivered, sent by a reputable commercial overnight courier, or mailed by registered or certified United States mail, return receipt requested, postage prepaid, and addressed to the addressee at its address set forth below.

To Deloitte U.S.:  Deloitte LLP
                   2500 One PPG Place
                   Pittsburgh, PA  15222-5401
                   Attention:  Joe Klaja


To Consultant:   The address specified in the Work Order


To Client:       Westinghouse Electric Company
                 4350 Northern Pike
                 Monroeville, PA  15146
                 Attention: Cynthia J. Keating

A party may change its address for notice by giving prior written notice of the new address in conformity with the foregoing and the date upon which such new address will become effective.

20. **Entire Agreement**.  This Agreement, together with the pertinent Work Order, constitutes the entire agreement with respect to the subject matter hereof and supersedes all other oral or written representations, understandings, or agreements relating to the subject matter hereof.

21. **Severability**.  If any provision of this Agreement or any Work Order is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permitted the intent of Consultant and Client set forth in this Agreement or such Work Order.

22. **Waivers and Amendments**.  No delay or omission by Consultant or Client in enforcing its rights or remedies under this Agreement or any Work Order shall impair such right or remedy or be deemed to be a waiver thereof.  No waiver of any right or remedy under this Agreement or any Work Order with respect to any occurrence or event on one occasion shall be deemed a waiver of such right or remedy with respect to such occurrence or event on any other occasion. No amendment or waiver of this Agreement or any Work Order shall be valid unless in writing and signed by the parties thereto.

23. **Non-solicitation**.  During the term of a Work Order and for a period of one (1) year thereafter, each of Consultant and Client agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of the performance of Services under such Work Order with personnel of the other shall not, without the other's consent, directly employ, solicit, engage or retain the services of such personnel of the other.  In the event that either Consultant or Client breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to twenty percent (20%) of the annual base compensation of the relevant personnel in his/her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief.  This provision shall not restrict the right of either Consultant or Client to solicit or recruit generally in the media or by employment recruiter, or to hire personnel of Consultant or Client who respond to such solicitation or recruitment.

24. **Non-exclusivity**.  Each of Client and Consultant acknowledge that Consultant shall have the right to provide services of any kind or nature whatsoever to any person or entity as Consultant in its sole discretion deems appropriate, and to use any works of authorship or other intellectual property that may be included in the Deliverables, to develop for itself, or for others, materials or processes that may be similar to those produced as a result of the Services, except to the extent such works or Deliverables include the intellectual property of Client provided by, or on behalf of Client, to Consultant in connection with this Agreement or a Work Order.

25. **Paragraph Headings**.  The paragraph headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereof.

26. **Governing Law**. This Agreement and each Work Order, and all matters relating to this Agreement and each Work Order, shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).

27. **Consultant's Affiliated and Related Entities.** Client acknowledges and agrees that no Affiliate or Related Entity of Deloitte U.S. other than Consultant, whether or not acting as a subcontractor, shall have any liability hereunder to Client or any other person and Client will not bring any action against any such Affiliate or Related Entity in connection with this Agreement or any Work Order. Without limiting the foregoing, Affiliates and Related Entities of Deloitte U.S. are intended third party beneficiaries of this Agreement, including, without limitation, the limitation on liability and indemnification provisions hereof, and the agreements and undertakings of Client contained in the Work Order. Any Affiliate or Related Entity of Deloitte U.S. may in its own right enforce such terms, agreements and undertakings. Notwithstanding the foregoing, Client retains its rights to seek direct injunctive relief against any entity for breach of the confidentiality obligations set forth in this Agreement or any Work Order.

**IN WITNESS WHEREOF,** Deloitte U.S. (for and on behalf of its function-specific subsidiaries) and Client (on behalf of itself and its subsidiaries) have caused this Agreement to be executed and delivered by their respective duly authorized representatives as of the date first set forth above.

DELOITTE LLP                                    WESTINGHOUSE ELECTRIC COMPANY LLC

By: _____               By: _____

Name: _JOSEPH M. KLAJA_____               Name: _RICHARD A GASSBIAVELLI____

Title: _PRINCIPAL, DELOITTE_____               Title: _VP FINANCE_____

Date: _4/29/11_____               Date: _4/28/11_____

## WORK ORDER

Work Order Number:_____    Authorized Start Date: _____

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC dated April 21st, 2011 (the "Agreement"). For the purposes of this Work Order, Consultant shall be [*Name of Function-Specific Subsidiary*] and for purposes of Paragraph 7 of the Agreement, "Consultant" shall include [*Name of relevant subsidiary*].

**Consultant Services Description:**

**Estimated Timing of Services and Deliverables:**

**Fees and Expenses:**

**Client Responsibilities:**

**Other Terms (including changes in provisions of the Agreement):**

(1)    The parties hereby elect whether the indemnification provision set forth in Section 13(a)(ii) of the Agreement applies to this Work Order:

Yes    ☐

No    ☐

16

**WESTINGHOUSE ELECTRIC COMPANY LLC**    **CONSULTANT**

By: _____    By: _____

Printed
Name: _____    Printed
Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

    Address: _____

17

☒ **OGC has received fully executed MSA**

# Form of MSA Summary

**Note to readers:**

**This is a confidential summary intended to highlight critical aspects of the MSA. It should not be shared with the client or others outside of the Deloitte U.S. Entities. Many important provisions of the MSA are not discussed here, and no provision is discussed in its entirety. Individuals responsible for SOWs entered into under the MSA should always read the MSA itself.**

I.    **Overview**

    1.  Parties:

        a.  Named parties:  Deloitte LLP and Westinghouse Electric Company LLC

        b.  Other entities that are bound:  Westinghouse's subsidiaries, and Westinghouse Electric UK Limited and each of its subsidiaries

        c.  Other entities that can sign SOWs:  Westinghouse's subsidiaries, and Westinghouse Electric UK Limited and each of its subsidiaries

        d.  Does MSA contemplate that non-U.S. Deloitte entities will sign local implementation agreements (for a "global" MSA):  No

    2.  Services scope:  All services other than attest services

    3.  Term:  April 28, 2011 – April 28, 2014

    4.  Rate card:  No

    5.  Order of precedence:  In the event of a conflict between the MSA and a SOW, the MSA controls, except if the parties expressly agree in such SOW that such SOW controls.

II.    **When drafting a SOW, keep in mind the following:**

    1.  Indemnity - The broad third party indemnity set forth in Section 13(a)(ii) of the MSA must be specifically agreed upon in the SOW to be rendered applicable.

