**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
In re                                                    :
                                                         :    **Chapter 11**
**WESTINGHOUSE ELECTRIC**                                :
**COMPANY LLC,** *et al.,*                               :    **Case No. 17-10751 (MEW)**
                                                         :
              **Debtors.**                               :    **(Jointly Administered)**
--------------------------------------------------------x

## JOINT CHAPTER 11 PLAN OF REORGANIZATION

**WEIL, GOTSHAL & MANGES LLP**          **TOGUT, SEGAL & SEGAL LLP**
767 Fifth Avenue                        One Penn Plaza, Suite 3335
New York, New York 10153                New York, New York 10119
Telephone: (212) 310-8000               Telephone: (212) 594-5000
Facsimile: (212) 310-8007               Facsimile: (212) 967-4258
Gary T. Holtzer                         Albert Togut
Robert J. Lemons                        Kyle J. Ortiz
Garrett A. Fail                         Patrick Marecki
David N. Griffiths                      Charles M. Persons

*Attorneys for Debtors*                 *Attorneys for the Debtor*
*and Debtors in Possession*             *Toshiba Nuclear Energy Holdings (UK) Ltd.*


                                        Dated:  January 29, 2018
                                                New York, New York

# TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION ..................................................1

SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS .....................15

2.1.    Administrative Expense Claims ..................................................................15
2.2.    Professional Fee Claims ..............................................................................16
2.3.    Priority Tax Claims ......................................................................................17
2.4.    DIP Claims....................................................................................................17

SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS .............................18

3.1.    Classification in General...............................................................................18
3.2.    Formation of Debtor Group for Convenience Only .....................................18
3.3.    Summary of Classification............................................................................18
3.4.    Special Provision Governing Unimpaired Claims ........................................19
3.5.    Subordinated Claims .....................................................................................19

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS .....................................20

4.1.    Other Priority Claims (Class 1)....................................................................20
4.2.    Other Secured Claims (Class 2) ...................................................................20
4.3.    General Unsecured Claims (Class 3).............................................................20
4.4.    Intercompany Claims (Class 4) ....................................................................21
4.5.    U.S. HoldCo Interests (Class 5) ...................................................................21
4.6.    TNEH UK Interests (Class 6) ......................................................................22
4.7.    Intercompany Interests (Class 7)..................................................................22

SECTION 5.    MEANS FOR IMPLEMENTATION.......................................................22

5.1.    Vesting of Assets...........................................................................................22
5.2.    Plan Investment Transaction.........................................................................22
5.3.    Plan Settlement and Compromises ...............................................................23
5.4.    Wind Down Co ..............................................................................................26
5.5.    Cooperation and Access ...............................................................................29
5.6.    Segregated Account for Class 3A General Unsecured Claims .....................29
5.7.    Continuing Role of UCC ..............................................................................29
5.8.    Corporate Action ..........................................................................................29
5.9.    Other Transactions ........................................................................................30
5.10.    Exemption From Certain Transfer Taxes .....................................................30
5.11.    Effectuating Documents; Further Transactions.............................................30
5.12.    Preservation of Causes of Action .................................................................31
5.13.    Closing of the Chapter 11 Cases ..................................................................31

SECTION 6.    CORPORATE GOVERNANCE ..............................................................31

6.1.    Continued Corporate Existence.....................................................................31
6.2.    Boards of Directors and Officers ..................................................................31
6.3.    Organizational Documents.............................................................................32

SECTION 7.    DISTRIBUTIONS ...................................................................................32

7.1.    Administration of Distributions ...................................................................32
7.2.    Distribution Record Date ..............................................................................32
7.3.    Date of Distributions .....................................................................................32
7.4.    Delivery of Distributions ..............................................................................33

i

7.5.     Manner of Payment Under Plan ................................................................33
7.6.     Minimum Cash Distributions ...................................................................33
7.7.     Setoffs and Recoupment .........................................................................34
7.8.     Distributions After Effective Date ...........................................................34
7.9.     Allocation of Distributions Between Principal and Interest ......................34
7.10.    No Postpetition Interest on Claims ..........................................................34
7.11.    Claims Paid by Third Parties ...................................................................34
7.12.    Claims Payable by Third Parties ..............................................................35
7.13.    Distribution Order ..................................................................................35
7.14.    Withholding Rights .................................................................................35
7.15.    Distributions on Account of DIP Claims .................................................35

SECTION 8.    PROCEDURES FOR DISPUTED CLAIMS ...............................................36

8.1.     Objections to Prepetition Claims .............................................................36
8.2.     Allowance of Claims ...............................................................................36
8.3.     Estimation of Claims ..............................................................................36
8.4.     No Distributions Pending Allowance ........................................................36
8.5.     Resolution of Claims ..............................................................................36
8.6.     Segregated Account .................................................................................37
8.7.     Retained Amounts ...................................................................................37
8.8.     Late Filed Claims ...................................................................................38
8.9.     Amendments to Claims ............................................................................38

SECTION 9.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....................................38

9.1.     Assumption, Assignment, and Rejection of Executory Contracts and Unexpired
         Leases ....................................................................................................38
9.2.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................38
9.3.     Claims Based on Rejection of Executory Contracts and Unexpired Leases...................39
9.4.     Plan Funding Agreement ..........................................................................39
9.5.     Modifications, Amendments, Supplements, Restatements, or Other Agreements..........40
9.6.     Survival of Indemnification Obligations ...................................................40
9.7.     Reservation of Rights ..............................................................................40

SECTION 10.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE....................................40

10.1.    Conditions Precedent to the Effective Date ...............................................40
10.2.    Waiver of Conditions Precedent ...............................................................41
10.3.    Substantial Consummation .......................................................................41

SECTION 11.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............41

11.1.    Discharge of Claims and Termination of Interests .......................................41
11.2.    Avoidance Actions ..................................................................................42
11.3.    Discharge of Debtors...............................................................................42
11.4.    Term of Injunctions or Stays....................................................................42
11.5.    Release of Liens .....................................................................................42
11.6.    Releases by the Debtors...........................................................................42
11.7.    Releases by Holders of Claims and Interests ..............................................44
11.8.    Exculpation ...........................................................................................45
11.9.    Injunction ..............................................................................................46
11.10.   Waiver of Statutory Limitation on Releases ...............................................46

ii

SECTION 12.    MODIFICATION OF THE PLAN ................................................................47

    12.1.    Amendments ........................................................................................47

SECTION 13.    RETENTION OF JURISDICTION ............................................................47

SECTION 14.    MISCELLANEOUS PROVISIONS ...........................................................49

    14.1.    Immediate Binding Effect...................................................................49
    14.2.    Severability of Plan Provisions upon Confirmation ...........................49
    14.3.    Expedited Tax Determination .............................................................49
    14.4.    Exemption from Securities Laws ........................................................49
    14.5.    Solicitation of Votes on the Plan........................................................49
    14.6.    Payment of Statutory Fees .................................................................50
    14.7.    Governing Law ...................................................................................50
    14.8.    Additional Documents........................................................................50
    14.9.    Successor and Assigns........................................................................50
    14.10.   Entire Agreement ...............................................................................50
    14.11.   Notices................................................................................................50

WEIL:\96403338\14\80768.0017

Each of the Debtors, with the support of the PSA Parties, proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the respective meanings set forth in Section 1.

SECTION 1.    **DEFINITIONS AND INTERPRETATION**

**Definitions**

1.1    ***Additional Consent Claims*** means the Claims set forth in Proofs of Claim numbers 2075, 2100, 2112, 2114, 2383, 2384, 2385, 2386, 2455, 2769, 2770, 2776, 3005, 3008, 3041, 3042, 3091, 3118, 3119, 3125, 3126, 3127, 3128, 3129, 3130, 3131, 3133, 3134, 3135, 3136, and 3137, each as may be amended or supplemented from time to time.

1.2    ***Administrative Expense Claim*** means any Claim against a Debtor for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority or superpriority pursuant to sections 364(c)(1), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses (such as wages, salaries, or commissions for service rendered after the Petition Date, and payments for goods and other services), (b) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of the title 28 of the United States Code, 28 U.S.C. §§1-1401, and (c) all Allowed Claims that are to be treated as Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code; *provided*, *however* that Intercompany Claims, DIP Claims and Professional Fee Claims shall not be considered Administrative Expense Claims.

1.3    ***Administrative Expense Claims Bar Date*** means the first Business Day that is 30 days following the Effective Date, except as otherwise specifically set forth in the Plan.

1.4    ***Administrative Expense Claims Objection Bar Date*** means the first Business Day that is 120 days following the Effective Date, except as otherwise specifically set forth in the Plan; *provided*, *however*, that the Administrative Expense Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Oversight Board.

1.5    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.6    ***Allowed*** means any Claim against a Debtor: (a) that (i) is timely filed by the Bar Date, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) that (i) is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary Proof of Claim has been timely filed, or (c) allowed under the Plan or by a Final Order, including without limitation, (x) the Toshiba GUC Claims and Class 3B General Unsecured Claims in the amounts set forth herein, and (y) the DIP Claims.  With respect to any Claim described in clause (a) above, such Claim will be considered Allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the Claims Objection Bar Date, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to the Claims Procedures Orders or other order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related hereto and such allowance is approved and authorized by the Bankruptcy Court.

1.7    ***Amended By-Laws*** means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated by-laws (including any articles of association,

operating agreement, or similar constitutional document, if any, required under the laws of such Reorganized Debtor's jurisdiction of organization), a substantially final form of which will be contained in the Plan Supplement if such amended documents contain material changes to the existing documents, and otherwise acceptable to the Plan Investor in its sole discretion, in consultation with the Debtors.

1.8    **Amended Certificate of Incorporation** means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation (including any operating agreement, memorandum of association or similar constitutional document, if any, required under the laws of such Reorganized Debtor's jurisdiction of organization), a substantially final form of which will be contained in the Plan Supplement, if it contains material changes to the existing document, and otherwise acceptable to the Plan Investor in its sole discretion, in consultation with the Debtors.

1.9    **Assumed Liabilities** means the obligations of the Debtors set forth on Exhibit I hereto, which obligations will be assumed by the Reorganized Debtors.

1.10    **AUAM** means Advance Uranium Asset Management Limited.

1.11    **AUAM Loan Claim** means the Claim set forth in Proof of Claim number 3029 filed by AUAM against WEC in the Chapter 11 Cases.

1.12    **Available Cash** means (a) all Cash or Cash equivalents of Wind Down Co, including, without limitation all Net Plan Investment Proceeds, less (b) the amount of cash (i) necessary to pay holders of Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Professional Fee Claims, and Allowed Other Secured Claims in accordance with the Plan, and (ii) estimated and reserved by the Plan Oversight Board to (A) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including, without limitation, professional fees and any costs and fees associated with administering Wind Down Co, (B) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code, and (C) fund and maintain any postpetition reserves required under the Plan, any agreement, or applicable law.  Available Cash shall also include the applicable portions of (x) excess amounts retained for Disputed Claims that become available in accordance with Section 8.6 herein, and (y) amounts of undeliverable Distributions that become available in accordance with Section 7.4 herein.

1.13    **Avoidance Action** means any action commenced, or that may be commenced, before, on or after the Effective Date, by or on behalf of the Debtors, Reorganized Debtors, the Estates, or Wind Down Co, pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

1.14    **Ballot** means each of the ballots distributed with the Disclosure Statement to each holder of an Impaired Claim that is entitled to vote to accept or reject the Plan.

1.15    **Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.16    **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

2

1.17    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.18    ***Bar Date*** means the dates by which Proofs of Claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to the Bar Date Order or other applicable order, or pursuant to the Plan.

1.19    ***Bar Date Order*** means that certain *Order Pursuant to 11 U.S.C. § 502(b)(9), Fed. R. Bankr. P. 2002 and 3003(c)(3), and Local Rule 3003-1 (I) Establishing Deadline for Filing Proofs of Claim and Procedures Relating Thereto and (II) Approving form and Manner of Notice Thereof*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 28, 2017 at ECF No. 788, as supplemented, modified, or amended from time to time.

1.20    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.21    ***Cash*** means legal tender of the United States of America.

1.22    ***Cash Pooling Agreement*** means that certain *Cash Pooling Agreement*, dated as of June 17, 2010, by and among WEC, Westinghouse Electric UK Holdings Limited, the other customers thereto, and Bank Mendes Gans N.V.

1.23    ***Cash Pool Claims*** means the Claims listed on <u>Exhibit B</u> annexed hereto, including any Claim against a Debtor by a holder of a Cash Pool Claim on account of an asserted indemnification obligation of the Debtors related to the Cash Pooling Agreement.

1.24    ***Cash Pool Settlement*** means, pursuant to the Plan, the waiver, release, satisfaction or other agreed upon treatment of all Cash Pool Claims by holders in exchange for, in accordance with the Plan Funding Agreement and the Solvency Steps Plan (as defined in the Plan Funding Agreement), the holders thereof being rendered Solvent.

1.25    ***Causes of Action*** means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any Avoidance Action, (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

1.26    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on March 29, 2017, and styled *In re Westinghouse Electric Company LLC, et al.*, Case No. 17-10751 (MEW).

1.27    ***CFPI*** means Citigroup Financial Products Inc.

3

1.28    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.29    ***Claims Objection Bar Date*** means the first Business Day that is 180 days after the Effective Date or such later date as may be permitted pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Oversight Board.

1.30    ***Claims Procedures Orders*** means, collectively (a) that certain *Order Pursuant to 11 U.S.C. §§ 503(b)(9) and 105(a) (I) Approving Procedures for the Resolution and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9) and (II) Prohibiting Vendors from Pursuing such Claims Outside the Procedures*, entered by the Bankruptcy Court in the Chapter 11 Cases on November 15, 2017 at ECF No. 1759, (b) that certain *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 and 9019(b) Authorizing the Debtors to (I) File Omnibus Claims Objections and (II) Establish Procedures for Settling Certain Claim*s entered by the Bankruptcy Court in the Chapter 11 Cases on November 15, 2017 at ECF No. 1761, (c) that certain *Order Pursuant to 11 U.S.C. §§ 105(a) and 546(c) Establishing and Implementing Exclusive and Global Procedures for Treatment of Reclamation Claims* entered by the Bankruptcy Court in the Chapter 11 Cases on May 24, 2017 at ECF No. 542, and (d) any amendment, supplement or modification to the foregoing.

1.31    ***Claims Register*** means the official register of Claims against the Debtors maintained by the Solicitation and Distribution Agent.

1.32    ***Class*** means any group of Claims or Interests classified pursuant to Section 3 of the Plan.

1.33    ***Class 3A General Unsecured Claim*** means a General Unsecured Claim other than a Class 3B General Unsecured Claim.

1.34    ***Class 3B General Unsecured Claim*** means a General Unsecured Claim set forth on <u>Exhibit E</u> or <u>Exhibit F</u> annexed hereto.

1.35    ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.36    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.37    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.38    ***Confirmation Order*** means an order (a) confirming the Plan, (b) approving the Plan Investment Transaction, (c) determining that Plan Investor is a good faith purchaser, (d) providing that the closing of the Plan Investment Transaction will occur in accordance with the terms and conditions of the Plan Funding Agreement, and (e) providing that the Plan Oversight Board shall be vested with all rights and authority to implement the Reconciliation Plan in accordance with the Plan Support Agreement.

1.39    ***Consenting Claimholder*** means Nucleus Acquisition LLC.

1.40    ***Consummation*** means the occurrence of the Effective Date of the Plan.

4

1.41    ***Control*** means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

1.42    ***Cure Obligation*** means all (a) amounts required to cure any monetary defaults; and (b) other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to section 365 or 1123 of the Bankruptcy Code.

1.43    ***D&O Policy*** means any insurance policy for directors, members, trustees, and officers liability maintained by the Debtors' Estates as of the Effective Date.

1.44    ***Debtors*** means Westinghouse Electric Company LLC; CE Nuclear Power International, Inc.; Fauske and Associates LLC; Field Services, LLC; Nuclear Technology Solutions LLC; PaR Nuclear Holding Co., Inc.; PaR Nuclear, Inc.; PCI Energy Services LLC; Shaw Global Services, LLC; Shaw Nuclear Services, Inc.; Stone & Webster Asia Inc.; Stone & Webster Construction Inc.; Stone & Webster International Inc.; Stone & Webster Services LLC; Toshiba Nuclear Energy Holdings (UK) Limited; TSB Nuclear Energy Services Inc.; WEC Carolina Energy Solutions, Inc.; WEC Carolina Energy Solutions, LLC; WEC Engineering Services Inc.; WEC Equipment & Machining Solutions, LLC; WEC Specialty LLC; WEC Welding and Machining, LLC; WECTEC Contractors Inc.; WECTEC Global Project Services Inc.; WECTEC LLC; WECTEC Staffing Services LLC; Westinghouse Energy Systems LLC; Westinghouse Industry Products International Company LLC; Westinghouse International Technology LLC; and Westinghouse Technology Licensing Company LLC.

1.45    ***DIP Agent*** means (a) the Administrative Agent and the Collateral Agent (each as defined in the DIP Credit Agreement), solely in their capacity as agent under the DIP Credit Agreement.

1.46    ***DIP Claim*** means any and all Claims of the DIP Agent and DIP Lenders arising under or related to the DIP Loan Documents and as authorized under the Final DIP Order, including all principal, interest, default interest, fees, expenses, costs, and other charges provided for thereunder.

1.47    ***DIP Credit Agreement*** means that certain *Superpriority Senior Debtor-in-Possession Credit Agreement*, dated as of May 26, 2017, as amended, supplemented, or otherwise modified, by and among certain of the Debtors, the DIP Agent, and the DIP Lender signatories thereto.

1.48    ***DIP Facility*** means that certain superpriority, senior debtor-in-possession financing facility provided for under the DIP Loan Documents.

1.49    ***DIP Lenders*** means the Lenders (as defined in the DIP Credit Agreement) and the DIP L/C Issuer, solely in their capacity as such under the DIP Credit Agreement.

1.50    ***DIP L/C*** means a "Letter of Credit" as defined in the DIP Credit Agreement.

1.51    ***DIP L/C Issuer*** means the "L/C Issuer" as defined in the DIP Credit Agreement.

1.52    ***DIP Liens*** means all liens, charges, mortgages and similar instruments pledging collateral to secure the DIP Claims in accordance with, and pursuant to, the DIP Loan Documents.

1.53    ***DIP Loan Documents*** means the "DIP Loan Documents," as such term is defined in the Final DIP Order, collectively with the Final DIP Order and the DIP L/Cs.

5

1.54    ***DIP Maturity Date*** means the earlier of the Scheduled Termination Date or the Maturity Date as each such term is defined in the DIP Credit Agreement.

1.55    ***Disallowed*** means a Claim against a Debtor, or any portion thereof, (a) that has been disallowed by a Final Order of the Bankruptcy Court, a settlement, or the Plan, (b) that is listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or applicable law, or (c) that is not listed in the Debtors' Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or under applicable law.

1.56    ***Disclosure Statement*** means the disclosure statement for the Plan which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.57    ***Disclosure Statement Order*** means an order of the Bankruptcy Court approving the Disclosure Statement.

1.58    ***Disputed*** means, with respect to a Claim, a Claim against a Debtor (a) neither Allowed nor Disallowed, or (b) held by a Person or Entity against whom or which any of the Debtors, Wind Down Co, or the Plan Oversight Board has commenced a proceeding, including an objection to such Claim, asserting an Avoidance Action.

1.59    ***Disputed Claims Reserve*** means a Cash reserve funded for Distributions to holders of Disputed Claims if and to the extent that such Disputed Claims become Allowed Claims.

1.60    ***Distribution*** means any payment or transfer made to holders of Allowed Claims under the Plan.

1.61    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Plan Oversight Board in accordance with the terms of the Plan, on which Wind Down Co makes a Distribution to holders of Allowed Claims.

1.62    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Section 10 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.63    ***EMEA Subsidiaries*** means the Subsidiaries of TNEH UK.

1.64    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.65    ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.66    ***Excluded Assets*** means the assets of the Debtors set forth on <u>Exhibit J</u> to the Plan, to be transferred to Wind Down Co immediately prior to the closing of the Plan Investment Transaction.

1.67    ***Exculpated Parties*** means, collectively: (a) the Debtors, Reorganized Debtors, and Wind Down Co, (b) the DIP Lenders, (c) the DIP Agent, (d) the Plan Oversight Board, (e) the Released Subsidiaries, (f) the PSA Parties, (g) VC Summer Claimholder, and (h) with respect to each of

6

the foregoing entities in clauses (a) through (g), such Entities' Representatives, in each case, solely in their capacity as such.

1.68    ***Executory Contract*** means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.69    ***Final Class 3A Distribution Date*** means the date on which all Class 3A General Unsecured Claims have been either Allowed or Disallowed and the Solicitation and Distribution Agent has made the final Distribution of Segregated Funds to holders of Allowed Class 3A General Unsecured Claims.

1.70    ***Final DIP Order*** means that certain *Final Order (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims Pursuant to Bankruptcy Code Sections 105, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rule 4001-2 and (III) Granting Related Relief*, entered by the Bankruptcy Court in the Chapter 11 Cases on May 26, 2017 at ECF No. 565, and all exhibits thereto as each may be amended, modified, or supplemented from time to time.

1.71    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.72    ***General Unsecured Claim*** means any unsecured Claim against any Debtor, other than an Intercompany Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court. For the avoidance of doubt, Cash Pool Claims and the AUAM Loan Claim shall be considered General Unsecured Claims.

1.73    ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.74    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.75    ***Initial Distribution*** means the first Distribution to holders of Allowed Claims.

1.76    ***Initial Distribution Date*** means a date selected by the Plan Oversight Board for the Initial Distribution that is no later than 60 days after the Effective Date.

1.77    ***Intercompany Claim*** means any Claim against any of the Debtors by any of the Westinghouse Entities, other than the Cash Pool Claims and AUAM Loan Claim.

7

1.78    ***Intercompany Interest*** means an Interest in a Debtor, other than an Interest in U.S. HoldCo or TNEH UK.

1.79    ***Interests*** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.80    ***Interim Compensation Order*** means the *Order Pursuant to 11 U.S.C. §§ 105(a), 330, 331, Fed. R. Bankr. P. 2016, and Local Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals*, entered by the Bankruptcy Court in the Chapter 11 Cases on May 24, 2017 at ECF No. 544, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

1.81    ***L/C Cash Collateralization Amount*** has the meaning set forth in the DIP Credit Agreement.

1.82    ***LFA Claims*** means the claims of WEC against TNEH UK and the EMEA Subsidiaries pursuant to the Liquidity Facility Agreement.

1.83    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.84    ***Liquidity Facility Agreement*** means that certain *Liquidity Facility Agreement* by and among WEC and the borrowers thereto, dated as of April 5, 2017, as has been or may be amended, restated, or modified.

1.85    ***Material Claims*** means the Claims set forth in (a) Proofs of Claim numbers 2464, 2467, and 3007, (b) the Additional Consent Claims; and (c) Proofs of Claim numbers 3086, 3087, 3413, and 3414, and any amendments thereof, and irrespective of any assignments or transfers thereof.

1.86    ***Net Plan Investment Proceeds*** means $3,702,000,000 in Cash (subject to certain adjustments and holdbacks under the Plan Funding Agreement) to be delivered by the Plan Investor to Wind Down Co pursuant to the Plan Funding Agreement and this Plan.

1.87    ***NI Contract*** means that certain *AP1000 Nuclear Island Contract for Nuclear Power Self-reliance Program Supporting Projects* dated as of July 24, 2007 by and between, among others, WEC, Westinghouse Industry Products International Company Ltd., Stone & Webster Asia Inc., Stone & Webster International Inc., and the NI Counterparties.

1.88    ***NI Counterparties*** means State Nuclear Power Technology Corporation Ltd., Sanmen Nuclear Power Company Ltd., and Shandong Nuclear Power Company Ltd.

1.89    ***NI Settlement*** means those certain agreements entered into among WEC, Westinghouse Industry Products International Company Ltd., Stone & Webster Asia Inc., Stone & Webster International Inc., and the NI Counterparties, over a series of dates in December 2017, copies of which will be included with the Plan Supplement.

1.90    ***Other Priority Claim*** means any Claim against any of the Debtors entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other

8

than an Administrative Expense Claim, DIP Claim, Intercompany Claim, Professional Fee Claim, or a Priority Tax Claim.

1.91    ***Other Secured Claim*** means any Secured Claim other than a Priority Tax Claim, DIP Claim, or Intercompany Claim.

1.92    ***PBGC*** means the Pension Benefit Guaranty Corporation.

1.93    ***Pension Funding Agreement*** means that certain *Settlement and Pension Funding Agreement* dated as of January 26, 2018, by and among WEC, Plan Investor, the Consenting Claimholder and the PBGC, a copy of which is annexed hereto as <u>Exhibit H.</u>

1.94    ***Pension Plan*** means each of the following defined benefit pension plans: (a) Westinghouse Electric Company Pension Plan, (b) Westinghouse Pension Plan for Newington Boilermakers, and (c) Westinghouse Pension Plan for Windsor Boilermakers.

1.95    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other entity.

1.96    ***Petition Date*** means March 29, 2017.

1.97    ***Plan*** means this joint chapter 11 plan of reorganization, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 12.1 herein.

1.98    ***Plan Documents*** means the Plan, the Disclosure Statement, the Solicitation Procedures Motion, and the Disclosure Statement Order.

1.99    ***Plan Funding Agreement*** means that that certain *Plan Funding Agreement* dated as of January 12, 2018, by and among TNEH UK, U.S. HoldCo, and the Plan Investor, which provides for, among other things, the sale, issuance, conveyance, assignment, transfer and delivery to Plan Investor of all issued and outstanding equity interests in Reorganized U.S. HoldCo and WECHOL, a partially redacted copy of which was filed with the Bankruptcy Court at ECF No. 2180 and is also annexed hereto as <u>Exhibit A.</u>

1.100    ***Plan Investment Proceeds*** means, collectively, (a) the Net Plan Investment Proceeds, and (b) $100,000,000 in Cash to be delivered to WEC or Reorganized WEC by the Plan Investor in accordance with the Pension Funding Agreement.

1.101    ***Plan Investment Transaction*** means the sale, issuance, conveyance, assignment, transfer and delivery to Plan Investor of all issued and outstanding equity interests in Reorganized U.S. HoldCo and WECHOL (and indirectly, each of their respective direct and indirect subsidiaries) in accordance with the Plan and Plan Funding Agreement.

1.102    ***Plan Investor*** means Brookfield WEC Holdings LLC.

1.103    ***Plan Oversight Board*** means the committee consisting of five (5) members (three (3) to be selected by Consenting Claimholder, one (1) to be selected by the UCC, and one (1) to be selected by the Debtors) established on the Confirmation Date to, among other things, oversee and direct

9

Wind Down Co and its implementation and administration of the Plan. A list of the members of the Plan Oversight Board shall be filed with the Plan Supplement.

1.104 ***Plan Oversight Board By-Laws*** means the Plan Oversight Board's by-laws, which shall govern the formation and operation of the Plan Oversight Board. The Plan Oversight Board By-Laws shall be filed with the Plan Supplement.

1.105 ***Plan Supplement*** means the compilation of documents to be filed no later than five (5) calendar days prior to the Voting Deadline, containing, among other things, the (a) Schedules of Executory Contracts, (b) Schedule of Preserved Avoidance Actions, (c) Amended Certificates of Incorporation, (d) Amended By-Laws, (e) identity of the members of the Plan Oversight Board, (f) Plan Oversight Board By-Laws, (g) Reconciliation Plan, (h) Toshiba-EMEA Settlement Agreement, (i) Wind Down Co Organizational Documents, (j) NI Settlement, (k) list of Released Subsidiaries, (l) any amendments to the agreements or adjustments to the compensation of WEC's and TNEH UK's independent directors; and (m) the information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided*, *however*, that through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits or amendments to the documents contained in, and exhibits to, the Plan Supplement, subject to the terms of the Plan Support Agreement and Plan Funding Agreement; *provided*, *further* that the Schedules of Executory Contracts shall be filed not later than five (5) calendar days prior to the Confirmation Hearing.

1.106 ***Plan Support Agreement*** means that certain Plan Support Agreement (including all exhibits thereto), dated as of January 17, 2018, by and among the Debtors and the PSA Parties, as may be amended, restated, or otherwise modified in accordance with its terms.

1.107 ***Priority Claim*** means any Priority Tax Claim or Other Priority Claim.

1.108 ***Priority Tax Claim*** means any secured or unsecured Claim against a Debtor of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.109 ***Pro Rata*** means, with respect to an Allowed Claim, the proportion that an Allowed Claim bears to the aggregate amount of Allowed Claims and Disputed Claims within its Class.

1.110 ***Professional*** means an Entity retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

1.111 ***Professional Fee Claim*** means any Claim against a Debtor for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by a Professional.

1.112 ***Professional Fee Escrow*** means an interest-bearing escrow account to be funded on the Effective Date in an amount equal to an estimate of all unpaid Professional Fee Claims.

1.113 ***Proof of Claim*** means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

1.114 ***PSA Parties*** means Toshiba Corporation, the UCC, Plan Investor and Consenting Claimholder.

10

1.115    ***Reconciliation Plan*** means a cooperation and responsibility plan between the Debtors and UCC with respect to the allowance and disallowance of Claims against the Debtors' Estates, in accordance with the terms set forth in the Plan Support Agreement, which shall be reasonably acceptable to each of the PSA Parties.  A copy of the Reconciliation Plan shall be filed with the Plan Supplement.

1.116    ***Reinstatement*** or ***Reinstated*** means rendering a Claim or Interest Unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.117    ***Released Parties*** means, collectively: (a) the Debtors, Reorganized Debtors, and Wind Down Co, (b) the DIP Lenders, (c) the DIP Agent, (d) the Plan Oversight Board, (e) the Released Subsidiaries, (f) the PSA Parties, (g) VC Summer Claimholder, and (h) with respect to each of the foregoing entities in clauses (a) through (g), such Entities' Representatives, in each case, solely in their capacity as such.

1.118    ***Released Subsidiaries*** means certain non-Debtor Westinghouse Entities to receive the benefit of the releases and exculpations provided pursuant to this Plan, a list of which Entities shall be provided with the Plan Supplement.

1.119    ***Released TNEH UK Claims*** means the Claims listed on <u>Exhibit C</u> annexed hereto.

1.120    ***Released Toshiba Claims*** means the Claims listed on <u>Exhibit D</u> annexed hereto.

1.121    ***Releasing Parties*** means collectively and in each case in their capacity as such: each holder of a Claim against or an Interest in a Debtor (including the DIP Lenders and the DIP Agent), other than those who (a) were entitled to vote on the Plan and did not vote on the Plan, or (b) voted to reject and also did not check the box on the applicable Ballot indicating that they opt to grant the releases provided in the Plan, and with respect to each of the foregoing entities, such entities' predecessors, successors and assigns, subsidiaries, Affiliates, current and former officers, directors, principals, managers, shareholders, members, partners, equity holders, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.122    ***Reorganized Debtor*** or ***Reorganized Debtors*** means individually, any Debtor and, collectively, all Debtors, in each case as reorganized under the Plan from and after the Effective Date.

1.123    ***Reorganized U.S. HoldCo*** means U.S. HoldCo from and after the Effective Date.

1.124    ***Reorganized WEC*** means WEC from and after the Effective Date.

1.125    ***Replacement DIP Facility*** means any postpetition financing facility that replaces the DIP Facility and provides for the full and indefeasible repayment in Cash of the DIP Claims arising under or related to the DIP Loan Documents on the earlier of the DIP Maturity Date or the Effective Date, including all principal, interest, default interest, fees, expenses, costs, and other charges provided for thereunder (or, in the case of any DIP L/Cs outstanding on the Effective Date, funding of the L/C Cash Collateralization Amount or such other treatment shall have been provided with respect to such DIP L/C as the Debtors and the DIP L/C Issuer shall agree).

11

1.126   ***Representative*** shall mean any Person or Entity's successor, predecessor, assign, subsidiary, Affiliate, officer, director, manager, member, shareholder, equity holder, employee, partner, agent, attorney, advisor, investment banker, financial advisor, accountant, actuary, consultant or other professional, in each case in such capacity, serving on or after the Petition Date.

1.127   ***Schedule of Assigned Contracts*** means the schedule of Executory Contracts and Unexpired Leases to be assumed and assigned by the Debtors to Wind Down Co on the Effective Date pursuant to the Plan Funding Agreement, to be filed in accordance with the Solicitation Procedures Order, in a form and substance reasonably acceptable to Consenting Claimholder, and as may be amended from time to time prior to the Effective Date in accordance with the Solicitation Procedures Order.

1.128   ***Schedule of Assumed Contracts*** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors on the Effective Date, to be filed in accordance with the Solicitation Procedures Order, and as may be amended from time to time prior to the Effective Date in accordance with the Solicitation Procedures Order.

1.129   ***Schedule of Preserved Avoidance Actions*** means the schedule of Entities against whom the Debtors shall not be deemed to have released potential Avoidance Actions against on the Effective Date, to be filed with the Plan Supplement.

1.130   ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.131   ***Schedules of Executory Contracts*** means, collectively, the Schedule of Assigned Contracts and Scheduled of Assumed Contracts and any amendments of, supplements to or modifications to the foregoing.

1.132   ***Secured Claim*** means a Claim against a Debtor secured by a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

1.133   ***Securities Act*** means the Securities Act of 1933, as amended.

1.134   ***Segregated Account*** means a segregated account managed by the Solicitation and Distribution Agent to hold the Segregated Funds.

1.135   ***Segregated Funds*** means $1,150,000,000 of Available Cash to be deposited with the Solicitation and Distribution Agent in the Segregated Account on the Effective Date.

1.136   ***Solicitation and Distribution Agent*** means Kurtzman Carson Consultants LLC, the notice, claims, and solicitation and distribution agent retained by the Debtors for the Chapter 11 Cases.

1.137   ***Solicitation Procedures Motion*** means the Debtors' motion for entry of an order (a) approving the Disclosure Statement, (b) establishing procedures for the assumption and assumption and assignment of Executory Contracts and Unexpired Leases under the Plan and the form of cure notices and assumption notices related thereto, (c) establishing the Voting Deadline, (d) approving solicitation

WEIL:\96403338\14\80768.0017

procedures, distribution of solicitation packages, and establishing a deadline and procedures for temporary allowance of Claims for voting purposes, (e) approving the form of ballots and voting instructions, and (f) approving the form and manner of notice of the Confirmation Hearing and related issues.

1.138    ***Solicitation Procedures Order*** means an order of the Bankruptcy Court approving the Solicitation Procedures Motion.

1.139    ***Solvent*** has the meaning ascribed to such term in the Plan Funding Agreement.

1.140    ***Subordinated*** means subordinated under section 510 of the Bankruptcy Code, or otherwise contractually subordinated.

1.141    ***Subsidiary*** of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person, and with respect to which Entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising Control.

1.142    ***TNEH UK*** means Toshiba Nuclear Energy Holdings (UK) Limited.

1.143    ***Toshiba*** shall mean Toshiba Corporation.

1.144    ***Toshiba Affiliates*** shall mean each of Toshiba's direct and indirect subsidiaries on the Effective Date, in each case excluding the Westinghouse Entities.

1.145    ***Toshiba Distribution Order*** means that certain *Order Regarding Distributions in Respect of Claims and Interests of Toshiba Corporation and Affiliates*, entered by the Bankruptcy Court in the Chapter 11 Cases on July 20, 2017 at ECF No. 953, supplemented by that certain *Stipulation and Order Regarding Distributions in Respect of Cash Pooling Claim of Toshiba Corporation and Affiliates*, entered by the Bankruptcy Court in the Chapter 11 Cases on November 16, 2017 at ECF No. 1769.

1.146    ***Toshiba GUC Claims*** means the Claims listed on <u>Exhibit G</u> annexed hereto.

1.147    ***Toshiba-EMEA Settlement Agreement*** means an agreement to be filed with the Bankruptcy Court in the Plan Supplement, memorializing the settlement of claims between Toshiba and each of the EMEA Subsidiaries, as described in Section 5.3(d)(ii).

1.148    ***UCC*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

1.149    ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.150    ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.151    ***U.S. AP1000 Projects*** means, collectively, (a) Units 3 & 4 at the Alvin W. Vogtle Electric Generating Plant located near Waynesboro, Georgia, and (b) Units 2 & 3 at the Virgil C. Summer Nuclear Generating Station located near Jenkinsville, South Carolina.

13

1.152   ***U.S. Debtors*** means U.S. HoldCo and its direct and indirect Debtor Subsidiaries.

1.153   ***U.S. HoldCo*** means TSB Nuclear Energy Services Inc.

1.154   ***U.S. Trustee*** means the United States Trustee for Region 2.

1.155   ***VC Summer Claimholder*** means CFPI, or its assignee, as record holder of the VC Summer Claims, and any Entity holding a participation interest in the VC Summer Claims.

1.156   ***VC Summer Claims*** means the Claims set forth in Proofs of Claim numbers 2440, 2444, 3088, and 3089 filed in the Chapter 11 Cases, and any amendments thereof, and irrespective of any assignments or transfers thereof.

1.157   ***Vogtle Claims*** means the Claims set forth in Proofs of Claim numbers 2222 and 2132, filed in the Chapter 11 Cases, and any amendments thereof, and irrespective of any assignments or transfers thereof.

1.158   ***Voting Deadline*** means March 15, 2018 at 8:00 p.m. (prevailing Eastern Time), or such date and time as may be set by the Bankruptcy Court in accordance with the Solicitation Procedures Order.

1.159   ***WEC*** means Westinghouse Electric Company LLC.

1.160   ***WECHOL*** means Westinghouse Electric UK Holdings Limited.

1.161   ***Westinghouse Entities*** means, collectively, (a) the U.S. Debtors and their direct and indirect Subsidiaries, (b) TNEH UK, and (c) the EMEA Subsidiaries.

1.162   ***Wind Down Co*** means an Entity to be established on the Effective Date for the benefit of holders of Claims against the Debtors, which Entity shall be a limited liability company managed by its member(s) in accordance with the Wind Down Co Organizational Documents; *provided, however,* that the Consenting Claimholder, with the reasonable consent of the PSA Parties, may elect before the Effective Date to create Wind Down Co using a different form of Entity, including the use of a liquidating trust, if the Consenting Claimholder determines that such form would be in the best interests of the Reorganized Debtors and holders of Allowed Claims against the Debtors.

1.163   ***Wind Down Co Organizational Documents*** means any organizational documents of Wind Down Co, substantially final forms of which will be contained in the Plan Supplement, and in form and substance reasonably acceptable to the Consenting Claimholder.

## A.    Interpretation; Application of Definitions and Rules of Construction

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  The words "include," "includes," and "including," shall be deemed followed by the phrase "without limitation."  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender, (2)

14

any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions, (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto, (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, and (6) all references to claim numbers in the Plan shall include any amended, modified, and/or superseded Claims relating thereto and any assignment or transfer of any such Claim.

**B.    Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**C.    Controlling Document**

The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). In the event of an inconsistency between this Plan, the Disclosure Statement, or any exhibit or schedule to the Disclosure Statement, this Plan shall control. As of the Effective Date, in the event of an inconsistency between this Plan and the Plan Support Agreement or the Plan Funding Agreement, this Plan shall control; *provided*, *however*, that the parties to the Plan Support Agreement or the Plan Funding Agreement, as applicable, shall use commercially reasonable efforts to eliminate any such inconsistency by agreement prior to the provisions of this section becoming applicable and enforceable.

**D.    Joint Chapter 11 Plan**

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

**SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS**

2.1.    *Administrative Expense Claims*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the applicable Debtor or Wind Down Co (or the Reorganized Debtors, as applicable) agree to different treatment, Wind Down Co (or with regard to an Allowed Administrative Expense Claim that is an Assumed Liability under the Plan Funding Agreement, the applicable Reorganized Debtor) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to the Allowed amount of such Allowed Claim, which payment shall be made on, or as soon as reasonably practicable after, the first Business Day after the later of the (a) Effective Date, and (b) the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided, however*, that the DIP Claims shall receive the treatment provided in Section 2.4 below; *provided further* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the

15

Debtors shall be paid by Wind Down Co or the Reorganized Debtors (as applicable) in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by Section 2.4 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, Wind Down Co, and the Reorganized Debtors, or their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.  The Plan Oversight Board may file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

## 2.2.    *Professional Fee Claims*

(a)    *Professional Fee Escrow.*  No later than five (5) Business Days after the Effective Date, Wind Down Co shall establish and fund the Professional Fee Escrow.  Funds held in the Professional Fee Escrow shall not be considered property of Wind Down Co or property of the Reorganized Debtors; *provided*, *however*, that any funds in the Professional Fee Escrow, including interest earned on funds held in the Professional Fee Escrow, after all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders of the Bankruptcy Court shall be released to Wind Down Co and deemed to constitute Available Cash and shall be distributed pursuant to the Plan as if such amounts had constituted Available Cash on the Effective Date.  The Professional Fee Escrow shall be held in trust for the Professionals and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full in Cash.  No Liens, claims, or interests shall encumber the Professional Fee Escrow or Cash held in the Professional Fee Escrow in any way.  Professional Fees owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court.  The Debtors' obligations to pay Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow.  For the avoidance of doubt, the fees and expenses of the DIP Agent's and DIP Lenders' professionals do not constitute Professional Fee Claims and shall be paid in accordance with and pursuant to the DIP Loan Documents.

(b)    *Estimation of Fees and Expenses.*  Professionals shall provide a good faith estimate of their Professional Fee Claims projected to be outstanding as of the Effective Date and shall deliver such estimate to the Debtors no later than five (5) calendar days before the anticipated Effective Date.  Such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow.  Wind Down Co shall use Cash on hand to increase the amount of the Professional Fee Escrow to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow based on such estimates.

16

(c)    *Final Fee Applications and Payment of Allowed Professional Fee Claims*. All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on Wind Down Co and the Reorganized Debtors no later than the first Business Day that is sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by order of the Bankruptcy Court.

2.3.    ***Priority Tax Claims***

Except to the extent that a holder of an Allowed Priority Tax Claim and the applicable Debtor or Wind Down Co (or if a Priority Tax Claim is an Assumed Liability under the Plan Funding Agreement, the applicable Reorganized Debtor) agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to the Allowed amount of such Allowed Priority Tax Claim on, or as soon as is reasonably practicable after, the first Business Day after the later of the (a) Effective Date, and (b) date such Priority Tax Claim becomes an Allowed Priority Tax Claim; *provided further* that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by Wind Down Co or the Reorganized Debtors (as applicable) in the ordinary course of business, consistent with past practice.

2.4.    ***DIP Claims***

The DIP Claims shall be Allowed in the full amount due and owing under the DIP Credit Agreement and the DIP Loan Documents. Except to the extent that a holder of a DIP Claim agrees in writing to a different treatment, each holder of a DIP Claim shall be indefeasibly paid in full in Cash in an amount equal to the full amount of such Claims on the earlier of the DIP Maturity Date or the Effective Date (or, in the case of any DIP L/Cs outstanding on the DIP Maturity Date or the Effective Date, the funding of the L/C Cash Collateralization Amount (or, in lieu thereof, the establishment of "backstop" letters of credit or other Cash collateralization thereof at 105%, in each case, pursuant to Section 2.4(a)(iii)(C) of the DIP Credit Agreement); *provided*, *however*, that DIP Claims in respect of contingent and unliquidated obligations of the Debtors under the DIP Loan Documents (including, without limitation, under Section 9.5 of the DIP Credit Agreement) shall survive the Effective Date on an unsecured basis and shall not be discharged or released pursuant to the Plan or the Confirmation Order and shall be paid by Wind Down Co as and when due under the DIP Loan Documents. Upon the indefeasible payment in full in Cash of all DIP Claims (or, in the case of any DIP L/Cs outstanding on the DIP Maturity Date or the Effective Date, the funding of the L/C Cash Collateralization Amount (or, in lieu thereof, the establishment of "backstop" letters of credit or other Cash collateralization thereof at 105%, in each case, pursuant to Section 2.4(a)(iii)(C) of the DIP Credit Agreement)) in accordance with the preceding sentence, all Liens and security interests granted to the DIP Agent pursuant to the DIP Loan Documents shall be deemed cancelled and shall be of no further force and effect and, except as set forth in the preceding sentence, each Allowed DIP Claim shall be deemed to be fully satisfied, settled, released, and discharged.

Pursuant to the DIP Credit Agreement, all Distributions pursuant to this Section 2.4 shall be made to the DIP Agent for distribution to the DIP Lenders in accordance with the DIP Credit Agreement and the DIP Loan Documents. The DIP Agent shall retain all right as DIP Agent under the DIP Loan Documents in connection with the delivery of Distributions to the DIP Lenders. The DIP Agent shall not have any liability to any person with respect to Distributions made or directed to be made by such DIP Agent, except for liability resulting from gross negligence or willful misconduct of the DIP

17

Agent.  All Cash Distributions to be made hereunder to the DIP Agent on account of the DIP Claims shall be made by wire transfer.

If the Debtors enter into a Replacement DIP Facility, the repayment of DIP Claims contemplated by the preceding paragraphs of this Section 2.4 shall be effected on the date of, and substantially concurrently with, the closing of the Replacement DIP Facility, and the provisions of the preceding paragraphs of this Section 2.4 shall apply, *mutatis mutandis*, to the repayment of the Replacement DIP Facility on the Effective Date.

SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS**

3.1.    ***Classification in General***

Claims and Interests, except for Administrative Expense Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in this Section 3.  A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution (subject to Section 5.3) under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    ***Formation of Debtor Group for Convenience Only***

This Plan (including, but not limited to, Sections 2 and 3 of the Plan) groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

3.3.    ***Summary of Classification***

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 4.

18

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Conclusively Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Conclusively Presumed to Accept) |
| 3 | Class 3A General Unsecured Claims<br>Class 3B General Unsecured Claims | Impaired | Yes (Entitled to Vote) |
| 4 | Intercompany Claims | Unimpaired | No (Conclusively Presumed to Accept) |
| 5 | U.S. HoldCo Interests | Impaired | No (Not Entitled to Vote, but accepting pursuant to the Plan Support Agreement) |
| 6 | TNEH UK Interests | Impaired | No (Not Entitled to Vote, but accepting pursuant to the Plan Support Agreement) |
| 7 | Intercompany Interests | Unimpaired | No (Conclusively Presumed to Accept) |

### 3.4.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors, Wind Down Co and the Plan Oversight Board, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, Wind Down Co and the Plan Oversight Board, as applicable, reserve the right to reclassify or subordinate any Disputed or Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, or on any other grounds.

### 3.6    *Cramdown*

If any Class of Claims or Interests is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code, or (b) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court may, after notice and a hearing, determine such controversy on or before the Confirmation Date.

WEIL:\96403338\14\80768.0017

SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS**

    4.1.    ***Other Priority Claims (Class 1)***

        (a)    *Classification*: Class 1 consists of Allowed Other Priority Claims against the Debtors.

        (b)    *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash Distributions, to be made in accordance with Section 7 herein, in an amount equal to the Allowed amount of such Claim.

        (c)    *Voting*: Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

    4.2.    ***Other Secured Claims (Class 2)***

        (a)    *Classification*: Class 2 consists of the Other Secured Claims. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

        (b)    *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment, each holder of an Allowed Other Secured Claim shall, at the option of Wind Down Co or the Reorganized Debtors (as applicable): (i) be paid the Allowed amount of such Other Secured Claim in full in Cash in accordance with Section 7 herein, in full and final satisfaction of such Claim, (ii) receive delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) have its Allowed Other Secured Claim Reinstated pursuant to section 1124 of the Bankruptcy Code.

        (c)    *Voting*: Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

    4.3.    ***General Unsecured Claims (Class 3)***

        (a)    *Classification*: Class 3 consists of General Unsecured Claims against the Debtors. For purposes of voting on the Plan, holders of Class 3A General Unsecured Claims and holders of Class 3B General Unsecured Claims shall be considered a single Class. For purposes of Claim treatment and Distributions, and to reflect the settlements incorporated into Section 5.3 herein, Class 3 shall be divided into Class 3A General Unsecured Claims and Class 3B General Unsecured Claims.

        (b)    *Treatment*:

            (i)    *Class 3A General Unsecured Claims*: Except to the extent that a holder of an Allowed Class 3A General Unsecured Claim has agreed to less favorable treatment, each holder of an Allowed Class 3A General Unsecured Claim (other than holders of Cash Pool Claims) shall receive, in full and final satisfaction of such Claim, Cash Distributions, to be made in accordance with Section 7 herein, in an amount equal to the lesser of (1) its Pro Rata share of the Segregated Funds, and (2) 100% of the amount of such Allowed 3A General Unsecured Claim. In no event shall the holder of a

20

Class 3A General Unsecured Claim receive Distributions (y) in excess of the Allowed amount of such Claim, or (z) in respect of postpetition interest.

(ii)    *Class 3B General Unsecured Claims*:  Except to the extent that a holder of an Allowed Class 3B General Unsecured Claim has agreed to less favorable treatment, each holder of an Allowed Class 3B General Unsecured Claim shall receive its Pro Rata share of 100% of the membership interests in Wind Down Co (or, if Wind Down Co is not a limited liability company, 100% of the beneficial ownership interests in Wind Down Co), which pursuant to the provisions of the Plan, the Plan Oversight Board By-Laws and the Wind Down Co Organizational Documents, will be obligated to distribute Available Cash from time to time to its members (or, if Wind Down Co is not a limited liability company, to the holders of its beneficial ownership interests); *provided*, *however*, that notwithstanding anything to the contrary in this subsection, the Allowed Class 3B General Unsecured Claims on Exhibit F to the Plan shall be deemed to be subordinated to all other Allowed Class 3B General Unsecured Claims, and Wind Down Co shall not make any Distributions of Available Cash to the holders of the Allowed Class 3B General Unsecured Claims on Exhibit F to the Plan unless and until the holders of all Allowed Class 3B General Unsecured Claims on Exhibit E to the Plan have received payment in full on account of such Claims.

(c)    *Voting*:  Class 3 is Impaired, and holders of General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

### 4.4.    *Intercompany Claims (Class 4)*

(a)    *Classification*:  Class 4 consists of Intercompany Claims against the Debtors.

(b)    *Treatment*: At the option of the Debtors, subject to the terms of the Plan Funding Agreement, holders of Allowed Intercompany Claims shall have such Claims Reinstated, settled, offset, cancelled, extinguished or eliminated, including by way of capital contribution.  For the avoidance of doubt, any settlement or payment made on account of an Intercompany Claim in accordance with the Plan Funding Agreement shall not be made out of the Segregated Account or otherwise reduce the amount of the Segregated Funds available to holders of Class 3A General Unsecured Claims (other than Cash Pool Claims who shall participate in the Cash Pool Settlement).

(c)    *Voting*:  As a result of the settlements and compromises provided for in Section 5.3 herein, Class 4 is deemed Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

### 4.5.    *U.S. HoldCo Interests (Class 5)*

(a)    *Classification*:  Class 5 consists of Interests in U.S. HoldCo.

(b)    *Treatment:*  The holders of Interests in U.S. HoldCo shall not receive or retain any property or Distributions under the Plan on account of such Interests.  Interests in U.S. HoldCo shall be cancelled on the Effective Date.

(c)    *Voting*:  Class 5 is Impaired, and holders of Interests in U.S. HoldCo are not entitled to vote to accept or reject the Plan.  The ultimate parent of the holder of all US HoldCo Interests has agreed, pursuant to the Plan Support Agreement, to accept and support the Plan.

WEIL:\96403338\14\80768.0017

4.6.    ***TNEH UK Interests (Class 6)***

(a)    *Classification*: Class 6 consists of Interests in TNEH UK.

(b)    *Treatment:*  The holders of Interests in TNEH UK shall not receive or retain any property or Distributions under the Plan on account of such Interests.  Interests in TNEH UK shall be cancelled (or such equivalent under local law) on the Effective Date.

(c)    *Voting*:  Class 6 is Impaired, and holders of Interests in TNEH UK are not entitled to vote to accept or reject the Plan.  The controlling holder of Interests in TNEH UK has agreed, pursuant to the Plan Support Agreement, to accept and support the Plan.

4.7.    ***Intercompany Interests (Class 7)***

(a)    *Classification*: Class 7 consists of Intercompany Interests.

(b)    *Treatment*:  Each Intercompany Interest shall be Reinstated on the Effective Date.

(c)    *Voting*:  Holders of Class 7 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

## SECTION 5.    MEANS FOR IMPLEMENTATION

5.1.    ***Vesting of Assets***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates other than Excluded Assets and any Cause of Action preserved for the benefit of Wind Down Co under Section 5.12 or Section 11.2 hereof shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to the Plan Funding Agreement, this Plan and the Confirmation Order.   From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

5.2.    ***Plan Investment Transaction***

Pursuant to and subject to the terms and conditions of Plan Funding Agreement, on the Effective Date, the Plan Investor will (a) be issued 100% of the equity interests in Reorganized U.S. HoldCo, and (b) purchase all of the issued and outstanding equity interests in WECHOL, in each case, free and clear of all Liens (other than Liens arising under applicable securities laws).  The Confirmation Order shall authorize the Plan Investment Transaction under sections 363 and 1123(b)(4) of the Bankruptcy Code under the terms and conditions of the Plan Funding Agreement.  Upon Confirmation, the Debtors shall be authorized to take any and all actions necessary to consummate the Plan Investment Transaction, without the need for any further corporate actions or further order of the Bankruptcy Court and without any further actions by holders of Claims or Interests.

WEIL:\96403338\14\80768.0017

5.3.    ***Plan Settlement and Compromises***

The Plan contemplates and is predicated upon entry of an order (which may be the Confirmation Order) substantively consolidating the Debtors' Estates and the Chapter 11 Cases pursuant to a global and integrated compromise and settlement of all disputes among the Debtors, the PSA Parties, the EMEA Subsidiaries, and the PBGC, approval of which is being sought under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  Specifically, and without limitation, the treatment of the Class 3A General Unsecured Claims (including the Toshiba GUC Claims, Cash Pool Claims, and AUAM Loan Claim), Class 3B General Unsecured Claims (including the VC Summer Claims and Vogtle Claims), Intercompany Claims, Released Toshiba Claims, Released TNEH UK Claims, and LFA Claims provided herein is a settlement and compromise of the delay, expense, and uncertainty associated with extensive potential litigation, including among other things, (a) litigation relating to the valuation of the U.S. Debtors, TNEH UK, and the EMEA Subsidiaries, and the associated allocation of Plan Investment Proceeds between and among the U.S. Debtors on the one side, and TNEH UK and the EMEA Subsidiaries on the other side, and (b) litigation relating to the allowance and amount of the VC Summer Claims, Vogtle Claims, and Claims and Interests of Toshiba and the Toshiba Affiliates.  Further, the treatment of such Claims pursuant to the settlements provided herein supports maximum recoveries for the holders of Allowed Claims while providing for the solvency of the EMEA Subsidiaries and going concern emergence of the Reorganized Debtors from these Chapter 11 Cases.  The Plan is deemed a motion for approval of compromises and settlements contained herein, and the Confirmation Order will approve, under Bankruptcy Rule 9019, the global settlement provided for hereunder and the associated substantive consolidation of the Debtors' Estates and Chapter 11 Cases.  The Plan settlement will be implemented as follows:

(a)    *Treatment of Class 3B General Unsecured Claims*

On the Effective Date, the Class 3B General Unsecured Claims shall be Allowed in the amounts stated on Exhibit E and Exhibit F, as applicable, annexed hereto.  All Claims for amounts in excess of the amounts listed on Exhibit E and Exhibit F hereto shall be deemed withdrawn.  The holders of Class 3B General Unsecured Claims have agreed to less favorable treatment than other holders of General Unsecured Claims by (i) until after the Final Class 3A Distribution Date, waiving their right to any Distributions from Segregated Funds deposited into the Segregated Account for the benefit of holders of Allowed Class 3A General Unsecured Claims, (ii) consenting to $100,000,000.00 of Plan Investment Proceeds, which would otherwise constitute Available Cash distributable to holders of Class 3B General Unsecured Claims, being transferred by the Plan Investor to WEC or Reorganized WEC for use exclusively in accordance with the Pension Funding Agreement, (iii) after the Final Class 3A Distribution Date, waiving their right to receive 5% of any remaining Segregated Funds and directing that such remaining Segregated Funds be used exclusively in accordance with the Pension Funding Agreement, and (iv) consenting to the Allowed Class 3B General Unsecured Claims on Exhibit F being subordinated to the Allowed Class 3B General Unsecured Claims on Exhibit E.  In connection with the settlement of the Class 3B General Unsecured Claims, on the Effective Date, the VC Summer Claims shall be deemed discharged without consideration.

(b)    *Allowance of Toshiba Trade Claims*

On the Effective Date, the Toshiba GUC Claims shall be Allowed as Class 3A General Unsecured Claims in the amounts stated on Exhibit G annexed hereto which amounts shall not exceed $43,665,642.48.  All amounts claimed in excess of such amounts shall be Disallowed.  For the avoidance of doubt, any Toshiba GUC Claim with an "unknown" claim amount reflected on Exhibit G (*see* items 24 through 27) shall be deemed waived and withdrawn on the Effective Date.

23

(c)    *Allowance of AUAM Loan Claim*

On the Effective Date, the AUAM Loan Claim shall be Allowed as a Class 3A General Unsecured Claim in an amount equal to $43,152,613.01. Any amounts claimed under the AUAM Loan Claim in excess of such amount shall be Disallowed.

(d)    *Settlement of Intercompany Claims*

(i)    *Waiver of LFA Claims against TNEH UK and the EMEA Subsidiaries.* On the Effective Date, WEC shall be deemed to have irrevocably waived, released and discharged any and all right to repayment of the LFA Claims, or the LFA Claims shall otherwise be resolved in a manner satisfactory to the Debtors, Plan Investor, and non-Debtor obligors of the LFA Claims; *provided*, that WEC shall not release or be deemed to release any LFA Claims until the DIP Claims are indefeasibly repaid in full in Cash.

(ii)    *Waiver of Toshiba Claims against the EMEA Subsidiaries.* On the Effective Date, pursuant to the Toshiba-EMEA Settlement Agreement, Toshiba shall be deemed to have irrevocably waived, released, deemed satisfied, or otherwise discharged any and all right to repayment of the Released Toshiba Claims, and each EMEA Subsidiary shall be deemed to have waived, released, deemed satisfied, or otherwise discharged all liabilities in any way that each such EMEA Subsidiary has, had, or may have against Toshiba and the Toshiba Affiliates, including but not limited to any liability arising from or relating to the Cash Pool Settlement, except for any liabilities relating to any contract, instrument, or other agreement or document between any such EMEA Subsidiary and Toshiba or any Toshiba Affiliate.

(iii)    *Waiver of TNEH UK Claims against the EMEA Subsidiaries.* On the Effective Date, TNEH UK shall be deemed to have irrevocably waived, released, deemed satisfied, or otherwise discharged any and all right to repayment of the Released TNEH UK Claims.

(iv)    *Settlement of Cash Pool Claims.* The Cash Pool Settlement is incorporated in the Plan and shall become effective on the Effective Date. Pursuant to the Cash Pool Settlement, the Cash Pool Claims shall be either waived, discharged, or be Allowed in an amount such that the applicable holder receives the amount of Plan Investment Proceeds or other funds necessary to render such holder Solvent on the Effective Date, solely to the extent required under the Plan Funding Agreement. For the avoidance of doubt, notwithstanding any amounts of the Plan Investment Proceeds or other funds that are advanced to the holders of Cash Pool Claims in accordance with the Plan Funding Agreement, any such advances shall not be made out of the Segregated Account or reduce the amount of the Segregated Funds available to other holders of Class 3A General Unsecured Claims, and under no circumstances shall any holders of Cash Pool Claims receive any Distributions as holders of Class 3A General Unsecured Claims from the Segregated Account or the Segregated Funds.

(v)    *Settlement of Intercompany Claims.* On the Effective Date, in accordance with Section 4.4(b), Intercompany Claims shall be Reinstated, settled, offset, cancelled, extinguished or eliminated. All Intercompany Claims shall be ignored for purposes of making Distributions to holders of all other Allowed Claims; *provided*, that the Debtors may, in accordance with the Plan Funding Agreement, settle Intercompany Claims in an amount such that the applicable holder of an Intercompany Claim receives an amount of Plan Investment Proceeds necessary to render such holder Solvent on the Effective Date. For the avoidance of doubt, notwithstanding any amounts of the Plan Investment Proceeds that are advanced to the holders of Intercompany Claims in accordance with the Plan Funding Agreement, any such advances shall not be made out of the Segregated Account or reduce the amount of the Segregated Funds available to other holders of Class 3A General Unsecured Claims, and

24

under no circumstances shall any holders of Intercompany Claims receive any Distributions as holders of Class 3A General Unsecured Claims from the Segregated Account or the Segregated Funds.

(e)    *Settlement of PBGC Claims*

In consideration for the contributions to be provided under the Pension Funding Agreement and the assumption of the Pension Plans referenced therein, effective as of the Effective Date, (i) all proofs of claim filed by the PBGC in the Chapter 11 Cases shall be deemed withdrawn, and (ii) the PBGC shall release WEC and its controlled group for all claims arising from the Pension Plans in accordance with the Pension Funding Agreement.  One (1) Business Day after the Effective Date, in accordance with the Pension Funding Agreement, Reorganized WEC shall contribute an aggregate amount of $100,000,000 in Cash from the Plan Investment Proceeds, to one or more of the Pension Plans. On or promptly following the Final Distribution Date, an aggregate amount equal to 5% of any remaining Segregated Funds in the Segregated Account will be contributed to one or more of the Pension Plans (or to Reorganized WEC for such contribution).

(f)    *Settlement of NI Contract Claims*

In consideration for the payments to be made under the NI Settlement, and the assumption of the NI Contract, effective as of the Effective Date, (i) all Proofs of Claims related to the NI Contract filed by the NI Counterparties shall be deemed withdrawn in accordance with the terms of the NI Settlement, and (ii) the NI Counterparties shall be deemed to have released the Debtors for all claims arising from the NI Contract in accordance with the NI Settlement.

(g)    *Settlement of Additional Consent Claims*

Any settlement agreement entered into among the Debtors and the holders of the Additional Consent Claims that is contained in the Plan Supplement is incorporated in the Plan and shall become effective in accordance with its terms.

(h)    *Deemed Substantive Consolidation for Distribution Purposes*

(i)    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code and Bankruptcy Rule 9019, effective as of the Effective Date, of the substantive consolidation of the Estates for distribution purposes only, and the Bankruptcy Court's findings that the substantive consolidation of the Estates to the extent set forth herein is (1) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates and all holders of Claims, (3) fair, equitable, and reasonable, and (4) effected after due notice and opportunity for hearing.

(ii)    On and after the Effective Date, solely for Distribution purposes (1) all assets and liabilities of the Debtors shall be treated as though they were pooled, (2) each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors, (3) all Intercompany Claims shall be Reinstated, settled, offset, cancelled, extinguished or eliminated in accordance with Sections 4.4 and 5.3 herein, (4) no Distributions shall be made under the Plan on account of any Intercompany Interest, (5) any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one consolidated Claim against the substantively-consolidated Debtors, and (6) any joint or several liability of

25

any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one consolidated Claim against the substantively-consolidated Debtors.

(iii)    The deemed substantive consolidation of the Debtors under the Plan and pursuant to the global settlement hereunder shall not (other than for purposes related to funding Distributions under the Plan) affect (1) the legal and organizational structure of the Debtors or Reorganized Debtors, (2) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (3) any agreements entered into by Wind Down Co on or after the Effective Date, (4) the Debtors' or Wind Down Co's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (5) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the Debtors, and (6) distributions to the Debtors, Reorganized Debtors, or Wind Down Co from any insurance policies or the proceeds thereof. Notwithstanding the substantive consolidation called for herein and pursuant to the settlement hereunder, each and every Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until each Debtor's particular case is closed, dismissed or converted; *provided*, that on and after the Effective Date, Wind Down Co shall be solely responsible for the payment of such U.S. Trustee fees.

5.4.    ***Wind Down Co***

(a)    *Form of Wind Down Co*

Wind Down Co shall be a limited liability company unless, on or before the Effective Date, the Consenting Claimholder determines, with the reasonable consent of the PSA Parties, that Wind Down Co shall be a different form of Entity (*e.g.,* a corporation or a liquidating trust, among others), and determines that such form is in the best interests of the Reorganized Debtors and holders of Allowed Claims against the Debtors.   If Wind Down Co is a limited liability company, the Consenting Claimholders may elect to treat Wind Down Co as a corporation for tax purposes.   If it is determined that Wind Down Co shall take the form of a liquidating trust, (a) the terms of the liquidating trust shall be set forth in a liquidating trust agreement, (b) Wind Down Co shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code to the holders of Claims, consistent with the terms of the Plan, (c) the sole purpose of Wind Down Co shall be the liquidation and distribution of the assets transferred to Wind Down Co in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business, (d) all parties (including the Debtors, holders of Claims, the UCC, the Plan Oversight Board, the Distribution and Solicitation Agent and the trustee of the liquidating trust) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Class 3B General Unsecured Claims followed by the deemed transfer of such assets to Wind Down Co), (e) all parties shall report consistently with the valuation of the assets transferred to Wind Down Co as determined by the trustee of the liquidating trust (or its designee), (f) the trustee of the liquidating trust shall be responsible for filing returns for the trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a), and (g) the trustee of the liquidating trust shall annually send to each holder of an interest in the liquidating trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.   Regardless of the form of Wind Down Co, and in furtherance of section 1123(b)(3)(B) of the Bankruptcy Code, Wind Down Co shall have the same authority in respect of all taxes and tax filings of the Debtors for all taxable periods (or portions thereof) ending on or prior to

26

the Effective Date as if Wind Down were the applicable Debtors, subject only (as between the Reorganized Debtors and Wind Down Co) to the Plan Funding Agreement.

(b)    *Assets of Wind Down Co on and after the Effective Date*

In accordance with the Plan Funding Agreement, and subject to Section 5.6 hereof, on the Effective Date: (i) Plan Investor shall deliver the Net Plan Investment Proceeds to Wind Down Co, (ii) the Excluded Assets shall be transferred from the Debtors to Wind Down Co, and (iii) any Cause of Action preserved for the benefit of Wind Down Co under Section 5.12 or Section 11.2 hereof shall be transferred from the Debtors to Wind Down Co. The Net Plan Investment Proceeds, Excluded Assets, and any Cash received by Wind Down Co after the Effective Date (less the amount of the Segregated Funds to be deposited in the Segregated Account) will be deposited into accounts owned by Wind Down Co at the direction of the Plan Oversight Board, and will be utilized by Wind Down Co, at the direction of the Plan Oversight Board, to make Distributions to holders of Allowed Claims against the Debtors' Estates and to fund the operations of Wind Down Co.

(c)    *Responsibilities of Wind Down Co*

Wind Down Co shall be responsible for administering the Debtors' obligations under the Plan, in each case solely to the extent required under the Plan. For the avoidance of doubt, Wind Down Co's obligations to any holder of a Claim against the Debtors or their Estates shall be no greater than the Debtors' liability to such holder under the Plan. From and after the Effective Date, none of the Reorganized Debtors shall assume, or be liable or otherwise responsible for any actions against or liability, debt, guarantee, Claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of any kind or description, including all costs and expenses related thereto of the Debtors that are not Assumed Liabilities, including, for the avoidance of doubt, any rejection damages arising from the rejection of any Executory Contract or Unexpired Lease, and no Reorganized Debtor shall be liable for, or be deemed to assume, any Claim against, or liability of, the Debtors, except for the Assumed Liabilities.

(d)    *Post-Effective Date Authority of Wind Down Co*

After the Effective Date, Wind Down Co shall have the authority, without the need for Bankruptcy Court approval (unless otherwise expressly indicated herein), to perform its obligations hereunder, including, without limitation, to:

(i)    maintain the books and records and accounts of Wind Down Co;

(ii)    invest Cash of Wind Down Co (other than the Segregated Funds), and any income earned thereon;

(iii)    incur and pay reasonable and necessary expenses in connection with the performance of the Plan Oversight Board's and Wind Down Co's duties under the Plan, including the reasonable fees and expenses of professionals retained by Wind Down Co; *provided*, that for the avoidance of doubt, the compensation and expenses of the Plan Oversight Board and Wind Down Co, including professional fees, shall not be paid from the Segregated Funds;

(iv)    retain professionals to assist in performing its duties under the Plan;

(v)    administer Wind Down Co's tax obligations, including (1) filing tax returns and paying tax obligations, (2) requesting, if necessary, an expedited determination of any unpaid tax liability of Wind Down Co under Bankruptcy Code section 505(b) for all taxable periods of the applicable Debtor ending after the Petition Date through the dissolution of Wind Down Co as determined under applicable tax laws, and (3) representing the interest and account of Wind Down Co before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(vi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to Wind Down Co that are required hereunder, by any Governmental Unit or under applicable law;

(vii)    pay statutory fees in accordance with Section 14.6 of the Plan; and

(viii)    perform other duties and functions of Wind Down Co that are consistent with the implementation of the Plan;

*provided, however,* that Wind Down Co shall take the following actions to implement the Plan, solely as directed by the Plan Oversight Board:

(A)    except to the extent Claims have been previously Allowed, control and effectuate the Reconciliation Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors (other than Assumed Liabilities); *provided, further,* that Additional Consent Claims shall not be Allowed absent reasonable consent of the PSA Parties;

(B)    make Distributions to holders of Allowed Claims other than Class 3A General Unsecured Claims and Assumed Liabilities, in accordance with the Plan; *provided, however*, that the Additional Consent Claims shall not be entitled to any Distributions as Class 3A General Unsecured Claims absent the consent of the UCC;

(C)    to direct and control the wind down, liquidation, sale and/or abandoning of the remaining assets of Wind Down Co under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims; and

(D)    prosecute all Causes of Action (other than those Causes of Action that are released, waived, or transferred pursuant to the Plan) on behalf of Wind Down Co for the benefit of holders of Allowed Claims, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action.

(e)    *Indemnification*. Wind Down Co shall indemnify and hold harmless each member of the Plan Oversight Board, solely in its capacity as a member of the Plan Oversight Board, for any losses incurred in such capacity, except to the extent such losses were the result of such member's gross negligence, willful misconduct or criminal conduct.

(f)    *Continued Existence*. Wind Down Co will continue in existence until all Claims against the Debtors have been fully resolved and all Available Cash has been fully distributed in accordance with the Plan, and all other duties and functions of Wind Down Co and the Plan Oversight Board as set forth this Section 5.4 of the Plan have been fully performed.

28

5.5.    *Cooperation and Access*

Subject to Section 6.1 of the Plan Funding Agreement, from and after the Effective Date, in connection with any reasonable business purpose, or as is necessary to administer, or satisfy Wind Down Co's obligations in connection with administering the Chapter 11 Cases, the Reorganized Debtors will, (a) afford Wind Down Co and the Plan Oversight Board access to the Reorganized Debtors' properties, books and records, (b) furnish to Wind Down Co and the Plan Oversight Board financial and other information, and (c) make available to Wind Down Co and the Plan Oversight Board those employees of the Reorganized Debtors whose assistance, expertise, testimony, notes or recollections or presence may be reasonably necessary to assist Wind Down Co and the Plan Oversight Board.

5.6.    *Segregated Account for Class 3A General Unsecured Claims*

On the Effective Date, Wind Down Co shall deposit the Segregated Funds in the Segregated Account.  Until the Final Class 3A Distribution Date, the Segregated Funds shall be utilized for the sole purpose of (a) making Distributions to holders of Allowed Class 3A General Unsecured Claims (other than holders of Cash Pool Claims), (b) establishing a Disputed Claims Reserve for Disputed Class 3A General Unsecured Claims, and (c) making Distributions on account of Disputed Class 3A General Unsecured Claims as such Disputed Claims are resolved.  After the Final Class 3A Distribution Date, (i) 95% of any remaining Segregated Funds shall be delivered to Wind Down Co to be distributed to holders of Allowed Class 3B General Unsecured Claims in accordance with the terms herein, and (ii) 5% of any remaining Segregated Funds shall be transferred to Reorganized WEC to be contributed by Reorganized WEC to its pension plans in accordance with the Pension Funding Agreement.

5.7.    *Continuing Role of UCC*

The UCC shall continue to exist following the Confirmation Date and Effective Date solely for the purposes of performing its responsibilities under the Reconciliation Plan, overseeing distributions from the Segregated Account, and as otherwise set forth herein.  The UCC shall cease to exist upon the earliest to occur of the resignation of all its remaining members, the closing of the Chapter 11 Cases, and the Final Class 3A Distribution Date, if not otherwise provided herein; *provided, however,* that after such date, the UCC shall exist and its Professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by Wind Down Co subject to application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings, and (b) pending appeals of the Confirmation Order.

5.8.    *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, and all conditions to the Effective Date having been satisfied, all actions contemplated by the Plan (including any action to be undertaken by Wind Down Co or the Plan Oversight Board) and the Plan Funding Agreement shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

WEIL:\96403338\14\80768.0017

5.9.    *Other Transactions*

On or following the Effective Date, the Plan Oversight Board, with the consent of the Consenting Claimholder, UCC, and Plan Investor (in each case not to be unreasonably withheld), and subject to any consents required by the Plan Support Agreement or Plan Funding Agreement, shall take such actions as may be necessary or appropriate to effect the transactions as set forth in this Plan.  The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Plan Oversight Board, with the consent of the Consenting Claimholder, UCC and Plan Investor (in each case not to be unreasonably withheld), to be necessary or appropriate, subject to the terms of the Plan Funding Agreement.  The actions taken by the Plan Oversight Board, with the consent of the Consenting Claimholder, UCC, and Plan Investor (in each case not to be unreasonably withheld), to effect the restructuring transactions may include: (a) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms consistent with the terms of the Plan, and any ancillary documents and that satisfy the applicable requirements of applicable state or foreign law and any other terms to which the applicable parties may agree; (b) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, and any ancillary documents and having other terms for which the applicable parties may agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion (or, in each case, the functional equivalent thereof) pursuant to applicable federal, state or foreign law, including but not limited to an amended certificate of incorporation and by-laws (or, in each case, the functional equivalent thereof, as applicable); (d) the cancellation of shares, warrants and any other convertible, exercisable or exchangeable securities; and (e) all other actions that the Plan Oversight Board with the consent of the Consenting Claimholder, UCC and Plan Investor (in each case not to be unreasonably withheld) determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state or foreign law in connection with the restructuring transactions.

5.10.    *Exemption From Certain Transfer Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the Plan Investment Transaction, the transfer of WECHOL Interests to the Plan Investor by TNEH UK, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, Distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, (b) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, or (c) any transfer of the Debtors' assets to Wind Down Co or a liquidating trust, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.11.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and Wind Down Co are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to

30

effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Co, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

5.12. *Preservation of Causes of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action, subject to the terms of the Plan Funding Agreement. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. With respect to any Causes of Action of Wind Down Co, on and after the Effective Date, the Plan Oversight Board shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

5.13. *Closing of the Chapter 11 Cases*

After the Chapter 11 Case of a Debtor has been fully administered, the Plan Oversight Board shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

SECTION 6.    **CORPORATE GOVERNANCE**

6.1. *Continued Corporate Existence*

Except as otherwise provided in this Plan or the Plan Funding Agreement, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Incorporation and the Amended By-Laws. On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; or (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

6.2. *Boards of Directors and Officers*

Within two (2) Business Days following the entry of the Confirmation Order, any and all directors nominated by Toshiba who were then serving on boards of directors of the Debtors or subsidiaries of the Debtors shall have resigned from their positions on such boards, subject to any applicable regulatory requirements. From the date of such resignation through the Effective Date, each of

31

the boards of directors of the Debtors shall remain in place, and no additional appointees or removals shall have been directed by any holder of U.S. HoldCo Interests or TNEH UK Interests.

The composition of each board of directors or similar governing body, as applicable, of the Reorganized Debtors, shall be disclosed prior to the entry of the Confirmation Order to the extent required by section 1129(a)(5) of the Bankruptcy Code. On the Effective Date and specifically following the closing of the Plan Investment Transaction with the Plan Investor, the Plan Investor shall have full power and authority to appoint the directors and officers of the Reorganized Debtors.

### 6.3. *Organizational Documents*

As of the Effective Date, the certificates or articles of incorporation, by-laws, shareholder agreements, limited liability company agreements, memoranda of association, or such other applicable formation or governance documents of each of the Debtors may be amended to the extent necessary to carry out the provisions of the Plan.

## SECTION 7.    **DISTRIBUTIONS**

### 7.1. *Administration of Distributions*

Wind Down Co, as authorized and directed by the Plan Oversight Board, shall be responsible for administering and making Distributions to holders of Allowed Claims in accordance with this Plan, including this Section 7, other than Claims that constitute Assumed Liabilities, which shall be paid by the Reorganized Debtors; *provided*, that notwithstanding any other provision of this Plan, the UCC shall retain sole authority to authorize and direct the Solicitation and Distribution Agent to make Distributions from the Segregated Account to holders of Allowed Class 3A General Unsecured Claims in accordance with the treatment outlined in Section 4.3(b)(i) herein. For the avoidance of doubt, Additional Consent Claims shall not be entitled to any Distributions as Class 3A General Unsecured Claims absent the consent of the UCC.

### 7.2. *Distribution Record Date*

The Plan Oversight Board and UCC (solely with respect to Class 3A General Unsecured Claims) shall have no obligation to recognize any transfer of the Claims or Interests (a) occurring on or after the Effective Date, or (b) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.

### 7.3. *Date of Distributions*

Except as otherwise provided herein, Wind Down Co shall make, or, solely with respect to Class 3A General Unsecured Claims, the UCC shall direct, the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date; *provided*, *however*, that the Initial Distribution to holders of Allowed Class 3B General Unsecured Claims listed on Exhibit E hereto shall include 100% of the membership interests (or other beneficial ownership interests) in Wind Down Co. After the Initial Distribution Date, the Plan Oversight Board, or, solely with respect to Class 3A General Unsecured Claims, the UCC, shall, from time to time, determine the subsequent Distribution Dates. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Notwithstanding anything to the contrary in the Plan, no holder of an

WEIL:\96403338\14\80768.0017

Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

### 7.4.    *Delivery of Distributions*

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until Wind Down Co, or solely with respect to Class 3A General Unsecured Claims, the UCC, has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; *provided*, *however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution was made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to Wind Down Co or the Segregated Account (as applicable) automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### 7.5.    *Manner of Payment Under Plan*

At the option of Wind Down Co, or solely with respect to Class 3A General Unsecured Claims, the UCC, any Cash payment to be made hereunder may be made by a check or wire transfer. Any wire transfer fees incurred by Wind Down Co or the Solicitation and Distribution Agent (as applicable) in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Allowed Claim.  The wire transfer fee will be deducted from the amount of the Distribution a holder of an Allowed Claim would otherwise receive. Wind Down Co, or solely with respect to Class 3A General Unsecured Claims, the UCC, will, to the extent practicable, make aggregate Distributions on account of all the Allowed Claims held by a particular holder.

In order to receive a Distribution under the Plan, a holder of an Allowed Claim must submit to the Solicitation and Distribution Agent both (a) the applicable Form W-9 or, if the payee is a foreign Person, Form W-8, unless such Person is exempt under the tax code and so notifies Wind Down Co or the Solicitation and Distribution Agent, as applicable, and (b) a form certifying that neither the holder nor, to the best of their knowledge, any Person or Entity for whom they may be acting or who may be the beneficial owner of a Claim or Interest that is in their name or control is a person or entity with whom it is illegal for a U.S. Person to transact under (i) the Office of Foreign Assets Control sanctions regulations, or (ii) the list of Specially Designated Nationals and Blocked Persons.  Unless Wind Down Co or the Solicitation and Distribution Agent (as applicable) receives original, properly completed copies of each form with an amount of time sufficient, in the Plan Oversight Board's or UCC's sole discretion (as applicable), to process in advance of a scheduled Distribution Date, the holder of an Allowed Claim that would otherwise be entitled to a Distribution shall not receive any Distribution on the applicable Distribution Date.

### 7.6.    *Minimum Cash Distributions*

Wind Down Co and the Solicitation and Distribution Agent (as applicable) shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; *provided*, *however*, that if any Distribution is not made pursuant to this Section 7.6, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.  Wind Down Co and the Solicitation and Distribution Agent (as applicable) shall not be required to make any final Distributions of Cash less than $50 to any holder of an Allowed Claim.  If either (a) all Allowed Claims (other than those whose Distributions are deemed undeliverable hereunder) have been

33

paid in full, or (b) the amount of any final Distributions to holders of Allowed Claims would be $50 or less and the aggregate amount of Cash available for Distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further Distribution shall be made by Wind Down Co and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Plan Oversight Board.

### 7.7.    *Setoffs and Recoupment*

Wind Down Co may, with the express consent of the Reorganized Debtors, but shall not be required to, set off against or recoup any Claim, any claims of any nature whatsoever that the Debtors or Wind Down Co may have against the holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Wind Down Co of any such claim Wind Down Co may have against the holder of such Claim.

### 7.8.    *Distributions After Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 7.9.    *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 7.10.    *No Postpetition Interest on Claims*

Postpetition interest shall not accrue or be paid on any General Unsecured Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date, except to the extent permitted under the Plan or the Bankruptcy Code.

### 7.11.    *Claims Paid by Third Parties*

Wind Down Co (at the direction of the Plan Oversight Board) shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, Wind Down Co, or the Solicitation and Distribution Agent. If a holder of a Claim receives a Distribution from Wind Down Co and/or the Solicitation and Distribution Agent on account of such Claim and also receives payment from a third party on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to Wind Down Co or the Solicitation and Distribution Agent (as applicable), to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total Allowed amount of such Claim as of the date of any such Distribution under the Plan. The failure of such holder to timely repay or return such Distribution shall result in the holder owing Wind Down Co interest on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

34

7.12.    ***Claims Payable by Third Parties***

No Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation and Distribution Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

7.13.    ***Distribution Order***

Any Distributions on account of Claims or Interests that are subject to the Toshiba Distribution Order shall be made in accordance with the terms thereunder; *provided*, *however*, that to the extent any provision in the Toshiba Distribution Order conflicts with any provision in the Plan or Confirmation Order, the terms of the Plan or Confirmation Order (as applicable) shall govern.

7.14.    ***Withholding Rights***

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to Wind Down Co, or solely with respect to Class 3A General Unsecured Claims, the UCC, or such other Person designated by the Plan Oversight Board or the UCC (as applicable) (which entity shall subsequently deliver to the applicable party) any applicable tax forms, as described in Section 7.5.   If such request is made by the Plan Oversight Board, UCC, or such other Person designated by the Plan Oversight Board or UCC and the holder fails to comply before the date that is 150 days after the request is made, the amount of such Distribution shall irrevocably revert to Wind Down Co or the Segregated Account (as applicable) and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.  In the event the Plan Oversight Board determines that a holder has failed to comply with the Plan Oversight Board's initial request for a Form W-8 or Form W-9, the Plan Oversight Board shall file a notice on the Court's docket listing the name of such holder and provide not less than 30 days' notice for such holder to comply with the Plan Oversight Board's request.

7.15.    ***Distributions on Account of DIP Claims***

Notwithstanding anything to the contrary contained herein, the foregoing provisions of this Section 7 (including Sections 7.2 and 7.10) shall not apply to the DIP Claims, and the Distributions on account of the DIP Claims, including the manner and timing thereof, shall be solely governed by Section 2.4 and the terms of the DIP Credit Agreement.

SECTION 8.    **PROCEDURES FOR DISPUTED CLAIMS**

### 8.1.    *Objections to Prepetition Claims*

As of the Effective Date, objections to, and requests for estimation of Claims against the Debtors may only be interposed and prosecuted by Wind Down Co (as directed by the Plan Oversight Board).  Such objections and requests for estimation shall be served and filed on or before the Claims Objection Bar Date.

### 8.2.    *Allowance of Claims*

After the Effective Date, Wind Down Co shall have and shall retain any rights and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Assumed Liability and any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim; *provided*, *however*, that the Additional Consent Claims shall not be Allowed absent reasonable consent of the PSA Parties.

### 8.3.    *Estimation of Claims*

Wind Down Co may at any time, at the direction of the Plan Oversight Board, request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, Wind Down Co may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 8.4.    *No Distributions Pending Allowance*

No payment or Distribution provided under the Plan (including from the Segregated Funds) shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 8.5.    *Resolution of Claims*

Except as otherwise provided herein (including the release provisions hereof) or in the Plan Funding Agreement, Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code and the Claims Procedures Orders, on and after the Effective Date, Wind Down Co, under the direction of the Plan Oversight Board, may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that Wind Down Co may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection

36

herewith; *provided*, *however*, that the Additional Consent Claims shall not be Allowed absent reasonable consent of the PSA Parties.  Wind Down Co may pursue any retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the Plan and the Plan Funding Agreement.

8.6.    *Segregated Account*

(a)    *Segregated Account*.  As Disputed Class 3A General Unsecured Claims are resolved pursuant to this Section 8, the UCC may direct the Solicitation and Distribution Agent to make Distributions of Segregated Funds out of the Segregated Account on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such Distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the UCC in the UCC's sole discretion.  In the event the holders of Allowed Class 3A General Unsecured Claims have not received payment in full on account of their Claims after the resolution of all Disputed Class 3A General Unsecured Claims, then the UCC shall direct the Solicitation and Distribution Agent to make a final Distribution to all holders of Allowed Class 3A General Unsecured Claims in an amount equal to such holders' Pro Rata share of any remaining Segregated Funds.  In the event that holders of Allowed Class 3A General Unsecured Claims have received payment in full on account of such Claims, the remaining funds in the Segregated Account shall be disbursed in accordance with Section 5.3(e) and 5.6 hereof.  For the avoidance of doubt, in the event any such Disputed Claim is Disallowed, the holder of such Disputed Claim shall not receive any proceeds from the Segregated Account, and the Segregated Funds reserved for such Disputed Claim shall revert to the Segregated Account until the Final Class 3A Distribution Date.

(b)    *Treatment of Segregated Account as a "Disputed Ownership Fund" for U.S. Federal Income Tax Purposes*.  All parties (including the Debtors, holders of Claims, the UCC and, at the direction of the UCC, the Solicitation and Distribution Agent) will (i) treat the Segregated Account as a "disputed ownership fund" governed by Section 1.468B-9 of the Treasury Regulations, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All taxes imposed on the assets or income of the Segregated Account shall be payable out of the assets of the Segregated Account.  The UCC or its designee shall be responsible for complying with all tax payment and tax filing obligations of the Segregated Account.

8.7.    *Retained Amounts*

Wind Down Co, at the direction of the Plan Oversight Board, shall withhold and retain from Distribution (a) an amount sufficient to pay holders of Disputed Claims (other than Disputed Class 3A General Unsecured Claims) the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (b) such lesser amount as estimated by the Bankruptcy Court, or (c) such lesser amount as agreed to between Wind Down Co and the holders thereof.  For the avoidance of doubt, (i) all Class 3B General Unsecured Claims shall be Allowed on the Effective Date and thus there shall be no disputed claims reserve for Class 3B General Unsecured Claims, and (ii) the amounts retained for Class 3A General Unsecured Claims shall be funded solely from Segregated Funds in the Segregated Account.  As Disputed Claims are resolved pursuant to Section 8 hereof, the Plan Oversight Board shall direct Wind Down Co, or solely with respect to Allowed Class 3A General Unsecured Claims, the UCC shall direct the Solicitation and Distribution Agent, to make Distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such Distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Oversight Board in the Plan Oversight Board's sole discretion.

37

8.8.    *Late Filed Claims*

Except as otherwise provided herein or as agreed to by the Debtors or Plan Oversight Board, any Proof of Claim filed after the Bar Date with respect to such Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless such late Proof of Claim has been deemed timely filed by a Final Order.

8.9.    *Amendments to Claims*

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Plan Oversight Board, and any such new, amended, or supplemented Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

SECTION 9.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

9.1.    *Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned by the Debtors during the Chapter 11 Cases shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is listed on the Schedules of Executory Contracts, (b) as of the Effective Date is subject to a pending motion to assume or assume and assign such Unexpired Lease or Executory Contract, or (c) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan, including, for the avoidance of doubt, the Plan Funding Agreement.

9.2.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described below, by the Debtors or Wind Down Co (as applicable), or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (a) the amount of the Cure Obligation, (b) the ability of Wind Down Co or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (c) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment (as applicable); *provided*, *however*, that the Debtors or Wind Down Co (as applicable) may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court, subject to the obligations of the Debtors and Wind Down Co (as applicable) under the Plan Funding Agreement.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting

38

the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. **Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity**.

The Plan Investor and the Reorganized Debtors shall have no liability to any counterparty to any Executory Contract or Unexpired Lease, except for Assumed Liabilities, and all such counterparties shall be enjoined from asserting any such liability (except for an Assumed Liability) against Plan Investor or the Reorganized Debtors.

For the avoidance of doubt, any settlement or payment made on account of a Cure Obligation shall not be made out of the Segregated Account or otherwise reduce the amount of the Segregated Funds available to holders of Class 3A General Unsecured Claims (other than Cash Pool Claims which shall participate in the Cash Pool Settlement).

### 9.3. *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on Wind Down Co no later than thirty (30) days after the later of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.

**Each holder of a Claim arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (a) be treated as a creditor with respect to such Claim, or (b) participate in any Distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Plan Oversight Board, Wind Down Co, the Estates, or the property for any of the foregoing without the need for any objection or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as Class 3A General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

### 9.4. *Plan Funding Agreement*

The Debtors' assumption, assignment, or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Plan Investor's rights and obligations under the Plan Funding Agreement, including (a) any obligations of Wind Down Co to pay Cure Obligations with respect to Executory Contracts and Unexpired Leases assumed by the Reorganized Debtors in accordance with the Plan Funding Agreement, and (b) any rights of the Plan Investor to require the Debtors to add or remove an Executory Contract or Unexpired Lease from the applicable Schedule of Executory Contracts prior to the Confirmation Hearing.

WEIL:\96403338\14\80768.0017

### 9.5. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Unless otherwise provided in an order entered by the Bankruptcy Court, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9.6. *Survival of Indemnification Obligations*

To the fullest extent permitted by applicable law, and as set forth in Section 7.02 of the Plan Funding Agreement, any outstanding obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan unless such obligation was rejected by the Debtors pursuant to a Bankruptcy Court order, or is the subject of a motion to reject pending on the Effective Date. For the avoidance of doubt, any settlement or payment made on account of a Cure Obligation shall not be made out of the Segregated Account or otherwise reduce the amount of the Segregated Funds available to holders of Class 3A General Unsecured Claims (other than Cash Pool Claims which shall participate in the Cash Pool Settlement).

### 9.7. *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Schedules of Executory Contracts, Plan Supplement, or Plan Funding Agreement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized Debtors, Wind Down Co, or the Plan Oversight Board, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## SECTION 10. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 10.1. *Conditions Precedent to the Effective Date*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)  *Confirmation Order.*  The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)  *Plan Funding Agreement.*  The Plan Funding Agreement has not been terminated in accordance with its terms and all conditions precedent to the closing under the Plan Funding Agreement have been satisfied or been waived by the applicable party to the Plan Funding Agreement and the Plan Investment Transaction shall have closed and Wind Down Co has received the Net Plan Investment Proceeds;

(c)  *Funding of Segregated Account.*  The Segregated Funds shall have been deposited into the Segregated Account (or shall be deposited on the Effective Date) in accordance with Section 5.6 of the Plan;

(d)  *Cash Pool Settlement.*  The Cash Pool Settlement shall have become effective in accordance with Section 5.3(d)(iv) of the Plan;

(e)  *Pension Funding Agreement.*  The Pension Funding Agreement shall have be in full force and effect; and

(f)  *Execution and Delivery of Documents.*  All actions, documents and agreements necessary to implement and consummate the Plan and the consummation of the Plan Investment Transaction, including, without limitation, entry into the documents contained in the Plan Supplement, each in form and substance reasonably satisfactory to the Debtors, and the transactions and other matters contemplated thereby, shall have been effected or executed.

10.2.  ***Waiver of Conditions Precedent***

Without limiting any applicable restrictions or rights of the Plan Investor under the Plan Funding Agreement or the PSA Parties under Plan Support Agreement, each of the conditions precedent in Section 10.1, other than the condition set forth in Section 10.1(a), may be waived in whole or in part by the Debtors and the PSA Parties.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

10.3.  ***Substantial Consummation***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## SECTION 11.  **SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

11.1.  ***Discharge of Claims and Termination of Interests***

Except as otherwise provided in the Plan, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against Wind Down Co, the Debtors and any of their assets, property or Estates, as applicable, (b) all Claims and Interests shall be satisfied, discharged and released in full, and the Reorganized Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code, and (c) all Entities shall be precluded from asserting against the Reorganized Debtors,

41

the Estates, Wind Down Co, the Plan Oversight Board, the Plan Investor, their successors and assigns and their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

11.2.    *Avoidance Actions*

Notwithstanding anything to the contrary herein, on the Effective Date, the Debtors shall be deemed to have released all Avoidance Actions against the PSA Parties, the DIP Lenders and the DIP Agent, their predecessors-in-interest, affiliates (including the Toshiba Affiliates) and their successors and assigns, and other Persons and Entities; *provided*, *however*, that the Reorganized Debtors or Wind Down Co, as applicable, shall be entitled to prosecute Avoidance Actions (a) generally as a defense against any Claim (other than any Class 3B General Unsecured Claim or Toshiba GUC Claims), (b) against holders of Material Claims, and (c) that are listed in the Schedule of Preserved Avoidance Actions.

11.3.    *Discharge of Debtors*

Except as otherwise expressly provided in the Plan, upon the Effective Date, in consideration of the distributions to be made under the Plan, each holder of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, Wind Down Co, and the Reorganized Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date; *provided*, *however*, that the DIP Claims shall not be waived, released and discharged unless and until the DIP Claims are indefeasibly repaid in full in Cash in accordance with Section 2.4. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim or Interest against the Debtors, Wind Down Co and the Reorganized Debtors.

11.4.    *Term of Injunctions or Stays*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

11.5.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors; *provided*, *however*, that the DIP Liens shall not be waived, released and discharged unless and until the DIP Claims are indefeasibly repaid in full in Cash in accordance with Section 2.4.

11.6.    *Releases by the Debtors*

**WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THIS PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE CONCESSIONS MADE AS SET FORTH IN THIS PLAN AND THE OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN, AND THE**

42

**SERVICE OF THE RELEASED PARTIES IN FACILITATING THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, THE DEBTORS, THE REORGANIZED DEBTORS, AND ANY OTHER PERSON SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES SHALL BE DEEMED TO HAVE FOREVER RELEASED AND COVENANTED WITH THE RELEASED PARTIES TO FOREVER RELEASE, WAIVE AND DISCHARGE ANY AND ALL LIABILITIES IN ANY WAY THAT SUCH PERSON OR ENTITY HAS, HAD OR MAY HAVE AGAINST ANY RELEASED PARTY (WHICH RELEASE SHALL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED HEREIN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), IN EACH CASE, RELATING TO A DEBTOR, THE ESTATES, THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF OR SUPPLEMENTS THERETO, THE DIP LOAN DOCUMENTS, THE DIP CREDIT AGREEMENT, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER, INCLUDING, WITHOUT LIMITATION, CAUSES OF ACTION 74.11 THROUGH 74.14 AS LISTED ON THE SCHEDULES, AS WELL AS ANY SUCH LIABILITIES AND CAUSES OF ACTION ARISING FROM THE CONTRACTS UNDERLYING TOSHIBA GUC CLAIMS 24 THROUGH 27 LISTED ON EXHIBIT G ANNEXED HERETO; *PROVIDED, HOWEVER,* THAT THE FOREGOING PROVISION OF THIS SECTION SHALL HAVE NO EFFECT ON: (A) THE LIABILITY OF ANY PERSON OR ENTITY THAT WOULD OTHERWISE RESULT FROM THE FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (i) PREVIOUSLY ASSUMED, (ii) ENTERED INTO DURING THE CHAPTER 11 CASES, OR (iii) TO BE TO BE ENTERED INTO, ASSUMED, OR DELIVERED IN CONNECTION WITH THIS PLAN; OR (B) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD); FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PROVISION SHALL RELIEVE ANY RELEASED PARTY FROM ANY OBLIGATION OR LIABILITY UNDER THE PLAN OR PLAN FUNDING AGREEMENT. ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE AN ORDER APPROVING THE DEBTORS' RELEASE PURSUANT TO BANKRUPTCY RULE 9019, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTORS' RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR REORGANIZED DEBTORS ASSERTING ANY CLAIM OR CAUSES OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE. NOTHING HEREIN SHALL ABROGATE APPLICABLE ATTORNEY DISCIPLINARY RULES.**

43

11.7.    *Releases by Holders of Claims and Interests*

**WITHOUT LIMITING ANY OTHER APPLICABLE PROVISIONS OF, OR RELEASES CONTAINED IN, THIS PLAN, AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THIS PLAN, AND THE CONSIDERATION AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN, EACH RELEASING PARTY SHALL BE DEEMED TO HAVE FOREVER RELEASED AND COVENANTED WITH THE RELEASED PARTIES TO FOREVER RELEASE, WAIVE AND DISCHARGE ANY AND ALL LIABILITIES IN ANY WAY THAT SUCH RELEASING PARTY HAS, HAD OR MAY HAVE AGAINST ANY RELEASED PARTY (WHICH RELEASE SHALL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED HEREIN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), IN EACH CASE, RELATING TO A DEBTOR, THE ESTATES, THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, ANY AMENDMENTS THEREOF OR SUPPLEMENTS THERETO, THE DIP LOAN DOCUMENTS, THE DIP CREDIT AGREEMENT, THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTIONS IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING PROVISION OF THIS SECTION SHALL HAVE NO EFFECT ON: (A) THE LIABILITY OF ANY PERSON OR ENTITY THAT WOULD OTHERWISE RESULT FROM THE FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (i) PREVIOUSLY ASSUMED, (ii) ENTERED INTO DURING THE CHAPTER 11 CASES, OR (iii) TO BE TO BE ENTERED INTO, ASSUMED, OR DELIVERED IN CONNECTION WITH THIS PLAN; (B) THE LIABILITY OF ANY RELEASED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH RELEASED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD); OR (C) ANY NON-RELEASED PARTY; FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PROVISION SHALL RELIEVE ANY RELEASED PARTY FROM ANY OBLIGATION OR LIABILITY UNDER THE PLAN OR PLAN FUNDING AGREEMENT. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE DIP LENDERS AND THE DIP AGENT ARE ONLY RELEASING CLAIMS ARISING UNDER OR CONNECTED TO THE DIP CREDIT AGREEMENT AND SOLELY IN THEIR CAPACITY AS DIP LENDERS AND DIP AGENT AND ONLY UPON THE INDEFEASIBLE REPAYMENT IN FULL IN CASH AS PROVIDED IN SECTION 2.4. THE DIP LENDERS AND DIP AGENT ARE NOT RELEASING ANY OTHER CLAIMS AGAINST ANY RELEASED PARTY THAT THE DIP LENDERS AND THE DIP AGENT MAY HAVE OR OWN IN ANY OTHER CAPACITY.**

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE AN ORDER APPROVING THE THIRD PARTY RELEASE PURSUANT TO BANKRUPTCY RULE 9019, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE**

GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSES OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE. NOTHING HEREIN SHALL ABROGATE APPLICABLE ATTORNEY DISCIPLINARY RULES.

11.8.  *Exculpation*

FROM AND AFTER THE EFFECTIVE DATE, THE EXCULPATED PARTIES SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY PERSON OR ENTITY, AND NO HOLDER OF A CLAIM OR INTEREST, NO OTHER PARTY IN INTEREST AND NONE OF THEIR RESPECTIVE REPRESENTATIVES SHALL HAVE ANY RIGHT OF ACTION AGAINST ANY EXCULPATED PARTY OR ANY OF THEIR RESPECTIVE REPRESENTATIVES FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN BEFORE THE EFFECTIVE DATE IN CONNECTION WITH, RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE NEGOTIATION, CONSIDERATION, FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE EXHIBITS, THE DISCLOSURE STATEMENT, THE DIP LOAN DOCUMENTS, ANY AMENDMENTS OF OR SUPPLEMENTS TO ANY OF THE FOREGOING OR ANY OTHER TRANSACTIONS PROPOSED IN CONNECTION WITH THE CHAPTER 11 CASES OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION THEREWITH DURING THE CHAPTER 11 CASES OR IN CONNECTION WITH ANY OTHER OBLIGATIONS ARISING UNDER THIS PLAN OR THE OBLIGATIONS ASSUMED HEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS SECTION SHALL HAVE NO EFFECT ON: (1) THE LIABILITY OF ANY PERSON OR ENTITY THAT WOULD OTHERWISE RESULT FROM THE FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THIS PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (i) PREVIOUSLY ASSUMED, (ii) ENTERED INTO DURING THE CHAPTER 11 CASES, OR (iii) TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN, OR (2) THE LIABILITY OF ANY EXCULPATED PARTY THAT WOULD OTHERWISE RESULT FROM ANY ACT OR OMISSION OF SUCH EXCULPATED PARTY TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD).  FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PROVISION SHALL RELIEVE ANY EXCULPATED PARTY FROM ANY OBLIGATION OR LIABILITY UNDER THE PLAN OR PLAN FUNDING AGREEMENT. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE DIP LENDERS AND THE DIP AGENT ARE ONLY EXCULPATING THE EXCULPATED PARTIES FROM CLAIMS ARISING UNDER OR CONNECTED TO THE DIP CREDIT AGREEMENT AND SOLELY IN THEIR CAPACITY AS DIP LENDERS AND DIP AGENT AND ONLY UPON THE INDEFEASIBLE REPAYMENT IN FULL IN CASH AS PROVIDED IN SECTION 2.4. THE DIP LENDERS AND DIP AGENT ARE NOT EXCULPATING ANY OTHER CLAIMS AGAINST ANY EXCULPATED PARTY THAT THE DIP LENDERS AND THE DIP AGENT MAY HAVE OR OWN IN ANY OTHER CAPACITY.

45

11.9.   *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE
CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD
CLAIMS OR INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS,
DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO
COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE
BEEN RELEASED PURSUANT TO SECTION 11.6 HEREOF; (3) HAVE BEEN RELEASED
PURSUANT TO SECTION 11.7 HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT
TO SECTION 11.8 HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION
PROVIDED IN SECTION 11.8); OR (5) ARE OTHERWISE STAYED OR TERMINATED
PURSUANT TO THE TERMS OF THE PLAN, SHALL BE PERMANENTLY ENJOINED AND
PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE
FOLLOWING ENFORCEMENT ACTIONS AGAINST THE DEBTORS, THE REORGANIZED
DEBTORS, THE RELEASED PARTIES OR ANY OF THEIR RESPECTIVE ASSETS OR
PROPERTY ON ACCOUNT OF ANY SUCH WAIVED, DISCHARGED OR RELEASED
CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS,
DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES: (A) COMMENCING OR
CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,
INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR
LIABILITIES THAT HAVE BEEN RELEASED, COMPROMISED OR SETTLED; (B)
ENFORCING, LEVYING, ATTACHING, COLLECTING, OR RECOVERING BY ANY
MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER; (C) CREATING,
PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND;
(D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY
KIND AGAINST ANY DEBT, LIABILITY, OR OBLIGATION DUE TO THE DEBTORS,
REORGANIZED DEBTORS, OR RELEASED PARTIES; AND (E) COMMENCING OR
CONTINUING ANY ACTION, IN ANY MANNER, OR IN ANY PLACE TO ASSERT ANY
CLAIM WAIVED, DISCHARGED OR RELEASED UNDER THIS PLAN OR THAT DOES NOT
OTHERWISE COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THIS
PLAN; *PROVIDED, HOWEVER*, THAT NOTHING CONTAINED IN THE PLAN SHALL
PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY
PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; *PROVIDED*,
*FURTHER*, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO
PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR
COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR
OTHERWISE TO THE EXTENT PERMITTED BY LAW.

11.10.   *Waiver of Statutory Limitation on Releases*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN
THE PLAN (INCLUDING UNDER THIS SECTION 11 OF THE PLAN) EXPRESSLY
ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT
EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT
TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY
AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY
CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE
ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR
CLAIMS.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH
RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT
BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT

46

**EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 11 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.**

SECTION 12.    **MODIFICATION OF THE PLAN**

12.1.    *Amendments*

(a)    *Plan Modifications*.    The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided*, *however*, that the Plan and exhibits, supplements, or appendices hereto may not be modified in any way that adversely affects the Distributions, recoveries, treatment, classification, or other rights or entitlements of (i) the PSA Parties (either as a group or individually) without the consent of each affected PSA Party, and (ii) the DIP Lenders and DIP Agent without the DIP Agent's consent.    In addition, after the Confirmation Date, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments*.    Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court, subject to the proviso contained in Section 12.1(a) herein and the rights of the PSA Parties set forth in the Plan Support Agreement.

SECTION 13.    **RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom (including Cure Obligations);

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, subordination, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

WEIL:\96403338\14\80768.0017

(f)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Funding Agreement, the Confirmation Order, the Plan Oversight Board By-Laws, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(k)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code with respect to the Debtors for all taxable periods through the Effective Date, and with respect to Wind Down Co, for all taxable periods through the dissolution of Wind Down Co);

(m)     to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(n)     to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(o)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     to enter a final decree closing the Chapter 11 Cases;

(q)     to enforce all orders previously entered by the Bankruptcy Court;

(r)     to recover all assets of the Debtors and property of the Estates, wherever located; and

(s)     to hear and determine any rights, Claims or Causes of Action held by or accruing to the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

48

SECTION 14.    **MISCELLANEOUS PROVISIONS**

### 14.1.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the PSA Parties, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors, Wind Down Co, and the Plan Oversight Board.

### 14.2.    *Severability of Plan Provisions upon Confirmation*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Oversight Board (as the case may be); and (c) non-severable and mutually dependent.

### 14.3.    *Expedited Tax Determination*

The Reorganized Debtors may request an expedited determination of taxes of the Debtors under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for all taxable periods through the Effective Date.  In addition, Wind Down Co may request an expedited determination of taxes of Wind Down Co, including any reserve for Disputed Claims, or as to the Debtors, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, Wind Down Co, for all taxable periods through the dissolution of Wind Down Co, or for or on behalf of the Debtors for all taxable periods through the Effective Date.

### 14.4.    *Exemption from Securities Laws*

The (a) issuance and sale of all of the equity Interests in Reorganized U.S. HoldCo pursuant to the Plan Funding Agreement and Section 5.2 of the Plan, and (b) the issuance of and Distribution of interests of Wind Down Co pursuant to Section 4.3(b)(ii)  of the Plan and are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.

### 14.5.    *Solicitation of Votes on the Plan*

As of and subject to the occurrence of the Confirmation Date the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

49

14.6.    *Payment of Statutory Fees*

On the Effective Date and thereafter as may be required, Wind Down Co shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case; *provided*, *however*, that after the Effective Date such fees shall only be payable until such time as a final decree is entered closing a Debtor's Chapter 11 Case, a Final Order converting such case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the Chapter 11 Case is entered.  For the avoidance of doubt, such fees shall not be paid from the Segregated Account.

14.7.    *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

14.8.    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

14.9.    *Successor and Assigns*

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

14.10.    *Entire Agreement*

On the Effective Date, the Plan, the Plan Supplement, the Plan Funding Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan; *provided*, *however*, that the Plan Support Agreement shall not be so superseded solely to the extent such agreements contain covenants or other obligations are incorporated into the Plan and apply to the period after the Effective Date.

14.11.    *Notices*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a) if to the Debtors:

Westinghouse Electric Company LLC

50

1000 Westinghouse Drive
Cranberry Township, PA 16066
Attention: Michael T. Sweeney
Telephone: (412) 374-4526
Facsimile: (724) 940-8506

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:    Gary T. Holtzer
          Robert J. Lemons
          Garrett A. Fail
          David N. Griffiths
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(b) if to TNEH UK:

Toshiba Nuclear Energy Holdings (UK) Ltd.
Attn:    David Jan Baker
          Alan B. Miller
c/o Togut, Segal & Segal
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Attn:    Albert Togut
          Kyle J. Ortiz
          Patrick Marecki
          Charles M. Persons

- and -

One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Kyle J. Ortiz
Patrick Marecki
Charles M. Persons


          After the Effective Date, Wind Down Co shall have the authority to send a notice to
Entities that receive documents pursuant to Bankruptcy Rule 2002, notifying them they must file a
renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, Wind
Down Co is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002
to those Entities who have filed such renewed requests.

51

Dated:  January 29, 2018
        New York, New York

                         Respectfully submitted,


                         By: /s/ *Lisa J. Donahue*_____
                             Name: Lisa J. Donahue
                             Title: Chief Transition and Development Officer

WEIL:\96403338\14\80768.0017

**<u>Exhibit A</u>**

**Plan Funding Agreement**

**PLAN FUNDING AGREEMENT**

dated as of January 12, 2018

by and among

Toshiba Nuclear Energy Holdings (UK) Limited

and

TSB Nuclear Energy Services Inc.

each as a **Company**,

and

Brookfield WEC Holdings LLC,

as **Plan Investor**

Table of Contents

Page

ARTICLE I        DEFINITIONS ..................................................................................2

Section 1.01.    Certain Defined Terms ......................................................2

ARTICLE II       EQUITY ISSUANCE AND SALE; CLOSING ...............................2

Section 2.01.    Issuance and Sale of Equity ..............................................2

Section 2.02.    Excluded Assets, Assumed Liabilities and Excluded Liabilities ................3

Section 2.03.    Closing .............................................................................4

Section 2.04.    Designated Contracts; Cure Costs ....................................4

ARTICLE III      PURCHASE PRICE ...........................................................................6

Section 3.01.    Purchase Price ...................................................................6

Section 3.02.    Escrows .............................................................................7

Section 3.03.    Certain Closing Deliverables ............................................7

Section 3.04.    Preliminary Solvency Tax Adjustment Statement .............9

Section 3.05.    Estimated Closing Statement; Closing Payment ................9

Section 3.06.    Proposed Final Closing Statement and Final Closing Statement ................9

Section 3.07.    Post-Closing Adjustment ................................................12

Section 3.08.    Certain Calculation Principles ........................................13

Section 3.09.    Purchase Price Allocation ...............................................13

Section 3.10.    Withholding ....................................................................13

Section 3.11.    ███████ Holdback ........................................................13

Section 3.12.    █████████ Holdback.....................................................14

Section 3.13.    ████ Holdback ...............................................................14

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF COMPANIES .................16

Section 4.01.    Formation and Qualification of the Company Group Members,
                 Reorganized Company Group Members and Non-Controlled JVs ...........16

Section 4.02.    [RESERVED] ..................................................................17

Section 4.03.    Capital Structure of the Reorganized Company Group Members
                 and the Acquired Companies ...........................................17

Section 4.04.    Enforceability..................................................................18

Section 4.05.    No Conflict......................................................................19

Section 4.06.    Consents and Approvals ..................................................19

Section 4.07.    Financial Information; Absence of Undisclosed Liabilities; Books
                 and Records; Internal Controls .......................................20

Section 4.08.    Absence of Certain Changes or Events.............................21

i

Table of Contents

Section 4.09.   Absence of Litigation; Orders ...................................................................21

Section 4.10.   Compliance with Laws; Permits ...............................................................22

Section 4.11.   Intellectual Property ..................................................................................22

Section 4.12.   Environmental Matters ..............................................................................24

Section 4.13.   Material Contracts .....................................................................................25

Section 4.14.   Employment and Employee Benefits Matters ...........................................27

Section 4.15.   Taxes .........................................................................................................30

Section 4.16.   Real Property .............................................................................................32

Section 4.17.   Brokers ......................................................................................................33

Section 4.18.   Title ...........................................................................................................33

Section 4.19.   Sufficiency of Assets .................................................................................33

Section 4.20.   Insurance ...................................................................................................34

Section 4.21.   Inventory and Accounts Receivable ..........................................................34

Section 4.22.   FCPA, Sanctions and Export Controls ......................................................35

Section 4.23.   Privacy and Data Security .........................................................................36

Section 4.24.   Solvency ....................................................................................................37

Section 4.25.   ■ ................................................................................................................37

Section 4.26.   Regulator Cash ..........................................................................................37

Section 4.27.   No Other Representations or Warranties ...................................................37

ARTICLE V   REPRESENTATIONS AND WARRANTIES OF PLAN INVESTOR .........38

Section 5.01.   Formation and Authority of Plan Investor; Enforceability .......................38

Section 5.02.   No Conflict ................................................................................................38

Section 5.03.   Consents and Approvals ............................................................................39

Section 5.04.   Absence of Restraint; Compliance with Laws; Actions ............................39

Section 5.05.   Securities Matters ......................................................................................39

Section 5.06.   Financial Ability ........................................................................................40

Section 5.07.   Brokers ......................................................................................................42

Section 5.08.   Solvency ....................................................................................................42

Section 5.09.   Investigation ..............................................................................................42

ARTICLE VI   ADDITIONAL AGREEMENTS ...................................................................43

Section 6.01.   Conduct of Business Before the Closing ...................................................43

Section 6.02.   Access to Information .................................................................................47

WEIL:\96391119\18\80768.0017

Table of Contents

| | | |
|---|---|---|
| Section 6.03. | Confidentiality | 48 |
| Section 6.04. | Regulatory and Other Authorizations; Consents | 49 |
| Section 6.05. | Third Party Consents | 53 |
| Section 6.06. | Company Guarantees; Other Obligations | 53 |
| Section 6.07. | Financing | 54 |
| Section 6.08. | Cooperation | 59 |
| Section 6.09. | Solvency Steps Planning | 60 |
| Section 6.10. | Section 280G Update | 61 |
| Section 6.11. | Regulator Cash | 61 |
| ARTICLE VII | POST-CLOSING COVENANTS | 61 |
| Section 7.01. | Access | 61 |
| Section 7.02. | Directors' and Officers' Indemnification and Exculpation | 62 |
| Section 7.03. | Preservation of Books and Records | 63 |
| Section 7.04. | Further Assurances | 63 |
| Section 7.05. | Returned Cash | 64 |
| ARTICLE VIII | EMPLOYEE MATTERS | 64 |
| ARTICLE IX | BANKRUPTCY COURT MATTERS | 64 |
| Section 9.01. | Break-Up Fee and Expense Reimbursement | 64 |
| Section 9.02. | Competing Transaction | 64 |
| Section 9.03. | Notices | 65 |
| Section 9.04. | Bankruptcy Court Filings | 66 |
| ARTICLE X | TAX MATTERS | 67 |
| Section 10.01. | Transfer Taxes | 67 |
| Section 10.02. | Tax Cooperation | 67 |
| Section 10.03. | US Group Tax Filings and Tax Contests | 68 |
| Section 10.04. | US Group Pre-Closing Tax Refunds | 70 |
| Section 10.05. | TNEH UK Group Relief | 70 |
| Section 10.06. | TNEH UK Straddle Period Taxes | 70 |
| Section 10.07. | Survival of Tax Obligations | 71 |
| ARTICLE XI | CONDITIONS TO CLOSING | 71 |
| Section 11.01. | Conditions to Obligations of Companies | 71 |
| Section 11.02. | Conditions to Obligations of Plan Investor | 72 |

WEIL:\96391119\18\80768.0017

Table of Contents

Page

Section 11.03.    Frustration of Closing Conditions...........................................................74

Section 11.04.    Waiver of Closing Conditions ................................................................74

ARTICLE XII    TERMINATION.....................................................................................74

Section 12.01.    Termination..............................................................................................74

Section 12.02.    Notice of Termination.............................................................................76

Section 12.03.    Effect of Termination..............................................................................76

ARTICLE XIII    MISCELLANEOUS ...............................................................................78

Section 13.01.    Rules of Construction .............................................................................78

Section 13.02.    Expenses .................................................................................................79

Section 13.03.    Notices ....................................................................................................79

Section 13.04.    Survival ...................................................................................................82

Section 13.05.    Limitation on Liability ...........................................................................82

Section 13.06.    Public Announcements............................................................................83

Section 13.07.    Severability.............................................................................................83

Section 13.08.    Assignment .............................................................................................83

Section 13.09.    No Third-Party Beneficiaries .................................................................84

Section 13.10.    Entire Agreement....................................................................................84

Section 13.11.    Amendments ...........................................................................................84

Section 13.12.    Waiver.....................................................................................................84

Section 13.13.    Governing Law .......................................................................................85

Section 13.14.    Dispute Resolution; Consent to Jurisdiction..........................................85

Section 13.15.    Waiver of Jury Trial................................................................................86

Section 13.16.    Admissibility into Evidence....................................................................86

Section 13.17.    Remedies; Specific Performance ............................................................86

Section 13.18.    Non-Recourse..........................................................................................87

Section 13.19.    Interest.....................................................................................................88

Section 13.20.    Disclosure Schedules and Exhibits .........................................................88

Section 13.21.    Provision Respecting Legal Representation ............................................88

Section 13.22.    Privilege..................................................................................................89

Section 13.23.    Counterparts............................................................................................89

iv

EXHIBITS

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Joinder Agreement |
| Exhibit C | Employee Matters Agreement |
| Exhibit D | Terms of Asset Purchase Agreement |

SCHEDULES

| | |
|---|---|
| Schedule A-I | Company Group Members |
| Schedule A-II | Non-Controlled JVs |
| Schedule B | Debtors |

Disclosure Schedules

WEIL:\96391119\18\80768.0017

This PLAN FUNDING AGREEMENT, dated as of January 12, 2018 (the "**Agreement Date**") and effective as of January 4, 2018, is made by and between TSB Nuclear Energy Services Inc. ("**TNESI**"), Toshiba Nuclear Energy Holdings (UK) Limited ("**TNEH UK**" and, together with TNESI, the "**Companies**" and, each, a "**Company**"), and Brookfield WEC Holdings LLC, a Delaware limited liability company ("**Plan Investor**" and, together with Companies, the "**Parties**").

## PRELIMINARY STATEMENTS

A.  Companies and Plan Investor desire to undertake the transactions contemplated by this Agreement.

B.  On March 29, 2017, Debtors commenced jointly administered proceedings, under *In re Westinghouse Electric Company LLC, et al.*, Case No. 17-10751 (MEW) (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

C.  Companies own, directly or indirectly, the equity interests of (i) the Persons set forth on Schedule A-I (each of the Subsidiaries, including the Controlled JVs listed thereon, a "**Company Subsidiary**" and collectively with TNESI, the "**Company Group Members**" and each a "**Company Group Member**") as and to the extent set forth beside such Company's name on Schedule A-I and (ii) the Persons set forth on Schedule A-II (each a "**Non-Controlled JV**"), the Non-Controlled JVs collectively with the Company Group Members, the "**Acquired Companies**" and each an "**Acquired Company**".

D.  TNEH UK owns all of the issued and outstanding equity interests (the "**WECHOL Shares**") in Westinghouse Electric UK Holdings Limited, an English limited company ("**WECHOL**"), and Plan Investor desires to acquire from TNEH UK, and TNEH UK desires to sell to Plan Investor, the WECHOL Shares.

E.  To implement the restructuring and related transactions described in this Agreement, Plan Investor desires to provide funding for the Plan in the Bankruptcy Cases in exchange for acquiring, as provided in the Plan, (i) newly issued equity interests in TNESI upon emergence from the Bankruptcy Cases (such interests, constituting one-hundred percent (100%) of the issued and outstanding equity of the Reorganized Company, the "**Reorganized Company Interests**") and (ii) the WECHOL Shares from TNEH UK, and TNESI and TNEH UK, desire to sell to Plan Investor the Reorganized Company Interests and the WECHOL Shares, respectively, upon the terms and subject to the conditions set forth herein.

F.  Immediately prior to the Closing, Wind Down Co (defined below) will execute and deliver to Companies and Plan Investor a Joinder Agreement in substantially the form attached hereto as Exhibit B to join as a Party to this Agreement and a joinder in the form attached to the Escrow Agreement to join as a party to the Escrow Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and

1

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

# ARTICLE I

# DEFINITIONS

Section 1.01.  <u>Certain Defined Terms</u>.  Capitalized terms used in this Agreement have the meanings specified in <u>Exhibit A</u> or the Plan, as applicable.

# ARTICLE II

# EQUITY ISSUANCE AND SALE; CLOSING

Section 2.01.  <u>Issuance and Sale of Equity</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, TNESI shall issue, sell, convey, assign, transfer and deliver to Plan Investor (or one or more Affiliates designated by Plan Investor prior to the Closing), and Plan Investor (or such Affiliates) shall purchase, acquire and accept from TNESI, the Reorganized Company Interest, free and clear of all Liens (other than Liens arising under applicable securities Laws).

(b)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, TNEH UK shall sell, convey, assign, transfer and deliver to Plan Investor (or one or more Affiliates designated by Plan Investor prior to the Closing), and Plan Investor (or such Affiliates) shall purchase, acquire and accept from TNEH UK, the WECHOL Shares, free and clear of all Liens (other than Liens arising under applicable securities Laws).

(c)    The transactions contemplated by <u>Sections 2.01(a)</u> and <u>2.01(b)</u> will result in the transfer, indirectly through the acquisition of the Reorganized Company and of WECHOL, of each Acquired Company (or the Controlled JV Interests and Non-Controlled JV Interests thereof).

(d)    From the Agreement Date until the fourteenth (14th) day after the Agreement Date, Plan Investor may, by written notice (the "**Alternative Structure Notice**") to Companies, propose  modifications to the acquisition structure pursuant to which Plan Investor shall acquire TNESI, WECHOL and the other Company Group Members, and/or their respective assets and liabilities pursuant to a plan of reorganization (an "**Alternative Acquisition Structure**") to achieve certain efficiencies not currently available to Plan Investor pursuant to the existing Transactions. The Alternative Structure Notice shall set forth in reasonable detail Plan Investor's proposed changes to the acquisition structure contemplated by this Agreement and such other information as may be reasonably necessary for Companies to evaluate such Alternative Acquisition Structure.  If the Alternative Acquisition Structure is acceptable to Companies, acting reasonably,  Plan Investor and Companies shall cooperate with each other and negotiate promptly, earnestly and in good faith such amendments or modifications to this Agreement as may be reasonably necessary to give effect to the Alternative Acquisition Structure and use commercially reasonable efforts to reach agreement on reasonable terms of any such amendments or modifications; <u>provided</u>, that in no event shall any such modification or

WEIL:\96391119\18\80768.0017

amendment reduce the  Purchase Price or the Assumed Liabilities or increase the Excluded Liabilities or have any effect on the scope of the assets of the Business acquired, directly or indirectly, by Plan Investor.

(e)    Notwithstanding anything to the contrary in this Agreement, if (i) the confirmation of the Plan is denied on or before March 31, 2018 or (ii) at any time following the Agreement Date, the Parties mutually agree that confirmation of the Plan is unlikely to occur (each event described in the foregoing clauses (i) or (ii), a "**Conversion Event**"; and the date upon which either of the events described in the foregoing clauses (i) or (ii) first occurs, the "**Conversion Date**"), then the Transactions shall thereupon automatically convert to a sale (the "**363 Sale**") of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code pursuant to the terms of a Stock and Asset Purchase Agreement, containing the terms set forth in Exhibit D and otherwise prepared and negotiated in accordance with the immediately succeeding sentence (it being understood that such Stock and Asset Purchase Agreement contains terms providing that its effectiveness is conditioned upon the Conversion Date having first occurred).  Following the Agreement Date, the Parties shall promptly prepare and negotiate promptly, earnestly and in good faith to enter into (or cause their appropriate Affiliates to enter into) a stock and asset purchase agreement (a "**Definitive SAPA**") with respect to the 363 Sale reflecting the terms of this Agreement as modified by the terms set forth in Exhibit D and including such other terms as are customary, appropriate and reasonable in connection therewith.  The Parties expressly acknowledge and agree that the terms set forth in this Agreement as modified by the terms set forth in Exhibit D constitute all of the material terms of the 363 Sale.  Notwithstanding the fact that this Agreement refers to the possibility of the execution and delivery of a Definitive SAPA, the Parties expressly acknowledge and agree that unless and until a Definitive SAPA is entered into the terms of this Agreement, as modified by the terms set forth in Exhibit D, shall be binding and enforceable by the Parties hereto with respect to the 363 Sale and, if the Conversion Date occurs and a Definitive SAPA has not been entered into on or before such date, the Parties (or their appropriate Affiliates) shall consummate the closing of the 363 Sale on the basis of this Agreement (and the terms embodied herein), as modified by the terms set forth in Exhibit D.

Section 2.02.   Excluded Assets, Assumed Liabilities and Excluded Liabilities.

(a)    Excluded Assets.  The assets of Debtors set forth on Schedule 2.02(a) (the "**Excluded Assets**") will be transferred to Wind Down Co in accordance with the Plan immediately prior to Closing.

(b)    Assumed Liabilities; Excluded Liabilities.  Notwithstanding anything to the contrary herein, only the Liabilities designated on Schedule 2.02(b) as the "**Assumed Liabilities**" shall be assumed by the Reorganized Debtors, as applicable, and Plan Investor shall acquire the Reorganized Company Interests provided that only such Assumed Liabilities have been assumed by the Reorganized Debtors as of the Closing. The Plan and the Confirmation Order shall provide that none of the Reorganized Debtors shall assume, be liable or otherwise responsible for any Actions against or Liabilities of Debtors that are not Assumed Liabilities, including, for the avoidance of doubt, any rejection damages arising from the rejection of any Executory Contract (collectively, the "**Excluded Liabilities**"), and no Reorganized Debtor shall be liable for, or be deemed to assume, any Excluded Liabilities. As provided in the Plan,

**HIGHLY CONFIDENTIAL**

immediately prior to the Closing, Wind Down Co shall assume all of the Excluded Liabilities, and Wind Down Co shall be solely responsible for their discharge from and after the Closing.

Section 2.03.  <u>Closing</u>.  The closing of the sale and purchase of the Reorganized Company Interests and the WECHOL Shares (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, at 9:00 a.m. (New York City time) on the third (3rd) Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with <u>Article XI</u> (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing.  Notwithstanding the foregoing, if the Marketing Period has not ended on the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article XI (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), then the Closing will occur on the earlier of (a) any Business Day during the Marketing Period specified by Plan Investor to Companies on no less than three (3) Business Days' prior written notice and (b) the third (3rd) Business Day following the final day of the Marketing Period (subject, in the case of each of the foregoing clauses (a) and (b), to the full satisfaction or due waiver of all of the Closing Conditions at such time (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time)).  The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".  For all purposes under this Agreement and each other Transaction Agreement, (i) except as otherwise provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (ii) the Closing shall be deemed effective as of the Effective Time.

Section 2.04.  <u>Designated Contracts; Cure Costs</u>.

(a)  <u>Closing and Payment of Cure Costs</u>.  Pursuant to Section 365 of the Bankruptcy Code, this Agreement and the applicable Cure Costs & Designation Orders, Reorganized Debtors shall, effective upon the Closing, assume the Designated Contracts and reject or assume and assign to Wind Down Co (at their sole discretion) the Excluded Contracts (in each case, to the extent not previously assumed or rejected).  Any Cure Costs, as set forth in a Cure Costs & Designation Order, with respect to the Designated Contracts will be paid by (i) if prior to Closing, by Companies and (ii) if following the Closing, by Wind Down Co, and none of Plan Investor or, following the Closing, any Company Group Member shall have any liability therefore.

(b)  <u>Original Contract Schedule</u>.  Schedule 2.04(b) (the "**Original Contract Schedule**") sets forth all Executory Contracts to which any Debtor is a party or beneficiary or by which any Business Assets held by any Debtor are currently bound (the "**Original Contracts**").

(c)  <u>Cure Notice</u>.  No later than February 22, 2018 (the "**Cure Notice Deadline**"), the Debtors shall file with the Bankruptcy Court, and serve, written notice, in form and substance reasonably satisfactory to Plan Investor and to Debtors, to the non-debtor

counterparty to each Original Contract that Plan Investor may elect to have the relevant Debtors assume such Original Contract at the Closing (the "**Cure Notice**").  Cure Notices will identify an Original Contract by (i) the name and date of the Original Contract, (ii) the non-debtor counterparty to the Original Contract and its address, (iii) the proposed amount of the Cure Costs associated with such Original Contract and (iv) the deadline for such non-debtor counterparty to object to the proposed amount of the Cure Costs.

(d)    Undisclosed Contracts.  If, at any time prior to the Closing Date, any Party becomes aware that any Debtor is a party to any Executory Contract that is not listed on the Original Contract Schedule (each, an "**Undisclosed Contract**"), within five (5) Business Days of such discovery, the discovering Party will notify the other Parties of such Undisclosed Contract and such Undisclosed Contract will be deemed an "Original Contract" hereunder.  If an Undisclosed Contract is discovered after the Cure Notice Deadline, within five (5) Business Days after discovery, Debtors will file with the Bankruptcy Court, and serve, a Cure Notice, in form and substance reasonably satisfactory to Plan Investor and Debtors, to the non-debtor counterparty to the Undisclosed Contract, and use commercially reasonable efforts to have any objections to such supplemental Cure Notice heard at the Confirmation Hearing (or as soon as practicable thereafter).

(e)    Designation by Plan Investor.  On or prior to the date that is five (5) Business Days prior to the Confirmation Hearing (the "**Designation Deadline**"), Plan Investor may elect, after reasonable consultation with Debtors, the Original Contracts it wishes to have Debtors assume on the Closing Date (the "**Designated Contracts**") by providing written designation.  Any Original Contract not designated by Plan Investor in writing as a Designated Contract on or before the Designation Deadline shall be deemed an Excluded Contract.  Notwithstanding anything to the contrary herein, from time to time prior to the Designation Deadline, Plan Investor may elect, after reasonable consultation with Debtors, to have any Designated Contract designated (or re-designated) as an Excluded Contract or any Excluded Contract designated (or re-designated) as a Designated Contract by providing notice in writing thereof to Debtors.  If any Original Contract is designated (or re-designated) as a Designated Contract or an Excluded Contract, Companies agree to make any appropriate additions, deletions or other changes to any applicable schedule (including Schedule 2.02(a)) to reflect such addition or exclusion.  Promptly on or before the Closing Date, Debtors (or Reorganized Debtors) will file with the Bankruptcy Court, and serve, a written notice, in form and substance reasonably satisfactory to Plan Investor and Debtors, to each non-debtor counterparty indicating whether such non-debtor counterparty's Original Contract will be assumed, rejected or assumed and assigned to Wind Down Co at the Closing.  Notwithstanding the foregoing, an Original Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Debtors if such Original Contract (i) is rejected under Section 365 of the Bankruptcy Code prior to the Closing pursuant to Section 2.04(h), (ii) is not a Cure Cost Contract and is designated for rejection by Companies prior to the Designation Deadline in accordance with Section 2.04(h) or (iii) is validly terminated by the other party thereto or terminates or expires in accordance with its own terms on or prior to the Designation Deadline and is not continued or otherwise extended prior to or upon assumption.

(f)    Resolution of Cure Disputes.  If any objections are filed by, or received from, any non-debtor counterparty in response to a Cure Notice, Debtors (or Wind Down Co, as

WEIL:\96391119\18\80768.0017

the case may be) will use commercially reasonable efforts to resolve any disputes with the non-debtor counterparty.  If such dispute relates to a Contract (i) that has a term of at least two (2) years and (ii) the Cure Costs payable in respect of which exceeds $2 million (any such Contract, a "**Cure Cost Contract**"),  Debtors (or Wind Down Co, as the case may be) will consult with Plan Investor in connection with any discussions, negotiations, prosecution or litigation, or resolution relating to the final determination of the Cure Costs and any final determination or resolution of such Cure Costs shall be subject to the prior approval of Plan Investor (which approval shall not be unreasonably withheld, conditioned or delayed).

(g)     Amendment of Original Contracts.  From and after the Agreement Date, as reasonably requested by Plan Investor, and at Plan Investor's sole cost and expense, Debtors will reasonably cooperate with Plan Investor to allow Reorganized Debtors to enter into an amendment of any Designated Contract upon assumption of such Designated Contract by Reorganized Debtors (and Debtors will reasonably cooperate with Plan Investor as reasonably requested by Plan Investor in negotiations with the counterparties thereof); provided, that Debtors will not be required to enter into any such amendment if such amendment would result in an assumption by any Debtor of such Designated Contract prior to the Closing Date.

(h)     Assumption Motions.  Debtors will give notice to Plan Investor, prior to the submission by any Debtor of any motion in the Bankruptcy Cases, to assume or reject any Executory Contract of Debtors together with a copy of the proposed Order authorizing the assumption or rejection of such Executory Contract; provided, that in no event will any Debtor reject or seek to reject any Cure Cost Contract prior to the Closing Date, unless prior written approval has been obtained from Plan Investor (which consent shall not be unreasonably withheld, conditioned or delayed); provided, further, that notwithstanding any designation or re-designation by Plan Investor, in no event will Debtor be required (i) to assume any Executory Contract that was previously rejected under Section 365 of the Bankruptcy Code in accordance with this Agreement or (ii) to reject or seek to reject any Contract or Designated Contract to the extent that Debtors reasonably determine that  the assumption of such Contract is required to comply with their Nuclear Obligations and/or to obtain the required Consents contemplated in Section 4.06 (and upon Debtors' determination of the same, such Contract shall be deemed a Designated Contract hereunder and shall be assumed), or (iii) to assume any Designated Contract that requires a Consent of any Government Authority or other party (other than Bankruptcy Court approval), unless such Consent has been obtained on or prior to the Closing. For the avoidance of doubt, any Debtors may (A) reject or seek to reject any Executory Contract other than a Cure Cost Contract and (B) seek to assume and assign to Wind Down Co any Executory Contract other than a Cure Cost Contract, in each case without the Plan Investor's prior written approval.

## ARTICLE III

## PURCHASE PRICE

Section 3.01. Purchase Price.  Pursuant to the terms and conditions of the Plan, Plan Investor shall pay the aggregate consideration hereunder to Wind Down Co, as provided herein. The aggregate consideration to be paid by Plan Investor to Wind Down Co for the sale of all of the Reorganized Company Interests and the WECHOL Shares (the "**Purchase Price**")

shall be an amount in cash equal to the sum of (a) $3.802 billion (the "**Base Purchase Price**") plus (b) the Final Acquired Company Cash, minus (c) the Final Acquired Company Debt, plus (d) the Final Working Capital Increase (if any), minus (e) the Final Working Capital Decrease (if any), plus (f) the Final Solvency Tax Adjustment (which can be a negative number), if any.

Section 3.02. Escrows. On the Closing Date, pursuant to the terms of the Escrow Agreement, Plan Investor shall deposit with Citibank, N.A., in its capacity as escrow agent (the "**Escrow Agent**"), the sum of $100,000,000 by wire transfer of immediately available funds (the "**Purchase Price Escrow Funds**"), to be released by the Escrow Agent and delivered to either Plan Investor or Wind Down Co, in accordance with this Agreement and the Escrow Agreement. Pursuant to the Escrow Agreement, the Purchase Price Escrow Funds shall be distributed in accordance with Section 3.07. On January 8, 2018, pursuant to the terms of the Escrow Agreement, an Affiliate of Plan Investor deposited, on Plan Investor's behalf, with the Escrow Agent the sum of $200,000,000 by wire transfer of immediately available funds (the "**Escrowed Deposit**"), to be released by the Escrow Agent and delivered to Plan Investor, Companies or Wind Down Co, as applicable, in accordance with this Agreement and the Escrow Agreement. Pursuant to the terms of the Escrow Agreement, the Escrowed Deposit (together with all accrued investment income thereon) shall be distributed as follows:

(a)    if the Closing shall occur, the Escrowed Deposit shall be applied towards the Purchase Price payable by Plan Investor to Wind Down Co and all accrued investment income thereon (if any) shall be delivered to Plan Investor at the Closing;

(b)    if (i) this Agreement is terminated by Companies pursuant to Section 12.01(b) or Section 12.01(n), and (ii) at the time of such termination, the Closing Conditions set forth in Section 11.02 (in each case, other than those that can only be satisfied at the Closing itself) are satisfied or waived at the time of such termination the Escrowed Deposit, together with all accrued investment income thereon (if any), shall be delivered to Companies (such amount, the "**Termination Fee**") as provided in Article XII and neither Companies nor any other Person (including Wind Down Co) shall have the right to any further remedy or Action against Plan Investor with respect to this Agreement or such termination (including the right to obtain specific performance pursuant to Section 13.17), and Plan Investor shall have no further Liability, pursuant to this Agreement, the Plan or otherwise, with respect thereto; or

(c)    if this Agreement is terminated for any other reason, the Escrowed Deposit, together with all accrued investment income thereon (if any), shall, in each case, be returned to Plan Investor.

Section 3.03. Certain Closing Deliverables. At the Closing:

(a)    Companies shall deliver or cause to be delivered to Plan Investor the following:

(i)    to the extent the Reorganized Company Interests or the WECHOL Shares are certificated, certificates evidencing the issuance of Reorganized Company Interests and WECHOL Shares, as applicable (or an indemnity, in a form mutually agreeable to the Parties, in respect of any such certificates which are lost or missing), duly endorsed in blank or

7

accompanied by stock powers duly executed in blank or other duly executed instruments of transfer as required by applicable Law or otherwise to validly transfer title in and to the Reorganized Company Interests and the WECHOL Shares to Plan Investor;

(ii)    evidence satisfactory to Plan Investor that all equity interests of the Reorganized Debtors (other than the Reorganized Company) and the WECHOL Shares have been issued to the applicable Company Group Member;

(iii)    a counterpart of the Joint Written Instructions, duly executed by Companies, directing the Escrow Agent to deliver to Wind Down Co the Escrowed Deposit in accordance with Section 3.02(a);

(iv)    the officers' certificate required to be delivered pursuant to Section 11.02(a)(iv);

(v)    to the extent requested by Plan Investor and, with respect to Regulated Entities, only to the extent permitted by applicable Law, duly signed resignations, effective as of the Closing Date, of all directors and officers (or Persons performing similar functions) of each Company Group Member; and

(vi)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Plan Investor, as may be necessary to convey the Reorganized Company Interests and the WECHOL Shares to Plan Investor.

(b)    Plan Investor shall deliver or cause to be delivered to Companies the following:

(i)    the Closing Payment (*less* the sum of the Purchase Price Escrow Funds, the ███████████, the ██████████ Holdback and the ██████████ Holdback, if any), as specified in the Closing Notice, by wire transfer of immediately available funds, to an account or accounts of Wind Down Co as directed by Companies in the Closing Notice;

(ii)    a counterpart of the Joint Written Instructions, duly executed by Plan Investor, directing the Escrow Agent to deliver to Wind Down Co the Escrowed Deposit in accordance with Section 3.02(a);

(iii)    a receipt or receipts for the Reorganized Company Interests and the WECHOL Shares, duly executed by Plan Investor and other instruments of transfer duly executed by Plan Investor, as required by applicable Law or otherwise to validly transfer title in and to the Reorganized Company Interests and the WECHOL Shares to Plan Investor;

(iv)    the officer's certificate required to be delivered to Companies pursuant to Section 11.01(a)(iv);

(v)    the Purchase Price Escrow Funds to the Escrow Agent pursuant to Section 3.02; and

HIGHLY CONFIDENTIAL

(vi)    such other documents, instruments and certificates as Companies may reasonably request.

Section 3.04. <u>Preliminary Solvency Tax Adjustment Statement</u>.  Not later than (a) the date upon which the Solvency Steps Plan is required to be delivered to Plan Investor pursuant to <u>Section 6.09(a)(ii)</u> or (b) fifty (50) days before the due date of the Estimated Closing Statement pursuant to <u>Section 3.05</u>, the Companies shall prepare and deliver to the Plan Investor a written statement (the "**Preliminary Solvency Tax Adjustment Statement**") setting forth Companies' good faith calculation of the Preliminary Solvency Tax Adjustment.  No later than twenty-five (25) days prior to the due date of the Estimated Closing Statement pursuant to <u>Section 3.05</u>, the Plan Investor shall deliver to the Companies any comments to the Preliminary Solvency Tax Adjustment Statement, and the Companies shall consider in good faith any such comments in its preparation of the Estimated Closing Statement and, as the Companies' reasonably deem appropriate, incorporate such comments.  Prior to delivery of the Estimated Closing Statement, the Plan Investor and the Companies' agree to act in good faith to seek to resolve any differences between them with respect to the Preliminary Solvency Tax Adjustment Statement.

Section 3.05. <u>Estimated Closing Statement; Closing Payment</u>.  No fewer than four (4) Business Days before the Closing Date, Companies shall prepare and deliver to Plan Investor a written statement (the "**Estimated Closing Statement**") setting forth Companies' good faith calculation of the amounts of each of: (a) the Estimated Acquired Company Cash, (b) the Estimated Acquired Company Debt, (c) the amount of any Estimated Working Capital Increase or Estimated Working Capital Decrease, (d) the Estimated Solvency Tax Adjustment, if any, and (e) the amount to be paid by Plan Investor to Wind Down Co at Closing (the "**Closing Payment**"), which amount shall be equal to the sum of: (i) the Base Purchase Price, <u>plus</u> (ii) the Estimated Acquired Company Cash, <u>minus</u> (iii) the Estimated Acquired Company Debt, <u>plus</u> (iv) the Estimated Working Capital Increase, if applicable, <u>minus</u> (v) the Estimated Working Capital Decrease, if applicable, <u>plus</u> (vi) the Estimated Solvency Tax Adjustment (which can be a negative number), if any, and (f) the wire transfer information for the account or accounts to which Plan Investor shall pay the Closing Payment.  Plan Investor shall have the right to provide Companies with reasonable comments regarding the Estimated Closing Statement, and Companies shall review and take into account any such comments in good faith (and, as appropriate based on such good faith review, shall deliver an updated Estimated Closing Statement to Plan Investor promptly prior to the Closing, if appropriate); <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, Companies shall make the final determination as to whether any comments from Plan Investor require any such update and in no event shall Closing be delayed in connection with Plan Investor's right to provide comments.  In furtherance of the foregoing, Companies shall also permit Plan Investor and its Representatives to have reasonable access to the work papers and other books and records of the Company Group Members used in the preparation of the Estimated Closing Statement for purposes of assisting Plan Investor and its Representatives in their review of the Estimated Closing Statement.

Section 3.06. <u>Proposed Final Closing Statement and Final Closing Statement</u>.

(a)    Within sixty (60) days after the Closing Date, Plan Investor shall provide to Wind Down Co a written statement (the "**Proposed Final Closing Statement**") setting forth

WEIL:\96391119\18\80768.0017

(i) the Proposed Final Acquired Company Cash, (ii) the Proposed Final Acquired Company Debt, (iii) the Proposed Final Working Capital and (iv) the Proposed Final Solvency Tax Adjustment, and describing in reasonable detail any proposed changes to the Estimated Closing Statement and attaching supporting schedules, working papers and all other relevant details to enable a review thereof by Wind Down Co.  If Plan Investor fails to timely deliver the Proposed Final Closing Statement, the Estimated Closing Statement shall become conclusive and binding upon the Parties as the Final Closing Statement.

(b)    Wind Down Co shall have sixty (60) days (the "**Review Period**") from the date upon which Plan Investor delivered its Proposed Final Closing Statement to review the same.  During the Review Period and Wind Down Co and its Representatives shall be permitted upon reasonable notice, and execution of a confidentiality agreement in customary form, to review Plan Investor's work papers, all books and records of the Reorganized Company Group Members (and, to the extent Companies' possession or control, the Non-Controlled JVs) used in the preparation or useful in the review of the Proposed Final Closing Statement, and the work papers of Plan Investor's accountants and Plan Investor's accountants' review of the Proposed Final Closing Statement in accordance with Plan Investor's accountants' normal disclosure procedures and conditioned upon the execution of a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such accountants with respect to the reliance of Wind Down Co thereon, and Plan Investor shall promptly, and in any event within such time frame as reasonably required by Wind Down Co, make available the individuals in its and the Company Group Members' employ as well as Representatives of its independent accountants responsible for and knowledgeable about the information used in, and the preparation of the Proposed Final Closing Statement, to respond to the reasonable inquiries of, or requests for information by, Wind Down Co or its Representatives.  Plan Investor agrees that, following the Closing through the date that the Final Closing Statement becomes conclusive and binding upon Plan Investor and Wind Down Co in accordance with this Article III, it will not (and Plan Investor will cause the Company Group Members not to) take any actions with respect to any books, records, policies or procedures on which the Proposed Final Closing Statement is based or on which the Final Closing Statement is to be based that would reasonably be expected to impede or delay the determination of the amount of the Final Acquired Company Cash, the Final Acquired Company Debt, the Final Working Capital, the Final Solvency Tax Adjustment or the preparation of the Dispute Notice (defined below) or the Final Closing Statement in the manner and utilizing the methods required by this Agreement.

(c)    If Wind Down Co disputes any item set forth in the Proposed Final Closing Statement, Wind Down Co shall, during the Review Period, deliver written notice to Plan Investor of the same, specifying in reasonable detail the basis for such dispute and Wind Down Co's proposed modifications to the Proposed Final Closing Statement (such notice, the "**Dispute Notice**").  Upon the expiration of the Review Period, any matters that are not subject to a timely delivered Dispute Notice shall be deemed to have been agreed to and shall be conclusive and binding upon Plan Investor and Wind Down Co.  During the thirty (30)-day period immediately following Wind Down Co's delivery of a Dispute Notice (the "**Resolution Period**"), Plan Investor and Wind Down Co shall negotiate in good faith to reach an agreement as to any matters identified in such Dispute Notice as being in dispute, and, to the extent such matters are so resolved within the Resolution Period, then the Proposed Final Closing Statement as revised to incorporate such changes as have been agreed between Plan Investor and Wind

10

Down Co shall be conclusive and binding upon all Plan Investor and Wind Down Co as the Final Closing Statement.

(d)      If (a) (i) the amounts proposed by Plan Investor in the Proposed Final Closing Statement would, if finally determined in accordance with Plan Investor's proposal, result in a Post-Closing Adjustment the absolute value of which is greater than the Post-Closing Adjustment Threshold or (ii)) Wind Down Co submits a Dispute Notice and the absolute value of the amount of the Post-Closing Adjustment that would result if Wind Down Co's position with respect to all amounts in dispute were finally determined in favor of Wind Down Co would be greater than the Post-Closing Adjustment Amount, and (b) Plan Investor and Wind Down Co fail to resolve all such matters in dispute within the Resolution Period (any matters identified in a Dispute Notice that remain in dispute following the expiration of the Resolution Period (the "**Remaining Disputed Items**"), then the Remaining Disputed Items shall be finally and conclusively determined by Grant Thornton LLP, or if Grant Thornton LLP is unable or unwilling to serve in such capacity, BDO US LLP (and if both Grant Thornton LLP and BDO US LLP are unable or unwilling to serve in such capacity, such other independent accounting firm as shall be agreed upon in writing by Wind Down Co and Plan Investor) (the "**Independent Accounting Firm**"); provided, however, that if the Remaining Disputed Items involve a dispute regarding the calculation of the Solvency Tax Cost, and the Independent Accounting Firm determines that it is unable or unwilling to determine such dispute, then the Parties will work together in good faith to select an appropriate independent tax, valuation or similar firm (the "**Solvency Tax Firm**") to resolve such dispute to the extent it relates to the calculation of the Solvency Tax Cost. In the event that the Parties engage a Solvency Tax Firm to resolve disputes with respect to any Solvency Tax Cost, then all references to "Independent Accounting Firm" in this Section 3.06 shall also refer to the Solvency Firm, as applicable.

(e)      Wind Down Co and Plan Investor shall instruct the Independent Accounting Firm to promptly, but no later than forty (40) days after its acceptance of its appointment, determine (it being understood that in making such determination, the Independent Accounting Firm shall be functioning as an expert and not as an arbitrator), based solely on written presentations of Plan Investor, on the one hand, and Wind Down Co, on the other hand, submitted to the Independent Accounting Firm and not by independent review, only those matters remaining in dispute and submitted to the Independent Accounting Firm, and will render a written report setting forth its determination as to such disputed matters and the resulting calculations of the Final Acquired Company Cash, the Final Acquired Company Debt, the Final Working Capital, the Final Working Capital Increase (if any), the Final Working Capital Decrease (if any), the Final Solvency Tax Adjustment and the Post-Closing Adjustment (if any), which report and calculations will be conclusive and binding upon all Parties absent manifest mathematical error. A copy of all materials submitted to the Independent Accounting Firm pursuant to the immediately preceding sentence shall be provided by Wind Down Co or Plan Investor, as applicable, to the other Party concurrently with the submission thereof to the Independent Accounting Firm. In resolving any disputed item, the Independent Accounting Firm (i) shall be bound by the provisions of this Section 3.06(e) and Section 3.08 and (ii) may not assign a value to any item greater than the greatest value for such item claimed by Plan Investor or Wind Down Co, or less than the smallest value for such item claimed by Plan Investor or Wind Down Co, as applicable. If, before the Independent Accounting Firm renders its determination with respect to the disputed items in accordance with this Section 3.06(e), (x)

11

Wind Down Co notifies Plan Investor of its agreement with any items in the Proposed Final Closing Statement or (y) Plan Investor notifies Wind Down Co of its agreement with any items in the Estimated Closing Statement, then in each case such items as so agreed will be conclusive and binding on Plan Investor and Wind Down Co immediately upon such notice and will not be subject to review by the Independent Accounting Firm.

(f)    The fees and expenses of the Independent Accounting Firm shall be borne by either Wind Down Co or Plan Investor, based on the extent to which such Party's aggregate position with respect to the disputed amounts differs from the aggregate position with respect to the same determined by the Independent Accounting Firm pursuant to Section 3.06(e) relative to the difference of the other Party's aggregate position with respect to the disputed amounts from the aggregate position with respect to the same determined by the Independent Accounting Firm pursuant to Section 3.06(e).  For example, if the position of Wind Down Co is eighty (80), the position of the Independent Accounting Firm is forty (40), and the position of Plan Investor is thirty (30), then the fees and expenses of the Independent Accounting Firm shall be borne eighty percent (80%) by Wind Down Co and twenty percent (20%) by Plan Investor.

Section 3.07.    Post-Closing Adjustment.

(a)    If the Post-Closing Adjustment is a positive number greater than the Post-Closing Adjustment Threshold, Plan Investor shall pay an amount equal to the Post-Closing Adjustment to Wind Down Co.  If the Post-Closing Adjustment is a negative number, the absolute value of which is greater than the Post-Closing Adjustment Threshold, Wind Down Co and Plan Investor shall, subject to Section 3.07(b) below, cause the Escrow Agent to release to Plan Investor an amount equal to the absolute value of the Post-Closing Adjustment from the Purchase Price Escrow Funds.

(b)    To the extent the Purchase Price Escrow Funds are insufficient to make the full payment due to Plan Investor under this Section 3.07, Wind Down Co shall pay to Plan Investor prior to the date which is five (5) Business Days after the date on which the Final Closing Statement becomes conclusive and binding on Plan Investor and Wind Down Co in accordance with the provisions of Section 3.06 (the "**Post-Closing Adjustment Payment Deadline**"), the amount of the Post-Closing Adjustment exceeding the Purchase Price Escrow Funds.

(c)    Any payment due under this Section 3.07 shall be paid on or prior to the Post-Closing Adjustment Payment Deadline, by wire transfer of immediately available funds to Wind Down Co's account or Plan Investor's account, as applicable.

(d)    Any payment due under this Section 3.07 that is not paid on or prior to the Post-Closing Adjustment Payment Deadline shall bear interest at the Interest Rate.    All computations of interest shall be made in accordance with Section 13.19.

(e)    To the extent there remains a balance in the Purchase Price Escrow Funds after the payments described above in this Section 3.07 have been made in full, such balance shall, in accordance with the Escrow Agreement, promptly be paid over to Wind Down Co's account as designated in the applicable schedule to the Escrow Agreement.

WEIL:\96391119\18\80768.0017

Section 3.08. <u>Certain Calculation Principles</u>.   Each Closing Statement shall be (a) in a format substantially similar to the Closing Statement in the form attached in <u>Schedule 3.08</u> hereto; (b) prepared and determined from the books and records of the Business and in accordance with the Transaction Accounting Principles; and (c) consistent with the provisions of this Agreement relating to the Parties' and Wind Down Co's respective rights and obligations for the payment or reimbursement of costs and expenses.

Section 3.09. <u>Purchase Price Allocation</u>.   The Parties shall use commercially reasonable efforts to determine the allocation of the Purchase Price between the Companies.

Section 3.10. <u>Withholding</u>.   Plan Investor shall be entitled to deduct and withhold from any cash consideration payable or otherwise deliverable pursuant to this Agreement to Wind Down Co any amounts as may be required to be deducted or withheld therefrom under the Code, or under any provision of state, local or foreign Tax Law, Plan Investor shall provide Companies (and, if formed, Wind Down Co) with notice of any withholding at least ten (10) Business Days prior to the Closing Date, and shall work in good faith with Companies (and, if formed, Wind Down Co) to minimize any such withheld amounts. To the extent such amounts are so deducted or withheld and timely paid over to the proper Government Authority in accordance with applicable Law, the amount of such consideration shall be treated for all purposes under this Agreement as having been paid to the Person to whom such consideration would otherwise have been paid.

Section 3.11. ███████ Holdback.



(a)   Promptly following the Agreement Date, the Parties shall jointly appoint a reasonably mutually acceptable independent ████████ ███████ (the "████████") to prepare an estimate (the "████████") of the total costs (the "████████") expected to be incurred by the Companies to ███████████████████████████████████████████████████████████████████████████████ The ███████ shall be calculated on the same basis used by the Companies in the preparation of the Financial Statements.

(b)   Companies shall provide the ████████ with all information in the possession of Companies and the Company Group Members with respect to the ███████ (all of which information also shall be made available to Plan Investor), and shall make available to the ████████ and Plan Investor the individuals in the Company Group Members' employ responsible for and knowledgeable about such information and the ███████ and, to the extent within Companies' control, individuals in the employ of any ████████ heretofore engaged by any Company Group Member with respect to ████████.

(c)   Companies and Plan Investor shall jointly request that the ███████ complete its work and deliver the ████████ to the Parties within ninety (90) days following its engagement. The ████████ shall be requested to allocate its estimate of

13

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
To the extent the ██████████████ exceed ██████████ (such amount, the "**Excess Amount**"), the Closing Payment shall be reduced by an amount equal to the lesser of (i) the Excess Amount and (ii) ███████████ (the "███████████████████████████"). There shall be no adjustment to the Closing Payment ████████████████████████████████

(d)    The fees and expenses of the ████████████████ shall be borne by Companies and paid prior to Closing.

Section 3.12.    ██████████ Holdback.

(a)    If, prior to the Closing, ████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████ Plan Investor shall deduct and withhold from the Closing Payment an amount equal to $100,000,000 (the "██████████ Holdback").

(b)    If, as of the Closing, the ████████████████████████████████
████████ shall be ████████ pursuant to Section 6.09 hereof.

(c)    If, as of the Closing, the ██████████████████████████████████, the following shall apply:

(i)    ███████████████████████████████████████
██████████████████████████; and

(ii)    With respect to each calendar year in which Plan Investor ██████████ ████████████████ Holdback shall be reduced by, and Plan Investor shall retain, an amount equal to the ████████████, pro rata through the calendar day on such year in which the ████████████████████.

(d)    Subject to clause (c), following the Closing, no later than two (2) Business Days following the ████████████████████████, Plan Investor shall pay to Wind Down Co, in cash by wire transfer of immediately available funds, an amount equal to ██████████ Holdback less the aggregate amount of any ████████████████████ retained by Plan Investor.

Section 3.13.    ██████████ Holdback.

14

(a)    If, prior to the Closing, Westinghouse ██████████ ███████████████ have not entered into a ███████████████████ providing for ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ or as otherwise acceptable to Plan Investor acting reasonably (the "████████████████████"), Plan Investor shall, subject to clause (b) below, deduct and withhold from the Closing Payment an amount equal to ███████████████████████████████ For the avoidance of doubt, the ████████████████████████ must include the following terms:

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (collectively, the "**Required Terms**").

(b)    Notwithstanding Section 3.13(a), if, as of the Closing, the ███████████████ ██████████ has been executed and delivered on the Required Terms but not the ███████████ ████████ then Plan Investor shall deduct from the Closing Payment an amount equal to (i) 100% minus the Applicable Percentage multiplied by (ii) ██████████████ Holdback and Plan Investor shall have no further liability in respect of the ██████████████ Holdback.

(c)    If, as of the Closing, the ██████████████████ has not been executed and delivered:

(i)    Plan Investor shall use commercially reasonable efforts to enter into the ████████████████████████████████████████; and ██████████████████████████████

(ii)    Subject to Section 3.13(c)(i), following the Closing, no later than two (2) Business Days after a Company Group Member executes and delivers a ██████████████ ███████████████ that includes the Required Terms, Plan Investor shall pay to Wind Down Co, in cash by wire transfer of immediately available funds, an amount equal to the Applicable Percentage multiplied by the ██████████████ Holdback.

(d)    For purposes of this Section 3.13, the capitalized terms used herein shall have the meanings specified below:

15

WEIL:\96391119\18\80768.0017

(i)    "**Applicable Percentage**" means a fraction, the numerator of which is the amount of ███████████████████████ and the denominator of which is the amount of ████████████████

(ii)    ███████████████████████████

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF COMPANIES

Companies hereby represent and warrant to Plan Investor that, except as set forth in the Disclosure Schedules:

Section 4.01.  Formation and Qualification of the Company Group Members, Reorganized Company Group Members and Non-Controlled JVs.

(a)    Each Company Group Member is, and as of the Closing each Reorganized Company Group Member will be, a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to operate its business as now conducted. Each Company Group Member is, and as of the Closing each Reorganized Company Group Member will be, duly qualified as a foreign corporation or other organization to do business, and, to the extent legally applicable, each Company Group Member is, and as of the Closing each Reorganized Company Group Member will be in good standing, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions in which the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

(b)    To the Knowledge of Companies, each Non-Controlled JV is a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to operate its business as now conducted. To the Knowledge of Companies, each Non-Controlled JV is duly qualified as a foreign corporation or other organization to do business, and, to the extent legally applicable, each Non-Controlled JV is in good standing, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions in which the failure to be so

16

qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 4.02.    [RESERVED]

Section 4.03.    <u>Capital Structure of the Reorganized Company Group Members and the Acquired Companies</u>.

(a)    The authorized capital stock or other equity interests and the number of issued and outstanding shares or other equity interests of each Reorganized Company Group Member as of the Closing will be as set forth on <u>Schedule 4.03(a)</u>.  As of the Closing, all of the Reorganized Company Interests will have been duly authorized and validly issued, fully paid and nonassessable and will not have been issued in violation of any applicable Law or right of any Person, including any preemptive rights or other restriction pursuant to any Contract or otherwise.

(b)    On the Agreement Date, one or more of the Company Group Members owns, and as of the Closing the Company Group Members will own, the number of issued and outstanding shares or other equity interests of each applicable Company Group Member that is a Subsidiary thereof as set forth on <u>Schedule 4.03(a)</u>, as applicable, free and clear of all Liens, except for (i) any Lien arising out of, under or in connection with the Securities Act or any other applicable securities Laws, (ii) any Lien arising out of, under or in connection with this Agreement or any other Transaction Agreement or (iii) any Lien created by or through Plan Investor or its Affiliates.   All outstanding shares or other equity interests of each Company Group Member have been duly authorized and validly issued and, to the extent applicable, are fully paid and nonassessable and were not issued in violation of any applicable Law or right of any Person, including any preemptive rights or other restriction pursuant to any Contract or otherwise.  As of the Closing, all outstanding shares or other equity interests of each applicable Reorganized Company Group Member will have been duly authorized and validly issued and, to the extent applicable, will have been fully paid and nonassessable and will not have been issued in violation of any applicable Law or right of any Person, including any preemptive rights or other restriction pursuant to any Contract or otherwise.  There are no options, warrants or rights of conversion or other similar rights, Contracts or other agreements, arrangements or commitments obligating any Company Group Member to repurchase, issue or sell any of its shares, other equity interests, phantom equity rights, preferred interests or securities convertible into or exchangeable for its shares or other equity interests, other than as provided in this Agreement or in <u>Schedule 4.03(b)</u>.  As of the Closing, there will be no options, warrants or rights of conversion or other similar rights, Contracts or other agreements, arrangements or commitments obligating any applicable Company Group Member that is a Reorganized Company Group Member to repurchase, issue or sell any of its shares, other equity interests, phantom equity rights, preferred interests or securities convertible into or exchangeable for its shares or other equity interests, other than as provided in this Agreement or in <u>Schedule 4.03(b)</u>.  There are no voting trusts, stockholder or shareholder agreements, proxies or other agreements in effect with respect to the voting or transfer of the shares or other equity interests of any Company Group Member, and as of the Closing there will be no voting trusts, stockholder or shareholder agreements, proxies or other agreements in effect with respect to the voting or transfer of the shares or other equity interests of any Reorganized Company Group Member.

WEIL:\96391119\18\80768.0017

(c)    To the Knowledge of Companies, the authorized capital stock and the number of issued and outstanding shares or other equity interests of each Non-Controlled JV is set forth on Schedule 4.03(c).  A Company Group Member owns, and as of the Closing a Reorganized Company Group Member will own, the Non-Controlled JV Interests, free and clear of all Liens, except (i) any Lien arising out of, under or in connection with the Securities Act or any other applicable securities Laws, (ii) any Lien arising out of, under or in connection with any of the agreements relating to the organization, formation, ownership or governance of such Non-Controlled JV to the extent listed on Schedule 4.03(c), (iii) any Lien arising out of, under or in connection with this Agreement or any other Transaction Agreement or (iv) any Lien created by or through, or resulting from any false or circumstances relating to, Plan Investor or its Affiliates. Except as set forth on Schedule 4.03(c), to the Knowledge of Companies, there are no other outstanding or authorized shares or other equity interests in the Non-Controlled JVs other than the Non-Controlled JV Interests.  To the Knowledge of Companies, all Non-Controlled JV Interests have been, and as of the Closing will have been, duly authorized and validly issued, and, to the extent applicable, fully paid and nonassessable and were not, and will not have been, as applicable, issued in violation of any applicable Law or right of any Person, including any preemptive rights or other restriction pursuant to any Contract or otherwise. To the Knowledge of Companies, there are no voting trusts, stockholder or shareholder agreements, proxies or other agreements in effect with respect to the voting or transfer of the shares or other equity interests of any Non-Controlled JVs, and, to the Knowledge of Companies as of the Closing, there will be no voting trusts, stockholder or shareholder agreements, proxies or other agreements in effect with respect to the voting or transfer of the shares or other equity interests of any Non-Controlled JV.

Section 4.04.   Enforceability.

(a)    Except for such authorizations required by the Bankruptcy Court, each Company Group Member has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party.  The execution, delivery and performance by each Company Group Member of the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party have been duly authorized by all requisite corporate action on the part of such Company Group Member (or, in the case of Company Group Members other than Companies, will be duly authorized prior to Closing) and no further action by or on behalf of such Person is required in connection therewith.  This Agreement has been duly executed and delivered by Companies, and upon execution and delivery thereof, the other Company Transaction Agreements will be duly executed and delivered by the Company Group Members party thereto, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Company Transaction Agreements will constitute, legal, valid and binding obligations of the Company Group Member party thereto, enforceable in each case against the Company Group Members party thereto in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

(b)    Except for such authorizations required by the Bankruptcy Court, TNEH UK has the requisite corporate or other appropriate power and authority to execute, deliver and

perform its obligations under the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party.  The execution, delivery and performance TNEH UK of the Company Transaction Agreements (including the consummation of the Company Transactions) to which it is a party have been duly authorized by all requisite corporate action on the part of TNEH UK and no further action by or on behalf of such Person is required in connection therewith.

Section 4.05.  No Conflict.  Provided that all Consents listed on Schedules 4.05 and 4.06 have been obtained, except as otherwise provided in this Article IV, and except as may result from any facts or circumstances relating to Plan Investor or its Affiliates, the execution, delivery and performance by the Company Group Members and TNEH UK of the Company Transaction Agreements do not and will not:

(i)    violate or conflict with the certificate or articles of incorporation or bylaws or similar organizational documents of any of the Company Group Members, TNEH UK or the Non-Controlled JVs;

(ii)    conflict with or violate in any material respect any Law or Order applicable to the Company Group Members or TNEH UK (or, to the Knowledge of Companies, the Non-Controlled JVs) or to the Business; or

(iii)    result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to any Person any right to terminate, amend, accelerate or cancel, or result in the creation of any Assumed Liability or Lien on or with respect to the Company Group Members or TNEH UK (or, to the Knowledge of Companies, the Non-Controlled JVs), or their equity interests (including the Reorganized Company Interests) or any Business Asset pursuant to, any Contract to which any of the Company Group Members or TNEH UK (or, to the Knowledge of Companies, the Non-Controlled JVs) is a party or by which such equity interests or Business Assets are bound, except for any such breaches, defaults, rights or Liens as would not reasonably be expected to have a Material Adverse Effect, or would not materially impair or delay the ability of any Company Group Members or TNEH UK to consummate the Company Transactions or otherwise perform its obligations under the Company Transaction Agreements to which such Company Group Members or TNEH UK is a party.

Section 4.06.  Consents and Approvals.  The execution, delivery and performance by the Company Group Members and TNEH UK of the Company Transaction Agreements do not, and will not, require any material Consent, waiver, or other action by, or any material filing with or notification to, any Government Authority by any Company Group Members or TNEH UK (or, to the Knowledge of Companies, any Non-Controlled JV), except (a) in connection with applicable filing, notification, waiting period or approval requirements under applicable Antitrust Laws, (b) as may be necessary as a result of any facts or circumstances relating to Plan Investor or Plan Investor's Affiliates or (c) the filing, or receipt of, any Consents or notices listed on Schedule 4.06.

WEIL:\96391119\18\80768.0017

Section 4.07.    Financial Information; Absence of Undisclosed Liabilities; Books and Records; Internal Controls.

(a)    Schedule 4.07(a) sets forth (i) the audited combined balance sheet, income statements and statements of cash flows of Toshiba Nuclear Energy Holdings (US), Inc. and Toshiba Nuclear Energy Holdings (UK) Ltd. for the fiscal years ended March 31, 2015 and March 31, 2016 and (ii) the management-prepared audited combined balance sheet and unaudited management-prepared combined income statement and statement of cash flows of Toshiba Nuclear Energy Holdings (US), Inc. and Toshiba Nuclear Energy Holdings (UK) Ltd. for the fiscal year ended March 31, 2017 (the balance sheets, income statements and statements of cash flows referred to in clauses (i) and (ii) collectively, the "**Financial Statements**", and the balance sheet referred to in clause (ii), the "**Latest Balance Sheet**").   Subject to the disclosure set forth on Schedule 4.07(a), the Financial Statements (A) have been prepared based on the books and records of the Business, (B) have been prepared in all material respects in accordance with GAAP, and (C) present fairly, in all material respects, the financial condition and results of operation of the Business as of the respective dates and for the respective periods presented, subject, with respect to the unaudited Financial Statements, to normal and recurring year-end adjustments (none of which will be material) and to the absence of complete notes.

(b)    With respect to any Non-Controlled JV that is not required to be consolidated on the Latest Balance Sheet, to the Knowledge of Companies, all of such Non-Controlled JV's financial statements (including balance sheets and income statements) (A) have been prepared based on the books and records of such Non-Controlled JV and (B) have been prepared in all material respects in accordance with GAAP or other generally accepted financial reporting standard.  To the Knowledge of Companies, there is no event or circumstance that, with the passage of time or otherwise, would result in any material amendment or revision of such financial statements that have been provided to Companies.

(c)    Other than (i) Liabilities set forth in the Financial Statements, (ii) Liabilities for Taxes, (iii) Liabilities incurred in the ordinary course of business since March 31, 2017, (iv) performance and payment obligations under Contracts to which any Company Group Member is a party (including Company Guarantees) (excluding any Liabilities arising from a breach or violation thereof), (v) Liabilities of Company Group Members to other Company Group Members and (vi) Liabilities the sum of which, or reserve required with respect thereto, are equal to or less than $25,000,000 in the aggregate, the Company Group Members, taken as a whole, do not have and are not subject to any Liabilities.

(d)    Each of the Company Group Members maintains a system of internal accounting controls sufficient to provide reasonable assurances that:   (i) transactions are executed in accordance with management's general or specific authorization; (ii) subject to the disclosure set forth on Schedule 4.07(d), transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(e)     Since the Latest Balance Sheet Date, none of the Company Group Members have incurred any Debt involving amounts in excess of $10,000,000, except for the Debt set forth on Schedule 4.07(e).

Section 4.08.    Absence of Certain Changes or Events.

(a)     Except as contemplated by the Transaction Agreements or in connection with the negotiation and execution of the Transaction Agreements or the consummation of the Transactions, since the Latest Balance Sheet Date to the Agreement Date, (i) the Company Group Members have conducted the Business in all material respects in the ordinary course of business, (ii) to the Knowledge of Companies, the Non-Controlled JVs have operated their respective businesses in all material respects in the ordinary course of business and (iii) there has not been a Material Adverse Effect or any event that would materially impair or delay the ability of each Company Group Member to consummate the Company Transactions or otherwise perform its respective obligations under the Company Transaction Agreements to which such Company Group Member is a party.

(b)     Except as set forth on Schedule 4.08, since the Latest Balance Sheet Date to the Agreement Date:

(i)     none of the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) has failed in any material respect to comply with any Order, including any Order of the Bankruptcy Court;

(ii)     none of the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) has, other than in the ordinary course of business, sold, licensed, subjected to a material Lien (other than a Permitted Lien) or transferred any of its material assets, rights or properties or canceled any material debts or claims or waived any material rights; and

(iii)     neither Company has paid or set aside for payment any dividend or other distribution in respect of shares of its capital stock or other securities, or redeemed, purchased or otherwise acquired, directly or indirectly, any shares of its capital stock or other securities.

Section 4.09.    Absence of Litigation; Orders.    There are no (and, during the three (3) years preceding the Agreement Date, there have not been any) Actions pending or, to the Knowledge of Companies, threatened against the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) that would (a) reasonably be expected to be, individually or, with respect to any series of related Actions, in the aggregate, material to the Company Group Members taken as a whole or otherwise interfere in any material respect with the conduct of the Business as conducted prior to the commencement of the Bankruptcy Cases or (b) prevent or materially impair or delay the ability of any Company Group Members to consummate the Company Transactions or otherwise perform its respective obligations under the Company Transaction Agreements to which such Company Group Member is a party.    There are no Orders pending or, to the Knowledge of Companies, threatened by or before any Government Authority, which are brought by or against any of the Company Group Members or any of their

WEIL:\96391119\18\80768.0017

HIGHLY CONFIDENTIAL

officers or directors (in the case of the officers and directors of the Non-Controlled JVs, to the Knowledge of Companies) involving or relating to the Business or the Company Group Members, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Company Group Members taken as a whole.

Section 4.10.   Compliance with Laws; Permits.

(a)    None of the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) are or, during the three (3) years preceding the Agreement Date have been, in violation of any Laws or Orders applicable to the conduct of the Business except where such violation would not reasonably be expected to be, individually or, with respect to any series of related violations, material to the Business or the Company Group Members taken as a whole in the aggregate or where the failure to be in compliance would be expected to interfere in any material respect with the conduct of the Business as conducted prior to the commencement of the Bankruptcy Cases.   None of the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) have, in the three (3) years preceding the Agreement Date, received any written notice of or been charged with the violation of any Laws or Orders, except where such violation would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Company Group Members taken as a whole.

(b)    The Company Group Members, in the aggregate, hold, and at all times during the two (2) years preceding the Agreement Date have held, all material Permits that are necessary for the operation of the Business as then operated and as currently operated. During the two (2) years preceding the Agreement Date, none of the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) have been in default under or violating in any respect any material Permit, and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation of any material Permit, except as would not reasonably be expected to result in the Company Group Members incurring Liabilities material to the Company Group Members taken as a whole.   Provided that all Consents listed on Schedules 4.05 and 4.06 have been obtained, to the Knowledge of Companies, no material Permit will be suspended or revoked as a result of the transactions contemplated hereunder.

Section 4.11.   Intellectual Property.

(a)    Subject to Section 4.11(b) and the knowledge qualification contained therein, to the Knowledge of Companies, the Business Assets, the Business Intellectual Property, and the Business Technology, together with all other third party Intellectual Property rights licensed to the Company Group Members, constitute all Intellectual Property and Technology Used by and necessary to the operation of the Business in all material respects as it is conducted on the Agreement Date, assuming receipt of all relevant Consents relating to the matters set forth on Schedules 4.05 and 4.06 or as contemplated by Sections 4.05 and 4.06.   Except as set forth in Schedule 4.11(a), the Company Group Members exclusively own all right, title and interest in and to the material Business Intellectual Property and the material Business Technology, and, to the Knowledge of Companies, all other Business Intellectual Property and Business Technology.

WEIL:\96391119\18\80768.0017

**HIGHLY CONFIDENTIAL**

(b)    To the Knowledge of Companies, the operation of the Business by the Company Group Members as it is conducted on the Agreement Date does not infringe upon or misappropriate the Intellectual Property, Software or Data of any third party.

(c)    None of the Company Group Members has received any written claim or notice from any Person during the three (3) years preceding the Agreement Date alleging that the operation of the Business by the Company Group Members infringes upon or misappropriates any Intellectual Property, Software or Data of any third party.  As of the Agreement Date, there are no infringement Actions pending or, to the Knowledge of Companies, threatened in writing against the Company Group Members alleging that the operation of the Business by the Company Group Members infringes upon or misappropriates, or otherwise violates any Intellectual Property, Software or Data of any third party.

(d)    To the Knowledge of Companies, no Person is engaging in any activity that infringes any material Business Intellectual Property or material Business Technology.

(e)    Each Company Group Member has taken commercially reasonable efforts to maintain and protect the Business Intellectual Property, including the confidentiality of the material Trade Secrets included in the Business Intellectual Property.

(f)    The computer software, computer hardware, firmware, networks, interfaces and related systems (collectively, "**IT Systems**") currently used in the Business are sufficient in all material respects for the Business' current needs.  During the three (3) years preceding the Agreement Date, there have been no material failures, crashes, or other material adverse events, including, to the Knowledge of Companies, viruses or security breaches, affecting the IT Systems owned or licensed to the Company Group Members and used in respect of the Business that have caused a material disruption to the Business.

(g)    To the Knowledge of Companies, none of the Software included in the Business Technology uses or is distributed, integrated, or bundled with any Software subject to any license identified by the Open Source Initiative as an open source license (opensource.org/licenses) or any similar open source license that, as used, distributed, integrated or bundled by any Company Group Member: (i) requires or conditions, or would reasonably be expected to require or condition, the use or distribution of such Software on the disclosure, licensing, or distribution of any source code for any portion of the Software included in the Business Technology; or (ii) otherwise imposes, or would reasonably be expected to impose, any limitation, restriction or condition on the right or ability of any Company Group Member to use or distribute any such Software.

(h)    No funding, facilities or personnel of any Government Authority or college, university or other education institution were used to develop or create, in whole or in part, any Business Intellectual Property where, as a result of such funding or the use of such facilities or personnel, such Government Authority or institution has any rights in any Business Intellectual Property, in whole or in part, that adversely affects the Company Group Members' rights to use such Business Intellectual Property in any way.

23

(i)        Schedule 4.11(i) sets forth a true and complete list of all Business Registrable IP material to the Business taken as a whole, as of the Agreement Date.

(j)        Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Companies in this Section 4.11 and the first sentence of Section 4.19, other than as expressly set forth in Article IV with specific reference to Intellectual Property, Software, Data, and Technology, are the sole and exclusive representations and warranties made regarding the ownership, Use and sufficiency of Intellectual Property, Software, Data and Technology.

Section 4.12.    Environmental Matters.

(a)        Except as would not reasonably be expected to result in any Company Group Member incurring material Liabilities or as disclosed on Schedule 4.12(a):

(i)        each Company Group Member (and, to the Knowledge of Companies, the Non-Controlled JVs) is, and in the three (3) years preceding the Agreement Date has been, in compliance in all material respects with applicable Environmental Laws, which compliance includes the possession of all permits required or necessary under all Environmental Laws, and compliance with the terms and conditions thereof;

(ii)        none of the Company Group Members have received any written communication from any Person or Government Authority alleging any noncompliance with any Environmental Laws in the three (3) years preceding the Agreement Date that remains unresolved;

(iii)        none of the Company Group Members have received any written communications from any Person or Government Authority alleging that any Company Group Member has any Liability for any offsite locations where they have stored, disposed or arranged for the disposal of, Hazardous Materials that remains unresolved;

(iv)        each Company Group Member possesses and is, and in the three (3) years preceding the Agreement Date has been, in compliance with those Environmental Permits, and the terms and conditions thereto, necessary to operate the Business;

(v)        there are no Actions pending or, to the Knowledge of Companies, threatened, against any Company Group Members, or against any Person (including any of their respective Affiliates) whose Liability for any Action any Company Group Members has retained or assumed either contractually or by operation of law, alleging that any Company Group Member is violating, or responsible for a Liability under, any Environmental Law; and

(vi)        Companies are not required by any Environmental Law to perform a site assessment for Hazardous Materials, or to remove or remediate Hazardous Materials, at the Owned Real Property or Leased Real Property by virtue of the transactions set forth herein and contemplated hereby.

(b)        Companies have made available to Plan Investor complete and correct copies of all material non-privileged environmental studies, assessments, reports, investigations,

24

HIGHLY CONFIDENTIAL

and other material, non-privileged information in their possession or control relating to environmental matters that could reasonably be expected to result in any Company Group Member incurring material Liabilities, including those relating to compliance (or noncompliance) by any of the Company Group Members with any Environmental Laws.

(c)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Companies in this Section 4.12 are the sole and exclusive representations and warranties of Companies pertaining or relating to any environmental matters, including those related to Environmental Laws, Environmental Permits or Hazardous Materials.

Section 4.13.   Material Contracts.

(a)     Schedule 4.13(a) lists the following Contracts to which any Company Group Member is a party, in each case that is in effect on the Agreement Date (all contracts that are required to be listed on Schedule 4.13(a) being referred to as the "**Material Contracts**") (other than any purchase orders issued under any such Contracts):

(i)      Contracts with Material Customers;

(ii)     Contracts with Material Suppliers;

(iii)    joint venture agreements;

(iv)    Contracts with any Affiliate or current officer or director of any Company Group Member (other than Employee Plans or Contracts made in the ordinary course of business on terms generally available to similarly situated non-affiliated parties);

(v)     operating leases in excess of $5,000,000 and capital leases in excess of $2,500,000;

(vi)    Contracts with any labor union or association representing any Covered Employees (including collective bargaining agreements);

(vii)   Contracts for the sale of any of the assets of the Business, other than inventory or equipment in the ordinary course of business, for consideration in excess of $5,000,000;

(viii)  Contracts relating to the acquisition or disposition in the two (2) years preceding the Agreement Date by any Company Group Member of any operating business or the capital stock of any other Person, in each case for consideration in excess of $5,000,000;

(ix)    Contracts relating to the incurrence of Debt or the making of any loans, in each case involving amounts in excess of $10,000,000;

(x)     Contracts that obligate any Company Group Member to make any capital expenditure or investment in excess of $2,500,000;

WEIL:\96391119\18\80768.0017

(xi)    Contracts that could result in or require the imposition of any Lien (other than Permitted Liens) on any asset of the Company Group Members, other than Employee Plans;

(xii)    Contracts containing any covenant (A) granting "most favored nation" or "exclusivity" status, (B) that restricts in any material respect the ability of any Company Group Member to engage in any line of business or to compete with any Person or operate at any location, (C) that prohibits or restricts in any material respect the right of any Company Group Member to make, sell, supply, market or distribute any products or services sold or provided by, the Company Group Members, or (D) granting any rights of first refusal, rights of first offer or other similar rights to any Person with respect to any material assets, rights or properties of any Company Group Member;

(xiii)    Contracts that are requirements Contracts binding on any Acquired Company or that contain any "take or pay" provisions;

(xiv)    [INTENTIONALLY OMITTED];

(xv)    Contracts providing for change of control, bonus, change in control severance (other than as required by Law), transaction bonus, stay bonus or other bonus payments arising from the Transactions;

(xvi)    Contracts to issue equity securities or other securities convertible thereto to any Person (other than issuances by a Company Group Member (other than the Companies) to another Company Group Member);

(xvii)    material settlements or other arrangements entered into in the two (2) years preceding the Agreement Date or otherwise in effect with respect to any Action;

(xviii)    Contracts relating to the licensing of material Intellectual Property and/or Technology other than in the ordinary course of business;

(xix)    Contracts pursuant to which Companies or any of their Subsidiaries (A) incurred liabilities or expense in excess of $10,000,000 in the fiscal year ended March 31, 2017, (B) will accrue obligations to make payments in excess of $10,000,000 after November 30, 2017, (C) recorded revenues in excess of $10,000,000 in the fiscal year ended March 31, 2017 or (D) will accrue revenues in excess of $10,000,000 after November 30, 2017;

(xx)    Nuclear Liability Policies;

(xxi)    Contracts, directly or indirectly, with project owners developing projects to own, construct and/or operate AP1000 nuclear reactors;

(xxii)    any Contracts relating to the sale, purchase, exchange, leasing or swapping of uranium in any form (or of rights in relation thereto); and

(xxiii)    Contracts providing for the construction of nuclear reactors.

WEIL:\96391119\18\80768.0017

**HIGHLY CONFIDENTIAL**

(b)    Other than as set forth on <u>Schedule 4.13(b)</u>, Companies have made available to Plan Investor true and complete copies of each Material Contract

(c)    Each Material Contract is a legal, valid and binding obligation of the Company Group Member party thereto, as the case may be, and, to the Knowledge of Companies, each other party to such Material Contract, and is enforceable against the applicable Company Group Member and, to the Knowledge of Companies, each other party to such Material Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.  Subject, in each case, to Claims filed against any Debtor in the Bankruptcy Cases, none of the Company Group Members has delivered any notice of any default or event that with notice or lapse of time or both would constitute a default by a third party under any Material Contract.  To the Knowledge of Companies, no event or circumstance has occurred that with notice or lapse of time or both would constitute a material default by a third party under any Material Contract.  Subject to Claims filed against any Debtor in the Bankruptcy Cases, as of the Agreement Date and during the three (3) years preceding the Agreement Date, none of the Company Group Members has breached any Material Contract in any material respect. To the Knowledge of Companies, no other party to any Material Contract has materially breached such Material Contract and in the last twelve (12)-month period preceding the Agreement Date, none of the Company Group Members have received written notice of intent to terminate a Material Contract from any such party.

(d)    <u>Schedule 4.13(d)</u> lists, as of the Agreement Date, each Material Customer and each Material Supplier.  As of the Agreement Date, no Material Customer or Material Supplier has expressed in writing in the twelve (12)-month period preceding the Agreement Date to any Company Group Member its current intention to reduce the volume of, or materially and adversely modify or cancel or otherwise terminate its relationship, or otherwise obtain a material discount, rebate or change to such relationship.  There is no pending or, to the Knowledge of Companies, threatened, material dispute with any Material Customer or Material Supplier.

Section 4.14.    <u>Employment and Employee Benefits Matters</u>.

(a)    <u>Schedule 4.14(a)</u> lists, as of the Agreement Date, all material Employee Plans.  With respect to each material Employee Plan, Companies have previously made available to Plan Investor a true and complete copy of the following documents, to the extent applicable: (A) any plan documents and related trust agreements, and all amendments thereto, (B) the most recent Forms 5500 and all schedules thereto and the most recent actuarial report, if any, (C) the most recent IRS determination letter and (D) the most recent summary plan descriptions.

(b)    Each Assumed Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter, or is entitled to rely on an opinion letter, from the IRS, and nothing has occurred with respect to the operation of any such Assumed Employee Plan which could reasonably be expected cause the loss of such qualification or exemption or the imposition of any material liability, penalty or tax under ERISA or the Code.

(c)    None of the Company Group Members, nor any of their respective ERISA Affiliates, currently sponsors or maintains, or in the six (6) years preceding the Agreement Date

WEIL:\96391119\18\80768.0017

**HIGHLY CONFIDENTIAL**

has sponsored or maintained, (i) any plan subject to Title IV of ERISA, including a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) ("**Multiemployer Plans**"), (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(d)     With respect to any Employee Plan subject to Title IV of ERISA or Section 302 of ERISA or Section 412 or 4971 of the Code (other than any Multiemployer Plan) to which the Company Group Members or their respective ERISA Affiliates has any liability or contributes, except as would not reasonably be expected to result in material liability to the Company Group Members and other than, after the date hereof, in connection with the Bankruptcy Cases or as a result of the Transactions: (i) no liability under Title IV of ERISA has been incurred that has not been satisfied in full and no condition exists that is likely to cause the Company Group Members or any of their respective ERISA Affiliates to incur liability thereunder, other than liability for premiums due to the Pension Benefit Guaranty Corporation ("**PBGC**"), (ii) all premiums to the PBGC have been paid in full, (iii) no failure to satisfy the "minimum funding standards" within the meaning of Sections 302 and 303 of ERISA and Sections 412 and 430 of the Code (whether or not waived) has occurred, (iv) all contributions required to be made to any such plan have been timely made, (v) the PBGC has not instituted proceedings to terminate any such plan and there has been no determination that any such plan is, or is expected to be, in "at risk" status (within the meaning of Section 303 of ERISA), and (vi) an election for funding relief has not been made under Section 430(c)(2)(D) of the Code or Section 303(c)(2)(D) of ERISA.

(e)     With respect to any Multiemployer Plan to which the Company Group Members or their respective ERISA Affiliates has any liability or contributes to, except as would not reasonably be expected to result in material liability to the Company Group Members: (i) all contributions required to be made by the Company Group Members or their respective ERISA Affiliates to any such plan have been timely made, (ii) none of the Company Group Members or their respective ERISA Affiliates has incurred any withdrawal liability under Title IV of ERISA which remains unsatisfied, (iii) if the Acquired Companies or their respective ERISA Affiliates were to experience a "withdrawal" or "partial withdrawal" (as such terms are defined in Part I of Subtitle E of Title IV of ERISA) from such plan, no liability to a Multiemployer Plan as a result of such withdrawal or partial withdrawal from such Multiemployer Plan would be incurred, and (iv) neither the Company Group Members nor their respective ERISA Affiliates has received any notification, nor has any reason to believe, that any such plan has been terminated or is insolvent or may reasonably be expected to be terminated or insolvent.

(f)     Each Assumed Employee Plan for current or former employees located outside of the U.S. (1) that is intended to qualify for special tax treatment, has met all requirements for such tax treatment, (2) if intended or required to be qualified, approved or registered with a Government Authority, is and has been so qualified, approved or registered and nothing has occurred that could reasonably be expected to result in the loss of such qualification, approval or registration, as applicable, and (3) has been maintained in all material respects in good standing, to the extent applicable, with applicable Government Authorities and in compliance with its terms.

**HIGHLY CONFIDENTIAL**

(g)     Each Assumed Employee Plan has been operated in accordance with its terms and the requirements of all applicable Laws, except as would not reasonably be expected to result in material liability to the Company Group Members.  No non-exempt "prohibited transaction" (within the meaning of Section 406 of ERISA and Section 4975 of the Code) has occurred or is reasonably expected to occur with respect to any Assumed Employee Plan, except as would not reasonably be expected to result in material liability to the Company Group Members.

(h)     No material Actions are pending or, to the Knowledge of Companies, threatened in writing in connection with any Assumed Employee Plan that would reasonably be expected to result in material liability to the Company Group Members.

(i)     Schedule 4.14(i) sets forth a list of each collective bargaining agreement to which any Company Group Member is a party that is applicable to the Covered Employees. Except as set forth on Schedule 4.14(i), no labor union represents any employees of the Company Group Members and, to the Knowledge of Companies, no labor union has attempted to organize, and there are no current organizing efforts concerning, the employees of any Company Group Member.

(j)     With respect to the Covered Employees, except as would not reasonably be expected to result in material liability to the Company Group Members, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending, or, to the Knowledge of Companies, threatened against the Company Group Members, or their respective Affiliates, or (ii) unfair labor practice charges, grievances or charges filed with any Government Authority or other complaints pending, or, to the Knowledge of Companies, threatened by or on behalf of any employee or group of employees of the Company Group Members, or their respective Affiliates.

(k)     The Company Group Members have complied in all material respects with all Laws relating to the hiring and employment of employees, including provisions thereof relating to wages, hours, collective bargaining, employment discrimination, civil rights, safety and health, workers' compensation, pay equity, classification of employees, and the collection and payment of withholding and/or social security Taxes.  The Company Group Members have met in all material respects all requirements required by Law or regulation relating to the employment of foreign citizens, including all requirements of I-9.  The Company Group Members have complied in all material respects with all Laws that could require overtime to be paid to any current or former employee of the Company Group Members.

(l)     Neither the execution, delivery and performance of this Agreement nor the consummation of the Transactions will (either alone or in combination with another event) (i) result in any severance or other payment becoming due, or increase the amount of any compensation or benefits due, to any current or former employee, officer, director, consultant or other service provider of the Company Group Members, or their respective Affiliates; (ii) limit or restrict the right of the Company Group Members to merge, amend or terminate any Assumed Employee Plan; or (iii) result in the acceleration of the time of payment or vesting, or result in any payment or funding (through a grantor trust or otherwise) of any such compensation or benefits under, or increase the amount of compensation or benefits due under, any Assumed Employee Plan.  No person is entitled to receive any additional payment (including any tax

29

gross-up or other payment) from the Company Group Members as a result of the imposition of the excise taxes required by Section 4999 of the Code or any taxes required by Section 409A of the Code.

(m)    As of the date hereof, the consummation of the Transactions would constitute a transfer of less than one-third of the total gross fair market value (determined without regard to any liabilities associated with such assets) of Toshiba Corporation and all members of its affiliated group (as defined in Section 1504 of the Code, determined without regard to Section 1504(b)).

(n)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Companies in this Section 4.14 are the sole and exclusive representations and warranties made regarding Covered Employees, Employee Plans or other employment or employee benefits matters.

Section 4.15.   Taxes.

(a)    The Acquired Companies (with respect to Non-Controlled JVs, to the Knowledge of Companies) have timely filed, or have had timely filed on their behalf, all Tax Returns required to be filed by such Acquired Companies (taking into account requests for extensions to file such Tax Returns), all such Tax Returns are true, correct and complete in all material respects, all material amounts of Taxes (whether or not shown as due on such Tax Returns) owed by such Acquired Companies have been timely paid, other than with respect to any Taxes the payment of which was precluded by reason of the Bankruptcy Cases.  The Latest Balance Sheet reflects accrued Taxes not yet due and payable, or that are being contested in good faith, in accordance with GAAP.

(b)    No material deficiencies for any Taxes have been proposed, asserted or assessed by a Taxing Authority against any Company Group Members (or, to the Knowledge of Companies, any Non-Controlled JV) that are still pending.

(c)    There are no Liens for Taxes on the Business Assets or any of the equity interests of any Company Group Members (or, to the Knowledge of Companies, any Non-Controlled JV) (or, as of the Closing, the Reorganized Company Interests and WECHOL Shares) other than Permitted Liens.

(d)    The Company Group Members (and, to the Knowledge of Companies, the Non-Controlled JVs) have complied in all material respects with all applicable withholding obligations for Taxes required to have been withheld in connection with amounts paid to any Covered Employee, independent contractor, creditor or any other third party.

(e)    To the Knowledge of Companies, there is no Action or known audit now pending with respect to any of the Company Group Members in respect of any Tax, nor has any claim for additional Tax been asserted in writing by any Taxing Authority, and no Taxing Authority has threatened in writing to commence any such Action or audit.

(f)    No claim has been made in writing by any Taxing Authority during the five (5) years preceding the Agreement Date in a jurisdiction where any of the Acquired

Companies (with respect to the Non-Controlled JVs, to the Knowledge of Companies) has not filed a Tax Return that it is or may be subject to Tax by such jurisdiction.

(g)    (i) There is no outstanding request for any extension of time for any of the Acquired Companies (with respect to Non-Controlled JVs, to the Knowledge of Companies) to pay any Taxes or file any Tax Returns, other than any such request made in the ordinary course of business; (ii) there has been no waiver or extension of any applicable statute of limitations for the assessment or collection of any Taxes of any of the Acquired Companies (with respect to Non-Controlled JVs, to the Knowledge of Companies) that is currently in force; and (iii) none of the Acquired Companies (with respect to Non-Controlled JVs, to the Knowledge of Companies) is a party to, has any obligation under or is bound by any agreement with a Person other than an Acquired Company (other than any customary commercial contract not primarily related to Taxes or commercial lending arrangements) providing for the payment of or in respect of Taxes, payment for Tax losses, entitlements to refunds or similar Tax matters.

(h)    None of the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) (i) is or has ever been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group of which an Acquired Company, WEC Insurance Limited, TSB Nuclear Energy USA Group Inc., Toshiba Nuclear Energy Holdings (US) Inc., or any predecessor of any such entity is a common parent) or (ii) has any liability for the Taxes of any Person (other than an Acquired Company, WEC Insurance Limited, TSB Nuclear Energy USA Group Inc., Toshiba Nuclear Energy Holdings (US) Inc., or any predecessor of any such entity) under Treasury Regulations Section 1.1502-6 (or any similar provision of U.S. state or local or non-U.S. Law), as a transferee or successor, or by contract (other than any customary commercial contract not primarily related to Taxes or commercial lending arrangements) or otherwise.

(i)    The Company Group Members (and, to the Knowledge of Companies, the Non-Controlled JVs) are in compliance in all material respects with all applicable transfer pricing Laws in all jurisdictions, including the use of an arm's length or similar standard for related person charges, and the execution and maintenance of contemporaneous documentation substantiating the transfer pricing practices and methodology of such Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs).

(j)    All relevant taxing jurisdictions have been properly notified in accordance with Section 9.03.

(k)    No Company Group Member (and, to the Knowledge of Companies, no Non-Controlled JV) directly owned by a Person that is not formed or organized in the U.S. has been a United States real property holding corporation within the meaning of Section 897(e)(2) of the Code during the applicable period specified in Section 897(e)(1)(A)(ii) of the Code.

(l)    No Company Group Member (and, to the Knowledge of Companies, no Non-Controlled JV) has been party to a "listed transaction" as such term is defined in Section 6707A(e)(1) and Treasury Regulations Section 1.6011-4(b)(2).

WEIL:\96391119\18\80768.0017

(m)    No Company Group Member (and, to the Knowledge of Companies, no Non-Controlled JV) has distributed stock of another Person, or has had its stock distributed by another Person, during the two (2) year period preceding the Agreement Date in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(n)    There are no current Tax rulings, requests for rulings, closing agreements, or any other Contracts with any Taxing Authorities issued to, or entered into with, a Company Group Member (or, to the Knowledge of Companies, to a Non-Controlled JV) that could have an adverse effect on the liability of any such Company Group Member for Taxes for any Tax period ending after the Closing Date.

(o)    No Company Group Members (nor, to the Knowledge of Companies, any Non-Controlled JV) will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (A) change in method of accounting for a taxable period ending on or prior to the Closing Date; (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date; or (C) installment sale or open transaction disposition made on or prior to the Closing Date.

Section 4.16.   Real Property.

(a)    Schedule 4.16(a) sets forth a list of the Owned Real Property and Leased Real Property as of the Agreement Date, and, with respect to the Leased Real Property, Schedule 4.16(a) contains a list of all Real Property Leases.  The Company Group Members have good and valid title to all such Owned Real Property as of the Agreement Date and valid and existing title to the leasehold estate (as lessee or sublessee) in all such Leased Real Property set forth on Schedule 4.16(a), in each case free and clear of all Liens, except for Permitted Liens and Liens that secure Debt. The Company Group Members have made available to Plan Investor copies of any title insurance policies (together with copies of any documents of record listed as exceptions to title on such policies) currently insuring the Owned Real Property and copies of the most recent surveys of the same in each case that are in the Company Group Members' possession. All certificates of occupancy required to operate the Owned Real Property in its current manner have been issued by the applicable Government Authority and remain in full force and effect, except where the failure to obtain such certificates of occupancy would not be reasonably likely to result in a Material Adverse Effect.   None of the Owned Real Property is subjected to any option, first refusal, first offer, purchase right, lease, license, sublease or other occupancy agreement granting to any third party any right to use, occupy or enjoy any portion of the Owned Real Property or to obtain title to any portion of the Owned Real Property, except as disclosed on Schedule 4.16(a).

(b)    Each lease or sublease for Leased Real Property under which any of the Company Group Members is a lessee or sublessee is a legal, valid and binding obligation of the Company Group Member party thereto, as the case may be, and, to the Knowledge of Companies, each other party to such lease or sublease, and is enforceable against the applicable Company Group Member and, to the Knowledge of Companies, each other party to such lease or

WEIL:\96391119\18\80768.0017

sublease, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.  Subject, in each case, to Claims filed against any Debtor in the Bankruptcy Cases, none of the Company Group Members has delivered any notice of any default or event that with notice or lapse of time or both would constitute a default by a third party under any such lease or sublease, except as disclosed on Schedule 4.16(b).  To the Knowledge of Companies, no event or circumstance has occurred that with notice or lapse of time or both would constitute a material default by a third party under any such lease or sublease.  As of the Agreement Date and during the three (3) years preceding the Agreement Date, none of the Company Group Members has breached any such lease or sublease in any material respect. To the Knowledge of Companies, no other party to any such lease or sublease has breached such lease or sublease and, in the last twelve (12)-month period preceding the Agreement Date, none of the Company Group Members have received written notice of intent to terminate any such lease or sublease from any such party.

(c)    To the Knowledge of Companies, none of the Company Group Members has received any written notice from any Government Authority asserting any violation of applicable Laws with respect to any Real Properties that remains uncured as of the Agreement Date and that would reasonably be expected to have a Material Adverse Effect. As of the Agreement Date, to the Knowledge of Companies, no condemnation, requisition or taking by Government Authority has been threatened or contemplated, and the Company Group Members have not received any notice of any such condemnation, requisition or taking by a Government Authority with respect to the Owned Real Property.

(d)    The Owned Real Property is equipped with all utilities reasonably required to operate the Business in all material respects.

(e)    There are no ongoing material construction projects and alterations being performed by any Company Group Member on the Real Property.

Section 4.17. Brokers.  Except for fees and expenses of PJT Partners LP (the "**Companies' Banker**"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Company Group Members or any of their respective Affiliates in connection with any Transaction.  Wind Down Co will be solely responsible for the investment advisory fees and expenses of Companies' Banker.

Section 4.18. Title.  Except for Permitted Liens, the Business Assets (other than Real Properties, which are the subject of Section 4.16) are owned by or otherwise made available to the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) and at the Closing, the Company Group Members will own good and valid title to each of the Business Assets or will be vested with good and valid title to such Real Property Leases, as the case may be, free and clear of all Liens, except Permitted Liens.  The Acquired Companies hold good and valid title to all of their assets, properties and rights free and clear of any and all Liens, except for Permitted Liens or where any such Lien would not be reasonably likely to result in a Material Adverse Effect.

Section 4.19. Sufficiency of Assets.  The Business Assets (i) are sufficient to conduct the Business in the ordinary course of business from and after the Closing in

substantially the same manner as conducted prior to Closing and (ii) constitute all of the assets, properties and rights necessary to conduct the Business in substantially the same manner as currently conducted; provided that with respect to Intellectual Property and Technology the foregoing representation and warranty is subject to Section 4.11(b) and the Knowledge qualifier contained therein and assumes receipt of all relevant Consents relating to the matters set forth on Schedule 4.05 and Schedule 4.06 or as contemplated by Section 4.05 and Section 4.06. After giving effect to the Closing, subject to the exclusion of the Excluded Assets or the Excluded Contracts, no Person other than Plan Investor and the Company Group Members will retain title to or any other interest in any of the assets, properties and rights related to, necessary for or used in the Business, other than subleases of and Liens on Real Property. All improvements, buildings and building fixtures located on the Owned Real Property that are used and necessary for the operation of the Business are in functional operating condition and repair and generally are adequate and suitable in all material respects for the present use and operation thereof.

Section 4.20.   Insurance.

(a)      Schedule 4.20(a) provides a summary of all material Insurance Policies maintained for, at the expense of or for the benefit of, the Company Group Members or the Business (such schedule showing as to each policy the carrier, policy number, coverage limits, expiration dates, annual premiums, deductibles, self-insured retentions, a general description of the type of coverage provided, whether the insurance is "occurrence" based or "claims-made" based insurance and a statement describing each existing claim under a policy of insurance for an amount in excess of $100,000). Each such Insurance Policy is in full force and effect, all premiums due to date thereunder have been paid in full and none of the Company Group Members (or, to the Knowledge of Companies, none of the Non-Controlled JVs) nor any of their Affiliates is in default with respect to any other obligations thereunder. No written notice of cancellation or nonrenewal, in whole or in part, with respect to any such Insurance Policy currently in force has been received by the Company Group Members (or, to the Knowledge of Companies, the Non-Controlled JVs) as of the Agreement Date.

(b)      As of the Agreement Date, except as set forth on Schedule 4.20(a), to the Knowledge of Companies, there has been no refusal of insurance coverage or any notice that a defense will be afforded with reservation of rights under the Insurance Policies, nor has there been any erosion or exhaustion of the limits of liability, commutations, settlements, waivers or releases under such Insurance Policies.

(c)      The Company Group Members have complied with all requirements to purchase insurance assumed under contract or applicable Law, including requirements to provide and/or retain evidence of such insurance and all inspections of plants and equipment required by Law have occurred.

(d)      The Nuclear Liability Policies will remain in full force and effect at and immediately after the Closing for the benefit of Plan Investor and the Reorganized Company Group Members and will not require any Consent or notice to any Person.

Section 4.21. Inventory and Accounts Receivable. All inventory, whether or not reflected in the Financial Statements, has been acquired for sale in the ordinary course of

34

business and, except to the extent of any inventory reserve reflected on the Latest Balance Sheet, is not excess, obsolete or slow-moving.  Each of the accounts receivable included in the Latest Balance Sheet arose from bona fide arm's-length transactions in the ordinary course of business, is current and represents the genuine, valid and legally enforceable indebtedness of the account debtor, payable on ordinary trade terms.  None of the accounts receivable included in the Latest Balance Sheet represents an obligation for goods sold on consignment, on approval or on a sale-or-return basis or is subject to any other repurchase or return arrangement. Except as set forth on Schedule 6.06, no Company Group Member (and, to the Knowledge of Companies, no Non-Controlled JV) is a beneficiary of, party to or bound by any bonding program or facility, letter of credit, surety bond, banker's acceptance or related reimbursement agreement or obligation.

Section 4.22.   FCPA, Sanctions and Export Controls.

(a)      In the five (5) years preceding the Agreement Date, no Company Group Member nor any director, officer or employee of any Company Group Member, nor, to the Knowledge of Companies, any Affiliate or any Company Group Member or any director, officer or employee of any Affiliate or any Company Group Member, nor to the Knowledge of Companies, any agent, representative or other Person acting on behalf of any Acquired Company (such Persons collectively with the Acquired Companies being the "**Covered Persons**" for purposes of this Section 4.22) has, directly or indirectly, (i) made, offered, authorized or promised any illegal contributions, gifts, entertainment or other unlawful payments, regardless of form, relating to non-U.S. political activity, (ii) made, offered, authorized or promised any unlawful payments or expenses to or on behalf of any non-U.S. Government Official or other Person, regardless of form, (iii) taken or authorized any action that violates any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or any applicable Law passed pursuant to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, the Bribery Act 2010 of the United Kingdom, or any other applicable anti-corruption or anti-bribery Law (collectively, the "**Anti-Corruption Laws**"), (iv) made, offered, authorized or promised any payment, rebate, payoff, influence payment, contribution, gift, bribe, rebate, kickback, benefit or any other thing of value to any non-U.S. Government Official or to any other Person while knowing that all or some portion of the payment or thing of value would be made, offered, given, promised or passed on to a non-U.S. Government Official, regardless of form, to improperly obtain favorable treatment in obtaining or retaining business, to pay for favorable treatment already secured, to secure any improper advantage, or to improperly influence any act or decision of a non-U.S. Government Official in his or her official capacity, (v) made, offered, authorized, or promised any payment or other benefit or thing of value to a customer or other counterparty to induce or reward the improper performance of the customer's or other counterparty's function or the breach of a duty owed by the customer or other counterparty to his or her employer; (vi) established or maintained, any unrecorded or improperly recorded fund of corporate monies or other properties or assets or made any false entries on any books of account or other records of any Acquired Company for any purpose, or (vii) received any notice, request or citation or been made aware of any allegation, investigation (formal or informal), inquiry, action, charge or proceeding with regard to a potential violation by any Covered Person of any Anti-Corruption Law.  Each Company Group Member has developed and implemented an anti-corruption compliance program that includes internal controls, policies and procedures designed to reasonably promote compliance with all applicable Anti-Corruption Laws.

WEIL:\96391119\18\80768.0017

(b)      No Company Group Member nor, to the Knowledge of Companies, any other Covered Person is or has been in the five (5) years preceding the Agreement Date (i) included on the SDN List or owned twenty-five percent (25%) or more or otherwise controlled by a Person on the SDN List, (ii) organized or resident in, or owned twenty-five percent (25%) or more or otherwise controlled by a Person that is organized or resident in, a country or territory (each, a "**Sanctioned Country**") that is the subject or the target of comprehensive sanctions administered or enforced by the U.S. government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority (collectively, "**Sanctions**"), including Iran, Syria, Cuba, North Korea and Crimea, (iii) (A) a party to any Contract with any Person that is or has been (x) identified on the SDN List or (y) owned twenty-five percent (25%) or more or otherwise controlled by (if applicable), or acting on behalf of, any Person that is on the SDN List, in violation of applicable Sanctions, or (B) engaged in any activities in, with any Person ordinarily resident in, or involving a government, or any political subdivision, agency or instrumentality of the government of, a Sanctioned Country, in violation of applicable Sanctions or (iv) the subject of any formal investigation, proceeding or civil or criminal action by any sanctions authority in respect of any actual or alleged breach of applicable Sanctions.  Each Company Group Member has developed and implemented a compliance program that includes internal controls, policies and procedures designed to ensure compliance with all applicable Sanctions.

(c)      Each Company Group Member is, and to the Knowledge of Companies, all other Covered Persons (other than Covered Persons who are natural persons) at all times during the five (5) years preceding the Agreement Date has been, in compliance with all Export Control Laws and anti-money laundering laws applicable to it.  No action by or before any Government Authority involving any Company Group Member (or, to the Knowledge of Companies, the Non-Controlled JVs) with respect to Export Control Laws or anti-money laundering laws is pending or, to the Knowledge of Companies, threatened.  Each Company Group Member has developed and implemented a compliance program that includes internal controls, policies and procedures designed to ensure compliance with all applicable Export Control Laws or anti-money laundering laws.

Section 4.23.   Privacy and Data Security.

(a)      All published, posted and internal policies, procedures, agreements and notices of the Company Group Members (and, to the Knowledge of Companies, the Non-Controlled JVs) relating to collection, use, disclosure, storage, retention, destruction, or cross-border transfer of Personal Data (collectively, the "**Privacy Policies**") comply in all material respects with applicable Data Protection Laws, and the Company Group Members (and, to the Knowledge of Companies, the Non-Controlled JVs) comply in all material respects with the terms of the Privacy Policies.

(b)      The Company Group Members (and, to the Knowledge of Companies, the Non-Controlled JVs) take commercially reasonable steps, materially compliant with applicable Data Protection Laws, to protect the operation, confidentiality, integrity and security of their software, systems and websites involved in the collection and/or processing of Personal Data.

WEIL:\96391119\18\80768.0017

(c)    To the Knowledge of Companies, for the three (3) years preceding the Agreement Date, there have been no material failures, crashes, security breaches, or other adverse events or incidents related to Personal Data that would require notification of individuals, law enforcement, or any Government Authority or any remedial action under any applicable Data Protection Law or Material Contract.    There are no pending or, to the Knowledge of Companies, expected complaints, actions, fines, or other penalties against the Acquired Companies in connection with any such failures, crashes, security breaches or other adverse events or incidents.

Section 4.24. <u>Solvency</u>. As of the Closing Date (after giving effect to the Transactions or actions necessary to effectuate Companies' obligations in <u>Section 6.09</u>), each Company Group Member that is not a Debtor will be Solvent.

Section 4.25. ███ ███████████████████████████████████████
███████████ .

Section 4.26. <u>Regulator Cash</u>.    As of November 30, 2017, there was $178,399,366 of Regulator Cash held by the NRC, the Pennsylvania Department of Environmental Protection, the Utah Department of Environmental Quality and the Washington Department of Health.

Section 4.27. <u>No Other Representations or Warranties</u>.    Except for the representations and warranties expressly set forth in this <u>Article IV</u> (as modified by the Disclosure Schedules), none of the Acquired Companies or any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of the Acquired Companies or any of their respective Affiliates (or Toshiba Corporation), including any representation or warranty regarding any Acquired Company or any other Person, the Reorganized Company Interests, any Business Assets, any Liabilities of any Acquired Companies, any Assumed Liabilities, the Business, any Transaction, any other rights or obligations to be transferred pursuant to the Transaction Agreements or any other matter, and the Acquired Companies hereby disclaim all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of any Acquired Company or any other Person, including any of their respective Representatives.  Except for the representations and warranties expressly set forth in this <u>Article IV</u>, each Acquired Company hereby (i) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Business Assets or the Business, and (ii) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Plan Investor or any of Plan Investor's Affiliates or any Representatives of Plan Investor or any of Plan Investor's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Plan Investor by any Representative of the Acquired Companies, respectively), including omissions therefrom.  Without limiting the foregoing, no Acquired Company makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Plan Investor or any of its Affiliates or any Representatives of Plan Investor of any of its Affiliates regarding the probable success, profitability or value of the Acquired

37

Companies the Business Assets or the Business.  The disclosure of any matter or item in any Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would be reasonably expected to result in a Material Adverse Effect.  Notwithstanding anything in this Agreement to the contrary, nothing herein shall serve to limit the liability of Companies who commits fraud (excluding constructive fraud).

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF PLAN INVESTOR**

Plan Investor hereby represents and warrants to Companies that, except as set forth in the Disclosure Schedule:

Section 5.01. <u>Formation and Authority of Plan Investor; Enforceability</u>.  Plan Investor is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Plan Investor Transaction Agreements (including the consummation of the Plan Investor Transactions).  The execution, delivery and performance of the Plan Investor Transaction Agreements by Plan Investor (including the consummation of the Plan Investor Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Plan Investor, and no shareholder or other similar approval is required in connection with Plan Investor's execution, delivery and performance of the Plan Investor Transaction Agreements.  This Agreement has been, and upon execution and delivery thereof, the other Plan Investor Transaction Agreements will be, duly executed and delivered by Plan Investor, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Plan Investor Transaction Agreements will constitute, legal, valid and binding obligations of Plan Investor enforceable against Plan Investor in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 5.02. <u>No Conflict</u>.    Provided that all Consents and other actions described in <u>Section 5.03</u> have been obtained, except as may result from any facts or circumstances relating to the Company Group Members or their respective Affiliates, the execution, delivery and performance by Plan Investor of the Plan Investor Transaction Agreements do not and will not:

(a)    violate or conflict with the certificate or articles of incorporation or bylaws or similar organizational documents of Plan Investor;

(b)    conflict with or violate in any material respect any Law or Order applicable to Plan Investor; or

(c)    result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to any Person any right to terminate, amend, accelerate or cancel, or result in the creation of any Liability or Lien on any assets or properties of Plan

38

Investor pursuant to, any Contract to which Plan Investor or any of its Subsidiaries or Affiliates is a party to or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, rights or Liens as would not materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

Section 5.03.  <u>Consents and Approvals</u>.  The execution, delivery and performance by Plan Investor of the Plan Investor Transaction Agreements do not and will not require any material Consent, waiver or other action by, or any material filing with or notification to, any Government Authority, except (a) in connection with applicable filing, notification, waiting period or approval requirements under applicable Antitrust Laws, (b) where the failure to obtain such Consent or waiver, to take such action, or to make such filing or notification, would not materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements, (c) as may be necessary as a result of any facts or circumstances relating to Companies or their respective Affiliates or (d) for the Consents and filings listed on <u>Schedule 5.03</u>.  Plan Investor is not aware of any reason why any material Consent, waiver or other action by any Government Authority will not be received or obtained in order to permit consummation of the Plan Investor Transactions on a timely basis or to permit Plan Investor to otherwise perform its obligations under the Plan Investor Transaction Agreements.

Section 5.04.   <u>Absence of Restraint; Compliance with Laws; Actions</u>.

(a)    Plan Investor is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

(b)    There are no Actions pending or, to the knowledge of Plan Investor, threatened, that would reasonably be expected to materially impair or delay the ability of Plan Investor to consummate the Plan Investor Transactions or otherwise perform its obligations under the Plan Investor Transaction Agreements.

Section 5.05.  <u>Securities Matters</u>.  Plan Investor is an "accredited investor" (as such term is defined in Rule 501 of Regulation D under the Securities Act).  The Reorganized Company Interests are being acquired by Plan Investor for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Reorganized Company Interests or any interest in them.  Plan Investor has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Reorganized Company Interests, and Plan Investor is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Reorganized Company Interests.  Plan Investor acknowledges that the Reorganized Company Interests have not been registered under the Securities Act, or any securities Laws or any state or other jurisdiction (U.S. or non-U.S.), and understands and agrees that it may not sell or dispose of any Reorganized Company Interests except pursuant to a registered offering in compliance

with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable securities Laws of any state or other jurisdiction (U.S. or non-U.S.).

Section 5.06.  Financial Ability.

(a)    True and complete copies of executed commitment letters (including all related fee letters and side letters (redacted in respect of (i) the amounts, percentages and basis points of compensation set forth therein, and (ii) the pricing and other economic terms of the "market flex" provisions set forth therein; so long as such redactions do not adversely affect the conditionality, availability or aggregate amount of the Debt Financing)), and all exhibits, schedules, annexes, supplements and term sheets forming part thereof addressed to Plan Investor dated as of the Agreement Date (as amended or modified only in accordance with Section 6.07, the "**Debt Commitment Letters**") from the financial institutions party thereto (collectively, the "**Debt Financing Sources**"), pursuant to which the Debt Financing Sources have committed to provide Plan Investor with debt financing for the Transactions (the "**Debt Financing**"), have been provided to Companies on or prior to the Agreement Date.

(b)    True and complete copy of the executed commitment letter addressed to Plan Investor dated as of the Agreement Date (as amended or modified only in accordance with Section 6.07, the "**Equity Commitment Letter**" and, together with the Debt Commitment Letters, the "**Commitment Letters**"), from the investors party thereto (collectively, the "**Equity Investors**"), pursuant to which the Equity Investors have committed (i) to provide cash equity for the Transactions (the "**Equity Financing**" and, together with the Debt Financing, the "**Financing**"), have been provided to Companies on or prior to the Agreement Date.

(c)    The aggregate proceeds of the Financing committed to be provided to Plan Investor under the Commitment Letters are sufficient for Plan Investor to pay the Purchase Price and any other amounts required to consummate the Transactions on the terms contemplated by the Transaction Agreements as well as the transactions contemplated or required by the Commitment Letters and to pay all related fees and expenses payable by Plan Investor thereunder.  In the event that the Closing does not occur, the proceeds of the Equity Financing committed to be provided to Plan Investor under the Equity Commitment Letter are sufficient to satisfy any Liabilities or obligations of Plan Investor to Companies.

(d)    The Equity Commitment Letter is legal, valid and binding obligations of the parties thereto, are in full force and effect, and are enforceable against the parties thereto in accordance with their terms, subject to the Bankruptcy and Equity Exception.  The Debt Commitment Letters are legal, valid and binding obligations of Plan Investor and, to the knowledge of Plan Investor, the other parties thereto, are in full force and effect, and are enforceable against the parties thereto in accordance with their terms, subject to the Bankruptcy and Equity Exception.

(e)    There are no side letters or other Contracts, agreements or understandings to which Plan Investor is a party relating to the Financing other than (i) as expressly set forth in the Commitment Letters and (ii) customary engagement letter(s) or non-disclosure agreement(s) which do not adversely affect the conditionality, availability or aggregate amount of the Financing.

(f)    The Equity Commitment Letter provides, and will continue to provide, that Companies are a third-party beneficiary thereof and are entitled to enforce such agreement, and that Plan Investor and the Equity Investors have waived any defenses to the enforceability of such third-party beneficiary rights, in each case in accordance with its terms and subject to the limitations set forth herein and in <u>Section 13.17</u> (Remedies; Specific Performance).

(g)    Except as specifically set forth in the Commitment Letters, there are no conditions precedent to the obligations of (i) the Equity Investors to fund the Equity Financing or (ii) the Debt Financing Sources to fund the Debt Financing.

(h)    As of the Agreement Date, (i) none of the Commitment Letters has been amended or modified (and no such amendment or modification is contemplated by Plan Investor or, to the knowledge of Plan Investor, any other party to any Commitment Letter, as of the Agreement Date, other than, in the case of the Debt Commitment Letters, (x) any amendment or modification to add additional arrangers, bookrunners, managers, agents, lenders or other financing sources thereto and grant customary rights in connection therewith and (y) any assignment of the Debt Commitment Letters by Plan Investor to a newly formed entity that is under common control with the Plan Investor and assumes the obligations of the Plan Investor hereunder after the date hereof in accordance with the terms of the Debt Commitment Letter) and (ii) the respective commitments set forth in the Commitment Letters have not been withdrawn or rescinded in any respect (and no such withdrawal or rescission is contemplated by Plan Investor or, to the knowledge of Plan Investor, any other party to any Commitment Letter, as of the Agreement Date).  To the knowledge of Plan Investor, no event has occurred which would result in any breach by Plan Investor of, or constitute a default by Plan Investor under, any term or condition to closing of the Commitment Letters, or otherwise result in any portion of the Financing contemplated thereby to be unavailable or delayed (assuming satisfaction of the Closing Conditions set forth in <u>Section 11.02</u>).  Plan Investor (i) is not aware of any fact or occurrence that makes any of the representations or warranties of Plan Investor in any of the Commitment Letters inaccurate in any material respect, (ii) has no reason to believe that it will be unable to satisfy on a timely basis any term or condition of closing to be satisfied by it or its Affiliates contained in the Commitment Letters (assuming compliance by Companies with their respective obligations pursuant to <u>Section 6.07</u>, satisfaction of the Closing Conditions set forth in <u>Section 11.02</u> and subject to the occurrence of the Marketing Period) and (iii) has no reason to believe that any portion of the Financing required to consummate the Transactions will not be made available to Plan Investor on the Closing Date, including any reason to believe that any of the Equity Investors or Debt Financing Sources will not perform their respective funding obligations under the Commitment Letters in accordance with their respective terms and conditions (assuming compliance by Companies with their respective obligations pursuant to <u>Section 6.07</u>, satisfaction of the Closing Conditions set forth in <u>Section 11.02</u> and subject to the occurrence of the Marketing Period).  Plan Investor has fully paid any and all commitment fees and other fees required by the Debt Commitment Letters to be paid as of the Agreement Date, and will pay in full any other commitment fees and other fees required to be paid thereunder as and when they become payable.

(i)    The obligations of Plan Investor under this Agreement are not contingent on the availability of the Financing.

Section 5.07. <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Plan Investor or any of Plan Investor's Affiliates in connection with any Transaction.

Section 5.08. <u>Solvency</u>.  Assuming (i) the accuracy of the representations and warranties of Companies set forth in <u>Article IV</u> and (ii) that any estimates, projections, forecasts of the Company Group Members are reasonable, immediately after giving effect to the consummation of the Transactions (including any financings being entered into in connection therewith) and taking into account all obligations of Plan Investor pursuant to the Transaction Agreements, the Plan Investor and its Subsidiaries (after giving effect to the Transactions), when taken as a whole on a consolidated basis:

(a)    have property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability);

(b)    have assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured;

(c)    will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured; and

(d)    are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which they have unreasonably small capital.

Section 5.09. <u>Investigation</u>.  Plan Investor acknowledges and agrees that it (a) has completed such inquiries and investigations as it has deemed appropriate into, and, based thereon, has formed an independent judgment concerning, the Acquired Companies, the Reorganized Company Interests, the Liabilities of the Acquired Companies, the Business Assets, the Assumed Liabilities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements and (b) has been furnished with, or given access to, all such projections, forecasts, estimates, appraisals, statements, promises, advice, data or information about the Acquired Companies, the Reorganized Company Interests, the Liabilities of the Acquired Companies, the Business Assets, the Assumed Liabilities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements, as it has requested.  Plan Investor further acknowledges and agrees that (x) the only representations and warranties made by Companies are the representations and warranties expressly set forth in <u>Article IV</u> (as qualified by the Disclosure Schedules) and, except as set forth on any Schedule to this Agreement, Plan Investor has not relied upon any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Companies or any of their Affiliates, any Representatives of Companies or any of their Affiliates or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Companies' Banker, or management

presentations, data rooms (electronic or otherwise) or other due diligence information, and that Plan Investor will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information and (y) any claims Plan Investor may have for breach of any representation or warranty shall be based solely on the representations and warranties of Companies expressly set forth in Article IV (as qualified by the Disclosure Schedules).  Except as otherwise expressly set forth in this Agreement, Plan Investor understands and agrees that the Acquired Companies, the Business, the Business Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Article IV (as qualified by the Disclosure Schedules) without any other representations or warranties of any nature whatsoever.

# ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.01.    Conduct of Business Before the Closing.

(a)    Plan Investor acknowledges that Companies are operating a significant portion of the Business in the context of the Bankruptcy Cases. Subject to the foregoing, during the Pre-Closing Period (i) Companies shall (A) use, and shall cause each Company Group Member (including, subject to Section 6.01(b), the Controlled JVs) to use, commercially reasonable efforts to maintain the Business Assets substantially in their current condition (subject to ordinary wear and tear), (B) use commercially reasonable efforts to maintain the Nuclear Liability Policies in full force and effect in all material respects at the coverage levels currently in effect as of the Agreement Date; and (C) use commercially reasonable efforts to make, and to cause each Company Group Member (including, subject to Section 6.01(b), the Controlled JVs) to make, the capital expenditures set forth in the Budget and to carry out the actions set forth in the Transformation Plan, in each case, in all material respects and (ii), except (A) as required by applicable Law, to the extent necessary to comply with Nuclear Obligations, to the extent permitted by an Order of the Bankruptcy Court, or as otherwise contemplated by or necessary to effectuate the Transaction Agreements, or (B) for matters identified on Schedule 6.01, during the Pre-Closing Period unless Plan Investor otherwise consents in writing in advance below, (which consent shall, other than with respect to clause (xii)(B) or (xii)(C) below, not be unreasonably withheld, conditioned or delayed), Companies will, and will cause the other Company Group Members (including, subject to Section 6.01(b), the Controlled JVs) to, (1) subject to actions contemplated by the Transformation Plan, conduct the Business in the ordinary course of business, (2) use commercially reasonable efforts to preserve substantially intact (x) the present business operations, organization (including management, engineers and sales force), assets and goodwill of the Business, (y) the present material relationships with Persons having business dealings with the Company Group Members, including the Material Customers and the Material Suppliers and (z) all material Permits of the Company Group Members (including, subject to Section 6.01(b), the Controlled JVs) and (3) notwithstanding the foregoing clauses (1) and (2), not do any of the following:

(i)    grant any Lien on the Reorganized Company Interests, the WECHOL Shares or any other equity interests in the Company Group Members or on the Non-

Controlled JV Interests or any Business Assets (in each case, whether tangible or intangible) material to the Business, other than granting a Permitted Lien on any Business Assets;

(ii)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or division;

(iii)     incur any Debt (other than Debt referred to in clause (g) of the definition of Debt), issue any debt securities or, except to the extent permitted by an Order of the Bankruptcy Court, assume, grant, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances (in each case, other than (A) in the ordinary course of business, (B) to the extent provided in Schedule 6.01(a) or (C) pursuant to intercompany borrowing arrangements (1) that will be settled or repaid in full, or canceled or terminated, at or before the Closing or (2) solely between or among the Acquired Companies);

(iv)     issue or sell any additional shares of, or other equity interests in, the Company Group Members, or securities convertible into or exchangeable for such shares or equity interests (other than, in each case, the issuance or sale of shares of, or other equity interest in, one Company Group Member to another Company Group Member) or contemplated by the Transformation Plan (and in which case, on terms no less favorable to the Plan Investor and its Affiliates than as contemplated thereby) or issue or grant any options, warrants, calls, subscription rights or other rights of any kind to acquire such shares, other equity interests or securities or rights derivative from such securities;

(v)     sell, transfer, lease, sublease, license or otherwise dispose of any Business Assets having a value, individually or in the aggregate, in excess of $5,000,000 other than (A) sales of inventory or obsolete equipment in the ordinary course of business or (B) as contemplated by the Transformation Plan (and in which  case, on terms no less favorable to the Plan Investor and its Affiliates than as contemplated thereby);

(vi)     except as contemplated by the Transformation Plan and except as required by the terms of an Employee Plan as in effect on the date hereof, (A) increase, agree to increase or promise to increase or accelerate the vesting or payment of the wages, salaries, or bonuses (1) payable to any Covered Employee who is reasonably expected to earn more than $300,000 in annual base compensation and (2) if such action is not accounted for in the Budget or the Transformation Plan and would reasonably be expected to result in aggregate payments by (and Liabilities to) the Business in excess of $5,000,000 in any calendar year, (B) except as expressly contemplated in (A), (i) increase, agree to increase or promise to increase or accelerate the vesting or payment of severance, termination, retention or change-in-control pay or other material benefits payable to any Covered Employee, (ii) establish or increase or promise to increase or accelerate the vesting or payment of any compensation or benefits under any Employee Plan, (iii) adopt, establish, amend or terminate any Employee Plan, or any agreement, plan, policy or arrangement that would constitute an Employee Plan if it were in existence on the Agreement Date or (C) hire or make an offer to hire any new officer, director, consultant or other individual service provider in each case, that is reasonably expected to be paid base compensation in excess of $300,000 in any calendar year, except, in each case, as required by Law or by order of the Bankruptcy Court;

WEIL:\96391119\18\80768.0017

**HIGHLY CONFIDENTIAL**

(vii)    enter (or commit to enter) into, amend, terminate or extend any collective bargaining agreement or agreement with a union or agree to apply any collective bargaining agreement to a new location or group of Covered Employees;

(viii)    make any change in any method of accounting or accounting practice or policy used by the Business in the preparation of its financial statements, other than changes required by GAAP, applicable non-U.S. general accounting principles or applicable Law;

(ix)    enter into any settlement or release with respect to any material Action, other than any settlement or release that (A) (1) contemplates only the payment of money not in excess of $5,000,000, (2) would not be expected to have an adverse effect on the operation of the Business after the Closing and (3) does not impose any ongoing limits on the conduct or operation of the Business, (B) involves the payment of Liabilities reflected or reserved against in full in the Financial Statements or the Disclosure Schedules, (C) (1) contemplates the payment of money not in excess of $5,000,000, (2) would not be expected to have an adverse effect on the operation of the Business after the Closing and (3) relates to the Business that any Company Group Member believes necessary or appropriate under Nuclear Licenses or Permits, or (D) subject to Section 2.04, involves a settlement of any Claim(s) filed against any Debtor in the Bankruptcy Cases, and, in the case of (A) and (B) only, results in a full release for the benefit of any Company Group Member of the claims giving rise to such Action and all Liabilities arising thereunder;

(x)    other than in the ordinary course of business, on commercially reasonable terms and solely to the extent not terminable without Liability following the Closing on less than thirty (30) days' notice, enter into any transactions, Contracts or understandings with Affiliates that would be binding on the Company Group Member or the Business Assets after the Closing;

(xi)    except to the extent reasonably necessary to implement the Solvency Steps Plan, amend the organizational documents of any Company Group Member;

(xii)    enter into, amend or terminate (A) other than in the ordinary course of business or in a manner contemplated by the Transformation Plan, any Material Contract;  (B) any Contract (other than fuel fabrication contracts performed by the Global Nuclear Fuels segment or outage services contracts performed by the Global Field Services and I&C segments) that (x) is reasonably anticipated to result in revenues to, or expenditures by, the Company Group Members, or (y) could result (in the event of a breach thereof) in liability exposure to the Company Group Members (taking into account liquidated damages, limits on liability and applicable insurance coverage), in excess of $25,000,000; or (C) any Contract to conduct business in ███ (the covenants in clauses (B) and (C), the **"Designated Interim Covenants"**);

(xiii)    declare, set aside or pay any dividends or distributions on any capital stock of any Company Group Member (in cash or in kind) to the extent such dividends or distributions are payable after the Closing;

WEIL:\96391119\18\80768.0017

(xiv)    liquidate or dissolve any Company Group Member;

(xv)    enter into any new line of business outside of the Business;

(xvi)    cause the Business to make or become legally committed to make (A) capital expenditures that, in the aggregate, exceed the Budget on a per facility basis by twenty percent (20%) or (B) capital expenditures that, in the aggregate, exceed the Budget by $10,000,000, except for expenses actually incurred in connection with maintenance and restoration of Real Property for unexpected emergencies or casualties;

(xvii)    with respect to an Company Group Member, make, change, or revoke any material election in respect of Taxes or adopt or change any material accounting method with respect to Taxes, make any material agreement or settlement with respect to Taxes, file any material amended Tax Return, surrender any material right to claim a refund of Taxes, or consent to any material extension or waiver of the limitation period applicable to any Tax claim or assessment; in each case, unless required by applicable Law;

(xviii)    except as contemplated by the Transformation Plan, implement any employee layoffs or plant closing that could reasonably be expected to implicate the Worker Adjustment and Retraining Notification Act, as amended, or any similar state, local or foreign law;

(xix)    amend or cancel any material Insurance Policy that is reasonably expected to continue to cover the Business and the Business Assets (in whole or in part) from and after the Closing, including the Facility Form insurance policy with American Nuclear Insurers, or fail to timely pay any insurance premium under any such material Insurance Policy when due;

(xx)    terminate or materially alter any Nuclear Liability Policy; or

(xxi)    authorize, commit or agree to do any of the foregoing.

(b)    Notwithstanding anything to the contrary in this Section 6.01, Companies' covenants in this Agreement with respect to the Controlled JVs (including any obligations to cause the Controlled JVs to comply with the covenants in this Article VI) shall only apply to the extent that such compliance would not cause Companies or any of their Affiliates to breach or violate, (x) any agreement relating to the organization, formation, ownership or governance of the Controlled JVs or (y) any fiduciary or other duties owed by Companies or any of their Affiliates to such Controlled JV or its equity-holders.

(c)    In addition, Companies shall use their commercially reasonable efforts (including by asserting its rights pursuant to Contract) to cause the Non-Controlled JVs to comply with the covenants in this Article VI as if they were Company Group Members.

(d)    The Companies shall, and shall cause the Company Group Members to, reasonably cooperate in good faith with the Plan Investor in their ongoing review, enhancement, and, where necessary or appropriate, implementation of compliance policies and programs for all Controlled JVs related to Anti-Corruption Laws, Sanctions, Export Control Laws, or anti-money

46

laundering laws. Each Company Group Member agrees to promptly, but no later than four (4) Business Days from the date of discovery thereof by the Company, inform/notify the Plan Investor of the existence or reasonable possibility of any governmental inquiry, governmental investigation, lawsuit or administrative proceeding related to violations of Anti-Corruption Laws, Sanctions, Export Control Laws, or anti-money laundering laws related to Company Group Members, or any of its affiliates, any of their respective directors, officers, employees or third parties that could reasonably be expected to materially affect the Company Group Members', or any of its affiliates', businesses or result in material liability to the Company Group Members, or any of its affiliates.

Section 6.02.    Access to Information.

(a)    During the Pre-Closing Period, upon one (1) Business Day prior notice and as promptly as practicable following the date hereof, Companies shall, and shall cause each of the other Company Group Members to, (i) afford the Representatives of Plan Investor reasonable access, during normal business hours, to the properties (including, subject to Section 6.02(b)(iii), for purposes of conducting environmental assessments), books and records of Companies and their Affiliates to the extent any such books and records relate to the Business and (ii) as promptly as practicable furnish to the Representatives of Plan Investor such additional financial and operating data and other information regarding the Business or reflecting its financial and operating performance as Plan Investor or its Representatives may from time to time reasonably request for purposes of consummating the Transactions and preparing to operate the Business following the Closing, in each case at the sole cost and expense of Plan Investor.

(b)    Notwithstanding anything in this Agreement to the contrary,

(i)    (A) in no event shall the Acquired Companies or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, (2) information with respect to bids, the identity of any bidder, confidentiality or non-disclosure agreements, letters of intent, expressions of interest or other proposals, in each case, received prior to the Agreement Date in connection with transactions comparable to those contemplated by this Agreement or any information or analysis relating to any such communications, (3) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to any of the Acquired Companies relating to such information or (4) information the disclosure of which would cause any Acquired Company to breach a confidentiality obligation by which it is bound (provided, that with respect to each of clauses (3) and (4) above, the Company Group Members and their respective Affiliates shall use reasonable best efforts to provide such information in a manner that would not result in such a jeopardy or breach, and to the extent any information is withheld pursuant to such clauses (3) or (4), the Company Group Members and their respective Affiliates, as applicable, shall use reasonable best efforts to identify the information so withheld (to the extent such identification would not result in such a jeopardy or breach)), and (B) the investigation contemplated by Section 6.02(a) shall not unreasonably interfere with any of the businesses, personnel or operations of any of the Company Group Members or the Business;

(ii)    Company Group Members shall cause any of their respective Affiliates or the Business', auditors, accountants and other professional advisers to make any

work papers available to any Person in accordance with such auditors', accountants' and other professional advisors' normal disclosure procedures; provided that such Person has signed a customary agreement relating to such access to work papers with respect to reliance by such Person thereon;

(iii)    During the Pre-Closing Period, Plan Investor shall not conduct any invasive environmental investigation at any Owned Real Property or Leased Real Property, including any sampling, testing or other intrusive indoor or outdoor investigation of soil, subsurface strata, surface water, groundwater, sediments, building materials or ambient air or anything else at or in connection with any Owned Real Property or Leased Real Property;

(iv)    during the Pre-Closing Period, without the prior written consent of Companies, which Companies may withhold for any reason or no reason in their discretion, neither Plan Investor nor any of its Representatives shall contact any employees of, suppliers to, or customers of, any Acquired Companies or any of their respective Affiliates (other than as required by applicable Laws or by Order of the Bankruptcy Court) in connection with or with respect to this Agreement, any other Transaction Agreement or any Transaction, or to otherwise discuss the business or operations of the Acquired Companies or the Business; and

(v)    no Acquired Company shall be required, during the Pre-Closing Period, to disclose, or cause or seek to cause the disclosure of, to Plan Investor or its Affiliates or Representatives (or provide access to any properties, books or records of the Acquired Companies or any of their Affiliates that would reasonably be expected to result in the disclosure to such Persons or others of) any Export Controlled Information or any Sensitive Nuclear Information or any confidential information relating to Trade Secrets and/or Technology, processes, trademark, trade name, service mark or copyright applications or product development, or pricing and marketing plans, in each case, in violation of applicable Law, nor shall any Acquired Company be required to permit or cause or seek to cause others to permit Plan Investor or its Affiliates or Representatives to have access to or to copy or remove from the properties of the Acquired Companies or any of their Affiliates any documents, drawings or other materials that might reveal any such confidential information.

(c)    If so requested by either or both Companies, Plan Investor shall enter into a customary and reasonable joint defense agreement or common interest agreement with one or more of the Company Group Members or any of their respective Affiliates with respect to any information provided to Plan Investor, or to which Plan Investor gains access, pursuant to this Section 6.02 or otherwise.

Section 6.03. Confidentiality.  Plan Investor acknowledges that the Proprietary Information (as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement and the Clean Team Agreement, as applicable, and the terms of the Confidentiality Agreement and Clean Team Agreement, as applicable, are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Plan Investor, its Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the

obligations under the Confidentiality Agreement and the Clean Team Agreement, as applicable, shall terminate. If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms; provided, that the term of the Confidentiality Agreement as set forth in Section 26 thereof shall be amended to refer to two (2) years from the date of termination of this Agreement. For the avoidance of doubt, the provisions in the Confidentiality Agreement which by their terms survive the termination of the Confidentiality Agreement shall continue in full force and effect in accordance with their terms.

Section 6.04.    Regulatory and Other Authorizations; Consents.

(a)    Each of Plan Investor and Companies shall, and Companies shall cause their respective Affiliates to, (i) make all required filings and use reasonable best efforts to promptly obtain all Consents, Permits and Orders of all Government Authorities (other than any required approvals or action of the Bankruptcy Court, which are governed exclusively by Article IX) that may be, or become, necessary for the execution and delivery of, and performance of its obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "**Government Approvals**"), and to supply promptly any additional information and documentary material that may be requested by a Government Authority (including to promptly make available any information and appropriate personnel in response to any queries made by a Government Authority, which may include information regarding this Agreement, Plan Investor's capabilities as the potential purchaser of the Business, Plan Investor's or Companies' organizational and capital structure, the citizenship of any controlling person(s) thereof, or other matters), and (ii) use reasonable best efforts to promptly secure the issuance, reissuance or transfer of all Permits, including Environmental Permits, that may be or become necessary to operate the Business following the Closing.  Each Party will reasonably cooperate with the other in promptly seeking to obtain all such Government Approvals and the issuance, reissuance or transfer of such Permits.  Plan Investor shall pay all customary fees or make other customary payments required by applicable Law to any Government Authority in order to obtain any such Government Approvals, Consents, Orders or approvals.

(b)    Without limiting the generality of the Parties' obligations under Section 6.04(a), promptly after the Agreement Date, Companies and Plan Investor shall, in connection with the NRC Approvals, (i) prepare and jointly submit applications to the NRC requesting the NRC Approvals and (ii) respond (and in any event respond no later than as requested by NRC) to any request for additional information, documents or other materials received after filing the applications. Companies and Plan Investor shall, in connection with the NRC Approvals, (A) reasonably cooperate in all respects and consult with each other in connection with the preparation and consideration of the NRC applications, as well as in connection with any presentation or proceeding associated with such NRC application, including by allowing each such other Party to have an opportunity to review in advance and comment on drafts of the applications; (B) promptly inform each such other Party of any communication received by such Party from, or given by such Party to, the NRC, by promptly providing true, correct and complete copies to the other of any such written communications, except for any exhibits to such communications that must be kept confidential pursuant to applicable Law or at the request of the NRC; and (C) permit each such other Party to review in advance any

communication that it gives to, and consult with each other in advance of any meeting, substantive phone call or conference with the NRC, and to the extent not prohibited by the NRC, give each such other Party the opportunity to attend and participate in any phone calls or in-person meetings with the NRC, in each of clauses (A), (B) and (C) of this Section 6.04(b), subject to confidentiality considerations contemplated by applicable Law or required by the NRC. The Parties shall consult with each other as to the appropriate time of filing such NRC applications and shall agree in good faith upon the timing of such NRC applications.

(c)      Without limiting the generality of Plan Investor's undertaking pursuant to Section 6.04(a), Companies and Plan Investor agree to make an appropriate filing of a Notification and Report Form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 with respect to the Transactions contemplated hereby within fifteen (15) Business Days of the Agreement Date, and to make, or cause to be made, any filings that, in the reasonable judgment of Plan Investor, are required or advisable to make under any other Antitrust Laws with respect to the Transactions contemplated hereby within thirty (30) Business Days of the Agreement Date (it being understood that, in relation to Schedule 4.06(2) (European Commission filing), the obligation under this Section 6.04(c) shall be satisfied upon filing of the first draft of Form CO).

(d)      With respect to review and clearance by CFIUS, pursuant to Section 721 of the DPA, Plan Investor and Companies shall: (i) promptly prepare and file a draft Joint Voluntary Notice for review by the CFIUS staff, not later than twenty (20) Business Days after the Agreement Date, promptly provide CFIUS with any additional or supplemental information requested by CFIUS on such draft Joint Voluntary Notice, and promptly submit the formal Joint Voluntary Notice after resolution of all questions or comments received from CFIUS staff or confirmation that CFIUS has no further comment on the draft Joint Voluntary Notice; and (ii) promptly respond (and in any event respond no later than as required by CFIUS) to any request for additional information, documents or other materials received after filing of the formal Joint Voluntary Notice.  Plan Investor and Companies shall, in connection with the CFIUS review, (A) cooperate in all respects and consult with each other in connection with the preparation and consideration of the CFIUS Joint Voluntary Notice, including by allowing each such other Party to have an opportunity to review in advance and comment on drafts of filings and submissions; (B) promptly inform each such other Party of any communication received by such Party from, or given by such Party to, CFIUS, by promptly providing true, correct and complete copies to the other of any such written communications, except for any exhibits to such communications providing the personal identifying information required by 31 C.F.R. § 800.402(c)(6)(vi) or that otherwise is requested by CFIUS to remain confidential from each such other Party; and (C) permit each such other Party to review in advance any communication that it gives to, and consult with each other in advance of any meeting, substantive phone call or conference with CFIUS, and to the extent not prohibited by CFIUS, give each such other Party the opportunity to attend and participate in any in-person meetings with CFIUS, in each of clauses (A), (B) and (C) of this Section 6.04(d), subject to confidentiality considerations contemplated by Section 721 of the DPA or required by CFIUS. Each of Plan Investor and Companies shall respond to any request for information from CFIUS in the timeframe set forth in the CFIUS regulations, 31 C.F.R. Part 800; provided, however, that either Party, after consultation with each such other Party, may request in good faith an extension of time pursuant to 31 C.F.R. § 800.403(a)(3) to respond to CFIUS requests for follow-up information, provided that under no circumstance may

a Party request any extension that causes CFIUS to reject the Joint Voluntary Notice filed by the Parties or modifies the time for completion of the CFIUS review or investigation.

(e)    Notwithstanding anything herein to the contrary, Plan Investor shall use reasonable best efforts to overcome any objections or national security concerns raised by CFIUS and to receive the CFIUS Clearance so as to enable Closing, including providing such reasonable assurances as may be requested or imposed by CFIUS, including entering into a mitigation agreement, a letter of assurances, a national security agreement or other similar arrangement or agreement (in each case, reasonably acceptable to Plan Investor) in relation to the business and assets of the Acquired Companies.

(f)    Without limiting the generality of Plan Investor's undertaking pursuant to Section 6.04(a), but subject to the terms hereof, Plan Investor shall use reasonable best efforts to avoid or eliminate each and every impediment under any antitrust, competition or trade regulation Law that may be asserted by any antitrust or competition or any other Government Authority or any other party so as to enable the Parties hereto to promptly close the Transactions contemplated hereby and by the other Transaction Agreements, including using reasonable best efforts to avoid the entry of, and the commencement of litigation seeking the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of materially delaying or preventing the consummation of the Transactions contemplated hereby and by the other Transaction Agreements.  In addition, Plan Investor shall defend through litigation on the merits any Action by any party in order to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would prevent the Closing prior to the Outside Date. Notwithstanding anything herein to the contrary, Plan Investor shall not be required to (and not be required to cause any of its Affiliates to) propose, negotiate, commit to or effect, by consent decree, hold separate orders or otherwise, the sale, divestiture, disposition or restrictions on the operation of its assets, properties or businesses or of the assets, properties or businesses to be acquired by it pursuant hereto.

(g)    Each Party shall promptly notify the other Parties of any oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this Section 6.04, permit the other Parties and their respective Representatives to review in advance any communication relating to the matters that are the subject of this Section 6.04 proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this Section 6.04, provided, however, that materials proposed to be submitted in response to any such Government Authority communication may be redacted (i) to remove references concerning the valuation of the Business; (ii) as necessary to comply with contractual arrangements, applicable Law or by order of the Bankruptcy Court; and (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns.  No Party shall agree to participate in any meeting or discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Government Authority, gives the other Parties the opportunity to attend and participate at such meeting.  Subject to the Confidentiality Agreement,

WEIL:\96391119\18\80768.0017

the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods.  The Parties shall share the right to control and direct the process by which the Parties hereto seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law (which shall include any review by CFIUS), including by directing the strategy and making final determinations related to the review or investigation of the Transactions contemplated by this Agreement and the other Transaction Agreements by any Government Authority and attending all meetings, discussions, and communications with any Government Authority except to the extent that such Government Authority may request to communicate exclusively with one Party.

(h)     Plan Investor shall not, and shall not permit any of its Affiliates to, take any action (including acquiring or agreeing to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquiring or agreeing to acquire any assets) that would reasonably be expected to have the effect of (i) materially delaying, impairing or impeding the receipt of, or increasing the risk of not receiving, any required Government Approval or the issuance, reissuance or transfer of any Permit or Environmental Permit, (ii) materially delaying, impairing or impeding the expiration or termination of any applicable waiting period with respect to a Government Approval (and shall not, without the consent of Companies, withdraw or refile any filing or restart the waiting period on any Government Authority's review, or enter into a timing agreement with a Government Authority), (iii) materially increasing the risk of any Government Authority entering an Order prohibiting the consummation of the Transactions or (iv) otherwise materially delaying the consummation of the Transactions.

(i)     Notwithstanding anything in this Agreement to the contrary (including Section 6.01), Plan Investor acknowledges on behalf of itself and its Affiliates and its and their Representatives, successors and assigns that the operation of the Business shall remain in the dominion and Control of Companies until the Closing and that none of Plan Investor, any of its Affiliates or their respective successors or assigns will provide, directly or indirectly, any directions, orders, advice, aid, assistance or information to any director, officer or Covered Employee, except as specifically contemplated or permitted by this Article VI or as otherwise consented to in writing in advance by Companies.

(j)     During the Pre-Closing Period, Plan Investor shall reasonably cooperate with and support the Regulated Entities in all required respects (including by providing all required information), to enable the Regulated Entities to comply with their Nuclear Obligations at all times, including to:

(i)     continue their engagement with any applicable Relevant Authority as and when required in connection with the Transactions contemplated by this Agreement or any other Transaction Agreement;

(ii)     conduct any internal review process and assessment in respect of any change in ownership, control, management, governance, resources or any other relevant

change of the Regulated Entity resulting from the Transactions contemplated by this Agreement or any other Transaction Agreement; and/or

(iii)    seek any approval or positive response from any applicable Relevant Authority in respect of the Transactions contemplated by this Agreement or any other Transaction Agreement.

(k)    During the Pre-Closing Period, Plan Investor shall (and shall cause its Affiliates to) use reasonable best efforts to assist the Regulated Entities in obtaining all required approvals or consents from the applicable Relevant Authorities in respect of the Transactions contemplated by this Agreement or any other Transaction Agreement.

Section 6.05.   <u>Third Party Consents</u>.   Each Party agrees to cooperate to obtain any other consents and approvals from any third person other than a Government Authority that may be required in connection with the Transactions (the "**Third Party Consents**"). Notwithstanding anything in this Agreement to the contrary, neither Companies nor any of their respective Affiliates shall (a) be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any such Third Party Consent or (b) take any action described in clause (a), preceding, without first obtaining Plan Investor's written consent. Each Party shall give prompt written notice to the other of any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions.

Section 6.06.   <u>Company Guarantees; Other Obligations</u>.

(a)    At or before the Closing, Plan Investor shall use commercially reasonable efforts to, and Companies shall cooperate with Plan Investor and use commercially reasonable efforts to assist Plan Investor to, arrange for substitute letters of credit, Plan Investor guarantees or other credit support obligations, as applicable, to replace (A) any such Company Guarantees (including the NDA Parent Company Guarantee) outstanding as of the Agreement Date, all of which are listed on <u>Schedule 6.06</u>, and (B) any such Company Guarantees entered into or issued in the ordinary course of business during the Pre-Closing Period (x) with Plan Investor's prior written consent or (y) in accordance with <u>Section 6.01</u> (including as set forth on <u>Schedule 6.01(a)</u> but excluding those letters of credit issued in accordance with item 21 of <u>Schedule 6.01(a)</u>).  To the extent the beneficiary or counterparty under any Company Guarantee does not accept as of the Closing any such substitute letter of credit, Plan Investor guarantee or other obligation proffered by Plan Investor, effective from and after the Closing Date, Plan Investor shall, and shall cause each of its Affiliates to, (x) indemnify, defend and hold harmless the obligor (the "**Guarantee Obligor**") of each Company Guarantee that is not replaced in accordance with the foregoing provisions ("**Surviving Company Guarantees**") against, and reimburse the Guarantee Obligor for, all amounts paid, including out-of-pocket costs and expenses in connection with such Company Guarantees, including out-of-pocket expenses of the Guarantee Obligor in maintaining such Surviving Company Guarantees, whether or not any such Surviving Company Guarantee is drawn upon or required to be performed, and shall in any event promptly reimburse the Guarantee Obligor to the extent any Surviving Company Guarantee is called upon and the

Guarantee Obligor makes any payment or are obligated to reimburse the party issuing the Surviving Company Guarantee and (y) not, without the Guarantee Obligor's prior written consent, amend in any manner adverse to the Guarantee Obligor, or extend (or permit the extension of), any Surviving Company Guarantee.

(b)    Plan Investor, at its own discretion and sole expense, may order (i) preliminary title reports from a nationally recognized title company (the "**Title Company**") with respect to any of the Owned Real Property located in the United States (the property covered by such reports being referred to herein as the "**Titled Property**") and (ii) surveys from one or more licensed surveyors. Companies and their Subsidiaries shall use commercially reasonable efforts in cooperating with Plan Investor, the Title Company, and the surveyors in connection with the compilation of title and survey to the Titled Property and in connection with Plan Investor's efforts to obtain owner's and/or lender's title insurance policies and accompanying surveys, including by providing access to such Titled Property (subject to Section 6.02), and providing documentation in the possession of Companies and their Subsidiaries related to the Titled Property reasonably requested by Plan Investor. At Closing, the Reorganized Company shall provide customary affidavits and other instruments as are reasonably required by the Title Company for the deletion of any standard or printed exceptions (including exceptions related to mechanics liens or other similar liens) in any title insurance policies issued pursuant thereto that are customarily deleted by virtue of an owner delivering such instruments in commercial real estate transactions in the state in which the Titled Property that is the subject of such a title insurance policy is located.

Section 6.07.    Financing.

(a)    During the Pre-Closing Period, subject to the limitations set forth below, and unless otherwise agreed by Plan Investor, Companies will, and will cause the Company Group Members, the management of the Business and their respective representatives to, use reasonable best efforts to provide to Plan Investor all customary and reasonable cooperation that is reasonably requested by Plan Investor, at Plan Investor's sole expense, in connection with Plan Investor's arrangement, obtaining and syndication, as applicable, of the Debt Financing, including using reasonable best efforts to take the following actions: (A) causing the Company Group Members' senior officers, with appropriate expertise, at reasonable times and upon reasonable notice, to participate in (including by assisting in the preparation for) a reasonable number of customary bank meetings and lender presentations with prospective lenders and investors in debt securities, (B) furnishing to Plan Investor, on a timely basis, the Required Information, the quarterly financial statements regularly prepared by the Companies and delivered under the Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of May 26, 2017 (as amended, restated, amended and restated or otherwise modified from time to time), by and among Westinghouse Electric Company LLC, the Companies, the lenders party thereto and Citibank, N.A., as administrative agent or any replacement credit agreement (the "**DIP Credit Agreement**") (substantially concurrently with, or promptly following, delivery thereof under the DIP Credit Agreement) and any other documents reasonably necessary to permit Plan Investor to prepare, and otherwise assist with the preparation of, customary materials for rating agency presentations, bank information memoranda, offering documents and other customary marketing and syndication materials required in connection with the Debt Financing, (C) assisting Plan Investor in the preparation of pro forma financial statements, information and

54

data contemplated to be delivered under the Debt Commitment Letters or otherwise customarily included in rating agency presentations, bank information memoranda, offering documents and other customary marketing and syndication materials required in connection with the Debt Financing; provided, that without limiting the obligations to provide historical information or assumptions as the basis therefor, the Company Group Members shall not be required to prepare any post-Closing financial information, pro forma financial information, any estimates or projections with respect to pro forma cost savings or synergies or any pro forma capitalization or ownership information with respect to the Plan Investor, (D) cooperating with the Debt Financing Sources' reasonable evaluation of the applicable Company Group Members for the purpose of establishing collateral arrangements (including conducting, at the Plan Investor's sole cost and expense, appraisals and field audits contemplated by the Debt Commitment Letter and providing information with respect to inventory, receivables, deposit accounts and related assets), in each case, to the extent customary in asset-based revolving credit facilities; provided, that no such collateral arrangements shall be effective until the Closing, (E) assisting in the negotiation of definitive documents for the Debt Financing (including credit agreements, note purchase agreements, indentures, pledge and security documents, guarantees and other financing documents) and customary officer's certificates and closing documents, in each case, as may be reasonably be requested by Plan Investor and, subject to the effectiveness thereof being contingent upon the Closing, and the execution and delivery of such definitive documents, certificates and closing documents, (F) facilitating the pledging of collateral and the granting of security interests in respect of the Debt Financing; provided, that no such pledge shall be effective until the Closing, (G) facilitating the release and termination, effective upon the Closing, of liens and guarantees, including obtaining customary payoff and release letters, lien terminations and releases and other similar documents as may reasonably be requested by Plan Investor, (H) executing and delivering such reasonable and customary authorization letters (which may include customary representations and warranties regarding accuracy and completeness of information consistent with the "information" representation in the Debt Commitment Letter and the absence of material non-public information) for use in syndicating and marketing the Debt Financing, (I) facilitating the assistance of the Companies' independent auditors to participate in accounting due diligence sessions, to provide reasonable assistance to Plan Investor in connection with the Plan Investor's preparation of pro forma financial statements, information and data required to be delivered under the Debt Commitment Letters or otherwise customarily included in rating agency presentations, bank information memoranda, offering documents and other customary marketing and syndication materials required in connection with the Debt Financing and (J) furnishing Plan Investor and the Debt Financing Sources at least three (3) Business Days prior to the Closing Date with all documentation and other information required by bank regulatory authorities under any applicable "know-your-customer" and anti-money laundering Law rules and regulations, including the USA PATRIOT Act, relating to Companies or any of their Subsidiaries to satisfy conditions to the Debt Financing that has been reasonably requested in writing by the Plan Investor at least ten (10) Business Days prior to the Closing Date; provided, however, that, in each case under this Section 6.07, such cooperation does not: (a) require (1) the entry by Companies or any of their Affiliates (other than the Company Group Members) into any agreement (whether or not conditioned on the Closing) or (2) the entry by any Company Group Member into any agreement the effectiveness of which is, and any of such Company Group Member's obligations thereunder are, not conditioned on the Closing, (b) unreasonably interfere with the ongoing operations of any

HIGHLY CONFIDENTIAL

Company or any Company Group Member, (c) require any action, including the delivery of or access to any information, that Companies reasonably believe would result in a violation of any Contract or confidentiality agreement or any Law, or the loss of any legal or other privilege (provided, that Companies and the Company Group Members shall use reasonable best efforts to provide such information in a manner that would not result in such a violation or loss, and to the extent any information is withheld pursuant to this clause (c), Companies or the Company Group Members, as applicable, shall use reasonable best efforts to identify the information so withheld (to the extent such identification would not result in such a violation or loss), (d) include any action that would cause any representation, warranty, covenant or other obligation in the Transaction Agreements to be breached or any Closing Condition to fail to be satisfied, (e) involve consenting to the pre-filing of UCC-1s or any other grant of Liens or other encumbrances, (f) require the giving of representations or warranties to any third parties (except as set forth above with respect to reasonable and customary authorization letters) or the indemnification thereof, (g) have any liability or obligation under any agreement or document relating to the Financing or be required to incur any liability or obligation under any agreement or document related to the Financing prior to the Closing (except as set forth above with respect to reasonable and customary authorization letters), (h) require the waiver or amendment of any terms of this Agreement, (i) require the payment of any fees or reimbursement of any expenses by Companies or any Group Members prior to the closing, (j) cause any director, officer or Covered Employee to incur any personal liability (including that none of the board of directors of the Transferred Entities shall be required to enter into any resolutions or take any similar action approving the Financing (except with respect to any such resolutions or similar actions that will take effect immediately upon (but not prior to) the occurrence of Closing that are to be adopted solely by directors that will continue as directors following the occurrence of Closing) or (k) require the delivery of, or assistance in the preparation of, any financial statements other than as set forth in, or incorporated by reference into, the definition of Required Information (excluding, for the avoidance of doubt, customary summary presentations of the financial statements set forth in, or incorporated by reference into,  the definition of Required Information that are customarily included in bank information memoranda, offering documents and other customary marketing and syndication materials required in connection with the Debt Financing and the quarterly financial statements regularly prepared by the Companies and delivered under the DIP Credit Agreement).   Plan Investor agrees that the effectiveness of any documents executed by or on behalf of the Company Group Members in connection with the Financing (except as set forth above with respect to reasonable and customary authorization letters) shall be subject to, and shall not be effective until, the consummation of the Closing, and that in no event shall Companies or any of their Affiliates (other than the Company Group Members) be required to execute or deliver any documents in connection with the Financing.   All non-public or otherwise confidential information regarding any Company Group Member obtained by Plan Investor pursuant to this Section 6.07(a) shall be kept confidential in accordance with the Confidentiality Agreement.    As a condition to Companies' obligations pursuant to this Section 6.07(a), Plan Investor shall on the Closing Date (or, to the extent the Closing Date does not occur on or prior to the Outside Date, promptly following the Outside Date), upon request by Companies, reimburse Companies for all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented out-of-pocket attorney's fees and expenses and disbursements) incurred by any of the Company Group Members in connection with the cooperation contemplated by this Section 6.07(a). Plan Investor shall be entitled to use all such

materials provided by Companies as set forth in the foregoing provisions of this clause (a) in connection with the Equity Financing or equity offerings by Affiliates of Plan Investor. Subject to the limitations and qualifications set forth in the foregoing provisions of this clause (a), the Companies hereby consent to the use of the Required Information and any other financial statements delivered pursuant to the foregoing provisions of this clause (a) (including, for the avoidance of doubt, any pro forma financial statements, information and data prepared by Plan Investor) in connection with the Equity Financing or equity offerings by Affiliates of Plan Investor, including in any offering documents prepared by in connection with all or any portion of the Equity Financing or equity offerings by Affiliates of Plan Investor. Notwithstanding anything to the contrary contained in this clause (a), in the event that Plan Investor intends to include the report of an independent auditor in the documentation for the Equity Financing, it shall obtain the consent of such auditor.

(b)    Plan Investor shall not permit any assignment of any Commitment Letter, or any amendment or modification to be made to, or any waiver of any provision or remedy under, any Commitment Letter, in each case to the extent such amendment, modification or written waiver would adversely impact the conditionality, availability or aggregate amount of the Financing, in each case, without obtaining Companies' prior written consent (it being understood that the Company's prior written consent is required for any such amendment, modification or waiver that (i) reduces the aggregate amount of the Financing (other than in the case of any reduction of the Debt Financing as a result of the receipt by the Plan Investor of an equivalent amount of cash proceeds of any alternate debt financing, the proceeds of which are maintained in escrow and subject to release conditions that are not more onerous, taken as a whole, than the conditions set forth in the Debt Commitment Letter), (ii) imposes new or additional conditions, or otherwise expands any of the conditions, to the receipt of any Financing or (iii) effects any other amendment, modification or waiver that would reasonably be expected to delay or prevent the Closing or make the funding of the Financing less likely to occur); it being agreed that nothing herein shall, in the case of the Debt Commitment Letters, prohibit (1) any assignment of the Debt Commitment Letters by Plan Investor to a newly formed entity that is under common control with the Plan Investor and assumes the obligations of the Plan Investor hereunder after the date hereof in accordance with the terms of the Debt Commitment Letters or (2) any amendment or modification to (x) add additional arrangers, bookrunners, managers, agents, lenders or other financing sources thereto and grant customary rights in connection therewith or (y) reduce the principal amount of the Debt Financing as a result of the receipt by the Plan Investor of an equivalent amount of cash proceeds of any alternate debt financing, the proceeds of which are maintained in escrow and subject to release conditions that are not more onerous, taken as a whole, than the conditions set forth in the Debt Commitment Letter. In addition to the foregoing, Plan Investor shall not release or consent to the termination of any Debt Commitment Letter or of any lender in accordance with the terms of any Debt Commitment Letter prior to the first to occur of Closing and the expiration of such Debt Commitment Letter in accordance with its terms, except (i) for replacements of any Debt Commitment Letter with alternative financing in accordance with Section 6.07(e), (ii) assignments of commitments thereunder to additional or replacement arrangers, bookrunners, managers, agents, lenders or other financing sources that will become parties thereto in accordance with the terms thereof, (iii) reductions in the principal amount of the Debt Financing as a result of the receipt by the Plan Investor of an equivalent amount of cash proceeds of any alternate debt financing, the proceeds of which are maintained in escrow and subject to release conditions that are not more onerous, taken as a whole, than the

conditions set forth in the Debt Commitment Letter or (iv) with Companies' prior written consent.

(c)    Plan Investor shall take all actions and do all things necessary, proper or advisable to obtain the Equity Financing, including by (i) maintaining in effect the Equity Commitment Letter, (ii) using reasonable best efforts to ensure the accuracy of all representations and warranties of Plan Investor, if any, set forth in the Equity Commitment Letter, (iii) complying with its obligations under the Equity Commitment Letter, (iv) satisfying on a timely basis all conditions applicable to Plan Investor in the Equity Commitment Letter that are within its control, (v) enforcing its rights under the Equity Commitment Letter and (vi) consummating the Equity Financing at or prior to the Closing, including by causing the Equity Investors to fund the Equity Financing at the Closing.

(d)    Plan Investor shall use its reasonable best efforts to arrange the Debt Financing and obtain the financing contemplated thereby as promptly as practicable on terms and conditions (subject to clause (iii) below) described in each Debt Commitment Letter (after giving effect to the exercise of any "market flex" provisions set forth therein), including using its reasonable best efforts to (i) maintain in effect each Debt Commitment Letter, (ii) comply with its obligations under each Debt Commitment Letter, (iii) negotiate, execute and deliver definitive agreements with respect to each Debt Commitment Letter on terms and conditions (x) in the case of any provisions relating to the conditionality or amount of the Debt Financing, no less favorable in any respect and (y) in the case of any other provisions, not materially less favorable than those described in each Debt Commitment Letter (after giving effect to the exercise of any "market flex" provisions set forth therein), in each case, on a timely basis (taking into account the expected timing of the Marketing Period), (iv) satisfy on a timely basis (taking into account the expected timing of the Marketing Period) all conditions and obligations to be satisfied by Plan Investor or its Affiliates in each Debt Commitment Letter and such definitive agreements that are within its or its Affiliates' control, (v) enforce its rights under each Debt Commitment Letter and such definitive agreements and (vi) consummate the Debt Financing at the Closing (which, for the avoidance of doubt, shall include agreeing to consummate the Debt Financing even if any flex rights are exercised to their maximum extent).  Notwithstanding the foregoing, nothing herein shall require Plan Investor to commence any Action to enforce any provision of the Debt Commitment Letters; it being agreed that any such determination to commence any such Action shall be made by Plan Investor in its sole discretion.

(e)    If any portion of the Debt Financing becomes unavailable on the terms (including any flex rights) and conditions contemplated in the Debt Commitment Letters due to a breach by the Debt Financing Sources, or otherwise, Plan Investor shall use reasonable best efforts to obtain, as promptly as practicable following the occurrence of such event, (i) alternative financing for any such portion from alternative sources and (ii) one or more new Debt Commitment Letters and new definitive agreements with respect to such alternative financing.  Plan Investor shall promptly provide Companies with a copy of any new Debt Commitment Letters and any fee letter in connection therewith.  If any new Debt Commitment Letters are obtained, (i) any reference in this Agreement to the "Commitment Letters" or "Debt Commitment Letters" shall be deemed to include such new Debt Commitment Letters to the extent still then in effect (together with any accompanying fee letter), (ii) any reference in this Agreement to the "Financing" or the "Debt Financing" shall mean the Debt Financing

contemplated by the Debt Commitment Letters as modified pursuant to the foregoing and (iii) any reference in this Agreement to the "Debt Financing Sources" shall be deemed to include the lender parties to such new Debt Commitment Letters to the extent still then in effect.

(f)     Plan Investor shall (i) keep Companies informed on a reasonably current basis in reasonable detail of all material activity concerning the Financing (including the status of its efforts to obtain the Financing or any alternative financing pursuant to Section 6.07(e)) and (ii) promptly provide Companies with copies of all executed amendments, modifications or replacements of any Debt Commitment Letter (it being understood that any amendments, modifications or replacements shall only be as permitted herein) or definitive agreements related to the Financing, and such other information and documentation available to Plan Investor as shall be reasonably requested by Companies for purposes of monitoring the progress of the financing activities.  Without limiting the generality of the foregoing, Plan Investor shall promptly notify Companies (A) of any breach (or threatened breach) or default (or any event or circumstance that could reasonably be expected to give rise to any breach or default) by any party to the Commitment Letters or definitive agreements related to the Financing of which Plan Investor becomes aware, (B) of the receipt by Plan Investor of any written notice or communication from any Equity Investor or Debt Financing Source with respect to any breach (or threatened breach) or default (or any event or circumstance that could reasonably be expected to give rise to any breach or default), or any termination or repudiation, in each case by any party to a Commitment Letter or any definitive agreements related to the Financing of any provisions of any Commitment Letter or such definitive agreements and (C) if for any reason Plan Investor at any time believes it will not be able to obtain all or any portion of the Financing on the terms, in the manner or from the sources contemplated by the Commitment Letters or any definitive agreements related to the Financing.

(g)     For the avoidance of doubt, if the Financing (including any alternative financing pursuant to Section 6.07(e)) has not been obtained, Plan Investor shall continue to be obligated to consummate the Transactions on the terms contemplated by this Agreement and subject only to the satisfaction or waiver of the Closing Conditions set forth in Section 11.02 and to Plan Investor's rights under Section 12.01, regardless of whether Plan Investor has complied with all of its other obligations under this Agreement (including its obligations under this Section 6.07).

(h)     During the Pre-Closing Period, Plan Investor may request that Companies assist Plan Investor in Plan Investor's preparation of "carve-out" financial statements with respect to the Business.  Companies may, in their sole and exclusive discretion, determine whether or not to provide such assistance.  Any such preparation of such financial statements (and any assistance so provided by Companies) shall be at the sole cost and expense of Plan Investor.  In no event shall the preparation of such financial statements interfere in any way with Companies' preparation of Companies' audited financial statements for the fiscal year ending March 31, 2018.

Section 6.08.  Cooperation.    During the Pre-Closing Period, (a) each of Companies, on the one hand, and Plan Investor, on the other hand, shall, and Companies shall cause their respective Affiliates to, (i) refrain from taking any actions that would reasonably be expected to materially impair, delay or impede the Closing and (ii) without limiting the

foregoing, use reasonable best efforts to cause all Closing Conditions of the other Parties to be met as promptly as practicable and in any event on or before the Outside Date and (b) each Party shall keep the other Parties reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions of the other Parties.

Section 6.09.   Solvency Steps Planning.

(a)    On or prior to the Closing Date, Companies shall, or shall cause the Company Group Members to, take all reasonable steps necessary to render the Subsidiaries of TNEH UK (the "**EMEA Subsidiaries**") Solvent as of the Closing Date pursuant to the Solvency Steps Plan. In furtherance of the foregoing:

(i)    as soon as practicable after the Agreement Date, Companies shall, and shall cause its Subsidiaries to, engage in solvency planning to determine the requisite steps and transactions necessary to render the EMEA Subsidiaries Solvent as of the Closing Date (the "**Solvency Objectives**").   Prior to the delivery of the Solvency Steps Plan by Companies, Plan Investor and Companies shall cooperate in all respects and consult with each other in connection with the preparation and consideration of such steps and transactions and in connection therewith, Companies shall deliver reasonably promptly to Plan Investor a draft of the Solvency Steps Plan for Plan Investor's reasonable review and comment prior to the delivery required to be made pursuant to Section 6.09(a)(ii);

(ii)    no later than ninety (90) days after the Agreement Date, Companies shall propose to Plan Investor a solvency steps plan to achieve the Solvency Objectives (as may be updated from time to time in accordance herewith, the "**Solvency Steps Plan**"). Such Solvency Steps Plan shall set forth the proposed transactions that the Companies will effectuate to implement the Solvency Objectives, the proposed sequence and timing of such transactions, and the aggregate amount of cash to be required used by, or contributed to, the EMEA Subsidiaries to achieve the Solvency Objective (the "**Solvency Cash**"); and

(iii)    Plan Investor shall have the right to provide Companies with reasonable comments to the Solvency Steps Plan, and Companies shall review and take into account any such comments in good faith (and, as appropriate based on such good faith review, shall deliver an updated Solvency Steps Plan to Plan Investor promptly and in any event prior to the Closing, if appropriate); provided, that if, in the reasonable judgment of Plan Investor, the Solvency Steps Plan:

(A)    is reasonably likely to or will result in any Solvency Tax Cost, Plan Investor and Companies shall reasonably cooperate during the Pre-Closing Period to minimize any such potential negative impact and the Solvency Steps Plan shall be updated to reflect any such changes reasonably agreed by Plan Investor and Companies; or

(B)    is reasonably likely to or will result in any negative impact on the Business other than a Solvency Tax Cost following Companies' receipt of notice thereof, the Solvency Steps Plan shall be subject to Plan Investor's reasonable consent.

(b)    Notwithstanding the foregoing, to the extent the Solvency Steps Plan results in a Solvency Tax Cost, such amount shall be borne fifty percent (50%) by Companies (or Wind Down Co, as applicable) and fifty percent (50%) by Plan Investor by adjusting the Base Purchase Price for fifty percent (50%) of the Solvency Tax Cost (the "**Solvency Tax Adjustment**") as provided in Article III.  Accordingly, if the Final Solvency Tax Adjustment is a positive amount, the Solvency Tax Adjustment will increase the Base Purchase Price pursuant to Section 3.01.  Conversely, if the Final Solvency Tax Adjustment is a negative amount the Solvency Tax Adjustment will decrease the Base Purchase Price pursuant to Section 3.01 (by "adding" a negative amount).

(c)    Subject to Section 6.09(a)(iii), to the extent that the Solvency Steps Plan contemplates certain reasonable actions or transactions to be taken or consummated by Plan Investor or by the Company Group Members on the Closing Date to facilitate Companies achieving the Solvency Objectives (including, among other things, the contribution of any portion of the Closing Payment to the EMEA Subsidiaries on the Closing Date)  Plan Investor shall, and shall cause the Company Group Members to, use reasonable best efforts to cause such actions and transactions to be taken or consummated, as applicable, on the Closing Date.

Section 6.10.    Section 280G Update.  Not later than thirty (30) days prior to the Closing, Companies shall provide to Plan Investor an updated analysis setting forth the value estimated to be transferred in connection with the consummation of the Transactions relative to the total gross fair market value (determined without regard to any liabilities associated with such assets) of Toshiba Corporation and all members of its affiliated group (as defined in Section 1504 of the Code, determined without regard to Section 1504(b)) as of the date of such analysis.

Section 6.11.    Regulator Cash.  Companies shall, and shall cause the Company Group Members to, upon actual receipt of any Returned Regulator Cash, promptly notify Plan Investor in writing of such receipt and deposit and maintain such Returned Regulator Cash in a segregated account of any Company Group Member through and including Closing.

# ARTICLE VII

# POST-CLOSING COVENANTS

Section 7.01.    Access.

(a)    Subject to entering into a confidentiality agreement in customary form, from and after the Closing Date, in connection with  any reasonable business purpose (which, for the avoidance of doubt, shall not include any investigation or pursuit of any litigation or claim against Plan Investor or any Acquired Company), including the preparation or amendment of Tax Returns, claims or obligations relating to Excluded Liabilities, financial statements, or the determination of any matter relating to the rights or obligations of the Acquired Companies or any of their Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Case, upon reasonable prior notice, and except to the extent necessary to (i) ensure compliance with any applicable Law or an order of the Bankruptcy Court, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any contractual confidentiality obligations, Plan Investor shall,

WEIL:\96391119\18\80768.0017

and shall cause each of the Reorganized Company Group Members and, to the extent within the Plan Investor's control, the Non-Controlled JVs, and their respective Representatives to, (A) afford Wind Down Co and its Representatives and their respective Affiliates reasonable access, during normal business hours, to the properties, books and records of Plan Investor and the Company Group Members (and the extent within the Plan Investor's control, the Non-Controlled JV) in respect of any of the Reorganized Company Group Members, the Non-Controlled JVs and the Business, the Business Assets and the Assumed Liabilities; (B) furnish to Wind Down Co and its Representatives and their respective Affiliates such additional financial and other information regarding the Acquired Companies, their respective Affiliates, the Business, the Business Assets and the Assumed Liabilities as Wind Down Co or its Representatives may from time to time reasonably request and (C) make available to Wind Down Co and its Representatives and their respective Affiliates those employees of Plan Investor or the Company Group Members and to the extent possible, the Non-Controlled JVs, whose assistance, expertise, testimony, notes or recollections or presence may be reasonably necessary to assist Wind Down Co, its Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above, including the presence of such Persons for interviews and depositions and as witnesses in hearings or trials for such purposes, provided, however, that the foregoing shall not unreasonably interfere with the business or operations of Plan Investor or any of its Affiliates; provided, further, that the auditors and accountants of Plan Investor or its Affiliates shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants with respect to reliance by such Person thereon; and provided, further, that any expenses incurred pursuant to this Section 7.01(a) shall be the sole responsibility of Wind Down Co. Notwithstanding anything to the contrary herein, Wind Down Co shall have continued access to all books and records related to the Business as is necessary to administer the Bankruptcy Cases and Wind Down Co may retain copies of such books and records, as necessary or appropriate in connection with such purpose.

(b)    If so requested by Plan Investor, on the one hand, or Wind Down Co or any of their respective Affiliates, on the other hand, Wind Down Co or one of its Affiliates, or Plan Investor or one of its Affiliates, as the case may be, shall enter into a customary joint defense agreement or common interest agreement with Plan Investor and its Affiliates, or Wind Down Co and its Affiliates, as applicable, with respect to any information to be provided to Wind Down Co or its Affiliates pursuant to Section 7.01(a).

Section 7.02.    Directors' and Officers' Indemnification and Exculpation.

(a)    Plan Investor agrees that all rights of the individuals who on or prior to the Closing Date were directors, officers or employees (in all of their capacities) of the Company Group Members (collectively, the "**D&O Indemnified Parties**") to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Closing Date as provided in the certificate of incorporation, bylaws, or comparable organizational documents of the Company Group Members, as applicable, as now in effect, and any indemnification agreement, as now in effect by and between a D&O Indemnified Party and a Company Group Member, shall survive the Closing Date and shall continue in full force and effect against the

WEIL:\96391119\18\80768.0017

applicable Company Group Member in accordance with the terms of such agreement. Such rights shall not be amended or otherwise modified in any manner that would adversely affect the rights of the D&O Indemnified Parties, unless such modification is required by Law.

(b)    The provisions of this <u>Section 7.02</u> are intended to be for the benefit of and shall be enforceable by, each D&O Indemnified Party, his or her successors and heirs and his or her legal representatives and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such person may have by Contract or otherwise. The obligations of Plan Investor under this <u>Section 7.02</u> shall not be amended, terminated or modified in such a manner as to adversely affect any D&O Indemnified Party (including such Person's successors, heirs and legal representatives) to whom this <u>Section 7.02</u> applies without the written consent of the affected D&O Indemnified Party (it being expressly agreed that the D&O Indemnified Parties to whom this <u>Section 7.02</u> applies shall be third-party beneficiaries of this <u>Section 7.02</u>), and this <u>Section 7.02</u> shall be enforceable by such D&O Indemnified Parties and their respective successors, heirs and legal representatives and shall be binding on all successors and assigns of Plan Investor and each Reorganized Company Group Member.

(c)    If Plan Investor or, following the Closing, any Reorganized Company Group Member, or any of their respective successors or assigns, (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Plan Investor or such Reorganized Company Group Member or any of their respective successors or assigns, as the case may be, shall assume all of the obligations set forth in this <u>Section 7.02(c)</u>.

Section 7.03.    <u>Preservation of Books and Records</u>.    Plan Investor agrees that it shall preserve and keep all original books and records of the Reorganized Company Group Members (and to the extent within the control of Plan Investor after the Closing, the Non-Controlled JVs) in the possession or control of Plan Investor or the Reorganized Company Group Members for the longer of (a) any applicable statute of limitations and (b) a period of six (6) years from the Closing Date; <u>provided</u>, <u>however</u>, that in no event shall Plan Investor or its Affiliates be obligated to preserve or keep any books and records for a longer period than the period for which the applicable Company Group Member preserves and keeps books and records relating to the Business (based on such Company Group Member's record retention policies and practices as of the Closing Date).

Section 7.04.    <u>Further Assurances</u>.    From time to time following the Closing, each of Wind Down Co and Plan Investor shall, and Plan Investor shall cause the Company Group Members (and to the extent within the control of Plan Investor after the Closing, the Non-Controlled JVs) to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions contemplated hereby as may be reasonably requested by the other Parties (including (i) transferring back to Wind Down Co or its designees each Excluded Asset and any asset or Liability not contemplated by this Agreement to be a Business Asset or an Assumed Liability, respectively, which asset or Liability was transferred to Plan Investor (directly or as an asset of

any Acquired Company) or any Company Group Member any asset or Liability contemplated by this Agreement to be a Business Asset or an Assumed Liability, respectively, which was not transferred to Plan Investor (directly or as an asset of any Acquired Company) at the Closing, as appropriate); provided, however, that except for the Company Group Member's and Non-Controlled JV's obligations to discharge an Assumed Liability and Wind Down Co's obligations to discharge any Excluded Liability, and subject to Section 2.03, nothing in this Section 7.04 shall require any Party or its Affiliates to pay money to (other than costs of delivery and similar logistical expenses), commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing.

Section 7.05.  Returned Cash. If, at any time following Closing, any amounts held by any of (i) the NDA, in connection with the UK decommissioning obligations and the "locked-box" protocol and/or (ii) Bank Mendes Gans N.V in connection with the Cash Pooling Agreement, dated June 17, 2010, in each case, as of the Closing Date is released or remitted to Plan Investor or any Company Group Member, Plan Investor shall, and shall cause the Company Group Members to, promptly remit the same to Wind Down Co. or its designee, net of any fees or expenses of Plan Investor in connection with any repatriation, or transfer to Wind Down Co, of such amounts.

## ARTICLE VIII

## EMPLOYEE MATTERS

With respect to employee matters, the Parties have made the agreements and covenants set forth in Exhibit C to this Agreement, which is hereby incorporated into this Agreement.

## ARTICLE IX

## BANKRUPTCY COURT MATTERS

Section 9.01.  Break-Up Fee and Expense Reimbursement.

(a)    The Break-Up Fee and the Expense Reimbursement as provided herein, in each case, will be entitled to administrative expense status pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(b)    Each Party agrees and acknowledges that Plan Investor's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of time and have required significant commitment of financial, legal and other resources by the Plan Investor and its Affiliates, and that such due diligence, efforts, negotiation and execution have provided value to Companies and their respective Affiliates.  The provision of the Break-Up Fee and Expense Reimbursement is an integral part of this Agreement, without which Plan Investor would not have entered this Agreement.

Section 9.02.  Competing Transaction.

(a)    From the Agreement Date, Companies will not, and will not permit their respective Affiliates or their Representatives to, directly or indirectly:

(i)      initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any person (other than Plan Investor or its affiliates) with respect to a Competing Transaction or otherwise facilitate any effort or attempt to make a proposal or offer with respect to a Competing Transaction, including conducting or supporting any overbid or auction process;

(ii)      engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information, data, due diligence information, or data room access (electronic or otherwise) to any person relating to, any Competing Transaction;

(iii)      enter into or seek to enter into any agreement with respect to, make any filings with the Bankruptcy Court in furtherance of, or negotiate in any respect, a Competing Transaction;

(iv)      propose or seek Bankruptcy Court approval of a bidding process with respect to a sale under Section 363 of the Bankruptcy Code; or

(v)      publicly propose to do any of the actions prohibited by any of above clauses, other than in connection with a transaction with Plan Investor or its affiliates.

(b)      Companies will (and will cause their respective Affiliates to, and will direct and cause Representatives to) cease and terminate all solicitations, discussions and negotiations with any persons with respect to any Competing Transaction, or any inquiry or proposal that could reasonably result in any Competing Transaction.

(c)      Notwithstanding the foregoing Section 9.02(a) and Section 9.02(b), the Companies and their respective board of directors (or committees thereof) or officers, may only consider, negotiate or enter into a proposed Competing Transaction if, in the good faith judgment of Companies, their board of directors (or committees thereof), or their respective officers after considering the advice of external counsel, the failure to take such action would be inconsistent with its fiduciary duties under applicable law and the proposal for such Competing Transaction (i) was not received in violation of Section 9.02(a)(i) or Section 9.02(a)(ii) above, (ii) is evidenced by complete definitive documentation, (iii) provides not less than $200 million of additional distributable value (inclusive of amounts equal to the Break-Up Fee and Expense Reimbursement) over the Transactions, (iv) contains no greater conditionality or contingency to consummation than the Transactions, and (v) taken as a whole, is not less favorable to Companies than the Transaction contemplated in this Agreement; provided, that Companies will provide notice of their entry into a binding definitive agreement for a Competing Transaction within two (2) business days after such entry.

Section 9.03.   Notices.  Each Company will promptly (and, in any event, within 24 hours) notify and deliver a copy to Plan Investor if, with respect to all or a material portion of such Company, any bona fide written proposal or offer with respect to a Competing Transaction is received by such Company or its Representatives.

WEIL:\96391119\18\80768.0017

Section 9.04.    <u>Bankruptcy Court Filings</u>.

(a)    Debtors shall use reasonable best efforts to obtain the entry of the Plan Investor Protections Order not later than January 18, 2018.  Plan Investor agrees that it will promptly take such actions as are reasonably requested by Debtors to assist in obtaining the Plan Investor Protections Order.

(b)    By January 29, 2018, Companies shall file with the Bankruptcy Court the Plan, an accompanying disclosure statement relating to the Plan (the "**Disclosure Statement**"), and a motion (the "**Disclosure Statement and Solicitation Procedures Motion**") seeking approval of (i) the Disclosure Statement, (ii) balloting and solicitation procedures ("**Solicitation Procedures**"), (iii) procedures for (A) the assumption or rejection of Executory Contracts, (B) the establishment of Cure Costs, and (C) the designation of Executory Contracts for assumption or rejection (the "**Designation Procedures**"), and (iv) authority to sell the Business to the Plan Investor pursuant to a 363 Sale subject to and in accordance with <u>Section 2.01(e)</u>, each in form and substance reasonably acceptable to Plan Investor.  Debtors shall use reasonable best efforts to obtain entry of the order approving the Disclosure Statement and Solicitation Procedures (the "**Disclosure Statement Order**") not later than February 27, 2018.  Plan Investor agrees that it will promptly take such actions as are reasonably requested by Debtors to assist in obtaining the Disclosure Statement Order.

(c)    Debtors shall use reasonable best efforts to obtain the entry of the Confirmation Order by no later than March 31, 2018.

(d)    The Debtors will give timely, proper and adequate notice of any and all motions, orders, hearings and other proceedings relating to the Transactions (i) as ordered by the Bankruptcy Court, (ii) to all persons entitled to such notice, including, among others, all persons that have asserted or, to the Companies' Knowledge, may hold claims, liens, liabilities, encumbrances or interests related to Debtors, all taxing authorities that have jurisdiction over the Companies' Business, all Government Authorities in jurisdictions applicable to Debtors, and on all parties to any Executory Contracts of Debtors, in each case only as may be required by the Bankruptcy Rules or applicable Order of the Bankruptcy Court and solely to the extent such noticing information is reasonably available to Debtors, and (iii) as Plan Investor may reasonably request.

(e)    All motions, orders, agreements and other documents relating to the Transaction will be in form and substance reasonably acceptable to Plan Investor and the Debtors.  Debtors shall provide to Plan Investor a copy of any pleading, proposed order or other document relating to the Transaction that it intends to file with the Bankruptcy Court promptly and to the extent possible, not less than three (3) business days prior to the filing date.

(f)    Except as provided in <u>Section 9.02</u>, after entry of the Plan Investor Protections Order, the Disclosure Statement Order, or the Confirmation Order, neither Company will take, and each will ensure that none of their respective Affiliates take, any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, vacation, modification in any manner or staying of the Plan Investor Protections Order, the Disclosure Statement Order, or the Confirmation Order.

WEIL:\96391119\18\80768.0017

(g)    Debtors shall be responsible for making all appropriate filings of pleadings with the Bankruptcy Court relating to the Transactions, which pleadings shall be submitted to Plan Investor prior to their filing for Plan Investor's prior review and comment and be in form and substance reasonably satisfactory to Plan Investor and to Debtors.

(h)    In the event the entry of the Plan Investor Protections Order, the Disclosure Statement Order, the Sale Order or the Confirmation Order is appealed, Companies shall use commercially reasonable efforts to defend, and cause the relevant court to deny, each such appeal.

(i)    Companies shall, and shall cause their affiliated debtors and debtors-in-possession, to reasonably consult in good faith with Plan Investor regarding pleadings they or their Affiliates intend to file in connection with, or which might reasonably affect (i) the consummation of the Transactions or (ii) the Bankruptcy Court's approval of the Plan Investor Protections Order, the Disclosure Statement Order, or the Confirmation Order.

## ARTICLE X

## TAX MATTERS

Section 10.01. <u>Transfer Taxes</u>.    Notwithstanding anything to the contrary in this Agreement, to the extent not exempt under the Confirmation Order or Section 1146 of the Bankruptcy Code, (i) where the Reorganized Company is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions, the Reorganized Company shall promptly pay and discharge such Transfer Tax, and (ii) where Wind Down Co or TNEH UK are liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions, the Reorganized Company shall be liable for and shall indemnify, defend and hold harmless Wind Down Co or TNEH UK, as applicable, from and against any such Transfer Taxes (unless such indemnity is prohibited by (or otherwise invalid under) applicable Law in which case the Reorganized Company shall indemnify, defend and hold harmless Wind Down Co or TNEH UK, as applicable, for an amount equal to any such Transfer Taxes).    The party required by Law to file a Tax Return with respect to such Transfer Taxes shall, with the cooperation of the other parties, timely prepare and file such Tax Return.    If Wind Down Co or TNEH UK file any such Tax Return, the Reorganized Company shall within five (5) days of receipt of evidence of filing reimburse Wind Down Co or TNEH UK, as applicable, for any Transfer Taxes paid by Wind Down Co or TNEH UK in connection with the filing of such Tax Return.    The Companies, TNEH UK, Company Group Members and Wind Down Co agree to timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any such Transfer Taxes.

Section 10.02. <u>Tax Cooperation</u>.    Without limiting the obligations set forth in <u>Sections 6.02</u>, <u>7.01</u> and elsewhere in this <u>Article X</u>, the Parties shall furnish or cause to be furnished to each other, upon request, and as promptly as practicable, such information and assistance relating to TNEH UK, the U.S. Group, the Acquired Companies (with respect to a Non-Controlled JV, to the extent in the custody of such Party and not restricted from disclosure under any agreement) and the Excluded Assets as is reasonably necessary for the filing of Tax

67

Returns, the determination of the Solvency Tax Cost, the making of any election related to Taxes, and the preparation for, or the prosecution or defense of, any audit, claim, demand, proposed adjustment or deficiency relating to Taxes, and any other matter or proceeding relating to Taxes. The Parties shall cooperate with each other in the conduct of any such audit or other proceeding related to Taxes and all other Tax matters relating to TNEH UK, the Acquired Companies and the Excluded Assets, provided such cooperation shall not unreasonably interfere with the business operation of either Party. Plan Investor agrees that it shall preserve and keep, or cause to be preserved and kept, all original books and records in respect of the Business relating to Taxes in accordance with Section 7.03.

Section 10.03. US Group Tax Filings and Tax Contests.

(a)    As reflected in Schedule 2.02(b), the pre-Closing tax liabilities of the U.S. Debtors are not Assumed Liabilities. Nevertheless (subject to Section 10.01), the Plan Investor and/or TNESI (herein jointly referred to as the "**Plan Investor/TNESI**") shall timely prepare and file, or cause to be prepared and filed, all Tax Returns of the U.S. Group and the U.S. Debtors for taxable periods beginning prior to the Closing Date, including Tax Returns for any taxable period beginning on or before the Closing Date and ending after the Closing Date (a "**Straddle Period**"), and any amended Tax Returns reasonably requested by Wind Down Co. Such Tax Returns shall (in each case, unless otherwise required by Law) be prepared consistent with the assumptions (including elections) in the PFA Transaction Model and with past practice and otherwise be prepared with a view to minimizing the amount of Taxes allocable to Pre-Closing Tax Periods (so long as such minimization does not negatively impact the contemplated tax attributes available to the reorganized U.S. Debtors as per the PFA Transaction Model). At least thirty (30) days prior to the due date for any such Tax Return if such Tax Return relates to income Taxes, and at least twelve (12) days prior to the due date if such Tax Return relates to non-income Taxes, the Plan Investor/TNESI shall provide to Wind Down Co a copy of such Tax Return, and the Plan Investor/TNESI shall incorporate therein any reasonable comments timely provided in writing by Wind Down Co. Wind Down Co and the Plan Investor/TNESI shall undertake in good faith to resolve the issues raised by such comments. If Wind Down Co and the Plan Investor/TNESI are unable to resolve any issue by the earlier of (i) ten (10) days after the date of receipt by Plan Investor/TNESI of Wind Down Co's request for changes or (ii) ten (10) days prior to the due date (including any extension thereof) for filing of the Tax Return in question, then Wind Down Co and the Plan Investor/TNESI shall jointly engage the Independent Accountant to resolve such dispute, and the decision of such Independent Accountant shall be final. If the Independent Accountant is unable to resolve any such dispute prior to the due date for such Tax Return, such Tax Return shall be timely filed as proposed by Wind Down Co, subject to amendment if necessary to reflect the resolution by the Independent Accountant. Wind Down Co shall pay the Plan Investor or TNESI the amount of any such Taxes attributable to a Pre-Closing Tax Period of a Debtor that are due and payable at least three (3) Business Days before the due date of such filing (or in Wind Down's discretion and with the Plan Investor/TNESI's cooperation, shall make timely payment directly to the applicable Government Authority).

(b)    In the case of any Straddle Period, the amount of any Taxes imposed on or calculated by  reference to income, gain, receipts, capital, sales, use or payment of wages of the U.S. Group or any of the U.S. Debtors for the Pre-Closing Tax Period shall be determined based

on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the Taxable period of any partnership or other pass-through entity in which the U.S. Group or U.S. Debtor holds a beneficial interest shall be deemed to terminate at such time) and the amount of all other Taxes of the U.S. Group or a U.S. Debtor for a Straddle Period that relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period (or in the case of such Taxes determined on an arrears basis, the immediately preceding taxable period) multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(c)    If the Plan Investor, the U.S. Group or any of the U.S. Debtors receives notice of a proposed adjustment or deficiency by any Government Authority or an audit or any other administrative or judicial proceeding with respect to Taxes of the U.S. Group or any of the U.S. Debtors by any Government Authority for any Pre-Closing Tax Period or Straddle Period, the Plan Investor/TNESI shall notify Wind Down Co of the receipt of such communication from the Government Authority within ten (10) days of receipt and provide  Wind Down Co with copies of all correspondence and other documents received from the Government Authority and, to the extent known, describe in reasonable detail the facts and circumstances with respect to the subject matter thereof.  Subject to Section 10.03(d), the Plan Investor/TNESI shall control any audit or other proceeding in respect of any such Taxes for any Pre-Closing Tax Period (a "**Tax Contest**"), in consultation with Wind Down Co; provided, however, that (i) Wind Down Co, at its sole cost and expense, shall have the right to participate in any Tax Contest, (ii) Wind Down Co, at its sole cost and expense, shall have the right to control (including the settlement or resolution thereof and the selection of counsel) such Tax Contest to the extent it relates to a Pre-Closing Tax Period and the Plan Investor/TNESI does not substantially comply with its obligations hereunder with respect to such Tax Contest, (iii) the Plan Investor/TNESI shall not extend, nor permit to be extended, any statute of limitations of the U.S. Group or any U.S. Debtor for any Pre-Closing Tax Period without the consent of Wind Down Co, other than for ordinary course Tax Return filing extensions and, in the case of a Straddle Period, which consent shall not be unreasonably withheld, delayed, or conditioned, and (iv) the Plan Investor/TNESI shall not, and shall cause the reorganized U.S. Debtors not to, settle, resolve, or abandon a Tax Contest (whether or not Wind Down Co participates in or controls such Tax Contest) for a Pre-Closing Tax Period of the U.S. Group or a U.S. Debtor without the prior written permission of Wind Down Co (which, in the case of a Straddle Period, shall not be unreasonably withheld, delayed, or conditioned), and it being agreed that Wind Down Co and the Plan Investor/TNESI shall in good faith work to reach a mutually agreeable solution in the event of a disagreement as to whether to settle, resolve or abandon a Tax Contest.  The Plan Investor/TNESI shall defend, or shall cause to be defended, any Tax Contest diligently and in good faith.   The Plan Investor/TNESI shall keep Wind Down Co fully informed regarding the status of any Tax Contest.  If Wind Down Co elects to participate in a Tax Contest, (A) Wind Down Co shall notify the Plan Investor/TNESI of such intent; and (B) the Plan Investor/TNESI shall promptly take, or cause to be taken, all actions necessary to allow Wind Down Co (and its counsel) to fully participate in such Tax Contest.

(d)    If, in accordance with the preceding provision, Wind Down Co elects to control a Tax Contest for a Pre-Closing Tax Period, (i) Wind Down Co shall notify the Plan Investor/TNESI of such intent; (ii) the Plan Investor/TNESI shall promptly complete and

execute, or cause to be completed and executed, as applicable, any powers of attorney or other documents and take other reasonable actions that Wind Down Co requests to allow Wind Down Co to control such Tax Contest; and (iii) while it controls a Tax Contest, Wind Down Co shall (1) keep the Plan Investor/TNESI reasonably informed regarding the status of such Tax Contest; (2) allow the Plan Investor/TNESI, at the Purchaser's sole cost and expense, to participate in such Tax Contest to the extent the Plan Investor could be adversely affected by the outcome of the Tax Contest; and (3) not settle, resolve, or abandon any such Tax Contest if such settlement, resolution, or abandonment would result in the Plan Investor or any of its Affiliates incurring any material Tax without the prior written consent of the Plan Investor or TNESI (which shall not be unreasonably withheld, delayed, or conditioned).

(e)      If Wind Down Co does not control or participate in a Tax Contest (whether by election or otherwise) that relates to a Pre-Closing Tax Period or Straddle Period, (i) the Plan Investor/TNESI shall keep Wind Down Co reasonably informed regarding the status of such Tax Contest; and (ii) if requested by Wind Down Co, the Plan Investor/TNESI shall settle (or cause to be settled) the Tax Contest on terms acceptable to the applicable Government Authority and Wind Down Co.

(f)      To the extent possible under applicable Law, the Parties shall take such actions as shall be necessary or appropriate to cause the Taxable year of each Company Group Member to end on the Closing Date; provided, that the Parties shall not be required to effect a change in structure to cause any such Taxable year to end on the Closing Date.

Section 10.04. <u>US Group Pre-Closing Tax Refunds</u>.   Any refund or credit of Taxes of the U.S. Group or any U.S. Debtor (including as a result of any overpayment of Taxes in prior periods) accruing to the U.S. Group or such U.S. Debtor that is a refund or credit against Taxes paid in respect of any Pre-Closing Tax Period shall, net of any Taxes or expenses incurred in connection with the receipt or realization of such refund or credit, be for the account of Wind Down Co and shall be paid by the Plan Investor, TNESI or the applicable company to Wind Down Co within five (5) Business Days of receipt.   The Plan Investor/TNESI agree to elect, or cause to be elected, the receipt in cash of any credit of Tax benefit or reduction accruing to the U.S. Group or any U.S. Debtor in respect of any Pre-Closing Tax Period.

Section 10.05. <u>TNEH UK Group Relief</u>.  Except with the consent of TNEH UK and Wind Down Co or their designees  (which consent shall not be unreasonably withheld, conditioned or delayed), neither Plan Investor nor any Affiliate of Plan Investor shall (or shall cause or permit any Company Group Member to), (i) settle or compromise any audit, claim, demand, proposed adjustment, deficiency, assessment or administrative or judicial proceeding relating to, or (ii) amend, refile or otherwise modify, any Tax Return of any Company Group Member for any taxable year or period commencing on or before the Closing Date to the extent such settlement, compromise, amendment, refiling or modification relates to or otherwise impacts the surrender of Group Relief to TNEH UK.

Section 10.06. <u>TNEH UK Straddle Period Taxes</u>.   Taxes (other than Transfer Taxes) imposed upon or assessed directly against the assets of TNEH UK being transferred to the Plan Investor or its designee (including personal property Taxes and similar Taxes) for the post-Closing portion of the Straddle Period shall be apportioned to the Plan Investor (on a pro-

rata basis based on the number of days in the Straddle Period following the Closing Date). If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Straddle Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Straddle Period. When the actual amounts become known, such apportionment shall be recalculated promptly, and Plan Investor and TNEH UK, as applicable, shall within ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts make any payment or refund so that the correct apportioned amount is paid by each of Plan Investor and TNEH UK.

Section 10.07. <u>Survival of Tax Obligations</u>. The obligations set forth in this <u>Article X</u> with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

## ARTICLE XI

## CONDITIONS TO CLOSING

Section 11.01. <u>Conditions to Obligations of Companies</u>. The obligation of Companies to consummate the Transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by Companies in their sole discretion, at or before the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    The representations and warranties made in <u>Sections 5.01</u>, <u>5.03</u> and <u>5.04</u> qualified as to materiality shall be true and correct in all respects, and those not so qualified shall be true and correct in all material respects, in each case, as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all respects for those qualified as to materiality and in all material respects for those not so qualified, in each case, as of such date);

(ii)    all other representations and warranties of Plan Investor contained in this Agreement shall be true and correct in all respects as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all respects as of such date), except for breaches or inaccuracies that would not reasonably be expected to have a material adverse effect on Plan Investor or materially impair or materially delay the ability of Plan Investor to consummate the Transactions or otherwise perform its obligations under the Transaction Agreements; <u>provided</u>, <u>however</u>, that for purposes of determining the satisfaction of the condition in this clause (ii), no effect shall be given to the exceptions of "material" in such representations and warranties;

(iii)    the covenants contained in this Agreement required to be complied with by Plan Investor on or before the Closing shall have been complied with in all material respects; and

(iv)    Companies shall have received a certificate signed by an authorized officer of Plan Investor, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (i) through (iii).

(b)    <u>Governmental Approvals</u>.   All (i) Required Approvals shall have been obtained (including CFIUS Clearance) (provided, that, with respect to the required NRC Approval, such Required Approval shall be deemed obtained upon the issuance of an approval Order by the NRC without regard to any rehearing or appeals process), (ii) Required Notices shall have been made and (iii) waiting periods imposed by any Government Authority necessary for the consummation of the Transactions as set forth on <u>Schedule 11.01(b)</u> shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)    <u>No Order</u>.   There shall be no Order in existence that prohibits or materially restrains the consummation of the Transactions, and there shall be no proceeding brought by any Government Authority pending before any court of competent jurisdiction seeking such an Order.

(d)    <u>Transaction Agreements</u>.   Plan Investor shall have executed and delivered to Companies all Plan Investor Transaction Agreements.

(e)    <u>Plan</u>.   Unless a Conversion Event has occurred, the conditions precedent to the consummation of the Plan (other than those required to be satisfied by Companies or any Affiliate thereof on the Closing Date) have been satisfied or waived in accordance with the terms of the Plan.

(f)    <u>Plan Confirmation</u>. The Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order and the Confirmation Order (or, if a Conversion Event has occurred, the Sale Order), in form and substance reasonably satisfactory to Plan Investor, shall have been entered by the Bankruptcy Court and shall not have been stayed, vacated or modified except in a manner reasonably satisfactory to Plan Investor.

Section 11.02. <u>Conditions to Obligations of Plan Investor</u>.   The obligations of Plan Investor to consummate the Transactions contemplated by this Agreement shall be subject to the fulfillment or Plan Investor's waiver in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    The representations and warranties made in <u>Sections 4.01</u>, <u>4.03</u> and <u>4.04</u> shall be true and correct in all respects other than *de minimis* breaches or inaccuracies as of the Agreement Date and as of the Closing as if made on the Closing Date;

(ii)    all other representations and warranties of Companies contained in this Agreement shall be true and correct as of the Agreement Date and as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; <u>provided</u>,

72

however, that for purposes of determining the satisfaction of the condition in this clause (ii), no effect shall be given to the exceptions of "material" or "Material Adverse Effect" in such representations and warranties;

(iii)    the covenants contained in this Agreement required to be complied with by Companies on or before the Closing shall have been complied with in all material respects; provided, however, that the Designated Interim Covenants shall have been complied with in all respects; and

(iv)    Plan Investor shall have received a certificate signed by an authorized officer of each of Companies, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (i) through (iii).

(b)    Governmental Approvals.    All (i) Required Approvals shall have been obtained (including CFIUS Clearance) (provided, that, with respect to the required NRC Approval, such Required Approval shall be deemed obtained upon the issuance of an approval Order by the NRC without regard to any rehearing or appeals process), (ii) Required Notices shall have been made and (iii) waiting periods imposed by any Government Authority necessary for the consummation of the Transactions as set forth on Schedule 11.02(b) shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)    No Order.    There shall be no Order in existence that prohibits or materially restrains the consummation of the Transactions, and there shall be no proceeding brought by any Government Authority pending before any court of competent jurisdiction seeking such an Order.

(d)    Company Transaction Agreements.    The Company Group Members shall have executed and delivered, or caused to be executed and delivered, to Plan Investor all Company Transaction Agreements.

(e)    Plan Investor Protections Order.    The Bankruptcy Court shall have entered the Plan Investor Protections Order, in form and substance reasonably satisfactory to Plan Investor and the Debtors, and such Plan Investor Protections Order shall not have been stayed, vacated or modified except in a manner reasonably satisfactory to Plan Investor.

(f)    Disclosure Statement; Plan Confirmation.

(i)    Unless a Conversion Event has occurred, the Disclosure Statement shall have been approved by the Bankruptcy Court and the Disclosure Statement Order, in form and substance reasonably satisfactory to Plan Investor, shall have been entered by the Bankruptcy Court.

(ii)    The Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order and the Confirmation Order (or if a Conversion Event has occurred, the Sale Order), in form and substance reasonably satisfactory to Plan Investor, shall have been entered by the Bankruptcy Court and shall not have been stayed, vacated or modified except in a manner reasonably satisfactory to Plan Investor.

WEIL:\96391119\18\80768.0017

(g)    <u>Plan</u>.  Unless a Conversion Event has occurred, the conditions precedent to the consummation of the Plan (other than those required to be satisfied by Plan Investor or any Affiliate thereof) have been satisfied or waived in accordance with the terms of the Plan.

(h)    [INTENTIONALLY OMITTED]

(i)    <u>Required Consents</u>.  Each of the consents listed on <u>Schedule 11.02(i)</u> shall have been obtained and shall be in full force and effect.

(j)    <u>Required Transactions.</u>  Each of the transactions listed on <u>Schedule 11.02(j)</u> shall have been consummated.

(k)    <u>No Material Adverse Effect</u>.  From the Agreement Date, there shall not have been any Material Adverse Effect.

Section 11.03. <u>Frustration of Closing Conditions</u>.  Neither Companies nor Plan Investor may rely on the failure of any condition set forth in this <u>Article XI</u> to be satisfied if such failure was caused by such Party's failure to comply with the terms and conditions of this Agreement.

Section 11.04. <u>Waiver of Closing Conditions</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>Article XI</u> that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

## ARTICLE XII

## TERMINATION

Section 12.01. <u>Termination</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)    by the mutual written consent of Companies and Plan Investor;

(b)    by Companies, if Plan Investor shall have breached any representation or warranty or failed to comply with any covenant or agreement that would cause any Closing Condition set forth in <u>Section 11.01(a)</u> not to be satisfied, and (i) such breach is not waived by Companies or (ii) if such breach has not been waived by Companies but is curable and is not cured by Plan Investor prior to the earlier to occur of (A) thirty (30) days after receipt of Companies' notice of its intent to terminate and (B) by the Outside Date; <u>provided</u>, <u>however</u>, that Companies are not then in breach of this Agreement;

(c)    by Plan Investor, if Companies shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Companies that would cause any Closing Condition set forth in <u>Section 11.02(a)</u> not to be satisfied, and (i) such breach is not waived by Plan Investor or, (ii) if such breach has not been waived by Plan Investor but is curable and is not cured by Companies prior to the earlier to occur of (A) thirty (30) days after receipt of Plan Investor's notice of its intent to terminate and (B) by the Outside Date; <u>provided</u>, <u>however</u>, that Plan Investor is not then in breach of this Agreement;

74

(d)     by either Companies or Plan Investor, if the Closing shall not have occurred by July 12, 2018 (the "**Initial Outside Date**"); provided, however, that

(i)     if the condition set forth in Section 11.01(f) and Section 11.02(f) shall not have been satisfied or waived by the Initial Outside Date, each of Plan Investor and Companies may (in their sole discretion) extend the Initial Outside Date for an additional ninety (90) days by delivery of written notice of such extension to the other Party no fewer than five (5) Business Days before the Initial Outside Date;

(ii)     if the condition set forth in ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ shall not have been satisfied or waived by the Initial Outside Date, each of Plan Investor and Companies may (in their sole discretion) extend the Initial Outside Date for an additional ninety (90) day period by delivery of written notice of such extension to the other Party no fewer than five (5) Business Days before the Initial Outside Date; or

(iii)     if all of the Closing Conditions set forth in Section 11.01 and Section 11.02 (in each case, other than those that can only be satisfied at the Closing itself) have been satisfied or waived, but the Marketing Period has not yet commenced as a result of Companies having failed to deliver audited financial statements for the fiscal year ending March 31, 2018 pursuant to the terms hereof, each of Plan Investor and Companies may (in their sole discretion) extend the Initial Outside Date for an additional ninety (90) days by delivery of written notice of such extension to the other Party no fewer than five (5) Business Days before the Initial Outside Date (in each case, the Initial Outside Date as extended pursuant to clauses (i), (ii), and (iii) preceding, the "**Outside Date**");

provided, further, that the right to terminate this Agreement under this Section 12.01(d) shall not be available to a Party whose breach of this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur before such date;

(e)     by either Companies or Plan Investor in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Reorganized Company Interests or the WECHOL Shares contemplated by this Agreement and such Order shall have become final and non-appealable;

(f)     by Plan Investor, if the Plan Investor Protections Order is not entered by January 31, 2018;

(g)     by Plan Investor, if following entry by the Bankruptcy Court of the Plan Investor Protections Order, the Plan Investor Protections Order is (x) amended, modified or supplemented in a manner not reasonably satisfactory to Plan Investor (y) voided, reversed or vacated;

(h)     by Plan Investor, if (i) any Companies or any Affiliate of Companies seeks, or does not use its commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason or (ii) any Companies or an Affiliate of Companies seeks, or does not use its commercially reasonable efforts to oppose any other Person in seeking, the Bankruptcy Court to

75

enter an order appointing a trustee in the Bankruptcy Cases or appointing a reasonable officer or an examiner with enlarged powers relating to the operation of Companies' businesses under Bankruptcy Code Section 1106(b), or such an order is entered for any reason;

(i)      by Plan Investor, if the Plan and the Disclosure Statement Motion is not filed by January 29, 2018;

(j)      by Plan Investor, if the Disclosure Statement Order is not entered by February 27, 2018;

(k)      by Plan Investor, if the Confirmation Order is not entered by March 31, 2018 at 9:00 p.m. Eastern Time and neither Conversion Event has occurred pursuant to Section 2.01(e) (it being agreed and understood that if a Conversion Event occurs on March 31, 2018, then Plan Investor shall not have any right to terminate this Agreement pursuant to this Section 12.01(k));

(l)      by Plan Investor, if the Sale Order is not entered by April 16, 2018;

(m)      by Plan Investor, if (i) following entry by the Bankruptcy Court of either the Disclosure Statement Order or the Confirmation Order, either Order is (x) amended, modified or supplemented in a manner adverse to Plan Investor or (y) voided, reversed or vacated;

(n)      by Companies, if (i) all of the Closing Conditions set forth in Section 11.02 (in each case, other than those that can only be satisfied at the Closing itself) have been satisfied or waived, (ii) Companies have confirmed in writing that Companies are ready, willing and able to consummate the Closing and the transactions contemplated hereby assuming Plan Investor complies with its obligations hereunder, and (iii) Plan Investor fails to consummate the Closing when required pursuant to the terms and conditions for this Agreement, by four (4) Business Days written notice to Plan Investor; provided, that the right to terminate this Agreement under this Section 12.01(n) shall not be available to Companies in the event Plan Investor has notified Companies that Plan Investor shall cause the Closing to occur on or prior to the expiration of such four (4) Business Day period and Plan Investor fulfills its obligations hereunder to cause the Closing to occur within such time period; or

(o)      by either Companies or Plan Investor, if either Company enters into a definitive agreement with respect to a Competing Transaction.

Section 12.02. Notice of Termination.   If either Companies or Plan Investor desires to terminate this Agreement pursuant to Section 12.01, such Party(ies) shall give written notice of such termination to the other Parties.

Section 12.03. Effect of Termination.

(a)      If this Agreement is terminated pursuant to Section 12.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (a) Section 6.03, (b) Section 12.01 and this Section 12.03 and (c) Article XIII (excluding Sections 13.06, 13.17, 13.20, 13.21 and 13.22).  Upon the valid termination of this Agreement by

WEIL:\96391119\18\80768.0017

Companies, except as expressly provided in Section 12.03(c) or in the case of a termination pursuant to Sections 12.01(b) or 12.01(n), none of Companies, their Affiliates or any other Person shall have any claim or right to any remedy with respect to this Agreement against Plan Investor or any of its Affiliates (including, for the avoidance of doubt, pursuant to Section 13.17); provided, that nothing in this Section 12.03 shall be deemed to release any Party from any Liability for fraud (excluding constructive fraud) committed by such Party or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement; and

(b)    Notwithstanding Section 12.03(a), in the event of a termination of this Agreement (i) by Plan Investor pursuant to Sections 12.01(c) (f), (g), (h), (i), (j), (k), (l), (m) or (o), Companies shall pay to Plan Investor within two (2) Business Days after the date of such termination the Expense Reimbursement or (ii) (A) by Plan Investor or Companies pursuant to Section 12.01(o) or (B) by Plan Investor pursuant to Section 12.01(c), as a result of Companies' willful and intentional breach of their obligations set forth in Section 9.02, Companies shall pay to Plan Investor the Break-Up Fee on the earlier of (y) the date of consummation of a Competing Transaction or (z) the Outside Date (as the same may have previously been extended) if no material breach by Plan Investor of this Agreement has occurred.

Companies acknowledge that the agreements contained in this Section 12.03(b) are an integral part of the Transactions, and that without these agreements, Plan Investor would not have entered into this Agreement; accordingly, if Companies fail to timely pay any amount due pursuant to this Section 12.03(b) and, in order to obtain the payment, Plan Investor commence an Action which results in a judgment against Companies for any payment set forth in this Section 12.03(b), Companies shall pay Plan Investor its costs and expenses (including attorney's fees and disbursements) in connection with such Action, together with interest on such payment at the Interest Rate through the date such payment was actually received.

(c)    Notwithstanding Section 12.03(a), in the event of a termination of this Agreement pursuant to (i) Section 12.01(b), and at the time of such termination, the Closing Conditions set forth in Section 11.02 (in each case, other than those that can only be satisfied at the Closing itself) are satisfied or waived at the time of such termination or (ii) Section 12.01(n), then Plan Investor and Companies shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver an amount equal to the Termination Fee to Companies pursuant to Section 3.02.

Plan Investor acknowledges that the agreements contained in this Section 12.03(c) are an integral part of the Transactions, and that without these agreements, Companies would not have entered into this Agreement; accordingly, if Plan Investor fails to timely pay any amount due pursuant to this Section 12.03(c) and, in order to obtain the payment, Companies commence an Action which results in a judgment against Plan Investor for any payment set forth in this Section 12.03(c), Plan Investor shall pay Companies their costs and expenses (including attorney's fees and disbursements) in connection with such Action, together with interest on such payment at the Interest Rate through the date such payment was actually received.

# ARTICLE XIII

## MISCELLANEOUS

Section 13.01. <u>Rules of Construction</u>.  The following rules of construction shall govern the interpretation of this Agreement:

(a)    references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of New York as required to be applied thereunder by the Bankruptcy Court; references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b)    an item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statements to the extent (i) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that is related to the subject matter of such representation, (ii) such item is otherwise specifically set forth on the balance sheet or financial statement or (iii) such item is reflected on the balance sheet or financial statement and is specifically referred to in the notes thereto;

(c)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(d)    whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires;

(e)    (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

(f)    (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the

WEIL:\96391119\18\80768.0017

terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) the term "or" shall not be exclusive and shall mean "and/or";

(g)    (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(h)    references to any Person includes such Person's successors and permitted assigns;

(i)    whenever this Agreement requires any Acquired Company, as applicable, to take any action, such requirement shall be deemed to involve an undertaking on the part of the relevant Company or Plan Investor, as applicable, to take such action or to cause such Company Group Member or Plan Investor Party, as applicable, to take such action;

(j)    the phrase "ordinary course of business" or similar phrases shall refer to the ordinary course of the Business in a manner substantially consistent with past practice as conducted prior to the commencement of the Bankruptcy Cases;

(k)    unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; and

(l)    each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. Further, prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

Section 13.02. Expenses.    Except as otherwise specified in the Transaction Agreements and the Plan, each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs. Assuming the consummation of the Closing, the Plan will provide for the payment on or after the Closing Date of all fees and expenses of Plan Investor for the Transactions by the Reorganized Company.

Section 13.03. Notices.    All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made

WEIL:\96391119\18\80768.0017

**HIGHLY CONFIDENTIAL**

(a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed (followed by delivery of an original by another delivery method provided for in this Section 13.03) or (c) upon delivery by overnight courier service, in each case to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section 13.03):

| | |
|---|---|
| If to TNESI, to: | c/o Westinghouse Electric Company LLC<br>1000 Westinghouse Dr. #572a<br>Cranberry Township, PA 16066<br>Attention:   Michael T.  Sweeney<br>E-mail:       sweenemt@westinghouse.com |
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:   Howard Chatzinoff<br>               Gary Holtzer<br>               Garrett Fail<br>E-mail:howard.chatzinoff@weil.com<br>               gary.holtzer@weil.com<br>               garrett.fail@weil.com |
| with a copy (which will not constitute notice) to: | Milbank, Tweed, Hadley & McCloy LLP<br>2029 Century Park East, 33rd Floor<br>Los Angeles, California 90067<br>Attention:   Paul Aronzon<br>               Thomas Kreller<br>               Adam Moses<br>E-mail:  paronzon@milbank.com<br>               tkreller@milbank.com<br>               amoses@milbank.com |
| with a copy (which will not constitute notice) to: | Proskauer Rose LLP<br>Eleven Times Square<br>New York, New York 10036<br>Attention:   James P. Gerkis<br>E-mail:       JGerkis@proskauer.com |

WEIL:\96391119\18\80768.0017

**HIGHLY CONFIDENTIAL**

| | |
|---|---|
| If to TNEH UK, to: | Toshiba Nuclear Energy Holdings (UK) Limited<br>3 Furzeground Way<br>Stockley Park, Uxbridge<br>Middlesex, UB11 1EZ, England<br>Attention:   Keiko Suefuji<br>E-mail:      keiko.suefuji@toshiba.co.jp |
| with a copy (which will not constitute notice) to: | Togut, Segal & Segal LLP<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br>Attention:   Albert Togut<br>               Kyle Ortiz<br>               Brian Moore<br>E-mail:      altogut@teamtogut.com<br>               kortiz@teamtogut.com<br>               bmoore@teamtogut.com |
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:   Howard Chatzinoff<br>               Gary Holtzer<br>               Garrett Fail<br>E-mail:      Howard.chatzinoff@weil.com<br>               gary.holtzer@weil.com<br>               garrett.fail@weil.com |
| with a copy (which will not constitute notice) to: | Proskauer Rose LLP<br>Eleven Times Square<br>New York, New York 10036<br>Attention:   James P. Gerkis<br>E-mail:      JGerkis@proskauer.com |
| If to Plan Investor, to: | Brookfield WEC Holdings LLC c/o Brookfield Capital Partners LLC<br>250 Vesey Street, 15th Floor<br>New York, New York 10281<br>Attention:   Ron Bloom and Mark Weinberg<br>E-mail:      ron.bloom@brookfield.com<br>               mark.weinberg@brookfield.com |

WEIL:\96391119\18\80768.0017

| | |
|---|---|
| with a copy (which will not constitute notice) to: | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019 |

Attention:   Matthew Feldman
                William Gump
                John Longmire
                Kfir Abutbul

E-mail:     mfeldman@willkie.com
              wgump@willkie.com
              jlongmire@willkie.com
              kabutbul@willkie.com

If to Reorganized Company, to:     Brookfield WEC Holdings LLC c/o Brookfield
                            Capital Partners LLC
                            250 Vesey Street, 15th Floor
                            New York, New York 10281

Attention:   Ron Bloom and Mark Weinberg
E-mail:     ron.bloom@brookfield.com
              mark.weinberg@brookfield.com

with a copy (which will not constitute notice) to:     Willkie Farr & Gallagher LLP
                    787 Seventh Avenue
                    New York, New York 10019

Attention:   Matthew Feldman
                William Gump
                John Longmire
                Kfir Abutbul

E-mail:     mfeldman@willkie.com
              wgump@willkie.com
              jlongmire@willkie.com
              kabutbul@willkie.com

Section 13.04. <u>Survival</u>.   Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

Section 13.05. <u>Limitation on Liability</u>.   Notwithstanding anything in this Agreement or in any other Transaction Agreement to the contrary, except in the event of fraud (excluding constructive fraud), claims with respect to the calculation of the Purchase Price in accordance with the terms of this Agreement, claims with respect to the amount of Cure Costs, claims with respect to Assumed Liabilities or Excluded Liabilities: (a) the maximum Liability of either Companies, on the one hand, or Plan Investor, on the other hand, for a breach of this

Agreement shall not exceed three percent (3%) of the Base Purchase Price unless the Termination Fee or the Break-Up Fee is due and owing in accordance with this Agreement; (b) if the Break-Up Fee is payable hereunder, the maximum Liability of Companies under this Agreement shall not exceed the Break-Up Fee and the Expense Reimbursement; (c) if the Termination Fee is payable hereunder, the maximum Liability of Plan Investor under this Agreement shall not exceed the Termination Fee and any costs and expenses owed pursuant to the last sentence of Sections 12.03(b) and (c); and (d) in no event shall any Party have any Liability under this Agreement (including under this Article XIII) for any consequential, special, indirect or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement); provided that the foregoing limitations on liability will not prevent a Party from seeking specific enforcement in accordance with Section 13.17.

Section 13.06. Public Announcements. The initial press release with respect to the execution of this Agreement shall be a joint press release to be reasonably agreed upon by the Parties and issued reasonably promptly following the execution hereof. No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, conditioned or delayed), except if a Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by order of the Bankruptcy Court or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to (a) advise the other Parties before making such disclosure and (b) provide each such other Party a reasonable opportunity to review and comment on such release or announcement and consider in good faith any comments with respect thereto).

Section 13.07. Severability. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 13.08. Assignment. This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties. No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; provided, however, that Plan Investor may, immediately prior to the Closing (but, in no event prior to that time), assign this Agreement and any or all rights and obligations under this Agreement, in whole or in part, to any of its Affiliates without the prior consent of

83

Companies, and Companies may assign this Agreement to a trust in connection with the Bankruptcy Cases, upon prior written notice to Plan Investor; provided, further, that no such assignment shall release any other Party from any Liability under this Agreement.   Any attempted assignment in violation of this Section 13.08 shall be void *ab initio*.

Section 13.09. No Third-Party Beneficiaries.   This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to the D&O Indemnified Parties pursuant to Section 7.02(a) or as expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party. Notwithstanding the foregoing, the Debt Financing Sources (and the Debt Financing Source Related Parties) are express and intended third-party beneficiaries of this Section 13.09 and Sections 13.05, 13.11, 13.13, 13.14(c), 13.15 and 13.18.

Section 13.10. Entire Agreement.   This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts (including the Letter of Intent dated January 4, 2018, between Brookfield Capital Partners LLC and Companies), whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 13.11. Amendments.   This Agreement (including all exhibits and schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.   Notwithstanding anything to the contrary contained herein, no amendments or modifications to the provisions of this Agreement of which the Debt Financing Sources (and the Debt Financing Source Related Parties) are express and intended third-party beneficiaries pursuant to Section 13.09 (including any amendments or modifications to any defined terms used therein for purposes thereof) shall be permitted in a manner adverse in any respect to any such Debt Financing Source (or Debt Financing Source Related Parties) without the prior written consent of such Debt Financing Source (with respect to itself and any of its Debt Financing Source Related Parties).

Section 13.12. Waiver.   At any time before the Closing, either Companies or Plan Investor may (a) extend the time for the performance of any obligation or other acts of the other Parties, (b) waive any breaches or inaccuracies in the representations and warranties of the other Parties contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement, but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.   Any such waiver shall be in a written instrument duly executed by the waiving Parties.   No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 13.13. <u>Governing Law</u>.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the Debt Financing (including the Debt Commitment Letters), the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "**Transaction Dispute**"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

Section 13.14. <u>Dispute Resolution; Consent to Jurisdiction</u>.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, and except as otherwise provided in <u>Section 3.06</u>, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 13.03</u>; <u>provided</u>, <u>however</u>, upon the closing of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)    submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)    agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)    agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in <u>Section 13.03</u> of any process required by any such court, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)    The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

WEIL:\96391119\18\80768.0017

(c)    Notwithstanding the provisions of clause (a) above, each of the Parties hereto agrees that:

(i)    it will not bring or support any Action, cause of Action, claim, cross-claim or third party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way relating to this Agreement or the Debt Financing, including but not limited to any dispute arising out of or relating in any way to the Debt Commitment Letters or the performance thereof, in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the federal courts, the United States District for the Southern District of New York (and any appellate courts thereof); and

(ii)    any Action brought by a Debt Financing Source against the Plan Investor exclusively based upon or arising out of the Debt Financing, the Debt Commitment Letters, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, shall be subject to the exclusive jurisdiction of the federal and New York state courts located in the Borough of Manhattan within the City of New York and any appellate court from any thereof.

Section 13.15. <u>Waiver of Jury Trial</u>.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates or Representatives will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.   Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which the other Parties are relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a copy of this <u>Section 13.15</u> with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.  The provisions of this <u>Section 13.15</u> shall apply to any Action against any Debt Financing Source (or any Debt Financing Source Related Party) that may be based upon, arise out of or relate to the Debt Financing, the Debt Commitment Letters, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, *mutatis mutandis*.

Section 13.16. <u>Admissibility into Evidence</u>.    All offers of compromise or settlement among the Parties or their Representatives in connection with the attempted resolution of any Transaction Dispute (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 13.17. <u>Remedies; Specific Performance</u>.

(a)    Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not

exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, subject to Section 13.17(c), each Party agrees that the other Parties will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at law or in equity. Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement. Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

(c)     Notwithstanding anything in this Agreement to the contrary, it is acknowledged and agreed that Companies shall be entitled to specific performance of Plan Investor's obligations to cause the Equity Financing to be funded and to consummate the Closing only in the event that each of the following conditions has been satisfied: (i) all of the conditions set forth in Section 11.02 have been satisfied (in each case, other than those to be satisfied at the Closing itself), and Plan Investor fails to complete the Closing by the date the Closing is required to have occurred pursuant to this Agreement, including Section 2.03 and (ii) Companies have confirmed in a written notice delivered to Plan Investor that if specific performance is granted and the Equity Financing and Debt Financing (or alternative financing, to the extent described above) are funded, Companies stand ready, willing and able for the Closing to occur. For the avoidance of doubt, while Companies may pursue both a grant of specific performance as and only to the extent expressly permitted by this Section 13.17 and the payment of the Termination Fee, under no circumstances shall Plan Investor be obligated to both specifically perform the terms of this Agreement and pay the Termination Fee or to specifically perform the terms of this Agreement following the valid termination hereof by Companies pursuant to Article XII.

Section 13.18. Non-Recourse.   All claims, obligations, Liabilities, or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties in the preamble to this Agreement ("**Contracting Parties**"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to (including the Debt

Financing Sources (and the Debt Financing Source Related Parties)), any of the foregoing ("**Nonparty Affiliates**"), shall have any liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.

Section 13.19. <u>Interest</u>.  If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.  All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case for the actual number of days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 13.20. <u>Disclosure Schedules and Exhibits</u>.  The Disclosure Schedules, Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.  The representations and warranties of Companies set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules, and neither Companies nor any of their Affiliates shall be, or deemed to be, in breach of any such representations and warranties (and no claim shall lie in respect thereof) in respect of any such matter so disclosed in the Disclosure Schedules.  Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or Schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of the Disclosure Schedules as though fully set forth in such other Schedule(s) or section(s) to the extent reasonably apparent on the face of such matter, information or item disclosed. Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations or condition (financial or otherwise) of the Business.  The Disclosure Schedules have been arranged for purposes of convenience in separately titled Schedules corresponding to the Sections of this Agreement.

Section 13.21. <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP, Baker & McKenzie LLP and Togut, Segal & Segal LLP have served as counsel to Companies, the Company Group Members in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP, Baker & McKenzie LLP and Togut, Segal & Segal LLP (or any successor thereto) each may serve as counsel to Wind Down Co or any Affiliate or Representative of Wind Down Co, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of Companies and any Company Group Member and each Party consents thereto

88

and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates and Representatives to consent to waive any conflict of interest arising from such representation.

Section 13.22. <u>Privilege</u>.  Plan Investor, for itself and its Affiliates, and its and its Affiliates' respective successors and assigns, hereby irrevocably and unconditionally acknowledges and agrees that, other than in the case of fraud (excluding constructive fraud) (such potential claims to be reasonably determined upon the advice of counsel), all attorney-client privileged communications between any Acquired Company and its respective Affiliates or Representatives and their counsel, including Weil, Gotshal & Manges LLP, Togut, Segal & Segal LLP, Baker McKenzie LLP and Morgan, Lewis & Bockius LLP, made before the consummation of the Closing in connection with the negotiation, preparation, execution, delivery and Closing under any Transaction Agreement, any Transaction Dispute or, before the Closing, any other matter, shall, to the extent privileged under applicable Law prior to the Closing Date, continue after the Closing to be privileged communications with such counsel and neither Plan Investor nor any of its former or current Affiliates or Representatives nor any Person purporting to act on behalf of or through Plan Investor or any of its current of former Affiliates or Representatives, shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications belongs to Plan Investor, any Acquired Company or the Business or on any other grounds.

Section 13.23. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOWS]

IN WITNESS WHEREOF, Companies and Plan Investor have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**COMPANIES:**

**TSB Nuclear Energy Services Inc.**

By: _____

Name: Marc Beilinson
Title:  Authorized Signatory

**Toshiba Nuclear Energy Holdings (UK) Limited**

By: _David J. Baker_

    Name:  David J. Baker
    Title:    Director

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, Companies and Plan Investor have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**COMPANIES:**

**TSB Nuclear Energy Services Inc.**

By: _____
    Name:
    Title:

**Toshiba Nuclear Energy Holdings (UK) Limited**

By: _____
    Name:
    Title:

**PLAN INVESTOR:**

**BROOKFIELD WEC HOLDINGS LLC**

By: Brookfield Capital Partners LLC, its managing member

By: _____
    Name: Ron Bloom
    Title: Vice Chairman & Managing Partner

By: _____
    Name: Mark Weinberg
    Title: Managing Partner

**HIGHLY CONFIDENTIAL**

# EXHIBIT A

## DEFINITIONS

"**Acquired Company Cash**" means, as of the relevant date of calculation, the aggregate amount of (i) Excess Cash and (ii) Operational Cash, calculated in the manner set forth on Schedule 14.01.

"**Acquired Company Debt**" means the aggregate amount of all outstanding Debt of the Company Group Members as of the Effective Time, calculated in accordance with the Transaction Accounting Principles and, for the purposes of this definition, Acquired Company Debt shall exclude (a) outstanding Debt of the Company Group Members owed to any other Company Group Member, (b) ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ (c) any Claims subject to compromise in the Bankruptcy Cases, and (d) Company Guarantees to be replaced by Plan Investor pursuant to Section 6.06.

"**Action**" means any action, suit, arbitration, investigation or proceeding by or before any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) Companies shall not be deemed an Affiliate of Plan Investor, nor, after the Closing, of any Reorganized Company Group Member or Non-Controlled JV, (b) after the Closing, Plan Investor shall be deemed an Affiliate of each of the Reorganized Company Group Members and (c) other than for purposes of Section 4.13(a)(iv), Toshiba Corporation shall not be deemed an Affiliate of any Company Group Member.

"**Agreement**" means this Plan Funding Agreement, dated as of January 12, 2018, by and between Companies and Plan Investor, including the Disclosure Schedules and the Exhibits, and all amendments to such agreement made in accordance with Section 13.11.

"**Agreement State**" means any state that has entered in to an agreement with the NRC pursuant to Section 274 of the Atomic Energy Act of 1954, as amended, to exercise regulatory authority over certain Nuclear Materials.

"**Antitrust Laws**" means any Laws applicable to Plan Investor or any Acquired Company under any applicable jurisdiction that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"**Assumed Employee Plan**" means any Employee Plan other than any Employee Plan identified as an "Excluded Employee Plan" in Exhibit C to this Agreement.

"**Bankruptcy and Equity Exception**" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium,

1

fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as applicable to the Bankruptcy Cases.

"**BNP Cash**" means cash deposited by LC Collateral SPV LLC through the LC Facility pursuant to that certain LC Facility (excluding all Regulator Cash or Returned Regulator Cash).

"**Break-Up Fee**" means an amount of cash equal to $75,000,000.

"**Budget**" means the business plan capital expenditure budget made available by Companies to Plan Investor on the Agreement Date.

"**Business**" means the businesses of Companies and their respective Affiliates (including the Company Group Members), as and where conducted immediately prior to the Agreement Date, including, among other things, (i) providing nuclear fuel and core engineering services, nuclear fuel fabrication and other nuclear technical services and design technology, licensing, management, operational support, inspection and start-up services and supplying products and goods, in each case, to Nuclear Installations and (ii) managing, operating and closing facilities of, or providing services to, the U.S. government and other governments.

"**Business Assets**" means all assets and properties that are owned, leased or licensed by any Company Group Member other than the Excluded Assets.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which commercial banks in the City of New York, New York are required or authorized by Law to be closed.

"**Business Intellectual Property**" means all Intellectual Property to the extent owned or purported to be owned by any Company Group Member, including the Business Registrable IP.

"**Business Registrable IP**" means patents, patent applications, registered trademarks, registered service marks, copyright registrations, Internet domain name registrations, and applications for any of the foregoing, in each case owned or purported to be owned by a Company Group Member in any jurisdiction including those set forth on Schedule 4.11(i).

"**Business Technology**" means all Technology to the extent owned or purported to be owned by any Company Group Member.

"**Cash**" means all cash and cash equivalents calculated in accordance with GAAP, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments and all bank accounts and securities accounts; provided, that "Cash" shall not include any (a) checks written but not yet cleared, (b) wires in transit to third parties or (c) proceeds from any insurance

2

recovery relating to or arising from any event or claim that occurs after the Agreement Date and before the Closing Date to the extent received in connection with an Assumed Liability or was paid to the Company Group Members in respect to a loss arising from any of its assets that is not an Excluded Asset.

"**CFIUS**" means the Committee on Foreign Investments in the U.S.

"**CFIUS Clearance**" means that: (i) the Parties shall have received written notice from CFIUS that review or investigation under Section 721 of DPA of the Transactions has concluded and CFIUS shall have determined that there are no unresolved national security concerns with respect to the Transactions, and advised that any action under said Section 721, and any review or investigation related thereto, has concluded with respect to the Transactions; (ii) CFIUS has concluded that the Transactions are not covered transactions that are subject to review under the DPA; or (iii) CFIUS shall have sent a report to the President requesting the President's decision on the CFIUS notice submitted by the Parties and either (A) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on the Transactions shall have expired without any such action being threatened, announced or taken or (B) the President shall have announced a decision not to take any action to suspend, prohibit or place any limitations on the Transactions.

"**Claim**" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

"**Clean Team Agreement**" means that certain Clean Team Agreement dated November 9, 2017, by and between Plan Investor and Westinghouse Electric Company LLC, as the same may be amended from time to time in accordance with its terms.

"**Closing Conditions**" means conditions to the respective obligations of the Parties to consummate the Transactions contemplated by this Agreement, as set forth in <u>Article XI</u>.

"**Closing Notice**" means a notice prepared and delivered by Companies to Plan Investor that contains the amount of the Closing Payment and the account or accounts to which Plan Investor shall pay the Closing Payment pursuant to <u>Section 3.05</u>.

"**Closing Statement**" means, collectively, the Estimated Closing Statement, the Proposed Final Closing Statement and the Final Closing Statement.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Company Guarantees**" means, collectively, all letters of credit, guarantees, surety bonds, performance bonds and other financial assurance obligations issued by third parties (including Toshiba Corporation) on behalf of (or for the account of) the Acquired Companies, or their respective Affiliates in connection with the Business.

"**Company Transaction Agreements**" means this Agreement and each other Transaction Agreement to which any Company Group Member is named as a party on the signature pages thereto.

3

"**Company Transactions**" means the transactions contemplated by the Company Transaction Agreements.

"**Competing Transaction**" means (i) any merger, acquisition, divestiture, sale, business combination, recapitalization, joint venture, or other transaction directly or indirectly involving the equity, voting power or all or a material portion of the Company or any other similar transaction (in each case, whether under a sale under Section 363 of the Bankruptcy Code, a chapter 11 plan or any other transaction) that would serve as an alternative to the Transaction; (ii) any plan of reorganization or liquidation that does not contemplate, or that would be reasonably expected to impede or delay the implementation or consummation of, the Transaction; or (iii) any proposal that by its terms requires the Company to abandon, terminate or fail to consummate the Transaction; provided, that in no event shall a 363 Sale to Plan Investor constitute a Competing Transaction.

"**Compliant**" means, with respect to the written Required Information that has been or will be made available to the Plan Investor by the Company Group Members or any of their respective representatives on their behalf in connection with the Transactions, that (a) such Required Information, when taken as a whole, does not contain any untrue statement of a material fact regarding the Reorganized Company Interests, the Business Assets and the Business or omit to state any material fact regarding the Reorganized Company Interests, the Business Assets and the Business necessary in order to make such Required Information not materially misleading under the circumstances (after giving effect to all supplements and updates thereto from time to time) and (b) the Company Group Members' auditors have not withdrawn any audit opinion with respect to any financial statements contained in the Required Information for which they have provided an opinion (unless, in the case of this <u>clause (b)</u>, a new audit opinion is issued with respect to the financial statements for the applicable periods by such auditors or any other independent public accounting firm of national standing or otherwise reasonably acceptable to Plan Investor).

"**Confidentiality Agreement**" the means the Proprietary Information/Non-Disclosure Agreement dated September 25, 2017, by and between Plan Investor and Westinghouse Electric Company LLC, as the same may be amended from time to time in accordance with its terms.

"**Confirmation Hearing**" means the hearing before the Bankruptcy Court to consider confirmation of the Plan.

"**Confirmation Order**" means an order of the Bankruptcy Court in form and substance reasonably acceptable to Plan Investor and Companies approving this Agreement and the terms and conditions hereof, and approving and authorizing Companies to consummate the Transactions pursuant to a chapter 11 plan.

"**Consent**" means any consent, approval or authorization.

"**Contract**" means any contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or

4

**HIGHLY CONFIDENTIAL**

commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"**Control**" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.  The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"**Controlled JV Interests**" means the equity interests in the Controlled JVs listed on Schedule A-I held by any Company Group Member.

"**Controlled JVs**" means the Persons listed on Schedule A-I under the heading "Controlled JVs".

"**Covered Employee**" means any employee of any Company Group Member.

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code Section 365(b) to effectuate the assumption by the applicable Debtor, and the assignment to Plan Investor, of the Designated Contracts to which such Debtor is party, as determined by the Bankruptcy Court or agreed to by Debtors and the non-debtor counterparty to the applicable Designated Contract.

"**Cure Costs & Designation Order**" means, with respect to any Original Contract, an Order of the Bankruptcy Court (which may be the Confirmation Order or the Disclosure Statement Approval Order), in form and substance reasonably acceptable to Plan Investor and Debtors, (i) determining the Cure Costs with respect to such Original Contract; (ii) if an Original Contract is designated a Designated Contract, authorizing Debtors to assume such Original Contract on the Closing Date or (iii) if an Original Contract is an Excluded Contract, authorizing Debtors to (A) reject or (B) assume and assign to Wind Down Co such Original Contract on the Closing Date, each on the terms and conditions set forth in this Agreement.

"**Data**" means databases and compilations, including all data and collections of data, whether machine readable or otherwise.

"**Data Protection Laws**" means any and all Laws in the United States or elsewhere in the world related to the collection, use, disclosure, storage, retention, destruction, or cross-border transfer of Personal Data.

"**Debt**" means, with respect to any Person and without duplication, all Liabilities, including all obligations in respect of principal, accrued interest, penalties, fees and premiums, of such Person (a) for borrowed money (including amounts outstanding under overdraft facilities), (b) evidenced by notes, bonds, debentures or other similar Contracts, (c) in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the ordinary course of business which are reserved for and set forth on the Estimated Closing Statement), (d) for the capitalized liability under all capital leases of such Person, (e) for Contracts relating to interest rate protection, swap agreements and collar agreements, in each case, to the extent payable if such Contract is

5

terminated at the Closing and excluding any Contract that has been cash collateralized, (f) any deferred compensation payable to any employee or other individual service provider (to the extent not reserved for and set forth on the Estimated Closing Statement), (g) the aggregate amount of all fees, expenses and other obligations or other Liabilities of the Company Group Members in connection with the Transactions that remain unpaid as of immediately prior to the Closing including fees and expenses payable to legal or financial advisors or consultants, and (h) in the nature of guarantees of the obligations described in clauses (a) through (e) above of any other Person.

"**Debt Financing Source Related Parties**" means, with respect to any Debt Financing Source, its Affiliates, and any of its or their respective successors and assigns, managers, shareholders, members, general or limited partners or equityholders, and any Representative of any of the foregoing.

"**Debtors**" means TNESI, TNEH UK and each of the subsidiaries of TNESI set forth on Schedule B.

"**Disclosure Schedules**" means the disclosure schedules dated as of the Agreement Date delivered by Companies to Plan Investor, and which form a part of this Agreement.

"**Effective Date**" shall mean the date of consummation of the Plan which shall be the Closing Date.

"**Effective Time**" means 12:01 a.m. (New York City time) on the Closing Date.

"**Employee Plans**" means (a) all employee benefit plans (within the meaning of Section 3(3) of ERISA), (b) all retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, severance, or vacation plans, programs or agreements and (c) all individual employment, retention, termination, severance or other similar agreements, in each case, whether or not subject to ERISA, sponsored, maintained, contributed or required to be contributed to, or pursuant to which any of the Company Group Members currently has any obligation with respect to any current or former employee of a Company Group Member, other than statutorily required plans or arrangements.

"**Environmental Law**" means any applicable Law relating to pollution or protection of human health and safety (to the extent related to exposure to Hazardous Materials), or the environment, including: Laws relating to Releases or threatened Releases of Hazardous Materials, Nuclear Laws and Laws relating to endangered or threatened species of fish, wildlife and plants, and the management or use of natural resources.

"**Environmental Permit**" means any Permit required pursuant to Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

6

HIGHLY CONFIDENTIAL

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Company Group Members, is treated as a single employer under Section 414 of the Code or Section 4001(b)(1) of ERISA, or that is, or was at the relevant time, a member of the same "controlled group" as the Company Group Members pursuant to Section 4001(a)(14) of ERISA.

"**Escrow Agreement**" means that certain Escrow Agreement by and between Companies, Plan Investor and the Escrow Agent, dated as of January 8, 2018.

"**Estimated Acquired Company Cash**" means Companies' good faith estimate of Acquired Company Cash as of immediately prior to the Closing.

"**Estimated Acquired Company Debt**" means Companies' good faith estimate of Acquired Company Debt, as of immediately prior to the Closing.

"**Estimated Solvency Tax Adjustment**" means Companies' good faith estimate of the Solvency Tax Adjustment as of the Closing Date.

"**Estimated Working Capital**" means Companies' good faith estimate of the Net Working Capital of the Business as of the Effective Time.

"**Estimated Working Capital Decrease**" means the amount, if any, by which the Target Working Capital exceeds the Estimated Working Capital set forth on the Estimated Closing Statement.

"**Estimated Working Capital Increase**" means the amount, if any, by which the Estimated Working Capital set forth on the Estimated Closing Statement exceeds the Target Working Capital.

"**Excess Cash**" means, as of the relevant date of calculation, the aggregate amount of Cash of the Company Group Members (including all interest thereon), *less* the items set forth as "Adjustments from GAAP Cash to Excess Cash" on Schedule 14.01, in each case calculated in the manner set forth on Schedule 14.01; provided, that if such aggregate amount exceeds $35,000,000, then "Excess Cash" shall be $35,000,000.

"**Excluded Contract**" means any Original Contract that is not a Designated Contract.

"**Executory Contracts**" means any executory Contract (including any unexpired leases) to which any Debtor is a party or a beneficiary, including any real property leases governing the Leased Real Property and any executory Contracts governing or related to the Intellectual Property and Technology licenses.

"**Exhibits**" means the exhibits dated as of the Agreement Date (and as may be amended from time to time) which form a part of this Agreement.

"**Expense Reimbursement**" means an amount of cash equal to the reasonable and documented fees and expenses (including reasonable fees and expenses of legal, tax,

7

accounting, insurance, nuclear regulatory and financial advisors, and other professionals) incurred by Plan Investor and its affiliates in connection with this Agreement and the Transactions in an amount not to exceed $25,000,000.

"**Export Control Laws**" means all Laws related to the regulation of imports, exports, re-exports, transfers, releases, shipments, transmissions or any other provision or receipt of Export Controlled Information and other goods, technology, software or services including: (a) the Export Administration Regulations administered by the United States Commerce Department (including the antiboycott regulations administered by the Office of Antiboycott Compliance); (b) United States customs regulations administered by the United States Customs and Border Protection; (c) the EU Dual-Use Regulation, Council Regulation (EC) No 428/2009 and (d) all other applicable import and export controls in the countries in which any Acquired Company conducts business.

"**Export Controlled Information**" means all technology and related material controlled under Category 0 of the List of Dual-Use Goods and Technologies and Munitions List issued from time to time by the Wassenaar Arrangement On Export Controls for Conventional Arms and Dual-Use Goods and Technologies, and in respect of any persons subject to US jurisdiction, all technical data, services and commodities that are subject to the Export Administration Regulations of the Department of Commerce (15 C.F.R. Parts 730-774), the regulations administered by the Office of Foreign Asset Control in the Department of Treasury, as well as regulations administered by NRC governing the licensing for export of certain nuclear equipment, components and Source Material and Special Nuclear Material and regulations administered by the Department of Energy governing the export of nuclear services, nuclear technological data and certain commodities related to nuclear services (10 C.F.R. Part 810), and when applicable, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130).

"**Final Acquired Company Cash**" means the Acquired Company Cash as of immediately prior to the Closing as finally determined pursuant to Section 3.06.

"**Final Acquired Company Debt**" means the Acquired Company Debt as of immediately prior to the Closing as finally determined pursuant to Section 3.06 (provided, that for the avoidance of doubt, the Final Acquired Company Debt shall not include any Liability to the extent such Liability is reflected in the Final Working Capital).

"**Final Closing Statement**" means a written statement (a) setting forth the Final Acquired Company Cash, the Final Acquired Company Debt, the amount of any Final Working Capital Increase or any Final Working Capital Decrease, as applicable, the Final Working Capital and the Post-Closing Adjustment and (b) indicating any changes to the Estimated Closing Statement as finally determined pursuant to Section 3.06.

"**Final Solvency Tax Adjustment**" means the Solvency Tax Adjustment as finally determined pursuant to Section 3.06.

"**Final Working Capital**" means the calculation of the Net Working Capital of the Business as of the Effective Time as finally determined pursuant to Section 3.06.

8

"**Final Working Capital Decrease**" means the amount (if any) by which the Target Working Capital exceeds the Final Working Capital.

"**Final Working Capital Increase**" means the amount (if any) by which the Final Working Capital exceeds the Target Working Capital.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Government Authority**" means any U.S. federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body, including any Relevant Authority.

"**Government Official**" means any officer, director, or employee of any Government Authority. Without limiting the foregoing, "Government Official" includes any government officer, director, or employee, any officer, director, or employees of any government-controlled entity or public international organization, any employee of a government-owned or -controlled (in whole or in part) business, corporation, organization, or other entity, any Person acting in an official capacity for or on behalf of any Government Authority, or any political party, party official, or candidate for public office; in addition, "Government Official" includes any immediate relative of any Person described above. Immediate relatives include any of the following relations, whether by blood or through marriage: spouse, parent, child, sibling, grandparent/child.

"**Hazardous Materials**" means any chemical, pollutant, contaminant, or substance, material, or waste that is defined or regulated as "hazardous," "toxic," a "pollutant," a "contaminant," or words of similar meaning and regulatory effect by any relevant Government Authority with jurisdiction over the environment, including, Nuclear Materials, petroleum and petroleum products, by-products, derivatives or wastes, greenhouse gases, asbestos or asbestos-containing materials or products, polychlorinated biphenyls (PCBs) or PCB-containing equipment, and lead or lead-based paints or materials.

"**Insurance Policies**" means, collectively, all policies and programs of or agreements for insurance and interests in insurance pools and programs (in each case including self-insurance and insurance from Affiliates), including the American Nuclear Insurers Facility Form coverage and any rights to rebates thereunder.

"**Intellectual Property**" means any and all of the following intellectual property and similar rights, title, or interest in or arising under the Laws of the U.S. or any other country: (a) patents, patent applications, and patent rights, including any such rights granted upon any reissue, reexamination, division, extension, provisional, continuation, or continuation-in-part applications, (b) copyrights, moral rights and rights equivalent thereto (including the rights of attribution, assignation and integrity), mask work rights, database rights and design rights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (c) Trademarks and (d) Trade Secrets.

"**Interest Rate**" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

9

"**IRS**" means the U.S. Internal Revenue Service.

"**Joint Voluntary Notice**" means a joint voluntary notice as provided for in 50 USC 4565 and 31 CFR 800.401

"**Joint Written Instructions**" means written instructions from Companies and Plan Investor, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the Escrowed Deposit as provided for under this Agreement.

"**Knowledge of Companies**" means, with respect to matters relating to the Non-Controlled JVs, the actual knowledge of, and with respect to all other matters, the actual knowledge, after reasonable inquiry, of the following Persons as of the Agreement Date:  José Emeterio Gutiérrez, Michael Sweeney, Daniel Sumner and Mark Marano.

"**Latest Balance Sheet Date**" means March 31, 2017.

"**Law**" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order, treaty, binding guideline or other requirement or rule of law (including common law) promulgated by a Government Authority, including Nuclear Laws.

"**LC Facility**" has the meaning set forth in the Disclosure Schedules.

"**Leased Real Property**" means any real property that is leased by any Company Group Member, in each case, granting the Company Group Members a right of use or occupancy in such real property.

"**Liabilities**" means any liability, debt, guarantee, Claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, security interest, transfer restriction, easement, purchase right, right of first refusal, conditional sale agreement, encumbrance, claim, lien, Claim of successor liability or charge of any kind.

"**Marketing Period**" means the first period of fifteen (15) consecutive Business Days after the Agreement Date and throughout each day of which and at the end of which (a) Plan Investor has the Required Information and such Required Information is Compliant, (b) the Closing Conditions are satisfied (other than (i) the Closing Conditions set forth in (A) Section 11.01(b) relating to the Required Approvals described in items 8 and 10 of Schedule 11.01(b) and (B) Section 11.02(b) relating to the Required Approvals described in items 8 and 11 of Schedule 11.02(b) (clauses (A) and (B), collectively, the "**Specified Conditions**"), respectively, and (ii) those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to satisfaction or waiver of those Closing Conditions at such time) and (c) nothing has occurred and no condition exists that would cause any of the Closing Conditions to fail to be satisfied (other than (i) the Specified Conditions and (ii) those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to satisfaction or waiver of those Closing

10

Conditions at such time), assuming such conditions were applicable at any time during such 15 consecutive Business Day period; provided, that (x) January 15, 2018, February 19, 2018, May 28, 2018, July 4, 2018, November 22, 2018 and November 23, 2018 shall not be considered Business Days for purposes of calculating such 15 consecutive Business Day period, (y) if the Marketing Period has not concluded on or prior to August 17, 2018, then the Marketing Period shall commence no earlier than September 4, 2018 and (z) the Marketing Period shall conclude on or prior to December 21, 2018.  Notwithstanding anything in this definition to the contrary, (A) the Marketing Period will not commence or be deemed to have commenced if, after the Agreement Date and prior to the expiration of such 15 consecutive Business Day period referenced herein, (i) the Company Group Members issue a public statement indicating their intent to restate any historical financial statements of the Company Group Members included in, or incorporated by reference into, the Required Information or any such restatement is under active consideration, in which case the Marketing Period will not be deemed to commence unless and until such restatement has been completed and the relevant Required Information has been amended or the Company Group Members have announced that they have concluded that no restatement will be required in accordance with GAAP and (ii) any Required Information would not be Compliant at any time during such 15 consecutive Business Day period (it being understood and agreed that if any Required Information provided at the commencement of the Marketing Period ceases to be Compliant during such 15 consecutive Business Day period, then the Marketing Period will be deemed not to have commenced) or otherwise does not include any requirement of the definition of "Required Information") and (B) the Marketing Period will end on any earlier date prior to the expiration of such 15 consecutive Business Day period upon which the Debt Financing is funded in full in accordance with the terms of the Debt Commitment Letter.  If Companies shall in good faith reasonably believe that they have provided the Required Information and the Required Information is Compliant, they may deliver to Plan Investor a written notice to that effect (stating when it believes such Required Information was delivered) in which case Companies shall be deemed to have delivered the Required Information to Plan Investor on the date specified in that notice and the Required Information shall be deemed to be Compliant unless Plan Investor in good faith reasonably believes that Companies have not completed delivery of the Required Information or the Required Information is not Compliant and, within three (3) business days after its receipt of such notice from Companies, Plan Investor delivers a written notice to Companies to that effect (stating with specificity which Required Information Plan Investor reasonably believes Companies have not delivered or the reason for which the Required Information is not Compliant); provided that delivery of such written notice from Plan Investor to Companies will not prejudice Companies' right to assert that the Required Information has, in fact, been delivered and that such Required Information is Compliant.

"**Material Adverse Effect**" means any change, effect, occurrence, state of facts or development that, either individually or in aggregate with all other changes, effects, occurrences, state of facts or developments, has or would be reasonably expected to have a material adverse effect on the financial condition, business or results of operations of the Company Group Members, in each case taken as a whole; provided, however, that any adverse effect arising out of, resulting from or attributable to: (a) to the extent not disproportionately affecting the Company Group Members relative to similarly situated Persons or businesses, an event or circumstances or series of events or circumstances affecting (i) the U.S. (or any other country or jurisdiction) or the global economy generally or capital, financial, banking, credit or securities markets generally, including changes in interest or exchange rates, (ii) political

11

conditions generally of the U.S. or any other country or jurisdiction in which the Business, any Company Group Member operates or (iii) any industry generally in which the Business or any Company Group Member or any customers thereof, operates or in which products or services of the Business are used or distributed, (b) the negotiation, pendency, announcement or consummation of the Transactions contemplated by this Agreement or any other Transaction Agreement, including the failure to take any action as a result of any restrictions or prohibitions set forth herein or therein following a request for the consent of Plan Investor to take such action or the identity of Plan Investor or its Affiliates, (c) any changes in applicable Law or GAAP, or accounting principles, practices or policies that any of the Acquired Companies is required to adopt, or the enforcement or interpretation thereof to the extent not disproportionately affecting the Acquired Companies relative to similarly situated Persons or businesses, (d) actions taken at the request or with the consent of Plan Investor, (e) any acts of God, including any earthquakes, hurricanes, tornadoes, floods, tsunami, or other natural disasters, or any other damage to or destruction of Business Assets caused by casualty, (f) any hostilities, acts of war (whether or not declared), sabotage, terrorism or military actions, or any escalation or worsening of any such hostilities, act of war, sabotage, terrorism or military actions to the extent not disproportionately affecting the Acquired Companies relative to similarly situated Persons or businesses, (g) in any filings prior to the Agreement Dates by any Acquired Company with the Bankruptcy Court, (h) any failure to meet internal or published projections, estimates or forecasts of revenues, earnings, or other measures of financial or operating performance for any period (provided, that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded from the determination of whether a Material Adverse Effect has occurred), (i) any strikes, work stoppages, slowdowns or other labor actions, (j) any effect resulting from the filing of the Bankruptcy Case and reasonably anticipated effects thereof, including any effect resulting from or any reasonably anticipated effects of the pendency of the Bankruptcy Case or (k) any adverse change or effect that is cured, without any further adverse effect on the Acquired Companies, in each case taken as a whole, before the Closing shall not, in any such case, constitute a Material Adverse Effect.

"**Material Customers**" means the largest twenty-five (25) customers of the Business during the fiscal year ended March 31, 2017 based on revenues recognized, as listed in Schedule 4.13(d).

"**Material Suppliers**" means the largest twenty-five (25) suppliers of the Business, respectively, by expenses recognized (taken as a whole) during the fiscal year ended March 31, 2017, excluding administrative or other non-operational suppliers, as listed in Schedule 4.13(d).

"**NDA**" means the UK Nuclear Decommissioning Authority.

"**NDA Parent Company Guarantee**" means the Parent Company Guarantee dated March 23, 2010, jointly provided by Westinghouse Electric Company LLC and Westinghouse Electric UK Holdings Limited for the benefit of the NDA.

"**Net Working Capital**" has the meaning set forth on Schedule 3.08.

12

**HIGHLY CONFIDENTIAL**

"**Non-Controlled JV Interests**" means the equity interests in the Non-Controlled JVs listed on <u>Schedule A-II</u> held by any Company Group Member.

"**NRC**" means the United States Nuclear Regulatory Commission.

"**NRC Approvals**"  means the consent of the NRC and/or any Agreement State pursuant to Section 184 of the Atomic Energy Act to the direct or indirect transfer of control of Nuclear Materials licenses to Plan Investor, approval of all conforming administrative license amendments associated with such transfer, consent to the direct or indirect transfer of, and approval of any related amendments to, any Nuclear Materials licenses associated with such transfer and any other reviews or approvals required under the Nuclear Laws in connection with <u>Section 2.02</u> herein.

"**Nuclear Installation**" means any nuclear powered electric generating facility, nuclear processing facility or nuclear test facility.

"**Nuclear Law**" means any and all applicable laws, rules, regulations, orders, treaties and other enactments, in any jurisdiction, applicable to civil nuclear power installations, Nuclear Material, nuclear fuel, enrichment of uranium, any use, storage, disposal, manufacture, fabrication, handling, transport, storage or processing of Nuclear Material, nuclear fuel and/or radioactive waste and/or the decommissioning of nuclear sites, as in effect from time to time, and all regulations promulgated thereunder and the policies, guidance and interpretations issued pursuant to and the administration of, the foregoing, each as amended from time to time.

"**Nuclear Liability**" means any obligation or liability arising out of or resulting from the radioactive properties or a combination of radioactive properties with toxic, explosive or other hazardous properties of nuclear fuel or radioactive products, materials or waste, or of Nuclear Material.

"**Nuclear Liability Policies**" means all insurance policies covering any Nuclear Liability or Liabilities with respect to any act or omission of any Acquired Company that is subject to any Nuclear Obligation.

"**Nuclear Material**" has the meaning provided in the IAEA Safeguards Glossary, published by the International Atomic Energy Agency, as such glossary may be updated or amended from time to time.

"**Nuclear Obligations**" means (i) any obligations of a Regulated Entity pursuant to any applicable Nuclear Law, nuclear license, permit, approval, exemption, agreement, or requirement of an applicable regulatory board, commission or relevant authority, including any Relevant Authority; and (ii) any act, omission or other matter that such Regulated Entity determines by reference to the proper exercise of the judgment of the Regulated Entity as to what is or is not required to be done in any given situation in order to comply with those obligations (taking into account any applicable regulatory guidance or codes of conduct).

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

13

"**Operational Cash**" means, as of the relevant date of calculation, the aggregate amount of Cash of the Company Group Members (including all interest thereon), calculated in the manner set forth on Schedule 14.01, aggregating the items set forth under the heading "Sample Operational Cash Calculation" (and for the avoidance of doubt, excluding any Solvency Cash); provided, that if such aggregate amount exceeds $100,000,000, then "Operational Cash" shall be $100,000,000.

"**Order**" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination or award entered by or with any Government Authority.

"**Owned Real Property**" means all owned real property held by each Company Group Member, together with (to the extent of such Company Group Member's interest therein) all buildings, structures, improvements and fixtures thereon.

"**Permits**" means all permits, licenses, authorizations, Consents, clearances, closures, decisions, registrations, concessions, grants, franchises, certificates, identification numbers exemptions, waivers and filings issued or required by any Government Authority under applicable Law.

"**Permitted Liens**" means the following Liens: (a) Liens for Taxes, assessments or other governmental charges or levies that are being contested in good faith by appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP or that are not yet due or payable or that may thereafter be paid without penalty, (b) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, workmen, repairmen and other Liens imposed or permitted by Law in the ordinary course of business that are not yet due or payable or that are being contested in good faith by appropriate proceedings, (c) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security, (d) defects or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary conduct of the Business, (e) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a Government Authority, (f) any title matters shown in any title policy or report made available to Plan Investor, (g) any set of facts an accurate up-to-date survey shows, provided, that such facts do not adversely affect the current use or operation of the Leased Real Property or Owned Real Property for the Business in any material respect, (h) Liens that affect the underlying fee interests of any Leased Real Property or real property over which the Reorganized Company have easement or other property rights, or (i) right, terms or conditions of any leases, subleases, licenses or occupancy agreements made available to Plan Investor, including title of a lessor under a capital or operating lease.

"**Person**" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"**Personal Data**" has the same meaning as the term "personal data," "personal information," or the equivalent under applicable Data Protection Laws.

14

"**PFA Transaction Model**" means that certain transaction model, dated January 8, 2018, prepared by KPMG LLP and named the "PFA Transaction Model".

"**Plan**" means the chapter 11 plan of reorganization to be filed in the Bankruptcy Cases with respect to Debtors (including all exhibits, supplements, appendices and schedules thereto), in form and substance consistent with this Agreement and in all material respects reasonably acceptable to Plan Investor, as such may be amended, supplemented or modified from time to time in accordance with the terms and conditions herein.

"**Plan Investor Protections Motion**" means a motion, in form and substance reasonably satisfactory to Plan Investor seeking entry of the Plan Investor Protections Order.

"**Plan Investor Protections Order**" means an Order of the Bankruptcy Court in form and substance reasonably satisfactory to the Plan Investor and Companies approving the Break-Up Fee, the Expense Reimbursement and the covenants of Companies set forth in Section 9.02.

"**Plan Investor Transaction Agreements**" means this Agreement and each other Transaction Agreement to which Plan Investor is named as a party on the signature pages thereto.

"**Plan Investor Transactions**" means the transactions contemplated by the Plan Investor Transaction Agreements.

"**Post-Closing Adjustment**" means the amount (which may be positive or negative) equal to the sum of: (a) the Final Acquired Company Cash minus the Estimated Acquired Company Cash, (b) the Final Acquired Company Debt, minus the Estimated Acquired Company Debt, (c) the Final Working Capital minus the Estimated Working Capital and (d) the Final Solvency Tax Adjustment minus the Estimated Solvency Tax Adjustment.

"**Post-Closing Adjustment Threshold**" means $10,000,000.

"**Post-Closing Tax Period**" means any taxable period (or portion thereof) beginning after the Closing Date.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means any taxable period (or portion thereof) ending on or before the Closing Date, including the pre-Closing portion of any Straddle Period.

"**Preliminary Solvency Tax Adjustment**" means Companies' good faith estimate of the Solvency Tax Adjustment (as provided in Section 6.09(b)) as of the Closing Date, to be provided in accordance with Section 3.04.

"**President**" means the President of the United States of America.

WEIL:\96391119\18\80768.0017

"**Proposed Final Acquired Company Cash**" means Plan Investor's good faith, proposed final calculation of the Acquired Company Cash as of immediately prior to the Closing.

"**Proposed Final Acquired Company Debt**" means Plan Investor's good faith, proposed final calculation of the Acquired Company Debt as of immediately prior to the Closing.

"**Proposed Final Solvency Tax Adjustment**" means Plan Investor's good faith, proposed final calculation of the Solvency Tax Adjustment.

"**Proposed Final Working Capital**" means Plan Investor's good faith, proposed final calculation of the Net Working Capital of the Business as of the Effective Time.

"**Real Properties**" means, collectively, the Owned Real Property and the Leased Real Property.

"**Real Property Leases**" means all leases, subleases, licenses, and other agreements for the leasing, uses, or occupancy of the Leased Real Property, pursuant to which the Company Group Members are a lessor, sublessor, licensor, lessee, sublessee, or licensee, including all amendments, supplements, modifications, replacements, and restatements of the foregoing.

"**Regulated Entity**" means any or all of Springfields Fuels Limited, Westinghouse Electric Belgium S.A., Westinghouse Electric Sweden AB, Westinghouse Electric Company LLC and any other entity that Companies inform Plan Investor should be treated as a Regulated Entity for the purposes of this Agreement

"**Regulator Cash**" means Cash held by the NRC, the Pennsylvania Department of Environmental Protection, the Utah Department of Environmental Quality and the Washington Department of Health in special trusts on account of environmental and decommissioning liabilities of the Company Group Members.

"**Release**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including ambient air, surface water, groundwater, and surface or subsurface strata), including the movement of Hazardous Materials through or in the air, soil, surface water, or groundwater.

"**Relevant Authority**" means any or all of the following, as the context may require: the UK Office for Nuclear Regulation, the NDA, the UK Department for Business, Energy and Industrial Strategy, the Swedish Radiation Safety Authority, the Swedish Ministry of Foreign Affairs, the Swedish Ministry for Policy Coordination and Energy, the Swedish Ministry for the Environment and Energy, the Belgian Federal Agency for Nuclear Control, the Belgian Organisation for Radioactive Waste and Enriched Fissile Materials, the United States Nuclear Regulatory Commission, any other U.S. federal, state or local governmental or administrative body that has jurisdiction over Companies, and/or any other relevant authority as may be notified by Companies to Plan Investor.

16

"**Reorganized Company**" means TNESI, after giving effect to the Transactions and the Plan.

"**Reorganized Company Group Members**" means the Reorganized Company, the Reorganized Debtors, and, in each case each of their direct and indirect Subsidiaries.

"**Reorganized Debtors**" means all Debtors as reorganized pursuant to the Confirmation Order upon the Effective Date.

"**Representative**" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, investment bankers, other representatives or any other Person acting on behalf of such Person.

"**Required Approvals**" means the approvals of the Government Authorities set forth on Schedule 11.01(b) and Schedule 11.02(b).

"**Required Information**" means (a) the financial statements required by paragraph 5 of the Conditions Exhibit of the Debt Commitment Letter (as in effect on the date hereof) and (b) all information reasonably requested by Plan Investor in connection with the Plan Investor's preparation of the pro forma financial statements required by paragraph 6 of the Conditions Exhibit of the Debt Commitment Letter (as in effect on the date hereof).

"**Required Notices**" means the notifications set forth on Schedule 11.01(b) and Schedule 11.02(b).

"**Returned Regulator Cash**" means any Regulator Cash returned to any Company Group Member at any time prior to Closing.

"**Sale Order**" means an order of the Bankruptcy Court in form and substance reasonably acceptable to Plan Investor and Companies approving the Definitive SAPA and the terms and conditions hereof, and approving and authorizing Companies to consummate the Transactions pursuant to Section 363 of the Bankruptcy Code.

"**SDN List**" means (i) the "List of Specially Designated Entities and Blocked Persons," which is issued and maintained by OFAC and is available as of the Agreement Date at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx and (ii) any other asset freeze or asset blocking related list maintained by, or other public announcement of Sanctions designation made by, any Government Authority and/or legislative body.

"**Section 721 of the DPA**" means Section 721 of the Defense Production Act of 1950 (50 U.S.C. § 4565), as amended.

"**Securities Act**" means the Securities Act of 1933.

"**Sensitive Nuclear Information**" means any information (including information incorporated in a production or utilization facility or important component part thereof) which is not available to the public and which is important to the design, construction, fabrication,

17

operation or maintenance of a uranium enrichment or nuclear fuel reprocessing facility or a facility for the production of heavy water.

"**Software**" means all (a) computer programs, including all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (c) all documentation including user manuals and other training documentation relating to any of the foregoing, in each case (a)-(c), excluding Data.

"**Solvency Tax Cost**" (which can be a positive or negative amount) means the sum of the following:

(1)  the estimated incremental Taxes payable (if any) by the U.S. Debtors for the year in which the Solvency Steps Plan is implemented, <u>less</u>

(2)  the estimated incremental Taxes payable (if any) by the Acquired Companies (other than the U.S. Debtors) for the year in which the Solvency Steps Plan is implemented, <u>less</u>

(3)  the projected net Tax cost (if any) of any estimated incremental changes in the Tax attributes of the U.S. Debtors  for the year in which the Solvency Steps Plan is implemented, <u>less</u>

(4) the projected net Tax cost (if any) of any estimated incremental changes in the Tax attributes of the Acquired Companies (other than the U.S. Debtors) for the year in which the Solvency Steps Plan is implemented, <u>plus</u>

(5)  the projected net Tax benefit (if any) of any estimated incremental changes in the Tax attributes of the U.S. Debtors  for the year in which the Solvency Steps Plan is implemented, <u>plus</u>

(6)  the projected net Tax benefits (if any) of any estimated incremental changes in the Tax attributes of the Acquired Companies (other than the U.S. Debtors) for the year in which the Solvency Steps Plan is implemented;

in each case, determined (a) on a "with and without" basis with respect to the transactions implemented pursuant to the Solvency Steps Plan and (b) as if the taxable year of the respective Acquired Companies closed on the Closing Date (including taking into account any reduction of Tax attributes as a result of the discharge of debt pursuant to the Plan, but disregarding any transactions out of the ordinary course that occur after the Closing on the Closing Date that are not expressly contemplated by this Agreement); <u>provided</u>, <u>however</u>, that  the sum of clauses (5) and (6) shall be capped at an amount equal to the sum of clauses (2) through (4).   For this purpose, the projected net Tax cost or net Tax benefits (as applicable) of any estimated incremental changes in the Tax attributes of any Acquired Companies for the taxable year(s) in which the respective steps of the Solvency Steps Plan is implemented shall be determined by (i)

18

using the PFA Transaction Model, (ii) adjusting the tax attributes in such model to reflect the incremental change in tax attributes attributable to the Solvency Steps Plan with respect to any such Acquired Company (it being understood that, for this purpose, any incremental change in a non-U.S. tax attribute will be treated as a change in the equivalent U.S. tax attribute), and (iii) calculating the incremental decrease (i.e., net tax cost) or increase (i.e., net tax benefit) in the net present value of the tax benefits otherwise computed, provided that in the case of any non-U.S. Acquired Company, any portion of such net tax cost or net tax benefit relating to such Company shall be calculated using the maximum marginal tax rate for the applicable taxing jurisdiction.

"**Solvent**" means, with respect to any entity, when the assets of such entity exceed the liabilities of such entity, calculated on an accounting basis consistent with such entity's statutory accounts.

"**Source Material**" means (a) uranium or thorium, or any combination thereof, in any physical or chemical form or (b) ores that contain by weight one-twentieth of one percent (0.05%) or more of (i) uranium, (ii) thorium, or (iii) any combination thereof.  Source Material does not include Special Nuclear Material.

"**Special Nuclear Material**" means plutonium, uranium-233, uranium enriched in the isotope-233 or in the isotope-235, and any other material that the NRC determines to be "Special Nuclear Material."  Special Nuclear Material also refers to any material artificially enriched by any of the foregoing materials or isotopes.  Special Nuclear Material does not include Source Material.

"██████ **Assumed Impact**" means the absolute value of: (a) (i) the total amount paid by any Company Group Member to the ██████ ████████████████████████████████████ provided that in no event shall the amount set forth in this clause (a) be less than zero, less (b) █████████ ██████████████████████████████████████████████████████ ; provided that if the amount set forth in clause (b) is greater than the amount set forth in clause (a), ██████████ Assumed Impact shall be zero.

"**Subsidiary**" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising Control.

"**Target Working Capital**" means $183,000,000.

"**Tax**" or "**Taxes**" means all federal, state, local, foreign and other income, excise, gross receipts, ad valorem, value-added, sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use, environmental, stamp, occupation, gains, property, transfer, use, payroll, intangibles or other taxes of any kind

19

whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Tax Returns**" means all returns and reports (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) required to be supplied to a Taxing Authority relating to Taxes.

"**Taxing Authority**" means any U.S. federal, state or local or non-U.S. jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection of such Taxes for such jurisdiction.

"**Technology**" means, collectively, all technology, Software, Data, designs, procedures, models, discoveries, processes, techniques, ideas, know-how, research and development, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice) apparatus, creations, improvements, works of authorship in any media, confidential, proprietary or non-public information, and other similar materials, and all recordings, graphs, drawings, reports, analyses and other writings, and other tangible embodiments of the foregoing in any form whether or not listed herein, and all related technology.

"**Trade Secrets**" means confidential and proprietary information, including rights relating to know-how or trade secrets, including ideas, concepts, methods, techniques, inventions (whether patentable or unpatentable), and other works, whether or not developed or reduced to practice, rights in industrial property, customer, vendor, and prospect lists, and all associated information or databases, and other confidential or proprietary information, in each case other than Software.

"**Trademarks**" means trademarks, service marks, trade names, service names, domain names, trade dress, logos and other identifiers of same, including all goodwill associated therewith, and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

"**Transaction Accounting Principles**" has the meaning set forth on <u>Schedule 3.08</u>.

"**Transaction Agreements**" means this Agreement, the Employee Matters Agreement, the Escrow Agreement and any other agreements, instruments or documents required to be delivered at the Closing, in each case including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"**Transfer Taxes**" means all sales, use, direct or indirect real property, transfer, stamp, business and occupation, value added (including VAT), recording, documentary, filing,

20

permit or authorization, registration, and similar non-income Taxes, and all related interest, penalties, fees and other governmental charges.

"**Transformation Plan**" means the transformation plan made available by Companies to Plan Investor on the Agreement Date.

"**U.S.**" means the United States of America.

"**U.S. Debtors**" means the Debtors other than TNEH UK.

"**U.S. Group**" means an affiliated group of corporations, of which Toshiba Nuclear Energy Holdings (US) Inc. (or a successor thereto) is the common parent, that files a consolidated U.S. federal income tax return.

"**Used**" means used, practiced, licensed, sublicensed, reproduced, distributed, performed, displayed and otherwise exploited, made, had made, sold, had sold, imported and otherwise provided, and prepared modifications, derivative works or improvements or commercialized or legally disposed of products and services thereunder.

"**VAT**" means any: (a) Tax imposed in compliance with the council directive of November 28, 2006 on the common system of value added tax (EC Directive 2006/112) (including, in relation to the United Kingdom, value added tax imposed by the Value Added Tax Act 1994 and legislation and regulations supplemental thereto), and (b) other Tax of a similar nature (including sales Tax, use Tax, consumption Tax and goods and services Tax), whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in (a), or elsewhere.

"**Wind Down Co**" means one or more liquidating trusts or other entities established for the benefit of holders of claims against, and equity interests in, Debtors, as Debtors determine on or before the Effective Date, in consultation with Plan Investor, is in the best interests of such holders and the Reorganized Company.

21

363 Sale ..................................................................................................Section 2.01(e)
Action ..............................................................................................................Exhibit A
Acquired Companies ..........................................................................Preliminary Statements
Acquired Company ............................................................................Preliminary Statements
Acquired Company Cash ...............................................................................Exhibit A
Acquired Company Debt ...............................................................................Exhibit A
Affiliate ..........................................................................................................Exhibit A
Agreement .......................................................................................................Exhibit A
Agreement Date ..............................................................................................Preamble
Agreement State .............................................................................................Exhibit A
Alternative Acquisition Structure ............................................................Section 2.01(d)
Alternative Structure Notice ....................................................................Section 2.01(d)
Anti-Corruption Laws ...............................................................................Section 4.22(a)
Antitrust Laws ................................................................................................Exhibit A
Applicable Percentage .............................................................................Section 3.13(d)(i)
Assumed Employee Plan ...............................................................................Exhibit A
Assumed Liabilities .......................................................................................Section 2.02(b)
Bankruptcy and Equity Exception .................................................................Exhibit A
Bankruptcy Cases ..............................................................................Preliminary Statements
Bankruptcy Code ..............................................................................Preliminary Statements
Bankruptcy Court ..............................................................................Preliminary Statements
Bankruptcy Rules ...........................................................................................Exhibit A
Base Purchase Price .......................................................................................Section 3.01
BNP Cash ........................................................................................................Exhibit A
Break-Up Fee ..................................................................................................Exhibit A
Budget .............................................................................................................Exhibit A
Business ...........................................................................................................Exhibit A
Business Assets ...............................................................................................Exhibit A
Business Day ...................................................................................................Exhibit A
Business Intellectual Property ..........................................................................Exhibit A
Business Registrable IP ...................................................................................Exhibit A
Business Technology .......................................................................................Exhibit A
Cash .................................................................................................................Exhibit A
CFIUS ..............................................................................................................Exhibit A
CFIUS Clearance .............................................................................................Exhibit A
Claim ...............................................................................................................Exhibit A
Clean Team Agreement ...................................................................................Exhibit A
Closing .............................................................................................................Section 2.03
Closing Conditions ..........................................................................................Exhibit A
Closing Date ....................................................................................................Section 2.03
Closing Notice .................................................................................................Exhibit A
Closing Payment ..............................................................................................Section 3.05

WEIL:\96391119\18\80768.0017

Closing Statement ......................................................................................Exhibit A
Code ........................................................................................................Exhibit A
Commitment Letters .............................................................................Section 5.06(b)
Companies ..............................................................................................Preamble
Companies' Banker ................................................................................Section 4.17
Company..................................................................................................Preamble
Company Group Member..........................................................Preliminary Statements
Company Group Members.........................................................Preliminary Statements
Company Guarantees ...............................................................................Exhibit A
Company Subsidiary ................................................................Preliminary Statements
Company Transaction Agreements ...........................................................Exhibit A
Company Transactions ............................................................................Exhibit A
Competing Transaction ...........................................................................Exhibit A
Compliant................................................................................................Exhibit A
Confidentiality Agreement ......................................................................Exhibit A
Confirmation Hearing ............................................................................Exhibit A
Confirmation Order.................................................................................Exhibit A
Consent....................................................................................................Exhibit A
Contract...................................................................................................Exhibit A
Contracting Parties.............................................................................Section 13.18
Control ...................................................................................................Exhibit A
Controlled JV Interests ...........................................................................Exhibit A
Controlled JVs ........................................................................................Exhibit A
Conversion Date ................................................................................Section 2.01(e)
Conversion Event ..............................................................................Section 2.01(e)
Covered Employee .................................................................................Exhibit A
Covered Persons.................................................................................Section 4.22(a)
Cure Cost Contract ............................................................................Section 2.04(f)
Cure Costs ..............................................................................................Exhibit A
Cure Costs & Designation Order .............................................................Exhibit A
Cure Notice ......................................................................................Section 2.04(c)
Cure Notice Deadline ........................................................................Section 2.04(c)
D&O Indemnified Parties..................................................................Section 7.02(a)
Data ........................................................................................................Exhibit A
Data Protection Laws .............................................................................Exhibit A
Debt ........................................................................................................Exhibit A
Debt Commitment Letters ..................................................................Section 5.06(a)
Debt Financing ..................................................................................Section 5.06(a)
Debt Financing Source Related Parties....................................................Exhibit A
Debt Financing Sources .....................................................................Section 5.06(a)
Debtors ...................................................................................................Exhibit A
Definitive SAPA ................................................................................Section 2.01(e)
Designated Contracts.........................................................................Section 2.04(e)

Designated Interim Covenants ..........................................................Section 6.01(a)(xii)
Designation Deadline ..........................................................................Section 2.04(e)
Designation Procedures.......................................................................Section 9.04(b)
DIP Credit Agreement .........................................................................Section 6.07(a)
Disclosure Schedules ..........................................................................Exhibit A
Disclosure Statement...........................................................................Section 9.04(b)
Disclosure Statement and Solicitation Procedures Motion ...............Section 9.04(b)
Disclosure Statement Order ................................................................Section 9.04(b)
Dispute Notice .....................................................................................Section 3.06(c)

■■■■■■■    ........................................................    ■■■■■■■
            ........................................................
■■■■■■■    ........................................................    ■■■■■■■

Effective Date ......................................................................................Exhibit A
Effective Time ......................................................................................Exhibit A
EMEA Subsidiaries ..............................................................................Section 6.09(a)
Employee Plans.....................................................................................Exhibit A
■■■■■■■    ........................................................    ■■■■■■■
Environmental Law...............................................................................Exhibit A
Environmental Permit ..........................................................................Exhibit A
Equity Commitment Letter ..................................................................Section 5.06(b)
Equity Financing ..................................................................................Section 5.06(b)
Equity Investors ...................................................................................Section 5.06(b)
ERISA ...................................................................................................Exhibit A
ERISA Affiliate.....................................................................................Exhibit A
Escrow Agent........................................................................................Section 3.02
Escrow Agreement ...............................................................................Exhibit A
Escrowed Deposit .................................................................................Section 3.02
Estimated Acquired Company Cash ...................................................Exhibit A
Estimated Acquired Company Debt ...................................................Exhibit A
Estimated Closing Statement...............................................................Section 3.05
Estimated Solvency Tax Adjustment .................................................Exhibit A
Estimated Working Capital .................................................................Exhibit A
Estimated Working Capital Decrease .................................................Exhibit A
Estimated Working Capital Increase ..................................................Exhibit A
Excess Cash...........................................................................................Exhibit A
Excluded Assets ...................................................................................Section 2.02(a)
Excluded Contract ................................................................................Exhibit A
Excluded Liabilities .............................................................................Section 2.02(b)
Executory Contracts .............................................................................Exhibit A
Exhibits .................................................................................................Exhibit A
Expense Reimbursement.......................................................................Exhibit A
Export Control Laws ............................................................................Exhibit A
Export Controlled Information.............................................................Exhibit A

24

Final Acquired Company Cash ............................................................................Exhibit A
Final Acquired Company Debt ............................................................................Exhibit A
Final Closing Statement .....................................................................................Exhibit A
Final Solvency Tax Adjustment .........................................................................Exhibit A
Final Working Capital ........................................................................................Exhibit A
Final Working Capital Decrease .........................................................................Exhibit A
Final Working Capital Increase ..........................................................................Exhibit A
Financial Statements ....................................................................................Section 4.07(a)
Financing .....................................................................................................Section 5.06(b)
GAAP ..................................................................................................................Exhibit A
Government Approvals .................................................................................Section 6.04(a)
Government Authority ........................................................................................Exhibit A
Government Official ...........................................................................................Exhibit A
Guarantee Obligor .......................................................................................Section 6.06(a)
Hazardous Materials ...........................................................................................Exhibit A
████████████████ ...................................................................████████████████
████████████████ ...................................................................████████████████
████████████████ ...................................................................████████████████
████████████████ ...................................................................████████████████
Independent Accounting Firm ......................................................................Section 3.06(d)
Initial Outside Date ......................................................................................Section 12.01(d)
Insurance Policies ..............................................................................................Exhibit A
Intellectual Property ...........................................................................................Exhibit A
Interest Rate .......................................................................................................Exhibit A
IRS ......................................................................................................................Exhibit A
IT Systems ...................................................................................................Section 4.11(f)
Joint Voluntary Notice .......................................................................................Exhibit A
Joint Written Instructions ...................................................................................Exhibit A
Knowledge of Companies ..................................................................................Exhibit A
Latest Balance Sheet ....................................................................................Section 4.07(a)
Latest Balance Sheet Date ..................................................................................Exhibit A
Law .....................................................................................................................Exhibit A
Leased Real Property ..........................................................................................Exhibit A
Liabilities ...........................................................................................................Exhibit A
Lien ....................................................................................................................Exhibit A
██████████ ..................................................................................████████████
Marketing Period ................................................................................................Exhibit A
Material Adverse Effect ......................................................................................Exhibit A
Material Contracts .......................................................................................Section 4.13(a)
Material Customers ............................................................................................Exhibit A
Material Suppliers ..............................................................................................Exhibit A
Multiemployer Plans ....................................................................................Section 4.14(c)
NDA ...................................................................................................................Exhibit A

25

NDA Parent Company Guarantee ...................................................................................Exhibit A
Net Working Capital .......................................................................................................Exhibit A
Non-Controlled JV .........................................................................................Preliminary Statements
Non-Controlled JV Interests ..........................................................................................Exhibit A
Nonparty Affiliates .......................................................................................................Section 13.18
NRC ...............................................................................................................................Exhibit A
NRC Approvals...............................................................................................................Exhibit A
Nuclear Installation ........................................................................................................Exhibit A
Nuclear Law ...................................................................................................................Exhibit A
Nuclear Liability ............................................................................................................Exhibit A
Nuclear Liability Policies...............................................................................................Exhibit A
Nuclear Material ............................................................................................................Exhibit A
Nuclear Obligations .......................................................................................................Exhibit A
OFAC ............................................................................................................................Exhibit A
Operational Cash............................................................................................................Exhibit A
Order ..............................................................................................................................Exhibit A
Original Contract Schedule ...........................................................................................Section 2.04(b)
Original Contracts .........................................................................................................Section 2.04(b)
Owned Real Property .....................................................................................................Exhibit A
Parties ............................................................................................................................Preamble
PBGC .............................................................................................................................Section 4.14(d)
Permits ...........................................................................................................................Exhibit A
Permitted Liens ..............................................................................................................Exhibit A
Person.............................................................................................................................Exhibit A
Personal Data .................................................................................................................Exhibit A
PFA Transactional Model ..............................................................................................Exhibit A
Plan.................................................................................................................................Exhibit A
Plan Investor ..................................................................................................................Preamble
Plan Investor/TNESI ......................................................................................................Section 10.03(a)
Plan Investor Protections Motion ..................................................................................Exhibit A
Plan Investor Protections Order .....................................................................................Exhibit A
Plan Investor Transaction Agreements ..........................................................................Exhibit A
Plan Investor Transactions .............................................................................................Exhibit A
Post-Closing Adjustment ...............................................................................................Exhibit A
Post-Closing Adjustment Payment Deadline .................................................................Section 3.07(b)
Post-Closing Adjustment Threshold ..............................................................................Exhibit A
Post-Closing Tax Period ................................................................................................Exhibit A
Pre-Closing Period .........................................................................................................Exhibit A
Pre-Closing Tax Period ..................................................................................................Exhibit A
Preliminary Solvency Tax Adjustment Statement.........................................................Section 3.04
President.........................................................................................................................Exhibit A
Privacy Policies .............................................................................................................Section 4.23(a)
Proposed Final Acquired Company Cash .......................................................................Exhibit A

WEIL:\96391119\18\80768.0017

Proposed Final Acquired Company Debt .......................................................................Exhibit A
Proposed Final Closing Statement ........................................................................Section 3.06(a)
Proposed Final Solvency Tax Adjustment ...............................................................Exhibit A
Proposed Final Working Capital ...............................................................................Exhibit A
Purchase Price ...................................................................................................Section 3.01
Purchase Price Escrow Funds ..............................................................................Section 3.02
Real Properties ............................................................................................................Exhibit A
Real Property Leases ..................................................................................................Exhibit A
Regulated Entity .........................................................................................................Exhibit A
Regulator Cash ...........................................................................................................Exhibit A
Release ........................................................................................................................Exhibit A
Relevant Authority ....................................................................................................Exhibit A
Remaining Disputed Items ..................................................................................Section 3.06(d)
Reorganized Company ...............................................................................................Exhibit A
Reorganized Company Group Members.....................................................................Exhibit A
Reorganized Company Interests...............................................................Preliminary Statements
Reorganized Debtors ..................................................................................................Exhibit A
Representative ............................................................................................................Exhibit A
Required Approvals ...................................................................................................Exhibit A
Required Information .................................................................................................Exhibit A
Required Items ...................................................................................................Section 3.13(a)
Required Notices ........................................................................................................Exhibit A
Returned Regulator Cash ...........................................................................................Exhibit A
Resolution Period ...............................................................................................Section 3.06(c)
Review Period ....................................................................................................Section 3.06(b)
Sale Order ..................................................................................................................Exhibit A
Sanctioned Country .............................................................................................Section 4.22(b)
Sanctions .............................................................................................................Section 4.22(b)
SDN List ....................................................................................................................Exhibit A
Section 721 of the DPA ..............................................................................................Exhibit A
Securities Act .............................................................................................................Exhibit A
██████████████ ........................................................................................... ███████████
Software .....................................................................................................................Exhibit A
Solicitation Procedures .......................................................................................Section 9.04(b)
Solvency Cash .................................................................................................Section 6.09(a)(ii)
Solvency Objectives ...........................................................................................Section 6.09(a)(i)
Solvency Steps Plan .........................................................................................Section 6.09(a)(ii)
Solvency Tax Adjustment ..................................................................................Section 6.09(b)
Solvency Tax Cost .....................................................................................................Exhibit A
Solvency Tax Firm .............................................................................................Section 3.06(d)
Solvent .......................................................................................................................Exhibit A
Source Material ..........................................................................................................Exhibit A
Special Nuclear Material............................................................................................Exhibit A

WEIL:\96391119\18\80768.0017

Specified Conditions ...........................................................................................Exhibit A
██████████████████ ....................................................................................████████
 ██████████ ...........................................................................................████████
Straddle Period ...........................................................................Section 10.03(a)
Subsidiary...............................................................................................Exhibit A
Surviving Company Guarantees...............................................................Section 6.06(a)
Target Working Capital ..............................................................................Exhibit A
Tax .........................................................................................................Exhibit A
Tax Contest ...............................................................................Section 10.03(c)
Taxes .....................................................................................................Exhibit A
Tax Returns .............................................................................................Exhibit A
Taxing Authority .......................................................................................Exhibit A
Technology...............................................................................................Exhibit A
Termination Fee .....................................................................Section 3.02(b)
Third Party Consents ....................................................................Section 6.05
Title Company ...........................................................................Section 6.06(b)
Titled Property .........................................................................Section 6.06(b)
TNEH UK .............................................................................................Preamble
TNESI ...................................................................................................Preamble
████████████████ .....................................................................████████
Trade Secrets............................................................................................Exhibit A
Trademarks...............................................................................................Exhibit A
Transaction Accounting Principles ..............................................................Exhibit A
Transaction Agreements ............................................................................Exhibit A
Transaction Dispute ..................................................................Section 13.13
Transactions ............................................................................................Exhibit A
Transfer Taxes .........................................................................................Exhibit A
Transformation Plan..................................................................................Exhibit A
Undisclosed Contract ...............................................................Section 2.04(d)
U.S. .......................................................................................................Exhibit A
U.S. Debtors............................................................................................Exhibit A
U.S. Group ..............................................................................................Exhibit A
Used ......................................................................................................Exhibit A
VAT .......................................................................................................Exhibit A
██████████████████ .................................................................████████
WECHOL ............................................................................Preliminary Statements
WECHOL Shares ................................................................Preliminary Statements
Wind Down Co .......................................................................................Exhibit A

28

**EXHIBIT B**

**FORM OF JOINDER**

**[see attached]**

FINAL

## EXHIBIT B

## FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT, dated [●], 2018, by [●], a [●], (the "**Wind Down Co**") to the Plan Funding Agreement (defined below) among TSB Nuclear Energy Services Inc. ("**TNESI**"), Toshiba Nuclear Energy Holdings (UK) Limited ("**TNEH UK**" and, together with TNESI, "**Companies**" and, each, a "**Company**"), and Brookfield WEC Holdings LLC, a Delaware limited liability company ("**Plan Investor**" and, together with Companies, the "**Parties**").

## RECITALS

WHEREAS, the Parties entered into that certain Plan Funding Agreement, dated as of January 12, 2018 (the "**Plan Funding Agreement**"), attached as Exhibit A hereto; and

WHEREAS, Recital F of the Plan Funding Agreement contemplates that immediately prior to the Closing of the Plan Funding Agreement, Wind Down Co will execute and deliver to the Parties a joinder agreement substantially in the form of Exhibit B thereto.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Wind Down Co hereby agrees as follows:

1.      Joinder of Plan Funding Agreement. By executing this Joinder Agreement, Wind Down Co hereby consents and agrees to become a party to and be bound by and subject to all of the terms of the Plan Funding Agreement as if it was an original signatory thereto, and shall be deemed to be a "Party" (as defined in the Plan Funding Agreement) thereunder and entitled to all of the rights that apply to such Party and assume and be subject to all of the obligations of such Party thereunder as fully as if Wind Down Co were one of its original parties.

2.      Defined Terms.  Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Plan Funding Agreement.

3.      Representations and Warranties.  Wind Down Co has received a copy of the Plan Funding Agreement and has read and understands the terms of the Plan Funding Agreement.

4.      Full force and Effect.  All of the terms and conditions of the Plan Funding Agreement remain in full force and effect.

5.      Notices.  All Notices provided to Wind Down Co shall be sent or delivered to the following:

Wind Down Co
[●]

6.    <u>Governing Law.</u>  THIS JOINDER AGREEMENT WILL BE EXCLUSIVELY GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE GOVERNING LAW SET FORTH IN SECTION 13.13 OF THE PLAN FUNDING AGREEMENT.

7.    <u>Severability</u>.  Any term or provision of this Joinder Agreement that is held by a court of competent jurisdiction or arbitrator to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the invalid, void, or unenforceable term or provision in any other situation or in any other jurisdiction.  If the final judgment of such court or arbitrator declares that any term or provision hereof is invalid, void or unenforceable, the parties agree to reduce the scope, duration, are or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the original intention of the invalid or unenforceable term or provision.

8.    <u>Headings</u>.  The descriptive headings contained in this Joinder Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Joinder Agreement.


[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, Wind Down Co has executed and delivered this Joinder Agreement as of the date first above written.

**[●]**

By: _____

Name:

Title:

*[Joinder Agreement]*

3

**<u>EXHIBIT A</u>**

4

WEIL:\96403571\5\80768.0017

**EXHIBIT C**

**EMPLOYEE MATTERS AGREEMENT**

**[see attached]**

## EXHIBIT C

## PROJECT RUBICON
## EMPLOYEE MATTERS

SECTION 1.    Employment of All Covered Employees.

(a)    *Employment with the Reorganized Companies.*  All Covered Employees (including, without limitation, those on leave of absence or disability) shall become employees of the Reorganized Companies or an Affiliate of the Reorganized Companies by operation of Law.   For purposes of this Exhibit C, any individual who becomes employed by the Reorganized Companies or an Affiliate of the Reorganized Companies (including the Reorganized Company Group Members) in accordance with this Exhibit C is referred to as a "Continuing Employee."

(b)    *Employee Representative Agreements*.  Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies (including the Reorganized Company Group Members) to, consistent with applicable Law, honor all collective bargaining, works council or other similar written employee representative agreements that cover any Continuing Employees.  Such collective bargaining, works council, and other similar written employee representative agreements covering Continuing Employees are collectively referred to as "Labor Agreements." The Plan Investor shall further cause the Reorganized Companies, or an Affiliate of the Reorganized Companies (including the Reorganized Company Group Members) to, honor all obligations to any Continuing Employees under any Labor Agreements.   In addition, the Plan Investor shall cause the Reorganized Companies, or an Affiliate of the Reorganized Companies (including the Reorganized Company Group Members) to, recognize and bargain in good faith with the applicable representative bodies.

SECTION 2.    Continuing Employees and Employee Plans.

(a)    *Liabilities*.  Effective as of the Closing, the Plan Investor shall cause the Reorganized Companies, or an Affiliate of the Reorganized Companies (including the Reorganized Company Group Members) to, assume or retain, as the case may be, any and all liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Continuing Employee, whether arising before, on or after the Closing, including for purposes of clarity any liabilities related to any Employee Plans as provided in Section 2(b) hereof.

(b)    *Employee Plans*.  Effective as of the Closing, the Plan Investor shall cause the Reorganized Companies, or an Affiliate of the Reorganized Companies to, assume each Employee Plan, including all assets and liabilities thereof, whenever arising, other than the Excluded Employee Plans.  For purposes of this Exhibit C, "Excluded Employee Plans" shall mean such Employee Plans as are specified on Schedule 1 attached hereto.

SECTION 3.    <u>Continuing Employees – Additional Employment Terms</u>.

(a)        *Terms and Conditions of Employment*.  For a period of at least twelve (12) months following the Closing Date, each Continuing Employee not covered by a Labor Agreement shall be entitled to receive, while in the employ of the Reorganized Companies or their Affiliates, at least the same salary, wages and cash incentive compensation opportunities (including annual and long-term cash incentive opportunities) as were provided to such employee immediately prior to the Closing Date by the Company Group Members; provided that, in the case of such cash incentive compensation opportunities, such comparison shall be based on the most recent ordinary course cash incentive compensation opportunities provided to such Continuing Employee (other than the Key Employee Retention Plan and Key Employee Incentive Plan adopted by Westinghouse Electric Company LLC), whether or not in place immediately prior to the Closing Date.  The Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies to provide, for a period of at least twelve (12) months following the Closing Date, each Continuing Employee not covered by a Labor Agreement with employee benefits (excluding incentive compensation, equity arrangements, deferred compensation arrangements, retention arrangements, and defined benefit pension plans) no less favorable in the aggregate than the employee benefits provided to such Continuing Employee immediately prior to the Closing Date (excluding incentive compensation, equity arrangements, deferred compensation arrangements, retention arrangements and defined benefit pension plans). Without limitation of the foregoing, the Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies to, honor and maintain (i) the Employee Plans that are retention and milestone plans as of the date hereof pursuant to the terms thereof, and (ii) the severance benefit plans set forth on <u>Schedule 2</u> pursuant to the terms thereof for at least twelve (12) months following the Closing, and shall not during such period terminate or amend such plans in any manner materially adverse to eligible current or former Covered Employees. Following the Closing, Plan Investor shall not and shall cause its Affiliates not to, reduce or eliminate any retiree health or life insurance benefits provided to any current or former Covered Employee or to which any current or former Covered Employee has or will have a right. For Continuing Employees covered by a Labor Agreement, the Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies to, provide the salary, benefits, and other terms and conditions of employment required under such applicable Labor Agreement.

(b)        *Credit for Service*.    The Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies to, credit Continuing Employees for service earned on and prior to the Closing Date with the Company Group Members or predecessors to the extent that such service was recognized for the same purpose under an analogous Employee Plan immediately prior to the Closing, in addition to service earned with the Reorganized Companies and their Affiliates on or after the Closing Date, (i) to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or the calculation of benefits under any employee benefit plan, program or arrangement of the Reorganized Companies or any of their Affiliates for the benefit of the Continuing Employees on or after the Closing Date (including, without

2

limitation, for purposes of the severance benefit plans set forth on <u>Schedule 2</u> attached hereto) and (ii) for such additional purposes as may be required by applicable Law; <u>provided</u>, <u>however</u>, that nothing herein shall result in a duplication of benefits with respect to the Continuing Employees.

(c)       *Pre-existing Conditions; Coordination*.  The Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies to, use commercially reasonable efforts to waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Continuing Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of the Reorganized Companies or any of their Affiliates for the benefit of the Continuing Employees on or after the Closing Date.  The Plan Investor shall cause the Reorganized Companies or an Affiliate of the Reorganized Companies to, credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Continuing Employees, deductibles, co-insurance, co-pays and out-of-pocket expenses paid by Continuing Employees and their respective spouses and dependents under Companies' or any of their Affiliates' health plans in the calendar year in which the Closing Date occurs.

SECTION 4.    <u>International Continuing Employees</u>.

In the event applicable Law requires treatment of Continuing Employees or Employee Plans that differs from the treatment set forth in this <u>Exhibit C</u>, such applicable Law shall govern.

SECTION 5.    <u>Impermissibility; Good Faith</u>.

In the event that any provision hereof is not permissible under any applicable Law or practice, the Parties agree that they shall in good faith take such actions as are permissible under such Law or practice to carry out to the fullest extent possible the purposes of such provision.

SECTION 6.    <u>Consultation with Employee Representative Bodies</u>.

The Parties shall, and shall cause their respective Affiliates to, mutually cooperate in undertaking all reasonably necessary or legally required provision of information to, or consultations, discussions or negotiations with, employee representative bodies (including any unions or works councils) that represent any Covered Employee.

SECTION 7.    <u>Employee Data Protection</u>.

(a)       "<u>Company Personal Data</u>" means any information relating to an identified or identifiable natural person that (i) is obtained by Plan Investor or any of its Affiliates from Companies or any of their Affiliates or Representatives, (ii) is processed by Plan Investor or any of its Affiliates on behalf of Companies' or any of their Affiliates, (iii) pertains to the personnel of Companies or any of their Affiliates, or (iv) is created by Plan

3

Investor or any of its Affiliates based on information of the types referred to in any of clauses (i), (ii), or (iii) above.

(b)    Plan Investor shall, and shall cause its Affiliates to, comply with all applicable Laws regarding the maintenance, use, sharing and processing of Company Personal Data, including (i) compliance with any applicable requirements to provide notice to, or obtain consent from, the data subject for processing of Company Personal Data after the Closing Date, and (ii) taking any other steps necessary to comply with applicable data protection Laws, including the execution of any separate agreements with Companies or their Affiliates to facilitate the lawful processing of certain Company Personal Data (such agreements to be executed before or after the Closing Date, as necessary).

(c)    Plan Investor shall, and shall cause its Affiliates to, share and otherwise process Company Personal Data only on a need-to-know basis, only as legally permitted and only to the extent necessary to perform its obligations under the Transaction Agreements or Companies' or their Affiliates' further written instructions. Plan Investor shall, and shall cause its Affiliates to, use reasonable, technical and organizational measures to ensure the security and confidentiality of Company Personal Data in order to prevent, among other things, accidental, unauthorized or unlawful destruction, modification, disclosure, access or loss. Plan Investor agrees that, before the Closing Date, neither it nor its Affiliates shall disclose any Company Personal Data to third parties without the express written approval of Companies or the relevant Affiliate, unless required by applicable Law. Plan Investor or one of its Affiliates shall promptly inform Companies and their Affiliates of any breach of this security and confidentiality undertaking, unless prohibited from doing so by applicable Law.

SECTION 8.    Communications.

Prior to making any material written communications to officers of the Company Group Members or to Covered Employees generally that pertain to compensation or benefit matters contemplated by this Agreement, Companies shall provide Plan Investor with a copy of the intended communication, Plan Investor shall have a reasonable period of time to review and comment on the communication, and the Companies shall accept comments received from the Plan Investor that are reasonable.

SECTION 9.    No Third Party Beneficiaries.

Notwithstanding the provisions of this Exhibit C or any provision of the Agreement, nothing in this Exhibit C or the Agreement, except as provided in (c) below, is intended to and shall not (a) create any third party rights, (b) amend any employee benefit plan, program, policy or arrangement, (c) require Plan Investor or any of its Affiliates or Companies or any of their Affiliates to continue any employee benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified, except as set forth in Section 3(a) hereof or (d) provide any Covered Employee or any Continuing Employee with any third party beneficiary rights to continued employment or to any particular term or condition of employment.

4

## Schedule 1

Westinghouse Electric Company Executive Pension Plan

Westinghouse Electric Company Executive Retirement Plan

Westinghouse Electric Company Deferred Compensation Plan

Amended and Restated Employment between Daniel Roderick and Westinghouse
Electric Company LLC effective June 21, 2016 and Letter re: Secondment to Toshiba
Corporation and Supplement to Employment Agreement dated June 21, 2016.

5

## Schedule 2

**Severance Plans**

1.  Westinghouse Electric Company Executive Involuntary Separation Policy

2.  Westinghouse Electric Company Involuntary Separation Plan

3.  Westinghouse Electric Company Employee Security & Protection Plan for Union-Represented Employees

4.  Voluntary Severance Terms for Springfields Fuels Limited and Westinghouse Electric UK Holdings Limited – December 2017

6

**EXHIBIT D**

**TERMS OF ASSET PURCHASE AGREEMENT**

**[see attached]**

**Exhibit D**

**Summary of Material Changes with Respect to Conversion to
Stock and Asset Purchase Agreement ("SAPA") and Related Documents**

| TOPIC | MATERIAL TERMS |
|---|---|
| *General* | Buyer to acquire substantially all of the assets of U.S. Debtor entities and all subsidiaries of TNEH UK and the non-Debtor U.S. entities (the "Transferred Entities"). |
| **DEFINITIONS** | |
| *Purchase Price* | Base Purchase Price + Transferred Entity Cash – Transferred Entity Debt +/- Working Capital Increase (decrease) + Solvency Tax Adjustment (which may be a negative number) |
| *Base Purchase Price* | $3.652 billion |
| *Purchase Price Adjustments:* | |
| • *Acquired Company Cash (+)* | No change for Transferred Entities. |
| • *Solvency Plan (-)* | No change – Transferred Entities to be made solvent subject to PFA parameters. |
| • *Acquired Company Debt (-)* | Change to Transferred Entity Debt; Debt of U.S. Debtors will be an excluded liability. |
| • *Net Working Capital (+/-)* | No change to PFA. |
| • *Target Working Capital* | $183 million |

| TOPIC | MATERIAL TERMS |
|---|---|
| • *Post-Closing Adjustment Threshold* | No change to PFA. |
| *Cure Costs* | No change to PFA. |
| *Sellers' Transaction Expenses* | Included in Debt for Transferred Entities, no Debt of the Debtors will be assumed. |
| *Purchase Price Deposit* | No change to PFA. |
| *Holdbacks (-)* | No change to PFA. |
| **STRUCTURE** | |
| *US* | Buyer (or its designated affiliates) acquires substantially all of the U.S. Debtors' assets. |
| *Int'l* | No change to PFA. |
| *Delayed Assignment* | Assignment of contracts at closing will be delayed until required third party consents are obtained and benefits and burdens will be passed along to Buyer. |
| *Purchase Price Allocation* | Customary purchase price allocation. |
| **ALLOCATION OF ASSETS** | |
| *Transferred Assets* | No change to PFA (i.e. all or substantially all of the Debtors' assets). |
| *Assumed Liabilities* | No change to PFA. |
| *Excluded Assets* | No change to PFA. |

| TOPIC | MATERIAL TERMS |
|---|---|
| *Excluded Liabilities* | No change to PFA. |
| **REPRESENTATIONS AND WARRANTIES (COMPANIES)** | No material changes to PFA.  To include representations and warranties that cover the Business, Transferred Assets and Transferred Entities. |
| **REPRESENTATIONS AND WARRANTIES (PLAN INVESTOR)** | No change to PFA. |
| **ADDITIONAL AGREEMENTS** | |
| *Interim Operating Covenants* | No material change to PFA. |
| *Regulatory Matters* | No change to PFA. |
| *Guarantees & L/Cs* | No change to PFA; provided, that the Parties will negotiate in good faith to provide that the applicable guarantees provided by Debtors to non-Debtor entities will be replaced or addressed in connection with the transaction. |
| *Insurance* | Reasonable mutual cooperation covenant to obtain benefits of insurance policies with respect to assumed liabilities and liabilities of acquired companies. |
| *Use of Westinghouse Name* | Sellers covenant not to use Buyer name or marks. |
| *Intercompany Obligations* | Intercompany obligations to be settled in a manner reasonably satisfactory to Buyer and Sellers, including by means of offset, contribution, distribution, payment or otherwise. |
| **CONDITIONS TO CLOSING (Article XI)** | |

| TOPIC | MATERIAL TERMS |
|---|---|
| *Bringdown of Reps & Warranties/Covenants* | No change to PFA. |
| *Governmental Approvals / Notices* | Consent schedule to be revised in good faith to reflect asset sale structure. |
| *Third-Party Approvals* | Subject to negotiation in good faith of revised consent schedule in asset sale structure.  Parties will use bankruptcy process to minimize Debtor consents. |
| **BANKRUPTCY PROVISIONS** | Same as PFA, but adjusted for SAPA (e.g. "Confirmation Order" replaced with "Sale Order") |
| **TERMINATION** | |
| *Outside Date* | No change to PFA. |
| *Termination Fee* | No change to PFA. |
| *Break-Up Fee/Expense Reimbursement* | No change to PFA, with appropriate adjustments to triggers to address revised bankruptcy milestone closing conditions. |
| **MISCELLANEOUS** | |
| *Survival* | No change to PFA. |
| *Limitation of Liability* | No change to PFA. |
| *Expenses* | Seller expenses not paid prior to Closing to be treated as Debt and deducted from the purchase price to the extent the Buyer is obligated to pay. |
| *Assignment* | No change to PFA. |
| ███████ | No change to PFA. |
| *Returned Cash* | No change to PFA. |

| TOPIC | MATERIAL TERMS |
|---|---|
| | |
| **EMPLOYEE MATTERS** | No change to PFA or Exhibit C (Employee Matters Agreement) of PFA, subject to any adjustments required to account for the revised asset sale structure, including without limitation:<br><br>Covered Employees (as defined in the PFA) shall either transfer to the Buyer or an Affiliate as a matter of law or Buyer shall or shall cause an Affiliate to make an offer of employment to Covered Employees no later than thirty (30) days prior to the Closing Date. Each offer of employment for an individual who is not represented by a union shall provide for (i) at least the same base salary or wage rate as was provided to such employee immediately prior to the Closing Date, (ii) at least the same annual and long-term cash incentive opportunities as were provided to such employee immediately prior to the Closing Date (other than the Key Employee Retention Plan and Key Employee Incentive Plan), provided that such comparison shall be based on the most recent ordinary course cash incentive compensation opportunities provided to such Covered Employee, whether or not in place immediately prior to the Closing Date, and (iii) benefits (excluding incentive compensation, equity arrangements, deferred compensation arrangements, retention arrangements and defined benefit pension plans) no less favorable in the aggregate than the benefits provided to such employee immediately prior to the Closing Date. Offers of employment to union employees shall be in accordance with the applicable collective bargaining agreement.  Buyer shall assume the obligation to contribute to the multiemployer plans and appropriate provisions shall be added to the Employee Matters Agreement to avoid triggering a withdrawal.  Buyer shall take all necessary actions under Section 4204 of ERISA so that the transactions do not constitute a partial withdrawal or complete withdrawal under a multiemployer plan.  Prior to the Closing Date, Buyer shall take or cause its Affiliates to take such actions in writing as are necessary to adopt and assume sponsorship of the Assumed Employee Plans (as defined in the PFA) as of the Closing Date, and to effectuate the provisions of the Employee Matters Agreement. Buyer shall provide copies of such actions in writing at least fifteen (15) business days prior to the Closing Date, for review and comment by the Companies, and Buyer shall accept comments received from the Companies that are reasonable. |
| **TAX MATTERS** | |
| *Transfer Taxes* | No change to PFA. |
| *Tax Returns* | Buyer generally controls with respect to Transferred Entities, (i) preparation of relevant Tax returns, (ii) Tax contests and (iii) Tax elections. |
| *Payment of Taxes* | Subject to the Solvency Tax Adjustment, Buyer shall bear and be responsible for (i) Taxes of the Transferred Entities for all Tax periods, and (ii) Taxes on assets of Sellers that are not Excluded Assets for post-Closing Tax periods.<br><br>Sellers retain Tax assets of the Sellers, and rights to refunds and other recoveries of Sellers' Taxes.<br><br>Other customary Tax provisions. |

| TOPIC | MATERIAL TERMS |
|---|---|
| **FINANCING MATTERS** | |
| *Marketing Period* | No change to PFA. |
| *Financial Statements* | No change to PFA. |
| *Equity Commitment Letters* | No change to PFA. |
| *Limited Guarantee* | No change to PFA. |
| **PLAN TERM SHEET** | N/A |

## Exhibit B

**Cash Pool Claims**

**Cash Pool Claims[1]**

| # | Cash Pool Claimant | Debtor against which Claim is Asserted | Claim Asserted ($USD) | Proof of Claim # | Indemnity Claim Against WEC |
|---|---|---|---|---|---|
| 1. | Westinghouse Electric UK Holdings Limited | WEC | $9,227,416.95[2] | 2200 | No |
| 2. | Nuclear Fuel Industries Ltd. | WEC | $26,803,401.13 | 3255 (amending 2126) | Yes |
| 3. | Westinghouse Electric Japan Limited | WEC | $213,871.67 | 2135 | Yes |
| 4. | Astare | WEC | $788,960.13 | 2162 | Yes |
| 5. | TNEE Electric Sweden Holdings AB (assigned from Westinghouse Electric Sweden AB) | WEC | $104,249,358.19 | 2145 | Yes |
| 6. | Westinghouse Service Nucleaire[3] | WEC | $12,954,208.14 | 2160 | Yes |
| 7. | Westinghouse Electric UK Holdings Limited (assigned from Westinghouse Electric Spain, S.A.U.) | WEC | $8,731,567.74 | 2200 | No |
| 8. | Westinghouse Electric Belgium SA | WEC | $7,448,464.45 | 2159 | Yes |
| 9. | Westinghouse Electric Germany GmbH | WEC | $63,007,880.34 | 2163 | Yes |
| 10. | Springfield Fuels Limited | WEC | $36,734,087.93 | 2176 | Yes |
| 11. | Uranium Asset Management Limited | WEC | $199,789,337.48 | 3031 | Yes |
| 12. | Westinghouse Electric Czech Republic s.r.o. | WEC | $1,590,749.88 | 2302 | No |

---

[1]  Each listed contract, purchase order, or invoice referenced therein also incorporates by reference any and all related documents including, without limitation, any and all amendments, change orders, contracts, purchase orders, invoices, or assignments of any of the foregoing.

[2]  Plus any interest, fees, or other amounts accrued following the termination of the Cash Pool Agreement.

[3]  Since the filing of its Cash Pool Claim, Westinghouse Service Nucleaire has merged with Westinghouse Electrique France SAS.

**Exhibit C**

**Released TNEH UK Claims**

**Released TNEH UK Claims[1]**

| # | EMEA Subsidiary which Claim is or may be Asserted against | Estimated Amount (as of the date hereof) ($USD)[2] | Description of Claim |
|---|---|---|---|
| 1. | Westinghouse Electric UK Limited | $134,371,910 | Loan Agreement between Westinghouse Electric UK Limited and TNEH UK dated September 30, 2006 |
| 2. | TSB (Investment Europe) Limited | $197,605,750 | Loan Agreement between Westinghouse Electric UK Limited and TNEH UK dated September 30, 2006 |
| 3. | Uranium Asset Management Limited | $295,135,910 | Loan Agreement between Westinghouse Electric UK Limited and TNEH UK dated September 30, 2006 |
| 4. | Mangiarotti S.p.A. | $24,641,757 | Any and all claims under credit agreements between Mangiarotti S.p.A. and TNEH UK dated November 16, 2017 and December 11, 2017, and any other similar agreements entered into prior to the Effective Date |
| 5. | Various borrowers under the LFA | $117,412,359 | Any and all claims of TNEH UK against an EMEA Subsidiary arising under the LFA on or prior to the Effective Date |

---

[1]  Each listed contract, purchase order, or invoice referenced therein also incorporates by reference any and all related documents including, without limitation, any and all amendments, change orders, contracts, purchase orders, invoices, or assignments of any of the foregoing.

[2]  The amounts listed herein may change based on accrual of interest, additional borrowings, or fluctuating foreign exchange rates. For the avoidance of doubt, on the Effective Date, TNEH UK shall waive any and all claims associated with agreements described above.

**Exhibit D**

**Released Toshiba Claims**

**Released Toshiba Claims**[1]

| # | Toshiba Entity | EMEA Subsidiary which Claim is or may be Asserted against | Amount (as of the date hereof) ($USD) | Description of Claim |
|---|---|---|---|---|
| 1. | Toshiba Corporation | Westinghouse Electric UK Holdings Limited | $359,352,441.00[2] | Second Amended and Restated Parent Guaranty Made by Toshiba Corporation in Favor of BNP Paribas, dated as of October 7, 2009, as Amended and Restated on November 10, 2011, and as further Amended and Restated as of December 11, 2015 |
| 2. | Toshiba Corporation | Westinghouse Electric Sweden AB | $45,399,000[3] | Surety Bond to PRI Pensionsgaranti in respect of Westinghouse Electric Sweden AB Pension Plan |

---

[1]   Each listed contract, purchase order, or invoice referenced therein also incorporates by reference any and all related documents including, without limitation, any and all amendments, change orders, contracts, purchase orders, invoices, or assignments of any of the foregoing.

[2]   Any amounts paid by Toshiba Corporation or drawn from the collateral account funded by Toshiba Corporation under the guaranty will be waived and released.

[3]   The amounts listed herein may change based on foreign exchange rates. For the avoidance of doubt, on the Effective Date, Toshiba shall waive any and all claims associated with the agreement described above.

**<u>Exhibit E</u>**

**Class 3B General Unsecured Claims**

**Allowed Class 3B General Unsecured Claims[1]**

| # | Contract | Claimant | Debtor against which Claim is Asserted | Allowed Amount of Claim[2] | Proof of Claim # |
|---|----------|----------|----------------------------------------|----------------------------|------------------|
| 1. | Engineering, Procurement and Construction Agreement dated as of April 8, 2008 (including all amendments thereto) | Consenting Claimholder, as assignee of Toshiba Corporation | WECTEC Global Project Services, Inc. | $1.00 | 2132 |
| 2. | Engineering, Procurement and Construction Agreement dated as of April 8, 2008 (including all amendments thereto) | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $1.00 | 2222 |
| 3. | Currency Trading Cancellation Fees | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $669,226.66 | 3010-A-1 (as amended by 3459) |
| 4. | AIG Surety Bond Guarantee and General Agreement of Indemnification | Consenting Claimholder, as assignee of Toshiba Corporation | WEC; WEC Carolina Energy Solutions, LLC; and any and all debtors which are principals or direct or indirect beneficiaries of any surety bond issued by AIG | $1,047,475.48[3] | 3010-A-2 (as amended by 3459) |
| 5. | Parent Guarantee of Westinghouse Electric Company LLC Property in Cranberry Township, Pennsylvania | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | Unknown[4] | 3010-A-3 (as amended by 3459) |

---

[1]    Each listed contract, purchase order, or invoice referenced therein also incorporates by reference any and all related documents including, without limitation, any and all amendments, change orders, contracts, purchase orders, invoices, or assignments of any of the foregoing.

[2]    The Class 3B General Unsecured Claims set forth on this Exhibit E shall be Allowed on the Effective Date in the amounts set forth herein; *provided, however,* that the Consenting Claimholder, the Debtors and the Plan Investor shall cooperate in good faith before the Plan Effective Date to adjust the Allowed amount of Class 3B General Unsecured Claims or allocate distributions with respect to Allowed Class 3B General Unsecured Claims under the Plan in a manner that is beneficial to the Reorganized Debtors; *provided, however,* that such good faith cooperation shall not require the Consenting Claimholder to allocate value in a manner that is materially adverse to the Consenting Claimholder.

[3]    The total amount paid by Toshiba Corporation under the guarantee for proof of claim number 3010-A-2 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

| 6. | Parent Guarantee of Hematite Site Decommissioning Project | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | Unknown[5] | 3010-A-4 (as amended by 3459) |
| 7. | Parent Guaranty in Favor of Florida Power Corporation d/b/a Progress Energy Florida, Inc. and Duke Energy Florida, Inc. | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | Unknown[6] | 3010-A-5 (as amended by 3459) |
| 8. | Toshiba Guaranty of Master Equipment Leasing Agreement dated as of March 27, 2013, dated as of February 14, 2017, and Security and Collateral Account Agreement on behalf of MHCB America Leasing Corporation dated as of March 31, 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | Unknown[7] | 3010-A-6 (as amended by 3459) |
| 9. | Toshiba Guaranty of Master Equipment Leasing Agreement dated as of March 31, 2014, dated as of February 14, 2017, Security and Collateral Account Agreement on behalf of MHBK (USA) Leasing & Finance LLC dated as of March 31, 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | Unknown[8] | 3010-A-7 (as amended by 3459) |

---

[4]  The total amount paid by Toshiba Corporation under the guarantee for proof of claim number 3010-A-3 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

[5]  The total amount paid by Toshiba Corporation under the guarantee for proof of claim number 3010-A-4 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

[6]  The total amount paid by Toshiba Corporation under the guaranty for proof of claim number 3010-A-5 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

[7]  The total amount paid by GNFT Corporation under the guaranty for proof of claim number 3010-A-6 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

[8]  The total amount paid by GNFT Corporation under the guaranty for proof of claim number 3010-A-7 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

ii

| 10. | Second Amended and Restated Parent Guaranty Made by Toshiba Corporation in Favor of BNP Paribas, dated as of October 7, 2009, as Amended and Restated on November 10, 2011, and as further Amended and Restated as of December 11, 2015 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC; and any and all Debtors which are principals or direct or indirect beneficiaries of any letter of credit issued by BNP Paribas or another financial institution | $359,352,441.00[9] | 3010-A-8 (as amended by 3459) |
| --- | --- | --- | --- | --- | --- |
| 11. | Guarantee Agreement by Toshiba Corporation on Behalf of CBS Corporation, dated as of October 18, 2006 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | Unknown[10] | 3010-A-9 (as amended by 3459) |
| 12. | Guaranty Agreement dated as of April 8, 2008 by Toshiba Corporation in favor of Georgia Power Company, for itself and as agent for Oglethorpe Power Corporation (An Electric Membership Corporation), Municipal Electric Authority of Georgia, and the City of Dalton, Georgia, as Amended and Supplemented | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $3,680,000,000 | 3010-A-10 (as amended by 3459) |
| 13. | Guaranty Agreement dated as of May 23, 2008 by Toshiba Corporation in favor of South Carolina Electric & Gas Company, for itself and as agent for the South Carolina Public Service Authority, as Amended and Supplemented | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $2,168,000,000 | 3010-A-11 (as amended by 3459) |
| 14. | Recharge Invoice for V.C. Summer Project LC from April 2016-March 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $479,719.12 | 3060-A-3 |

---

[9]    The total amount paid by Toshiba Corporation or drawn from the collateral account funded by Toshiba Corporation under the guaranty for proof of claim number 3010-A-8 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim.

[10]    The total amount paid by Toshiba Corporation under the guarantee for proof of claim number 3010-A-9 as of the Effective Date will be considered an Allowed Class 3B General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

| 15. | Additional Recharge Invoice for V.C. Summer Project LC from January 2017-March 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $1,021.79 | 3060-A-4 |
| 16. | Recharge Invoice for Vogtle Project LC from July 2016-March 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $9,705,123.71 | 3060-A-5 |
| 17. | Promissory Note dated as of February 13, 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $150,266,749.46 | 3044-A-1 |
| 18. | Promissory Note dated as of February 6, 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $100,177,857.67 | 3044-A-2 |
| 19. | Promissory Note dated as of March 24, 2016 | Consenting Claimholder, as assignee of Toshiba Corporation | TNEH UK | $4,267,157.00 | 3044-A-3 |
| 20. | Promissory Note dated as of March 29, 2017 | Consenting Claimholder, as assignee of Toshiba Corporation | TNEH UK | $6,600,420.55 | 3044-A-5 |
| 21. | Engineering, Procurement and Construction Agreement dated as of April 23, 2008 (including all amendments thereto) | Citigroup Financial Products Inc. | WEC | To be determined | 2440 and 3088 (as amended by 3437 and 3438)[11] |
| 22. | Engineering, Procurement and Construction Agreement dated as of April 23, 2008 (including all amendments thereto) | Citigroup Financial Products Inc. | WECTEC Global Project Services, Inc. | To be determined | 2444 and 3089 (as amended by 3448)[12] |

---

[11] Claim may be Allowed in an amount to be determined to the extent not withdrawn in accordance with this Plan.

[12] Claim may be Allowed in an amount to be determined to the extent not withdrawn in accordance with this Plan.

iv

**Exhibit F**

**Allowed Class 3B General Unsecured Claims**
**(Subordinated to all other Allowed Class 3B General Unsecured Claims)**

**Allowed Class 3B General Unsecured Claims**
**(Subordinated to all other Allowed Class 3B General Unsecured Claims[1]**

| # | Contract | Claimant | Debtor against which Claim is Asserted | Allowed Amount of Claim[2] | Proof of Claim # |
|---|----------|----------|----------------------------------------|---------------------------|------------------|
| 1. | Promissory Note recorded as of September 3, 2008 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $22,555,731.08 | 3044-A-4 |
| 2. | Loan Agreement dated as of September 30, 2006 | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $269,839,166.25 | 3044-A-6 |
| 3. | Loan Agreement dated as of September 30, 2006 | Consenting Claimholder, as assignee of Toshiba Corporation | U.S. HoldCo | $138,053,869.40 | 3044-A-7 |
| 4. | Cash Pool Agreement | Consenting Claimholder, as assignee of Toshiba Corporation | WEC | $650,000,000.00[3] | 2200 (as may be amended) |

---

[1]    Each listed contract, purchase order, or invoice referenced therein also incorporates by reference any and all related documents including, without limitation, any and all amendments, change orders, contracts, purchase orders, invoices, or assignments of any of the foregoing.

[2]    The Class 3B General Unsecured Claims set forth on this Exhibit F shall be Allowed on the Effective Date in the amounts set forth herein; *provided, however,* that the Consenting Claimholder, the Debtors and the Plan Investor shall cooperate in good faith before the Plan Effective Date to adjust the Allowed amount of Class 3B General Unsecured Claims or allocate distributions with respect to Allowed Class 3B General Unsecured Claims under the Plan in a manner that is beneficial to the Reorganized Debtors; *provided, however,* that such good faith cooperation shall not require the Consenting Claimholder to allocate value in a manner that is materially adverse to the Consenting Claimholder.

[3]    Plus any interest, fees, or other amounts accrued following the termination of the Cash Pool Agreement.

**<u>Exhibit G</u>**

**Toshiba GUC Claims**

**Toshiba GUC Claims**[1]

| # | Contract | Toshiba Claimant | Debtor against which Claim is Asserted | Allowed Amount of Claim[2] | Proof of Claim # |
|---|---|---|---|---|---|
| 1. | [Invoice and Purchase Orders for ANO Laser Peening and Laguna Verde Projects from December 2015-Jan 20217] | [Toshiba Technical Services International Corporation] | [WEC] | [$947,290.00[3]] | [839] |
| 2. | Purchase Order No. 4500293688 for Vogtle Steam Turbine Generator, Purchase Order No. 4500293689 for VC Summer Steam Turbine Generator, Purchase Order No. 4500318728 for VC Summer Generator Step Up Transformer | Toshiba America Energy Systems Corporation | WEC | $2,363,308.57 | 2408 |
| 3. | Invoices for Purchase Order No. 4500707836 and Purchase Order No. 4500711935 for Support Labor Reactor Side Work from January 2017-April 2017 | TurbinePROS, LLC | WEC Carolina Energy Solutions, Inc. | $956,231.99 | 2409 |

---

[1]   Each listed contract, purchase order, or invoice referenced therein also incorporates by reference any and all related documents including, without limitation, any and all amendments, change orders, contracts, purchase orders, invoices, or assignments of any of the foregoing.

[2]   Notwithstanding anything else in this Plan, the allowance of any Toshiba GUC Claim is subject to the applicable claimant becoming a party to the Plan Support Agreement. If the applicable claimant becomes a party to the Plan Support Agreement, such claim shall be Allowed on the Effective Date in the amounts set forth herein or as otherwise agreed between the applicable claimant and the Debtors.

[3]   This amount represents the amount asserted by the applicable claimant(s) against the applicable Debtor(s) in the applicable proof of claim, and is subject to adjustment based upon a separate settlement which will be documented and approved by the Bankruptcy Court as required under the Bankruptcy Code and the Bankruptcy Rules. Notwithstanding anything else herein, the Debtors are not agreeing to allow this claim in the asserted amount.

| 4. | Purchase Order No. 132176-D100.CA008 for CA01 Module Fabrication for Vogtle Unit 4, Purchase Order No. 132178-D100.CA008 for CA01 Module Fabrication for VC Summer Unit 3, Purchase Order No. 132176-G230.M0202 and Purchase Order No. 132176-G230.M0204 for Installation of ASME III Penetrations-Stub AP1000 for Vogtle Unit 4, Purchase Order No. 132178-G230.M0202 and Purchase Order No. 132178-G230.M0204 for Installation of ASME III Penetrations-Stub AP1000 for VC Summer Unit 3 | Toshiba America Nuclear Energy Corporation | WECTEC Global Project Services Inc. | $30,401,483.70 | 2415 |
|---|---|---|---|---|---|
| 5. | Invoices for Purchase Order No. 132177-2432 for Turbine Installation Work from March 2017-April 2017 | TurbinePROS, LLC | WECTEC Contractors Inc. | $819,506.27 | 2422 |
| 6. | Invoices for Purchase Order No. 1321752004-2108 for Turbine Installation Work from March 2017-April 2017 | TurbinePROS, LLC | WECTEC Global Project Services Inc. | $1,294,115.47 | 2428 |
| 7. | Invoices for VC Summer Turbine Building Unit 3 East Basemat Reinforcement, Embed and Piping Placement Demonstration Project from February 2017-March 2017 | Toshiba America Energy Systems Corporation | WECTEC Global Project Services Inc. | $24,384.86 | 2449 |
| 8. | Invoices for services performed from January 2017-March 2017 | Toshiba Logistics America, Inc. | WEC | $230,826.62 | 3002 |
| 9. | Joint Professional Services Invoice | [Toshiba Corporation] | TNEH UK | $500,000.00[4] | 3060-A-1 |
| 10. | Invoice for GOLD Training Program | Toshiba Human Resources Development Corporation | WEC | $94,830.69 | 3060-A-2 |
| 11. | [Letter Seeking Reimbursement for Additional Incurred Cost for ANO Laser Peening Projected dated as of March 4, 2016] | [Toshiba Corporation] | [WEC] | [$1,066,000.00[5]] | [3060-A-7] |

---

[4]    The amount of the professional services retainer actually drawn by TNEH UK shall be considered an Allowed Claim

ii

| 12. | Change to Purchase Order No. 4500663503 dated as of March 12, 2015, revised as of August 18, 2015 for milestone of Unit 2 | Toshiba Corporation | WEC | $1,153,909.00 | 3060-A-8 |
| 13. | Change Notice 35 to Purchase Order No. 4500442015 dated as of July 17, 2012, revised as of February 22, 2017 and Invoice dated as of February 28, 2017 | Toshiba Corporation | WEC | $368,646.52 | 3060-A-9 |
| 14. | Invoice for Purchase Order No. 4500442015 dated as of July 17, 2012, revised as of September 20, 2012, dated as of March 27, 2017 for Milestone 13 | Toshiba Corporation | WEC | $406,738.79 | 3060-A-10 (as amended by 3198 and 3260) |
| 15. | Invoice dated as of February 28, 2017 Purchase Order No. 4500714676 dated as of February 17, 2017 for SiC Fuel Cladding Test Tubes | Toshiba Corporation | WEC | $500.00 | 3060-A-11 (as amended by 3198 and 3260) |
| 16. | Purchase Order No. 4500690391 dated as of April 1, 2016 for Engineering Services | Toshiba Corporation | WEC | $748,000.00 | 3060-A-12 |
| 17. | [Purchase Order No. 4500698379 dated as of July 19, 2016 for Laser Peening Equipment] | [Toshiba Corporation] | [WEC] | [$1,200,000.00[6]] | [3060-A-13] |
| 18. | Change to Purchase Order No. 4500442015 dated as of July 17, 2012, revised as of February 22, 2017 and Invoice dated as of February 28, 2017 for CRD Parts Engineering Services | Toshiba Corporation | WEC | $420,000.00 | 3060-A-14 (as amended by 3198 and 3260) |
| 19. | Change to Purchase Order No. 4500663503 dated as of March 12, 2015, revised as of June 10, 2016, and Invoice dated as of September 30, 2016 Regarding Timer for Laguna Verde | Toshiba Corporation | WEC | $11,000.00 | 3060-A-15 |

---

[5]    This amount represents the amount asserted by the applicable claimant(s) against the applicable Debtor(s) in the applicable proof of claim, and is subject to adjustment based upon a separate settlement which will be documented and approved by the Bankruptcy Court as required under the Bankruptcy Code and the Bankruptcy Rules.  Notwithstanding anything else herein, the Debtors are not agreeing to allow this claim in the asserted amount.

[6]    This amount represents the amount asserted by the applicable claimant(s) against the applicable Debtor(s) in the applicable proof of claim, and is subject to adjustment based upon a separate settlement which will be documented and approved by the Bankruptcy Court as required under the Bankruptcy Code and the Bankruptcy Rules.  Notwithstanding anything else herein, the Debtors are not agreeing to allow this claim in the asserted amount.

iii

| 20. | Change to Purchase Order No. 4500694834 dated as of May 31 2016, revised as of August 19, 2016 and Invoice dated as of February 6, 2017 Regarding Additional Scope of Core Barrel for Summer Unit 3 | Toshiba Corporation | WEC | $60,000.00 | 3060-A-16 |
|-----|-----|-----|-----|-----|-----|
| 21. | Invoice for 10% of Purchase Order Amount Receipt at Portsmouth and Change Notices 10, 15, 16, and 17 | Toshiba Corporation | WEC | $379,400.00 | 3060-A-17 (as amended by 3198 and 3260) |
| 22. | Purchase Order No. 4500299006, dated as of March 31, 2009 for RVI Mockup Storage, Invoice dated as of March 8, 2017 | Toshiba Corporation | WEC | $7,350.00 | 3060-A-18 |
| 23. | Purchase Order No. 4500298465 Change Notice 9 for Cost Compensation Beyond Original Scope | Toshiba Corporation | WEC | $142,121.00 | 3060-A-19 (as amended by 3198 and 3260) |
| 24. | Purchase Order 4500318728, dated as of Sept 24, 2009 and Westinghouse Proprietary AP1000 Supply Chain Management General Terms and Conditions Revised June 3, 2008, and Appendix 1.2 and 2.0. | Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba America Nuclear Energy Corporation | WEC | Unknown[7] | 3060-A-20 |
| 25. | Purchase Order 4500293689, dated as of Feb 17, 2009 and Westinghouse Proprietary AP1000 Supply Chain Management General Terms and Conditions Revised June 3, 2008, and Appendix 1.2 and 2.0 | Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba America Nuclear Energy Corporation | WEC | Unknown[8] | 3060-A-21 |

[7] The total liquidated claim accrued by Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba North America Nuclear Energy Corporation related to Proof of Claim number 3060-A-20 as of the Effective Date will be considered an Allowed Class 3A General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

iv

| 26. | Purchase Order 4500318727, dated as of Sept 24, 2009 and Westinghouse Proprietary AP1000 Supply Chain Management General Terms and Conditions Revised June 3, 2008, and Appendix 1.2 and 2.0 | Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba America Nuclear Energy Corporation | WEC | Unknown[9] | 3060-A-22 |
| 27. | Purchase Order 4500293688, dated as of Feb 17, 2009 and Westinghouse Proprietary AP1000 Supply Chain Management General Terms and Conditions Revised June 3, 2008, and Appendix 1.2 and 2.0 | Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba America Nuclear Energy Corporation | WEC | Unknown[10] | 3060-A-23 |
| 28. | Toshiba Classic Sponsorship Invoice | Toshiba America Inc. | WEC | $70,000.00 | 3198 and 3260 (amending 3060 to add this claim as A-24) |

---

[8]    The total liquidated claim accrued by Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba North America Nuclear Energy Corporation related to Proof of Claim number 3060-A-21 as of the Effective Date will be considered an Allowed Class 3A General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

[9]    The total liquidated claim accrued by Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba North America Nuclear Energy Corporation related to Proof of Claim number 3060-A-22 as of the Effective Date will be considered an Allowed Class 3A General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

[10]    The total liquidated claim accrued by Toshiba Corporation, Toshiba America Energy Systems Corporation, and Toshiba North America Nuclear Energy Corporation related to proof of claim number 3060-A-23 as of the Effective Date will be considered an Allowed Class 3A General Unsecured Claim, and any and all other amounts claimed shall be deemed Disallowed.

v

**<u>Exhibit H</u>**

**Pension Funding Agreement**

WEIL:\96403338\14\80768.0017

Execution Version

## SETTLEMENT AND PENSION FUNDING AGREEMENT

This Settlement and Pension Funding Agreement (this "**Agreement**"), dated as of January 26, 2018 (the "**Execution Date**"), by and between Westinghouse Electric Company LLC, a Delaware limited liability company ("**WEC US**"), Brookfield WEC Holdings LLC, a Delaware limited liability company ("**Plan Investor**"), Nucleus Acquisition LLC ("**Consenting Claimholder**"), a Delaware limited liability company, Pension Benefit Guaranty Corporation ("**PBGC**" and together with WEC US, Consenting Claimholder and Plan Investor, each a "**Party**" and collectively the "**Parties**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the term sheet attached as Exhibit A hereto (as amended, restated, modified, supplemented or superseded from time to time, the "**Plan Term Sheet**").

## RECITALS

A.    PBGC is a wholly owned United States government corporation and agency of the United States that administers the pension plan insurance program established under Title IV of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), 29 U.S.C. §§ 1301-1416 (2012 & Supp. IV 2016).

B.    WEC US sponsors the following defined benefit pension plans: Westinghouse Electric Company Pension Plan, Westinghouse Pension Plan for Newington Boilermakers, and Westinghouse Pension Plan for Windsor Boilermakers (each a "**Plan**" and collectively, the "**Plans**").

C.    Each Plan is an "employee pension benefit plan" as that term is defined in 29 U.S.C. § 1002(2), has been determined by the Secretary of the Treasury to be a plan described in 26 U.S.C. § 401(a), is a plan to which 29 U.S.C. § 1321(a) applies, is not exempt under 29 U.S.C. § 1321(b), and therefore is subject to Title IV of ERISA.

D.    WEC US and certain of its direct and indirect subsidiaries and affiliates (the "**Debtors**") commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on March 29, 2017.

E.    PBGC has asserted the claims against the Debtors in the Chapter 11 Cases, including but not limited to the claims set forth in proofs of claim number 1985, 1991, 1996, 1998, 2001, 2004, 2009, 2012, and 2015 (the "**PBGC Claims**").

F.    Consenting Claimholder has agreed to acquire from Toshiba Corporation ("**Toshiba**") certain other claims against the Debtors in the Chapter 11 Cases.

G.    Plan Investor has agreed under that certain Plan Funding Agreement dated January 12, 2018 (as amended, restated, modified, supplemented or superseded from time to time, the "**Plan Funding Agreement**") to acquire (a) newly issued equity interests in TSB Nuclear Energy Services Inc. and (b) the issued and outstanding equity interests in Westinghouse Electric UK Holdings Limited, each after giving effect to the transactions contemplated by the Plan Funding Agreement and the chapter 11 plan and other transaction agreements described therein (such

transactions, the "**Plan Investment**").  Plan Investor is relying on the obligations of the other Parties under this Agreement in order to make the Plan Investment.

H.    The Parties have engaged in arm's-length, good-faith discussions regarding a series of transactions to restructure the Debtors, as contemplated and outlined in that certain Plan Support Agreement, dated January 17, 2018 (as amended, restated, modified, supplemented or superseded from time to time, the "**PSA**") and the Plan Term Sheet (such transactions, together with the transactions contemplated hereby and by the Chapter 11 Plan Documents (as defined below), the "**Restructuring**"), pursuant to a chapter 11 plan for the Debtors substantially in accordance with the terms of the Plan Term Sheet (as amended, restated, modified, supplemented or superseded from time to time, the "**Chapter 11 Plan**" and together with any related agreements or documents related thereto, the "**Chapter 11 Plan Documents**"), which shall be effective upon entry of an order of the Bankruptcy Court confirming the Chapter 11 Plan and the satisfaction or waiver of any conditions to the effectiveness thereof (the date of such effectiveness, the "**Plan Effective Date**").

I.    PBGC has raised concerns that PBGC's possible long run loss with respect to each Plan may reasonably be expected to increase unreasonably as a result of the Chapter 11 Plan.

J.    After discussions among the Parties, and in furtherance of the Restructuring and to resolve PBGC's concerns, the Debtors, Consenting Claimholder and Plan Investor have reached an understanding with PBGC, under which, *inter alia*, WEC US will continue to maintain the Plans on and after the Plan Effective Date, and certain contribution payments will be made directly to the Plans in excess of those required by law.

Accordingly, the Parties agree as follows:

Article 1:    <u>Fixed Excess Contributions to the Plans; Additional Terms</u>

1.1    Effective as of the Plan Effective Date, WEC US (after giving effect to the Restructuring) shall continue to be the sponsor of the Plans.

1.2    The Chapter 11 Plan shall provide that the following cash contributions to the Plans shall be made at the times and in the amounts indicated, regardless of whether such contributions would otherwise be required by ERISA or the Internal Revenue Code of 1986, as amended (the "**IRC**") at the times and/or in the amounts set out here:

(a)    One (1) business day after the Plan Effective Date, WEC US shall contribute an aggregate amount of $100,000,000 in cash, from the proceeds of the transactions described in the Plan Funding Agreement, to one or more of the Plans, which funds shall be paid from cash otherwise allocable under the Chapter 11 Plan to the holders of Allowed Class 3B General Unsecured Claims.  WEC US may elect to increase the prefunding balance (as defined in 26 U.S.C. § 430(f)(6)) (a "**Prefunding Balance**") of any such Plan to any extent allowed by ERISA by reason of making contribution(s) under this <u>subsection (a)</u>.

(b)    On or promptly following the Final Distribution Date, an aggregate amount equal to 5% of any remaining Segregated Funds in the Segregated Account that would otherwise be allocable under the Chapter 11 Plan to the holders of Allowed Class 3B General Unsecured

Claims will be contributed to one or more of the Plans (or to WEC US for such contribution). WEC US shall not elect to create or increase the Prefunding Balance of any Plan by using (i) all or any part of any such contribution, or (ii) all or any portion of any excess described in 26 U.S.C. § 430(f)(6)(B) that is attributable to any such contribution. Notwithstanding anything to the contrary in this Agreement, this covenant not to so elect is continuing and will survive termination of this Agreement.

The contributions required by <u>subsections (a)</u> and <u>(b)</u> will be apportioned to one, two or all of the Plans in a manner to be determined by WEC US in its sole discretion, as settlor of the Plans. The Consenting Claimholder will be deemed to waive any entitlement under the Chapter 11 Plan to such contributions.

    1.3    WEC US shall pay in full in cash the 2018 PBGC flat-rate and variable-rate premiums when due in respect of the Plans (estimated to be in the approximate amount of $5 million).

    1.4    WEC US shall provide PBGC with a copy of the annual actuarial valuation report prepared for each Plan, within 30 days after receipt by WEC US.

    1.5    WEC US shall provide PBGC with a copy of each Plan's trust asset report as of December 31 of each year, within 30 days after such report is received by WEC US.

    1.6    WEC US shall provide PBGC with the written notices and information that PBGC would be entitled to receive if PBGC were a member of the private side lending syndicate for WEC US's senior secured first lien term loan facility and any refinancing thereof, including unrestricted access to any electronic data rooms established by WEC US for such members, when such notices and information are provided to any such member.

    1.7    Upon payment of the cash contribution under <u>Article 1.2</u> <u>subsection (a)</u>, PBGC hereby releases Toshiba and its subsidiaries and affiliates (after giving effect to the Restructuring) from any and all claims and obligations of any types relating to the Plans, whether arising before, at or after the Plan Effective Date.

    1.8    On the Plan Effective Date, each of the PBGC Claims shall be deemed permanently and irrevocably withdrawn and PBGC shall not be entitled to any property or distributions in respect thereof, except for the payments required to be paid to the Plans under <u>Article 1.2</u> hereof and to PBGC under <u>Article 1.3</u> hereof.

    1.9    WEC US's obligations under the terms of this Agreement will not be affected by any change in any Plan's contributing sponsor or in the membership of any such contributing sponsor's controlled group, as those terms are defined in Title IV of ERISA, except that the Parties shall, in connection with any such change that is not contemplated by the Plan Funding Agreement, discuss reasonable modifications to this Agreement or the Chapter 11 Plan, as applicable, to ensure the continued fair and reasonable application of this Agreement. Nothing in this Agreement (other than <u>Article 1.7</u>) will affect PBGC's ability to exercise any right, seek any remedy, or enforce any provision under Title IV of ERISA or other applicable law in connection with any contemplated or consummated transaction associated with any such change that is not contemplated by the Plan

Funding Agreement (other than the PBGC Claims or claims subject to the Release) after the Plan Effective Date.

**Article 2:        Informational and Reporting Requirements**

2.1        The Chapter 11 Plan Documents shall provide that documentation evidencing the amount and date of each contribution made pursuant to Article 1.2 shall be provided to PBGC and WEC US within five (5) business days after each such contribution.

**Article 3:        Agreement Release**

3.1        This Agreement will terminate and WEC US's obligations hereunder will cease five years after the Plan Effective Date (the "**Agreement Release Date**"); provided, that no such termination of this Agreement will affect any rights or obligations under Articles 1.2, 1.3 or 4.1.

3.2        Effective upon the Agreement Release Date, and in consideration of WEC US's complete performance of the terms, conditions, mutual covenants and agreements set forth herein, the adequacy and sufficiency of which are hereby acknowledged, PBGC, on its own behalf, and in every other capacity in which it may then act, will be deemed to have released WEC US and Plan Investor (and their respective controlled group members) from the obligations under this Agreement except as otherwise specified herein.

**Article 4:        Forbearance**

4.1        Without limiting the provisions of Article 1.7, PBGC shall forbear from taking any action under 29 U.S.C. § 1342(a)(4) or under any other provision of ERISA to initiate proceedings (a) before the Plan Effective Date to terminate any Plan on any basis, and (b) on and after the Plan Effective Date to terminate any Plan on the sole basis of consummation of the Restructuring. Notwithstanding the immediately preceding sentence, nothing in this Agreement limits PBGC's right to initiate and complete an involuntary termination of any Plan that is based solely on PBGC's determination (in accordance with then-applicable legal standards) that (y) such Plan "does not have assets available to pay benefits which are currently due under the terms of the plan" within the meaning of 29 U.S.C. § 1342(a) and (z) PBGC is therefore required to initiate termination proceedings pursuant to 29 U.S.C. § 1342(a).

**Article 5:        PBGC's Agreement to Support the Restructuring and Plan Investment**

5.1        As long as this Agreement has not been terminated pursuant to the terms hereof, PBGC agrees to:

(a)        to the extent PBGC is entitled to vote and is solicited, (i) timely vote or cause or direct to be voted all of its claims (as defined in the Bankruptcy Code) and interests in the Debtors' estates in favor of the Chapter 11 Plan by delivering its duly executed and completed ballot or ballots accepting such Chapter 11 Plan on a timely basis, and (ii) not change or withdraw (or cause or direct to be changed or withdrawn) such vote;

(b)        not take any action inconsistent in any material respect with, or intended to impede approval and consummation of the Restructuring;

4

(c)     not directly or indirectly object to, delay, impede or take any other action to materially interfere with acceptance, confirmation, consummation or implementation of this Agreement, the Restructuring, the Chapter 11 Plan, the Plan Investment or the Plan Investor Protections;

(d)     not directly or indirectly seek, solicit, encourage, formulate, consent to, propose, file, support, negotiate, participate in or vote for any restructuring, workout, plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, or sale of assets of or in respect of the Debtors other than the Chapter 11 Plan and Plan Investment, or encourage or cause any party to do any of the foregoing;

(e)     not file or support any motion with the Bankruptcy Court seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization; (iv) directing the appointment of a trustee pursuant to section 1104 of the Bankruptcy Code; (v) directing the appointment of an examiner pursuant to section 1104 of the Bankruptcy Code; (vi) seeking an appointment of any additional statutory committees of creditors, equity holders or other purported parties in interest under section 1102 of the Bankruptcy Code; or (vii) granting any relief inconsistent with the this Agreement, the PSA, the Plan Term Sheet, the Plan Funding Agreement, and/or the Chapter 11 Plan Documents; and

(f)     not object to or otherwise oppose any request by the Debtors for an extension of their exclusive periods to file and/or solicit acceptances of a plan of reorganization.

5.2     For the avoidance of doubt, nothing in this Agreement shall bind PBGC in its capacity as a member of the Official Committee of Unsecured Creditors in the Bankruptcy Cases.

**Article 6:     <u>Termination</u>**

6.1     This Agreement may be terminated by any Party upon prior written notice delivered to the other Parties upon the occurrence of any of the following events (each a "**Termination Event**"):

(a)     the failure of non-terminating Party to comply with the material terms hereof; or

(b)     termination of the Plan Funding Agreement, in accordance with its terms.

6.2     <u>Mutual Termination</u>.  This Agreement may be terminated by the mutual consent of the Parties.

6.3     <u>No Termination for Non-Compliance</u>.  No Party may validly terminate this Agreement based upon its failure to perform or comply in any material respect with the terms and conditions of this Agreement, the Plan Support Agreement, the Plan Funding Agreement or any of the Chapter 11 Plan Documents, to the extent such Chapter 11 Plan Document is effective, with such failure to perform or comply causing, or resulting in, the occurrence of one or more

Termination Events specified herein.  Nothing in this Article 6 shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date.

6.4    Effect of Termination.  Within three (3) business days following the delivery of a termination notice pursuant to Article 6.1 hereof, each of the Parties may together waive, in writing, the occurrence of the Termination Event identified in the termination notice.  Absent such waiver, this Agreement shall be terminated on the fourth (4th) business day following delivery of the termination notice (such date, the "**Termination Date**"); provided, however, any of the Parties shall be entitled to a retroactive nullification of the termination if it requests a judgment that the termination was invalid and procures an order granting such relief on or before the fourth (4th) business day following delivery of the termination notice.  On the Termination Date, the provisions of this Agreement shall terminate, except as otherwise provided herein; provided that if WEC US (after giving effect to the Restructuring) has assumed the Plans and the contribution described in Article 1.2 subsection (a) has been made, Article 4.1 shall be continuing and will survive termination of this Agreement.

6.5    Automatic Stay.  For the avoidance of doubt, each of the Parties hereby waives any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and shall not object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the provision of any such notice); provided, however, that nothing in this paragraph shall prejudice any Party's rights to argue that the termination was not proper under the terms of this Agreement.

6.6    Toshiba.  Notwithstanding any provision of this Agreement, unless otherwise agreed in writing by Toshiba, Article 1.7 shall survive the termination or other expiration or amendment of this Agreement.

**Article 7:        Representations and Warranties; Additional Covenants**

7.1    Subject to any necessary approval of the Bankruptcy Court, each of WEC US, Plan Investor and Consenting Claimholder hereby represents and warrants to PBGC that each of the following (as applicable) is true and correct as to it on the Execution Date:

(a)    Its execution, delivery, and performance of this Agreement has been duly authorized by all necessary company action;

(b)    Its execution and delivery of this Agreement, performance of its respective obligations hereunder, and compliance with the terms and provisions hereof (i) will not violate in any material respect any law applicable to it or any of its respective properties, the consequences of which violation could reasonably be expected to have a material adverse effect on its ability to perform its obligations hereunder, and (ii) will not violate any material contract or agreement which is binding on it, or its properties, or result in a breach of or constitute (with due notice, lapse of time or both) a default under any indenture, agreement, lease, or other instrument to which it is a party;

(c)    This Agreement has been duly executed by an authorized officer or other authorized representative; and

(d)    This Agreement constitutes a legal, valid, and binding contract and agreement enforceable by PBGC against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principals of equity.

7.2    PBGC hereby represents and warrants to WEC US, Plan Investor, and Consenting Claimholder that each of the following is true and correct as of the Execution Date:

(a)    PBGC is a wholly owned United States government corporation established under Title IV of ERISA.

(b)    PBGC has full power and authority to enter into and perform its obligations under this Agreement and to carry out and consummate the transactions contemplated by this Agreement.

(c)    PBGC's execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate action and are within PBGC's statutory authority.

(d)    PBGC's execution and delivery of this Agreement, PBGC's performance of its obligations hereunder, PBGC's consummation of the transactions contemplated hereby and PBGC's compliance with the terms and provisions hereof will not violate any law applicable to PBGC.

(e)    This Agreement has been duly executed by an authorized officer or other authorized representative of PBGC.

(f)    This Agreement constitutes a legal, valid, and binding contract and agreement of PBGC enforceable against PBGC in accordance with its terms.

(g)    PBGC has concluded that this Agreement adequately addresses its concerns regarding possible long run loss with respect to each Plan in connection with the Restructuring.

7.3    <u>Cooperation and Support</u>.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the transactions contemplated herein.  Furthermore, subject to the terms of this Agreement, each Party shall execute and deliver any other agreements or instruments, seek regulatory approvals and take other similar actions outside of the Chapter 11 Cases as may be reasonably appropriate or necessary, from time to time, to carry out the purposes and intent of this Agreement or to effectuate the solicitation of the Chapter 11 Plan, the Chapter 11 Plan and/or the Restructuring, as applicable, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement or the Plan Term Sheet.

**Article 8:    <u>General Provisions.</u>**

8.1    This Agreement is intended to be and is for the sole and exclusive benefit of the Parties and the Parties' respective successors and permitted assigns; <u>provided</u>, that Toshiba is an intended third-party beneficiary solely with respect to <u>Articles s 1.7</u>, 1.9,<u>4,5, and 6</u> of this Agreement.  Neither WEC US, Consenting Claimholder nor Plan Investor may (a) assign its rights

under this Agreement in whole or in part or (b) delegate any of its duties hereunder, in either case without the express prior written consent of PBGC. Any such assignment or delegation made without such consent will automatically be null and void ab initio. Nothing expressed or mentioned in or to be implied from this Agreement gives any person or entity other than WEC US, any other members of the Debtors' controlled group (as defined in 29 U.S.C. § 1301(a)(14) (but only with respect to Articles 1.3 and 4.1), Toshiba, Plan Investor, Consenting Claimholder and PBGC any legal or equitable right, remedy, or claim against the Parties under or with respect to this Agreement.

8.2    All notices, demands, instructions, and other communications required or permitted under this Agreement to any Party must be in writing and must be personally delivered or sent by facsimile or pre-paid recognized overnight delivery service with confirmed receipt, and will be deemed to be given for purposes of this Agreement on the date the writing is received by the intended recipient. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Article 8.2, all such notices, demands, instructions and other communications must be addressed to the Parties as indicated below:

> To PBGC:
>
>> Director
>> Corporate Finance and Restructuring Department
>> Pension Benefit Guaranty Corporation
>> 1200 K Street, N.W., Ste. 270
>> Washington, D.C. 20005-4026
>> Facsimile:    (202) 842-2643
>> Email:        SAcompliance@pbgc.gov
>
> with a copy to (which shall not constitute notice except as provided in Article 8.3):
>
>> Office of the General Counsel
>> Pension Benefit Guaranty Corporation
>> 1200 K Street, N.W., Ste. 300
>> Washington, D.C. 20005-4026
>> Facsimile:    (202) 326-4112
>> Attention:    Lori Butler
>>               Damarr Butler
>> Email:        butler.lori@pbgc.gov
>>               butler.damarr@pbgc.gov
>
> To WEC US:
>
>> Westinghouse Electric Company LLC
>> 1000 Westinghouse Drive
>> Cranberry Township, Pennsylvania 16066
>> Attention: Michael T. Sweeney
>> Email: sweenemt@westinghouse.com

with a copy to (which shall not constitute notice):

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue,
      New York, New York 10153
      Attention:    Gary T. Holtzer
                    Robert J. Lemons
                    Garrett A. Fail
                    David N. Griffiths
      Facsimile:    (212) 310-8007
      Email:    gary.holtzer@weil.com
                    robert.lemons@weil.com
                    garrett.fail@weil.com
                    david.griffiths@weil.com

To Plan Investor:

      Brookfield WEC Holdings LLC
      c/o Brookfield Capital Partners LLC
      250 Vesey Street, 15th Floor
      New York, New York 10281
      Facsimile:    [●]
      Attention:    Ron Bloom
                    Mark Weinberg
      E-mail:    ron.bloom@brookfield.com
                    mark.weinberg@brookfield.com

with a copy to (which shall not constitute notice):

      Willkie Farr & Gallagher LLP
      787 Seventh Avenue
      New York, New York 10119
      Attention:    Matthew A. Feldman
                    John C. Longmire
      E-mail:    mfeldman@willkie.com
                    jlongmire@willkie.com

To Consenting Claimholder:

      Nucleus Acquisition LLC
      c/o BRP Partners II, Inc., c/o The Baupost Group, L.L.C.
      10 St. James Avenue, Suite 1700
      Boston, MA 02116
      Attn:    Josh Greenhill
                Frederick Fogel
      Email:    jag@baupost.com

ffogel@baupost.com

with a copy to (which shall not constitute notice):

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019
> Attn:      Alan Kornberg
>             Kyle Kimpler
> Email:    akornberg@paulweiss.com
>             kkimpler@paulweiss.com

8.3    This Agreement may be executed in one or more counterparts and by different Parties on separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile or emailed PDF file (to the email address(es) above for WEC US, Plan Investor or Consenting Claimholder; to butler.lori@pbgc.gov and butler.damarr@pbgc.gov for PBGC) will be equally as effective as delivery of an original executed counterpart of this Agreement.

8.4    This Agreement contains the complete and exclusive statement of the agreement and understanding by and among the Parties.  This Agreement supersedes all prior agreements, understandings, commitments, representations, communications, and proposals, oral or written, between the Parties relating to the subject matter hereof.  This Agreement may not be amended, modified, or supplemented except by an instrument in writing executed by the Parties.

8.5    This Agreement is not and shall not be construed as or deemed to be an admission or concession by or on the part of any Party or Toshiba of any liability or non-liability in connection with any matter described in the Agreement.  The basis for this Agreement is the desire of the Parties to resolve the controversy between them without litigation.

8.6    The failure of any Party to enforce any provision of this Agreement will not constitute a waiver of such Party's right to enforce that provision of this Agreement.

8.7    In this Agreement, unless specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation"; and references to articles, subsections, clauses or exhibits are to those of this Agreement.  Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole and not merely to any subdivision in which such words appear unless the context otherwise requires.  Headings in this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.  A reference herein to any statute is deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise.

8.8    Except to any extent preempted by federal law, the laws of the State of New York (without regard to its conflicts of laws rules) will govern all matters relating to this Agreement.

10

8.9    The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  Nor will any rule of construction that favors a non-draftsman be applied.

8.10    This Agreement is not a document or instrument governing any Plan, nor does anything in this Agreement amend, supplement, or derogate from the documents and instruments governing any Plan.  Nothing in this Agreement alters, amends, or otherwise modifies the operation or administration of any Plan.

8.11    Except to any extent expressly stated herein, nothing in this Agreement restricts the authority of any Plan's fiduciaries to invest such Plan's assets, or restricts the authority of WEC US, as such Plan's sponsor, to amend, merge, or terminate such Plan, or to transfer assets and liabilities between such Plan and another pension plan.

8.12    This Agreement shall be effective on the Execution Date.

* * * *

IN WITNESS WHEREOF, the Parties have executed this Agreement below.

WESTINGHOUSE ELECTRIC COMPANY LLC


By: _____
Name:  Marc Beilinson
Title:    Authorized Signatory


BROOKFIELD WEC HOLDINGS LLC

By:  Brookfield Capital Partners LLC, its managing member


By: _____
Name:  Ron Bloom
Title:  Vice Chairman & Managing Partner


By: _____
Name:  Mark Weinberg
Title:  Managing Partner

8.9    The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  Nor will any rule of construction that favors a non-draftsman be applied.

8.10    This Agreement is not a document or instrument governing any Plan, nor does anything in this Agreement amend, supplement, or derogate from the documents and instruments governing any Plan.  Nothing in this Agreement alters, amends, or otherwise modifies the operation or administration of any Plan.

8.11    Except to any extent expressly stated herein, nothing in this Agreement restricts the authority of any Plan's fiduciaries to invest such Plan's assets, or restricts the authority of WEC US, as such Plan's sponsor, to amend, merge, or terminate such Plan, or to transfer assets and liabilities between such Plan and another pension plan.

8.12    This Agreement shall be effective on the Execution Date.

* * * *

IN WITNESS WHEREOF, the Parties have executed this Agreement below.

WESTINGHOUSE ELECTRIC COMPANY LLC

By:_____
Name:
Title:

BROOKFIELD WEC HOLDINGS LLC

By:  Brookfield Capital Partners LLC, its managing member

By: _____
Name:  Ron Bloom
Title:  Vice Chairman & Managing Partner

By: _____
Name:  Mark Weinberg
Title:  Managing Partner

PENSION BENEFIT GUARANTY CORPORATION

By:_____

Name: Karen L. Morris
Title:  Chief of Negotiations & Restructuring


NUCLEUS ACQUISITION LLC

By: BRP Partners II, Inc.
Its: Manager


By:_____
Name:
Title:

PENSION BENEFIT GUARANTY CORPORATION


By:_____
Name:
Title:


NUCLEUS ACQUISITION LLC

By: BRP Partners II, Inc.
Its: Manager


By:_____
Name: Joshua Greenhill
Title: Vice President


12

**<u>Exhibit I</u>**

**Assumed Liabilities**

## Assumed Liabilities[1]

The "**Assumed Liabilities**" consist solely of the following Liabilities of Debtors:

i.   all Liabilities in the amounts that have been reserved against and to the extent taken into account in the calculation of the items set forth on the Final Closing Statement;

ii.   all Liabilities of any Debtor with respect to performance under any of the Designated Contracts, assumed by Debtors pursuant to the Plan, in each case, to the extent arising after the Closing and all other Liabilities with respect thereto that arise from any events, facts or circumstances (including any breach or course of conduct) that occur after the Closing;

iii.   all Liabilities for (a) Taxes of the U.S. Debtors for Post-Closing Tax Periods and (b) Transfer Taxes allocated to the Plan Investor pursuant to Section 10.01;

iv.   all Liabilities relating to the Reorganized Debtors' ownership or operation of the Business Assets, to the extent arising from events, facts or circumstances that occur following the Closing;

v.   all decommissioning Liabilities arising before, on or after the Closing;

vi.   all Liabilities expressly assumed by the Reorganized Debtors pursuant to Exhibit C of the Plan Funding Agreement;

vii.   all Liabilities to indemnify or hold harmless any current or former director or officer of an Acquired Company for claims that relate to periods prior to or following the Closing; and

viii.   all Liabilities of Debtors to the extent arising on or after the Closing under the Transaction Documents; and Liabilities under Environmental Laws to investigate, cleanup, remediate, respond, remove, report, monitor or take similar actions with respect to the Owned Real Property or Leased Real Property (together with (to the extent of such Debtor's interest therein) all buildings, structures, improvements and fixtures thereon) on and after the Closing Date, regardless of whether the conditions giving rise to such Liabilities were known or unknown or existed before, on or after the Closing Date, and which Liabilities do not constitute "claims," as that term is defined in section 101 of the Bankruptcy Code.

---

[1] All capitalized terms in this Exhibit I shall have the meaning ascribed to such terms in the Plan Funding Agreement, and all Section references in this Exhibit I are references to Sections of the Plan Funding Agreement.

## Exhibit J

**Excluded Assets**

**Excluded Assets[1]**

1. Excess Cash of the Debtors (excluding in all respects all Regulator Cash and Returned Regulator Cash) in excess of $35,000,000; *provided*, *however*, that the amount of Excess Cash shall be calculated, for purposes of the Plan, without regard to the cap contained in the proviso in the definition of "Excess Cash" in the Plan Funding Agreement.

2. All Excluded Contracts.

3. All BNP Cash.

---

[1] All capitalized terms in this Exhibit J shall have the meaning ascribed to such terms in the Plan Funding Agreement.