**Presentment Date and Time: June 26, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: June 19, 2018 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): June 26, 2018 at 11:00 a.m. (Eastern Time)**

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail
David N. Griffiths
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re:                                                     :      **Chapter 11**
                                                           :
**WESTINGHOUSE ELECTRIC COMPANY**                          :      **Case No. 17-10751 (MEW)**
**LLC**, *et al.*,                                         :
                                                           :
          Debtors.[1]                                      :      **(Jointly Administered)**
                                                           :
------------------------------------------------------------ x

# NOTICE OF PRESENTMENT OF SUPPLEMENTAL APPLICATION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a), FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AUTHORITY TO EXPAND THE RETENTIONS OF DELOITTE CONSULTING LLP NUNC PRO TUNC TO JANUARY 19, 2018 AND DELOITTE FINANCIAL ADVISORY SERVICES LLP NUNC PRO TUNC TO FEBRUARY 9, 2018

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster, Inc. d/b/a WECTEC Global Project Services Inc. (8572), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961). The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

PLEASE TAKE NOTICE that on **June 26, 2018 at 10:00 a.m. (Eastern Time)**, the undersigned will present the annexed *Supplemental Application of the Debtors Pursuant To 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Expand the Retentions of Deloitte Consulting LLP Nunc Pro Tunc to January 19, 2018 and Deloitte Financial Advisory Services LLP Nunc Pro Tunc to February 9, 2018* (the "**Supplemental Application**") to the Honorable Michael E. Wiles, United States Bankruptcy Judge, in Room 617 of the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York, 10004 (the "**Bankruptcy Court**").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Supplemental Application (the "**Objections**") must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and the *Order pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing certain Notice and Case Management Procedures* [ECF No. 101] so as to be received no later than **June 19, 2018 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Supplemental Application, the Debtors may, on or after the Objection

2

Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Supplemental Application, which order may be entered with no further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that if one or more Objections are received by the Objection Deadline, the Bankruptcy Court may enter an order granting the relief requested in the Motion, except for relief that impacts any party with a pending Objection, and that if a written Objection is timely filed and served, a hearing (the "**Hearing**") will be held to consider such Objection(s) before the Honorable Michael E. Wiles in the Bankruptcy Court, on **June 26, 2018 at 11:00 a.m. (Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: New York, New York
June 12, 2018

/s/ *Robert J. Lemons*
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail
David N. Griffiths
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

3

Presentment Date and Time: June 26, 2018 at 10:00 a.m. (Eastern Time)
Objection Deadline: June 19, 2018 at 4:00 p.m. (Eastern Time)
Hearing Date and Time (Only if Objection Filed): June 26, 2018 at 11:00 a.m. (Eastern Time)

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail
David N. Griffiths
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------- x | | |
| In re: | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY** | : | **Case No. 17-10751 (MEW)** |
| **LLC,** *et al.*, | : | |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |
| ------------------------------------------------------------- x | | |

**SUPPLEMENTAL APPLICATION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a), FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AUTHORITY EXPAND THE RETENTIONS OF DELOITTE CONSULTING LLP NUNC PRO TUNC TO JANUARY 19, 2018 AND DELOITTE FINANCIAL ADVISORY SERVICES LLP NUNC PRO TUNC TO FEBRUARY 9, 2018**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster, Inc. d/b/a WECTEC Global Project Services Inc. (8572), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961). The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

Westinghouse Electric Company LLC and certain debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent in support of this supplemental application (the "**Supplemental Application**"):

## Background

1.      On March 29, 2017 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

2.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      On March 28, 2018, the Court entered an order [ECF No. 2988] confirming the Debtors' *Modified Second Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 2986] (the "**Plan**").

4.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Lisa J. Donahue Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [ECF No. 4], sworn to and filed on the Petition Date.

5.      On August 11, 2017, the Debtors filed an application, pursuant to sections 327(a) and 328 (a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules

2

2014-1 and 2016-1, to employ and retain Deloitte Financial Advisory Services LLP ("**Deloitte FAS**") as their financial advisory services provider *nunc pro tunc* to the Petition Date [ECF No. 1129] (the "**Deloitte FAS Application**").

6.      On September 5, 2017 the Court entered an order approving the FAS Retention Application on a final basis [ECF No. 1299] (the "**FAS Retention Order**").

7.      On March 12, 2017, the Debtors filed an application, pursuant to sections 327(a) and 328 (a) of the Bankruptcy Code, Rules 2014(a) and 2016 of the Bankruptcy Rules and Local Rules 2014-1 and 2016-1, to employ and retain Deloitte Consulting LLP ("**Deloitte Consulting**") as a consultant *nunc pro tunc* to September 8, 2017 [ECF No. 2809] (the "**Deloitte Consulting Application**" and, together with the Deloitte FAS Application the "**Original Applications**").

8.      Thereafter, on March 27, 2017, the Bankruptcy Court entered an order approving the Deloitte Consulting Retention Application [ECF No. 2972] (the "**Deloitte Consulting Retention Order**" and, together with the Deloitte FAS Retention Order, the "**Original Retention Orders**").

## **Jurisdiction**

9.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

## **Relief Requested**

10.      The Debtors seek authority pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, to expand the retentions and employments of: (a) Deloitte Consulting *nunc pro tunc* to January 19, 2018 to include the services set forth in the parties' work order, dated January 19, 2018, attached hereto as **Exhibit A** (the "**Additional Consulting Services SOW**"); and (b) Deloitte FAS *nunc*

3

*pro tunc* to February 9, 2018 to include the services set forth in the parties' work order, dated February 9, 2018, attached hereto as **Exhibit B** (the "**Additional Financial Services SOW**" and together with the Additional Consulting Services SOW the "**Additional Services SOWs**").

11.     In support of this Supplemental Application, the Debtors submit the Supplemental Declaration of Louis Librandi, a principal at Deloitte Consulting, attached hereto as **Exhibit C** (the "**Librandi Supplemental Declaration**"), and the Supplemental Declaration of Steven F. Stanton, a managing director at Deloitte FAS, attached hereto as **Exhibit D** (the "**Stanton Supplemental Declaration**" and, together with the Librandi Supplemental Declaration, the "**Supplemental Declarations**").

12.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit E** (the "**Proposed Order**").

### The Additional Services

13.     The Debtors are seeking authority to expand the scope of the respective retentions of Deloitte Consulting and Deloitte FAS (together the "**Deloitte Entities**") in order to assess various aspects of the business of Mangiarotti SpA ("**Mangiarotti**"), a wholly-owned indirect Italian subsidiary of Debtor Toshiba Nuclear Energy Holdings (UK) Limited.  As contemplated in the Additional Services SOWs, the Deloitte Entities, utilizing the Deloitte Touche Tohmatsu Limited member firm located in Italy ("**Deloitte Italy**") as a subcontractor, agreed to perform the work as described in detail within the Additional Services SOWs including, but not limited to: (a) Deloitte Consulting evaluating potential systems applications and product (SAP) enterprise resource planning (ERP) implementation at Mangiarotti; and (b) Deloitte FAS analyzing financial information and other relevant data to assist the Debtors in their anti-corruption compliance review at Mangiarotti (collectively, the "**Additional Services**").

4

## Professional Compensation

14.     Subject to Court approval, and in compliance with the *Order Pursuant to 11 U.S.C. §§ 105(a), 330, 331 Fed. R. Bankr. P. 2016, and Local Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 544], the Debtors will compensate the Deloitte Entities for the Additional Services based upon the terms set forth in the Additional Services SOWs.

15.     Deloitte Consulting's compensation for the work contemplated herein is a flat fee of $22,700, excluding expenses and applicable taxes.

16.     Deloitte FAS's compensation for the work contemplated herein shall be based on the following hourly rates (which exclude expenses and applicable taxes):

| Professional Level | Hourly Rate |
| --- | --- |
| Partner | $565 |
| Senior Consultant | $405 |
| Deloitte Italy Senior Consultant | $230 |

17.     The Deloitte Entities shall pay Deloitte Italy the fees that they bill to the Debtors for the services Deloitte Italy performs under the Additional Services SOWs.  In addition, the Deloitte Entities will bill the Debtors for actual, necessary, and reasonable out-of-pocket expenses incurred in connection with the provisions of the Additional Services SOWs.

18.     As set forth in the Original Applications and in accordance with the Original Retention Orders, each Deloitte Entity will keep reasonably detailed time records for the work pertaining to the Additional Services SOWs.  These time records shall contain detailed time entries describing the task(s) performed, and be organized by project category, as applicable. Additionally, each Deloitte Entity shall serve and file with the Court applications for interim and/or final Court approval and allowance pursuant to the applicable sections of the Bankruptcy Code,

WEIL:\96565304\3\80768.0017

the Fee Guidelines (as defined in the Original Applications), and the applicable orders of the Court

of the compensation and reimbursement of expenses requested under the Additional Services

SOWs.

### Deloitte's Disinterestedness

19.     To the best of the Debtors' knowledge except to the extent disclosed herein,

in the Declarations, or in the Original Applications and the supporting declarations thereto: (a)

each Deloitte Entity is a "disinterested person" within the meaning of section 101(14) of the

Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code and does not hold or

represent an interest adverse to the Debtors' estates; and (b) each Deloitte Entity has no connection

to the Debtors, their creditors or their related parties.  To the extent that any new relevant facts or

relationships bearing on the matters described herein during the period of the Deloitte Entities'

retentions are discovered or arise, the Deloitte Entities will use reasonable efforts to file promptly

a supplemental declaration, as required by Bankruptcy Rule 2014(a).

### Efforts to Avoid Duplication of Services

20.     The Deloitte Entities' services are intended to complement, and not

duplicate, the services to be rendered by any other professional retained by the Debtors in these

chapter 11 cases.  The Deloitte Entities have informed the Debtors that they understand that the

Debtors have retained and may retain additional professionals during the term of the engagement

and that the Deloitte Entities will use their reasonable efforts to work cooperatively with the

6

Debtors to integrate any respective work conducted by such professionals on behalf of the Debtors, to the extent any such integration is necessary.

### Basis for Relief

21.     The Debtors seek authority to amend the employment and retention of the Deloitte Entities under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtor] in carrying out the [Debtor's] duties under this title."  11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."  11 U.S.C. § 1107(b).

22.     The Debtors believe that the Deloitte Entities' fees are reasonable in light of industry practice and should be approved.  In addition, as noted above, the Deloitte Entities are "disinterested" and all of their fees and expenses are subject to approval of the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and further orders of the Court.  Accordingly, the Court should approve the supplemental employment and retention of the Deloitte Entities pursuant to the terms set forth in the Additional Services SOWs.

### Notice

23.     Notice of this Supplemental Application will be provided to the Rule 2002 Parties set forth in the *Order Pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No.

7

101].  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient

and no other or further notice need be provided.

24.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated: June 12, 2018
       New York, New York

WESTINGHOUSE ELECTRIC COMPANY, LLC
(for itself and on behalf of its affiliates
as Debtors and Debtors in Possession)


*/s/ Lisa J. Donahue*
NAME:  Lisa J. Donahue
TITLE:  Chief Transition and Development Officer

8

## EXHIBIT A

**Additional Consulting Services SOW**

## WORK ORDER

| Work Order Number: | XXX | Authorized Start Date: January 19, 2018 |

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC ("WEC" or "Westinghouse" or "Client") dated as of April 28th, 2011 (the "Agreement"), as amended.  For the purposes of this Work Order, Consultant shall be Deloitte Consulting LLP ("Deloitte Consulting" or "Consultant").

**Consultant Services Description:**

Consultant will provide the following Services (defined below) to WEC:

Westinghouse has retained Deloitte Consulting to assess processes and systems of its subsidiary in Italy in order to get information to evaluate a potential SAP ERP implementation.

The assessment will consider export control implications of implementing the SAP ERP modules in scope, including adding Italy to the US SAP instance.  The services and responsibilities of this Work Order are limited to the following:

- Participating in scoping discovery workshops (up to 5 days); and
- Gathering information regarding the export controls implications to be considered.

**Project Scope**
- Company: Mangiarotti Spa
- Systems: SAP ECC
- Processes: Finance, Supply Chain, Manufacturing, Sales
- Region: Italy

**Activities and Deliverables**

Deliverable provided by Deloitte Consulting will be a report that documents and identifies high level export controls considerations and recommendations for implementing SAP ERP, including adding Italy to the US SAP instance.

For this Deliverable, Deloitte Consulting will have Primary responsibility and WEC will hold Secondary responsibility, as defined below:

Definition:

- Primary: Responsible for executing the task and creating the resulting Deliverable.

- Secondary: Responsible for supporting the "Primary" role, but is not responsible for executing the resulting Deliverable.

1

**Project Organization and Governance**

Engagement Core Team:

- 1 FTE Senior Consultant

Timeframe for the Services contemplated in this Work Order: one week in January 2018 and follow-on support.

Westinghouse is expected to provide resources as required to accomplish the activities during the timeframe defined herein. Westinghouse will have a named Project Manager who will be responsible for the approval of Deliverables and the resolution of issues raised during the course of the Project. The Westinghouse Project Manager and the Deloitte Consulting resource will leverage existing Westinghouse governance processes.

**Project Assumptions**

The following is a list of some of the assumptions and expectations (the "Project Assumptions") upon which Deloitte Consulting has relied in agreeing to perform the Services and on which its fee is based. Any deviation from the Project Assumptions may cause changes to the time plan, fees, and expenses, Deliverables, level of effort required, or otherwise impact Deloitte Consulting's performance of the Services. The Project Assumptions are defined as part of this Work Order based upon Deloitte Consulting's experience with similar projects. These assumptions are detailed below.

- Westinghouse will provide the requested data needed to complete the activities and Deliverables. If WEC does not provide the data requested in the timeframe required, WEC agrees to the assumptions Deloitte Consulting will need to make to accommodate the gap in information in order to complete the activities and Deliverables.

