Presentment Date and Time: June 26, 2018 at 10:00 a.m. (Eastern Time)
Objection Deadline: June 19, 2018 at 4:00 p.m. (Eastern Time)
Hearing Date and Time (Only if Objection Filed): June 26, 2018 at 11:00 a.m. (Eastern Time)

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail
David N. Griffiths
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| In re: | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY** | : | **Case No. 17-10751 (MEW)** |
| **LLC,** *et al.*, | : | |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |
| ------------------------------------------------------- x | | |

**NOTICE OF PRESENTMENT OF SUPPLEMENTAL APPLICATION
OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a),
FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1
FOR AUTHORITY EXPAND THE RETENTION OF DELOITTE TRANSACTIONS
AND BUSINESS ANALYTICS LLP *NUNC PRO TUNC* TO JANUARY 22, 2018**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster, Inc. d/b/a WECTEC Global Project Services Inc. (8572), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961). The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

**PLEASE TAKE NOTICE** that on **June 26, 2018 at 10:00 a.m. (Eastern Time)**, the undersigned will present the annexed *Supplemental Application of the Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Expand the Retention of Deloitte Transactions and Business Analytics LLP Nunc Pro Tunc to January 22, 2018* (the "**Supplemental Application**") to the Honorable Michael E. Wiles, United States Bankruptcy Judge, in Room 617 of the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York, 10004 (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Supplemental Application (the "**Objections**") must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and the *Order pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing certain Notice and Case Management Procedures* [ECF No. 101] so as to be received no later than **June 19, 2018 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Supplemental Application, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order

2

annexed to the Supplemental Application, which order may be entered with no further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that if one or more Objections are received by the Objection Deadline, the Bankruptcy Court may enter an order granting the relief requested in the Motion, except for relief that impacts any party with a pending Objection, and that if a written Objection is timely filed and served, a hearing (the "**Hearing**") will be held to consider such Objection(s) before the Honorable Michael E. Wiles in the Bankruptcy Court, on **June 26, 2018 at 11:00 a.m. (Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: New York, New York
         June 12, 2018

/s/ *Robert J. Lemons*
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail
David N. Griffiths
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors
and Debtors in Possession*

3

**Presentment Date and Time: June 26, 2018 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: June 19, 2018 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): June 26, 2018 at 11:00 a.m. (Eastern Time)**

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Robert J. Lemons
Garrett A. Fail
David N. Griffiths
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY** | : | **Case No. 17-10751 (MEW)** |
| **LLC**, *et al.*, | : | |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

--------------------------------------------------------------- x

## SUPPLEMENTAL APPLICATION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a), FED. R. BANKR. P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AUTHORITY TO EXPAND THE RETENTION OF DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP *NUNC PRO TUNC* TO JANUARY 22, 2018

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster, Inc. d/b/a WECTEC Global Project Services Inc. (8572), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

Westinghouse Electric Company LLC and certain debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent in support of this supplemental application (the "**Supplemental Application**"):

### Background

1.    On March 29, 2017 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

2.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.    On March 28, 2018, the Court entered an order [ECF No. 2988] confirming the Debtors' *Modified Second Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 2986] (the "**Plan**").

4.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Lisa J. Donahue Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [ECF No. 4], sworn to and filed on the Petition Date.

5.    On August 11, 2017, the Debtors filed their application, pursuant to sections 327(a) and 328 (a) of the Bankruptcy Code, Rules 2014(a) and 2016 of the Federal Rules of

2

Bankruptcy Procedures (the "**Bankruptcy Rules**"), and Local Rules 2014-1 and 2016-1, to employ and retain Deloitte Transactions and Business Analytics LLP ("**DTBA**") as their valuation and discovery service provider *nunc pro tunc* to the Petition Date [ECF No. 1128] (the "**Original Retention Application**").

6.      On September 5, 2017 the Court entered an order approving the Retention Application on a final basis [ECF No. 1300] (the "**Original Retention Order**").

## Jurisdiction

7.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

## Relief Requested

8.      The Debtors seek authority pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, to amend the retention and employment of DTBA *nunc pro tunc* to January 22, 2018 to include the additional services set forth herein in accordance with the parties' work order dated January 22, 2018, which is annexed hereto as attached hereto as **Exhibit A** (the "**Additional Services SOW**").

9.      In support of this Supplemental Application, the Debtors submit the Supplemental Declaration of Keith Adams (the "**Adams Supplemental Declaration**"), which is annexed hereto as **Exhibit B.**

10.      A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit C** (the "**Proposed Order**").

## Additional Services

11.      The Debtors are seeking authority to expand the scope of DTBA's retention to assist the Debtors to develop an estimate of the fair market value of the Westinghouse trade

3

name as of January 1, 2018 (the "**Additional Services**").  The Debtors require such valuation in

order to comply with their ordinary course accounting.

### Professional Compensation

12.     Subject to Court approval, and in compliance with the *Order Pursuant to*

*11 U.S.C. §§ 105(a), 330, 331 Fed. R. Bankr. P. 2016, and Local Rule 2016-1 Establishing*

*Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*

[ECF No. 544], the Debtors will compensate DTBA for the Additional Services based upon the

hours actually expended by each assigned professional at each professional's respective hourly

rate.

13.     The hourly rates for the professionals providing the Additional Services are

as follows:

| Professional Level | Hourly Rate |
|---|---|
| Partner / Principal / Managing Director | $640 |
| Senior Manager | $561 |
| Manager | $521 |
| Senior Consultant | $454 |
| Consultant | $388 |

DTBA may also seek reimbursement for actual, necessary, and reasonable out-of-pocket expenses

incurred in connection with the provision of the Additional Services.

14.     As set forth in the Original Application and in accordance with the Original

Retention Order, DTBA will keep reasonably detailed time records for the Additional Services.

These time records shall contain detailed time entries describing the task(s) performed, and be

organized by project category, as applicable.  Additionally, DTBA shall serve and file with the

Court application(s) for interim or final Court approval and allowance, pursuant to the applicable

4

sections of the Bankruptcy Code, the Fee Guidelines (as defined in the Original Application), and the applicable orders of the Court, of the compensation and reimbursement of expenses requested under the Additional Services SOW.[2]

### DTBA's Disinterestedness

15.    To the best of the Debtors' knowledge and except to the extent disclosed herein, in the Adams Supplemental Declaration, and/or in the Original Retention Application or any of its supporting declarations:  (a) DTBA is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code and does not hold or represent an interest adverse to the Debtors' estates; and (b) DTBA has no connection to the Debtors, their creditors or their related parties.  To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of the DTBA's retention are discovered or arise, DTBA will use reasonable efforts to file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

### Efforts to Avoid Duplication of Services

16.    DTBA's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in these chapter 11 cases. DTBA has informed the Debtors that it understands that the Debtors have retained and may retain additional professionals during the term of the engagement and will use its reasonable efforts to

---

[2] Any such fee application may be combined with a fee application pertaining to the Original Retention Application.

5

work cooperatively with the Debtors to integrate any respective work conducted by such professionals on behalf of the Debtors, to the extent such integration is necessary.

## Basis for Relief

17.     The Debtors seek authority to expand the employment and retention of DTBA under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtor] in carrying out the [Debtor's] duties under this title."  11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."  11 U.S.C. § 1107(b).

18.     The Debtors believe that DTBA's fees are reasonable in light of industry practice and should be approved.  In addition, as noted above, DTBA is "disinterested" and all of its fees and expenses are subject to approval of the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and further orders of the Court. Accordingly, the Court should approve the supplemental employment and retention of DTBA pursuant to the terms set forth in the Additional Services SOW.

## Notice

19.     Notice of this Supplemental Application will be provided to the Rule 2002 Parties set forth in the *Order Pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No.

6

101].  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

20.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 12, 2018
      New York, New York

WESTINGHOUSE ELECTRIC COMPANY, LLC
(for itself and on behalf of its affiliates
as Debtors and Debtors in Possession)

_/s/ Lisa J. Donahue_____
NAME:  Lisa J. Donahue
TITLE:  Chief Transition and Development Officer

7

## EXHIBIT A

**Additional Services SOW**

# WORK ORDER

Work Order Number: __9300273187__             Authorized Start Date: __January 22, 2018__

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC (herein, "Client" or "you"), dated April 28, 2011 and amended on April 3, 2014 and again on June 14, 2017 (the "Agreement"). For the purposes of this Work Order, Consultant ("we" "us" or "our") shall refer to Deloitte Transactions and Business Analytics LLP.1 For purposes of the Work Order, Consultant's licensing agent, as described in Section 7 of the Agreement, shall be Deloitte Transactions and Business Analytics Products Company LLC.

**Consultant Services Description:**

## Background

Under the provisions of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 350, *Intangibles — Goodwill and Other*, it is required that all intangible assets not subject to amortization be tested for impairment annually or more frequently if events or changes in circumstances indicate that the assets might be impaired. The impairment test consists of a comparison of the fair value of an intangible asset with its carrying value amount.

