**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
In re                                            :
                                                 :        **Chapter 11**
**WESTINGHOUSE ELECTRIC**                        :
**COMPANY LLC**, *et al.*,                       :        **Case No. 17-10751 (MEW)**
                                                 :
                    **Reorganized Debtors.**     :        **Confirmed Cases**
--------------------------------------------------------x

## DECISION REGARDING OBJECTIONS TO ADMINISTRATIVE EXPENSE CLAIMS ASSERTED BY TOSHIBA CORPORATION AND ITS AFFILIATES

A P P E A R A N C E S :

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Toshiba Corporation*
   Four Times Square
   New York, NY 10036
     By:  Shana A. Elberg

   300 South Grand Avenue, Suite 3400
   Los Angeles, CA  90071
     By:  Van C. Durrer II

   40 Bank Street, Canary Wharf
   London E14 5DS, United Kingdom
     By:  Chris Mallon

PARKER POE ADAMS & BERNSTEIN LLP
*Attorneys for TurbinePROs, LLP and Toshiba America*
*Energy Systems Corporation*
   401 South Tryon Street, Suite 3000
   Charlotte, NC 28202
     By:  Kiah T. Ford IV
        John C. Amabile

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*Attorneys to W Wind Down Co LLC*
   1285 Avenue of the Americas
   New York, NY 10019
     By:  Alan W. Kornberg
        Kyle J. Kimpler
        John T. Weber
        Michael J. Colarossi

PROSKAUER ROSE LLP
*Attorneys for the Statutory Unsecured Claimholders'*
*Committee of Westinghouse Electric Company LLC, et al.*
    Eleven Times Square
    New York, NY 10036
        By: Martin J. Bienenstock
            Timothy Q. Karcher
            Vincent Indelicato

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Toshiba Corporation ("Toshiba") and two of its affiliates, TurbinePROS, LLC

("TurbinePROS") and Toshiba America Energy Systems Corporation ("Toshiba America"), have

filed motions seeking the allowance and payment of administrative expense claims. [ECF Nos.

3742, 3823 and 3826, respectively.] Toshiba originally asked, in the alternative, for permission

to file amended prepetition proofs of claim, but it has since withdrawn that alternative request.

Toshiba seeks to recover letter of credit fees and costs that Toshiba paid in connection

with guarantees that it provided to the owners of two nuclear power projects that the parties have

referred to as the Vogtle Project and the VC Summer Project. Toshiba seeks "recharge fees,

administrative fees and other post-petition carrying charges" that total $8,701,581.94.

TurbinePROS contends that after the bankruptcy filings it provided project management,

supervision, scheduling, quality control, labor and tooling services to the Debtors in connection

with the VC Summer Project. It seeks the allowance and payment of $246,517.34, representing

charges set forth in nine separate invoices.

Toshiba America contends that after the bankruptcy filings it provided labor and

materials in connection with the VC Summer Project under two separate contracts. It claims that

its contracts were put in a state of suspense between August 1, 2017 and July 31, 2018, and that

during that period Toshiba America incurred $65,840 of "suspension and demobilization costs."

W Wind Down Co. LLC ("Wind Down Co.") was formed under the Debtors' confirmed plan of reorganization to resolve remaining claims and to make distributions required by the plan. Wind Down Co. has objected to the motions filed by Toshiba and its affiliates. [ECF No. 4174.] The Statutory Unsecured Claimholders' Committee (the "Committee") has also objected to the Toshiba motion. [ECF No. 4176.] Wind Down Co. and the Committee contend that all of the Toshiba entities' claims are barred by the terms of a "global settlement" that was incorporated first into a Plan Support Agreement and then into the confirmed chapter 11 plan of reorganization. Wind Down Co. has also argued that as a matter of law the expenses that Toshiba incurred in connection with the letters of credit were incurred for Toshiba's own protection and do not qualify for treatment as administrative expenses of the Debtors' estates, or as items by which Toshiba provided a "substantial contribution" to the Debtors' cases.

Toshiba and its affiliates have filed responses to the objections [ECF Nos. 4307 and 4310] and the Court heard argument on May 16, 2019. [ECF No. 4323.] At the direction of the Court, the parties also filed letters that addressed certain questions that arose during oral argument. [ECF Nos. 4327 and 4337.] Toshiba contends that the Court should schedule an evidentiary hearing and should allow discovery in advance of that hearing, while Wind Down Co. and the Committee contend that the objections should be resolved as a matter of law.

For the reasons set forth below, the Court rules that the contention by Wind Down Co. and the Committee that the Toshiba entities' claims are barred by the terms of a "global settlement" cannot be resolved as a matter of law. The Court also rules that Toshiba's current allegations in support of its claims to reimbursement of letter of credit fees as administrative expenses of the estate are deficient, but that Toshiba may amend such contentions and may pursue limited discovery as to certain matters before a final ruling is issued.

## Background

At the hearing and in their papers the parties agreed to the facts that are set forth below, except as I have otherwise noted.

## The Guarantees and the Letters of Credit

Westinghouse Electric Company LLC ("Westinghouse") was a party to various contracts with the owners of the Vogtle and VC Summer Projects for the construction of nuclear power plants in Georgia and in South Carolina. Toshiba guaranteed Westinghouse's obligations to the project owners. Those guarantees were made in 2008, and Toshiba had no contractual rights to terminate them. The project owners had the right to enforce the guarantees without first exhausting remedies against the Debtors.