III.    **Major terms with unusual requirements**

    1.  Indemnity (Section 13(a)(i)) –  The Westinghouse indemnity is limited to claims arising out of its breach.

    2.  Internal Use (Section 12(b)) – Note that Westinghouse can share all work product with Toshiba Corporation and its affiliates.  Toshiba is the parent company of Westinghouse.

Questions about this MSA may be addressed to Joe Klaja (LCSP), John Chapman (SCP), or David Gabbai (OGC).

**<u>Exhibit C</u>**

**Wright Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                                          :        **Chapter 11**
                                                :
**WESTINGHOUSE ELECTRIC COMPANY**               :        **Case No. 17-10751 (MEW)**
**LLC,** *et al.,*                              :
                                                :
                                                :
            **Debtors.**[1]                     :        **(Jointly Administered)**
                                                :

------------------------------------------------------------ x

**DECLARATION OF TRAVIS WRIGHT IN SUPPORT OF THE APPLICATION OF
DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR. P. 2014(a)
AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AUTHORITY TO EMPLOY
AND RETAIN DELOITTE & TOUCHE LLP FOR ACCOUNTING ADVISORY
SERVICES *NUNC PRO TUNC* TO JULY 17, 2017**

I, Travis Wright, under penalty of perjury, declares as follows:

1.  I am a managing director of the firm of Deloitte & Touche LLP ("**Deloitte &
Touche**"), which has an office at 2600 One PPG Place, Pittsburgh, Pennsylvania 15222.  I am

duly authorized to make and submit this declaration (the "**Declaration**") on behalf of Deloitte &

Touche as accounting advisory services provider to Westinghouse Electric Company LLC and

certain above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in

support of the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

*Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and*

*Retain Deloitte & Touche LLP for Accounting Advisory Services Nunc Pro Tunc to July 17, 2017*

(the "**Application**").[2]

2.    The Debtors seek to retain Deloitte & Touche pursuant to the terms and

conditions set forth in that certain work order, dated August 11, 2017, to provide services

relating to the Debtors' Sarbanes Oxley ("**SOX**") readiness activities (the "**SOX Work**

**Order**"),[3] a copy of which is annexed to the Application as **Exhibit A**.

3.    The statements set forth in this Declaration are based upon my personal

knowledge, information and belief, the declaration of Keith Adams (the "**Adams Declaration**")

submitted in connection with the Debtors' application to retain Deloitte Transactions and

Business Analytics LLP ("**DTBA**") (*see* Docket No. 1128), an affiliate of Deloitte & Touche,

and client matter records kept in the ordinary course of business that were reviewed by me or

other personnel of Deloitte & Touche or its affiliates.

## Deloitte & Touche's Qualifications

4.    Deloitte & Touche is a public accounting firm with offices across the United

States.  Deloitte & Touche has significant experience in providing accounting services in large

and complex chapter 11 cases on behalf of debtors throughout the United States, including

numerous large chapter 11 cases in this district.  Such experience renders Deloitte & Touche

well-qualified and able to provide services to the Debtors during the pendency of these chapter

11 cases (the "**Chapter 11 Cases**").  Deloitte & Touche's services fulfill an important need and

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

[3]    The SOX Work Order is issued under and pursuant to the terms of that certain master services agreement between the Debtors and Deloitte LLP, an affiliate of Deloitte & Touche, dated April 28, 2011, as amended, for the provision of professional services (the "**MSA**").

2

are not provided by any of the Debtors' other professionals.

**Disinterestedness**

5.      Subject to the foregoing, except as set forth herein and in the attachments hereto, to the best of my information, knowledge, and belief based on reasonable inquiry: (a) neither I, Deloitte & Touche, nor any partner, principal, or managing director of Deloitte & Touche that is anticipated to provide the services for which Deloitte & Touche is to be retained (the "**Engagement Partners/Principals/Managing Directors**") holds any interest adverse to the Debtors; and (b) Deloitte & Touche and the Engagement Partners/Principals/Managing Directors have no relationship to the Debtors, their significant creditors, certain other significant parties-in-interest, or to the attorneys that are known to be assisting the Debtors in the Chapter 11 Cases, except as stated herein or in any attachment hereto.

6.      From time to time, Deloitte & Touche and its affiliates have provided or may currently provide services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to the Chapter 11 Cases, except as set forth herein or in the attachments hereto.

7.      As discussed in the Adams Declaration, in connection with its proposed retention by the Debtors, DTBA undertook a search to determine and to disclose whether it or its affiliates, including Deloitte & Touche, is or has been employed by, or have any relationships with the entities (the "**Potential Parties-in-Interest**"), whose specific names were provided to DTBA by the Debtors.  To check upon and disclose possible relationships with significant Potential Parties-in-Interest in the Chapter 11 Cases, DTBA researched its client databases and performed reasonable due diligence to determine whether it or its affiliates had any relationships with the Debtors or the significant Potential Parties-in-Interest.

3

8.      Deloitte & Touche and its affiliates have relationships with thousands of clients, some of which may be creditors of the Debtors or other parties-in-interest.  Accordingly, Deloitte & Touche and/or its affiliates have had, currently have and/or may have in the future banking or other relationships with such parties, or provided, may currently provide, and/or may provide in the future professional services to certain of these parties in matters unrelated to the Chapter 11 Cases.  Additionally, certain significant Potential Parties-in-Interest have or may have provided goods or services, may currently provide goods or services, and/or may in the future provide goods or services to Deloitte & Touche and/or its affiliates and the Engagement Partners/Principals/Managing Directors in matters unrelated to the Chapter 11 Cases.  A listing of such parties is attached to this Declaration as **Schedule 1**.

9.      Deloitte & Touche believes that the relationships described herein or reflected on Schedule 1 have no bearing on the services for which Deloitte & Touche's retention is being sought by the Debtors in the Chapter 11 Cases.  Furthermore, such relationships do not impair Deloitte & Touche's disinterestedness, and Deloitte & Touche does not represent an adverse interest in connection with the Chapter 11 Cases.

10.     Despite the efforts described above to identify and disclose Deloitte & Touche's connections with the significant Potential Parties-in-Interest in the Chapter 11 Cases, because Deloitte & Touche is a nationwide firm with many employees, Deloitte & Touche is unable to state with certainty that every client relationship or other connection has been disclosed.  In this regard, if Deloitte & Touche discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Bankruptcy Court.

4

11.    To the best of my knowledge, based on the internal search discussed above,

Deloitte & Touche has determined that certain relationships should be disclosed as follows:

(i)    Deloitte & Touche and/or its affiliates provide services in matters unrelated to the Chapter 11 Cases to certain of the Debtors' largest unsecured creditors and other Potential Parties-in-Interest or their affiliates listed on Schedule 1.