- Westinghouse will dedicate resources to the project to enable project work and effective, ongoing knowledge transfer.

- Westinghouse stakeholders will be available for interviews, workshops and providing insight to help shape Deloitte Consulting analyses within the timeframes required for the Project.

- Key Westinghouse stakeholders will be available for the duration of the workshops. These stakeholders (or their designees) participating in the workshops will have decision-making authority for their respective areas of responsibility.

- The scope of the Project will not deviate from the documented scope in this Work Order. Should that change, Deloitte Consulting will discuss these changes proactively with Westinghouse leadership and will agree to the implications to resourcing and fees prior to change in scope

2

- Deloitte Consulting resources will be given ample space and access to technologies (e.g., WI-FI, printing as needed) in Client's site in Mangiarotti, Italy (where the engagement will be conducted).

- The geographical scope of the assessment will operate in Italy.

- Westinghouse will seek to enable Deloitte personnel permission to access and review export-controlled information necessary for this Work Order.

- WEC will not share, and Deloitte Consulting will not require, any personally identifiable information (PII), protected health information (PHI), or highly sensitive confidential information (CI) requiring deviations from industry standard information protection protocols during the course of the Project.

- WEC acknowledges that Deloitte Consulting and its subcontractors are or may be required to comply with U.S. sanctions laws, including, but not limited to, sanctions regulations of the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"). OFAC sanctions regulations include country-based restrictions and denied party restrictions, which are also known as transacting with Specially Designated Nationals. WEC represents and warrants that the Services (including Deloitte Consulting's or any of its subcontractor's performance of the Services) do not violate OFAC sanctions regulations and that Deloitte Consulting and its subcontractors are not obligated to perform any such Services that would cause such violations.

**Estimated Timing of Services and Deliverables:**

The Services are expected to be concluded over the course of a one-week duration, although WEC and Deloitte Consulting agree that all dates are estimates and are subject to adjustment based on mutual agreement by the parties.

**The Bankruptcy Case:**

On March 29, 2017, the Client filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Client has requested that Deloitte Consulting perform the Services, and Deloitte Consulting has agreed to perform the Services, subject to the terms and conditions of this Work Order and the Agreement. This Work Order, and Deloitte Consulting's obligations and responsibilities relating to this engagement, shall be effective as of the effective date on the first page of this Work Order, subject to, and conditioned on, the Client obtaining Bankruptcy Court approval in the matter, In re Westinghouse Electric Company LLC, *et al.*, Case No. 17-10751 (MEW) (the "Case"), nunc pro tunc to such date.

Client agrees that Client will promptly seek the Bankruptcy Court's approval of this ordinary course engagement. If an application is required to be filed with the Bankruptcy Court, the application, proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to Deloitte Consulting in all respects. In addition to Deloitte Consulting's other

3

rights or remedies, Deloitte Consulting may, in its sole discretion and without any liability arising therefrom, terminate this Work Order in the event that (a) a third party objects or threatens to object, or Deloitte Consulting believes that a third party may object, in the form of an objection or otherwise, to Deloitte Consulting's retention by the Client on the terms and conditions set forth in this Work Order and the Agreement, (b) a final order authorizing the employment of Deloitte Consulting as consultant to the Client is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to Deloitte Consulting in its sole discretion, or (c) the Application of the Client seeking such order is denied by the Bankruptcy Court in the Case. In any such event, the Client hereby agrees to withdraw or amend, promptly upon Deloitte Consulting's request, any submission filed or to be filed with the Bankruptcy Court to retain Deloitte Consulting's Services in the Case.

**Fees and Expenses:**

Deloitte Consulting will perform the Services on a fixed fee basis.

Based on the assumptions set forth above, Deloitte Consulting's fees for its Services are **22,700 USD** (excluding out-of-pocket expenses and applicable taxes).

The Client agrees to pay, in addition to the fixed fee, actual out-of-pocket expenses, including, but not necessarily limited to, travel and lodging expenses, report preparation, delivery services, photocopying, communications charges and computer time and supplies, and taxes as applicable.

Subject to any applicable Bankruptcy Court orders, rules or procedures, Deloitte Consulting will invoice the fixed fee and actual expenses in a single invoice at the end of the term.

If Deloitte Consulting is required to apply for compensation for professional services rendered and for reimbursement of expenses incurred, it will do so in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the applicable local rules of bankruptcy procedure (the "Local Rules") and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under § 330 of the Bankruptcy Code. In such case, payment of fees and reimbursement of expenses will be subject to ultimate allowance and approval by the Bankruptcy Court. However, if necessary, the Client will ask the Bankruptcy Court for approval to allow Deloitte Consulting to submit invoices in accordance with the Local Rules. Payment of these invoices will be made by the Client on an interim basis subject to approval and allowance upon application to and order by the Bankruptcy Court. If necessary, Deloitte Consulting will submit fee applications seeking approval of its fees and expenses on a periodic basis. We will provide you with an invoice on a regular basis, with the invoice due and payable pursuant to the appropriate payment mechanism provided by the Bankruptcy Court.

**Project Change Requests:**

WEC and Deloitte Consulting agree to work in good faith in negotiating required changes to this Statement of Work, for example to reflect a further defined business case, a more detailed roadmap, a revised project timeline, change in assumptions, etc. as necessary. In the event that the parties agree to a change order in this engagement, such change order shall be delivered to Westinghouse Project Management in writing. The change order must include all

4

projected costs and expenses, an explanation of the scope of the change order and approval by the Westinghouse Steering Committee and Deloitte Consulting prior to commencement of any related work or incurrence of additional fees.

*[Remainder of Page Intentionally Left Blank]*

**Other Terms (including changes in provisions of the Agreement):**

(1)    The parties hereby elect whether the indemnification provision set forth in Section 13 (a) (ii) of the Agreement applies to this Work Order:

    Yes  ☒

    No   ☐

**WESTINGHOUSE ELECTRIC COMPANY LLC**   **DELOITTE CONSULTING LLP**

By: _____

Name: ___Yexi Liu_____

Title: _____

Date: _____

By: Suzanne Kao

Name: Principal

Date: 01/19/2018

6

AMENDMENT NO. 1
TO
MASTER SERVICES AGREEMENT
BETWEEN
DELOITTE LLP
AND
WESTINGHOUSE ELECTRIC COMPANY LLC

This Amendment No. 1 (this "Amendment") is made and entered into as of the 3rd day of April, 2014, between Deloitte LLP ("Deloitte U.S."), for an on behalf of its subsidiaries, and Westinghouse Electric Company LLC ("Westinghouse").

WHEREAS, Deloitte U.S. and Westinghouse have entered into a Master Services Agreement, dated April 28, 2011 (the "Agreement"), for the performance of services by function-specific subsidiaries of Deloitte U.S. on a statement of work basis;

WHEREAS, the Agreement shall expire pursuant to its terms on April 28, 2014; and

WHEREAS, the parties seek to amend the expiration date of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Deloitte U.S. and Westinghouse hereby agree to amend the Agreement, effective the date hereof, as follows:

1.   Section 6(a) of the Agreement, is hereby amended and restated in its entirety as follows:

"a)   This Agreement shall commence on April 28, 2011 and, unless terminated sooner in accordance with its terms, shall terminate on April 28, 2017."

Except as expressly amended herein, the Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Deloitte U.S. (for an on behalf of its subsidiaries) and Westinghouse have signed this Amendment as of the day and year written above.

DELOITTE LLP                                    WESTINGHOUSE ELECTRIC COMPANY LLC

By:_____ c              By:_____ .
   Name:                                          Name:
   Title:                                         Title:

## MASTER SERVICES AGREEMENT

**THIS AGREEMENT** is made and entered into as of the 28th day of April, 2011, by and between Deloitte LLP, a limited liability partnership registered under the laws of the State of Delaware ("Deloitte U.S."), for and on behalf of its function-specific subsidiaries, including, without limitation, Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte Tax LLP and Deloitte Financial Advisory Services LLP, and Westinghouse Electric Company LLC, a limited liability company organized under the laws of the State of Delaware ("Client").

<strong>WITNESSETH:</strong>

**WHEREAS,** Client desires to engage one or more function-specific subsidiaries of Deloitte U.S. to provide certain professional services; and

**WHEREAS,** one or more function-specific subsidiaries of Deloitte U.S. are willing to provide certain professional services to assist Client; and

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual promises contained herein, the parties agree as follows:

1.   **Engagement**.

    a)   Client understands and agrees that Deloitte U.S. is not a provider of professional services under this Agreement and that Work Orders (as hereinafter defined) will be executed by the Deloitte U.S. function-specific subsidiary having primary responsibility for performance of the requested services. As used herein, the term "Consultant" shall mean the Deloitte U.S. function-specific subsidiary that has executed the pertinent Work Order. For purposes of this Agreement, "Client" shall mean Westinghouse Electric Company LLC and its subsidiaries and Client Affiliates. Westinghouse Electric Company LLC represents that it has the power and authority to execute this Agreement and each Work Order (as defined herein) on behalf of, and to bind, itself and its subsidiaries and Client Affiliates. Client hereby engages Consultant, and Consultant hereby accepts the engagement, to provide professional services as further described in a Work Order issued pursuant hereto and on the terms and conditions set forth herein. No audit, review, compilation or attest services as described in the pronouncements on professional standards issued by the American Institute of Certified Public Accountants or any successor standard setting organization shall be performed under this Agreement. Consultant shall not provide advice regarding the financial accounting treatment of any transaction implemented from the services provided under a Work Order and will not assume any responsibility for any financial reporting with respect to such services.

    b)   For purposes of this Agreement, the following definitions apply:

        (i)   "Affiliates" shall mean any person or entity that controls, is controlled by, or is under common control with, such person or entity.

        (ii)   "Client Affiliates" shall mean Westinghouse Electric UK Limited, and each of its subsidiaries.

1

      (iii)   "Related Entities" shall mean the member firms of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and the Affiliates of such member firms.

2.    **Services**.

    a)    From time to time during the term of this Agreement as Client, in its sole discretion, determines that it requires professional services, Client shall request such services from Consultant pursuant to and in accordance with separate purchase orders, the content of which shall be substantially as set forth in Exhibit A annexed hereto and made a part hereof (herein referred to as the "Work Order"). In addition, any pre-printed terms in such purchase orders shall be superseded by the terms of this Agreement. Consultant, in its sole discretion, may agree to provide such services. Once executed by Consultant and Client, such Work Order shall be binding upon the parties thereto. Each Work Order shall specifically reference this Agreement and shall specify the details of the particular services to be performed under the Work Order (the "Services"). All rights and obligations of Consultant and Client hereunder shall be deemed to apply to such Work Order as if fully set forth therein. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of any Work Order, the terms of the Work Order shall control, provided, that, such term in such Work Order clearly sets forth the parties intent to modify a specific term of this Agreement. In the event such clarification is not set forth in such Work Order, this Agreement shall control any such conflict.

    b)    Consultant and Client expressly acknowledge and agree that the Work Orders are based on understandings and expectations that apply at the time such Work Orders are executed and that, except as specifically set forth in the applicable Work Order, the specific start and stop dates contained in the Work Orders are not firm performance dates, are expected to be revised during the term of any engagement, and are only to be regarded as estimated beginning and completion dates for the tasks and activities as of the date of the Work Orders. Nonetheless, Consultant agrees to use diligent efforts to meet such dates. Except where a Work Order provides for firm performance dates (but subject in such case to Section 11 below), if Consultant utilizes diligent efforts but is unable to meet such dates, it shall not be considered to have defaulted in its obligations hereunder. Consultant agrees to notify Client promptly in writing if it expects or encounters significant delays in completing its Services.

    c)    It is understood and agreed that the Services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. In connection with the performance of the Services, Consultant shall be entitled to rely on all decisions and approvals of Client.

3.    **Compensation**. For the Services provided by Consultant with respect to any Work Order, Client shall compensate Consultant in accordance with the terms of such Work Order.

4.    **Expenses**.

a) Client shall reimburse Consultant for all reasonable expenses described in the applicable Work Order incurred by Consultant in performing the Services (including, without limitation, all reasonable travel, meal, lodging, and mileage expenses) in accordance with Consultant's standard policies as they exist from time to time. Client shall be responsible for all taxes imposed on the Services or on the transaction, other than Consultant's income taxes imposed on a net basis or by employment withholding, and other than taxes imposed on Consultant's property.

b) Client acknowledges that temporary living reimbursements to Consultant's personnel may be deemed compensatory under federal, state, and local tax laws if such personnel's assignment in a particular location will exceed or has exceeded one year. The parties shall cooperate in good faith to limit the duration of a person's assignment in a particular location to less than one year. If Client's requirements are such that it becomes necessary for a person's services in a particular location to continue for a year or more and, as a result, such person's living expenses are deemed compensatory for tax purposes, then Client shall pay Consultant the amount of additional compensation provided to Consultant's personnel to compensate for taxes imposed therefor as reflected on a corresponding invoice.

5. **Payment of Invoices**.

a) Consultant's invoices shall be due net forty-five (45) days after the date of Client's receipt of an accurate and substantiated invoice. Except as otherwise provided in any Work Order, Consultant shall invoice Client following the end of each monthly period for fees accrued and expenses incurred by Consultant in performing the Services under such Work Order. Without limiting its rights or remedies, Consultant shall have the right to halt or terminate the performance of Services under a Work Order if payment for undisputed invoices for such Work Order is not received within sixty (60) days of the invoice date; provided, that, Consultant has provided Client with written notice of such failure, and Client has failed to cure such non-payment within fifteen (15) days of receiving such additional written notice. With respect to any invoices under a Work Order that Client disputes in good faith, Consultant agrees to continue performing Services under such Work Order while the parties seek to resolve such dispute in accordance with the dispute resolution procedure set forth in Section 5(b) hereof.

b) With respect to any disputed invoice, Client shall provide Consultant with written notice of any good faith dispute within fifteen (15) days after Client received the invoice subject to such dispute. The parties agree to immediately escalate such dispute to Consultant's lead engagement partner or principal for such Work Order and Client's business sponsor for such Work Order. If such dispute is not resolved to the mutual satisfaction of the parties, the parties agree to further escalate such dispute to a senior partner or principal of Consultant and the Vice President of Finance of Client. If the parties fail to resolve such dispute within seventy-five (75) days after Client received the invoice subject to such dispute, then Consultant shall have the right to halt or terminate such Services.