## Purpose and Use

As described in this engagement letter, Consultant will perform the Services and will communicate the results of the work in a Deliverable (as defined in the GBT&C) to Client. The Services and the Deliverable are solely for Client's internal use to assist it with its financial reporting requirements to test those intangible assets not subject to amortization, as described in ASC 350.

## Scope of the Services

## Services to Be Provided

We will develop an estimate of the fair value of the Westinghouse trade name (the "Trade Name") as of January 1, 2018 (the "Effective Date").

The Services will include only the Trade Name, and will not include the analysis of any other assets or liabilities.

## Type and Premise of Value

For financial reporting purposes, the type of value is fair value. Fair value, as defined in ASC 820, *Fair Value Measurements and Disclosures*, is the "price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

---

[1] On December 29, 2013 (the "Reorganization Date"), Deloitte Financial Advisory Services LLP ("Deloitte FAS") implemented a reorganization of its financial advisory and forensic services business to better align its organization structure with the way it conducts business resulting in its valuation service line, among others, being transferred to Deloitte Transactions and Business Analytics LLP ("DTBA"), an affiliate of Deloitte FAS.

Unless otherwise noted in the Deliverable, the type of value will reflect the highest and best use[2] of each nonfinancial asset or business interest included in the Services.

If the highest and best use of a nonfinancial asset is to use the asset in combination with other assets or with other assets and liabilities, the fair value of the asset will be estimated based on the price that would be received in a current transaction to sell the asset assuming that the asset would be used with other assets as a group or with other assets and liabilities, and that those assets and liabilities (i.e., its complementary assets and the associated liabilities) would be available to market participants.[3]

If the highest and best use of a nonfinancial asset is to use it on a standalone basis, the fair value of the asset will be estimated based on the price that would be received in a current transaction to sell the asset to market participants that would use the asset on a standalone basis.[4]

If the highest and best use of a business interest is consistent with its value as a going concern, then the value of the business interest will reflect the continued operation of the business. If the highest and best use of a business interest is consistent with its liquidation value, then the value of the business interest will reflect the estimated proceeds derived from the discontinuation of the business and the sale of its assets.

The value of each asset, asset group, or business interest will reflect the estimated exit price at which the asset, group of assets, or business interest would exchange in a hypothetical transaction occurring among market participants.

## Valuation Process

We will consider each of the following three widely accepted and commonly applied approaches in the valuation of the Subject Assets:

- Income Approach

- Market Approach

- Cost Approach

*Income Approach*

The income approach is a general way of determining a value indication for a business, business ownership interest, or a tangible or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount[5].

*Market Approach*

The market or sales comparison approach is a general way of estimating the value of a business, business ownership interest, or a tangible or intangible asset using one or more methods that compare the subject to

---

[2]  Paragraph 19 of ASU 2011-04, *Fair Value Measurement (Topic 820)*.

[3]  Ibid.

[4]  Ibid.

[5]  AICPA Statement on Standards for Valuation Services No. 1, *Appendix B: International Glossary of Business Valuation Terms*, p. 45.

2

similar investments or assets that have been sold or offered for sale. Sales and offering prices for the comparable investments or assets are adjusted to reflect differences between the investment or asset being valued and the comparable investments or assets, such as historical financial condition and performance, expected economic benefits, time and terms of sale, utility, and physical characteristics.

*Cost Approach*

The cost or asset approach is a general way of estimating the value of a business, business ownership interest, or a tangible or intangible asset by quantifying the amount of money required to replace the investment or asset with another having equivalent utility, sometimes described as future service capability.

*Reconciliation*

If we use more than one valuation approach, we will reconcile the indicated values in reaching our final estimate of value.

## Deliverable

At the conclusion of the Services, we will provide you with the results of our analysis in a summary report, as described in the American Institute of Certified Public Accountants (AICPA) Statement on Standards for Valuation Services No. 1, *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*. Our written report will consist of the following:

- Descriptions of the purpose, use, and scope of the analysis; the methodologies employed; and the results of the work

- Exhibits, including the following:

  - Valuation exhibits

  - A statement of assumptions and limiting conditions similar to that included in Appendix A

  - An appraiser's certification (representation) signed by the individual responsible for each identified analysis

Although Consultant might in certain circumstances provide Client with draft results of the work before it is finalized, any part of our analysis, including the recommendations or conclusions, may change between the time of any draft results and the issuance of the final Deliverable. Client understands that Client may not rely upon any of the analyses, conclusions, or recommendations unless and until the final Deliverable is issued.

Please note that we will provide feedback on the memos (if any) to be prepared by the Client but no deliverables will be provided associated with the recommendations on the application of ASC 350.

**Estimated Timing of Services and Deliverables:**

We are prepared to commence the Services promptly upon our receipt of your written authorization to proceed and of the requested information and documents.

We will provide you with our preliminary advice and recommendations in the form of schedules within two (2) to three (3) weeks of receiving all of the necessary information to perform our analysis. We will keep you informed of our progress and the development of any events that may change our delivery date.

3

We will issue a draft report to you within two (2) weeks of our discussion of preliminary results to provide you with the opportunity to ascertain whether (1) all of the information communicated to us and contained within the draft is complete and accurate, (2) all factors have been considered, and (3) the format of our report is consistent with your requirements. In order to expedite delivery of the final report, we anticipate receipt of your comments within 30 days of our issuance of the draft report.

We will provide you with copies of the final report shortly following the resolution of all matters included in your comments on the draft report. Any changes proposed by you and incorporated by us subsequent to our issuance of a final report are outside the scope of the Services and may impact our fees.

## Fees and Expenses:

While the actual fees will depend on your requirements and on circumstances encountered while performing the Services, our professional fees are expected to be in the range of $25,000 to $30,000 for the fair value estimate of the Trade Name. This fee estimate is based on the information now available to us and on the assumptions that we will be provided with the information requested for the analysis in an organized format, and that the information provided will be timely, complete, and accurate.

If new data or information received during the course of this engagement require the structure or scope of our analysis to be altered, we will promptly notify you of how such changes might impact our fee estimate. We will not undertake an expansion of the scope of the Services without mutual written agreement.

The foregoing estimated professional fees also reflect our current hourly billing rates in the table below. Our hourly rates are adjusted from time to time, and we will advise you promptly if a rate adjustment is being made by Consultant that will increase the professional fees expected to be billed in this engagement beyond the above estimate.

| Staff Level | Hourly Rate |
|---|---|
| Partner/Principal/Managing Director | $640 |
| Senior Manager | $561 |
| Manager | $521 |
| Senior Consultant | $454 |
| Consultant | $388 |

In addition to our professional fees, we will charge separately for engagement expenses related to the completion of the Services. Based on the information currently available to us, we do not expect these expenses to exceed eight (8) percent of our fee.

In accordance with our standard procedures for assignments of this nature, we will issue an initial billing in the amount of $15,000 upon commencement of the Services. A second invoice for the remaining balance plus expenses to be issued upon delivery of the draft report. Should issuance of our final report be delayed beyond thirty (30) days from the issuance of the draft report, we will issue a final invoice at that time. Additional fees may be incurred if additional changes are needed at a later date to issue in final format. Our invoices will reflect a single amount for the Services and a separate amount for expenses incurred. Payment shall be due upon receipt of an invoice and any outstanding invoices must be paid prior to issuance of the final report.

4

**Consultant Responsibilities:**

Keith Adams, Principal, of Consultant's Atlanta office will have overall responsibility for the Services. Peter Hannagan, Senior Manager, of the McLean office will act as Engagement Manager and will have operational responsibility for the Services. Other professionals from our Business Valuation practice will be included as needed during the engagement. Affiliates or entities related to Consultant may provide services as a subcontractor to Consultant in support of the Services.

## Professional Standards

In providing the Services, Consultant's personnel will follow (1) the general standards outlined in Rule 201 of the AICPA *Code of Professional Conduct* [ET section 201.01], and (2) the related guidance for consulting services established under Rule 202 of the AICPA *Code of Professional Conduct* [ET section 202.01].

**Client Responsibilities:**

While Consultant's team described above has the experience and knowledge necessary to perform the Services, your participation and that of other members of your team will be critical to achieving required engagement performance. Consultant will rely on Client to provide timely access to the properties, personnel, information, and documents necessary to perform the Services and to participate in the planning and cooperative activities required to successfully complete the engagement.

**Other Terms (including changes in provisions of the Agreement):**

(1)    The parties hereby elect whether the indemnification provision set forth in Section 13(a)(ii) of the Agreement applies to this Work Order:

        Yes        ☑

        No         ☐

(2)    To the extent that the Services include assets, properties, or business interests, the Client shall be solely responsible for, and Consultant shall have no responsibility for, (1) any and all financial and tax reporting, and (2) matters of legal description or title. Consultant shall be entitled to make, and shall have no responsibility for, the following assumptions regarding such assets, properties, and business interests: (1) title is good and marketable; (2) such assets, properties, or business interests are free and clear of any and all liens or encumbrances; (3) there is full compliance with all applicable federal, state, local, and national regulations and laws (including, without limitation, zoning regulations); (4) there are no encroachments; (5) the land is free of adverse soil conditions which could prohibit development of the property to its highest and best use; (6) there is responsible ownership and competent management with respect to such assets, properties, and business interests; (7) all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any federal, state, local, or national government, private entity, or organization have been obtained or renewed or will be obtained or renewed when needed for any use on which the Services are to be based; and (8) any plot plans, sketches, drawings, or other exhibits that may be included in Consultant's Deliverable, if any, are included only to assist the reader in visualizing the property.