The agreements between Westinghouse and the Vogtle and VC Summer Project owners stated that if Toshiba's credit ratings declined then letters of credit would have to be posted to protect the owners. Toshiba's credit ratings did decline, and that decline triggered obligations to provide letters of credit. Toshiba has argued that it was Westinghouse's obligation to post the letters of credit but that Toshiba arranged for the letters of credit because Westinghouse was unable to do so. It is undisputed that the letters of credit in favor of the Vogtle Project owners were issued on January 13, 2016 in the amount of $900 million (later increased to $920 million on March 18, 2016) and the letters of credit in favor of the VC Summer Project owners were issued on April 8, 2016 in the amount of $45,000,000. If the letters of credit had not been posted, then the owners could have declared a default and could have called on the guarantees.

Toshiba and Westinghouse did not enter into any written agreements regarding the costs of the letters of credit. Toshiba alleges that it issued monthly invoices for such costs and that Westinghouse paid some invoices, but that such payments stopped in July 2016.

The letters of credit were outstanding when these bankruptcy cases were filed in March 2017.  The letters of credit could not be cancelled before June 30, 2017, and they were subject to automatic one-year extensions unless Toshiba gave 60 days' prior notice of an election not to extend them.  The parties agreed that if Toshiba had given such a notice then the project owners could have drawn down on the letters of credit before the expiration dates were reached.

**The Interim Assessment Agreements and Toshiba's Settlements with the Owners**

The Debtors filed bankruptcy petitions on March 29, 2017.  In anticipation of the bankruptcy filings certain of the Debtors entered into "Interim Assessment Agreements" with the project owners, which were approved by an Order entered March 30, 2017.  The Interim Assessment Agreements permitted the projects to continue on an interim basis, at the expense of the owners, until final decisions were made.  Toshiba was not a party to the Interim Assessment Agreements, but the owners of the Vogtle and VC Summer Projects agreed that they would not take actions under Toshiba's guarantees and would not draw against the letters of credit while the Interim Assessment Agreements were in effect.  The Interim Assessment Agreements had initial terms of 30 days but they were extended a number of times.

Toshiba has argued that keeping the letters of credit in place (and not allowing them to expire on June 30, 2017) allowed the projects to continue and for their futures to be decided in an orderly manner, and therefore was of great benefit to the Westinghouse estate.  However, leaving the letters of credit in place was also of enormous benefit to Toshiba itself.  Toshiba's counsel went so far as to say during oral argument that Toshiba might have failed if the letters of credit had been called upon in early 2017.

During the periods in which the Interim Assessment Agreements were in effect Toshiba engaged in negotiations with the project owners regarding the guarantee claims against Toshiba.

In June and July 2017, Toshiba entered into separate settlement agreements with the project owners. The first of the settlement agreements was dated June 9, 2017 and related to the Vogtle Project. The agreement resolved Toshiba's obligations under the guarantees for an agreed amount of $3,680,000,000 minus certain specified recoveries. The parties agreed that Toshiba would make monthly payments in accordance with an agreed schedule but with a right to prepay such amounts. The letters of credit were to remain in place, but the project owners agreed not to assert claims under the guarantees or to make demands under the letters of credit except to the extent provided in the agreement and for so long as Toshiba made payments called for under the agreement. Finally, section 9.3 also stated that Toshiba would be subrogated to the owners' claims against Westinghouse once the agreed guarantee claim amount had been paid in full.

Toshiba also entered into a settlement agreement dated July 27, 2017 with the owners of the VC Summer Project. That agreement resolved Toshiba's obligations under the VC Summer guarantees for an agreed amount $2,168,000,000. Many other terms were similar to the terms of the Vogtle agreement, though there were differences that are not important to the issues presently before the Court. The VC Summer guarantees and letters of credit remained in place though the letters of credit were not to be drawn upon if the agreed payments were made.

As part of the settlement agreements, Toshiba agreed that all distributions to be made on account of claims filed (or to be filed) by Toshiba in the Debtors' bankruptcy cases, or on account of Toshiba's equity interests in the Debtors, would be paid directly to the Vogtle Project owners and VC Summer Project owners until such time as the settlement obligations were paid in full. At the parties' request the Court entered a Distribution Order on July 20, 2017 [ECF No. 953] that implemented this agreement. The "Distributions" that were subject to the Order included "any" payment or distribution from the Debtors, "whether in the ordinary course,

pursuant to a plan of reorganization or liquidation . . . , as proceeds of a sale, by order of the

Court or otherwise . . ."

**Proofs of Claim Filed by Toshiba**

Toshiba filed a number of proofs of claim on September 1, 2017. Three claims arguably

relate to the Vogtle and VC Summer Projects and/or to the letters of credit that are now at issue.

One such claim was Claim No. 3044, which was filed on behalf of Toshiba Corporation

and its affiliates in an amount "in excess of $690 million." Paragraph 3 of an addendum to

Claim 3044 refers to credit support that Toshiba provided for Westinghouse (including letters of

credit), and states that the claim included "all claims arising out of, relating to, or in connection

with" those letters of credit. Exhibit B to Claim No. 3044 listed the relevant letters of credit; the

four letters of credit that Toshiba had provided to the Vogtle and VC Summer Project owners

were included on that list. The addendum to Claim No. 3044 further stated that some parts of the

claim were contingent and unliquidated, though it did not specify which parts.

Toshiba also filed Claim No. 3010, which sought more than $180 million based on other

"credit support" that Toshiba had provided to the Debtors, including certain guaranty,

indemnification and/or collateralization obligations. Exhibit A to Claim No. 3010 listed 11

credit supports that Toshiba had provided; items 10 and 11 were the guarantees in favor of the

owners of the Vogtle and VC Summer Projects. However, the supporting letters of credit were

not listed in the addendum to Claim No. 3010.