(ii)    Law firms identified on Schedule 1, including Jones Day LLP; Kilpatrick Townsend & Stockton LLP; Latham & Watkins LLP; Ogletree, Deakins, Nash, Smoak & Stewart, P.C.; Parker, Poe, Adams & Bernstein LLP; Paul, Weiss, Rifkind & Garrison LLP; Proskauer Rose LLP; Reed Smith LLP; Seyfarth Shaw LLP; Rinaldi, Finkelstein & Franklin, LLC; Shearman & Sterling LLP; Skadden, Arps, Slate, Meagher & Flom LLP; Wachtell, Lipton, Rosen & Katz LLP; and Weil, Gotshal & Manges LLP, have provided, currently provide and may in the future provide legal services to Deloitte & Touche or its affiliates in matters unrelated to the Chapter 11 Cases, and/or Deloitte & Touche or its affiliates have provided, currently provide and may in the future provide services to such firms or their clients.

(iii)    In the ordinary course of its business, Deloitte & Touche and its affiliates have business relationships in unrelated matters with its principal competitors, which together with their affiliates may be Potential Parties-in-Interest in the Chapter 11 Cases.  For example, from time to time, Deloitte & Touche and one or more of such entities may work on assignments for the same client or may otherwise engage each other for various purposes.

(iv)    Certain financial institutions or their respective affiliates (including AIG; Allianz Global Corporate & Specialty SE; Citibank, N.A.; ING Bank N.V.; JPMorgan Chase Bank, N.A.; Insurance Company of the State of Pennsylvania; Lloyd's Syndicate; MB Financial Bank, N.A.; Metropolitan Life Insurance Co.; National Union Fire Insurance; Teachers Insurance and Annuity Association of America; U.S. Bank; and Wells Fargo Bank, N.A.) listed on Schedule 1 (i) are lenders to an affiliate of Deloitte & Touche (Deloitte & Touche is a guarantor of such indebtedness) and/or (ii) have financed a portion of the capital and/or capital loan requirements of various partners and principals, respectively, of Deloitte & Touche and its affiliates.

(v)    Certain Potential Parties-in-Interest may be adverse to and/or involved in litigation matters with Deloitte & Touche or its affiliates in connection with matters unrelated to the Chapter 11 Cases.

(vi)    Certain firms around the world, including affiliates of Deloitte & Touche, are members of Deloitte Touche Tohmatsu Limited ("**DTTL**"), a United Kingdom company limited by guaranty.  Certain of the non-US member firms of DTTL or their affiliates (the "**DTT Member Firms**") have provided, currently provide or may in the future provide professional services to certain

5

of the Debtors or their affiliates.[4]  In particular, the DTT Member Firm in India performed tax services for certain of the Debtors.

(vii) I understand that the DTT Member Firm in Japan and/or its affiliates ("**Deloitte Japan**") has in the past provided, is currently providing and is expected in the future to provide, services for Toshiba Corporation ("**Toshiba**"), the parent entity of the Debtors, in matters unrelated to these chapter 11 cases.  In addition, prior to the Petition Date, I understand that Deloitte Japan provided services for Toshiba related to a potential restructuring of the Debtors; however, these services were completed prior to the Petition Date.

(viii) Deloitte & Touche and/or its affiliates have provided and currently provide services to Toshiba and its affiliates in matters unrelated to these Chapter 11 Cases.

(ix) Deloitte & Touche and/or its affiliates have provided and continue to provide services to SCANA Corporation ("**SCANA**") and Southern Company Services, Inc.  ("**Southern**"), who are members of the official committee of unsecured creditors, in matters unrelated to these chapter 11 cases, including, in the case of Deloitte & Touche, acting as their independent auditor. However, in its capacity as independent auditor, Deloitte & Touche is providing ordinary course accounting advice and conducting typical audit procedures arising from SCANA's and Southern's contractual arrangement with the Debtors.

(x) Deloitte & Touche has provided and continues to provide audit services to certain clients and/or their affiliates in matters unrelated to these Chapter 11 Cases.  In its capacity as independent auditor, Deloitte & Touche also provides such clients with ordinary course auditing services and conducts typical audit procedures that may arise from such clients' business arrangements with the Debtors.

(xi) Deloitte & Touche and/or its affiliates have provided royalty compliance services for a client assessing amounts that the Debtors may owe under a license arrangement; however, these services were completed prior to the Petition Date.

(xii) Deloitte & Touche and certain of its affiliates, including Deloitte Tax LLP ("**Deloitte Tax**") and Deloitte Financial Advisory Services LLP (**"Deloitte FAS"**), have provided, continue to provide and may in the future provide services to Apollo Global Management, LLC and certain of its subsidiaries

---

[4]    Each of the DTT Member firms is a separate and independent legal entity.  It is not Deloitte & Touche's practice to undertake conflicts checks with DTT Member Firms for the purpose of identifying relationships that they may have with the Debtors and other parties-in-interest and Deloitte & Touche does not maintain a database for the purpose of identifying all such relationships.

6

(collectively, "**Apollo**") in matters unrelated to these cases. Certain funds managed by Apollo are the DIP lender to the Debtors, and Deloitte & Touche and certain of its affiliates may provide ordinary course accounting or tax services for Apollo that may have a relationship to certain of their managed funds' investments respecting the Debtors. Also, among other services, Deloitte & Touche acts as the independent auditor for a number of entities either currently or formerly owned by funds managed by Apollo or its principals.

(xiii) Deloitte FAS and/or certain of its affiliates have performed and continue to perform services for Chicago Bridge & Iron ("**CB&I**") in matters unrelated to the Chapter 11 Cases. In 2012 and 2013, Deloitte FAS and its affiliates also provided due diligence services in connection with Chicago Bridge & Iron's acquisition of Shaw Group, Inc., including valuation services performed in connection with certain construction contracts, including those that were subsequently sold or otherwise transferred to the Debtors, as such related to the purchase price allocation reflected in CB&I's post-acquisition balance sheet.

(xiv) In connection with a prospective engagement that did not go forward, personnel of DTBA provided some preliminary thoughts on how the team would approach such an engagement, which related to matters that would have involved the Debtors had the engagement been undertaken.

(xv) Deloitte & Touche was approved as independent auditors for Energy Future Holdings Corp. and certain of its affiliates in their chapter 11 cases, in matters unrelated to these Chapter 11 Cases.

(xvi) Subsequent to the Petition Date, the Debtors' management engaged Deloitte & Touche to prepare and deliver a one-day facilitated workshop for the Debtors' Chief Compliance Officer through Deloitte & Touche's Center for Executive Performance. Deloitte & Touche is not receiving any fees from the Debtors for these services, and such services are unrelated to the Chapter 11 Cases.