6. **Term**.

   a) This Agreement shall commence on the date hereof and, unless sooner terminated in accordance with its terms, shall terminate on the third anniversary of the date hereof.

   b) This Agreement may be terminated by either party at any time upon giving written notice to the other party not less than thirty (30) days before the effective date of termination; provided, however, that this Agreement shall continue to apply to all Work Orders that are in existence at the effective date of such termination and under which the Services have not been completed or otherwise terminated. Any Work Order may be terminated by Client at any time with or without cause, or by Consultant with cause, in either case by giving written notice to the other not less than thirty (30) days before the effective date of termination; provided that in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. In addition, Consultant may terminate any Work Order or performance of any part of the Services, if it determines that (i) a governmental, regulatory or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board or the Securities and Exchange Commission) or entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation or decision the result of which would render Consultant's performance of any part of the Services illegal or otherwise unlawful or in conflict with independence or professional rules, or (ii) circumstances change such that an attest client of Deloitte & Touche LLP or an affiliate of such attest client owns, directly or indirectly, 20% or more of the voting stock of Client or any of its affiliates. If any Work Order is terminated pursuant to this Paragraph 6(b), this Agreement shall continue to apply to all Work Orders that have not been terminated.

   c) The obligations of Consultant and Client that have been incurred prior to the effective date of termination (including, without limitation, the obligations of Client under Paragraphs 3 and 4 hereof) shall continue in full force and effect notwithstanding the expiration or termination of this Agreement or any Work Order and whether or not an invoice has been rendered with respect thereto.

7. **Ownership**. Upon full and final payment to Consultant under a Work Order, and subject to all other terms and conditions herein, Consultant hereby grants Client a royalty-free, fully paid-up, non-exclusive license to use, have used for the benefit of Client, modify, copy, create derivative works and distribute the works of authorship, materials, information and other intellectual property delivered to Client pursuant to the Work Order (the "Deliverables"). To the extent a Deliverable being licensed to Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such license is provided by Consultant as agent for Deloitte Consulting Product Services LLC (in the case of Work Orders executed by Deloitte Consulting LLP) or Deloitte & Touche Products Company LLC (in the case of Work Orders executed by Deloitte & Touche LLP) or Deloitte Tax Products Company LLC (in the case of Work Orders executed by Deloitte Tax LLP) or Deloitte FAS Products Company LLC (in the case of Work Orders executed by Deloitte Financial Advisory Services LLP), on the terms and conditions herein. The license grant in this Paragraph 7 does not apply to any software, documentation or products that are subject to a separate license agreement between Client and any third party, including, without limitation,

Deloitte Consulting Products Services LLC, Deloitte & Touche Products Company LLC, Deloitte Tax Products Company LLC and Deloitte FAS Products Company LLC.

8.    **Limitation on Warranties and Actions**.

a)    Consultant represents and warrants that it shall perform the Services in good faith, in a professional manner, with knowledge and judgment, in accordance with applicable professional standards, and shall be in compliance in all material respects with all requirements of the Work Order.    EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SETION 8(a) OR FOR ANY ADDITIONAL WARRANTIES IN A WORK ORDER (PROVIDED THAT ANY SUCH WARRANTY IS SPECIFICALLY IDENTIFIED AS A WARRANTY IN SUCH WORK ORDER), CONSULTANT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR CONSULTANT, UPON RECEIPT OF WRITTEN NOTICE, TO, AT CLIENT'S OPTION, EITHER (I) USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY SUCH CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH, OR (II) RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.

b)    No action, regardless of form, arising under or relating to this Agreement, any Work Order or the Services may be brought more than one year after Client becomes aware (or should have become aware) of the cause of action giving rise to the claim, except that an action for nonpayment may be brought not later than one year following the date of the last payment due to the entity bringing the action.

9.    **Limitation on Damages**. Client and Consultant agree that neither party, nor their Affiliates, subcontractors, nor their respective personnel shall be liable to the other party for any claims, liabilities, or expenses relating to this Agreement, any Work Order, or the Services under any Work Order ("Claims") for an aggregate amount in excess of (a) in the case of Consultant's liability to Client, the fees paid by Client to Consultant under such Work Order, or (b) in the case of Client's liability to Consultant, the amounts paid and payable to Consultant under such Work Order; except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the other party (the "Indemnitee") for any such Claim under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for such Claim.  In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, or incidental loss, damage, or expense relating to this Agreement, any Work Order, or the Services, except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the Indemnitee for any such loss, damage, or expense under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for

such loss, damage, or expense.   In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any punitive or exemplary damages relating to this Agreement, any Work Order, or the Services.   In circumstances where all or any portion of the provisions of this Paragraph are judicially determined to be unavailable or unenforceable, the aggregate liability of either party, its Affiliates, subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that their conduct bears to all other conduct giving rise to such Claim.

10.   **Client Responsibilities**.

a)   In addition to Client's responsibilities as set forth in a Work Order, as a condition to Consultant's performance of the Services, Client shall cooperate with Consultant in the performance by Consultant of the Services, including, without limitation, (i) providing Consultant with adequate working space, equipment and facilities and timely access to data, information, and personnel of Client, (ii) providing qualified personnel having appropriate skills to perform their assigned tasks and duties; (iii) providing a suitable infrastructure environment which will support the Services and allow Consultant and Client to work productively; and (iv) promptly notifying Consultant of any issues, concerns or disputes with respect to the Services.

b)   Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Consultant for purposes of the performance of the Services.

c)   Client acknowledges and agrees that Consultant's performance is dependent on Client's timely and effective satisfaction of Client's responsibilities under this Agreement and any Work Order and timely decisions and approvals of Client in connection with the Services.

d)   Client shall be solely responsible for: (i) making all management decisions and performing all management functions; (ii) designating a competent management member to oversee the Services; (iii) evaluating the adequacy and results of the Services; and (iv) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

11.   **Force Majeure**.   Neither party shall be liable for any delays or nonperformance resulting directly or indirectly from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel, and agents); acts or omissions or the failure to cooperate by any third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

12.   **Confidentiality and Internal Use.**

a)   To the extent that, in connection with this Agreement or any Work Order, either Consultant or Client (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the

disclosing party's consent. The disclosing party hereby consents to the receiving party disclosing applicable and appropriate information (i) to subcontractors, whether located within or outside of the United States, that are providing services specific to a Work Order and that have agreed to be bound by confidentiality obligations similar to those in this Paragraph 12(a), (ii) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining to this Agreement or any Work Order; provided, that, to the extent permitted by applicable law or regulation, the receiving party provides the disclosing party with prompt written notice of such requirement and, to the extent practical, the disclosing party has been given a prior opportunity to seek a protective order, or (iii) to the extent such information (A) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency on an unrestricted basis and available to the public) other than as the result of a disclosure in breach hereof, (B) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party which the receiving party believes is not prohibited from so disclosing such information to the receiving party by obligation to the disclosing party, (C) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (D) is developed by the receiving party independent of any disclosures of such information made by the disclosing party to the receiving party. The receiving party shall carry out its obligations under this Paragraph 12(a) using at least the same degree of care as it employs in maintaining in confidence its own proprietary and confidential information, but in no event less than a reasonable degree of care. Nothing in this Paragraph 12(a) shall alter Client's obligations under Paragraph 12(b). Notwithstanding anything to the contrary herein, Client acknowledges that Consultant, in connection with performing the Services, may develop or acquire experience, skills, and ideas that are retained in the unaided memory of its personnel. Client acknowledges and agrees that Consultant may use and disclose such experience, skills, and ideas.

b)   Client agrees that (i) all Services and Deliverables shall be solely for Client's internal use, and are not intended to be and should not be used by any person or entity other than Client, and (ii) except as otherwise provided in a Work Order, the Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to the Services or Deliverables be made to, any person or entity without Consultant's prior written consent other than (i) Client, or (ii) Toshiba Corporation and its Affiliates provided, that, such entities agree to comply with the restrictions on disclosure set forth in this paragraph.

c)   Tax Services Provisions

     (i)   Notwithstanding anything to the contrary in this Agreement or any Work Order, the provisions of this Paragraph 12 regarding confidentiality and internal use will not apply to the tax treatment and tax structure (as defined in Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance) of any transaction, tax services or Deliverables (collectively referred to as "Subject Tax Planning Advice"), if any, provided to Client by Consultant under any Work Order. Nothing in this Paragraph 12 shall be construed as limiting or restricting disclosure of the Subject Tax Planning Advice or any tax feature thereof for purposes of Rule 3501(c)(i) of PCAOB Release 2005-014

and Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance. The Client acknowledges that none of its other advisors have imposed or will impose any conditions of confidentiality with respect to any Subject Tax Planning Advice. All Services and Deliverables shall be solely for Client's informational purposes and internal use and neither this Agreement nor any Work Order shall create privity between Consultant and any person or party other than Client ("third party"). Neither the Services nor any Deliverables are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose, on the advice, opinions, reports, or other Services or Deliverables of Consultant. In the event of any unauthorized reliance, Client agrees to indemnify and hold harmless Consultant, its Affiliates, subcontractors and their respective personnel from all third-party claims, liabilities, costs and expenses.

(ii)   Certain Tax Disclosures and Reporting. In accordance with IRC sections 6111 and 6112 Contractor may be required to report to the IRS or certain state tax authorities the tax Services including without limitation any related tax transaction(s) described in the applicable Work Order as well as Client's participation therein. In addition, separate and apart from any reporting by Consultant, Client, in accordance with IRC section 6011, may also be required to disclose to a taxing authority its participation in one or more transactions which are the subject of the applicable Work Order. The determination of whether, when and to what extent Consultant and Client should comply with their respective federal or state "tax shelter" reporting requirements will be made exclusively and respectively by Consultant and Client. Consultant and Client further agree that (i) any liability for fines or penalties or any other consequences resulting from non-compliance by one party with applicable tax disclosure or reporting rules will be borne or incurred exclusively by the non-compliant party, and (ii) any request by Client of Consultant for services in identifying or otherwise consulting on transactions subject to IRC section 6011 or corresponding state law and the reporting or disclosing thereof will be the subject of a separate Work Order.

(iii)  Accountant / Client Privilege – IRC §7525. Client should be aware that certain information discussed with personnel of Consultant who are Federally Authorized Tax Practitioners or their agents for the purpose of obtaining Consultant's advice on tax matters may be privileged from disclosure in any non-criminal tax matters before the Internal Revenue Service and in non-criminal proceedings in Federal court that stem from matters before the Internal Revenue Service, if the United States is a party to the proceedings. Client is solely responsible for managing the recognition, establishment and maintenance of the confidentiality privilege and Client must notify Consultant if Client wishes to invoke the confidentiality privilege and Consultant will cooperate with Client's reasonable instructions relating to the confidentiality privilege. Circumstances may arise under which Client may wish to divulge or have Consultant divulge privileged information to other parties. Client should be aware that such disclosure might result in a waiver of the confidentiality privilege. Accordingly, if Client wishes Consultant to divulge such information, Consultant shall require Client to provide Consultant in advance with written authority to make such disclosures. In addition, if it is ultimately determined

that a significant purpose of the tax matter was to avoid or evade any U.S. federal income tax, Client should be aware that the confidentiality privilege under §7525 of the Internal Revenue Code will not apply to any communications between Client and Consultant.

In the event that Consultant receives a request from a third party (including a subpoena, summons or discovery demand in litigation) calling for the production of privileged information, Consultant will promptly notify Client and will follow Client's reasonable instructions regarding any third party requests or needs for such material before Consultant would disclose same as may be required under applicable law or rules. Client agrees to hold Consultant, its Affiliates, subcontractors, and their respective personnel harmless from and also assumes responsibility for any expenses (including attorney's fees, court costs, costs incurred by outside advisors and any other cost imposed whether by way of penalty or otherwise) incurred by Consultant as a result of Client's assertion of the confidentiality privilege or Client's direction to Consultant to assert the confidentiality privilege on behalf of Client.

**13. Indemnification and Insurance.**

a)   (i)   Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims attributable to claims of third parties to the extent arising out of Client's breach of this Agreement.