(3)    Consultant shall not assume any responsibility for identifying structural conditions. The Services will be based upon surface rights only, and no analysis will be made of the subsurface or of hazardous waste conditions, if any. The Services shall not take into consideration the

5

possibility of the existence of asbestos, PCB transformers, other toxic, hazardous, or contaminated substances, underground storage tanks, or the cost of removal of any such substance or item. Consultant is not qualified to detect, and shall not be responsible for detecting, such substances or items.

(4)    Consultant may use information and data furnished by parties other than the Client and its agents if Consultant in good faith believes that such information and data is reliable. Consultant, however, shall neither be responsible for, nor provide any assurance regarding, the accuracy or completeness of any such information or data. Consultant shall be entitled to assume, without independent verification, the accuracy and completeness of any and all assumptions provided to Consultant by or on behalf of the Client for purposes of the performance by Consultant of the Services.

(5)    In connection with the Services, in no event shall Consultant be required to (1) provide testimony, (2) serve as a witness, (3) update any Deliverable for any events or circumstances occurring subsequent to the date of such Deliverable, or (4) furnish additional work or services, unless pursuant to a separate signed work order with terms and conditions that are acceptable to Consultant and the Client. The Client acknowledges that: (1) neither the Services nor any Deliverables, in whole or in part, shall constitute a fairness or solvency opinion; (2) Consultant will not provide any legal advice or address any questions of law; and (3) the performance of the Services does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls, or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board, or other regulatory body.

(6)    Client acknowledges that the Deliverables are complete only when presented in their entirety and only for the purpose stated therein.

(7)    Client will be solely responsible for all decisions regarding the accounting treatment of any item or transaction (including decisions regarding its compliance with U.S. generally accepted accounting principles and acknowledges that the Services do not include the recording of any amounts in the Client's books or records. All amounts derived from the performance of the Services will be reviewed and approved by, and will be the responsibility of, Client management.

(8)    Any assistance provided by Consultant in connection with the documentation of any accounting treatment or whitepaper shall be performed solely to reflect the views of the Client. Such documentation will be an iterative process and Consultant may not be informed of, and is not responsible for, any final accounting position taken or accounting policies instituted by the Client.

(9)    Client will not seek Consultant's opinion, and Consultant will not provide any such opinion, on the application of accounting principles in connection with this engagement. Furthermore, Client management agrees that it will not represent to any third parties that it has obtained such opinion from Consultant under this engagement. If such opinion is requested under the requirements of Statements of Auditing Standards No. 50, Reports on the Application of Accounting Principles, and No. 97, Amendment to Statement on Auditing Standards No. 50, "Reports on the Application of Accounting Principles," any such services requested of Consultant would be subject to (1) a determination by Consultant as to whether such services can be rendered, (2) additional client acceptance procedures, and (3) a separate, signed engagement letter with terms and conditions that are acceptable to Consultant and the Client. Consultant is under no obligation to perform such an engagement, if requested.

(10)    For purposes of this SOW, notwithstanding anything to the contrary contained in the Agreement the parties agree that (i) this SOW may be executed by Deloitte Transactions and Business Analytics LLP (the entity that has responsibility for the performance of the services described in this SOW) and, accordingly, "Consultant" shall mean Deloitte Transactions and Business Analytics LLP, and (ii) all references in the Agreement to "Deloitte FAS Products Company LLC" shall be replaced with "Deloitte Transactions and Business Analytics Products Company LLC".

**WESTINGHOUSE ELECTRIC COMPANY LLC**

By: _____

Printed
Name: _Cory Weber_____

Title: _Manager, Technical Accounting_

Date: _1/31/18_____

**CONSULTANT**

**DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP**

By: _____

Printed
Name: _____

Title: _____

Date: _____

Address: _____

7

# APPENDIX A — ASSUMPTIONS AND LIMITING CONDITIONS

This report has been prepared pursuant to the following general assumptions and general limiting conditions:

1. The analyses, advice, recommendations, opinions, or conclusions contained herein are valid only as of the indicated date and only for the indicated purpose.

2. The analyses, advice, recommendations, opinions, or conclusions contained herein are for the exclusive use of the client for the sole and specific purposes noted herein and may not be used for any other purpose by the client or any other party. Furthermore, the analyses, advice, recommendations, opinions, or conclusions are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever. The analyses, advice, recommendations, opinions, or conclusions represent the considered opinion of Deloitte Transaction and Business Analytics LLP ("DTBA") based on information furnished to it by the client, its representatives, and other sources.

3. Possession of this valuation opinion report, or a copy thereof, does not carry with it the right of publication or distribution to or use by any third party. Any third party that uses the information contained herein does so at its sole risk and agrees to hold DTBA, its subcontractors, and their respective personnel harmless from any claims resulting from use by any other third party. Access by any third party does not create privity between DTBA and any third party.

4. No part of the contents of this report (especially the analyses, advice, recommendations, opinions, or conclusions; the identity of any DTBA personnel, or any reference to any of their professional designations or to DTBA) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent of DTBA.

5. No item in this report shall be changed by anyone other than DTBA, and DTBA shall have no responsibility for unauthorized changes.

6. Neither DTBA nor its personnel, by reason of this engagement, is required to furnish a complete valuation report, or to give testimony, or to be in attendance in court with reference to the subject assets, properties, or business interests unless arrangements have been previously made in writing.

7. We conducted interviews with the client or its representatives regarding past, present, and prospective operating results and have assumed that the information gathered in such interviews is accurate and complete.

8. Financial statements and related information provided to us in the course of this engagement by the client or its representatives have been accepted without any verification as fully and correctly reflecting the business conditions and operating results of the relevant assets, properties, or businesses for the respective periods, except as specifically noted herein. We have not audited, reviewed, or compiled any financial information provided to us and, accordingly, we express no audit opinion or any other form of assurance regarding such information.

9. If prospective financial information provided by the client or its representatives has been used in this analysis, we have not examined or compiled the prospective financial information and, therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

10. We do not provide assurance on the achievability of any forecasted results contained herein because events and circumstances frequently do not occur as expected, differences between actual and expected results may be material, and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

11. We have relied on the representations of the client or its representatives concerning the usefulness and condition of all real and personal property, intangible assets, or investments used or held in any subject business, as well as the amounts and settlement dates of its liabilities, except as specifically stated to the contrary in this report. We have not attempted to confirm whether all assets of any subject business are free and clear of liens and encumbrances or that the entity has good and marketable title to any assets.

12. We assume that subject assets, properties, or business interests are free and clear of any or all liens or encumbrances unless otherwise stated herein.

8

13. We believe the information obtained from public sources or furnished to us by other sources is reliable. However, we issue no warranty or other form of assurance regarding the accuracy of such information.

14. We assume that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of any subject asset, property, or business interest through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

15. DTBA is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report wishing to know whether such liabilities exist, or the scope and their effect on the value of any subject asset, property, or business interest, is encouraged to obtain a professional environmental assessment. DTBA does not conduct or provide environmental assessments and has not performed one in the course of this engagement.

16. We have not determined independently whether any subject asset, property, or business interest is subject to (1) any present or future liability relating to environmental matters (including, but not limited to, CERCLA/Superfund liability) or (2) the scope of any such liabilities. The analyses, advice, recommendations, opinions, or conclusions contained herein take no such liabilities into account, except as have been reported to us by the client or its representatives or by an environmental consultant working for the client, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the analyses, advice, recommendations, opinions, or conclusions contained herein. To the extent such information has been reported to us, we have relied on that information without verification and offer no warranty or representation as to its accuracy or completeness.

17. We have not made a specific compliance survey or analysis of any subject asset, property, or business interest to determine whether it is subject to, or in compliance with, the Americans with Disabilities Act of 1990, and the analyses, advice, recommendations, opinions, or conclusions contained herein do not consider the effect, if any, of noncompliance with such law.

18. We assume no responsibility for the legal description or matters including legal or title considerations. Title to the subject assets, properties, or business interests is assumed to be good and marketable unless otherwise stated herein.

19. We assume that the subject assets, properties, or business interests are responsibly owned and competently managed.

20. We assume that the client is in full compliance with all applicable federal, state, and local regulations and laws unless noncompliance is stated, defined, and considered in this report.

21. Unless otherwise stated, no effort has been made to determine the possible effect, if any, on any subject asset, property, or business interest due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

22. We assume that all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any federal, state, or local government, private entity, or organization have been or can be obtained or renewed for any use on which the analyses, advice, recommendations, opinions, or conclusions contained herein are based.