Toshiba also filed Claim 3060, seeking in excess of $17 million for certain so-called

"Trade Claims." Items 3, 4 and 5 on Exhibit A to Claim 3060 referred to unpaid "recharge"

invoices that Toshiba had issued, seeking reimbursement for the costs that Toshiba had incurred

during the period July 2016-March 2017 for the letters of credit it had provided in favor of the

Vogtle Project owners and for the period April 2016-March 2017 for the letters of credit it had provided in favor of the VC Summer Project owners. However, Exhibit A did not list any post-petition invoices for such amounts.

**The Completion of Toshiba's Payments to the Project Owners**

In December 2017, Toshiba made a lump sum payment in full satisfaction of the balance of the obligations that it owed to the Vogtle Project owners. The Vogtle letters of credit were then released on December 17, 2017, and the Vogtle Project owners' claims against Westinghouse were assigned to Toshiba.

In January 2018, Toshiba also made a lump sum payment in full satisfaction of its remaining obligations to the VC Summer Project owners. The VC Summer letters of credit were then released on January 14, 2018, and the VC Summer Project owners' claims against Westinghouse were assigned to Toshiba.

**Toshiba's Sales of Claims to Nucleus**

Toshiba Corporation entered into an Assignment and Purchase Agreement dated January 17, 2018 with an entity named Nucleus Acquisition LLC. Schedule 2.2 to the Agreement listed certain claims that were being assigned to Nucleus. The assigned claims included the portions of Claim No. 3010 that related to Toshiba's guarantees in favor of the owners of the Vogtle and VC Summer Projects; those claims were identified in Schedule 2.2 as claim numbers 3010-A-10 and 3010-A-11. The Claims listed on Schedule 2.2 also included the portions of Claim No. 3060 that related to the letter of credit fees that Toshiba had paid prior to the bankruptcy filings; those claims were referred to as Claim Nos. 3060-A-3, 3060-A-4 and 3060-A-5.

Schedule 2.2(a)(vi) to the Assignment and Purchase Agreement set forth a separate list of Toshiba claims that were not being sold to Nucleus and that were to be retained by Toshiba. The

portions of Claim No. 3044 that related to the letters of credit that Toshiba had provided in favor of the owners of the Vogtle and VC Summer Projects were included on this Schedule, where they were identified as Claim Nos. 3044-B-1, 3044-B-2, 3044-B-3 and 3044-B-4.

In Section 2.3(d) of the Assignment and Purchase Agreement Toshiba also retained rights to "all rights of Seller, as applicable, to any indemnity, hold harmless and similar agreement under any of the Claim Documents or any other agreement, arrangement, or understanding with any of the WEC Debtors."

**The January 2018 Plan Support Agreement and Plan Term Sheet**

Toshiba Corporation, Nucleus and other parties also entered into a Plan Support Agreement dated January 17, 2018.  Toshiba Corporation executed the agreement "on behalf of itself and certain of the Toshiba Affiliates . . . as identified on the signature page hereto."  In Section 7.06 of the Plan Support Agreement, Toshiba Corporation represented, on behalf of itself "and the Toshiba Affiliates which hold Claims," that Toshiba and the Affiliates owned or otherwise acted as agent for the beneficial holders of "its Claims" and held "no other Claims." The term "Claims" was defined in section 3.01 of the Plan Support Agreement as having the same meaning as the definition of "claims" under the Bankruptcy Code.  Curiously, however, section 7.06 did not contain any cross reference to the exhibits to the Plan Support Agreement or to any lists of particular claims.  Section 7.06 therefore was a plain representation that Toshiba and its Affiliates held "no other claims" other than "its Claims," but without any specific definition as to what "its Claims" were.

A Plan Term Sheet was attached to the Plan Support Agreement and it stated (at page 6, footnote 13) that certain claims filed by Toshiba and listed in Exhibit 3 would constitute the "Toshiba GUC Claims."  The parties agreed to support a plan under which the Toshiba GUC

Claims would be allowed in amounts stated on Exhibit 3 and otherwise would be disallowed.

The claims listed on Exhibit 3 do not include any of the various claims described above that

relate to the letters of credit provided to the owners of the Vogtle and VC Summer Projects.

Exhibit 4 to the Plan Term Sheet was a separate list of "Allowed Class 3B General

Unsecured Claims."  Exhibit 4 included the portions of proof of claim 3010 and 3060 that

Toshiba had agreed to assign to Nucleus.  However, there was no reference in Exhibit 4 to the

portions of proof of claim 3044 that related to the letters of credit that Toshiba had provided for

the Vogtle and VC Summer Projects and that were listed as claims that Toshiba "retained" under

its agreement with Nucleus.

Exhibit 5 to the Plan Term Sheet included a list of Toshiba claims that were to be

released.  The list did not include any of the claims that related to the guarantees and letters of

credit for the Vogtle and VC Summer Projects.

In short, the portions of Claim 3044 that referred to the relevant letters of credit were

listed as "retained" claims in the attachments to Toshiba's agreement with Nucleus.  However,

those claims were not listed in any of the attachments to the Plan Term Sheet that identified

claims that were to be allowed and claims that were to be released.

Page 9 of the Plan Term Sheet stated that the Plan "shall contain and effect a global and

integrated compromise and settlement of all disputes" among the Debtors and the parties to the

Plan Support Agreement, and specifically that "the treatment of the Class 3A General Unsecured

Claims (including the Toshiba GUC Claims) [and]. . . Released Toshiba Claims . . . is a

settlement and compromise" to avoid litigation.