(xvii) Deloitte & Touche and/or certain of its affiliates provides financial advisory services to the Pension Benefit Guaranty Corporation (the "**PBGC**"). The Debtors and their pension plans are not the subject of these services for the PBGC.

(xviii) Deloitte Consulting LLP ("**Deloitte Consulting**"), an affiliate of Deloitte & Touche, and certain of its affiliates, have provided and will continue to provide services to the Executive Office of the United States Trustee in matters unrelated to the Chapter 11 Cases.

12.    Furthermore, through reasonable inquiry, I do not believe there is any connection

7

between the personnel of Deloitte & Touche or its affiliates who are anticipated to provide services to the Debtors and the United States Bankruptcy Judge presiding in the Chapter 11 Cases, the U.S. Trustee, the Assistant United States Trustee for the Southern District of New York, and the attorney therefor assigned to the Chapter 11 Cases.

13.    Except as may be disclosed herein, to the best of my knowledge, information, and belief, Deloitte & Touche and the Engagement Partners/Principals/Managing Directors do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte & Touche and the Engagement Partners/Principals/Managing Directors are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

## Scope of Services

14.    Subject to this Court's approval of the Application, Deloitte & Touche has agreed to perform accounting advisory services for Westinghouse Electric Company LLC (**"WEC"**) in accordance with the terms and conditions set forth in the SOX Work Order, as requested by the Debtors.  As further described in the SOX Work Order Agreement, Deloitte & Touche shall provide internal audit cosourcing services relating to WEC's overall SOX readiness activities, including performing certain procedures, as follows:

    a) Entity Level Controls (**"ELCs"**) and Planning

        i.   Performing an assessment of the existing entity-level risk and control framework.  The scope of this review will cover the Corporate/US Location for Westinghouse Electric Company LLC (**"WEC"**), Sweden, France and Springfield locations;

       ii.   Assisting WEC with a mapping exercise of ELCs and providing a benchmarking assessment using the Committee of Sponsoring Organizations (COSO) 2013 framework;

8

iii.  Assisting WEC with documentation procedures for ELCs, including walkthroughs, as well as providing recommendations for remediation on design gaps; and

iv.  Performing testing procedures related to remediation efforts performed by WEC.

b)  Project Management and Roadmap Strategy

i.  Providing provide project management services for WEC, including regular status updates and progress reports; and

ii.  Assisting WEC with and providing documentation of a roadmap and strategy for execution of its SOX compliance program.

### Efforts to Avoid Duplication of Services

15.    The services performed by Deloitte & Touche will not unnecessarily duplicate or overlap with the other services performed by the Debtors' other retained consultants and advisors.   Deloitte & Touche understands that the Debtors have retained and may retain additional professionals during the term of the SOX Work Order, and Deloitte & Touche agrees to work cooperatively with the Debtors to avoid unnecessary duplication of services.

### Professional Compensation

16.    Deloitte & Touche's retention by the Debtors is conditioned upon its ability to be retained in accordance with its terms and conditions of employment, including the proposed compensation arrangements, set forth in the SOX Work Order.

17.    Pursuant to the terms of the SOX Work Order, Deloitte & Touche agreed to charge the Debtors the applicable hourly billing rates by classification of personnel with respect to such services, set forth in the table below.

| Personnel Classification | Hourly Rates |
|---|---|
| Partner/Principal/Managing Director | $ 450 |
| Senior Manager | $ 340 |
| Manager | $ 300 |
| Senior Consultant | $ 260 |
| Consultant | $ 215 |
| Intern | $ 100 |

9

18.     Hourly rates are revised periodically in the ordinary course of Deloitte & Touche's business.  Deloitte & Touche shall advise the Debtors of any new rates should it institute a rate-change during the Chapter 11 Cases.  Such changes will be noted on the invoices for the first time period in which a revised rate becomes effective.

19.     In addition to the rates set forth above, the Debtors shall reimburse Deloitte & Touche for all actual, reasonable and necessary expenses incurred by Deloitte & Touche in connection with the professional services performed, including, but not limited to, expenses incurred on account of travel and lodging, data processing and storage, and communications charges, courier services, and other similar expenses incurred on behalf of the Debtors.

20.     Deloitte & Touche intends to file interim and final fee applications for the allowance of compensation for the services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any applicable orders of the Court, including the Interim Compensation Order and the Order granting this application (to the extent compliance is not waived), and/or any guidelines issued by the Office of the U.S. Trustee.

21.     Deloitte & Touche will maintain records in support of any fees incurred in connection with the services it performs in the Chapter 11 Cases by category and nature of the services rendered, and will provide reasonably detailed descriptions of those services rendered on behalf of the Debtors, the time expended in provided those services, and the individuals who provided professional services on behalf of the Debtors.  Deloitte & Touche will present such records to the Court in its fee applications to the Court.  Deloitte & Touche requests that the invoices, after appropriate review, be paid in a manner consistent with the payment of other

retained professionals in this matter, subject to any administrative orders, if any, that would apply to interim payments. I understand that all payments rendered pursuant to Deloitte & Touche's retention by the Debtors must be approved by an order of this Court and based upon the filing by Deloitte & Touche of appropriate interim and final applications for allowance of compensation and reimbursement of expenses.

22.    As disclosed in their respective retention applications filed with the Court, Deloitte FAS and DTBA provided prepetition services to the Debtors. In the ninety (90) days prior to the Petition Date, the Debtors paid Deloitte FAS $2,291,566, including the application of retainer amounts, and DTBA $628,399. As of the Petition Date, no amounts were outstanding with respect to the invoices issued by DTBA, and $196,978 was outstanding with respect to the invoices issued and/or work performed by Deloitte FAS. I understand that Deloitte FAS will not seek any recovery with respect to such invoiced amounts.

23.    Prior to the Petition Date, Deloitte Consulting and Deloitte Tax each provided certain professional services to the Debtors. In the ninety (90) days prior to the Petition Date, the Debtors paid Deloitte Tax $9,022 for services performed. The Debtors did not make any payments to Deloitte Consulting during this period. As of the Petition Date, no amounts were outstanding with respect to the invoices issued by Deloitte Consulting. As of the Petition Date, $3,119 was outstanding with respect to the invoice(s) issued by Deloitte Tax.

24.    Some services incidental to the tasks to be performed by Deloitte & Touche in the Chapter 11 Cases may be performed by personnel now employed by or associated with affiliates of Deloitte & Touche, such as DTBA, Deloitte FAS, Deloitte Tax and Deloitte Consulting, and/or their respective subsidiaries, including subsidiaries located outside of the United States.