      (ii)   If specifically agreed upon in a Work Order, Client shall provide the following indemnity:

          Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims arising from the Client's disclosure of the Services or Deliverables (other than any Subject Tax Planning Advice) to any third party.

b)   Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties solely for bodily injury, death or damage to real or tangible personal property, to the extent caused by the negligence or intentional misconduct of Consultant in connection with this Agreement or any Work Order.

c)   Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties arising out of infringement by the Deliverables of any patent or copyright or any unauthorized use of any trade secret or trademark, except to the extent that such infringement or unauthorized use arises from (i) Client's modification of the Deliverables or use thereof in a manner not contemplated by this Agreement or the applicable Work Order, (ii) the failure of Client to use any corrections or modifications made available by Consultant, (iii) information, materials, instructions or specifications provided by or on behalf of Client, (iv) Client's distribution, marketing or use for the benefit of third parties of the Deliverables, or (v) the use of the Deliverable in combination with any product or data not provided by Consultant whether or not with Consultant's consent, where such combination gives rise to the claim of

infringement.   If any such Deliverable, or any portion thereof, becomes, or in Consultant's reasonable judgment, is likely to become the subject of a claim based upon infringement or unauthorized use, or if any such Deliverable or any portion thereof, is found by final, non-appealable order of a court of competent jurisdiction to be such an infringement or unauthorized use, Consultant, at its option and expense, shall have the right to (i) procure for Client the continued use of such Deliverable, (ii) replace or modify such Deliverable provided that the replacement or modified Deliverable is reasonably capable of performing substantially the same function, or (iii) require Client to cease use of such Deliverable and refund an appropriate portion of the fee paid with respect to the affected Deliverable.  The foregoing provisions of this paragraph constitute the sole and exclusive remedy of Client, and the sole and exclusive obligation of Consultant, relating to a claim that Consultant's Deliverable infringes any patent or copyright or makes unauthorized use of any trade secret or trademark of a third party.

d)    Insurance

Consultant shall, during the performance of Services and the warranty period therefor, maintain insurance of the types and minimum amounts set forth below. Maintenance of insurance shall not limit Consultant's liability for loss or damage in excess of policy limits or outside of policy coverage.

| Type of Coverage | Minimum Amount of Coverage |
|---|---|
| Worker's Compensation | As required by law |
| Employer's Liability | $100,000 for each person/disease/aggregate |
| Motor Vehicle Liability (covering owned, leased and non-owned vehicle) | $1,000,000 combined single limit |
| Commercial General Liability, including:<br><br>• Premises/Operations<br>• Underground<br>• Explosion & Collapse Hazard<br>• Products/Completed Operations<br>• Broad Form Property Damage<br>• Blanket Contractual Liability Coverage | $1,000,000 per occurrence /$2,000,000 aggregate |
| Product Liability (may be included in Commercial General Liability) | $2,000,000 aggregate |
| Property (if Consultant has care, custody or control of Client property) | Replacement Value |

Consultant shall upon Client's request provide a certificate evidencing the required insurance.

**14. Approval of Services and Deliverables.**

a) All Services shall be deemed accepted by Client if not rejected (or if notice of non-acceptance is not given) in writing, within thirty (30) days of complete of performance under any Work Order. If, during the term hereof, Client believes that there is a breach of the warranty in Paragraph 8(a) hereof, Client will notify Consultant, in writing, within thirty (30) days of becoming aware of the claimed breach, setting forth the nature of such claimed breach. Consultant shall promptly investigate such claim of breach and advise Client of Consultant's planned corrective action, if any. In addition, the provisions of Paragraphs 14(b) through 14(j) shall apply with respect to Work Orders for information technology-related Services.

b) All Deliverables prepared by Consultant shall have the written approval of Client's project director or his or her written designee that such Deliverables comply in all material respects with the requirements of the relevant Work Order, which approval shall not be unreasonably withheld.

c) Client shall complete its review of a Deliverable in not more than the number of business days that is specified in the Work Order for Client review of such Deliverable. If not specifically identified in the Work Order, then the number of business days for any Client review of a Deliverable shall be no more than ten (10) business days. Client shall provide Consultant (i) with approval of the Deliverable or (ii) with a written statement, as provided below, of the deficiencies preventing approval. Such business days shall be counted from and include the first business day following the delivery of the Deliverable to Client.

d) Client's review and approval of Deliverables shall be solely for the purpose of determining compliance in all material respects with the applicable acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, format or style of the Deliverables or the incorporation at that time of additional ideas or functionality. Approval shall be granted if the Deliverable conforms in all material respects to the applicable acceptance criteria set forth in the Work Order. In the event of Client's rejection of a Deliverable (or Client's notice that it is not accepting a Deliverable), Client shall provide a complete and written statement which identifies in reasonable detail, with references to the applicable acceptance criteria in the Work Order, all deficiencies. Deliverables requiring only minor or cosmetic corrections and not requiring extensive re-review by Client and for which corrections have been made by Consultant within specified times will be deemed approved.

e) Consultant shall have thirty (30) business days to complete all such corrective actions or changes in order for such Deliverable to conform in all material respects with the requirements therefor set forth in this Agreement or in the applicable Work Order. The count of such business days shall begin on the first business day following Consultant's receipt of the written statement of required corrective actions or changes as set forth in subparagraph (c) of this Paragraph.

f)  Client shall have ten (10) business days to complete a review of the corrective actions or changes made to the Deliverable in response to Client's written statement of deficiencies as set forth in subparagraph (c) of this Paragraph and notify Consultant in writing of acceptance or rejection (or non-acceptance). The count of such days shall begin on the first business day after Client receives the corrected or changed Deliverable from Consultant. Client's review and approval of such corrected or changed Deliverable shall be solely for the purpose of determining that corrections have been made to bring the Deliverables into compliance in all material respects with the acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, for format, style or the incorporation of additional ideas or functionality.

g)  Client and Consultant may mutually agree to extend the period of time allotted for any review, correction or change under this Paragraph. Any such extension of time shall extend the schedule for subsequent Deliverables by a corresponding amount.

h)  Notwithstanding the provisions of Paragraphs 14(b) through 14(g), approval of a Deliverable shall be deemed given by Client if Client has not delivered to Consultant a notice of deficiencies in writing for such Deliverable prior to the expiration of any period for Client review thereof as set forth in this Paragraph, or if Client uses the Deliverable in production. Notwithstanding the foregoing provisions of this Paragraph, approval of corrective actions or changes with respect to a Deliverable shall be deemed given by Client if Client has not rejected in writing (or has not provided written notice that it is not accepting), in accordance with this Paragraph, such corrective actions or changes with respect to such Deliverables prior to the expiration of any period for Client review thereof as set forth in this Paragraph.

i)  To the extent that any Deliverables have been approved by Client at any stage of Consultant's performance hereunder, Consultant shall be entitled to rely on such approval for purposes of all subsequent stages of Consultant's performance hereunder. Upon Client's approval of each Deliverable, Client agrees that, in the event of a contradiction between the relevant Work Order and the approved Deliverable, the contradiction shall be resolved by the approved Deliverable controlling.

j)  If Consultant is unable to correct any deficiency in a Deliverable within the period of time set forth above, Client shall be entitled, at its option, to a refund or credit of professional fees paid to Consultant hereunder with respect to the Services giving rise to the claimed deficiency and this shall be Client's sole and exclusive remedy, and Consultant's sole and exclusive obligation, with respect to any claim that the Deliverables do not conform to the terms of this Agreement and the Work Order.

15. **Waiver of Jury Trial. CONSULTANT AND CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT, ANY WORK ORDER, OR THE SERVICES.**

16. **Independent Contractor.** It is understood and agreed that each of Consultant and Client is an independent contractor and that neither of them is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner or representative. Neither Consultant nor Client shall act or represent itself, directly or by implication, in any

such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

17.  **Survival.**  All Paragraphs herein relating to compensation, expenses, payment of invoices, ownership, limitation on warranties and actions, limitation on damages, confidentiality and internal use, indemnification, waiver of jury trial, survival, binding nature, assignment and subcontracting, non-solicitation, non-exclusivity, interpretation, governing law, and jurisdiction and venue shall survive the expiration or termination of this engagement.  **The provisions of Paragraphs 8, 9, 12, 13, 15, 26 and 27 shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*) or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

18.  **Binding Nature; Assignment and Subcontracting.**  This Agreement and each Work Order shall be binding on the respective parties thereto and their respective permitted successors and assigns; provided, however, that, except as provided below, neither Consultant nor Client may assign, transfer, or delegate any of its rights or obligations under this Agreement or any Work Order (including, without limitation, interests or claims relating to this Agreement or any Work Order) without the prior written consent of the other.  Client hereby consent to Consultant assigning or subcontracting any of Consultant's rights or obligations under this Agreement or any Work Order to (a) any Affiliate of Consultant or Related Entity, whether located within or outside the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Consultant.  Client may assign this Agreement or any Work Order to any entity that acquires all or a substantial part of the assets or business of Client, provided, that Consultant provides its prior written consent to such assignment (such consent not to be unreasonably withheld).  Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

19.  **Notices.**  Whenever under this Agreement or any Work Order notice is required or permitted to be given, such notice shall be in writing and effective upon receipt.  All notices shall be hand delivered, sent by a reputable commercial overnight courier, or mailed by registered or certified United States mail, return receipt requested, postage prepaid, and addressed to the addressee at its address set forth below.

To Deloitte U.S.:  Deloitte LLP
2500 One PPG Place
Pittsburgh, PA  15222-5401
Attention:  Joe Klaja

To Consultant:  The address specified in the Work Order

To Client:  Westinghouse Electric Company
4350 Northern Pike
Monroeville, PA  15146
Attention: Cynthia J. Keating

A party may change its address for notice by giving prior written notice of the new address in conformity with the foregoing and the date upon which such new address will become effective.

20. **Entire Agreement**. This Agreement, together with the pertinent Work Order, constitutes the entire agreement with respect to the subject matter hereof and supersedes all other oral or written representations, understandings, or agreements relating to the subject matter hereof.

21. **Severability**. If any provision of this Agreement or any Work Order is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permitted the intent of Consultant and Client set forth in this Agreement or such Work Order.

22. **Waivers and Amendments**. No delay or omission by Consultant or Client in enforcing its rights or remedies under this Agreement or any Work Order shall impair such right or remedy or be deemed to be a waiver thereof. No waiver of any right or remedy under this Agreement or any Work Order with respect to any occurrence or event on one occasion shall be deemed a waiver of such right or remedy with respect to such occurrence or event on any other occasion. No amendment or waiver of this Agreement or any Work Order shall be valid unless in writing and signed by the parties thereto.

23. **Non-solicitation**. During the term of a Work Order and for a period of one (1) year thereafter, each of Consultant and Client agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of the performance of Services under such Work Order with personnel of the other shall not, without the other's consent, directly employ, solicit, engage or retain the services of such personnel of the other. In the event that either Consultant or Client breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to twenty percent (20%) of the annual base compensation of the relevant personnel in his/her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either Consultant or Client to solicit or recruit generally in the media or by employment recruiter, or to hire personnel of Consultant or Client who respond to such solicitation or recruitment.

24. **Non-exclusivity**. Each of Client and Consultant acknowledge that Consultant shall have the right to provide services of any kind or nature whatsoever to any person or entity as Consultant in its sole discretion deems appropriate, and to use any works of authorship or other intellectual property that may be included in the Deliverables, to develop for itself, or for others, materials or processes that may be similar to those produced as a result of the Services, except to the extent such works or Deliverables include the intellectual property of Client provided by, or on behalf of Client, to Consultant in connection with this Agreement or a Work Order.

25. **Paragraph Headings**. The paragraph headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereof.

26. **Governing Law**.  This Agreement and each Work Order, and all matters relating to this Agreement and each Work Order, shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).

27. **Consultant's Affiliated and Related Entities.**  Client acknowledges and agrees that no Affiliate or Related Entity of Deloitte U.S. other than Consultant, whether or not acting as a subcontractor, shall have any liability hereunder to Client or any other person and Client will not bring any action against any such Affiliate or Related Entity in connection with this Agreement or any Work Order.  Without limiting the foregoing, Affiliates and Related Entities of Deloitte U.S. are intended third party beneficiaries of this Agreement, including, without limitation, the limitation on liability and indemnification provisions hereof, and the agreements and undertakings of Client contained in the Work Order.  Any Affiliate or Related Entity of Deloitte U.S. may in its own right enforce such terms, agreements and undertakings. Notwithstanding the foregoing, Client retains its rights  to seek direct injunctive relief against any entity for breach of the confidentiality obligations set forth in this Agreement or any Work Order.

**IN WITNESS WHEREOF,** Deloitte U.S. (for and on behalf of its function-specific subsidiaries) and Client (on behalf of itself and its subsidiaries) have caused this Agreement to be executed and delivered by their respective duly authorized representatives as of the date first set forth above.

DELOITTE LLP                                WESTINGHOUSE ELECTRIC COMPANY LLC

By: _____                 By: _____

Name: _JOSEPH M. KLAJA_                      Name: _RICHARD A GRASSIAVELLI_

Title: _PRINCIPAL, DELOITTE_                 Title: _VP FINANCE_

Date: _4/29/11_                              Date: _4/28/11_

## WORK ORDER

Work Order Number:_____    Authorized Start Date: _____

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC dated April 21st, 2011 (the "Agreement"). For the purposes of this Work Order, Consultant shall be [*Name of Function-Specific Subsidiary*] and for purposes of Paragraph 7 of the Agreement, "Consultant" shall include [*Name of relevant subsidiary*].

**Consultant Services Description:**

**Estimated Timing of Services and Deliverables:**

**Fees and Expenses:**

**Client Responsibilities:**

**Other Terms (including changes in provisions of the Agreement):**

(1)    The parties hereby elect whether the indemnification provision set forth in Section 13(a)(ii) of the Agreement applies to this Work Order:

Yes        ☐

No         ☐

16

**WESTINGHOUSE ELECTRIC COMPANY LLC**          **CONSULTANT**


By: _____          By: _____

Printed                                      Printed
Name: _____          Name:_____

Title:_____          Title: _____

Date: _____          Date:_____

                                             Address: _____

## **EXHIBIT B**

**Additional Financial Services SOW**

# WORK ORDER

Work Order Number:

Authorized Start Date:
February 9, 2018

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC ("WEC" or "Westinghouse" or "Client") dated as of April 28th, 2011 (the "Agreement"), as amended.  For the purposes of this Work Order, Consultant shall be Deloitte Risk and Financial Advisory[1] ("Deloitte Advisory" or "Advisor").

## Consultant Services Description:

Advisor will provide the following Services (defined below) to WEC:

Westinghouse has retained Deloitte Advisory to provide assistance in analysing financial information and other relevant data in order to assist Client in its anti-corruption compliance review at one of Client's locations in Montefalcone and Udine, Italy (the "Engagement").

Advisor will provide a subject matter resource to assist WEC in performing its anti-corruption inspection at one of Client's locations in Montefalcone, Italy. The services and responsibilities of this Work Order are limited to the following:

- Providing an Italian-speaking senior consultant level resource (the "Deloitte Italy Senior Consultant") from Advisor's related entity in Italy to work at Client's direction to help Client execute its anti-corruption inspection. Client will be solely responsible for the direction and control of the work performed by the Deloitte Italy Senior Consultant.