23. We assume no responsibility for any financial or tax reporting requirements; such reporting requirements are the responsibility of the client for whom this analysis was prepared.

9

AMENDMENT NO. 1
TO
MASTER SERVICES AGREEMENT
BETWEEN
DELOITTE LLP
AND
WESTINGHOUSE ELECTRIC COMPANY LLC

This Amendment No. 1 (this "Amendment") is made and entered into as of the 3rd day of April, 2014, between Deloitte LLP ("Deloitte U.S."), for an on behalf of its subsidiaries, and Westinghouse Electric Company LLC ("Westinghouse").

WHEREAS, Deloitte U.S. and Westinghouse have entered into a Master Services Agreement, dated April 28, 2011 (the "Agreement"), for the performance of services by function-specific subsidiaries of Deloitte U.S. on a statement of work basis;

WHEREAS, the Agreement shall expire pursuant to its terms on April 28, 2014; and

WHEREAS, the parties seek to amend the expiration date of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Deloitte U.S. and Westinghouse hereby agree to amend the Agreement, effective the date hereof, as follows:

1.    Section 6(a) of the Agreement, is hereby amended and restated in its entirety as follows:

"a)    This Agreement shall commence on April 28, 2011 and, unless terminated sooner in accordance with its terms, shall terminate on April 28, 2017."

Except as expressly amended herein, the Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Deloitte U.S. (for an on behalf of its subsidiaries) and Westinghouse have signed this Amendment as of the day and year written above.

DELOITTE LLP                              WESTINGHOUSE ELECTRIC COMPANY LLC

By:_____               By:_____
   Name:                                     Name:
   Title:                                     Title:

## MASTER SERVICES AGREEMENT

**THIS AGREEMENT** is made and entered into as of the 28th day of April, 2011, by and between Deloitte LLP, a limited liability partnership registered under the laws of the State of Delaware ("Deloitte U.S."), for and on behalf of its function-specific subsidiaries, including, without limitation, Deloitte & Touche LLP, Deloitte Consulting LLP, Deloitte Tax LLP and Deloitte Financial Advisory Services LLP, and Westinghouse Electric Company LLC, a limited liability company organized under the laws of the State of Delaware ("Client").

WITNESSETH:

**WHEREAS,** Client desires to engage one or more function-specific subsidiaries of Deloitte U.S. to provide certain professional services; and

**WHEREAS,** one or more function-specific subsidiaries of Deloitte U.S. are willing to provide certain professional services to assist Client; and

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual promises contained herein, the parties agree as follows:

1. **Engagement.**

   a)   Client understands and agrees that Deloitte U.S. is not a provider of professional services under this Agreement and that Work Orders (as hereinafter defined) will be executed by the Deloitte U.S. function-specific subsidiary having primary responsibility for performance of the requested services. As used herein, the term "Consultant" shall mean the Deloitte U.S. function-specific subsidiary that has executed the pertinent Work Order. For purposes of this Agreement, "Client" shall mean Westinghouse Electric Company LLC and its subsidiaries and Client Affiliates. Westinghouse Electric Company LLC represents that it has the power and authority to execute this Agreement and each Work Order (as defined herein) on behalf of, and to bind, itself and its subsidiaries and Client Affiliates. Client hereby engages Consultant, and Consultant hereby accepts the engagement, to provide professional services as further described in a Work Order issued pursuant hereto and on the terms and conditions set forth herein. No audit, review, compilation or attest services as described in the pronouncements on professional standards issued by the American Institute of Certified Public Accountants or any successor standard setting organization shall be performed under this Agreement. Consultant shall not provide advice regarding the financial accounting treatment of any transaction implemented from the services provided under a Work Order and will not assume any responsibility for any financial reporting with respect to such services.

   b)   For purposes of this Agreement, the following definitions apply:

      (i)   "Affiliates" shall mean any person or entity that controls, is controlled by, or is under common control with, such person or entity.

      (ii)  "Client Affiliates" shall mean Westinghouse Electric UK Limited, and each of its subsidiaries.

1

     (iii)   "Related Entities" shall mean the member firms of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and the Affiliates of such member firms.

2. **Services.**

    a)   From time to time during the term of this Agreement as Client, in its sole discretion, determines that it requires professional services, Client shall request such services from Consultant pursuant to and in accordance with separate purchase orders, the content of which shall be substantially as set forth in Exhibit A annexed hereto and made a part hereof (herein referred to as the "Work Order"). In addition, any pre-printed terms in such purchase orders shall be superseded by the terms of this Agreement. Consultant, in its sole discretion, may agree to provide such services. Once executed by Consultant and Client, such Work Order shall be binding upon the parties thereto. Each Work Order shall specifically reference this Agreement and shall specify the details of the particular services to be performed under the Work Order (the "Services"). All rights and obligations of Consultant and Client hereunder shall be deemed to apply to such Work Order as if fully set forth therein. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of any Work Order, the terms of the Work Order shall control, provided, that, such term in such Work Order clearly sets forth the parties intent to modify a specific term of this Agreement. In the event such clarification is not set forth in such Work Order, this Agreement shall control any such conflict.

    b)   Consultant and Client expressly acknowledge and agree that the Work Orders are based on understandings and expectations that apply at the time such Work Orders are executed and that, except as specifically set forth in the applicable Work Order, the specific start and stop dates contained in the Work Orders are not firm performance dates, are expected to be revised during the term of any engagement, and are only to be regarded as estimated beginning and completion dates for the tasks and activities as of the date of the Work Orders. Nonetheless, Consultant agrees to use diligent efforts to meet such dates. Except where a Work Order provides for firm performance dates (but subject in such case to Section 11 below), if Consultant utilizes diligent efforts but is unable to meet such dates, it shall not be considered to have defaulted in its obligations hereunder. Consultant agrees to notify Client promptly in writing if it expects or encounters significant delays in completing its Services.

    c)   It is understood and agreed that the Services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. In connection with the performance of the Services, Consultant shall be entitled to rely on all decisions and approvals of Client.

3. **Compensation.** For the Services provided by Consultant with respect to any Work Order, Client shall compensate Consultant in accordance with the terms of such Work Order.

4. **Expenses.**

a)  Client shall reimburse Consultant for all reasonable expenses described in the applicable Work Order incurred by Consultant in performing the Services (including, without limitation, all reasonable travel, meal, lodging, and mileage expenses) in accordance with Consultant's standard policies as they exist from time to time. Client shall be responsible for all taxes imposed on the Services or on the transaction, other than Consultant's income taxes imposed on a net basis or by employment withholding, and other than taxes imposed on Consultant's property.

b)  Client acknowledges that temporary living reimbursements to Consultant's personnel may be deemed compensatory under federal, state, and local tax laws if such personnel's assignment in a particular location will exceed or has exceeded one year. The parties shall cooperate in good faith to limit the duration of a person's assignment in a particular location to less than one year. If Client's requirements are such that it becomes necessary for a person's services in a particular location to continue for a year or more and, as a result, such person's living expenses are deemed compensatory for tax purposes, then Client shall pay Consultant the amount of additional compensation provided to Consultant's personnel to compensate for taxes imposed therefor as reflected on a corresponding invoice.

5.  **Payment of Invoices**.

a)  Consultant's invoices shall be due net forty-five (45) days after the date of Client's receipt of an accurate and substantiated invoice. Except as otherwise provided in any Work Order, Consultant shall invoice Client following the end of each monthly period for fees accrued and expenses incurred by Consultant in performing the Services under such Work Order. Without limiting its rights or remedies, Consultant shall have the right to halt or terminate the performance of Services under a Work Order if payment for undisputed invoices for such Work Order is not received within sixty (60) days of the invoice date; provided, that, Consultant has provided Client with written notice of such failure, and Client has failed to cure such non-payment within fifteen (15) days of receiving such additional written notice. With respect to any invoices under a Work Order that Client disputes in good faith, Consultant agrees to continue performing Services under such Work Order while the parties seek to resolve such dispute in accordance with the dispute resolution procedure set forth in Section 5(b) hereof.

b)  With respect to any disputed invoice, Client shall provide Consultant with written notice of any good faith dispute within fifteen (15) days after Client received the invoice subject to such dispute. The parties agree to immediately escalate such dispute to Consultant's lead engagement partner or principal for such Work Order and Client's business sponsor for such Work Order. If such dispute is not resolved to the mutual satisfaction of the parties, the parties agree to further escalate such dispute to a senior partner or principal of Consultant and the Vice President of Finance of Client. If the parties fail to resolve such dispute within seventy-five (75) days after Client received the invoice subject to such dispute, then Consultant shall have the right to halt or terminate such Services.