**The Plan and Confirmation Order**

The confirmed chapter 11 plan of reorganization incorporated many of the terms of the

"Plan Term Sheet" that was attached to the Plan Support Agreement.  The Plan distinguished

between Class 3A general unsecured claims (the holders of which were entitled to cash payments from Wind Down Co.) and Class 3B general unsecured claims (the holders of which were entitled to interests in Wind Down Co.)  Exhibit G listed certain "Toshiba GUC Claims" that were being allowed as general unsecured claims, and Exhibit D listed certain Toshiba Claims that were being released as part of the Plan.  In addition, Exhibit E to the Plan listed claims that were held by Nucleus and that were allowed as Class 3B general unsecured claims.  Exhibit F listed additional claims that were held by Nucleus that were to be allowed as Class 3B claims but that were to be subordinated to other allowed Class 3B claims.  [ECF No. 2986.]

Notably, the portions of Claim No. 3044 that related to the letters of credit, and that had been identified as "retained" claims in Toshiba's agreement with Nucleus, did not appear on any of these exhibits to the Plan.

The confirmed plan reiterated the intent that the Plan would constitute "a global and integrated compromise and settlement" of disputes among the Debtors, the parties to the Plan Support Agreement, and others.  *Id.* at 23.  More specifically, section 5.3 of the Plan provided:

> The Plan contemplates and is predicated upon entry of an order (which may be the Confirmation Order) substantively consolidating the Debtors' Estates and the Chapter 11 Cases pursuant to a global and integrated compromise and settlement of all disputes among the Debtors, the PSA Parties, the EMEA Subsidiaries, and the PBGC, approval of which is being sought under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Specifically, and without limitation, the treatment of the Class 3A General Unsecured Claims (including the Toshiba GUC Claims, Cash Pool Claims, and AUAM Loan Claim), Class 3B General Unsecured Claims (including the VC Summer Claims and Vogtle Claims), Intercompany Claims, Released Toshiba Claims, Released TNEH UK Claims, and LFA Claims provided herein is a settlement and compromise of the delay, expense, and uncertainty associated with extensive potential litigation, including among other things, (a) litigation relating to the valuation of the U.S. Debtors, TNEH UK, and the EMEA Subsidiaries, and the associated allocation of Plan Investment Proceeds between and among the U.S. Debtors on the one side, and TNEH UK and the EMEA Subsidiaries on the other side, and (b) litigation relating to the allowance and amount of the VC Summer Claims, Vogtle Claims, and

11

> Claims and Interests of Toshiba and the Toshiba Affiliates. . . . The Plan is deemed a motion for approval of compromises and settlements contained herein, and the Confirmation Order will approve, under Bankruptcy Rule 9019, the global settlement provided for hereunder . . .

*Id.*

The Court made certain findings of fact and conclusions of law and confirmed the plan of reorganization in an Order entered on March 28, 2018.  [ECF No. 2988.]  Paragraph K(10) of the Court's findings of fact and conclusions of law stated that the plan "incorporates a global settlement and compromise" of certain issues, including "agreements to avoid litigation relating to the allowance and amount of the VC Summer Claims, Vogtle Claims and Claims and Interests of Toshiba and the Toshiba Affiliates."  Paragraph K(10) further stated that the entry of the Order "constitutes the Court's approval *[sic]* the terms of the Global Settlement that are set forth in the Plan."  Paragraph 17 of the Court's confirmation Order similarly stated that the entry of the Order "constitutes this Court's approval of the terms of the Global Settlement that are set forth in the Plan and of all other compromises and settlements set forth in the Plan . . ."

**Toshiba's August 2018 Claims**

On August 16, 2018, Toshiba filed a motion seeking allowance and payment of an "administrative expense" claim based on the letter of credit fees that Toshiba had paid during the course of the Debtors' bankruptcy cases.  More particularly, Toshiba sought to recover all of the costs of the Vogtle letters of credit from March 29, 2017 (the date of commencement of these bankruptcy cases) through December 18, 2017 (the date on which the letters were cancelled), and all of the costs of the VC Summer letters of credit from March 29, 2017 through January 24, 2018 (the date on which those letters were cancelled).  In the alternative, Toshiba sought permission to amend pre-petition Claim No. 3044 to seek recovery of those same letter of credit fees.  As noted above, Toshiba has since abandoned this alternative part of the motion.

On August 31, 2018, Toshiba also filed Claim No. 3667 in the amount of $8,701,581.94. The claim is described as a claim to recover "letter of credit" fees. The addendum to the Claim makes clear that Toshiba seeks recovery, as an administrative expense, of all of the letter of credit fees that Toshiba paid after March 29, 2017.

### Whether the "Global Settlement" Bars the Administrative Claims

Wind Down Co. and the Committee contend that the purpose of the "Global Settlement" was to resolve all claims of any kind that Toshiba and its affiliates might have, and that the approval of the terms of that Global Settlement should bar Toshiba and its affiliates from asserting the three administrative expense claims that are presently before the Court. They also urge that the terms of the parties' agreements are so clear that the Court should rule on this issue as a matter of law and without any further discovery.

It is true that Toshiba represented in the Plan Support Agreement that Toshiba owned "its Claims" and owned "no other" claims. The objectors suggest that this amounted to a representation that Toshiba had no claims other than those listed on the exhibits to the Plan Term Sheet. However, the Plan Support Agreement and the Plan Term Sheet never specified just what was covered by Toshiba's representation about the ownership of "its Claims." There was no statement, for example, that the exhibits to the Plan Term Sheet constituted all of the Claims that Toshiba and its affiliates owned. In fact, a simple comparison of the exhibits to the Plan Term Sheet against the Claims that Toshiba had actually filed would have shown that there were claims that Toshiba had filed but that were not included on the various exhibits, including the portions of Claim No. 3044 that related to the letters of credit that Toshiba had provided in favor of the project owners.