25.    Deloitte & Touche has received no promises regarding compensation in the

11

Chapter 11 Cases other than in accordance with the Bankruptcy Code and as set forth in this Declaration. Deloitte & Touche has no agreement with any nonaffiliated or unrelated entity to share any compensation earned in the Chapter 11 Cases.

26.     Deloitte & Touche respectfully requests that its retention be made effective *nunc pro tunc* to July 17, 2017 so that Deloitte & Touche may be compensated for the professional services it has provided before the Application is heard by the Court. Deloitte & Touche has provided services to the Debtors in advance of approval of the Application in anticipation that its retention would be approved *nunc pro tunc* to July 17, 2017. Deloitte & Touche submits that these circumstances are of a nature warranting retroactive approval.

*[Remainder of Page Intentionally Left Blank]*

12

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 19, 2017

*/s/ Travis Wright*
_____
Travis Wright
Managing Director
Deloitte & Touche LLP

13

## Schedule 1

Potential parties-in-interest or their affiliates for whom Deloitte & Touche or its affiliates has provided or is currently providing services in matters unrelated to the Chapter 11 Cases, except as set forth above, or with whom such parties have other relationships, including banking relationships.

| |
|---|
| 1st Constitution Bank |
| ABB AB |
| Accenture LLP |
| ACE |
| ACE/Westchester |
| Aecon Industrial |
| Aetna Inc. |
| AIG |
| Air Products & Chemicals Inc. |
| Airgas Inc. |
| Alabama Power Company |
| Alabama, State of |
| Alaska, State of - Corporations Business & Professional Licensing |
| ALCOSAN |
| AlixPartners, LLP |
| Allegheny Power |
| Allianz Global Corporate & Specialty SE |
| Allied Waste Services |
| Alvarez & Marsal Holdings, LLC |
| Amec Foster Wheeler Nuclear UK Ltd. |
| Amec Foster Wheeler PLC |
| Ameren Missouri |
| American Casualty Co. of Reading |
| American Electric Power |
| American Equipment Co. |
| American Home Assurance Co. |
| American Nuclear Insurers (ANI) |
| Amlin Corporate Insurance |
| Amundi Absolute Return Apollo Fund PLC |
| Ansaldo |
| AON Hewitt |
| Apollo Investment Corporation |
| AREVA |

| |
|---|
| Ariba, Inc. |
| Aricent US, Inc. |
| Arizona Public Service Company |
| Arizona, State of |
| Arkansas, State of |
| Armstrong |
| AT&T |
| ATI Specialty Alloys Components |
| Atkins |
| Avaya |
| AXIS Insurance Company |
| Babcock & Wilcox Nuclear Energy Inc. |
| Backoffice Associates |
| Baker Concrete Construction Inc. |
| Banco Santander |
| Bank of China |
| Bank of Taiwan |
| Bank of Tokyo-Mitsubishi UFJ, Ltd. |
| Basler Electric |
| Battelle Memorial Institute |
| Bayerische Hypo- und Vereinsbank AG |
| BC&I Stone & Webster, Inc. |
| Beacon Health Options |
| Ben Franklin Design & Mfg. Co. Inc. |
| Berkeley Research Group, LLC (Toshiba Advisors) |
| Bishop, James E. |
| Blackbox |
| Blanchard Machinery Co. |
| BMO Harris Bank N.A. |
| BNP Paribas |
| Board of Water, Light and Sinking Fund Commissioners |
| BP Energy CO. |
| Brenntag |
| Bruce Power |
| Burns, John W. |
| BWXT Nog Technologies Inc. |
| Cable USA Inc. |
| California, State of |
| Cameco Corporation |

| |
|---|
| Cameron Measurement Systems |
| Canberra Industries Inc. |
| Cartus Formally Cendant Mobility |
| Cascade Natural Gas |
| CA-The Concourse Limited Partnership |
| CB&I Contractors, Inc. |
| CBS Corporation |
| CDW Computer Centers, Inc. |
| Century Link - Voice - Ogden |
| Ceradyne Inc. |
| CEZ, A. S. |
| CH2MHill Plateau Remediation Company |
| Chattanooga Gas |
| Chicago Bridge & Iron Company (Delaware) |
| Chicago Bridge & Iron Company, N.V. |
| China Telecom Beijing Co. |
| China Unicom Beijing Co. |
| Chromalox |
| Cigna Corp. |
| Citibank, N.A. |
| Citizens of Georgia Power |
| City of Aurora, Tax Licensing Division |
| City of Chicago Department of Finance |
| City of Dalton, Georgia, The |
| City of Mobile Alabama Tax Collector |
| City of New Orleans - Sales Tax Division |
| Clean Harbors Environmental Svcs. |
| CNA Surety |
| Colorado Department of Revenue |
| Comcast Corporation |
| ComEd |
| Computershare Inc. |
| ConEd (Consolidated Edison) |
| Connecticut Secretary of State Document Review |
| Consolidated Communications |
| Constellation Energy Nuclear Group |
| Santee Cooper |
| Corey, Nina A. |
| Crane Nuclear Inc. |

| |
|---|
| Crawford & Co. |
| CSC Computer Sciences Corp. |
| CSC Consulting Inc. |
| Curtiss Wright |
| Cvc Nominees Ltd. |
| CVS Caremark |
| Daikin Applied Americas Inc. |
| Delaware Dept. of State |
| Department of Energy |
| Deutsche Bank AG |
| DHI.DHW Group Co. LTD |
| DirecTv |
| DirecTv Sports Net Pittsburgh LLC |
| Dominion |
| Doosan Babcock Ltd |
| DRS Consolidated Controls Inc. |
| Ducera Partners (SCANA Advisors) |
| Duke Energy |
| Duquesne Light Company |
| E.ON Generation GmbH |
| Eagle Technologies Group |
| Earthlink Business |
| Eaton Corporation |
| EDF - Ceidre |
| Emerson Industrial |
| Emirates Nuclear Energy Corporation |
| EnBW Energie Baden-W?rttemberg AG |
| Energy & Process Corporation |
| Energy Northwest |
| Energy Solutions Government Group, Inc. |
| Energy Steel & Co. |
| Energy Steel And Supply Co |
| Enersys Delaware Inc. |
| ENGIE |
| Entergy |
| EPM - Fisher Controls Intl Inc. |
| EPRI (Electric Power Research Institute) |
| Erie Insurance |
| ESKOM |