## Project Scope

Refer to Consultant Service Description above for project scope.

## Activities and Deliverables

The Deliverable is expected to include the workpapers and analyses resulting from the procedures performed by the Deloitte Italy Senior Consultant at the direction of Client. Although not providing legal advice, Advisor will also provide Client with an overview of Italian anti-corruption laws and key anti-corruption search terms in Italian.

## Project Organization and Governance

The Advisor engagement core team is expected to consist of the Deloitte Italy Senior Consultant full-time for one week plus planning and follow-up, who may consult with Jeff Bergmann, Advisor Senior Consultant, Anthony Campanelli, Advisor Partner, or other

---

[1] As used in this letter, "Deloitte Risk and Financial Advisory" means Deloitte Financial Advisory Services LLP

Advisor personnel. This engagement will be conducted under attorney-client privilege pursuant to the WEC Audit Letter dated February 9, 2018.

Estimated timeframe for the Services contemplated in this Work Order: one week of on-site work in February 2018 with additional hours for pre-planning and follow-on assistance.

Westinghouse is expected to provide resources as required to accomplish the activities during the timeframe defined herein. Westinghouse will have a named Project Manager who will be responsible for the approval of Deliverables and the resolution of issues raised during the course of the Project. The Westinghouse Project Manager and the Deloitte Advisory resource will leverage existing Westinghouse governance processes.

## Project Assumptions

The following is a list of some of the assumptions and expectations (the "Project Assumptions") upon which Deloitte Advisory has relied in agreeing to perform the Services and on which its fee is based. Any deviation from the Project Assumptions may cause changes to the time plan, fees, and expenses, Deliverables, level of effort required, or otherwise impact Deloitte Advisory's performance of the Services. The Project Assumptions are defined as part of this Work Order based upon Deloitte Advisory's experience with similar projects. These assumptions are detailed below.

- Client will be solely responsible for the direction and control of the work performed by the Deloitte Italy Senior Consultant. Accordingly, Advisor will not be responsible for the scope, adequacy, sufficiency or nature of the Deloitte Italy Senior Consultant's work.

- Client will make all management decisions, perform all management functions, and assume all management responsibilities.

- Client will designate an individual with suitable skills, knowledge, and experience to oversee the work performed by the Deloitte Italy Senior Consultant.

- Client will evaluate the adequacy and results of the work performed by the Deloitte Italy Senior Consultant and accept responsibility for the results of such work. Advisor will make no representation nor provide any assurance with respect to the adequacy or the sufficiency of the procedures developed by Client.

- The Services will not constitute an engagement to provide audit, compilation, review, or attestation services as described in the pronouncements on professional standards issued by the AICPA, the Public Company Accounting Oversight Board, or other regulatory body and, therefore, we will not express an opinion or any other form of assurance as a result of performing the Services.

- Advisor will not provide any legal advice regarding our Services nor will Advisor provide any assurance regarding the outcome of any future audit or regulatory examination or other regulatory action; the responsibility for all legal issues with respect to these matters, such as reviewing all deliverables and work product for any legal implications to the Client, will be the Client's.

2

- The Deloitte Italy Senior Consultant will be given ample space and access to technologies (e.g., WI-FI, printing as needed) in Client's site in Montefalcone, Italy (where the engagement will be conducted).

- The geographical scope of the assessment will operate in Italy.

- Westinghouse will seek to enable Advisor personnel permission to access and review export-controlled information necessary for this Work Order.

- WEC will not share, and Deloitte Advisory will not require, any personally identifiable information (PII), protected health information (PHI), or highly sensitive confidential information (CI) requiring deviations from industry standard information protection protocols during the course of the Project.

- WEC acknowledges that Deloitte Advisory and its subcontractors are or may be required to comply with U.S. sanctions laws, including, but not limited to, sanctions regulations of the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"). OFAC sanctions regulations include country-based restrictions and denied party restrictions, which are also known as transacting with Specially Designated Nationals. WEC represents and warrants that the Services (including Deloitte Advisory's or any of its subcontractor's performance of the Services) do not violate OFAC sanctions regulations and that Deloitte Advisory and its subcontractors are not obligated to perform any such Services that would cause such violations.

**Estimated Timing of Services and Deliverables:**

The Services are expected to be concluded over the course of a one-week duration, although WEC and Deloitte Advisory agree that all dates are estimates and are subject to adjustment based on mutual agreement by the parties.

**The Bankruptcy Case:**

On March 29, 2017, the Client filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Client has requested that Deloitte Advisory perform the Services, and Deloitte Advisory has agreed to perform the Services, subject to the terms and conditions of this Work Order and the Agreement. This Work Order, and Deloitte Advisory's obligations and responsibilities relating to this engagement, shall be effective as of the effective date on the first page of this Work Order, subject to, and conditioned on, the Client obtaining Bankruptcy Court approval in the matter, In re Westinghouse Electric Company LLC, *et al.*, Case No. 17-10751 (MEW) (the "Case"), nunc pro tunc to such date.

Client agrees that Client will promptly seek the Bankruptcy Court's approval of this ordinary course engagement. If an application is required to be filed with the Bankruptcy Court, the application, proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to Deloitte Advisory in all respects. In addition to Deloitte Advisory's other rights or remedies, Deloitte Advisory may, in its sole discretion and without any liability arising

3

therefrom, terminate this Work Order in the event that (a) a third party objects or threatens to object, or Deloitte Advisory believes that a third party may object, in the form of an objection or otherwise, to Deloitte Advisory's retention by the Client on the terms and conditions set forth in this Work Order and the Agreement, (b) a final order authorizing the employment of Deloitte Advisory as consultant to the Client is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to Deloitte Advisory in its sole discretion, or (c) the Application of the Client seeking such order is denied by the Bankruptcy Court in the Case. In any such event, the Client hereby agrees to withdraw or amend, promptly upon Deloitte Advisory's request, any submission filed or to be filed with the Bankruptcy Court to retain Deloitte Advisory's Services in the Case.

**Fees and Expenses:**

Deloitte Advisory will perform the Services on a time and materials basis. Our per-hour billing rates (excluding applicable VAT taxes) are as follows:

| | |
|---|---|
| Advisor Partner | $565 |
| Advisor Senior Consultant | $405 |
| Deloitte Italy Senior Consultant[2] | $230 |

The Client agrees to pay, in addition to the engagement fees, actual out-of-pocket expenses, including, but not necessarily limited to, travel and lodging expenses, report preparation, delivery services, photocopying, communications charges and computer time and supplies, and taxes as applicable.

Subject to any applicable Bankruptcy Court orders, rules or procedures, Deloitte Advisory will invoice the engagement fees and actual out-of-pocket expenses in a single invoice at the end of the term.

If Deloitte Advisory is required to apply for compensation for professional services rendered and for reimbursement of expenses incurred, it will do so in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the applicable local rules of bankruptcy procedure (the "Local Rules") and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under § 330 of the Bankruptcy Code. In such case, payment of fees and reimbursement of expenses will be subject to ultimate allowance and approval by the Bankruptcy Court. However, if necessary, the Client will ask the Bankruptcy Court for approval to allow Deloitte Advisory to submit invoices in accordance with the Local Rules. Payment of these invoices will be made by the Client on an interim basis subject to approval and allowance upon application to and order by the Bankruptcy Court. If necessary, Deloitte Advisory will submit fee applications seeking approval of its fees and expenses on a periodic basis. We will provide you with an invoice on a regular basis, with the invoice due and payable pursuant to the appropriate payment mechanism provided by the Bankruptcy Court.

---

[2] Refers to Italian-speaking senior consultant level resource from Advisor's Deloitte Italy practice.

4

**Project Change Requests:**

WEC and Deloitte Advisory agree to work in good faith in negotiating required changes to this Statement of Work, for example to reflect a further defined business case, a more detailed roadmap, a revised project timeline, change in assumptions, etc. as necessary. In the event that the parties agree to a change order in this engagement, such change order shall be delivered to Westinghouse Project Management in writing. The change order must include all projected costs and expenses, an explanation of the scope of the change order and approval by the Westinghouse Steering Committee and Deloitte Advisory prior to commencement of any related work or incurrence of additional fees.

**Other Terms (including changes in provisions of the Agreement):**

(1)    The parties hereby elect whether the indemnification provision set forth in Section 13 (a) (ii) of the Agreement applies to this Work Order:

Yes    ☒

No    ☐

**WESTINGHOUSE ELECTRIC COMPANY LLC**          **Deloitte Financial Advisory Services LLP**

By: *Monica Deoras*                By: *Anthony J. Capanelli*

Name: Monica Deoras                Name: Anthony J. Campanelli

Title: Assistant General Counsel        Title: Partner

Date: February 9, 2018                Date: February 9, 2018

AMENDMENT NO. 1
TO
MASTER SERVICES AGREEMENT
BETWEEN
DELOITTE LLP
AND
WESTINGHOUSE ELECTRIC COMPANY LLC

This Amendment No. 1 (this "Amendment") is made and entered into as of the 3rd day of April, 2014, between Deloitte LLP ("Deloitte U.S."), for an on behalf of its subsidiaries, and Westinghouse Electric Company LLC ("Westinghouse").

WHEREAS, Deloitte U.S. and Westinghouse have entered into a Master Services Agreement, dated April 28, 2011 (the "Agreement"), for the performance of services by function-specific subsidiaries of Deloitte U.S. on a statement of work basis;

WHEREAS, the Agreement shall expire pursuant to its terms on April 28, 2014; and

WHEREAS, the parties seek to amend the expiration date of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Deloitte U.S. and Westinghouse hereby agree to amend the Agreement, effective the date hereof, as follows:

1.    Section 6(a) of the Agreement, is hereby amended and restated in its entirety as follows:

"a)    This Agreement shall commence on April 28, 2011 and, unless terminated sooner in accordance with its terms, shall terminate on April 28, 2017."

Except as expressly amended herein, the Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Deloitte U.S. (for an on behalf of its subsidiaries) and Westinghouse have signed this Amendment as of the day and year written above.

DELOITTE LLP                              WESTINGHOUSE ELECTRIC COMPANY LLC

By:_____            By:_____
   Name:                                    Name:
   Title:                                   Title:

## MASTER SERVICES AGREEMENT

**THIS AGREEMENT** is made and entered into as of the 28th day of April, 2011, by and between Deloitte LLP, a limited liability partnership registered under the laws of the State of Delaware ("Deloitte U.S."), for and on behalf of its function-specific subsidiaries, including, without limitation, Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte Tax LLP and Deloitte Financial Advisory Services LLP, and Westinghouse Electric Company LLC, a limited liability company organized under the laws of the State of Delaware ("Client").

### WITNESSETH:

**WHEREAS,** Client desires to engage one or more function-specific subsidiaries of Deloitte U.S. to provide certain professional services; and

**WHEREAS,** one or more function-specific subsidiaries of Deloitte U.S. are willing to provide certain professional services to assist Client; and

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual promises contained herein, the parties agree as follows:

1. **Engagement.**

   a) Client understands and agrees that Deloitte U.S. is not a provider of professional services under this Agreement and that Work Orders (as hereinafter defined) will be executed by the Deloitte U.S. function-specific subsidiary having primary responsibility for performance of the requested services. As used herein, the term "Consultant" shall mean the Deloitte U.S. function-specific subsidiary that has executed the pertinent Work Order. For purposes of this Agreement, "Client" shall mean Westinghouse Electric Company LLC and its subsidiaries and Client Affiliates. Westinghouse Electric Company LLC represents that it has the power and authority to execute this Agreement and each Work Order (as defined herein) on behalf of, and to bind, itself and its subsidiaries and Client Affiliates. Client hereby engages Consultant, and Consultant hereby accepts the engagement, to provide professional services as further described in a Work Order issued pursuant hereto and on the terms and conditions set forth herein. No audit, review, compilation or attest services as described in the pronouncements on professional standards issued by the American Institute of Certified Public Accountants or any successor standard setting organization shall be performed under this Agreement. Consultant shall not provide advice regarding the financial accounting treatment of any transaction implemented from the services provided under a Work Order and will not assume any responsibility for any financial reporting with respect to such services.

   b) For purposes of this Agreement, the following definitions apply:

      (i) "Affiliates" shall mean any person or entity that controls, is controlled by, or is under common control with, such person or entity.

      (ii) "Client Affiliates" shall mean Westinghouse Electric UK Limited, and each of its subsidiaries.

1

(iii)    "Related Entities" shall mean the member firms of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and the Affiliates of such member firms.

2.    **Services**.

a)    From time to time during the term of this Agreement as Client, in its sole discretion, determines that it requires professional services, Client shall request such services from Consultant pursuant to and in accordance with separate purchase orders, the content of which shall be substantially as set forth in Exhibit A annexed hereto and made a part hereof (herein referred to as the "Work Order"). In addition, any pre-printed terms in such purchase orders shall be superseded by the terms of this Agreement. Consultant, in its sole discretion, may agree to provide such services. Once executed by Consultant and Client, such Work Order shall be binding upon the parties thereto. Each Work Order shall specifically reference this Agreement and shall specify the details of the particular services to be performed under the Work Order (the "Services"). All rights and obligations of Consultant and Client hereunder shall be deemed to apply to such Work Order as if fully set forth therein. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of any Work Order, the terms of the Work Order shall control, provided, that, such term in such Work Order clearly sets forth the parties intent to modify a specific term of this Agreement. In the event such clarification is not set forth in such Work Order, this Agreement shall control any such conflict.

b)    Consultant and Client expressly acknowledge and agree that the Work Orders are based on understandings and expectations that apply at the time such Work Orders are executed and that, except as specifically set forth in the applicable Work Order, the specific start and stop dates contained in the Work Orders are not firm performance dates, are expected to be revised during the term of any engagement, and are only to be regarded as estimated beginning and completion dates for the tasks and activities as of the date of the Work Orders. Nonetheless, Consultant agrees to use diligent efforts to meet such dates. Except where a Work Order provides for firm performance dates (but subject in such case to Section 11 below), if Consultant utilizes diligent efforts but is unable to meet such dates, it shall not be considered to have defaulted in its obligations hereunder. Consultant agrees to notify Client promptly in writing if it expects or encounters significant delays in completing its Services.

c)    It is understood and agreed that the Services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. In connection with the performance of the Services, Consultant shall be entitled to rely on all decisions and approvals of Client.