6. **Term**.

a) This Agreement shall commence on the date hereof and, unless sooner terminated in accordance with its terms, shall terminate on the third anniversary of the date hereof.

b) This Agreement may be terminated by either party at any time upon giving written notice to the other party not less than thirty (30) days before the effective date of termination; provided, however, that this Agreement shall continue to apply to all Work Orders that are in existence at the effective date of such termination and under which the Services have not been completed or otherwise terminated. Any Work Order may be terminated by Client at any time with or without cause, or by Consultant with cause, in either case by giving written notice to the other not less than thirty (30) days before the effective date of termination; provided that in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. In addition, Consultant may terminate any Work Order or performance of any part of the Services, if it determines that (i) a governmental, regulatory or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board or the Securities and Exchange Commission) or entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation or decision the result of which would render Consultant's performance of any part of the Services illegal or otherwise unlawful or in conflict with independence or professional rules, or (ii) circumstances change such that an attest client of Deloitte & Touche LLP or an affiliate of such attest client owns, directly or indirectly, 20% or more of the voting stock of Client or any of its affiliates. If any Work Order is terminated pursuant to this Paragraph 6(b), this Agreement shall continue to apply to all Work Orders that have not been terminated.

c) The obligations of Consultant and Client that have been incurred prior to the effective date of termination (including, without limitation, the obligations of Client under Paragraphs 3 and 4 hereof) shall continue in full force and effect notwithstanding the expiration or termination of this Agreement or any Work Order and whether or not an invoice has been rendered with respect thereto.

7. **Ownership**. Upon full and final payment to Consultant under a Work Order, and subject to all other terms and conditions herein, Consultant hereby grants Client a royalty-free, fully paid-up, non-exclusive license to use, have used for the benefit of Client, modify, copy, create derivative works and distribute the works of authorship, materials, information and other intellectual property delivered to Client pursuant to the Work Order (the "Deliverables"). To the extent a Deliverable being licensed to Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such license is provided by Consultant as agent for Deloitte Consulting Product Services LLC (in the case of Work Orders executed by Deloitte Consulting LLP) or Deloitte & Touche Products Company LLC (in the case of Work Orders executed by Deloitte & Touche LLP) or Deloitte Tax Products Company LLC (in the case of Work Orders executed by Deloitte Tax LLP) or Deloitte FAS Products Company LLC (in the case of Work Orders executed by Deloitte Financial Advisory Services LLP), on the terms and conditions herein. The license grant in this Paragraph 7 does not apply to any software, documentation or products that are subject to a separate license agreement between Client and any third party, including, without limitation,

Deloitte Consulting Products Services LLC, Deloitte & Touche Products Company LLC, Deloitte Tax Products Company LLC and Deloitte FAS Products Company LLC.

8.  **Limitation on Warranties and Actions**.

a)  Consultant represents and warrants that it shall perform the Services in good faith, in a professional manner, with knowledge and judgment, in accordance with applicable professional standards, and shall be in compliance in all material respects with all requirements of the Work Order. EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SETION 8(a) OR FOR ANY ADDITIONAL WARRANTIES IN A WORK ORDER (PROVIDED THAT ANY SUCH WARRANTY IS SPECIFICALLY IDENTIFIED AS A WARRANTY IN SUCH WORK ORDER), CONSULTANT DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR CONSULTANT, UPON RECEIPT OF WRITTEN NOTICE, TO, AT CLIENT'S OPTION, EITHER (I) USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY SUCH CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH, OR (II) RETURN OF PROFESSIONAL FEES PAID TO CONSULTANT HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.

b)  No action, regardless of form, arising under or relating to this Agreement, any Work Order or the Services may be brought more than one year after Client becomes aware (or should have become aware) of the cause of action giving rise to the claim, except that an action for nonpayment may be brought not later than one year following the date of the last payment due to the entity bringing the action.

9.  **Limitation on Damages**. Client and Consultant agree that neither party, nor their Affiliates, subcontractors, nor their respective personnel shall be liable to the other party for any claims, liabilities, or expenses relating to this Agreement, any Work Order, or the Services under any Work Order ("Claims") for an aggregate amount in excess of (a) in the case of Consultant's liability to Client, the fees paid by Client to Consultant under such Work Order, or (b) in the case of Client's liability to Consultant, the amounts paid and payable to Consultant under such Work Order; except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the other party (the "Indemnitee") for any such Claim under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for such Claim. In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, or incidental loss, damage, or expense relating to this Agreement, any Work Order, or the Services, except to the extent (i) judicially determined to have resulted primarily from the bad faith or intentional misconduct of such party or its subcontractors, (ii) arising from such party's breach of its confidentiality obligations set forth in Section 12 hereof, or (iii) to the extent that one party is required to indemnify the Indemnitee for any such loss, damage, or expense under Section 12(c) or 13 hereof and the Indemnitee is liable to a third party for

such loss, damage, or expense.  In no event shall either party, its Affiliates, subcontractors or their respective personnel be liable to the other party for any punitive or exemplary damages relating to this Agreement, any Work Order, or the Services.  In circumstances where all or any portion of the provisions of this Paragraph are judicially determined to be unavailable or unenforceable, the aggregate liability of either party, its Affiliates, subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that their conduct bears to all other conduct giving rise to such Claim.

10.  **Client Responsibilities**.

   a)  In addition to Client's responsibilities as set forth in a Work Order, as a condition to Consultant's performance of the Services, Client shall cooperate with Consultant in the performance by Consultant of the Services, including, without limitation, (i) providing Consultant with adequate working space, equipment and facilities and timely access to data, information, and personnel of Client, (ii) providing qualified personnel having appropriate skills to perform their assigned tasks and duties; (iii) providing a suitable infrastructure environment which will support the Services and allow Consultant and Client to work productively; and (iv) promptly notifying Consultant of any issues, concerns or disputes with respect to the Services.

   b)  Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Consultant for purposes of the performance of the Services.

   c)  Client acknowledges and agrees that Consultant's performance is dependent on Client's timely and effective satisfaction of Client's responsibilities under this Agreement and any Work Order and timely decisions and approvals of Client in connection with the Services.

   d)  Client shall be solely responsible for: (i) making all management decisions and performing all management functions; (ii) designating a competent management member to oversee the Services; (iii) evaluating the adequacy and results of the Services; and (iv) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

11.  **Force Majeure**.  Neither party shall be liable for any delays or nonperformance resulting directly or indirectly from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel, and agents); acts or omissions or the failure to cooperate by any third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

12.  **Confidentiality and Internal Use.**

   a)  To the extent that, in connection with this Agreement or any Work Order, either Consultant or Client (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the

disclosing party's consent.  The disclosing party hereby consents to the receiving party disclosing applicable and appropriate information (i) to subcontractors, whether located within or outside of the United States, that are providing services specific to a Work Order and that have agreed to be bound by confidentiality obligations similar to those in this Paragraph 12(a), (ii) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining to this Agreement or any Work Order; provided, that, to the extent permitted by applicable law or regulation, the receiving party provides the disclosing party with prompt written notice of such requirement and, to the extent practical, the disclosing party has been given a prior opportunity to seek a protective order, or (iii) to the extent such information (A) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency on an unrestricted basis and available to the public) other than as the result of a disclosure in breach hereof, (B) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party which the receiving party believes is not prohibited from so disclosing such information to the receiving party by obligation to the disclosing party, (C) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (D) is developed by the receiving party independent of any disclosures of such information made by the disclosing party to the receiving party.  The receiving party shall carry out its obligations under this Paragraph 12(a) using at least the same degree of care as it employs in maintaining in confidence its own proprietary and confidential information, but in no event less than a reasonable degree of care.  Nothing in this Paragraph 12(a) shall alter Client's obligations under Paragraph 12(b).  Notwithstanding anything to the contrary herein, Client acknowledges that Consultant, in connection with performing the Services, may develop or acquire experience, skills, and ideas that are retained in the unaided memory of its personnel.   Client acknowledges and agrees that Consultant may use and disclose such experience, skills, and ideas.

b)    Client agrees that (i) all Services and Deliverables shall be solely for Client's internal use, and are not intended to be and should not be used by any person or entity other than Client, and (ii) except as otherwise provided in a Work Order, the Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to the Services or Deliverables be made to, any person or entity without Consultant's prior written consent other than (i) Client, or (ii) Toshiba Corporation and its Affiliates provided, that, such entities agree to comply with the restrictions on disclosure set forth in this paragraph.

c)    Tax Services Provisions

(i)    Notwithstanding anything to the contrary in this Agreement or any Work Order, the provisions of this Paragraph 12 regarding confidentiality and internal use will not apply to the tax treatment and tax structure (as defined in Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance) of any transaction, tax services or Deliverables (collectively referred to as "Subject Tax Planning Advice"), if any, provided to Client by Consultant under any Work Order.  Nothing in this Paragraph 12 shall be construed as limiting or restricting disclosure of the Subject Tax Planning Advice or any tax feature thereof for purposes of Rule 3501(c)(i) of PCAOB Release 2005-014

and Internal Revenue Code Sections 6011 and 6111 and related Internal Revenue Service guidance. The Client acknowledges that none of its other advisors have imposed or will impose any conditions of confidentiality with respect to any Subject Tax Planning Advice. All Services and Deliverables shall be solely for Client's informational purposes and internal use and neither this Agreement nor any Work Order shall create privity between Consultant and any person or party other than Client ("third party"). Neither the Services nor any Deliverables are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose, on the advice, opinions, reports, or other Services or Deliverables of Consultant. In the event of any unauthorized reliance, Client agrees to indemnify and hold harmless Consultant, its Affiliates, subcontractors and their respective personnel from all third-party claims, liabilities, costs and expenses.