In addition, Toshiba's agreement with Nucleus was dated the same day as the Plan Support Agreement.  The agreement with Nucleus *did* separately identify the portions of Claim No. 3044 that related to the letters of credit, and it included those portions of Claim No. 3044 on a list of "retained claims."  The record that is presently before me is not clear as to whether the other parties to the Plan Support Agreement were aware of the terms of Toshiba's agreement with Nucleus.  However, awareness of those terms might support Toshiba's contention that the parties knew that claims relating to the letters of credit were being retained by Toshiba.

The objectors also suggest that the "global settlement" must have been intended to bar and release all claims by Toshiba and its affiliates that were not otherwise being allowed pursuant to the terms of the Plan Term Sheet.  However, there is no statement in the Plan Support Agreement, or the Plan Term Sheet, or the confirmed Plan, or the Court's confirmation Order to the effect that all of Toshiba's claims were to be released except to the extent they were being expressly allowed.  To the contrary:  the Plan Term Sheet and the confirmed Plan each listed specific Toshiba Claims that were to be released, and those lists of released claims did not include any claims related to the letter of credit fees.  Nor did the lists of released claims include references to the administrative expense claims that have been asserted by TurbinePROS and by Toshiba America.  If the intent was to release and bar any claims that were not being allowed (as the objectors suggest), then the usual practice would have been to say exactly that.  It is hard to understand, if the objectors are right, just why the parties would instead have listed specific claims that were being released.  The usual implication of listing specific "released" claims is that other claims have not been released.

Some of the words that appear in the Plan Support Agreement and the Plan – in particular, the statements that the parties were making a "global" settlement to resolve "disputes"

14

among them – are expansive.  They may support the objectors' interpretation of the parties'

agreements.  However, the use of these words is not enough to permit the Court to rule, as a

matter of law, that the agreements bar all claims by Toshiba and its affiliates that were not listed

on the exhibits to the Plan Term Sheet and the confirmed Plan.  I will leave open the possibility

that at an evidentiary hearing the objectors will be able to show that this was, in fact, the

agreement of the parties, but I simply cannot find that this was the case as a matter of law, given

that the administrative claims presently before the Court were not included among the "released"

claims and given that neither the Plan Support Agreement nor the Plan included specific

language that purported to release or to bar claims that were not specifically addressed.

### Whether the Letter of Credit Claims Could Be Allowed as Administrative Claims

Toshiba has dropped its motion to amend its pre-petition proofs of claim but it continues

to argue that its claims for reimbursement of letter of credit fees and costs constitutes an

administrative expense claim that should be allowed under section 503 of the Bankruptcy Code.

At the outset it should be noted that it was not entirely clear from Toshiba's papers whether

Toshiba sought allowance of its claim under section 503(b)(1)(A) (which provides for the

allowance of "actual and necessary" costs and expenses of preserving the estate) or under section

503(b)(3)(D) (which in relevant part permits allowance of actual, necessary expenses incurred by

a creditor or equity security holder in "making a substantial contribution" in a chapter 11 case).

In its papers Toshiba referred to both standards and largely seemed to conflate them, arguing

generally that if the letter of credit fees provided a "benefit" to Westinghouse then they are

allowable.  During oral argument, Toshiba's counsel stated that Toshiba would "live or die" on

its contention that Westinghouse had an enforceable post-petition obligation to reimburse

Toshiba for the letter of credit fees based on a prior course of conduct.  *See* Hr'g Tr., May 16,

2019, at 17:3-19:18.  [ECF No. 4323.]  At other times during the argument, however, Toshiba

15

continued to pursue its "substantial contribution" arguments as "alternative" grounds for its claim. *Id.* at 7:21-24, 35:21-38:18; 97:2-4. The Court therefore will address both contentions.

As to section 503(b)(1)(A): Toshiba does not contend that there was any written or oral agreement by Westinghouse to reimburse Toshiba for the letter of credit fees. Toshiba argues that there was a prior "course of conduct" that allegedly evidenced an obligation, in that Westinghouse – which was under Toshiba's control – reimbursed Toshiba for some of the initial letter of credit costs before ceasing to make such reimbursements in July 2016. However, Toshiba cited no authorities in support of its suggestion that a subsidiary's payments to a controlling parent are sufficient, without more, to give rise to a legal obligation to continue to make such payments. *See, e.g., Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 761 F.Supp. 1010, 1021 (S.D.N.Y. 1991), *aff'd*, 961 F.2d 1052 (2d. Cir. 1992) ("A prior course of dealings between the parties is a tool for interpreting existing contracts and may not be used to establish contract formation.")

More importantly, even if a "course of conduct" were sufficient to impose a legal obligation, Toshiba has failed to explain how or why an alleged course of conduct that ended many months before the bankruptcy filings should give rise to an administrative expense claim as opposed to a prepetition claim. It is well-established that a cost or expense does not qualify as an administrative expense unless "it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession" and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *See* Toshiba's Motion [ECF No. 3742] at 10, *citing In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007); *see also Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986). Toshiba argues

16

that the letters of credit conferred benefits on Westinghouse, but the first required element – the existence of a post-petition transaction – appears to be missing.  There is no allegation that Westinghouse made any post-bankruptcy promise to reimburse Toshiba, or that Westinghouse asked Toshiba to refrain from taking steps to terminate the letters of credit.  Toshiba's counsel asserted at the hearing that Westinghouse gave Toshiba the "impression" that Westinghouse would reimburse the letter of credit fees, but how this "impression" allegedly was created is unclear and not supported by any evidence.

In its decision *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984), the Court of Appeals for the Seventh Circuit addressed a situation in which yellow page advertisements had been ordered pre-bankruptcy with the agreement that the debtor did not need to reimburse the agency for the cost of such advertisements until after they were published.  The advertisements then were published after the bankruptcy filing.  The agency that placed the advertisements claimed that it was entitled to reimbursement as an administrative expense, on the theory that Jartran had received the benefit of the advertisements after the bankruptcy had commenced.  The Court disagreed, noting that the record showed that all of the relevant acts of Jartran had occurred pre-bankruptcy and that Jartran "performed no act after the filing of the petition that could be construed as an affirmation of the placement of the ads."  *Id*. at 589.