| |
|---|
| EvapTech |
| Eversource |
| Exelon Business Services Co. |
| Fairbanks Morse Engine, a division of Coltec Industries, Inc. |
| Fairpoint Communications |
| Federal Communications Commission |
| Federal Insurance Company (CHUBB) |
| Fifth Third Equipment Finance Company |
| First Communications |
| FirstEnergy |
| Fisher & Phillips, LLP |
| Fleet Bank-NH |
| Florida Department of Revenue |
| Florida Power & Light Company (FPL) |
| Florida, State of - Department of Revenue |
| Flowserve |
| Fluor Corp. |
| FPL Energy Point Beach, LLC |
| Fragomen, Del Rey, Bernsen, & Loewy |
| Framatome |
| Freedom Specialty |
| Frontier Communications |
| Frontier Technology Corp |
| Fujitsu Services Limited |
| GE Canada |
| GE Hitachi Nuclear Energy |
| Gemeinschaftskraftwerk Weser GmbH & Co. |
| General Cable Industries Inc. |
| General Electric Company |
| Georgia Power Company |
| Georgia, State of |
| Georgia, State of - Department of Revenue |
| Gerdau Ameristeel US Inc. |
| Global Nuclear Fuel - Japan Co. Ltd. |
| Gowlings/Marsh Canada Limited |
| Graftech International Holdings, Inc. |
| Granite Properties |
| Graver Technologies LLC |
| Gray Plant Mooty |

| |
|---|
| Graybar Electric Co Inc. |
| Great America Financial Services Corporation |
| Gregg Protection Services |
| Gutor Electronics, LLC |
| Hagemeyer North America, Inc. |
| Hawaii State of, - Department of Taxation |
| Hendrickx |
| Hitachi-GE Nuclear Energy Ltd. |
| Honeywell Inc. |
| Hudson Americas LLC |
| Iberdrola Generacion S.A.U. |
| IBM Credit LLC |
| Idaho Secretary of State Business Registration Division |
| IHI Corporation |
| Illinois Secretary of State |
| Indiana Michigan Power Company |
| Indiana Secretary of State |
| ING Bank N.V. |
| Insurance Company of the State of Pennsylvania, The |
| Intergraph |
| International SOS Travel Assistance |
| Intertek Iberica Spain SLU |
| Iowa Department of Revenue |
| ITT Cannon Veam Italia S.R.L. |
| Ivy Apollo Multi Asset Income Fund |
| IX WR 3735 Glen Lake Drive, L.P. |
| JBG/Commercial Management, L.L.C. |
| Jones Day LLP |
| Jones Lang LaSalle Americas, Inc. |
| JPMorgan Chase Bank, N.A. |
| Kansai Electric Power Company, Inc., The |
| Kansas City Power & Light Company |
| Kansas Gas and Electric Company |
| Kansas Secretary of State |
| Kema-Powertest LLC |
| Kennametal Deutschland GmbH |
| Kentucky Secretary of State, Office of |
| KEPCO |
| Kernkraftwerk Brokdorf GmbH & Co. oHG |

| |
|---|
| Kilpatrick Townsend & Stockton, LLP |
| KSB Aktiengesellschaft |
| Kurtzman Carson Consultants LLC |
| Larsen & Toubro |
| Latham & Watkins LLP |
| Lazard |
| Leidos Engineering LLC |
| Level 3 Communications LLC |
| Lewis, Mark B. |
| Liberty Mutual Insurance Company |
| Lincoln Electric Company |
| Lloyd's Syndicate |
| LMT Div. Curtiss-Wright Flow Control |
| Louisiana Secretary of State |
| Louisiana, State of - Department of Revenue |
| Lynx Technology Partners Inc. |
| Maine Depart. of the Secretary of State –Div. of Corporations Reporting & Information Section |
| Marsh GmbH |
| Martin Marietta Aggregates |
| Maryland, State of |
| Maryland, State of - Comptroller |
| Massachusetts Department of Revenue |
| MB Financial Bank, N.A. |
| Mecklenburg County Tax Collector (NC) |
| Meggitt France |
| Memphis (TN), City of, Treasurer |
| Merrill Lynch |
| Metal Improvement Co. LLC |
| Metropolitan Council |
| Metropolitan District, The |
| Metropolitan Life Insurance Co. |
| Michigan Department of Natural Resources (MDNR) |
| Michigan Department of Treasury |
| Michigan, State of |
| Midcap Financial Trust |
| Milbank, Tweed, Hadley & McCloy LLP |
| Ministerio De Hacienda Y Administraciones Publicas |
| Ministry of Economy, UAE |

| |
|---|
| Minnesota Life Insurance Company |
| Minnesota, State of – Dept. of Revenue |
| Mirion Technologies |
| Missouri Department of Natural Resources |
| Mistras Group Inc. |
| Mitsubishi Corporation |
| Mitsui |
| Mizuho (USA) Leasing & Finance Corporation |
| Montana Secretary of State's Office |
| Munich Re |
| NASA |
| National Union Fire Insurance Company (AIG) |
| National Union Fire Insurance, *et. al* |
| Navitas Lease Corp. |
| Nebraska Public Power District |
| Nebraska Secretary of State |
| Nevada Secretary of State Commercial Recordings Division |
| New Hampshire Secretary of State |
| New Jersey State of - Department of the Treasury, Division of Taxation |
| New Mexico Secretary of State, Office of |
| New York State Department of State |
| Newport News Industrial Corp. |
| Nextera Energy Point Beach, LLC |
| Nextira One LLC d/b/a Black Box |
| Nichols, Daniel |
| Nicor Gas |
| North Carolina Department of Revenue |
| North Carolina Mecklenburg County |
| North Carolina, State of |
| Northeast Utilities Service Company |
| Northern States Power Company |
| Nova Machine Products Corp. |
| Nuclear Fuel Services Inc. |
| Nuclear Management Company, LLC |
| Nuclear Power Institute of China |
| Nuclear Regulatory Commission (NRC) |
| NuGen |
| NYC Department of Finance |
| Obayashi Corp. |

| |
|---|
| Oglethorpe Power Company |
| Ogletree, Deakins, Nash, Smoak & Stewart, PC |
| Ohio Department of Taxation |
| OKG AB |
| Oklahoma Secretary of State |
| Omaha Public Power District |
| OneBeacon Insurance Company |
| Ontario Power Generation (OPG) |
| Oracle |
| Oregon, State of |
| Pacific Gas and Electric Company (PG&E) |
| Pall Gmbh |
| Palmetto Health |
| Parker Hannifin AB |
| Parker Poe Adams & Bernstein LLP |
| Paul, Weiss Rifkind & Garrison LLP |
| PCC Structurals |
| PCI Energy Services LLC |
| Peerless Manufacturing Co |
| Penn Power (Firstenergy of PA) |
| Pennsylvania Power and Light Company |
| Pennsylvania, Commonwealth of |
| Pension Benefit Guaranty Corporation |
| Peoples Natural Gas |
| Personal Communications |
| PJT Partners Inc. |
| Plumbers & Pipefitters 562 |
| PNC Bank, National Association |
| PreussenElektra GmbH - Kernkraftwerk Brokdorf |
| Pricewaterhouse Coopers LLP |
| Princeton Credit Corporation |
| Progress Energy Carolinas, Inc. |
| Proskauer Rose LLP |
| PSEG Nuclear LLC |
| Public Service and Gas Company |
| Putzmeister America Inc. |
| PWR Owner's Group |
| Questar Gas |
| Ramsey County (MN) |