3.    **Compensation**. For the Services provided by Consultant with respect to any Work Order, Client shall compensate Consultant in accordance with the terms of such Work Order.

4.    **Expenses**.

a) Client shall reimburse Consultant for all reasonable expenses described in the applicable Work Order incurred by Consultant in performing the Services (including, without limitation, all reasonable travel, meal, lodging, and mileage expenses) in accordance with Consultant's standard policies as they exist from time to time. Client shall be responsible for all taxes imposed on the Services or on the transaction, other than Consultant's income taxes imposed on a net basis or by employment withholding, and other than taxes imposed on Consultant's property.

b) Client acknowledges that temporary living reimbursements to Consultant's personnel may be deemed compensatory under federal, state, and local tax laws if such personnel's assignment in a particular location will exceed or has exceeded one year. The parties shall cooperate in good faith to limit the duration of a person's assignment in a particular location to less than one year. If Client's requirements are such that it becomes necessary for a person's services in a particular location to continue for a year or more and, as a result, such person's living expenses are deemed compensatory for tax purposes, then Client shall pay Consultant the amount of additional compensation provided to Consultant's personnel to compensate for taxes imposed therefor as reflected on a corresponding invoice.

5.  **Payment of Invoices**.

a) Consultant's invoices shall be due net forty-five (45) days after the date of Client's receipt of an accurate and substantiated invoice. Except as otherwise provided in any Work Order, Consultant shall invoice Client following the end of each monthly period for fees accrued and expenses incurred by Consultant in performing the Services under such Work Order. Without limiting its rights or remedies, Consultant shall have the right to halt or terminate the performance of Services under a Work Order if payment for undisputed invoices for such Work Order is not received within sixty (60) days of the invoice date; provided, that, Consultant has provided Client with written notice of such failure, and Client has failed to cure such non-payment within fifteen (15) days of receiving such additional written notice. With respect to any invoices under a Work Order that Client disputes in good faith, Consultant agrees to continue performing Services under such Work Order while the parties seek to resolve such dispute in accordance with the dispute resolution procedure set forth in Section 5(b) hereof.

b) With respect to any disputed invoice, Client shall provide Consultant with written notice of any good faith dispute within fifteen (15) days after Client received the invoice subject to such dispute. The parties agree to immediately escalate such dispute to Consultant's lead engagement partner or principal for such Work Order and Client's business sponsor for such Work Order. If such dispute is not resolved to the mutual satisfaction of the parties, the parties agree to further escalate such dispute to a senior partner or principal of Consultant and the Vice President of Finance of Client. If the parties fail to resolve such dispute within seventy-five (75) days after Client received the invoice subject to such dispute, then Consultant shall have the right to halt or terminate such Services.

6.    **Term**.

a)    This Agreement shall commence on the date hereof and, unless sooner terminated in accordance with its terms, shall terminate on the third anniversary of the date hereof.

b)    This Agreement may be terminated by either party at any time upon giving written notice to the other party not less than thirty (30) days before the effective date of termination; provided, however, that this Agreement shall continue to apply to all Work Orders that are in existence at the effective date of such termination and under which the Services have not been completed or otherwise terminated. Any Work Order may be terminated by Client at any time with or without cause, or by Consultant with cause, in either case by giving written notice to the other not less than thirty (30) days before the effective date of termination; provided that in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. In addition, Consultant may terminate any Work Order or performance of any part of the Services, if it determines that (i) a governmental, regulatory or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board or the Securities and Exchange Commission) or entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation or decision the result of which would render Consultant's performance of any part of the Services illegal or otherwise unlawful or in conflict with independence or professional rules, or (ii) circumstances change such that an attest client of Deloitte & Touche LLP or an affiliate of such attest client owns, directly or indirectly, 20% or more of the voting stock of Client or any of its affiliates. If any Work Order is terminated pursuant to this Paragraph 6(b), this Agreement shall continue to apply to all Work Orders that have not been terminated.

c)    The obligations of Consultant and Client that have been incurred prior to the effective date of termination (including, without limitation, the obligations of Client under Paragraphs 3 and 4 hereof) shall continue in full force and effect notwithstanding the expiration or termination of this Agreement or any Work Order and whether or not an invoice has been rendered with respect thereto.

7.    **Ownership**. Upon full and final payment to Consultant under a Work Order, and subject to all other terms and conditions herein, Consultant hereby grants Client a royalty-free, fully paid-up, non-exclusive license to use, have used for the benefit of Client, modify, copy, create derivative works and distribute the works of authorship, materials, information and other intellectual property delivered to Client pursuant to the Work Order (the "Deliverables"). To the extent a Deliverable being licensed to Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such license is provided by Consultant as agent for Deloitte Consulting Product Services LLC (in the case of Work Orders executed by Deloitte Consulting LLP) or Deloitte & Touche Products Company LLC (in the case of Work Orders executed by Deloitte & Touche LLP) or Deloitte Tax Products Company LLC (in the case of Work Orders executed by Deloitte Tax LLP) or Deloitte FAS Products Company LLC (in the case of Work Orders executed by Deloitte Financial Advisory Services LLP), on the terms and conditions herein. The license grant in this Paragraph 7 does not apply to any software, documentation or products that are subject to a separate license agreement between Client and any third party, including, without limitation,

Deloitte Consulting Products Services LLC, Deloitte & Touche Products Company LLC, Deloitte Tax Products Company LLC and Deloitte FAS Products Company LLC.

8.    **Limitation on Warranties and Actions**.

a)    Consultant represents and warrants that it shall perform the Services in good faith, in a professional manner, with knowledge and judgment, in accordance with applicable professional standards, and shall be in compliance in all material respects with all requirements of the Work Order.    EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SETION 8(a) OR FOR ANY ADDITIONAL WARRANTIES IN A WORK ORDER (PROVIDED THAT ANY SUCH WARRANTY IS SPECIFICALLY IDENTIFIED AS A WARRANTY IN SUCH WORK ORDER), CONSULTANT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR CONSULTANT, UPON RECEIPT OF WRITTEN NOTICE, TO, AT CLIENT'S OPTION, EITHER (I) USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY SUCH CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH, OR (II) RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.

b)    No action, regardless of form, arising under or relating to this Agreement, any Work Order or the Services may be brought more than one year after Client becomes aware (or should have become aware) of the cause of action giving rise to the claim, except that an action for nonpayment may be brought not later than one year following the date of the last payment due to the entity bringing the action.

9.    **Limitation on Damages**. Client and Consultant agree that neither party, nor their Affiliates, subcontractors, nor their respective personnel shall be liable to the other party for any claims, liabilities, or expenses relating to this Agreement, any Work Order, or the Services under any Work Order ("Claims") for an aggregate amount in excess of (a) in the case of Consultant's liability to Client, the fees paid by Client to Consultant under such Work Order, or (b) in the case of Client's liability to Consultant, the amounts paid and payable to Consultant under such Work Order; except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the other party (the "Indemnitee") for any such Claim under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for such Claim.  In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, or incidental loss, damage, or expense relating to this Agreement, any Work Order, or the Services, except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the Indemnitee for any such loss, damage, or expense under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for

such loss, damage, or expense.   In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any punitive or exemplary damages relating to this Agreement, any Work Order, or the Services.   In circumstances where all or any portion of the provisions of this Paragraph are judicially determined to be unavailable or unenforceable, the aggregate liability of either party, its Affiliates, subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that their conduct bears to all other conduct giving rise to such Claim.

10.  **Client Responsibilities**.

a)  In addition to Client's responsibilities as set forth in a Work Order, as a condition to Consultant's performance of the Services, Client shall cooperate with Consultant in the performance by Consultant of the Services, including, without limitation, (i) providing Consultant with adequate working space, equipment and facilities and timely access to data, information, and personnel of Client, (ii) providing qualified personnel having appropriate skills to perform their assigned tasks and duties; (iii) providing a suitable infrastructure environment which will support the Services and allow Consultant and Client to work productively; and (iv) promptly notifying Consultant of any issues, concerns or disputes with respect to the Services.

b)  Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Consultant for purposes of the performance of the Services.

c)  Client acknowledges and agrees that Consultant's performance is dependent on Client's timely and effective satisfaction of Client's responsibilities under this Agreement and any Work Order and timely decisions and approvals of Client in connection with the Services.

d)  Client shall be solely responsible for: (i) making all management decisions and performing all management functions; (ii) designating a competent management member to oversee the Services; (iii) evaluating the adequacy and results of the Services; and (iv) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

11.  **Force Majeure**.  Neither party shall be liable for any delays or nonperformance resulting directly or indirectly from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel, and agents); acts or omissions or the failure to cooperate by any third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

12.  **Confidentiality and Internal Use.**

a)  To the extent that, in connection with this Agreement or any Work Order, either Consultant or Client (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the

disclosing party's consent. The disclosing party hereby consents to the receiving party disclosing applicable and appropriate information (i) to subcontractors, whether located within or outside of the United States, that are providing services specific to a Work Order and that have agreed to be bound by confidentiality obligations similar to those in this Paragraph 12(a), (ii) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining to this Agreement or any Work Order; provided, that, to the extent permitted by applicable law or regulation, the receiving party provides the disclosing party with prompt written notice of such requirement and, to the extent practical, the disclosing party has been given a prior opportunity to seek a protective order, or (iii) to the extent such information (A) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency on an unrestricted basis and available to the public) other than as the result of a disclosure in breach hereof, (B) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party which the receiving party believes is not prohibited from so disclosing such information to the receiving party by obligation to the disclosing party, (C) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (D) is developed by the receiving party independent of any disclosures of such information made by the disclosing party to the receiving party. The receiving party shall carry out its obligations under this Paragraph 12(a) using at least the same degree of care as it employs in maintaining in confidence its own proprietary and confidential information, but in no event less than a reasonable degree of care. Nothing in this Paragraph 12(a) shall alter Client's obligations under Paragraph 12(b). Notwithstanding anything to the contrary herein, Client acknowledges that Consultant, in connection with performing the Services, may develop or acquire experience, skills, and ideas that are retained in the unaided memory of its personnel. Client acknowledges and agrees that Consultant may use and disclose such experience, skills, and ideas.

b)   Client agrees that (i) all Services and Deliverables shall be solely for Client's internal use, and are not intended to be and should not be used by any person or entity other than Client, and (ii) except as otherwise provided in a Work Order, the Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to the Services or Deliverables be made to, any person or entity without Consultant's prior written consent other than (i) Client, or (ii) Toshiba Corporation and its Affiliates provided, that, such entities agree to comply with the restrictions on disclosure set forth in this paragraph.

c)   Tax Services Provisions

     (i)   Notwithstanding anything to the contrary in this Agreement or any Work Order, the provisions of this Paragraph 12 regarding confidentiality and internal use will not apply to the tax treatment and tax structure (as defined in Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance) of any transaction, tax services or Deliverables (collectively referred to as "Subject Tax Planning Advice"), if any, provided to Client by Consultant under any Work Order. Nothing in this Paragraph 12 shall be construed as limiting or restricting disclosure of the Subject Tax Planning Advice or any tax feature thereof for purposes of Rule 3501(c)(i) of PCAOB Release 2005-014

and Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance. The Client acknowledges that none of its other advisors have imposed or will impose any conditions of confidentiality with respect to any Subject Tax Planning Advice. All Services and Deliverables shall be solely for Client's informational purposes and internal use and neither this Agreement nor any Work Order shall create privity between Consultant and any person or party other than Client ("third party").  Neither the Services nor any Deliverables are intended for the express or implied benefit of any third party.  Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose, on the advice, opinions, reports, or other Services or Deliverables of Consultant.  In the event of any unauthorized reliance, Client agrees to indemnify and hold harmless Consultant, its Affiliates, subcontractors and their respective personnel from all third-party claims, liabilities, costs and expenses.

(ii)   Certain Tax Disclosures and Reporting.  In accordance with IRC sections 6111 and 6112 Contractor may be required to report to the IRS or certain state tax authorities the tax Services including without limitation any related tax transaction(s) described in the applicable Work Order as well as Client's participation therein.  In addition, separate and apart from any reporting by Consultant, Client, in accordance with IRC section 6011, may also be required to disclose to a taxing authority its participation in one or more transactions which are the subject of the applicable Work Order.  The determination  of whether, when and to what extent Consultant and Client should comply with their respective federal or state "tax shelter" reporting requirements will be made exclusively and respectively by Consultant and Client.  Consultant and Client further agree that (i) any liability for fines or penalties or any other consequences resulting from non-compliance by one party with applicable tax disclosure or reporting rules will be borne or incurred exclusively by the non-compliant party, and (ii) any request by Client of Consultant for services in identifying or otherwise consulting on transactions subject to IRC section 6011 or corresponding state law and the reporting or disclosing thereof will be the subject of a separate Work Order.