(ii)   Certain Tax Disclosures and Reporting. In accordance with IRC sections 6111 and 6112 Contractor may be required to report to the IRS or certain state tax authorities the tax Services including without limitation any related tax transaction(s) described in the applicable Work Order as well as Client's participation therein. In addition, separate and apart from any reporting by Consultant, Client, in accordance with IRC section 6011, may also be required to disclose to a taxing authority its participation in one or more transactions which are the subject of the applicable Work Order. The determination of whether, when and to what extent Consultant and Client should comply with their respective federal or state "tax shelter" reporting requirements will be made exclusively and respectively by Consultant and Client. Consultant and Client further agree that (i) any liability for fines or penalties or any other consequences resulting from non-compliance by one party with applicable tax disclosure or reporting rules will be borne or incurred exclusively by the non-compliant party, and (ii) any request by Client of Consultant for services in identifying or otherwise consulting on transactions subject to IRC section 6011 or corresponding state law and the reporting or disclosing thereof will be the subject of a separate Work Order.

(iii)  Accountant / Client Privilege – IRC §7525. Client should be aware that certain information discussed with personnel of Consultant who are Federally Authorized Tax Practitioners or their agents for the purpose of obtaining Consultant's advice on tax matters may be privileged from disclosure in any non-criminal tax matters before the Internal Revenue Service and in non-criminal proceedings in Federal court that stem from matters before the Internal Revenue Service, if the United States is a party to the proceedings. Client is solely responsible for managing the recognition, establishment and maintenance of the confidentiality privilege and Client must notify Consultant if Client wishes to invoke the confidentiality privilege and Consultant will cooperate with Client's reasonable instructions relating to the confidentiality privilege. Circumstances may arise under which Client may wish to divulge or have Consultant divulge privileged information to other parties. Client should be aware that such disclosure might result in a waiver of the confidentiality privilege. Accordingly, if Client wishes Consultant to divulge such information, Consultant shall require Client to provide Consultant in advance with written authority to make such disclosures. In addition, if it is ultimately determined

that a significant purpose of the tax matter was to avoid or evade any U.S. federal income tax, Client should be aware that the confidentiality privilege under §7525 of the Internal Revenue Code will not apply to any communications between Client and Consultant.

In the event that Consultant receives a request from a third party (including a subpoena, summons or discovery demand in litigation) calling for the production of privileged information, Consultant will promptly notify Client and will follow Client's reasonable instructions regarding any third party requests or needs for such material before Consultant would disclose same as may be required under applicable law or rules. Client agrees to hold Consultant, its Affiliates, subcontractors, and their respective personnel harmless from and also assumes responsibility for any expenses (including attorney's fees, court costs, costs incurred by outside advisors and any other cost imposed whether by way of penalty or otherwise) incurred by Consultant as a result of Client's assertion of the confidentiality privilege or Client's direction to Consultant to assert the confidentiality privilege on behalf of Client.

**13. Indemnification and Insurance.**

a)   (i)   Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims attributable to claims of third parties to the extent arising out of Client's breach of this Agreement.

(ii)   If specifically agreed upon in a Work Order, Client shall provide the following indemnity:

Client shall indemnify and hold harmless Consultant, its Affiliates, subcontractors, and their respective personnel from all Claims arising from the Client's disclosure of the Services or Deliverables (other than any Subject Tax Planning Advice) to any third party.

b)   Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties solely for bodily injury, death or damage to real or tangible personal property, to the extent caused by the negligence or intentional misconduct of Consultant in connection with this Agreement or any Work Order.

c)   Consultant shall indemnify, defend and hold harmless Client and its personnel from and against any and all Claims attributable to claims of third parties arising out of infringement by the Deliverables of any patent or copyright or any unauthorized use of any trade secret or trademark, except to the extent that such infringement or unauthorized use arises from (i) Client's modification of the Deliverables or use thereof in a manner not contemplated by this Agreement or the applicable Work Order, (ii) the failure of Client to use any corrections or modifications made available by Consultant, (iii) information, materials, instructions or specifications provided by or on behalf of Client, (iv) Client's distribution, marketing or use for the benefit of third parties of the Deliverables, or (v) the use of the Deliverable in combination with any product or data not provided by Consultant whether or not with Consultant's consent, where such combination gives rise to the claim of

infringement. If any such Deliverable, or any portion thereof, becomes, or in Consultant's reasonable judgment, is likely to become the subject of a claim based upon infringement or unauthorized use, or if any such Deliverable or any portion thereof, is found by final, non-appealable order of a court of competent jurisdiction to be such an infringement or unauthorized use, Consultant, at its option and expense, shall have the right to (i) procure for Client the continued use of such Deliverable, (ii) replace or modify such Deliverable provided that the replacement or modified Deliverable is reasonably capable of performing substantially the same function, or (iii) require Client to cease use of such Deliverable and refund an appropriate portion of the fee paid with respect to the affected Deliverable. The foregoing provisions of this paragraph constitute the sole and exclusive remedy of Client, and the sole and exclusive obligation of Consultant, relating to a claim that Consultant's Deliverable infringes any patent or copyright or makes unauthorized use of any trade secret or trademark of a third party.

d)    Insurance

Consultant shall, during the performance of Services and the warranty period therefor, maintain insurance of the types and minimum amounts set forth below. Maintenance of insurance shall not limit Consultant's liability for loss or damage in excess of policy limits or outside of policy coverage.

| Type of Coverage | Minimum Amount of Coverage |
|---|---|
| Worker's Compensation | As required by law |
| Employer's Liability | $100,000 for each person/disease/aggregate |
| Motor Vehicle Liability (covering owned, leased and non-owned vehicle) | $1,000,000 combined single limit |
| Commercial General Liability, including:<br><br>• Premises/Operations<br>• Underground<br>• Explosion & Collapse Hazard<br>• Products/Completed Operations<br>• Broad Form Property Damage<br>• Blanket Contractual Liability Coverage | $1,000,000 per occurrence /$2,000,000 aggregate |
| Product Liability (may be included in Commercial General Liability) | $2,000,000 aggregate |
| Property (if Consultant has care, custody or control of Client property) | Replacement Value |

10

Consultant shall upon Client's request provide a certificate evidencing the required insurance.

**14. Approval of Services and Deliverables.**

a)   All Services shall be deemed accepted by Client if not rejected (or if notice of non-acceptance is not given) in writing, within thirty (30) days of complete of performance under any Work Order.  If, during the term hereof, Client believes that there is a breach of the warranty in Paragraph 8(a) hereof, Client will notify Consultant, in writing, within thirty (30) days of becoming aware of the claimed breach, setting forth the nature of such claimed breach.  Consultant shall promptly investigate such claim of breach and advise Client of Consultant's planned corrective action, if any.  In addition, the provisions of Paragraphs 14(b) through 14(j) shall apply with respect to Work Orders for information technology-related Services.

b)   All Deliverables prepared by Consultant shall have the written approval of Client's project director or his or her written designee that such Deliverables comply in all material respects with the requirements of the relevant Work Order, which approval shall not be unreasonably withheld.

c)   Client shall complete its review of a Deliverable in not more than the number of business days that is specified in the Work Order for Client review of such Deliverable.  If not specifically identified in the Work Order, then the number of business days for any Client review of a Deliverable shall be no more than ten (10) business days.  Client shall provide Consultant (i) with approval of the Deliverable or (ii) with a written statement, as provided below, of the deficiencies preventing approval.  Such business days shall be counted from and include the first business day following the delivery of the Deliverable to Client.

d)   Client's review and approval of Deliverables shall be solely for the purpose of determining compliance in all material respects with the applicable acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, format or style of the Deliverables or the incorporation at that time of additional ideas or functionality.  Approval shall be granted if the Deliverable conforms in all material respects to the applicable acceptance criteria set forth in the Work Order. In the event of Client's rejection of a Deliverable (or Client's notice that it is not accepting a Deliverable), Client shall provide a complete and written statement which identifies in reasonable detail, with references to the applicable acceptance criteria in the Work Order, all deficiencies.  Deliverables requiring only minor or cosmetic corrections and not requiring extensive re-review by Client and for which corrections have been made by Consultant within specified times will be deemed approved.

e)   Consultant shall have thirty (30) business days to complete all such corrective actions or changes in order for such Deliverable to conform in all material respects with the requirements therefor set forth in this Agreement or in the applicable Work Order.  The count of such business days shall begin on the first business day following Consultant's receipt of the written statement of required corrective actions or changes as set forth in subparagraph (c) of this Paragraph.