Courts that have followed *Jartran* have held that "a creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate.  If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession."  *In re White Motor Corp.,* 831 F.2d 106, 110 (6th Cir. 1987).  In *White Motor*, a relocation company had entered into agreements under which it purchased homes from White Motor's employees who

17

were being relocated, and then maintained the homes until resale of the properties.  Upon resale,

the relocation company billed White Motor for its expenses, including any losses incurred upon

resale.  After White Motor's bankruptcy filing, the relocation company sought administrative

expense treatment of the maintenance expenses it incurred after the date of the bankruptcy filing

for properties it had purchased prior to the filing.  The Court held that the debtor-in-possession

had not induced the relocation company to continue to expend funds with respect to properties

acquired pre-bankruptcy and denied the requested administrative expense claim.  *Id.* at 111.

Courts in this district have followed the rules set forth in *Jartran*, *White Motor* and their

progeny.  *See, e.g., In re CIS Corp.*, 142 B.R. 640, 643 (S.D.N.Y. 1992) (applying the *Jartran*

test but deciding that a post-petition use of leased equipment constituted a transaction with the

estate); *In re Kuvykin*, No. 18-10760 (JLG), 2018 Bankr. LEXIS 2634, at *6 (Bankr. S.D.N.Y.

August 31, 2018) (holding that a post-petition use of real property constituted a transaction with

the estate); *In re Globe Metallurgical, Inc.*, 312 B.R. 34 (Bankr. S.D.N.Y. 2004) (noting that an

administrative claim requires proof of a transaction with a debtor but finding that the debtor's

post-petition use of low-cost electricity constituted a transaction with the estate); *In re Applied*

*Theory Corp.*, 312 B.R. 225, 238-39 (Bankr. S.D.N.Y. 2004) (noting the requirement of a post-

petition transaction but finding that it was not necessary to reach the issue because no post-

petition benefit had been conferred); *In re WorldCom, Inc.*, 308 B.R. 157, 165–66 (Bankr.

S.D.N.Y. 2004) (noting the requirement of a post-petition transaction and holding that

commissions that came due as the result of post-petition receipts, but that were attributable to

pre-petition services, did not give rise to administrative expense claims); *In re Adelphia Bus.*

*Sols., Inc.*, 296 B.R. 656, 664-65 (Bankr. S.D.N.Y. 2003) (noting the requirement of a post-

petition transaction and declining to rule as a matter of law as to whether the debtor's knowing

use of Verizon services on a post-petition basis gave rise to an administrative claim); *In re Drexel Burnham Lambert Group*, 134 B.R. 482, 489, 491 (Bankr. S.D.N.Y. 1991) (finding under the facts of that case that a transaction with the estate had occurred).

Toshiba agreed in its papers that under governing Second Circuit law an administrative claim is not proper unless the claim "arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession" and then "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *See* Toshiba's Motion [ECF No. 3742] at 10, *citing Bethlehem Steel*, 479 F.3d at 172. During oral argument, however, Toshiba's counsel took a different position, arguing that a claim "doesn't necessarily have to involve a post-petition transaction with the Debtor for it to be fair and equitable to reimburse the creditor for that value" as an administrative expense. Hr'g Tr., May 16, 2019, at 29:6-24, 97:3-19. [ECF No. 4323.] In support of that proposition Toshiba referred to the decision in *Metropolitan Life Ins. Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 161 B.R. 934 (Bankr. W.D. Pa. 1994).

In *Sharon Steel*, a debtor was party to a group insurance policy that provided life and accidental death and dismemberment coverage. Monthly premium payments were due, and the debtor failed to make one pre-petition payment and made only some (but not all) of the premium payments that were due for post-petition periods. MetLife sought entry of an order confirming that the automatic stay did not apply; alternatively, MetLife asked for permission to terminate the insurance contract for nonpayment, or for entry of an order compelling the debtor to assume or reject the contract. The debtor responded by confirming its desire to continue the insurance coverage on a post-petition basis and by proposing to make partial payments until confirmation of a plan of reorganization, at which time the debtor hoped to be able to pay all overdue sums.

19

The Court rejected the debtor's proposal and granted permission to MetLife to terminate the policy for nonpayment, and MetLife then terminated the policy.

Later during the course of the *Sharon Steel* case MetLife sought the payment of its post-petition premiums as administrative expenses. The Court held that an administrative claim must arise out of a transaction with the debtor-in-possession or trustee and that this requirement had been satisfied. 161 B.R. at 937-38. The Court observed that the debtor had affirmatively elected to continue coverage under the policy – in fact, the debtor had resisted the termination of the policy and had argued that the continuation of coverage was necessary – and therefore that the premiums arose from a transaction with the debtor-in-possession. *Id.* The Court further noted that the debtor's opposition to the administrative claim, after earlier demanding that the policies continue, was an effort "to play it both ways" that the Court would not permit. *Id.*

The decision in *Sharon Steel* does not support the proposition for which Toshiba cited it. The court in *Sharon Steel* did not dispense with the need to show the existence of a post-petition transaction. Instead, it affirmed that a post-petition transaction had occurred.