| |
|---|
| Reed Smith LLP |
| Republic Services |
| Rhode Island Department of State -Secretary of State |
| Rinaldi, Finkelstein & Franklin, LLC |
| Rio Tinto Uranium |
| Rocky Mountain Power |
| Rolls Royce |
| Rosemount Analytical Inc. |
| Rothschild & Co. |
| Royal and Sun Alliance Insurance PLC |
| Royal Bank of Scotland PLC (the) |
| RSCC Wire & Cable LLC |
| RWE |
| Ryerson |
| San Diego Gas & Electric Company |
| Sandvik SMT EMEA AB |
| Santa Clara County Tax Collector |
| SAP America Inc. |
| Sargent & Lundy |
| SC State Ports Authority |
| Scana Energy Marketing |
| Scientech, a Business Unit of Curtiss |
| Seyfarth Shaw LLP |
| SGL Carbon Gmbh |
| Shaw Constructors Group, Inc. |
| Shearman & Sterling LLP |
| Siemens AB |
| Skadden, Arps, Slate, Meagher & Flom LLP (Toshiba Advisors) |
| Skandinaviska Enskilda Banken AB (publ) |
| SKODA JS A.S. |
| SMBC |
| Solvay Fluorides LLC |
| Sompo Japan Insurance Company of America |
| South Carolina Department of Health and Environment Control |
| South Carolina Electric & Gas Company |
| South Dakota Secretary of State |
| South Texas Nuclear Operating Company |
| Southern California Edison Company |
| Southern Company Services, Inc. |

| |
|---|
| Southern Nuclear Company |
| Spok Inc. |
| Sprint |
| SPX Corp Copes Vulcan Operation |
| St. Charles Parish School Board Sales and Use Tax Department (Louisiana) |
| STARS Alliance |
| Starwood Capital |
| State Power Investment Corporation |
| Steadfast Insurance Company |
| Sulzer Chemtech Ltd. |
| Sumitomo Corporation Europe Limited |
| SWAGELOK |
| System Energy Resources, Inc. |
| TV Saarland Bildung |
| Taff, Michael S. |
| Teachers Insurance and Annuity Association of America |
| Tengizchevroil |
| Tennessee Valley Authority |
| Tennessee, State Board of Equalization |
| Texas Comptroller of Public Accounts |
| Texas Utilities Electric Company |
| Time Warner |
| T-Mobile |
| Toshiba Corporation |
| Toshiba Corporation Power Systems Company |
| Transcanada |
| Transport Logistics International |
| Tronox Speciality Alkali Corp. |
| Turner Construction Company |
| TXU Electric |
| U S Customs |
| U.S Fish & Wildlife Service |
| U.S. Army Corps of Engineers |
| U.S. Bank |
| U.S. Coast Guard |
| U.S. Customs and Border Protection |
| U.S. Department of Energy |
| U.S. Department of Health & Human Services |
| U.S. Department of Transportation |

| |
|---|
| U.S. Environmental Protection Agency |
| U.S. Federal Aviation Administration |
| U.S. Nuclear Regulatory Commission |
| U.S. Specialty Insurance Company (HCC) |
| Ultra Electronics Limited |
| UniCredit |
| Uniper Anlagenservice GmbH |
| United Rentals |
| United States - Department of the Treasury – IRS |
| United States Attorney's Office for the District of Delaware |
| United States Attorney's Office for the Southern District of New York |
| United States Department of Energy (DOE) |
| United States Enrichment Corporation |
| Unitil |
| Uranium One Inc. |
| US - Department of Defense (DOD) |
| US - Department of Health and Human Services (HHS) |
| US - Department of Transportation (DOT) |
| US - Environmental Protection Agency (EPA) |
| US - Internal Revenue Service |
| US - Occupational Safety and Health Administration (OSHA) |
| US Bank Transportation Solutions |
| US Ecology Idaho, Inc. |
| US Security Associates Inc. |
| Utah, State of |
| UT-Battelle, LLC |
| Vattenfall AB |
| Verizon |
| Vermont Secretary of State |
| Vigor |
| Virginia Electric & Power Company, d/b/a Dominion Virginia Power |
| Virginia State Corporation Commission |
| Vistra Energy (Luminant) |
| Wachs Energy Services Company |
| Wachtell, Lipton, Rosen & Katz |
| Walter Davis |
| Washington, State of |
| Waste Management North |
| Watlow Electric Mfg Co. |

| |
|---|
| Weed Instrument d/b/a Ultra Electronics |
| Weil, Gotshal & Manges LLP |
| Wells Fargo Bank, N.A. |
| Western Surety Company |
| Westinghouse Electric Company (Delaware) LLC |
| Williams Scotsman Inc. |
| Wisconsin Electric Power Company |
| Wisconsin Public Service Corporation |
| Wolf Creek Nuclear |
| Wyoming Secretary of State |
| Xcel Energy |
| Zetec Inc. (FR) – Struers |
| ZionSolutions |
| Zurich American Insurance Company |

**<u>Exhibit D</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                                :       **Chapter 11**
                                                      :
**WESTINGHOUSE ELECTRIC COMPANY**    :       **Case No. 17-10751 (MEW)**
**LLC,** *et al.*,                                :
                                                      :
                                                      :
         Debtors.[1]                          :       **(Jointly Administered)**
                                                      :

------------------------------------------------------------ x

### ORDER PURSUANT TO 11 U.S.C. §§ 327(A) AND 328, FED. R. BANKR. P. 2014(A) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AUTHORITY TO EMPLOY AND RETAIN DELOITTE & TOUCHE LLP FOR ACCOUNTING ADVISORY SERVICES *NUNC PRO TUNC* TO JULY 17, 2017

Upon the application (the "**Application**"),[2] dated October 19, 2017 of Westinghouse Electric Company LLC and certain debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 and 2016-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") for authority to employ and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

[2] Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Application.