(iii)  Accountant / Client Privilege – IRC §7525.  Client should be aware that certain information discussed with personnel of Consultant who are Federally Authorized Tax Practitioners or their agents for the purpose of obtaining Consultant's advice on tax matters may be privileged from disclosure in any non-criminal tax matters before the Internal Revenue Service and in non-criminal proceedings in Federal court that stem from matters before the Internal Revenue Service, if the United States is a party to the proceedings.  Client is solely responsible for managing the recognition, establishment and maintenance of the confidentiality privilege and Client must notify Consultant if Client wishes to invoke the confidentiality privilege and Consultant will cooperate with Client's reasonable instructions relating to the confidentiality privilege.  Circumstances may arise under which Client may wish to divulge or have Consultant divulge privileged information to other parties.  Client should be aware that such disclosure might result in a waiver of the confidentiality privilege.  Accordingly, if Client wishes Consultant to divulge such information, Consultant shall require Client to provide Consultant in advance with written authority to make such disclosures.  In addition, if it is ultimately determined

that a significant purpose of the tax matter was to avoid or evade any U.S. federal income tax, Client should be aware that the confidentiality privilege under §7525 of the Internal Revenue Code will not apply to any communications between Client and Consultant.

In the event that Consultant receives a request from a third party (including a subpoena, summons or discovery demand in litigation) calling for the production of privileged information, Consultant will promptly notify Client and will follow Client's reasonable instructions regarding any third party requests or needs for such material before Consultant would disclose same as may be required under applicable law or rules. Client agrees to hold Consultant, its Affiliates, subcontractors, and their respective personnel harmless from and also assumes responsibility for any expenses (including attorney's fees, court costs, costs incurred by outside advisors and any other cost imposed whether by way of penalty or otherwise) incurred by Consultant as a result of Client's assertion of the confidentiality privilege or Client's direction to Consultant to assert the confidentiality privilege on behalf of Client.

**13.** **Indemnification and Insurance.**

a)   (i)   Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims attributable to claims of third parties to the extent arising out of Client's breach of this Agreement.

(ii)   If specifically agreed upon in a Work Order, Client shall provide the following indemnity:

Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims arising from the Client's disclosure of the Services or Deliverables (other than any Subject Tax Planning Advice) to any third party.

b)   Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties solely for bodily injury, death or damage to real or tangible personal property, to the extent caused by the negligence or intentional misconduct of Consultant in connection with this Agreement or any Work Order.

c)   Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties arising out of infringement by the Deliverables of any patent or copyright or any unauthorized use of any trade secret or trademark, except to the extent that such infringement or unauthorized use arises from (i) Client's modification of the Deliverables or use thereof in a manner not contemplated by this Agreement or the applicable Work Order, (ii) the failure of Client to use any corrections or modifications made available by Consultant, (iii) information, materials, instructions or specifications provided by or on behalf of Client, (iv) Client's distribution, marketing or use for the benefit of third parties of the Deliverables, or (v) the use of the Deliverable in combination with any product or data not provided by Consultant whether or not with Consultant's consent, where such combination gives rise to the claim of

infringement. If any such Deliverable, or any portion thereof, becomes, or in Consultant's reasonable judgment, is likely to become the subject of a claim based upon infringement or unauthorized use, or if any such Deliverable or any portion thereof, is found by final, non-appealable order of a court of competent jurisdiction to be such an infringement or unauthorized use, Consultant, at its option and expense, shall have the right to (i) procure for Client the continued use of such Deliverable, (ii) replace or modify such Deliverable provided that the replacement or modified Deliverable is reasonably capable of performing substantially the same function, or (iii) require Client to cease use of such Deliverable and refund an appropriate portion of the fee paid with respect to the affected Deliverable. The foregoing provisions of this paragraph constitute the sole and exclusive remedy of Client, and the sole and exclusive obligation of Consultant, relating to a claim that Consultant's Deliverable infringes any patent or copyright or makes unauthorized use of any trade secret or trademark of a third party.

d)    Insurance

Consultant shall, during the performance of Services and the warranty period therefor, maintain insurance of the types and minimum amounts set forth below. Maintenance of insurance shall not limit Consultant's liability for loss or damage in excess of policy limits or outside of policy coverage.

| Type of Coverage | Minimum Amount of Coverage |
|---|---|
| Worker's Compensation | As required by law |
| Employer's Liability | $100,000 for each person/disease/aggregate |
| Motor Vehicle Liability (covering owned, leased and non-owned vehicle) | $1,000,000 combined single limit |
| Commercial General Liability, including:<br><br>• Premises/Operations<br>• Underground<br>• Explosion & Collapse Hazard<br>• Products/Completed Operations<br>• Broad Form Property Damage<br>• Blanket Contractual Liability Coverage | $1,000,000 per occurrence /$2,000,000 aggregate |
| Product Liability (may be included in Commercial General Liability) | $2,000,000 aggregate |
| Property (if Consultant has care, custody or control of Client property) | Replacement Value |

Consultant shall upon Client's request provide a certificate evidencing the required insurance.

**14. Approval of Services and Deliverables.**

a) All Services shall be deemed accepted by Client if not rejected (or if notice of non-acceptance is not given) in writing, within thirty (30) days of complete of performance under any Work Order.  If, during the term hereof, Client believes that there is a breach of the warranty in Paragraph 8(a) hereof, Client will notify Consultant, in writing, within thirty (30) days of becoming aware of the claimed breach, setting forth the nature of such claimed breach.  Consultant shall promptly investigate such claim of breach and advise Client of Consultant's planned corrective action, if any.  In addition, the provisions of Paragraphs 14(b) through 14(j) shall apply with respect to Work Orders for information technology-related Services.

b) All Deliverables prepared by Consultant shall have the written approval of Client's project director or his or her written designee that such Deliverables comply in all material respects with the requirements of the relevant Work Order, which approval shall not be unreasonably withheld.

c) Client shall complete its review of a Deliverable in not more than the number of business days that is specified in the Work Order for Client review of such Deliverable.  If not specifically identified in the Work Order, then the number of business days for any Client review of a Deliverable shall be no more than ten (10) business days.  Client shall provide Consultant (i) with approval of the Deliverable or (ii) with a written statement, as provided below, of the deficiencies preventing approval.  Such business days shall be counted from and include the first business day following the delivery of the Deliverable to Client.

d) Client's review and approval of Deliverables shall be solely for the purpose of determining compliance in all material respects with the applicable acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, format or style of the Deliverables or the incorporation at that time of additional ideas or functionality.  Approval shall be granted if the Deliverable conforms in all material respects to the applicable acceptance criteria set forth in the Work Order.  In the event of Client's rejection of a Deliverable (or Client's notice that it is not accepting a Deliverable), Client shall provide a complete and written statement which identifies in reasonable detail, with references to the applicable acceptance criteria in the Work Order, all deficiencies.  Deliverables requiring only minor or cosmetic corrections and not requiring extensive re-review by Client and for which corrections have been made by Consultant within specified times will be deemed approved.

e) Consultant shall have thirty (30) business days to complete all such corrective actions or changes in order for such Deliverable to conform in all material respects with the requirements therefor set forth in this Agreement or in the applicable Work Order.  The count of such business days shall begin on the first business day following Consultant's receipt of the written statement of required corrective actions or changes as set forth in subparagraph (c) of this Paragraph.

11

f) Client shall have ten (10) business days to complete a review of the corrective actions or changes made to the Deliverable in response to Client's written statement of deficiencies as set forth in subparagraph (c) of this Paragraph and notify Consultant in writing of acceptance or rejection (or non-acceptance). The count of such days shall begin on the first business day after Client receives the corrected or changed Deliverable from Consultant. Client's review and approval of such corrected or changed Deliverable shall be solely for the purpose of determining that corrections have been made to bring the Deliverables into compliance in all material respects with the acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, for format, style or the incorporation of additional ideas or functionality.

g) Client and Consultant may mutually agree to extend the period of time allotted for any review, correction or change under this Paragraph. Any such extension of time shall extend the schedule for subsequent Deliverables by a corresponding amount.

h) Notwithstanding the provisions of Paragraphs 14(b) through 14(g), approval of a Deliverable shall be deemed given by Client if Client has not delivered to Consultant a notice of deficiencies in writing for such Deliverable prior to the expiration of any period for Client review thereof as set forth in this Paragraph, or if Client uses the Deliverable in production. Notwithstanding the foregoing provisions of this Paragraph, approval of corrective actions or changes with respect to a Deliverable shall be deemed given by Client if Client has not rejected in writing (or has not provided written notice that it is not accepting), in accordance with this Paragraph, such corrective actions or changes with respect to such Deliverables prior to the expiration of any period for Client review thereof as set forth in this Paragraph.

i) To the extent that any Deliverables have been approved by Client at any stage of Consultant's performance hereunder, Consultant shall be entitled to rely on such approval for purposes of all subsequent stages of Consultant's performance hereunder. Upon Client's approval of each Deliverable, Client agrees that, in the event of a contradiction between the relevant Work Order and the approved Deliverable, the contradiction shall be resolved by the approved Deliverable controlling.

j) If Consultant is unable to correct any deficiency in a Deliverable within the period of time set forth above, Client shall be entitled, at its option, to a refund or credit of professional fees paid to Consultant hereunder with respect to the Services giving rise to the claimed deficiency and this shall be Client's sole and exclusive remedy, and Consultant's sole and exclusive obligation, with respect to any claim that the Deliverables do not conform to the terms of this Agreement and the Work Order.

**15. Waiver of Jury Trial. CONSULTANT AND CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT, ANY WORK ORDER, OR THE SERVICES.**

**16. Independent Contractor**. It is understood and agreed that each of Consultant and Client is an independent contractor and that neither of them is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner or representative. Neither Consultant nor Client shall act or represent itself, directly or by implication, in any

such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

17. **Survival**.   All Paragraphs herein relating to compensation, expenses, payment of invoices, ownership, limitation on warranties and actions, limitation on damages, confidentiality and internal use, indemnification, waiver of jury trial, survival, binding nature, assignment and subcontracting, non-solicitation, non-exclusivity, interpretation, governing law, and jurisdiction and venue shall survive the expiration or termination of this engagement.   **The provisions of Paragraphs 8, 9, 12, 13, 15, 26 and 27 shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*) or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

18. **Binding Nature; Assignment and Subcontracting**.  This Agreement and each Work Order shall be binding on the respective parties thereto and their respective permitted successors and assigns; provided, however, that, except as provided below, neither Consultant nor Client may assign, transfer, or delegate any of its rights or obligations under this Agreement or any Work Order (including, without limitation, interests or claims relating to this Agreement or any Work Order) without the prior written consent of the other.   Client hereby consent to Consultant assigning or subcontracting any of Consultant's rights or obligations under this Agreement or any Work Order to (a) any Affiliate of Consultant or Related Entity, whether located within or outside the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Consultant.   Client may assign this Agreement or any Work Order to any entity that acquires all or a substantial part of the assets or business of Client, provided, that Consultant provides its prior written consent to such assignment (such consent not to be unreasonably withheld).   Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

19. **Notices**.   Whenever under this Agreement or any Work Order notice is required or permitted to be given, such notice shall be in writing and effective upon receipt.   All notices shall be hand delivered, sent by a reputable commercial overnight courier, or mailed by registered or certified United States mail, return receipt requested, postage prepaid, and addressed to the addressee at its address set forth below.

To Deloitte U.S.: Deloitte LLP
2500 One PPG Place
Pittsburgh, PA  15222-5401
Attention:  Joe Klaja


To Consultant:   The address specified in the Work Order


To Client:        Westinghouse Electric Company
4350 Northern Pike
Monroeville, PA  15146
Attention: Cynthia J. Keating

A party may change its address for notice by giving prior written notice of the new address in conformity with the foregoing and the date upon which such new address will become effective.

20. **Entire Agreement**. This Agreement, together with the pertinent Work Order, constitutes the entire agreement with respect to the subject matter hereof and supersedes all other oral or written representations, understandings, or agreements relating to the subject matter hereof.

21. **Severability**. If any provision of this Agreement or any Work Order is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permitted the intent of Consultant and Client set forth in this Agreement or such Work Order.

22. **Waivers and Amendments**. No delay or omission by Consultant or Client in enforcing its rights or remedies under this Agreement or any Work Order shall impair such right or remedy or be deemed to be a waiver thereof. No waiver of any right or remedy under this Agreement or any Work Order with respect to any occurrence or event on one occasion shall be deemed a waiver of such right or remedy with respect to such occurrence or event on any other occasion. No amendment or waiver of this Agreement or any Work Order shall be valid unless in writing and signed by the parties thereto.

23. **Non-solicitation**. During the term of a Work Order and for a period of one (1) year thereafter, each of Consultant and Client agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of the performance of Services under such Work Order with personnel of the other shall not, without the other's consent, directly employ, solicit, engage or retain the services of such personnel of the other. In the event that either Consultant or Client breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to twenty percent (20%) of the annual base compensation of the relevant personnel in his/her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either Consultant or Client to solicit or recruit generally in the media or by employment recruiter, or to hire personnel of Consultant or Client who respond to such solicitation or recruitment.

24. **Non-exclusivity**. Each of Client and Consultant acknowledge that Consultant shall have the right to provide services of any kind or nature whatsoever to any person or entity as Consultant in its sole discretion deems appropriate, and to use any works of authorship or other intellectual property that may be included in the Deliverables, to develop for itself, or for others, materials or processes that may be similar to those produced as a result of the Services, except to the extent such works or Deliverables include the intellectual property of Client provided by, or on behalf of Client, to Consultant in connection with this Agreement or a Work Order.

25. **Paragraph Headings**. The paragraph headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereof.

26. **Governing Law.** This Agreement and each Work Order, and all matters relating to this Agreement and each Work Order, shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).

27. **Consultant's Affiliated and Related Entities.** Client acknowledges and agrees that no Affiliate or Related Entity of Deloitte U.S. other than Consultant, whether or not acting as a subcontractor, shall have any liability hereunder to Client or any other person and Client will not bring any action against any such Affiliate or Related Entity in connection with this Agreement or any Work Order. Without limiting the foregoing, Affiliates and Related Entities of Deloitte U.S. are intended third party beneficiaries of this Agreement, including, without limitation, the limitation on liability and indemnification provisions hereof, and the agreements and undertakings of Client contained in the Work Order. Any Affiliate or Related Entity of Deloitte U.S. may in its own right enforce such terms, agreements and undertakings. Notwithstanding the foregoing, Client retains its rights to seek direct injunctive relief against any entity for breach of the confidentiality obligations set forth in this Agreement or any Work Order.