f)    Client shall have ten (10) business days to complete a review of the corrective actions or changes made to the Deliverable in response to Client's written statement of deficiencies as set forth in subparagraph (c) of this Paragraph and notify Consultant in writing of acceptance or rejection (or non-acceptance). The count of such days shall begin on the first business day after Client receives the corrected or changed Deliverable from Consultant. Client's review and approval of such corrected or changed Deliverable shall be solely for the purpose of determining that corrections have been made to bring the Deliverables into compliance in all material respects with the acceptance criteria set forth in a Work Order and not for any other purpose, including, without limitation, for format, style or the incorporation of additional ideas or functionality.

g)    Client and Consultant may mutually agree to extend the period of time allotted for any review, correction or change under this Paragraph. Any such extension of time shall extend the schedule for subsequent Deliverables by a corresponding amount.

h)    Notwithstanding the provisions of Paragraphs 14(b) through 14(g), approval of a Deliverable shall be deemed given by Client if Client has not delivered to Consultant a notice of deficiencies in writing for such Deliverable prior to the expiration of any period for Client review thereof as set forth in this Paragraph, or if Client uses the Deliverable in production. Notwithstanding the foregoing provisions of this Paragraph, approval of corrective actions or changes with respect to a Deliverable shall be deemed given by Client if Client has not rejected in writing (or has not provided written notice that it is not accepting), in accordance with this Paragraph, such corrective actions or changes with respect to such Deliverables prior to the expiration of any period for Client review thereof as set forth in this Paragraph.

i)    To the extent that any Deliverables have been approved by Client at any stage of Consultant's performance hereunder, Consultant shall be entitled to rely on such approval for purposes of all subsequent stages of Consultant's performance hereunder. Upon Client's approval of each Deliverable, Client agrees that, in the event of a contradiction between the relevant Work Order and the approved Deliverable, the contradiction shall be resolved by the approved Deliverable controlling.

j)    If Consultant is unable to correct any deficiency in a Deliverable within the period of time set forth above, Client shall be entitled, at its option, to a refund or credit of professional fees paid to Consultant hereunder with respect to the Services giving rise to the claimed deficiency and this shall be Client's sole and exclusive remedy, and Consultant's sole and exclusive obligation, with respect to any claim that the Deliverables do not conform to the terms of this Agreement and the Work Order.

**15.**    **Waiver of Jury Trial. CONSULTANT AND CLIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT, ANY WORK ORDER, OR THE SERVICES.**

**16.**    **Independent Contractor.** It is understood and agreed that each of Consultant and Client is an independent contractor and that neither of them is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner or representative. Neither Consultant nor Client shall act or represent itself, directly or by implication, in any

such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

17.   **Survival.**   All Paragraphs herein relating to compensation, expenses, payment of invoices, ownership, limitation on warranties and actions, limitation on damages, confidentiality and internal use, indemnification, waiver of jury trial, survival, binding nature, assignment and subcontracting, non-solicitation, non-exclusivity, interpretation, governing law, and jurisdiction and venue shall survive the expiration or termination of this engagement.   **The provisions of Paragraphs 8, 9, 12, 13, 15, 26 and 27 shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*) or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

18.   **Binding Nature; Assignment and Subcontracting.**   This Agreement and each Work Order shall be binding on the respective parties thereto and their respective permitted successors and assigns; provided, however, that, except as provided below, neither Consultant nor Client may assign, transfer, or delegate any of its rights or obligations under this Agreement or any Work Order (including, without limitation, interests or claims relating to this Agreement or any Work Order) without the prior written consent of the other.   Client hereby consent to Consultant assigning or subcontracting any of Consultant's rights or obligations under this Agreement or any Work Order to (a) any Affiliate of Consultant or Related Entity, whether located within or outside the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Consultant.   Client may assign this Agreement or any Work Order to any entity that acquires all or a substantial part of the assets or business of Client, provided, that Consultant provides its prior written consent to such assignment (such consent not to be unreasonably withheld).   Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

19.   **Notices.**   Whenever under this Agreement or any Work Order notice is required or permitted to be given, such notice shall be in writing and effective upon receipt.   All notices shall be hand delivered, sent by a reputable commercial overnight courier, or mailed by registered or certified United States mail, return receipt requested, postage prepaid, and addressed to the addressee at its address set forth below.

To Deloitte U.S.:  Deloitte LLP
                   2500 One PPG Place
                   Pittsburgh, PA  15222-5401
                   Attention:  Joe Klaja

To Consultant:   The address specified in the Work Order

To Client:       Westinghouse Electric Company
                 4350 Northern Pike
                 Monroeville, PA  15146
                 Attention: Cynthia J. Keating

A party may change its address for notice by giving prior written notice of the new address in conformity with the foregoing and the date upon which such new address will become effective.

20. **Entire Agreement**.  This Agreement, together with the pertinent Work Order, constitutes the entire agreement with respect to the subject matter hereof and supersedes all other oral or written representations, understandings, or agreements relating to the subject matter hereof.

21. **Severability**.  If any provision of this Agreement or any Work Order is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permitted the intent of Consultant and Client set forth in this Agreement or such Work Order.

22. **Waivers and Amendments**.  No delay or omission by Consultant or Client in enforcing its rights or remedies under this Agreement or any Work Order shall impair such right or remedy or be deemed to be a waiver thereof.  No waiver of any right or remedy under this Agreement or any Work Order with respect to any occurrence or event on one occasion shall be deemed a waiver of such right or remedy with respect to such occurrence or event on any other occasion. No amendment or waiver of this Agreement or any Work Order shall be valid unless in writing and signed by the parties thereto.

23. **Non-solicitation**.  During the term of a Work Order and for a period of one (1) year thereafter, each of Consultant and Client agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of the performance of Services under such Work Order with personnel of the other shall not, without the other's consent, directly employ, solicit, engage or retain the services of such personnel of the other.  In the event that either Consultant or Client breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to twenty percent (20%) of the annual base compensation of the relevant personnel in his/her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief.  This provision shall not restrict the right of either Consultant or Client to solicit or recruit generally in the media or by employment recruiter, or to hire personnel of Consultant or Client who respond to such solicitation or recruitment.

24. **Non-exclusivity**.  Each of Client and Consultant acknowledge that Consultant shall have the right to provide services of any kind or nature whatsoever to any person or entity as Consultant in its sole discretion deems appropriate, and to use any works of authorship or other intellectual property that may be included in the Deliverables, to develop for itself, or for others, materials or processes that may be similar to those produced as a result of the Services, except to the extent such works or Deliverables include the intellectual property of Client provided by, or on behalf of Client, to Consultant in connection with this Agreement or a Work Order.

25. **Paragraph Headings**.  The paragraph headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereof.

26. **Governing Law.** This Agreement and each Work Order, and all matters relating to this Agreement and each Work Order, shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).

27. **Consultant's Affiliated and Related Entities.** Client acknowledges and agrees that no Affiliate or Related Entity of Deloitte U.S. other than Consultant, whether or not acting as a subcontractor, shall have any liability hereunder to Client or any other person and Client will not bring any action against any such Affiliate or Related Entity in connection with this Agreement or any Work Order. Without limiting the foregoing, Affiliates and Related Entities of Deloitte U.S. are intended third party beneficiaries of this Agreement, including, without limitation, the limitation on liability and indemnification provisions hereof, and the agreements and undertakings of Client contained in the Work Order. Any Affiliate or Related Entity of Deloitte U.S. may in its own right enforce such terms, agreements and undertakings. Notwithstanding the foregoing, Client retains its rights  to seek direct injunctive relief against any entity for breach of the confidentiality obligations set forth in this Agreement or any Work Order.

**IN WITNESS WHEREOF,** Deloitte U.S. (for and on behalf of its function-specific subsidiaries) and Client (on behalf of itself and its subsidiaries) have caused this Agreement to be executed and delivered by their respective duly authorized representatives as of the date first set forth above.

DELOITTE LLP                                WESTINGHOUSE ELECTRIC COMPANY LLC

By: _____             By: _____

Name: _J. JOSEPH M. KLAJA_               Name: _RICHARD A GASSBIAVELLI_

Title: _PRINCIPAL, DELOITTE_             Title: _VP FINANCE_

Date: _4/29/11_                          Date: _4/28/11_

## WORK ORDER

Work Order Number:_____    Authorized Start Date: _____

This Work Order incorporates the terms and conditions of the Master Services Agreement between Deloitte LLP, for and on behalf of its function-specific subsidiaries, and Westinghouse Electric Company LLC dated April 21st, 2011 (the "Agreement"). For the purposes of this Work Order, Consultant shall be [*Name of Function-Specific Subsidiary*] and for purposes of Paragraph 7 of the Agreement, "Consultant" shall include [*Name of relevant subsidiary*].