Toshiba's real argument appears to be that a purported pre-petition "course of conduct" gave rise to an executory contract under which Toshiba agreed to post letters of credit for so long as Westinghouse agreed to pay for them, and that Westinghouse "accepted" the benefit of the letters of credit and thereby "used" Toshiba's property on a post-petition basis. Hr'g Tr. May 16, 2019 at 17:3-11; 36:1-6; 37:14-23, 97:3-9. But there is nothing in the record that suggests that any "executory" contract was in place. For example, Toshiba does not contend that it owed any contractual obligation, to Westinghouse, to keep the letters of credit in place. If Westinghouse agreed to pay the costs of the letters of credit, that obligation apparently was unilateral and not part of an "executory" contract under which Toshiba owed ongoing obligations to Westinghouse.

There also does not appear to be any basis for Toshiba's contention that the Westinghouse estate "used" Toshiba's property. This is not a case in which a debtor leased real property or personal property and continued to use it after a bankruptcy filing. 11 U.S.C. §§ 365(d), 503(b); *see also In re Patient Educ. Media, Inc.*, 221 B.R. 97, 102–04 (Bankr. S.D.N.Y. 1998). Nor is this a case in which a debtor has made post-bankruptcy purchases of goods under a pre-bankruptcy executory supply contract, as in *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003). Similarly, this is not a case in which a debtor forced a contracting party to perform a contract on a post-petition basis, as in *Sharon Steel*.

Toshiba's guarantees, and the supporting letters of credit, were provided long before the bankruptcies. They continued in force after the bankruptcy filings in accordance with their pre-bankruptcy terms. The letters of credit were not cancellable until the end of June 2017, and they were subject to automatic renewals in the absence of an affirmative election by Toshiba to terminate them. If Westinghouse received any "benefits" through June 30, 2017, they flowed from obligations that were put in place and fully committed prior to the bankruptcy filings.

Toshiba could have elected to let the letters of credit lapse after June 2017 and it elected not to do so, but it is hard to see how that decision amounted to a "use" of Toshiba's property by Westinghouse. The letters of credit were provided in favor of the project owners, not Westinghouse. The automatic stay was in effect, so Westinghouse did not need the letters of credit to prevent a shutdown of the projects or a termination of its contracts with the owners. Toshiba admits that a termination of the letters of credit would have allowed the project owners to draw down on the letters of credit and would have threatened Toshiba's continued existence. Toshiba's own interests so plainly required that the letters of credit remain in place that it is difficult to see how the letters of credit represented a "use" of Toshiba's property by anyone

21

other than Toshiba itself, or how Westinghouse could fairly be charged with having "induced" Toshiba to do something that Toshiba would not otherwise have done.

It is also difficult to understand Toshiba's contention that Westinghouse should pay the entire cost of the letters of credit through the dates when the letters were cancelled. Westinghouse reached agreement on the terms by which it would reject its contract with the Vogtle Project owners in June 2017, and it reached similar agreements with the VC Summer Project owners by early August 2017. Westinghouse therefore rejected its contracts with the project owners long before the letters of credit were terminated. It is quite plain from the chronology that the letters of credit remained outstanding after June 2017 as security for Toshiba's obligations under its prior guarantees and under its settlements with the project owners, and not for the purpose of conferring benefits on Westinghouse.

Toshiba faces an even more serious problem. As noted above, there is nothing in the record to support the notion that the payment of the letter of credit costs was part of an executory contract. Westinghouse could not have incurred a post-bankruptcy administrative expense obligation to reimburse Toshiba for the letter of credit costs, and it could not have converted an alleged pre-bankruptcy obligation into an administrative expense obligation, without the Court's approval under sections 363 and/or 364 of the Bankruptcy Code. There is no reasonable ground on which to argue that the post-petition reimbursement of a parent company's costs of providing almost a billion dollars of letter of credit support should be regarded as an "ordinary course of business" transaction.

Westinghouse did seek approval of the Interim Assessment Agreements at the outset of these cases. If Toshiba believed that the letters of credit were necessary to allow the Interim Assessment Agreements to be implemented, and if it wanted Westinghouse to pay the post-

petition costs of the letters of credit, then it could and should have sought approval of that expense at the time when the Interim Assessment Agreements were presented for approval. The parties then could have debated the merits of the request, and Toshiba then could have made decisions about the renewal or termination of the letters of credit with clarity as to whether it could expect to recover the costs from the estate. Instead, there was no mention of the letter of credit fees at the time the Interim Assessment Agreements were presented for the Court's approval. When the Court asked Toshiba's counsel to explain why Toshiba did not seek the Court's approval of a reimbursement obligation, counsel said in response that there was concern that the Committee would not agree to such reimbursements. That answer seriously undercuts Toshiba's contention that it was "induced" to believe that that the letter of credit costs would be paid as administrative expense obligations of the estate. In any event, if an obligation requires court approval in order to be binding, and if a party elects not to seek such approval because of concerns that other parties would not agree, then the Court should be hesitant (at a minimum) to impose such an obligation after the fact.

Toshiba's arguments about the "benefits" that Westinghouse received raise further questions, but if those were the only issues a factual hearing would be required. For the reasons stated above, Toshiba's primary obstacle in attempting to establish a right to an administrative claim under section 503(b)(1)(A) is whether something that Toshiba did not do (*i.e.*, its failure to take the affirmative step of terminating Toshiba's own letters of credit in favor of the project owners) somehow constituted a transaction between Toshiba and Westinghouse that gave rise to an administrative expense claim.

As to the substantial contribution claim under section 503(b)(3)(D): the Bankruptcy Code does not define what constitutes a "substantial contribution." Courts generally consider

several factors, however, including "whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case." *In re S & Y Enterprises, LLC*, 480 B.R. 452, 462-63 (Bankr. E.D.N.Y. 2012).