retain Deloitte & Touche LLP ("**Deloitte & Touche**") to provide internal audit co-sourcing services relating to WEC's overall SOX readiness activities, including performing certain procedures, to the Debtors in accordance with the terms and conditions of the SOX Work Order and the MSA, *nunc pro tunc* to July 17, 2017, as more fully set forth in the Application and the Declaration of Travis Wright (the "**Wright Declaration**") in support thereof, and the Court being satisfied, based on the representations made in the Application and in the Wright Declaration, that Deloitte & Touche is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and, as required by section 327(a) of the Bankruptcy Code and referenced by section 328 of the Bankruptcy Code, neither represents nor holds an interest adverse to the Debtors or their estates; and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Application having been given as provided in the Application, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Application need be provided; and the Court having found and determined that the relief sought in the Application and granted herein is in the best interests of the Debtors, their respective estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Application is granted to the extent set forth herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, to retain and employ Deloitte & Touche to provide internal audit cosourcing services relating to WEC's overall SOX readiness activities, including performing certain procedures to the Debtors on an hourly fee basis except as provided below, in accordance with the terms and conditions of the SOX Work Order, annexed to the Application as **Exhibit A**, including without limitation, the compensation terms and the Indemnification Provisions set forth therein, *nunc pro tunc* to July 17, 2017, and to pay fees and reimburse expenses to Deloitte & Touche on the terms set forth in the SOX Work Order, subject to the further limits set forth in the Application and in this Order.  For the avoidance of doubt, this Order approves the terms on which post-petition services are being provided but it does not authorize an assumption of any executory contracts.  Deloitte & Touche shall not seek recovery of any unpaid professional fees owed to Deloitte & Touche that accrued prior to March 29, 2017 (the "**Petition Date**").

3.      Except as set forth herein, the services to be provided by Deloitte & Touche as set forth in the SOX Work Order (under the terms of the the MSA) are approved.

4.      Deloitte & Touche shall file interim and final fee applications for allowance of compensation for services rendered and reimbursement of expenses incurred (including, without limitation, the reasonable fees, and other charges of Deloitte & Touche's counsel, which counsel shall not be required to be retained pursuant to section 327 of the Bankruptcy Code or otherwise) in accordance with sections 330 and 331 of the Bankruptcy

Code, the Bankruptcy Rules, the Local Rules, applicable law and any applicable orders of this

Court.

5.       All applications for allowance of compensation and reimbursement of

expenses by Deloitte & Touche shall be subject to the reasonableness standard of review set

forth in section 330 of the Bankruptcy Code.

6.       Deloitte & Touche shall include in its fee applications, among other

things, time records setting forth, in summary format, a description of the services rendered by

each professional, and the time expended on each date by each such individual in rendering

services on behalf of the Debtors in one-tenth hour increments.

7.       Prior to increasing any rates set forth in the SOX Work Order or the

Application, Deloitte & Touche shall file a supplemental declaration with the Court and give ten

(10) business days' notice to the Debtors, and the U.S. Trustee, which supplemental declaration

shall explain the basis for the requested rate increases in accordance with section 330(a)(3)(F) of

the Bankruptcy Code and indicate whether the Debtors have received notice of and approved the

proposed rate increase.

8.       The Indemnification Provisions set forth in the MSA with respect to the

SOX Work Order are approved subject to the following modifications with respect to services

performed thereunder after the Petition Date and prior to the effective date of any plan of

reorganization of the Debtors:

       a.       All requests for payment of indemnity, contribution, or otherwise
          pursuant to the Indemnification Provisions shall be made by means
          of a final fee application and shall be subject to the approval of,
          and review by, the Court to ensure that such payment conforms to
          the terms of the Indemnification Provisions, the Bankruptcy Code,
          the Bankruptcy Rules, the Local Bankruptcy Rules, and other
          orders of this Court and is reasonable based on the circumstances
          of the litigation or settlement in respect of which indemnity is

4

sought; provided, however, that in no event shall an indemnified party be indemnified or receive contribution to the extent that any claim arose or expense has resulted for any such losses finally judicially determined by a court of competent jurisdiction to have primarily resulted from the breach of contract, gross negligence, willful misconduct, or fraud of any indemnified parties;

b.      In no event shall any indemnified parties be indemnified or receive contribution or other payment under the Indemnification Provisions if the Debtors or a representative of the Debtors' estates asserts a claim for, and a court determines by a final order that such claims primarily arose out of, such person's breach of contract, gross negligence, willful misconduct, or fraud of any Indemnified Parties;

c.      In the event an indemnified party seeks reimbursement of attorneys' fees from the Debtors pursuant to the indemnification provisions, the invoices and supporting time records from such attorneys shall be attached to Deloitte & Touche's own interim and final fee applications, and such invoices and time records shall be subject to the United States Trustee guidelines and the approval of the Bankruptcy Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code;

d.      Any provision of the Engagement Agreement that purports to limit the amount of liability of Deloitte & Touche, or that purports to limit the types of damages that may be awarded in an action against Deloitte & Touche shall be of no effect and shall be deemed to have been deleted;

e.      Any provision of the Engagement Agreement relating to expense policies and reimbursements shall be subject to the applicable Guidelines set forth in the Local Rules and General Orders of this Court.

9.      The MSA, with respect to the SOX Work Order, is modified as follows

with respect to all services performed thereunder for the Debtors after the Petition Date and

through the effective date of any plan of reorganization:

a.      The first sentence of Paragraph 16 of the MSA shall be deemed deleted and replaced with the following:

5

> Nothing contained in this Agreement shall alter in any way the duties imposed by law on Consultant in respect of the Services provided under the Agreement.  It is understood and agreed that each of Consultant and Client is an independent contractor and that neither of them is, nor shall be considered to be, the other's agent, distributor, partner, joint venturer, co-owner or representative.

10.    To the extent there may be any inconsistency between the terms of the Application, the SOX Work Order, the MSA, and this Order, this Order shall govern.

11.    Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

12.    Nothing contained in this Order, nor any payment made pursuant to this Order, shall be dispositive with respect to any future allocation of responsibility between and among Debtors and non-Debtors for such payment, and all rights with respect thereto are expressly reserved by the UCC.

13.    The Debtors are authorized to take all action necessary to carry out this Order.

14.    Notwithstanding anything in the Application or the Engagement Agreement to the contrary, during the pendency of the chapter 11 cases, this Court retains exclusive jurisdiction over all matters arising out of and/or pertaining to Deloitte & Touche's engagement.  Any provision of the Engagement Agreement that provides for mediation or arbitration or for jurisdiction in a different court shall not be applicable unless this Court lacks jurisdiction pursuant to the previous sentence.


Dated: _____, 2017
       New York, New York

                                          _____
                                          UNITED STATES BANKRUPTCY JUDGE

6