**IN WITNESS WHEREOF,** Deloitte U.S. (for and on behalf of its function-specific subsidiaries) and Client (on behalf of itself and its subsidiaries) have caused this Agreement to be executed and delivered by their respective duly authorized representatives as of the date first set forth above.

**DELOITTE LLP**

By: _____

Name: _JOSEPH M. KLAJA_

Title: _PRINCIPAL, DELOITTE_

Date: _4/29/11_

**WESTINGHOUSE ELECTRIC COMPANY LLC**

By: _____

Name: _RICHARD A GABBIANELLI_

Title: _VP FINANCE_

Date: _4/28/11_

15

## WORK ORDER

Work Order Number:_____    Authorized Start Date: _____

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC dated April 21st, 2011 (the "Agreement"). For the purposes of this Work Order, Consultant shall be [*Name of Function-Specific Subsidiary*] and for purposes of Paragraph 7 of the Agreement, "Consultant" shall include [*Name of relevant subsidiary*].

**Consultant Services Description:**

**Estimated Timing of Services and Deliverables:**

**Fees and Expenses:**

**Client Responsibilities:**

**Other Terms (including changes in provisions of the Agreement):**

(1)    The parties hereby elect whether the indemnification provision set forth in Section 13(a)(ii) of the Agreement applies to this Work Order:

Yes    ☐

No    ☐

16

**WESTINGHOUSE ELECTRIC COMPANY LLC**　　　**CONSULTANT**

By: _____　　　By: _____

Printed
Name: _____　　　Printed
Name:_____

Title:_____　　　Title: _____

Date: _____　　　Date:_____

　　　　　　　　　　　　　　　　　　　　　Address: _____

## **EXHIBIT C**

**Librandi Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY** | : | **Case No. 17-10751 (MEW)** |
| **LLC,** *et al.*, | : | |
| | : | |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------- x

**DECLARATION OF LOUIS LIBRANDI IN CONNECTION WITH THE APPLICATION**
**OF DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR.**
**P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AN ORDER**
**EXPANDING THE SCOPE OF THE RETENTION AND EMPLOYMENT OF**
**DELOITTE CONSULTING LLP TO INCLUDE ADDITIONAL CONSULTING**
**SERVICES** *NUNC PRO TUNC* **TO JANUARY 19, 2018**

Pursuant to 28 U.S.C. § 1746, I, Louis Librandi, under penalty of perjury, declare as

follows:

1.       I am a principal of the firm of Deloitte Consulting LLP ("**Deloitte Consulting**"),

which has an office at 1700 Market Street, Suite 2700, Philadelphia, Pennsylvania 19103.  I am

duly authorized to make and submit this declaration (the "**Supplemental Declaration**") on

behalf of Deloitte Consulting as consultant to Westinghouse Electric Company LLC and certain

above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in support of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

*Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for an Order Expanding the Scope of the Retention and Employment of Deloitte Consulting LLP to Include Additional Consulting Services* Nunc Pro Tunc *to January 19, 2018* (the "**Supplemental Application**").

2.    The statements set forth in this Supplemental Declaration are based upon my personal knowledge, upon information and belief, and/or upon client matter records kept in the ordinary course of business that were reviewed by me or personnel of Deloitte Consulting or its affiliates.

3.    I previously submitted a declaration (the "**Original Declaration**") in support of the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Consulting LLP for Consulting Services* Nunc Pro Tunc *to November 28, 2017* [Docket No. 2809] (the "**Original Application**"), so granted by order of the Court, dated March 27, 2018 [Docket No. 2972] (the "**Retention Order**").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Original Declaration or the Supplemental Application, as applicable.

4.    This Supplemental Declaration is subject to the statements and qualifications set forth in the Original Declaration and the previously submitted supplemental declarations, which are incorporated herein by reference.  As discussed in paragraph 10 of the Original Declaration, I stated that as additional material information was discovered, the Original Declaration would be supplemented.

2

5.      The Debtors have retained Deloitte Consulting to provide certain related consulting services to a non-Debtor affiliate in Italy, Manglarotti Spa, to evaluate a potential systems applications and products (SAP) enterprise resource planning (ERP) implementation, pursuant to a work order, dated January 19, 2018 (the "**Additional Services SOW**"), attached to the Supplemental Application as **Exhibit B**.  The compensation for these services, as provided in the Additional Services SOW, is a flat fee of $22,700, excluding expenses and applicable taxes. Deloitte Consulting has engaged the DTT Member Firm in Italy ("**Deloitte Italy**") as a subcontractor to perform certain of the services described in the Additional Services SOW. Deloitte Consulting shall pay Deloitte Italy a portion of the fixed fees that Deloitte Consulting bills to the Debtors for the services Deloitte Italy, as a subcontractor, performs under the Additional Services SOW.

6.      In addition, Deloitte Consulting will bill the Debtors for actual, necessary, and reasonable out-of-pocket expenses and applicable taxes incurred in connection with the provision of the Additional Services.

Dated: April 20, 2018             By:     _/s/ Louis Librandi_____
                                          Louis Librandi
                                          Principal
                                          Deloitte Consulting LLP

## __EXHIBIT D__

**Stanton Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
In re:                                             :          **Chapter 11**
                                                   :
**WESTINGHOUSE ELECTRIC COMPANY**                  :          **Case No. 17-10751 (MEW)**
**LLC**, *et al.*,                                 :
                                                   :
                                                   :
        Debtors.[1]                                :          **(Jointly Administered)**
                                                   :
------------------------------------------------------------- x

**DECLARATION OF STEVEN F. STANTON IN CONNECTION WITH THE**
**APPLICATION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328,**
**FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1**
**FOR AN ORDER EXPANDING THE SCOPE OF THE RETENTION AND**
**EMPLOYMENT OF DELOITTE FINANCIAL ADVISORY SERVICES LLP**
**TO INCLUDE ADDITIONAL FINANCIAL ADVISORY SERVICES**
***NUNC PRO TUNC* TO FEBRUARY 9, 2018**

Pursuant to 28 U.S.C. § 1746, I, Steven F. Stanton, under penalty of perjury, declare as

follows:

1.     I am a managing director of the firm of Deloitte Financial Advisory Services LLP

("**Deloitte FAS**"), which has an office at 555 12th Street NW, Suite 400, Washington, D.C.

20004.    I am duly authorized to make and submit this declaration (the "**Supplemental**

**Declaration**") on behalf of Deloitte FAS as financial advisory services provider to Westinghouse

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

Electric Company LLC and certain above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in support of the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for an Order Expanding the Scope of the Retention and Employment of Deloitte Financial Advisory Services LLP to Include Additional Financial Advisory Services* Nunc Pro Tunc *to February 9, 2018* (the "**Supplemental Application**").

2.     The statements set forth in this Supplemental Declaration are based upon my personal knowledge, upon information and belief, and/or upon client matter records kept in the ordinary course of business that were reviewed by me or personnel of Deloitte FAS or its affiliates.

3.     I previously submitted a declaration (the "**Original Declaration**") in support of the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Financial Advisory Services LLP for Financial Advisory Services* Nunc Pro Tunc *to the Petition Date* [Docket No. 1129] (the "**Original Application**"), so granted by order of the Court, dated September 5, 2017 [Docket No. 1299] (the "**Retention Order**").  I also previously submitted supplemental declarations in connection with the Original Application (*see* Docket Nos. 1129, 1555, 1628, and 3038).  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Original Declaration or the Supplemental Application, as applicable.

4.     This Supplemental Declaration is subject to the statements and qualifications set forth in the Original Declaration and the previously submitted supplemental declarations, which

are incorporated herein by reference.  As discussed in paragraph 11 of the Original Declaration, I stated that as additional material information was discovered, the Original Declaration would be supplemented.

5.      The Debtors have retained Deloitte FAS to provide certain services to assist in analyzing the Debtors' anti-corruption compliance review at the Debtors' locations in Italy pursuant to a work order dated February 9, 2018 (the "**Additional Services SOW**"), issued under and pursuant to the terms of the MSA.  The Additional Services SOW is attached (with the MSA) to the Supplemental Application as **Exhibit B**.  Deloitte FAS has engaged the DTT Member Firm in Italy ("**Deloitte Italy**") as a subcontractor to perform certain of the services described in the Additional Services SOW.  The compensation for these services, as provided in the Additional Services SOW, will be billed at the following hourly rates (which exclude expenses and applicable taxes):

| Professional Level | Hourly Rate |
|---|---|
| Partner | $565 |
| Senior Consultant | $405 |
| Deloitte Italy Senior Consultant | $230 |

Deloitte FAS shall pay Deloitte Italy the portion of the fees that Deloitte FAS bills to the Debtors for the services Deloitte Italy, as a subcontractor, performs under the Additional Services SOW.

Dated: April __, 2018          By:   */s/ Steven F. Stanton*_____
                                                        Steven F. Stanton, Managing Director
                                                        Deloitte Financial Advisory Services LLP

## **EXHIBIT E**

**Proposed Order**

WEIL:\96565304\3\80768.0017

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

In re:                                              :        Chapter 11
                                                    :
WESTINGHOUSE ELECTRIC COMPANY                       :        Case No. 17-10751 (MEW)
LLC, *et al.*,                                      :
                                                    :
            Debtors.[1]                             :        (Jointly Administered)
                                                    :
---------------------------------------------------------- x

## ORDER AUTHORITY TO RETAIN AND EMPLOY DELOITTE CONSULTING LLP NUNC PRO TUNC TO JANUARY 19, 2018 AND DELOITTE FINANCIAL ADVISORY SERVICES LLP NUNC PRO TUNC TO FEBRUARY 9, 2018

Upon the Supplemental Application, dated June 12, 2018 (the "**Supplemental Application**"), of Westinghouse Electric Company LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1 and 2016-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") for authority to expand the retentions of Deloitte Consulting LLP ("**Deloitte Consulting**") *nunc pro tunc* to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster, Inc. d/b/a WECTEC Global Project Services Inc. (8572), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

January 19, 2018 and Deloitte Financial Advisory Services LLP ("**Deloitte FAS**" and, together

with Deloitte Consulting, the "**Deloitte Entities**") *nunc pro tunc* to February 9, 2018, all as more

fully set forth in the Supplemental Application; and upon the Supplemental Declaration of Louis

Librandi and the Supplemental Declaration of Steven F. Stanton; and this Court having jurisdiction

to consider the Supplemental Application and  the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334 and the Amended Standing Order M-431, dated January 31, 2012 (Preska, C.J.);

and consideration of the Supplemental Application and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Supplemental Application having

been provided as set forth therein, and it appearing that no other or further notice need be provided

and this court having reviewed the Supplemental Application; and this Court being satisfied that

the Deloitte Entities have the capability and experience to provide the services described in the

Supplemental Application and that the Deloitte Entities do not hold an interest adverse to the

Debtors or their estates with respect to the matters upon which they are to be engaged; and it

appearing that the relief requested in the Supplemental Application is in the best interests of the

Debtors, their estates, its creditors, and other parties in interest; and after due deliberation thereon;

and good and sufficient cause appearing therefor;

### IT IS HEREBY ORDERED THAT:

1.      The Supplemental Application is granted to the extent set forth herein.

2.      Pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy

Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, the Debtors are hereby authorized

but not directed to (a) expand the retention and employment of the Deloitte Consulting *nunc pro*

*tunc* to January 19, 2018 to perform the services described in the work order dated January 19,

2018 and attached as **Exhibit A** to the Supplemental Application

2

(the "**Deloitte Consulting Work Order**") and (b) expand the retention and employment of Deloitte FAS *nunc pro tunc* to February 19, 2018 to perform the services described in the work order dated February 9, 2018 and attached as **Exhibit B** to the Supplemental Application (the "**Deloitte FAS Work Order**" and together with the Deloitte Consulting Work Order, the "**Work Orders**").

3.        The Deloitte Entities shall be compensated for their services under the Work Orders in accordance with the terms of the Supplemental Application, sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the *Order Pursuant to 11 U.S.C. §§ 105(a), 330, 331 Fed. R. Bankr. P. 2016, and Local Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 544], the *Order Pursuant to 11 U.S.C. §§ 327(a) and 328, Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Financial Advisory Services LLP as Financial Advisory Services Provider Nunc Pro Tunc to the Petition Date* [ECF No. 1299] (the "**Deloitte FAS Retention Order**"), the *Order Pursuant to 11 U.S.C. §§ 327(a) and 328, Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Consulting LLP for Consulting Services Nunc Pro Tunc to November 28, 2017* [ECF No. 2972] (the "**Deloitte Consulting Retention Order**" and together with the Deloitte FAS Retention Order the "**Original Retention Orders**"), and any other applicable procedures and orders of this Court.

4.        All modifications made to the Master Services Agreement by the Original Retention Orders shall also apply to the Work Orders.

5.        Nothing contained in this Order, nor any payment made pursuant to this Order, shall be dispositive with respect to any future allocation of responsibility between and

3

among Debtors and non-Debtors for such payment, and all rights with respect thereto are expressly reserved by the Unsecured Creditors' Committee.

6.    The Debtors are authorized to take all action necessary to carry out this Order.

7.    Notwithstanding anything in the Supplemental Application or the Work Orders to the contrary, during the pendency of the Chapter 11 Cases, this Court retains exclusive jurisdiction over all matters arising out of and/or pertaining to the Deloitte Entities' engagements. Any provisions of the Work Orders that provides for mediation or arbitration or for jurisdiction in a different court shall not be applicable unless this Court lacks jurisdiction pursuant to the previous sentence.

Dated: _____, 2018
        New York, New York

_____

UNITED STATES BANKRUPTCY JUDGE

WEIL:\96565304\3\80768.0017