**Consultant Services Description:**

**Estimated Timing of Services and Deliverables:**

**Fees and Expenses:**

**Client Responsibilities:**

**Other Terms (including changes in provisions of the Agreement):**

    (1)    The parties hereby elect whether the indemnification provision set forth in Section 13(a)(ii) of the Agreement applies to this Work Order:

        Yes    ☐

        No    ☐

**WESTINGHOUSE ELECTRIC COMPANY LLC**     **CONSULTANT**

By: _____     By: _____

Printed
Name: _____

Printed
Name: _____

Title: _____     Title: _____

Date: _____     Date: _____

Address: _____

## __EXHIBIT B__

**Adams Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **WESTINGHOUSE ELECTRIC COMPANY** | : | **Case No. 17-10751 (MEW)** |
| **LLC**, *et al.*, | : | |
| | : | |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

**DECLARATION OF KEITH ADAMS IN CONNECTION WITH THE APPLICATION
OF DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328, FED. R. BANKR.
P. 2014(a) AND 2016, AND LOCAL RULES 2014-1 AND 2016-1 FOR AN ORDER
EXPANDING THE SCOPE OF THE RETENTION AND EMPLOYMENT OF
DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP TO INCLUDE
ADDITIONAL VALUATION SERVICES *NUNC PRO TUNC* TO JANUARY 22, 2018**

Pursuant to 28 U.S.C. § 1746, I, Louis Librandi, under penalty of perjury, declare as

follows:

1.       I am a principal of the firm of Deloitte Transactions and Business Analytics LLP

("**DTBA**"), which has an office at 191 Peachtree Street NE, Suite 2000, Atlanta, Georgia 30303.

I am duly authorized to make and submit this declaration (the "**Supplemental Declaration**") on

behalf of DTBA as valuation services provider to Westinghouse Electric Company LLC and

certain above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in support

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC Global Project Services Inc. (8572), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961). The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

of the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for an Order Expanding the Scope of the Retention and Employment of Deloitte Transactions and Business Analytics LLP to Include Additional Valuation Services* Nunc Pro Tunc *to January 22, 2018* (the "**Supplemental Application**").

2.      The statements set forth in this Supplemental Declaration are based upon my personal knowledge, upon information and belief, and/or upon client matter records kept in the ordinary course of business that were reviewed by me or personnel of DTBA or its affiliates.

3.      I previously submitted a declaration (the "**Original Declaration**") in support of the *Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Transactions and Business Analytics LLP for Valuation and Discovery Services Provider* Nunc Pro Tunc *to the Petition Date* [Docket No. 1128] (the "**Original Application**"), so granted by order of the Court, dated September 5, 2017 [Docket No. 1300] (the "**Retention Order**"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Original Declaration or the Supplemental Application, as applicable.

4.      This Supplemental Declaration is subject to the statements and qualifications set forth in the Original Declaration and the previously submitted supplemental declarations, which are incorporated herein by reference.  As discussed in paragraph 11 of the Original Declaration, I stated that as additional material information was discovered, the Original Declaration would be supplemented.

2

5.      The Debtors have retained DTBA to provide certain additional valuation services to assist the Debtors in developing an estimate of the fair value of the Westinghouse trade tame as of January 1, 2018 pursuant to a work order, dated January 22, 2018 (the "**Additional Services SOW**"), attached to the Supplemental Application as **Exhibit B**.  The compensation for these services, as provided in the Additional Services SOW, is based on the following hourly rates (which exclude expenses):

| Professional Level | Hourly Rate |
|---|---|
| Partner / Principal / Managing Director | $640 |
| Senior Manager | $561 |
| Manager | $521 |
| Senior Consultant | $454 |
| Consultant | $388 |

6.      In addition, DTBA will bill the Debtors for actual, necessary, and reasonable out-of-pocket expenses incurred in connection with the provision of the Additional Services.

Dated: April 20, 2018          By:    _/s/ Keith Adams_____
                                       Keith Adams
                                       Principal
                                       Deloitte Transactions and Business
                                       Analytics LLP

# **EXHIBIT C**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                                      :        Chapter 11
                                            :
WESTINGHOUSE ELECTRIC COMPANY               :        Case No. 17-10751 (MEW)
LLC, *et al.*,                              :
                                            :
            Debtors.[1]                     :        (Jointly Administered)
                                            :

------------------------------------------------------------ x

## ORDER AUTHORIZING THE EXPANDED
## RETENTION OF DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP
## FOR ADDITIONAL VALUATION SERVICES *NUNC PRO TUNC* TO JANUARY 22, 2018

Upon the Supplemental Application, dated June 12, 2018

(the "**Supplemental Application**"), of Westinghouse Electric Company LLC and certain of its

affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections

327(a) and 328(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2014 and

2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2014-1

and 2016-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the Southern District of New York (the "**Local Rules**") for authority to

expand the employment and retention of Deloitte Transactions and Business Analytics  LLP

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Westinghouse Electric Company LLC (0933), CE Nuclear Power International, Inc. (8833), Fauske and Associates LLC (8538), Field Services, LLC (2550), Nuclear Technology Solutions LLC (1921), PaR Nuclear Holding Co., Inc. (7944), PaR Nuclear, Inc. (6586), PCI Energy Services LLC (9100), Shaw Global Services, LLC (0436), Shaw Nuclear Services, Inc. (6250), Stone & Webster Asia Inc. (1348), Stone & Webster Construction Inc. (1673), Stone & Webster, Inc. d/b/a WECTEC Global Project Services Inc. (8572), Stone & Webster International Inc. (1586), Stone & Webster Services LLC (5448), Toshiba Nuclear Energy Holdings (UK) Limited (N/A), TSB Nuclear Energy Services Inc. (2348), WEC Carolina Energy Solutions, Inc. (8735), WEC Carolina Energy Solutions, LLC (2002), WEC Engineering Services Inc. (6759), WEC Equipment & Machining Solutions, LLC (3135), WEC Specialty LLC (N/A), WEC Welding and Machining, LLC (8771), WECTEC Contractors Inc. (4168), WECTEC LLC (6222), WECTEC Staffing Services LLC (4135), Westinghouse Energy Systems LLC (0328), Westinghouse Industry Products International Company LLC (3909), Westinghouse International Technology LLC (N/A), and Westinghouse Technology Licensing Company LLC (5961).  The Debtors' principal offices are located at 1000 Westinghouse Drive, Cranberry Township, Pennsylvania 16066.

("**DTBA**") *nunc pro tunc* to January 22, 2018, all as more fully set forth in the Supplemental

Application; and upon the Declaration of Keith Adams in support of the Supplemental Application;

and this Court having jurisdiction to consider the Supplemental Application and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order M-

431, dated January 31, 2012 (Preska, C.J.); and consideration of the Supplemental Application and

the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice

of the Supplemental Application having been provided as set forth therein, and it appearing that

no other or further notice need be provided and this court having reviewed the Supplemental

Application; and this Court being satisfied that DTBA has the capability and experience to provide

the services described in the Supplemental Application and that DTBA does not hold an interest

adverse to the Debtors or their estates with respect to the matters upon which they are to be

engaged; and it appearing that the relief requested in the Supplemental Application is in the best

interests of the Debtors, their estates, its creditors, and other parties in interest; and after due

deliberation thereon; and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.       The Supplemental Application is granted to the extent set forth herein.

2.       Pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy

Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, the Debtors are hereby authorized

but not directed to expand the retention and employment of DTBA *nunc pro tunc* to January 22,

2018 to perform the services described in the work order dated January 22, 2018 annexed to the

Supplemental Application as **Exhibit A** (the "**Additional Services SOW**").

3.       DTBA shall be compensated for services performed under the Additional

Services SOW on an hourly basis in accordance with the sections 330 and 331 of the Bankruptcy

2

Code, the Bankruptcy Rules, the Local Rules, the *Order Pursuant to 11 U.S.C. §§ 105(a), 330, 331 Fed. R. Bankr. P. 2016, and Local Rule 2016-1 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 544], the *Order Pursuant to 11 U.S.C. §§ 327(a) and 328, Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 for Authority to Employ and Retain Deloitte Transactions and Business Analytics LLP as Valuation and Discovery Services Provider Nunc Pro Tunc to the Petition Date* [ECF No. 1300] (the "**Original Retention Order**") and any other applicable procedures and orders of this Court.

4.      All modifications to the Master Services Agreement made by the Original Retention Order shall apply to the Additional Services SOW.

5.      Nothing contained in this Order, nor any payment made pursuant to this Order, shall be dispositive with respect to any future allocation of responsibility between and among Debtors and non-Debtors for such payment, and all rights with respect thereto are expressly reserved by the Unsecured Creditors' Committee.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      Notwithstanding anything in the Supplemental Application or the Additional Services SOW to the contrary, during the pendency of the chapter 11 cases, this Court retains exclusive jurisdiction over all matters arising out of and/or pertaining to DTBA's engagement.  Any provision of the Additional Services SOW that provides for mediation or arbitration or for jurisdiction in a different court shall not be applicable unless this Court lacks jurisdiction pursuant to the previous sentence.

WEIL:\96573796\3\80768.0017

Dated: _____, 2018
    New York, New York

_____
United States Bankruptcy Judge

4