"Creditors face an especially difficult burden" in proving entitlement to a "substantial contribution" award because creditors "are presumed to act primarily in their own interests" and because "[e]fforts undertaken by creditors solely to further their own self-interest are not compensable" under section 503(b). *In re Dana Corp*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (internal citations omitted). A creditor does not need to be completely altruistic, but where a creditor's actions have been performed primarily to protect the creditor's own interests no "substantial contribution" claim is appropriate. *See In re Hancock St. SML LLC*, No. 1-14-45491-NHL, 2016 WL 6271329, at *7 (Bankr. E.D.N.Y. Oct. 25, 2016); *In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 3855320, at *2 (Bankr. S.D.N.Y. Aug. 5, 2014). Instead, a substantial contribution "must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Dana Corp.*, 390 B.R. at 108.

Whether a creditor has made a substantial contribution in a reorganization case is a question of fact on which the creditor bears the burden of proof. *In re Bayou Group, LLC*, 431 B.R. 549, 560 (Bankr. S.D.N.Y. 2010). Cases finding that a creditor made a "substantial contribution" generally involve a creditor playing a leadership role that would normally be expected of an estate-compensated professional. *Id.* at 562. The purpose of allowing substantial contribution claims is to encourage activities by creditors that go beyond the service of their own interests and that benefit the estate as a whole. As a result, section 503(b)(3)(D) "should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which,

24

accordingly, would have been undertaken absent an expectation of reimbursement from the estate." *Lebron v. Mechem Fin.*, 27 F.3d 937, 944 (3d Cir. 1994).

Toshiba's actions during the course of the Westinghouse cases were extremely constructive. It negotiated resolutions of large, complicated matters that could have resulted in expensive and time-consuming litigation and that could have indefinitely delayed the resolution of the Debtors' cases. Among these negotiations were a package of settlements that smoothed the way to confirmation of a plan just prior to the first anniversary of the filing of the bankruptcy petitions. The Court greatly appreciates the practical and professional way that Toshiba and its counsel addressed the issues that Toshiba faced.

However, Toshiba's actions (in particular its decisions about the letters of credit) primarily served Toshiba's own interests. The guarantee obligations were incurred long prior to the bankruptcy cases. As Toshiba's counsel acknowledged, those guarantee obligations were potentially ruinous for Toshiba itself. The Court has already noted that Toshiba had no practical choice but to leave the letters of credit in place. And even if (as Toshiba has alleged) the letters of credit allowed the underlying nuclear projects to be unwound on an orderly basis, thereby helping to minimize damage claims, once again Toshiba itself (as a guarantor who was obligated to pay such damages) was a primary beneficiary.

Toshiba's counsel urged the Court to measure the benefits that Westinghouse allegedly received from the letters of credit and to make Westinghouse bear the expense so long as those "benefits" arguably exceeded the costs of the letters of credit. But the Court believes that the more appropriate determination, in analyzing a "substantial contribution" claim, is the benefit to Toshiba itself. The alleged post-bankruptcy "contribution" by Toshiba was the fact that Toshiba did not take affirmative steps to terminate the letters of credit at the end of June 2017, but it is

quite plain that Toshiba's own interests would have made any such termination unthinkable, and therefore that the potential availability of reimbursement by the estate made no difference in Toshiba's decision.

Essentially, Toshiba's election not to cancel the letters of credit was a decision not to commit economic suicide. That decision may have benefited others, but the primary beneficiary was Toshiba itself, and the mere fact that others might have benefited does not mean that other people should pay the costs that Toshiba incurred in keeping itself alive. It would not be appropriate to use "substantial contribution" theories to direct the estate to pay expenses that so plainly and primarily served Toshiba's own needs.

For the foregoing reasons the Court holds that Toshiba's claim for reimbursement of the letter of credit fees as "substantial contribution" claims lacks merit. It also appears that Toshiba's claim for reimbursement of the fees as administrative expenses faces serious and perhaps insurmountable obstacles. However, for two reasons the Court will defer a final ruling on that latter issue.

First, as noted above the record is somewhat vague as to just how Westinghouse allegedly gave Toshiba the "impression" that it agreed to reimburse the letter of credit fees. The Court will give Toshiba the opportunity to amend its claim to specify the post-petition conduct by Westinghouse that allegedly induced Toshiba to leave the letters of credit in place. If Toshiba identifies any such conduct the Court will consider whether it supports the allowance of an administrative expense claim notwithstanding the other points mentioned above.

Second, Toshiba contends that it has received indications that Westinghouse may have taken the position, during discussions with the buyer of the Westinghouse assets, that Westinghouse had an enforceable obligation to reimburse Toshiba for the letter of credit fees.

Toshiba also argued that Westinghouse may have received payments (either from the buyer or from the project owners) in reimbursement of such post-petition letter of credit fees. Toshiba asked for permission to conduct limited discovery on these points. It does not appear that narrow discovery on these limited issues would be prejudicial to any party in interest. If in fact Westinghouse received post-petition payments attributable to alleged post-petition reimbursement obligations then Toshiba might have grounds on which to argue that such payments should be turned over to Toshiba, though nothing in this decision should be interpreted as a ruling on the merits of any such contention.[1]

### Further Steps

The parties are directed to confer and to submit a scheduling order on or before October 4, 2019 that identifies the scope and timing of any discovery or other pretrial proceedings that they believe are necessary and appropriate in light of the rulings set forth above.

Dated:  New York, New York
        September 19, 2019

                                    **s/Michael E. Wiles**
                                    Hon. Michael E. Wiles
                                    United States Bankruptcy Judge

---

[1]    In its post-trial submission Wind Down Co. stated that Westinghouse may have received $240,000 from the VC Summer Project owners in reimbursement of letter of credit fees, and Wind Down Co. agreed that if Wind Down Co. received such funds it would pay them to Toshiba.  [ECF No. 4337 at 3, n. 2.]